## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FBME BANK LTD.**<br>90 Archbishop Makario III Avenue<br>1391 Nicosia, Cyprus<br><br>**FBME LTD.**<br>75 Fort Street<br>George Town, Grand Cayman KY1-1108<br>Cayman Islands<br><br>       Plaintiffs,<br><br>    v.<br><br>**JACOB LEW**, in his official capacity as<br>Secretary of the Treasury<br>1500 Pennsylvania Avenue, NW<br>Washington, D.C. 20220<br><br>**U.S. DEPARTMENT OF THE TREASURY**<br>1500 Pennsylvania Avenue, NW<br>Washington, D.C. 20220<br><br>**JENNIFER SHASKY CALVERY**, in her<br>official capacity as Director of the Financial<br>Crimes Enforcement Network<br>PO Box 39,<br>Vienna, VA 22183<br><br>**FINANCIAL CRIMES ENFORCEMENT<br>NETWORK**,<br>PO Box 39,<br>Vienna, VA 22183<br><br>       Defendants. | Case No. 1:15-cv-01270 |

## COMPLAINT

**Introduction**

1.      On August 28, 2015, FBME Bank Ltd. ("FBME" or "the Bank") will cease to exist as an international commercial bank.  At the root of this irreparable harm is an unlawful final rule ("Final Rule") issued by a bureau of the U.S. Department of the Treasury known as the Financial Crimes Enforcement Network ("FinCEN").  When this Final Rule takes effect three weeks from now—it was published in the Federal Register on July 29, 2015, with an effective date of August 28, *see* 80 Fed. Reg. 45057 (July 29, 2015)—it will permanently cut off the Bank from the U.S. financial system, including U.S. dollar transactions and U.S. correspondent bank accounts.  Because the vast majority of FBME's business consists of U.S. dollar transactions, so the Final Rule will fundamentally impair FBME's business and imperil its survival.  Foreign regulators have informed the Bank that they are initiating procedures to liquidate or sell the Bank, citing the Final Rule as justification.

2.      FinCEN promulgated the Final Rule under § 311 of the USA PATRIOT Act, 31 U.S.C. § 5318A.  Although framed as a regulation, the Final Rule amounts to an adjudication of FBME—an adjudication in which FinCEN played the part of prosecutor, judge, jury, and executioner.  FinCEN conducted the investigation, branded FBME a financial institution of "primary money laundering concern," and imposed the maximal penalty available under § 311: FBME is barred from transacting in dollars with U.S. banks, either directly or through a third-party financial institution.  For a bank, this penalty is (as *The Economist* recently noted) "more often than not a death sentence."

3.      FinCEN arrived at the Final Rule through a process that evokes the Star Chamber. FinCEN held no hearing before a neutral arbiter, refused to inform the Bank of most of the factual allegations against it or the supposed proof underlying them, and failed to account for the extensive contrary evidence the Bank submitted in response to the known allegations.  When the

Bank disproved the few specifics that FinCEN offered, FinCEN acknowledged only some of its mistakes and inexplicably ignored the remaining mass of contrary evidence. Simply put, FinCEN refused to allow the facts to get in the way of its foreordained outcome, insisting upon the same maximal and disproportional penalty even as the factual case against FBME—to the extent FinCEN had revealed it—fell apart. In the end, the Final Rule failed to specify evidence or even allegations that would remotely suggest the Bank is in fact a "primary money laundering concern" that deserves the crushing sanction imposed, consistent with § 311 and the factors specified thereunder.

4.     FinCEN's Final Rule thus reflects a result in search of a reason. This Court will find no satisfying explanation for how FinCEN reasoned its way from the record before it to its astonishing conclusion that FBME devotes its business to money laundering. FBME does not seek to pretend that no transactions in its history have raised concerns. In that regard, FBME is no different than any other reputable bank the world over. But the transactions referred to by FinCEN reflect (to the extent the Bank can identify them from the vague information provided) little more than a series of isolated transactions, all predating 2012, that the bank itself identified and addressed at the time. There is no indication that any systemic problem plagues the Bank, much less that it is complicit in money laundering. Indeed, over the course of the Bank's long history, no regulatory authority has ever accused, much less convicted, the Bank of recurrent anti-money-laundering failures. If FinCEN nonetheless has a basis here to impose the maximum penalty under § 311, then banks all around the world must tremble.

5.     FinCEN's issuance of the Final Rule is, in short, irreconcilable with the procedural and substantive requirements of the Administrative Procedure Act, as well as with due

process under the U.S. Constitution, and it is incapable of ultimately withstanding this Court's review.

### Jurisdiction and Venue

6.  This Court has jurisdiction under 28 U.S.C. § 1331.

7.  Sovereign immunity is waived by 5 U.S.C. § 702.

8.  Venue in this Court is proper under 28 U.S.C. § 1391(e).

### Parties

9.  Plaintiff FBME is an international commercial bank headquartered in Tanzania. Its primary place of business is in Cyprus.  FBME is the subject of the Final Rule promulgated by FinCEN under § 311 of the USA PATRIOT Act and published at 80 Fed. Reg. 45057 (July 29, 2015).

10.  Plaintiff FBME Ltd. is a holding company that owns 100% of the shares of FBME.  It is headquartered in the Cayman Islands.

11.  Defendant Jacob Lew is sued in his official capacity as Secretary of the Treasury. The Secretary implements and administers § 311 of the USA PATRIOT Act.  Secretary Lew has delegated this authority to the Director of FinCEN.  The Secretary is located in Washington, D.C.

12.  Defendant U.S. Department of the Treasury is the executive agency led by Secretary Lew, which has responsibility for implementing and administering § 311 of the USA PATRIOT Act.  The Department is located in Washington, D.C.

13.  Defendant Jennifer Shasky Calvery is sued in her official capacity as Director of FinCEN.  The Director has been delegated the authority to implement and administer § 311 of the USA PATRIOT Act.  She exercised this authority to promulgate the Final Rule at issue in this lawsuit.  The Director is located in Vienna, Virginia.

14.     Defendant FinCEN is a bureau within the U.S. Department of the Treasury led by Director Shasky Calvery.  FinCEN promulgated the Final Rule at issue in this lawsuit.  FinCEN is located in Vienna, Virginia.

### Origins of FBME Bank

15.     FBME is an international commercial bank that, as of mid-2014, had some $2 billion in assets.  The Bank has operated in its current form since 1982, though its roots date back to 1952, when Michel Ayoub Saab and his brother established the Federal Bank of Lebanon as one of the first 16 banks in Lebanon.  In 1977, in the midst of the Lebanese Civil War and the Syrian occupation of Lebanon, the Federal Bank opened an office in Cyprus because of its relative political and economic stability, and its proximity to Lebanon.  Five years later, Michel Ayoub Saab and his two sons, Ayoub-Farid M. Saab and Fadi M. Saab, formed FBME (then called the Federal Bank of the Middle East) in Cyprus as a subsidiary of the Federal Bank of Lebanon.

16.     By 1985, the situation in Lebanon had grown dire.  The Saabs—as members of the Lebanese-Christian minority—feared nationalization of Lebanese banks by Syrian forces.  To protect FBME, the Saabs acquired the Federal Bank of Lebanon's 51% ownership stake in FBME.  As a result, FBME ceased to be a subsidiary; the two banks have remained separate since 1986, but owned by the same shareholders.

17.     Michel Ayoub Saab passed away in 1991.  His sons, Farid Saab and Fadi Saab, currently manage FBME as Chairman and Chief Executive Director, respectively.

### Operations, Customers, and Services

18.     FBME is headquartered in Tanzania but operates primarily in Cyprus.  FBME has two branches in Cyprus, through which 90% of FBME's activities are booked.  FBME also has four branches in Tanzania, and it had a representative office in Russia.  It is the largest bank in

Tanzania by asset size and the oldest international bank in Cyprus.   Nonetheless, because FBME's business consists primarily of providing commercial banking services to international companies, its functional currency has always been the U.S. dollar.

19.     The Bank services customers around the world.   FBME markets itself to customers by focusing on the high quality of services it provides.   Clients receive personalized care, including regular contact with senior managers.   To attend to its customers' needs, the Bank employs staff skilled in international banking and familiar with different cultures and languages. Working hours span global markets across different time zones in order to facilitate customer access.   Many of FBME's customers like to bank in Cyprus because it (i) is a member of the European Union, (ii) has advantageous tax laws, including one of the lowest corporate tax rates in the EU and favorable tax treaties with almost 50 countries, and (iii) is strategically located at the crossroads of Europe, Asia, the Middle East, and Africa.

20.     The Bank offers a wide variety of financial products and services, including corporate and personal banking, trade finance, FX trading facilities, credit facilities, loans, investment services, and online banking.   FBME does not operate retail branches; instead, it specializes in assisting high-net-worth customers with complex international business transactions.   As a result, cash transactions are only a miniscule fraction of FBME's transactions (1.9% of the number of transactions; 0.067% of transactions by value).   Almost all of the Bank's business flows electronically through accounts with major correspondent banks.

### Correspondent Banks

21.     A correspondent bank is a financial institution that provides services—such as conducting business transactions and accepting deposits—on behalf of another financial institution.   Banks routinely use correspondent banks to service transactions originating in foreign countries and to act as the domestic bank's agent abroad.   Opening a branch in every

country in which it has customers would be impracticable, so a domestic bank depends upon correspondent banks to provide the full range of services its customers expect.

22.     FBME is a boutique bank with few branches, none of which are retail banks.  To transact in any local currency—such as U.S. dollars—FBME must use correspondent banks.  The vast majority of FBME's transactions involve U.S. dollars.  Losing access to U.S. dollar correspondent accounts will leave the Bank unable to provide the international financial services that constitute a substantial majority of its business.

### U.S. Presence and Property

23.     Although FBME is based in Cyprus and Tanzania, it has property in the United States, and it maintains important ties with a number of American companies.  Over 150 of the Bank's customers reside or operate in the United States.  The Bank maintains accounts with around 30 companies headquartered in the United States, and it owns various U.S.-based securities.

24.     The Bank also holds a mortgage interest in an approximately 3,000-acre residential community currently under development in North Carolina.  Per the loan terms, FBME receives a percentage of each property sale in partial satisfaction of the loan.  These funds are presently held in escrow for FBME in a bank account in North Carolina.

### Business Model

25.     FBME employs a conservative business plan.  It pursues modest growth, low loan-to-deposit ratios, and high liquidity and solvency ratios.  Throughout FBME's 30-plus-year history, the Bank's shareholders have never declared a dividend, choosing instead to re-invest all funds to support the Bank's continued growth.  Thanks to its conservative approach, the Bank enjoyed exceptional financial health until July 2014, when FinCEN first proposed to sanction FBME under § 311.

### Section 311 of the USA PATRIOT Act

26.     Shortly following the attacks of September 11, 2001, the President signed into law the USA PATRIOT Act.  Section 311 of that Act (which is an amendment to the Bank Secrecy Act) authorizes the Secretary of the Treasury to "require domestic financial institutions and domestic financial agencies" to take one or more of five "special measures" against a foreign financial institution that the Secretary of the Treasury has found to be a "primary money laundering concern."  31 U.S.C. § 5318A(a)(1).  The special measures function as penalties against the entity designated a "primary money laundering concern."  The Secretary has delegated to the Director of FinCEN the responsibility for administering § 311.

27.     Section 311 does not specifically define the term "primary money laundering concern."  Before finding that banks or other financial institutions meet this undefined standard and warrant the imposition of a "special measure," the Secretary of the Treasury must consult with the Secretary of State and the Attorney General, § 5318A(c)(1), and "shall consider in addition such information as the Secretary determines to be relevant," including:

> (i) "the extent to which such financial institutions . . . are used to facilitate or promote money laundering in or through [a particular] jurisdiction, including any money laundering activity by organized criminal groups, international terrorists, or entities involved in the proliferation of weapons of mass destruction or missiles;
>
> (ii) the extent to which such institutions . . . are used for legitimate business purposes in the jurisdiction; and
>
> (iii) the extent to which [the special measure] is sufficient to ensure, with respect to . . . institutions operating in the jurisdiction, that the purposes of this subchapter continue to be fulfilled, and to guard against international money laundering and other financial crimes.

§ 5318A(c)(2)(B).

28.     The "special measures" available under the statute include requiring enhanced recordkeeping and reporting, § 5318A(b)(1); demanding beneficial ownership information on relevant accounts, § 5318A(b)(2); demanding information regarding customers of domestic financial institutions who are permitted to use suspect payable-through accounts, § 5318A(b)(3); and demanding information regarding customers of domestic financial institutions permitted to use suspect correspondent accounts, § 5318A(b)(4).

29.     The most severe measure is the fifth special measure, under which the Secretary can prohibit or otherwise restrict domestic financial institutions and agencies from opening or maintaining correspondent accounts for a designated foreign financial institution. § 5318A(b)(5).  The effect of the fifth special measure is to sever all ties between all domestic financial institutions or agencies and the "primary money laundering concern."

30.     In selecting which of the five special measures to apply to a "primary money laundering concern," the Secretary must consult with certain federal agencies and officials, § 5318A(a)(4)(A), and must consider a series of factors:

> (i) whether similar action has been or is being taken by other nations or multilateral groups;
>
> (ii) whether the imposition of any particular special measure would create a significant competitive disadvantage, including any undue cost or burden associated with compliance, for financial institutions organized or licensed in the United States;
>
> (iii) the extent to which the action or the timing of the action would have a significant adverse systemic impact on the international payment, clearance, and settlement system, or on legitimate business activities involving the particular jurisdiction, institution, class of transactions, or type of account; and
>
> (iv) the effect of the action on United States national security and foreign policy.

§ 5318A(a)(2)(B).

31.     The statute allows the first four of the five special measures to "be imposed by regulation, order, or otherwise as permitted by law."   § 5318A(a)(2)(B).   But the fifth special measure "may be imposed only by regulation."   § 5318A(a)(2)(C).   Resort to the fifth special measure thus triggers rulemaking procedures under the Administrative Procedure Act.   *See* 5 U.S.C. § 553.

### FinCEN's Notice Of Finding & Notice Of Proposed Rulemaking

32.     On July 22, 2014, FinCEN published a Notice of Finding and a Notice of Proposed Rulemaking, which state that "reasonable grounds exist" to conclude that FBME is a "primary money laundering concern," and which propose to impose against the Bank the fifth special measure authorized by § 311.   *See* Notice of Finding, 79 Fed. Reg. 42639 (July 22, 2014); Notice of Proposed Rulemaking, 79 Fed. Reg. 42486 (July 22, 2014).

33.     The Notice of Finding alleged an array of misconduct by FBME.  The principal charge was that FBME has had a series of failures in its anti-money-laundering controls. According to FinCEN, FBME's failures have attracted high-risk customers that use FBME "to facilitate money laundering, terrorist financing, transnational organized crime, fraud, sanctions evasion, and other illicit activity internationally and through the U.S. financial system."  79 Fed. Reg. at 42639.  Specifically, the Notice alleged that FBME facilitated money laundering and other crimes by:

- the head of an international narcotics trafficking and money laundering network (in 2011–12);

- a financier for Lebanese Hezbollah (in 2008);

- a financial advisor for a major transnational organized crime figure (in 2008);

- an entity that perpetrated a fraud against a U.S. person involving a high yield investment program (in 2009);

- an entity that carried out a phishing attack on a Michigan-based company (in 2010);

- the intended beneficiary of a fraud scheme, the majority of the proceeds of which came from a victim in California (in 2012);

- persons seeking to evade sanctions imposed by the International Emergency Economic Powers Act (no timeframe alleged);

- a front company for a U.S.-sanctioned Syrian entity, the Scientific Studies and Research Center, which has been designated as a proliferator of weapons of mass destruction (no timeframe alleged);

- gamblers, particularly U.S. gamblers that seek to engage in unlawful internet gambling (no timeframe alleged); and

- shell companies acting on behalf of the son of the President of Equatorial Guinea (in 2011–12).

*Id.* at 42639–40.  The Notice also alleged that FBME had attempted to evade the oversight of one of its primary regulators, the Central Bank of Cyprus, which (according to FinCEN) had twice found FBME's anti-money-laundering controls deficient.  *Id.*

34.   The Notice further found that FBME's customer base consisted of a "significant number" of shell companies—"that is, companies formed for the sole purpose of holding property or funds and that do not engage in any legitimate business activity."  *Id.* at 42639. According to FinCEN, from July 2007 to February 2013, at least 71 of these customers used FBME's address in Cyprus to transact with the U.S. financial system.  *Id.*[1]  The Notice also claimed that a "significant volume" of FBME's transactions "have little or no transparency and often no apparent legitimate business purpose."  *Id.*  As for FBME's "legitimate activity,"

---

[1]   By no means are shell companies illegal or nefarious.  Many corporations in the United States and elsewhere use holding or "shell" companies for legitimate purposes.  Certainly the mere fact that FBME transacts with shell companies should not be a basis for a § 311 sanction.

FinCEN concluded that "the limited amount of information" available regarding Cypriot branches of foreign banks made it "difficult to assess" such activity for FBME.  *Id.* at 42640

35.     Based on these preliminary findings, FinCEN proposed to revoke FBME's ability to access the U.S. financial system by imposing the "fifth special measure" under § 311.

### FBME's Public Comments On The Notice Of Finding

36.     FBME submitted public comment ("Comment") on September 22, 2014. FBME's Comment described (1) numerous steps the Bank had taken, both before and after FinCEN's Notices, to evaluate its anti-money-laundering and compliance program, (2) the results of those evaluations, and (3) FBME's actions to remediate discrete issues identified during the evaluations.  The Comment quoted analyses and reviews conducted by two highly respected audit firms—KPMG and Ernst & Young—which found that, notwithstanding historical deficiencies (generally predating 2012), FBME's compliance program not only meets but in some cases exceeds all applicable international standards, including the European Union's Third Money Laundering Directive and the fourth issue of the Central Bank of Cyprus's Directive regarding money laundering.  That conclusion was documented in a September 2014 assessment by Ernst & Young, which FBME submitted to FinCEN along with its Comment.  Beyond that, FBME had simultaneously solicited and begun implementing recommendations for further enhancements to its internal controls as part of an ongoing effort to improve in a manner consistent with best practices.

37.     FBME also endeavored to respond to the allegations described in the Notice of Finding.  But the Notice's lack of specificity made this difficult.  For example, FBME struggled to pinpoint and investigate such vague accusations as:  "As of 2008, a financial advisor for a major transnational organized crime figure who banked entirely at FBME in Cyprus maintained a relationship with the owners of FBME," and "in 2008, an FBME customer received a deposit of

hundreds of thousands of dollars from a financier for Lebanese Hezbollah."  79 Fed. Reg. at

42639.   Despite its best efforts, the Bank was hard pressed to make sense of the allegations

against it, much less address them with specificity.   As the Bank explained in its Comment, it

could not respond fully to the charges against it "because the Notice lacks information required

for the Bank to identify the transaction(s) at issue, and the Treasury Department has not shared

any additional information pertaining to the alleged transaction-specific activities with the

Bank."  At the same time, FBME made clear its commitment to addressing the allegations in the

Notice and rooting out any criminal activity involving the Bank:

> The Bank takes seriously any allegation that its customers have
> used the Bank for illicit or illegal purposes.  FBME looks forward
> to providing additional information to FinCEN and cooperating
> with U.S., Cypriot, and Tanzanian officials to halt any possible
> criminal or other illicit activities of third parties involving the
> Bank.

38.     As opaque as FinCEN was in its Notice, at least two things were clear.  First, none

of the specific misconduct alleged in the Notice extended past 2012.  That is, FinCEN identified

no transactions or account holders of concern postdating the compliance updating and

remediation that FBME had been undertaking for years with the benefit of reviews by KPMG

and Ernst & Young.  Second, even as to the historical period on which FinCEN focused, only a

handful of improper transactions were alleged, and there was no indication of a systemic

problem.

39.     Notwithstanding the difficulty it faced trying to refute FinCEN's cryptic

allegations, FBME did all it could to address those it could comprehend.  To take one example,

the Notice referred to a fraud on a U.S. person in connection with a high-yield investment

program that involved an FBME account.  *See* 79 Fed. Reg. at 42640.  FBME explained that its

controls had flagged the transaction in question, but after further due diligence consistent with

applicable standards, the customer provided sufficient information to establish the apparent legitimacy of the transaction.  A year later, when the customer cleared a separate transaction through another bank that appeared fraudulent, FBME immediately froze the customer's FBME account, conducted an independent investigation that called into question the legitimacy of the transactions, and reported the client to the appropriate Cypriot authorities.  *Id.*

40.     That is not to suggest that FBME laid claim to perfection across its anti-money-laundering and compliance programs.  To the contrary, FBME acknowledged discrete historical shortcomings, which formed the basis for improvement recommendations that KPMG and Ernst & Young provided in 2013 and 2014.  What is more, FBME demonstrated its willingness to engage with FinCEN to implement whatever further enhancements to its compliance protocols FinCEN might deem appropriate.  As FBME noted in its Comment, rehabilitation is among the Treasury Department's stated goals in imposing special measures under § 311, and the constructive engagement FBME sought was, by all indications, precisely what FinCEN was seeking to facilitate and encourage under § 311.

**FBME's Additional Submissions To FinCEN**

41.     To supplement its public comment, FBME submitted numerous letters and hundreds of pages of documents to FinCEN, including reports conducted by KPMG and Ernst & Young, detailed explanations of FBME's remedial efforts, and various alternative measures FinCEN might adopt short of applying § 311's fifth special measure.  On November 17, 2014, FBME submitted approximately six hundred pages of documents substantiating the conclusions set forth in Ernst & Young's September 2014 assessment.

42.     Four days later, on November 21, FBME wrote to FinCEN detailing how FBME was implementing suggestions arising from KPMG's and Ernst & Young's reviews in 2013 and 2014.  Notably, none of the reviews identified any systemic problem with FBME's anti-money-

13

laundering or compliance programs.  To the contrary, they confirmed that FBME's protocols met or exceeded international standards.  Even so, FBME had revised its protocols for the sake of addressing discrete shortcomings.  Out of forty recommendations made by KPMG, FBME already had fully implemented twenty nine as of November 2014; six were ready for implementation upon approval by regulatory authorities; two were in the process of being implemented; two were on schedule to be implemented by the end of March 2015; and one was inapplicable because it reflected a misunderstanding of FBME's procedures.  Similarly, FBME had already begun to address the sixteen recommendations made in Ernst & Young's September report, including by enhancing its employee training program and updating its customer-identification and due-diligence procedures.  Although FBME already used industry-leading electronic screening solutions, it upgraded to its screening software and systems for investigating alerts.

43.    Ten days later, on December 1, FBME submitted a *separate* transactional review that Ernst & Young conducted *specifically* to investigate the allegations in the Notice of Finding. The letter and review responded to each of the accusations in the Notice, one by the one (as best they could be nailed down).  Ernst & Young's team of professionals—who received all requested support from FBME employees in reviewing the Bank's files, transactions, and other information—could identify no basis for the Notice's allegations of money laundering involving: (1) financiers for Lebanese Hezbollah; (2) international narcotics traffickers; (3) transnational organized crime figures; or (4) governmental entities or other persons or entities associated with Equatorial Guinea.  Similarly, Ernst & Young confirmed that FBME's compliance policies worked as they should in the various instances at issue, and that FBME had taken appropriate steps to report suspicious activity, freeze assets, and terminate customer relationships.  For

example, although an FBME account had, in fact, been used in furtherance of a fraud involving a high-yield investment program and a phishing scheme before FBME instituted a freeze, there was no reason why these transactions should have triggered red flags under appropriate protocols that were in place.  Finally, Ernst & Young confirmed that although the other criticisms in the Notice did not reflect violations of international standards, FBME nevertheless had not only addressed the criticisms but in one instance implemented curative reforms more than five years earlier.  *Id.*

### FBME's Repeated But Unsuccessful Requests For Meaningful Specifics

44.     Recognizing that the Notice's lack of specificity (combined with FinCEN's subsequent refusal to come forward with specifics) relegated FBME and Ernst & Young to guesswork in responding, FBME again requested in its December 1 letter specifics that would enable further investigation of FinCEN's allegations.  Again, it received no response.

45.     On at least eight occasions before January 5, 2015, the Bank's lawyers also requested a meeting with FinCEN to discuss the Notices.  FinCEN declined to respond.  Only after the Bank's lawyers made a request to the Treasury Department did FinCEN finally consent to a meeting, which was held in FinCEN's offices on January 21, 2015.

46.     At the meeting, FBME's counsel emphasized that:   (1) the Notice gave no consideration to the fact that the overwhelming number of FBME account transactions are, beyond question, legitimate business transactions; (2) the most recent misconduct alleged in the Notice occurred in 2012; (3) FBME had overhauled its compliance protocols beginning long before the Notice and continuing through the present; (4) notwithstanding the staleness of FinCEN's allegations and the substantial reforms already undertaken, FBME took FinCEN's concerns seriously and continued to make every effort to address them; and (5) towards that end,

FBME was eager for details that would enable further response and remediation as and if appropriate.

47.    FBME followed up with a letter to FinCEN, dated January 26, 2015, in which it asked for more information about seven specific allegations in the Notice. After nearly a month, FinCEN finally responded. In a letter dated February 24, FinCEN addressed each of the seven allegations in turn. For six of the seven, it provided the same stonewalling response emblematic of its entire approach to this § 311 proceeding: "FinCEN is unable to release additional information in response to this question beyond the statements within the Notice of Finding." (FinCEN identified the seventh transaction, which had already been disclosed in a federal lawsuit.)

### FinCEN's Disregard Of Less Extreme Sanctions Available Under § 311

48.    In nearly every communication with FinCEN, the Bank made clear its commitment to work constructively in processing and addressing FinCEN's concerns. For example, counsel for FBME spoke with FinCEN Director Jennifer Shasky Calvery at the American Bar Association's Money Laundering Enforcement Conference in National Harbor, MD in November 2014. Among other things, Director Shasky Calvery acknowledged that FinCEN's approach was designed, at least in part, to rehabilitate the Bank.

49.    At the meeting on January 21, 2015, FBME's counsel had explained that the fifth special measure would be disproportionate and excessive, especially as compared to another recent enforcement action involving far more egregious circumstances in which FinCEN imposed only a fine. In subsequent letters, FBME's counsel noted that imposing the fifth special measure on FBME would be anti-rehabilitative, as it could go so far as to put FBME out of business. FBME proposed numerous alternative measures—such as FinCEN appointing a special monitor, imposing heightened reporting requirements for FBME, or levying a fine—that

(even crediting *arguendo* FinCEN's stated concerns) would be more appropriate and would further the goal of rehabilitation.

50.    FinCEN's treatment of other financial institutions showed just how disproportional it is to impose the fifth special measure in this case.  FBME specifically identified five recent examples of FinCEN levying only a fine in situations where (as in this case) FinCEN alleged that a financial institution failed to maintain adequate compliance programs or engaged in suspicious transactions.  FinCEN typically reserved the fifth special measure for more outrageous conduct, such as when a bank's high-level managers were *actively* complicit in money laundering.  Because nothing so egregious was alleged at FBME, a lesser sanction would have been far more congruent with FinCEN's practice.  But FinCEN was unmoved by FBME's calls for equal treatment and proportional punishment.

### FinCEN's Final Rule.

51.    On July 29, 2015, FinCEN published in the Federal Register the Final Rule imposing the fifth special measure under § 311.  80 Fed. Reg. 45057 (July 29, 2015).  While purporting to address FBME's voluminous submissions, the Final Rule ignores Ernst & Young's findings that FBME's current anti-money-laundering program fully satisfies EU and Cypriot standards and reflects a pattern of continuous improvements.  Tellingly, the Final Rule identifies *no* applicable compliance standard that FBME does not meet.

52.    Instead, the Final Rule declares "FBME's argument that its [anti-money laundering] compliance program is now adequate is weakened by the list of illicit actors identified in the [Notice of Finding] that have continued to make use of FBME as recently as 2014, including narcotics traffickers, terrorist financiers, and organized crime figures."  *Id.* at 45059.  In fact, FinCEN has kept hidden "the list of illicit actors" it supposedly "identified," and none of the allegations in the Notice (or, for that matter, the Final Rule) were "as recent[] as

17

2014."  After an extensive and exhaustive analysis of FBME's account holders and transactions utilizing publicly available information, Ernst & Young could identify no evidence of any such illicit actors making use of FBME.

53.     The only concession FinCEN makes in the Final Rule to the hard facts proved by FBME is extremely begrudging:  "[A]fter a thorough review of these materials, FinCEN believes that [with two minor exceptions], the statements made in the [Notice of Finding] remain true and accurate, and that FBME is of 'primary money laundering concern.'"  *Id.* 45060.  FinCEN neither addresses the extensive contrary evidence FBME submitted, nor specifies what affirmative evidence leaves it convinced.  All FinCEN offers is conclusory *ipse dixit* that "*information available to FinCEN*"—but not to FBME—"makes it reasonable to conclude that FBME's management facilitated, either actively or passively, the illicit activities of its customers, as FinCEN set forth in the [Notice of Finding]."  *Id.* at 45059.

54.     Perhaps most astonishingly of all, the Final Rule offers no explanation whatsoever as to why FBME warrants the fifth special measure even though far more egregious failures resulted in no such drastic sanction for other regulated entities.  As for FBME's customers, the Final Rule notes the existence of "other banks in both Cyprus and Tanzania that could alleviate potential impact on legitimate business activities within those jurisdictions."  80 Fed. Reg. at 45061.  That is cold comfort considering that FBME is the largest bank by assets in Tanzania, that other banks in Cyprus have been racked by instability, and that FBME's customers are about to lose essential financing for ongoing projects financed by FBME.

**FBME Will Be Cut Off From Transacting In U.S. Dollars**

55.     The Final Rule prohibits any U.S. financial institution from "establishing, maintaining, administering, or managing a correspondent account in the United States for, or on behalf of, FBME."  80 Fed. Reg. at 45062.  The Rule includes a "broad definition" of

18

"correspondent account"[2] that "includes most types of banking relationships with a U.S. depository institution and a foreign bank that are established to provide regular services, dealings, and other financial transactions." *Id.* In other words, the sanction prohibits *any* U.S. bank from engaging in any type of financial transaction with FBME, either directly or through a financial intermediary.

56. The repercussions of this reach far beyond the United States. Any U.S. bank would be violating FinCEN's Final Rule if FBME is anywhere upstream or downstream on any given transaction. The upshot is to foreclose any FBME transaction involving U.S. dollars, because any such transaction must pass through a U.S. correspondent account. In short, when the Final Rule becomes effective on August 28, 2015, FBME will be permanently cut off from the U.S. financial system, thereby requiring that FBME fundamentally transform its business in order to survive (assuming regulators do not liquidate or sell the Bank first).

### Foreign Regulators Are Poised To Pursue
### Follow-On Actions To Liquidate Or Sell The Bank

57. Were that not enough, the Cypriot government is now poised to force the Bank into liquidation or sale because of the Final Rule. The day after FinCEN issued its July 2014 Notice, the Cypriot government granted the Bank's regulator, the state-owned Central Bank of Cyprus, authority over FBME's Cyprus branches, and authorized the Central Bank to unilaterally sell them. To effectuate the sale, the Central Bank quickly appointed a Special Administrator, who immediately took steps to identify potential buyers, albeit unsuccessfully. The Special Administrator's efforts were halted (at least temporarily) by FBME's shareholders, who initiated

---

[2]     Specifically, "correspondent accounts" is defined as any "account established to receive deposits from, or make payments or other disbursements on behalf of, a foreign bank, or to handle other financial transactions related to the foreign bank." 80 Fed. Reg. at 45062.

proceedings in the International Court of Arbitration under a bilateral treaty protecting Cypriot-based investments.  The arbitral tribunal ordered the Central Bank to refrain from taking any measures that would destroy FBME Cyprus, unless the Central Bank found such measures to be absolutely necessary, in which case it had to provide 30-days notice before taking action.

58.     Upon publication of the Final Rule, the Central Bank pounced.  On August 3, 2015, the Central Bank sent FBME a letter stating it was providing the 30-days notice required by the tribunal so that it could take adverse actions against FBME, up to and including revocation of FBME's license and liquidation of its Cyprus branches.  Motivating this decision, the Central Bank explained, was "the issuance by FinCEN of the Final Rule."  In a remarkable paragraph apparently crafted with an eye towards this lawsuit (which undersigned counsel had alerted FinCEN and the Department of Justice would be forthcoming) the Central Bank added that it "does not concede that any of the foregoing steps would destroy irreparably the business of FBME or FBME Cyprus Branch."

59.     In response, the ultimate beneficial owners ("owners") of FBME sent the Central Bank a letter stating that the August 3 Letter afforded insufficient notice under the Tribunal's order.  In addition, the owners questioned the disproportionality of the Central Bank's response to the Final Rule.  Furthermore, the owners suggested that, before the effective date of the Final Rule, the Central Bank assist FBME in restructuring the small but viable portion of the business that still remains.  Last, the owners apprised the Central Bank that liquidation of FBME's Cyprus branches will destroy what remains of the Bank.

60.     The Tanzanian government has been moving in parallel.  Following the issuance of the Notice in July 2014, the Bank of Tanzania (which regulates FBME) installed a statutory manager to oversee FBME, and to liquidate or sell the Tanzanian branch if necessary.  The

manager told FBME that Tanzania considered FinCEN's Notice to be a "compliance issue" and they created no reason for alarm or overreaction from the Bank of Tanzania.  As a result, FBME successfully convinced the Tanzanian regulators to temporarily refrain from following the same course as the Central Bank of Cyprus.  This understanding was reached largely thanks to Tanzania's recognition that the Notice was preliminary.

61.     FinCEN's issuance of the Final Rule now threatens that understanding.  After the Final Rule came out, the Bank of Tanzania issued a public announcement:

> [T]he Bank of Tanzania has been monitoring FBME's operations
> while awaiting FinCEN investigation and Final Rule on
> FBME. . . . The Bank of Tanzania is aware that the Final Rule
> issued by FinCEN will affect the future of FBME and currently is
> reviewing the situation with the view of determining an
> appropriate course of action for the bank including resolution
> options as governed by law.

The "resolution options" under contemplation by the Bank of Tanzania include liquidation of FBME.

**Innocent Third Parties Face Harm**

62.     Beyond wreaking havoc on the Bank itself, the Final Rule will injure many others who depend on the Bank.  Individuals with deposits at the Bank face substantial risk of losses in a liquidation.  Clients who rely on the Bank for international commercial banking services will no longer be able to obtain them.  And many employees of the Bank will be terminated when the Bank is forced to cease its international commercial operations and downsize.

**FBME Tries To Avoid the Need for Litigation**

63.     On July 30, 2015, the day after the Final Rule was published, counsel for FBME contacted both FinCEN and its counsel at the U.S. Department of Justice to propose an agreement that might obviate need for litigation or a preliminary injunction.  Specifically, the Bank proposed that (i) the Final Rule be rescinded (which would avoid any litigation) or (ii) the

Final Rule have its effective date delayed until after a full merits hearing (which would avoid the need for a preliminary injunction).

64.     In multiple emails and telephone calls over the following days, counsel for FBME and counsel at the U.S. Department of Justice discussed FBME's legal claims and its proposal for rescinding or delaying the Final Rule.  Talks continued until August 6, 2015, when the Department of Justice informed FBME's counsel that FinCEN would not rescind or delay the Final Rule.

65.     The next day, FBME filed this lawsuit.

## Count I – Administrative Procedure Act
### (Final Rule Was Promulgated Without Observance of Procedure Required by Law)

66.     Plaintiffs repeat, re-allege, and incorporate the allegations in the preceding paragraphs.

67.     The Administrative Procedure Act requires a federal agency to notify interested parties of any regulation it proposes adopting.  The notice must include enough detail of the regulation's content, and of its factual and legal basis, to allow for meaningful and informed comment by interested parties.  An agency commits disabling procedural error when it fails to reveal portions of the factual basis underlying a regulation.

68.     Defendants failed to provide adequate notice and a meaningful opportunity for the Plaintiffs to comment on the Final Rule.  In the Notice of Finding, FinCEN accused FBME of a variety of misconduct, including facilitating a handful of incidents of money laundering.  Most of the critical factual allegations, however, are written in terms so vague that Plaintiffs could neither investigate nor refute them.  FBME repeatedly requested that FinCEN provide specifics of the accusations against it—such as names, dates, or other information that would enable FBME to identify the alleged misconduct—but FinCEN refused to supply them.  FinCEN also never

shared the supposed evidence underlying these allegations. Without such information, the Plaintiffs could not meaningfully comment on the rule as they otherwise would have.

69.     FinCEN then relied on its secret allegations when it issued the Final Rule and branded FBME a "primary money laundering concern" that supposedly deserves imposition of the fifth special measure.

70.     For such reasons and in such respects, the Final Rule was promulgated without observance of the procedure required by law, in violation of the Administrative Procedure Act.

## Count II – Administrative Procedure Act
### (Final Rule Is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law)

71.     Plaintiffs repeat, re-allege, and incorporate the allegations in the preceding paragraphs.

72.     The Administrative Procedure Act prohibits agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

73.     An agency regulation is arbitrary and capricious if (among other things) the agency (1) failed to examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made; (2) failed to consider an important aspect of the problem; (3) offered an explanation for its decision that runs counter to the evidence before it; and/or (4) defies the text of a statute or reflects an unreasonable interpretation thereof.

74.     In this case, FinCEN failed to consider the relevant data submitted by the Bank, failed to articulate a rational connection between the facts and the Final Rule, and failed to account for the contrary evidence before it. FBME submitted extensive information to FinCEN—including audits from neutral third parties KPMG and Ernst & Young—documenting the conscientiousness of its anti-money-laundering controls and refuting specific allegations

leveled against it in the Notice of Finding (at least those allegations that the Bank could make sense of from the Notice).  The evidence submitted showed that FinCEN's Notice of Finding was based on inaccurate, incomplete, or outdated information in crucial respects.   But FinCEN ignored it.  A regulation based on outdated or stale and erroneous data is arbitrary and capricious, especially when the agency possesses newer and better data.

75.     The Final Rule also failed to consider the requisite § 311 factors or explain why FBME is of "primary" money laundering concern.   Nothing in the Final Rule indicates that FBME is of special or primary concern to the Secretary of the Treasury. Nor is there anything to suggest that FBME exists primarily to launder funds.  To the contrary, the record leaves no doubt that the overwhelming number of FBME account transactions are legitimate business transactions (a fact that the Notice of Finding and Final Rule neglect to mention).  In determining whether an entity is of "primary money laundering concern," § 311 requires an agency to consider "the extent to which" the entity was used to facilitate or promote money laundering. FinCEN did not consider this factor at all.  An agency must articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made, and it cannot ignore an important aspect of the problem, such as one of the statutory elements.   For FinCEN to impose the harshest possible sanction under § 311 without explaining how the facts satisfy the statutory predicate was arbitrary and capricious in the extreme.

76.     FinCEN also failed to account adequately for the other factors that § 311 requires the agency to consider before deeming an organization to be a "primary money laundering concern" and imposing the fifth special measure.

77.     Relatedly, FinCEN has further transgressed its authority to the extent that it disregarded Congress' statutory prescription in § 311 specifically with respect to the term "primary money laundering concern," or unreasonably interpreted that term.

78.     The Final Rule also imposed an excessive and disproportionate penalty while failing to consider obvious alternatives.  FinCEN has imposed lesser penalties against financial institutions that have engaged in conduct far worse than anything alleged against FBME.  Yet the Final Rule contains no discussion of any alternative sanctions available.  Nor does it explain why imposing the fifth special measure is an appropriate and proportional response considering the facts of this case and how FinCEN has treated similarly-situated parties.  A regulation that imposes an excessive and disproportionate penalty is arbitrary and capricious, as is a regulation that fails to consider obvious alternatives.

79.     For these reasons, the Final Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, all in violation of the Administrative Procedure Act.

### Count III – Due Process
### (Failure To Provide Notice and a Hearing)

80.     Plaintiffs repeat, re-allege, and incorporate the allegations in the preceding paragraphs.

81.     The Due Process Clause of the Fifth Amendment guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law."  At its core, due process promises both effective notice and a meaningful opportunity to be heard.

82.     Notice of a deprivation of property must convey sufficient information for interested parties to have an opportunity to present their objections.  In other words, due process requires that a party facing deprivation of its property be given notice of the case against it.

83.     The opportunity to be heard must (barring exceptional circumstances not present here) occur *before* the deprivation.  And, at a minimum, a party being deprived of property must have a meaningful opportunity to present its case to a neutral decisionmaker.

84.     The Final Rule, when it goes into effect on August 28, 2015, will deprive FBME of a property interest by blocking it from accessing any correspondent account in the United States and by preventing it from accessing funds currently held on the Bank's behalf in North Carolina.

85.     Defendants have refused to provide effective notice of this deprivation.  In the Notice of Finding, FinCEN accused FBME of a variety of misconduct, including facilitating a handful of incidents of money laundering.  Most of the critical factual allegations, however, are written in terms so vague that the Plaintiffs could neither investigate nor refute them.  FBME repeatedly requested that FinCEN provide specifics of the accusations against it—such as names, dates, or other information that would enable FBME to identify the alleged misconduct—but FinCEN refused to supply them.  FinCEN also never shared the supposed evidence underlying these allegations.  Without such information, the Plaintiffs lacked proper, requisite notice of the case against FBME.

86.     FinCEN has also failed to provide a meaningful opportunity to be heard.  At no time over the course of FinCEN's "rulemaking"—which was really an adjudication in which FinCEN pronounced FBME guilty of unspecified money-laundering charges—was the Bank ever offered or provided *any* hearing, let alone a hearing before a neutral arbiter.

87.     For these reasons, the Final Rule, when it goes into effect on August 28, 2015, will deprive FBME of its property interest without due process of law, in violation of the Due Process Clause of the Fifth Amendment.

**Prayer for Relief**

Wherefore, Plaintiffs request judgment be entered in their favor as follows:

A.    An order preliminary enjoining the Final Rule from taking effect until this Court enters a final judgment in this case.

B.    An order holding unlawful and setting aside the Final Rule.

C.    An order permanently enjoining the Final Rule as unlawful and invalid.

D.    An award of costs and attorneys' fees under any applicable statute or authority.

E.    A grant of such additional or different relief as the Court deems just and proper.

Dated:  August 7, 2015                    Respectfully submitted,

                                          QUINN EMANUEL URQUHART &
                                          SULLIVAN LLP


                                          */s/ Derek L. Shaffer*
                                          Derek L. Shaffer (D.C. Bar No. 478775)
                                          William A. Burck (D.C. Bar No. 4015426)
                                          Lauren H. Dickie (IL Bar No. 6286037)
                                          Jonathan G. Cooper (D.C. Bar No. 999764)
                                          777 Sixth Street NW, 11th Floor
                                          Washington, DC 20001
                                          (202) 538-8000


                                          HOGAN LOVELLS US LLP


                                          */s/ Peter S. Spivack*
                                          Peter S. Spivack (D.C. Bar No. 453731)
                                          J. Evans Rice III (D.C. Bar No. 481768)
                                          555 Thirteenth Street NW
                                          Washington, DC 20004
                                          (202) 637-5600


                                          *Attorneys for Plaintiffs*
                                          *FBME Bank Ltd. and FBME Ltd.*