# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **FBME BANK LTD.**; and<br><br>**FBME LTD.**,<br><br>       Plaintiffs,<br><br>    v.<br><br>**JACOB LEW**, in his official capacity as Secretary of the Treasury;<br><br>**U.S. DEPARTMENT OF THE TREASURY**;<br><br>**JENNIFER SHASKY CALVERY**, in her official capacity as Director of the Financial Crimes Enforcement Network; and<br><br>**FINANCIAL CRIMES ENFORCEMENT NETWORK**,<br><br>       Defendants. | Case No. 1:15-cv-01270 |

# MEMORANDUM IN SUPPORT OF
# PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Table of Authorities.................................................................................................................... iv

Introduction ................................................................................................................................1

Background .................................................................................................................................3

      I.        FBME Bank ........................................................................................................3

             A.      Origins of FBME Bank................................................................................3

             B.      Operations, Customers, and Services...........................................................4

             C.      Correspondent Banks ..................................................................................5

             D.      U.S. Presence and Property.........................................................................6

             E.      Business Model ...........................................................................................6

      II.      Section 311 Of The USA PATRIOT Act .................................................................6

      III.     The Government's § 311 Proceedings Against FBME ............................................9

             A.      FinCEN's Notice Of Finding & Notice Of Proposed Rulemaking..............9

             B.      FBME's Public Comments On The Notice Of Finding ............................11

             C.      FBME's Additional Submissions To FinCEN ..........................................13

             D.      FBME's Repeated But Unsuccessful Requests For Meaningful Specifics15

             E.      FinCEN's Disregard Of Less Extreme Sanctions Available Under § 311 .16

             F.      FinCEN's Final Rule.................................................................................17

      IV.     FBME Will Cease Being an International Commercial Bank ...............................19

             A.      FBME Will Be Cut Off From Transacting In U.S. Dollars .....................19

             B.      Foreign Regulators Are Poised To Pursue Follow-On Actions To Liquidate Or Sell The Bank ....................................................................................20

             C.      Innocent Third Parties Face Harm ............................................................22

Legal Standards........................................................................................................................22

Argument ..................................................................................................................................23

I.      FBME Is Likely To Prevail On The Merits ........................................................23

        A.      The Government Violated The APA By Failing To Provide Meaningful
                Opportunity For Comment On The Final Rule.........................................23

        B.      The Government Violated Due Process By Denying FBME Meaningful
                Notice And Opportunity To Be Heard .......................................................28

        C.      The Final Rule Is Arbitrary And Capricious .............................................34

II.     Absent An Injunction, FBME Will Suffer Irreparable Harm................................41

III.    The Equities Tip Sharply For FBME ....................................................................42

IV.     An Injunction Serves The Public Interest .............................................................43

Conclusion ...................................................................................................................45

# TABLE OF AUTHORITIES

## Cases

*5455 Clarkins Drive, Inc. v. Poole*,
　　2009 WL 2567761 (N.D. Ohio Aug. 17, 2009) .................................................. 41

*Aamer v. Obama*,
　　742 F.3d 1023 (D.C. Cir. 2014).................................................................... 22

*Air Transportation Ass'n of America v. FAA*,
　　169 F.3d 1 (D.C. Cir. 1999)........................................................................ 24

*Al Haramain Islamic Foundation, Inc. v. U.S. Department of the Treasury*,
　　686 F.3d 965 (9th Cir. 2012) ................................................................. 31, 32

*American Medical Ass'n v. Reno*,
　　57 F.3d 1129 (D.C. Cir. 1995)..................................................................... 23

*American Radio Relay League, Inc. v. FCC*,
　　524 F.3d 227 (D.C. Cir. 2008)..................................................................... 24

*Armstrong v. Manzo*,
　　380 U.S. 545 (1965)................................................................................ 28

*Art-Metal USA, Inc. v. Solomon*,
　　473 F. Supp. 1 (D.D.C. 1978) ..................................................................... 42

*Automotive Finance Corp. v. EEE Auto Sales, Inc.*,
　　2011 WL 2580399 (E.D. Va. June 28, 2011) .................................................. 44

*Blom ASA v. Pictometry International Corp.*,
　　757 F. Supp. 2d 238 (W.D.N.Y 2010)........................................................... 41

*Boddie v. Connecticut*,
　　401 U.S. 371 (1971)................................................................................ 29

*Brendsel v. Office of Federal Housing Enterprise Oversight*,
　　339 F. Supp. 2d 52 (D.D.C. 2004) ............................................................... 42

*Catawba County v. EPA*,
　　571 F.3d 20 (D.C. Cir. 2009)...................................................................... 34

*Chamber of Commerce of the United States v. SEC*,
　　443 F.3d 890 (D.C. Cir. 2006)..................................................................... 24

*\*Connecticut Light & Power Co. v. Nuclear Regulatory Commission*,
　　673 F.2d 525 (D.C. Cir. 1982)............................................................ 24, 25, 27

*ConverDyn v. Moniz*,
    68 F. Supp. 3d 34 (D.D.C. 2014) .................................................. 22

*County Sovereignty Committee v. Department of State*,
    292 F.3d 797 (D.C. Cir. 2002)...................................................... 28

*Davis v. District of Columbia*,
    158 F.3d 1342 (D.C. Cir. 1998).................................................... 42

*Davis v. Pension Benefit Guaranty Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009).................................................... 22

*\*District Hospital Partners, L.P. v. Burwell*,
    786 F.3d 46 (D.C. Cir. 2015)............................................ 34, 35, 39, 40

*Doran v. Salem Inn, Inc.*,
    422 U.S. 922 (1975)................................................................. 41

*Engine Manufacturers Ass'n v. EPA*,
    20 F.3d 1177 (D.C. Cir. 1994)...................................................... 24

*Florida Power & Light Co. v. United States*,
    846 F.2d 765 (D.C. Cir. 1988)...................................................... 23

*Friedman v. Sebelius*,
    686 F.3d 813 (D.C. Cir. 2012)...................................................... 40

*Fuentes v. Shevin*,
    407 U.S. 67 (1972).................................................................. 29

*Glossip v. Gross*,
    135 S. Ct. 2726 (2015).............................................................. 22

*\*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013...................................................... 42, 43

*Gray Panthers v. Schweiker*,
    652 F.2d 146 (D.C. Cir. 1980)...................................................... 33

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004).............................................................. 31, 32

*Home Box Office, Inc. v. FCC*,
    567 F.2d 9 (D.C. Cir. 1977)......................................................... 24

*IDS Financial Services, Inc. v. Smithson*,
    843 F. Supp. 415 (N.D. Ill. 1994) ................................................. 44

*Indian River County v. Rogoff*,
--- F. Supp. 3d ----, 2015 WL 3616109 (D.D.C. June 10, 2015)......................................22

*\*Joint Anti-Fascist Refugee Committee v. McGrath*,
341 U.S. 123 (1951)..............................................................................28, 31, 32

*Klayman v. Obama*,
957 F. Supp. 2d 1 (D.D.C. 2013) ...................................................................43

*Logan v. Zimmerman Brush Co.*,
455 U.S. 422 (1982)........................................................................................29

*\*Mathews v. Eldridge*,
424 U.S. 319 (1976)......................................................................28, 30, 33

*Merck Sharp & Dohme Corp. v. Conway*,
861 F. Supp. 2d 802 (E.D. Ky. 2012)..............................................................43

*Morrissey v. Brewer*,
408 U.S. 471 (1972)........................................................................................29

*\*Motor Vehicle Manufacturers Ass'n of the United States v.*
*State Farm Mutual Automobile Insurance Co.*,
463 U.S. 29 (1983).............................................................................34, 39

*Mullane v. Central Hanover Bank & Trust Co.*,
339 U.S. 306 (1950)........................................................................................28

*\*National Council of Resistance of Iran v. Department of State*,
251 F.3d 192 (D.C. Cir. 2001)......................................................28, 30, 31, 33

*National Railroad Passenger Corp. v.*
*International Ass'n of Machinists & Aerospace Workers*,
1987 WL 18469 (D.D.C. Oct. 5, 1987).............................................................44

*National Shooting Sports Foundation, Inc. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013).........................................................................40

*Navajo Health Foundation—Sage Memorial Hospital, Inc. v. Burwell*,
2015 WL 1906107 (D.N.M. Apr. 9, 2015).........................................................44

*Northern Mariana Islands v. United States*,
686 F. Supp. 2d 7 (D.D.C. 2009) ...................................................................44

*Palestine Information Office v. Shultz*,
853 F.2d 932 (D.C. Cir. 1988).........................................................................33

*Parham v. J. R.*,
442 U.S. 584 (1979)..................................................................................... 32

*Petereit v. S.B. Thomas, Inc.*,
63 F.3d 1169 (2d Cir. 1995) ....................................................................... 41

*Portland Cement Ass'n v. Ruckelshaus*,
486 F.2d 375 (D.C. Cir. 1973)..................................................................... 26

\*Propert v. District of Columbia*,
948 F.2d 1327 (D.C. Cir. 1991)............................................................ 29, 33

*R.I.L.-R v. Johnson*,
--- F. Supp. 3d ----, 2015 WL 737117 (D.D.C. Feb. 20, 2015) ......................... 43

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011)..................................................................... 23

*Sierra Club v. Eubanks*,
335 F. Supp. 2d 1070 (E.D. Cal. 2004) ........................................................ 44

*Simms v. District of Columbia*,
872 F. Supp. 2d 90 (D.D.C. 2012) .............................................................. 32

*Texas Children's Hospital v. Burwell*,
--- F. Supp. 3d ----, 2014 WL 7373218 (D.D.C. Dec. 29, 2014) ..................... 43

*Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*,
559 F.2d 841 (D.C. Cir. 1977)..................................................................... 42

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 20 (2008)..................................................................................... 22

*Wrenn v. District of Columbia*,
--- F. Supp. 3d ----, 2015 WL 3477748 (D.D.C. May 18, 2015)..................... 22

**Statutes**

31 U.S.C. § 5318A ("Section 311 of the USA PATRIOT Act") ........................... passim

5 U.S.C. § 553................................................................................................ 23

5 U.S.C. § 706................................................................................................ 34

**Regulations**

79 Fed. Reg. 42486 (July 22, 2014) ("Notice of Proposed Rulemaking") ................... 9

79 Fed. Reg. 42639 (July 22, 2014) ("Notice of Finding") .................................................... passim

80 Fed. Reg. 45057 (July 29, 2015) ("Final Rule") ............................................................. passim

Treasury Order 180-01 § 3(a) (July 1, 2014) ................................................................................ 7

## INTRODUCTION

Absent a preliminary injunction, FBME Bank Ltd. ("FBME" or "the Bank") will on August 28, 2015, cease to exist as an international commercial bank.   At the root of this irreparable harm is an unlawful final rule ("Final Rule") issued by a bureau of the U.S. Department of the Treasury known as the Financial Crimes Enforcement Network ("FinCEN"). When this Final Rule takes effect three weeks from now—it was published in the Federal Register on July 29, 2015, with an effective date of August 28, *see* 80 Fed. Reg. 45057 (July 29, 2015)—it will permanently cut off the Bank from the U.S. financial system, including U.S. dollar transactions and U.S. correspondent bank accounts.   Because the vast majority of FBME's business consists of U.S. dollar transactions, the Final Rule will fundamentally impair FBME's business and imperil its survival.    Foreign regulators have informed the Bank that they are initiating procedures to liquidate or sell the Bank, citing the Final Rule as justification.[1]

FinCEN promulgated the Final Rule under § 311 of the USA PATRIOT Act, 31 U.S.C. § 5318A.   Although framed as a regulation, the Final Rule amounts to an adjudication of FBME—an adjudication in which FinCEN played the part of prosecutor, judge, jury, and executioner.   FinCEN conducted the investigation, branded FBME a financial institution of "primary money laundering concern," and imposed the maximal penalty available under § 311: FBME is barred from transacting in dollars with U.S. banks, either directly or through a third-

---

[1]     On July 30, 2015, the day after the Final Rule was published, FBME's counsel began corresponding with FinCEN and the U.S. Department of Justice to alert them that the instant suit and motion for a preliminary injunction would be filed unless an agreement could be reached to withdraw or delay the Final Rule.   Talks continued until August 6, 2015, when they failed. The next day, FBME promptly filed its Complaint and this motion for a preliminary injunction.

party financial institution.   For a bank, this penalty is (as *The Economist* recently noted) "more often than not a death sentence."[2]

FinCEN arrived at the Final Rule through a process that evokes the Star Chamber. FinCEN held no hearing before a neutral arbiter, refused to inform the Bank of most of the factual allegations against it or the supposed proof underlying them, and failed to account for the extensive contrary evidence the Bank submitted in response to the known allegations.   When the Bank disproved the few specifics that FinCEN offered, FinCEN acknowledged only some of its mistakes and inexplicably ignored the remaining mass of contrary evidence.   Simply put, FinCEN refused to allow the facts to get in the way of its foreordained outcome, insisting upon the same maximal and disproportional penalty even as the factual case against FBME—to the extent FinCEN had revealed it—fell apart.   In the end, the Final Rule failed to specify evidence or even allegations that would remotely suggest the Bank is in fact a "primary money laundering concern" that deserves the crushing sanction imposed, consistent with § 311 and the factors specified thereunder.

FinCEN's Final Rule thus reflects a result in search of a reason.   This Court will find no satisfying explanation for how FinCEN reasoned its way from the record before it to its astonishing conclusion that FBME devotes its business to money laundering.   FBME does not seek to pretend that no transactions in its history have raised concerns.   In that regard, FBME is no different than any other reputable bank the world over.   But the transactions referred to by FinCEN reflect (to the extent the Bank can identify them from the vague information provided) little more than a series of isolated transactions, all predating 2012, that the bank itself identified

---

[2]   *A Fearful Number*, THE ECONOMIST (June 6, 2015), http://goo.gl/kZXz6a.   For ease of reference, we have shrunk lengthy website links with Google's URL shortener, http://goo.gl.

and addressed at the time.   There is no indication that any systemic problem plagues the Bank, much less that it is complicit in money laundering.   Indeed, over the course of the Bank's long history, no regulatory authority has ever accused, much less convicted, the Bank of recurrent anti-money-laundering failures.   If FinCEN nonetheless has a basis here to impose the maximum penalty under § 311, then banks all around the world must tremble.

FinCEN's issuance of the Final Rule is, in short, irreconcilable with the procedural and substantive requirements of the Administrative Procedure Act, as well as with due process under the U.S. Constitution, and it is incapable of ultimately withstanding this Court's review.

This Court has an indispensable role to play in deciding weighty questions surrounding the legality of FinCEN's Final Rule.   Absent preliminary relief, however, FBME will likely not survive in its present form long enough for this case to run its course.   The propriety, and, indeed, the necessity for a preliminary injunction in this case are therefore clear.   We show below how the four traditional factors—(1) likelihood of success on the merits, (2) impending irreparable harm, (3) the balance of equities, and (4) the public interest—each separately support granting a preliminary injunction.

## BACKGROUND

### I.       FBME BANK

#### A.       Origins of FBME Bank

FBME is an international commercial bank that, as of mid-2014, had some $2 billion in assets.   Declaration of Ayoub-Farid Saab ¶ 21.   The Bank has operated in its current form since 1982, though its roots date back to 1952, when Michel Ayoub Saab and his brother established the Federal Bank of Lebanon as one of the first 16 banks in Lebanon.   *Id.* ¶ 6.   In 1977, in the midst of the Lebanese Civil War and the Syrian occupation of Lebanon, the Federal Bank opened an office in Cyprus because of its relative political and economic stability, and its proximity to

Lebanon.   *Id.* ¶¶ 9–10.   Five years later, Michel Ayoub Saab and his two sons, Ayoub-Farid M. Saab and Fadi M. Saab, formed FBME (then called the Federal Bank of the Middle East) in Cyprus as a subsidiary of the Federal Bank of Lebanon.   *Id.* ¶ 11.

By 1985, the situation in Lebanon had grown dire.   The Saabs—as members of the Lebanese-Christian minority—feared nationalization of Lebanese banks by Syrian forces.   *Id.* ¶ 14.   To protect FBME, the Saabs acquired the Federal Bank of Lebanon's 51% ownership stake in FBME.[3]   *Id.* ¶ 15.   As a result, FBME ceased to be a subsidiary; the two banks have remained separate since 1986, but ultimately owned by the same shareholders.   *Id.* ¶ 16.

Michel Ayoub Saab passed away in 1991.   His sons, Farid Saab and Fadi Saab, currently manage FBME as Chairman and Chief Executive Director, respectively.   *Id.* ¶¶ 17–20.

### B.    Operations, Customers, and Services

FBME is headquartered in Tanzania but operates primarily in Cyprus.   *Id.* ¶ 22.   FBME has two branches in Cyprus, through which 90% of FBME's activities are booked.   *Id.* ¶¶ 24–25.   FBME also has four branches in Tanzania, and it had a representative office in Russia.   *Id.* ¶¶ 24, 26.   It is the largest bank in Tanzania by asset size and the oldest international bank in Cyprus.   *Id.* ¶ 23.   Nonetheless, because FBME's business consists primarily of providing commercial banking services to international companies, its functional currency has always been the U.S. dollar.   *Id.* ¶ 31.

The Bank services customers around the world.   *Id.* ¶ 28.   FBME markets itself to customers by focusing on the high quality of services it provides.   *Id.* ¶ 32.   Clients receive personalized care, including regular contact with senior managers.   *Id.*   To attend to its customers' needs, the Bank employs staff skilled in international banking and familiar with

---

[3]    The second plaintiff, FBME Ltd., is the holding company that owns this stake.

different cultures and languages. *Id.* Working hours span global markets across different time zones in order to facilitate customer access. *Id.* Many of FBME's customers like to bank in Cyprus because it (i) is a member of the European Union, (ii) has advantageous tax laws, including one of the lowest corporate tax rates in the EU and favorable tax treaties with almost 50 countries, and (iii) is strategically located at the crossroads of Europe, Asia, the Middle East, and Africa. *Id.* ¶ 33.

The Bank offers a wide variety of financial products and services, including corporate and personal banking, trade finance, FX trading facilities, credit facilities, loans, investment services, and online banking. *Id.* ¶ 28. FBME does not operate retail branches; instead, it specializes in assisting high-net-worth customers with international business transactions. *Id.* ¶ 29. As a result, cash transactions comprise only a miniscule fraction of FBME's transactions (1.9% of the number of transactions; 0.067% of transactions by value). *Id.* ¶ 30. Almost all of the Bank's business flows electronically through accounts with major correspondent banks. *Id.*

## C.    Correspondent Banks

A correspondent bank is a financial institution that provides services—such as conducting business transactions and accepting deposits—on behalf of another financial institution. Declaration of Graeme Scott Wyllie ¶ 4. Banks routinely use correspondent banks to service transactions originating in foreign countries and to act as the domestic bank's agent abroad. *Id.* ¶ 5. Opening a branch in every country in which it has customers would be impracticable, so a domestic bank depends upon correspondent banks to provide the full range of services its customers expect. *Id.*

FBME is a boutique bank with few branches, none of which are retail branches. *Id.* ¶ 7. To transact in any local currency—such as U.S. dollars—FBME must use correspondent banks. *Id.* The vast majority of FBME's transactions involve U.S. dollars. *Id.* ¶ 8. Losing access to

U.S. dollar correspondent accounts will leave the Bank unable to provide the international financial services that constitute a substantial majority of its business.   *Id.* ¶ 20.

### D.     U.S. Presence and Property

Although FBME is based in Cyprus and Tanzania, it has property in the United States, and it maintains important ties with a number of American companies.   Saab Decl. ¶ 34.   Over 150 of the Bank's customers reside or operate in the United States.   *Id.* ¶ 35.   The Bank maintains accounts with around 30 companies headquartered in the United States, and it owns various U.S.-based securities.   *Id.* ¶ 36.

The Bank also holds a mortgage interest in an approximately 3,000-acre residential community under development in North Carolina.   *Id.* ¶ 37.   Per the loan terms, FBME receives a percentage of each property sale in partial satisfaction of the loan.   *Id.*   These funds are held in escrow for FBME in a bank account in North Carolina.   *Id.* ¶ 38.

### E.     Business Model

FBME employs a conservative business plan.   *Id.* ¶ 39.   It pursues modest growth, low loan-to-deposit ratios, and high liquidity and solvency ratios.   *Id.*   Throughout FBME's 30-plus-year history, the Bank's shareholders have never declared a dividend, choosing instead to re-invest all funds to support the Bank's continued growth.   *Id.* ¶ 40.   Thanks to its conservative approach, the Bank enjoyed exceptional financial health until July 2014, when FinCEN first proposed to sanction FBME under § 311.   *Id.* ¶ 41.

## II.     SECTION 311 OF THE USA PATRIOT ACT

Shortly following the attacks of September 11, 2001, the President signed into law the USA PATRIOT Act.   Section 311 of that Act (which is an amendment to the Bank Secrecy Act) authorizes the Secretary of the Treasury to "require domestic financial institutions and domestic financial agencies" to take one or more of five "special measures" against a foreign financial

institution that the Secretary of the Treasury has found to be a "primary money laundering concern."   31 U.S.C. § 5318A(a)(1).   The special measures function as penalties against the entity designated a "primary money laundering concern."   The Secretary has delegated to the Director of FinCEN the responsibility for administering § 311.   *See* Treasury Order 180-01 § 3(a) (July 1, 2014), *available at* http://goo.gl/xQARSA.

Section 311 does not specifically define the term "primary money laundering concern." Before finding that banks or other financial institutions meet this undefined standard and warrant the imposition of a "special measure," the Secretary of the Treasury must consult with the Secretary of State and the Attorney General, § 5318A(c)(1), and "shall consider in addition such information as the Secretary determines to be relevant," including:

> (i) "the extent to which such financial institutions . . . are used to facilitate or promote money laundering in or through [a particular] jurisdiction, including any money laundering activity by organized criminal groups, international terrorists, or entities involved in the proliferation of weapons of mass destruction or missiles;

> (ii) the extent to which such institutions . . . are used for legitimate business purposes in the jurisdiction; and

> (iii) the extent to which [the special measure] is sufficient to ensure, with respect to . . . institutions operating in the jurisdiction, that the purposes of this subchapter continue to be fulfilled, and to guard against international money laundering and other financial crimes.

§ 5318A(c)(2)(B).

The "special measures" available under the statute include requiring enhanced recordkeeping and reporting, § 5318A(b)(1); demanding beneficial ownership information on relevant accounts, § 5318A(b)(2); demanding information regarding customers of domestic financial institutions who are permitted to use suspect payable-through accounts, § 5318A(b)(3);

and demanding information regarding customers of domestic financial institutions permitted to use suspect correspondent accounts, § 5318A(b)(4).

The most severe measure is the fifth special measure, under which the Secretary can prohibit or otherwise restrict domestic financial institutions and agencies from opening or maintaining correspondent accounts for a designated foreign financial institution. § 5318A(b)(5).   The effect of the fifth special measure is to sever all ties between all domestic financial institutions or agencies and the "primary money laundering concern."

In selecting which of the five special measures to apply to a "primary money laundering concern," the Secretary must consult with certain federal agencies and officials, § 5318A(a)(4)(A), and must consider a series of factors:

> (i) whether similar action has been or is being taken by other nations or multilateral groups;
>
> (ii) whether the imposition of any particular special measure would create a significant competitive disadvantage, including any undue cost or burden associated with compliance, for financial institutions organized or licensed in the United States;
>
> (iii) the extent to which the action or the timing of the action would have a significant adverse systemic impact on the international payment, clearance, and settlement system, or on legitimate business activities involving the particular jurisdiction, institution, class of transactions, or type of account; and
>
> (iv) the effect of the action on United States national security and foreign policy.

§ 5318A(a)(2)(B).

The statute allows the first four of the five special measures to "be imposed by regulation, order, or otherwise as permitted by law."   § 5318A(a)(2)(B).   But the fifth special measure "may be imposed only by regulation."   § 5318A(a)(2)(C).   Resort to the fifth special measure thus triggers rulemaking procedures under the Administrative Procedure Act, 5 U.S.C. § 553.

## III.    THE GOVERNMENT'S § 311 PROCEEDINGS AGAINST FBME

### A.    FinCEN's Notice Of Finding & Notice Of Proposed Rulemaking

On July 22, 2014, FinCEN published a Notice of Finding and a Notice of Proposed Rulemaking, which state that "reasonable grounds exist" to conclude that FBME is a "primary money laundering concern," and which propose to impose against the Bank the fifth special measure authorized by § 311.    *See* Notice of Finding, 79 Fed. Reg. 42639 (July 22, 2014); Notice of Proposed Rulemaking, 79 Fed. Reg. 42486 (July 22, 2014).

The Notice of Finding alleged an array of misconduct by FBME.    The principal charge was that FBME has had a series of failures in its anti-money-laundering controls.    According to FinCEN, FBME's failures have attracted high-risk customers that use FBME "to facilitate money laundering, terrorist financing, transnational organized crime, fraud, sanctions evasion, and other illicit activity internationally and through the U.S. financial system."    79 Fed. Reg. at 42639. Specifically, the Notice alleged that FBME facilitated money laundering and other crimes by:

- the head of an international narcotics trafficking and money laundering network (in 2011–12);

- a financier for Lebanese Hezbollah (in 2008);

- a financial advisor for a major transnational organized crime figure (in 2008);

- an entity that perpetrated a fraud against a U.S. person involving a high yield investment program (in 2009);

- an entity that carried out a phishing attack on a Michigan-based company (in 2010);

- the intended beneficiary of a fraud scheme, the majority of the proceeds of which came from a victim in California (in 2012);

- persons seeking to evade sanctions imposed by the International Emergency Economic Powers Act (no timeframe alleged);

- a front company for a U.S.-sanctioned Syrian entity, the Scientific Studies and Research Center, which has been designated as a proliferator of weapons of mass destruction (no timeframe alleged);

- gamblers, particularly U.S. gamblers that seek to engage in unlawful internet gambling (no timeframe alleged); and

- shell companies acting on behalf of the son of the President of Equatorial Guinea (in 2011–12).

*Id.* at 42639–40.   The Notice also alleged that FBME had attempted to evade the oversight of one of its primary regulators, the Central Bank of Cyprus, which (according to FinCEN) had twice found FBME's anti-money-laundering controls deficient.   *Id.*

The Notice further found that FBME's customer base consisted of a "significant number" of shell companies—"that is, companies formed for the sole purpose of holding property or funds and that do not engage in any legitimate business activity."   *Id.* at 42639.   According to FinCEN, from July 2007 to February 2013, at least 71 of these customers used FBME's address in Cyprus to transact with the U.S. financial system.   *Id.*[4]   The Notice also claimed that a "significant volume" of FBME's transactions "have little or no transparency and often no apparent legitimate business purpose."   *Id.*   As for FBME's "legitimate activity," FinCEN concluded that "the limited amount of information" available regarding Cypriot branches of foreign banks made it "difficult to assess" such activity for FBME.   *Id.* at 42640.

Based on these preliminary findings, FinCEN proposed to revoke FBME's ability to access the U.S. financial system by imposing the "fifth special measure" under § 311.

---

[4]   By no means are shell companies illegal or nefarious.   Many corporations in the United States and elsewhere use holding or "shell" companies for legitimate purposes. Certainly the mere fact that FBME transacts with shell companies should not be a basis for a § 311 sanction.

**B.      FBME's Public Comments On The Notice Of Finding**

FBME submitted a public comment on September 22, 2014.   *See* Declaration of M. Elizabeth Peters, Ex. A ("FBME Comment" or "Comment").   FBME's Comment described (1) numerous steps the Bank had taken, both before and after FinCEN's Notices, to evaluate its anti-money-laundering and compliance program, (2) the results of those evaluations, and (3) FBME's actions to remediate discrete issues identified during the evaluations.   *Id.*   The Comment quoted analyses and reviews conducted by two highly respected audit firms—KPMG and Ernst & Young—which found that, notwithstanding historical deficiencies (generally predating 2012), FBME's compliance program not only meets but in some cases exceeds all applicable international standards, including the European Union's Third Money Laundering Directive and the fourth issue of the Central Bank of Cyprus's Directive regarding money laundering.   FBME Comment at 6–10, 17–19.   That conclusion was documented in a September 2014 assessment by Ernst & Young, which FBME submitted to FinCEN along with its Comment.   *See* Peters Decl. Ex. B.   Beyond that, FBME had simultaneously solicited and begun implementing recommendations for further enhancements to its internal controls as part of an ongoing effort to improve in a manner consistent with best practices.   *See, e.g.*, FBME Comment at 10–11.

FBME also endeavored to respond to the allegations described in the Notice of Finding. But the Notice's lack of specificity made this difficult.   For example, FBME struggled to pinpoint and investigate such vague accusations as:   "As of 2008, a financial advisor for a major transnational organized crime figure who banked entirely at FBME in Cyprus maintained a relationship with the owners of FBME," and "in 2008, an FBME customer received a deposit of hundreds of thousands of dollars from a financier for Lebanese Hezbollah."   79 Fed. Reg. at 42639.   Despite its best efforts, the Bank was hard pressed to make sense of the allegations against it, much less address them with specificity.   As the Bank explained in its Comment, it

could not respond fully to the charges against it "because the Notice lacks information required for the Bank to identify the transaction(s) at issue, and the Treasury Department has not shared any additional information pertaining to the alleged transaction-specific activities with the Bank." FBME Comment at 3. At the same time, FBME made clear its commitment to addressing the allegations in the Notice and rooting out any criminal activity involving the Bank:

> The Bank takes seriously any allegation that its customers have used the Bank for illicit or illegal purposes. FBME looks forward to providing additional information to FinCEN and cooperating with U.S., Cypriot, and Tanzanian officials to halt any possible criminal or other illicit activities of third parties involving the Bank.

*Id.*; *see also id.* at 27 ("[T]he Bank would be pleased to provide any additional information and assistance possible to U.S., Cypriot and Tanzanian officials in their investigations of criminal activity and enforcement of related laws."). After FBME submitted its public comment, Ernst & Young continued its review in an effort to identify the transactions referenced in the Notice.

As opaque as FinCEN was in its Notice, at least two things were clear. First, none of the specific misconduct alleged in the Notice extended past 2012. That is, FinCEN identified no transactions or account holders of concern postdating the compliance updating and remediation that FBME had been undertaking for years with the benefit of reviews by KPMG and Ernst & Young. *See* FBME Comment at 20–27; 79 Fed. Reg. at 42640. Second, even as to the historical period on which FinCEN focused, only a handful of improper transactions were alleged, and there was no indication of a systemic problem. FBME Comment at 27.

Notwithstanding the difficulty it faced trying to refute FinCEN's cryptic allegations, FBME did all it could to address those it could comprehend. To take one example, the Notice referred to a fraud on a U.S. person in connection with a high-yield investment program that involved an FBME account. *See* 79 Fed. Reg. at 42640. FBME explained that its controls had

flagged the transaction in question, but after further due diligence consistent with applicable standards, the customer provided sufficient information to establish the apparent legitimacy of the transaction.   FBME Comment at 26.   A year later, when the customer cleared a separate transaction through another bank that appeared fraudulent, FBME immediately froze the customer's FBME account, conducted an independent investigation that called into question the legitimacy of the transactions, and reported the client to the appropriate Cypriot authorities.   *Id.*

That is not to suggest that FBME laid claim to perfection across its anti-money-laundering and compliance programs.   To the contrary, FBME acknowledged discrete historical shortcomings, which formed the basis for improvement recommendations that KPMG and Ernst & Young provided in 2013 and 2014.   What is more, FBME demonstrated its willingness to engage with FinCEN to implement whatever further enhancements to its compliance protocols FinCEN might deem appropriate.   *See, e.g.*, FBME Comment at 27 ("FBME recognizes, however, that every compliance program—including its own—can be improved, and the Bank is entirely committed to continuing to enhance its Compliance Program to FinCEN's satisfaction.").   As FBME noted in its Comment, rehabilitation is among the Treasury Department's stated goals in imposing special measures under § 311, and the constructive engagement FBME sought was, by all indications, precisely what FinCEN was seeking to facilitate and encourage under § 311.   *See* FBME Comment at 2.

### C.    FBME's Additional Submissions To FinCEN

To supplement its public comment, FBME submitted numerous letters and hundreds of pages of documents to FinCEN, including reports conducted by KPMG and Ernst & Young, detailed explanations of FBME's remedial efforts, and various alternative measures FinCEN might adopt short of applying § 311's fifth special measure.   On November 17, 2014, FBME

submitted approximately six hundred pages of documents substantiating the conclusions set forth in Ernst & Young's September 2014 assessment.   *See* Peters Decl. ¶ 5 & Ex. C.

Four days later, on November 21, FBME wrote to FinCEN detailing how FBME was implementing suggestions arising from KPMG's and Ernst & Young's reviews in 2013 and 2014. *See* Peters Decl. Exs. D, E, F, G.   Notably, none of the reviews identified any systemic problem with FBME's anti-money-laundering or compliance programs.   To the contrary, they confirmed that FBME's protocols met or exceeded international standards.   Even so, FBME had revised its protocols for the sake of addressing discrete shortcomings.   Out of forty recommendations made by KPMG, FBME already had fully implemented twenty nine as of November 2014; six were ready for implementation upon approval by regulatory authorities; two were in the process of being implemented; two were on schedule to be implemented by the end of March 2015; and one was inapplicable because it reflected a misunderstanding of FBME's procedures.   *See id.* Ex. E.   Similarly, FBME had already begun to address the sixteen recommendations made in Ernst & Young's September report, including by enhancing its employee training program and updating its customer-identification and due-diligence procedures.   Although FBME already used industry-leading electronic screening solutions, it upgraded its screening software and systems for investigating alerts.   *See id.* Ex. G.

Ten days later, on December 1, FBME submitted a *separate* transactional review that Ernst & Young conducted *specifically* to investigate the allegations in the Notice of Finding. *See* Peters Decl. Ex. H ("December 1 Letter"); *id.*, Ex. I ("EY Transactional Review").   The December 1 Letter and the EY Transactional Review responded to each of the accusations in the Notice, one by the one (as best they could be nailed down).   Ernst & Young's team of professionals—who received all requested support from the FBME in reviewing the Bank's files,

transactions, and other information—could identify no basis for the Notice's allegations of money laundering involving: (1) financiers for Lebanese Hezbollah; (2) international narcotics traffickers; (3) transnational organized crime figures; or (4) governmental entities or other persons or entities associated with Equatorial Guinea.  *See* December 1 Letter at 3–4. Similarly, Ernst & Young confirmed that FBME's compliance policies worked as they should in the various instances at issue, and that FBME had taken appropriate steps to report suspicious activity, freeze assets, and terminate customer relationships.  *Id.*  For example, although an FBME account had, in fact, been used in furtherance of a fraud involving a high-yield investment program and a phishing scheme before FBME instituted a freeze, there was no reason why these transactions should have triggered red flags under appropriate protocols that were in place.  *Id.*  Finally, Ernst & Young confirmed that although the other criticisms in the Notice did not reflect violations of international standards, FBME nevertheless had not only addressed the criticisms but in one instance implemented curative reforms more than five years earlier.  *Id.*

### D.  FBME's Repeated But Unsuccessful Requests For Meaningful Specifics

Recognizing that the Notice's lack of specificity (combined with FinCEN's subsequent refusal to come forward with specifics) relegated FBME and Ernst & Young to guesswork in responding, FBME again requested in its December 1 letter specifics that would enable further investigation of FinCEN's allegations.  *Id.*  Again, it received no response.

On at least eight occasions before January 5, 2015, the Bank's lawyers also requested a meeting with FinCEN to discuss the Notices.   Peters Decl. ¶ 9.   FinCEN declined to respond. *Id.*  Only after the Bank's lawyers made a request to the Treasury Department did FinCEN finally consent to a meeting, which was held in FinCEN's offices on January 21, 2015.  *Id.* ¶ 11 & Exs. M, N.   At the meeting, FBME's counsel emphasized that:   (1) the Notice gave no consideration to the fact that the overwhelming number of FBME account transactions are,

beyond question, legitimate business transactions, Peters Decl. Ex. M at 20; (2) the most recent misconduct alleged in the Notice occurred in 2012, *id.* at 24; (3) FBME had overhauled its compliance protocols beginning long before the Notice and continuing through the present, *id.* at 10–14; (4) notwithstanding the staleness of FinCEN's allegations and the substantial reforms already undertaken, FBME took FinCEN's concerns seriously and continued to make every effort to address them, *id.* at 3, 27; and (5) towards that end, FBME was eager for details that would enable further response and remediation as and if appropriate, *id*.

FBME followed up with a letter to FinCEN, dated January 26, 2015, in which it asked for more information about seven specific allegations in the Notice. *See* Peters Decl. Ex. O. After nearly a month, FinCEN finally responded. In a letter dated February 24, FinCEN addressed each of the seven allegations in turn. For six of the seven, it provided the same stonewalling response emblematic of its entire approach to this § 311 proceeding: "FinCEN is unable to release additional information in response to this question beyond the statements within the Notice of Finding." *See* Peters Decl. Ex. Q. (FinCEN identified the seventh transaction, which had already been disclosed in a federal lawsuit.)

### E.    FinCEN's Disregard Of Less Extreme Sanctions Available Under § 311

In nearly every communication with FinCEN, the Bank made clear its commitment to work constructively in processing and addressing FinCEN's concerns. For example, counsel for FBME spoke with FinCEN Director Jennifer Shasky Calvery at a conference in November 2014. Among other things, Director Shasky Calvery acknowledged that FinCEN's approach was designed, at least in part, to rehabilitate the Bank. Peters Decl. ¶ 4.

At the meeting on January 21, 2015, FBME's counsel had explained that the fifth special measure would be disproportionate and excessive, especially as compared to another recent enforcement action involving far more egregious circumstances in which FinCEN imposed only

a fine.   Peters Decl. Ex. M at 22–23.   In subsequent letters, FBME's counsel noted that imposing the fifth special measure on FBME would be anti-rehabilitative, as it could go so far as to put FBME out of business.   *See* Peters Decl. Exs. S, T.   FBME proposed numerous alternative measures—such as FinCEN appointing a special monitor, imposing heightened reporting requirements for FBME, or levying a fine—that (even crediting *arguendo* FinCEN's stated concerns) would be more appropriate and would further the goal of rehabilitation.   *See, e.g.*, *id.* ¶¶ 15, 17 & Ex. P at 2.

FinCEN's treatment of other financial institutions showed just how disproportional it is to impose the fifth special measure in this case.   FBME specifically identified five recent examples of FinCEN levying only a fine in situations where (as in this case) FinCEN alleged that a financial institution failed to maintain adequate compliance programs or was engaged in suspicious transactions.   *See* Peters Decl. Ex. R at 2 n.2.   FinCEN typically reserved the fifth special measure for more outrageous conduct, such as when a bank's high-level managers were *actively* complicit in money laundering.   *Id.*   Because nothing so egregious was alleged at FBME, a lesser sanction would have been far more congruent with FinCEN's practice.   But FinCEN was unmoved by FBME's calls for equal treatment and proportional punishment.

### F.      FinCEN's Final Rule

On July 29, 2015, FinCEN published in the Federal Register the Final Rule imposing the fifth special measure under § 311.   80 Fed. Reg. 45057 (July 29, 2015) ("Final Rule").   While purporting to address FBME's voluminous submissions, the Final Rule ignores Ernst & Young's findings that FBME's current anti-money-laundering program fully satisfies EU and Cypriot standards and reflects a pattern of continuous improvements.   Tellingly, the Final Rule identifies *no* applicable compliance standard that FBME does not meet.

17

Instead, the Final Rule declares:   "FBME's argument that its [anti-money-laundering] compliance program is now adequate is weakened by the list of illicit actors identified in the [Notice of Finding] that have continued to make use of FBME as recently as 2014, including narcotics traffickers, terrorist financiers, and organized crime figures."   *Id.* at 45059.   In fact, FinCEN has kept hidden "the list of illicit actors" it supposedly "identified," and none of the allegations in the Notice (or, for that matter, the Final Rule) were "as recent[] as 2014."   After an extensive and exhaustive analysis of FBME's account holders and transactions utilizing publicly available information, Ernst & Young could identify no evidence of any such illicit actors making use of FBME.

The only concession FinCEN makes in the Final Rule to the hard facts proved by FBME is extremely begrudging:   "[A]fter a thorough review of these materials, FinCEN believes that [with two minor exceptions], the statements made in the [Notice of Finding] remain true and accurate, and that FBME is of 'primary money laundering concern.'"   *Id.* at 45060.   FinCEN neither addresses the extensive contrary evidence FBME submitted, nor specifies what affirmative evidence leaves it convinced.   All FinCEN offers is conclusory *ipse dixit* that "*information available to FinCEN*"—but not to FBME—"makes it reasonable to conclude that FBME's management facilitated, either actively or passively, the illicit activities of its customers, as FinCEN set forth in the [Notice of Finding]."   *Id.* at 45059.

Perhaps most astonishingly of all, the Final Rule offers no explanation whatsoever as to why FBME warrants the fifth special measure even though far more egregious failures resulted in no such drastic sanction for other regulated entities.   As for FBME's customers, the Final Rule notes the existence of "other banks in both Cyprus and Tanzania that could alleviate potential impact on legitimate business activities within those jurisdictions."   80 Fed. Reg. at

45061.   That is cold comfort considering that FBME is the largest bank by assets in Tanzania, *see* Peters Decl. Ex. S at 2, that other banks in Cyprus have been racked by instability, *see, e.g.*, Jean Christou, New EBRD Plan for Cyprus Targets Banks, Ports and Privatisations (Updated), *Cyprus Mail* (June 3, 2015), http://goo.gl/9m2Y5q, and that FBME's customers are about to lose essential financing for ongoing projects financed by FBME, *see* Peters Decl. Ex. T at 2.

## IV.   FBME WILL CEASE BEING AN INTERNATIONAL COMMERCIAL BANK

### A.       FBME Will Be Cut Off From Transacting In U.S. Dollars

The Final Rule prohibits any U.S. financial institution from "establishing, maintaining, administering, or managing a correspondent account in the United States for, or on behalf of, FBME."  80 Fed. Reg. at 45062.   The Rule includes a "broad definition" of "correspondent account"[5] that "includes most types of banking relationships with a U.S. depository institution and a foreign bank that are established to provide regular services, dealings, and other financial transactions."   *Id.*    In other words, the sanction prohibits *any* U.S. bank from engaging in any type of financial transaction with FBME, either directly or through a financial intermediary.

The repercussions of this reach far beyond the United States.   Any U.S. bank would be violating the Final Rule if FBME is anywhere upstream or downstream on any given transaction. The upshot is to foreclose any transaction involving U.S. dollars, because any such transaction must pass through a U.S. correspondent account.   In short, when the Final Rule becomes effective on August 28, 2015, FBME will be permanently cut off from the U.S. financial system, thereby requiring that FBME fundamentally transform its business in order to survive (assuming regulators do not liquidate or sell the Bank first).

---

[5]    Specifically, "correspondent accounts" is defined as any "account established to receive deposits from, or make payments or other disbursements on behalf of, a foreign bank, or to handle other financial transactions related to the foreign bank."   80 Fed. Reg. at 45062.

### B.  Foreign Regulators Are Poised To Pursue Follow-On Actions To Liquidate Or Sell The Bank

Were that not enough, the Cypriot government is now poised to force the Bank into liquidation or sale because of the Final Rule.  The day after FinCEN issued its July 2014 Notice, the Cypriot government granted the Bank's regulator, the state-owned Central Bank of Cyprus, authority over FBME's Cyprus branches, and authorized the Central Bank to unilaterally sell them.  Saab Decl. ¶¶ 47–48.  To effectuate the sale, the Central Bank quickly appointed a Special Administrator, who immediately took steps to identify potential buyers, albeit unsuccessfully.  *Id.* ¶ 48.  The Special Administrator's efforts were halted (at least temporarily) by FBME's shareholders, who initiated proceedings in the International Court of Arbitration under a bilateral treaty protecting Cypriot-based investments.  *Id.* ¶ 52.  The arbitral tribunal ordered the Central Bank to refrain from taking any measures that would destroy FBME Cyprus, unless the Central Bank found such measures to be absolutely necessary, in which case it had to provide 30-days notice before taking action.  *Id.* ¶ 53.

Upon publication of the Final Rule, the Central Bank pounced.  On August 3, 2015, the Central Bank sent FBME a letter stating it was providing the 30-days notice required by the tribunal so that it could take adverse actions against FBME, up to and including revocation of FBME's license and liquidation of its Cyprus branches.  *Id.* Ex. A at 4.[6]  Motivating this decision, the Central Bank explained, was "the issuance by FinCEN of the Final Rule."  *Id.*  In a remarkable paragraph apparently crafted with an eye towards this lawsuit (which undersigned counsel had alerted FinCEN and the Department of Justice would be forthcoming) the Central

---

[6]  If the Central Bank and Special Administrator accelerate the timing stated in their letter, however, FBME Bank will face an existential threat, expressly pegged to the Final Rule, well in advance of August 28.  Indeed, if that threat mounts, then FBME will need respectfully to return to this Court, on an even more exigent basis, seeking a temporary restraining order.

Bank added that it "does not concede that any of the foregoing steps would destroy irreparably the business of FBME or FBME Cyprus Branch."   *Id.* at 4–5.[7]

The Tanzanian government has been moving in parallel.   Following the issuance of the Notice in July 2014, the Bank of Tanzania (which regulates FBME) installed a statutory manager to oversee FBME, and to liquidate or sell the Tanzanian branch if necessary.   Saab Decl. ¶ 54. The manager told FBME that Tanzania considered FinCEN's Notice to be a "compliance issue" that created no reason for alarm or overreaction from the Bank of Tanzania.   *Id.* ¶ 55.   As a result, FBME successfully convinced the Tanzanian regulators to temporarily refrain from following the same course as the Central Bank of Cyprus.   *Id.* ¶ 56.   This understanding was reached largely thanks to Tanzania's recognition that the Notice was preliminary.   *Id.* ¶ 57.

FinCEN's issuance of the Final Rule now threatens that understanding.   After the Final Rule came out, the Bank of Tanzania issued a public announcement:

> [T]he Bank of Tanzania has been monitoring FBME's operations while awaiting FinCEN investigation and Final Rule on FBME. . . . The Bank of Tanzania is aware that the Final Rule issued by FinCEN will affect the future of FBME and currently is reviewing the situation with the view of determining an appropriate course of action for the bank including resolution options as governed by law.

Bank of Tanzania, *Public Notice* (July 2015), https://goo.gl/QCqTxC.   The "resolution options" under contemplation by the Bank of Tanzania include liquidation of FBME.

---

[7]    In response, the ultimate beneficial owners of FBME sent the Central Bank a letter stating that the August 3 Letter afforded insufficient notice under the tribunal's order.   Saab Decl. ¶ 63 & Ex. C.   In addition, the owners questioned the disproportionality of the Central Bank's response to the Final Rule.   *Id.* ¶ 63.   Furthermore, the owners suggested that, before the effective date of the Final Rule, the Central Bank should assist FBME in restructuring the small but viable portion of its business that still remains.   *Id.*   Last, the owners apprised the Central Bank that liquidation of FBME's Cyprus branches would destroy what remains of the Bank.   *Id.*

### C.      Innocent Third Parties Face Harm

Beyond wreaking havoc on the Bank itself, the Final Rule will injure many others who depend on the Bank.   Individuals with deposits at the Bank face substantial risk of losses in a liquidation.   Clients who rely on the Bank for international commercial banking services will no longer be able to obtain them.   And many employees of the Bank will be terminated when the Bank is forced to cease its international commercial operations and downsize.

## LEGAL STANDARDS

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."   *Glossip v. Gross*, 135 S. Ct. 2726, 2736 (2015) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).

This Court has applied a "sliding-scale approach" to these factors.   *See, e.g.*, *Indian River County v. Rogoff*, --- F. Supp. 3d ----, 2015 WL 3616109, at *4 (D.D.C. June 10, 2015); *Wrenn v. District of Columbia*, --- F. Supp. 3d ----, 2015 WL 3477748, at *3 (D.D.C. May 18, 2015); *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 45–46 & n.2 (D.D.C. 2014).   Under the sliding-scale approach, a movant who "makes an unusually strong showing on one of the factors . . . does not necessarily have to make as strong a showing on another factor."   *Wrenn*, 2015 WL 3477748, at *3 (quoting *Davis v. Pension Benefit Guaranty Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009)).   So, for example, if the balance of equities tips sharply in favor of a preliminary injunction, a court can issue one, even if the movant demonstrates only that there are serious questions surrounding the merits of its claims (rather than a likelihood of success).   Although the D.C. Circuit has yet to bless the sliding-scale formulation, *see Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (noting that the issue "remains an open question"), the majority of

circuits to consider it have adopted it. *See Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (collecting cases).

Whichever standard applies, however, the warrant for a preliminary injunction is clear and powerful in this case: The Final Rule is likely (if not certain) to fail judicial review on the merits, and the irreparable harm faced by the Bank is so imminent and so devastating that ultimate vindication will provide no succor—for the Bank and countless innocent parties that depend on it—unless a preliminary injunction issues now.

## ARGUMENT

## I. FBME IS LIKELY TO PREVAIL ON THE MERITS

FBME will likely prevail on three claims: the Final Rule was issued in disregard of the procedures required by (1) the Administrative Procedure Act ("APA") and (2) the Due Process Clause of the Fifth Amendment, and (3) the Final Rule is arbitrary and capricious.

### A. The Government Violated The APA By Failing To Provide Meaningful Opportunity For Comment On The Final Rule

In promulgating the Final Rule, FinCEN did not live up to its procedural obligations under the APA. The APA requires a federal agency to provide adequate notice of any regulation it proposes adopting. 5 U.S.C. § 553. This notice "must include sufficient detail on [the regulation's] content and basis in law and evidence to allow for meaningful and informed comment." *American Medical Ass'n v. Reno*, 57 F.3d 1129 (D.C. Cir. 1995); *accord, e.g.*, *Florida Power & Light Co. v. United States*, 846 F.2d 765, 771 (D.C. Cir. 1988) (the notice "must provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully"). The point of the notice is to enable "an *exchange* of views, information, and criticism between interested persons and the agency," which can happen only if

the agency "disclose[s] in detail the thinking that has animated the form of a proposed rule." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 (D.C. Cir. 1977).

Among the information an agency must divulge are the *facts* on which its rulemaking is premised. *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008); *accord, e.g.*, *Engine Manufacturers Ass'n v. EPA*, 20 F.3d 1177, 1181 (D.C. Cir. 1994) (agency must disclose "the data the agency used to develop the proposed rule").   In particular, "the most critical factual material that is used to support the agency's position on review must have been made public *in the proceeding* and exposed to refutation."   *Air Transportation Ass'n of America v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999).   "By requiring the 'most critical factual material' used by the agency be subjected to informed comment, the APA provides a procedural device to ensure that agency regulations are tested through exposure to public comment, to afford affected parties an opportunity to present comment and evidence to support their positions, and thereby to enhance the quality of judicial review."   *Chamber of Commerce of the United States v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006).

These notice requirements are essential to ensuring both the accuracy and fairness of agency regulations.   Without sufficient identification of the facts, commentators cannot correct inaccuracies that otherwise threaten to lead the agency astray.   "If the notice of proposed rule-making fails to provide an accurate picture of the reasoning that has led the agency to the proposed rule, interested parties will not be able to comment meaningfully upon the agency's proposals.   As a result, the agency may operate with a one-sided or mistaken picture of the issues at stake in a rule-making."   *Connecticut Light & Power Co. v. Nuclear Regulatory Commission*, 673 F.2d 525, 530 (D.C. Cir. 1982).   Notice of the agency's evidence and rationale also saves affected parties from being kept in the dark unfairly as to *why* the agency proposes to

proceed as it does.   "To allow an agency to play hunt the peanut with technical information, hiding or disguising the information that it employs, is to condone a practice in which the agency treats what should be a genuine interchange as mere bureaucratic sport."   *Id.*

The Plaintiffs were denied fair opportunity to comment on the Final Rule.   Most of the critical factual allegations that FinCEN leveled against FBME are written in terms so vague that FBME could neither investigate nor refute them.   For example, the Final Rule (and, before it, the Notice of Finding) accuses the Bank of facilitating "money laundering, terrorist financing, transnational organized crime, fraud schemes, sanctions evasion, weapons proliferation, corruption by politically-exposed persons, and other financial crime."   80 Fed. Reg. at 45058. To corroborate such damning allegations, the Final Rule pointed to exactly four (4) specific incidents:

> (1) "an FBME customer receiving a deposit of hundreds of thousands of dollars from a financier for Lebanese Hezbollah";
>
> (2) "providing financial services to a financial advisor for a major transnational organized crime figure";
>
> (3) "FBME's facilitation of the transfers to an FBME account involved in fraud against a U.S. person, with the FBME customer operating the alleged fraud scheme later being indicted in the United States District Court for the Northern District of Ohio"; and
>
> (4) "FBME's facilitation of U.S. sanctions evasion through its extensive customer base of shell companies, including at least one FBME customer that was a front company for a U.S.-sanctioned Syrian entity, the Scientific Studies and Research Center (SSRC) and which used its FBME account to process transactions through the U.S. financial system."

80 Fed. Reg. at 45058.   FinCEN had described these incidents in similarly nondescript terms in the Notice of Finding.   79 Fed. Reg. at 42639–40.

Conspicuously absent from both the Notice of Finding and the Final Rule are details that would afford a meaningful opportunity for FBME to investigate and comment on the first,

second, and fourth of these supposed incidents.[8]   Despite repeated requests by FBME for specifics behind these and other allegations, *e.g.*, Peters Decl. Exs. H, O, FinCEN never supplied FBME with:   (i) the identities of the Hezbollah financier, the financial advisor to organized crime, or the Bank customers evading U.S. sanctions; (ii) the relevant dates, or (iii) any other information sufficient to identify these allegations.   When FBME pressed for details, FinCEN stonewalled: "FinCEN is unable to release additional information in response to this question beyond the statements within the Notice of Finding."   *Id.* Ex. Q.   Needless to say, FinCEN also never shared the supposed evidence underlying these allegations—or any of the other allegations in the Notice or Final Rule.   Without such information, FBME could not marshal a thoroughgoing, on-point rejoinder, as it otherwise would have (nor could it cut off interactions with the alleged wrongdoers, which is presumably among FinCEN's goals).

"It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data, or on data that, [to a] critical degree, is known only to the agency." *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 393 (D.C. Cir. 1973).   Yet that is what happened here.   FinCEN was well aware that FBME lacked enough information to respond to these allegations, but it neither rectified the deficiency nor otherwise accounted for it.

---

[8]   FBME managed ultimately to get to the bottom of the third allegation.   As FBME explained in its comments on September 22, 2014, and in its follow up letter of December 1, 2014, a review by Ernst & Young confirmed that FBME did *not* knowingly facilitate a transfer involved in fraud against a U.S. person; to the contrary, as soon as FBME became alert to the fraudulent nature of the transaction, it immediately notified the appropriate authorities, specifically by filing a Suspicious Transaction Report with the Cypriot Financial Intelligence Unit.   FBME Comment at 26.   This goes to show that when FinCEN provided adequate notice of the factual allegations, FBME was able to offer meaningful commentary and engage in the sort of exchange of views between agency and affected party that the APA contemplates.   Even so, FinCEN arbitrarily and capriciously ignored FBME's comments refuting this specific allegation; it kept this accusation in the Final Rule without acknowledging the on-point evidence FBME had submitted disproving it.   *See* 80 Fed. Reg. at 45058 (repeating this allegation without addressing FBME's contrary evidence); *see also* Argument Section I.C.i, below.

Even in the dark, FBME did its best to "hunt the peanut."   It retained Ernst & Young to conduct comprehensive, detailed reviews of the Bank's customer files and transaction logs, and it reported the findings to FinCEN.   Ernst & Young identified no basis for the allegations regarding (1) financiers for Lebanese Hezbollah and (2) transnational organized crime figures. December 1 Letter at 3–4.[9]   The paucity of information provided by FinCEN nevertheless made it impossible to ensure that Ernst & Young had not overlooked or misidentified a transaction alluded to in the Notice.

In sum, FBME did its utmost to comment meaningfully on the Rule and to use all available information to stamp out financial transactions involving suspect individuals or organizations, but it was stymied by FinCEN's Kafkaesque refusal to specify the charges and evidence against the Bank that undergird the Final Rule—a refusal that violates the APA.   "An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary."   *Connecticut Light & Power*, 673 F.2d at 530–31.

To this day, FBME has not seen any factual evidence—either from its own internal review or from FinCEN—supporting the assertions in the Final Rule that FBME knowingly facilitated transactions with Hezbollah financiers, advisors to major transnational criminals, fraudsters targeting U.S. persons, or Syrian front entities.   The procedural requirements of the APA provide bedrock assurance that the Government will not use uncorroborated and

---

[9]   Initially Ernst & Young also found no link between any FBME customer and the Scientific Studies and Research Center.   But when the U.S. Department of Treasury updated its List of Specially Designated Nationals and Blocked Persons on October 16, 2014—three months after the Notice—FBME conducted another review and, consistent with its standard practices, immediately froze two accounts for a newly designated entry on the List that was potentially connected to the Scientific Studies Research Center.   December 1 Letter at 3–4.

undisclosed facts to justify invasive—and, in this case, punishing—regulation without affording affected parties a genuine opportunity to refute the basis for the regulation.   In this case, however, FinCEN arrived at a regulation that will decimate FBME while refusing even to specify why it is doing so.   This is anathema to the APA and sufficient reason to vacate the Final Rule.

### B.   The Government Violated Due Process By Denying FBME Meaningful Notice And Opportunity To Be Heard

FinCEN's dismal procedure violated not just the APA but also the U.S. Constitution. The Fifth Amendment guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law."   At its core, due process mandates both effective notice and a meaningful opportunity to be heard.   Here the administrative process afforded neither.[10]

It is "elementary and fundamental" that the notice of a deprivation must convey sufficient information to afford interested parties "an opportunity to present their objections."   *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).   In other words, due process requires that a person facing a deprivation of property receive "notice of the case against him . . . ."   *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 171–72 (1951) (Frankfurter, J., concurring)).

It is equally "fundamental" that the person receive an "opportunity to be heard 'at a meaningful time and in a meaningful manner.'"   *Id.* at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).   With respect to timing, the Fifth Amendment requires (except in extraordinary circumstances) that "an individual be given an opportunity for a hearing *before* he

---

[10]    Although FBME is based in Tanzania and Cyprus, it is entitled to protection under the U.S. Constitution because the Bank has sufficient property and presence within the United States.   *See* Saab Decl. ¶¶ 34–38; *see also 32 County Sovereignty Committee v. Department of State*, 292 F.3d 797, 799 (D.C. Cir. 2002); *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192, 202 (D.C. Cir. 2001).

is deprived of any significant property interest." *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971).   As for the manner of the hearing, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).   "[A]t a minimum," however, the "affected individual must have a meaningful opportunity *to present his case before a neutral decision-maker*." *Propert v. District of Columbia*, 948 F.2d 1327, 1333 (D.C. Cir. 1991) (emphasis added).

Animating these procedural requirements is a simple yet fundamental premise: "[W]hen a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972).   Had FBME received the notice and opportunity to be heard that due process requires, it could have corrected FinCEN's unfair and mistaken Final Rule.

Courts apply a "familiar two-part inquiry" to determine whether the strictures of the Due Process Clause have been satisfied: (1) whether the plaintiff faces a deprivation of a protected property or liberty interest, and, if so, (2) whether that plaintiff has received the process that is due. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).

> **1.    The Final Rule will deprive FBME of its property interests in accessing U.S. funds through correspondent banks**

The Final Rule will prohibit all U.S. financial institutions "from establishing, maintaining, administering, or managing a correspondent account in the United States for, or on behalf of, FBME."   80 Fed. Reg. at 45062.   This sanction prevents FBME from accessing any correspondent account at any financial institution across the country and prevents any U.S. financial institution from engaging in any transaction involving FBME.   Without such accounts, FBME cannot engage in any transactions, anywhere in the U.S. or around the world, involving

U.S. currency—which is the life blood of any financial institution of FBME's size and scope. Restricting an organization's access to even just *one* "small bank account" in the United States is a deprivation of property for purposes of due process.   *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192, 201, 203–05 (D.C. Cir. 2001).   Permanently restricting an entity's access to all correspondent accounts that touch dollars (upstream or downstream) thus unquestionably constitutes a deprivation of property that requires due process.[11]

### 2.   FinCEN issued the final rule without providing FBME requisite notice and opportunity for a hearing.

In *Mathews v. Eldridge*, the Supreme Court identified three factors that a court must evaluate when deciding what process is due for a particular deprivation:   (1) "the private interest that will be affected;" (2) "the risk of erroneous deprivation;" and (3) the "Government[] interest[s]" at issue.   424 U.S. at 335.   Balancing these factors, it is clear FBME was entitled to far more process than it was afforded here.

### i.   The private interests at issue relate to FBME's very ability to remain operational.

The interests at stake for FBME could not be higher.   As one commentator recently noted, a § 311 designation is, for a financial institution, akin to a "death sentence."   *A Fearful Number*, THE ECONOMIST (June 6, 2015), http://goo.gl/kZXz6af.   If the Final Rule takes effect, FBME will lose its ability to engage in financial transactions in U.S. dollars in the United States and around the world either directly or as a downstream (or upstream) participant.   Given the nature of today's global economy, this will cut off FBME from the international financial market. When the government brands an entity or individual with a designation that entails a significant

---

[11]   Furthermore, with respect to FBME's property in the United States, if the Final Rule is allowed to take effect, FBME would be unable to access the funds currently held on the Bank's behalf in a North Carolina escrow account.   *See* Saab Decl. ¶¶ 38, 69.

deprivation of property or liberty such as this, due process requires adequate notice and a meaningful opportunity to be heard before a neutral decision-maker. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (plurality opinion) ("[A] citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decision-maker."); *Joint Anti-Fascist*, 341 U.S. at 165–74 (Frankfurter, J., concurring) (due process requires notice and hearing for an organization slated to be designated as "Communist"); *National Council*, 251 F.3d at 208–09 (designating an entity a "foreign terrorist organization" without adequate notice or hearing violated due process). Here, FBME received neither the notice nor the hearing that the Constitution requires.

First, as explained above in Argument Section I.A, FinCEN's Notice was so vague as to prevent the Bank from being able to investigate the specific allegations against it, much less to offer a meaningful response.[12] Second, a hearing was never provided. At no time over the course of FinCEN's "rulemaking"—which amounted to an adjudication in which FinCEN pronounced FBME guilty of unspecified money-laundering charges—did FinCEN afford the Bank opportunity to present evidence to a neutral arbiter responsible for evaluating the government's allegations and the propriety and proportionality of its proposed response.

-----

[12]    To the extent FinCEN's designation relied on classified or privileged information, due process nevertheless requires FinCEN to make that information available to FBME in a way consistent with national security, such as by providing an unclassified summary or allowing access by an attorney with a proper security clearance. *Al Haramain Islamic Foundation, Inc. v. U.S. Department of the Treasury*, 686 F.3d 965, 983–84 (9th Cir. 2012) (agency violated due process by designating an organization a terrorist group based on classified information without making the information available to the organization in a way that did not implicate national security). The same principle should obtain here, lest due process be further compromised.

Through its written formal comment on the Notice and supplemental submissions to FinCEN, FBME did the best it could under the circumstances to respond to FinCEN's generalized and cryptic allegations.  But being relegated to guessing at the allegations and trying to refute them via written comments to the accuser is a far cry from what due process requires—namely, a description of the specific charges, and opportunity to contest those charges by marshaling responsive evidence before a *neutral* decision-maker.   *See e.g.*, *Hamdi*, 542 U.S. at 533; *Parham v. J. R.*, 442 U.S. 584, 606 (1979) (holding that a hearing before a "neutral factfinder" was required for due process); *Joint Anti-Fascist*, 341 U.S. at 168; *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 104 (D.D.C. 2012) (granting preliminary injunction because plaintiff likely could show due process violation when the government seized his property without affording him a hearing before a neutral party).

### ii.        The risk of erroneous deprivation is high

The risk of "erroneous deprivation" is especially high here because FinCEN has kept FBME in the dark as to many of the allegations against it.  *See Al Haramain Islamic Foundation, Inc. v. U.S. Department of the Treasury*, 686 F.3d 965, 986 (9th Cir. 2012) ("because AHIF-Oregon could only *guess* (partly incorrectly) as to the reasons for the investigation, the risk of erroneous deprivation was high").   Without details of the alleged transgressions, FBME could not meaningfully correct FinCEN's many misunderstandings.   Only with more thorough notice and a hearing before a neutral factfinder could FinCEN ensure that the allegations at issue here are sufficiently sound, and sufficiently contextualized, to prevent an erroneous deprivation.

If nothing else, the secrecy of FinCEN's purported justification for the Final Rule required that *someone* apart from the proponents review it and assess its sufficiency.   Because no one—not the Bank, not other stakeholders, not a neutral factfinder—has had the opportunity to do so, the risk of erroneous deprivation looms large.

### iii.   Better notice and a hearing would not impose an unreasonable administrative or financial burden on FinCEN

Last, the government would by no means have incurred unreasonable burdens in providing FBME with better notice and a hearing before the Final Rule issued.   *See Mathews*, 424 U.S. at 334.   This was not a situation where the government needed to act on an emergency basis to protect its interests or public safety—FinCEN waited a year between the preliminary Notice and the Final Rule.   Moreover, § 311 determinations are rare and well deserving of an investment of governmental resources commensurate with the stakes for the institutions facing sanctions, especially where, as here, the fifth special measure is under consideration.   Given the extensive resources the Government deployed for this case, and the relaxed pace at which it proceeded, it only made sense for FinCEN to afford FBME better notice and at least some semblance of a hearing at which specific allegations could be contested and neutrally assessed.

In situations involving stakes far lower than the existential threat FBME faces here, courts have repeatedly found that a hearing does not pose unreasonable burdens for the Government.   *See Propert*, 948 F.2d at 1333 (hearing before an "unbiased decision-maker" was required before city could tow and destroy "junk" vehicle); *Gray Panthers v. Schweiker*, 652 F.2d 146, 158 (D.C. Cir. 1980) (hearing was required before government could deny Medicare claims valued at less than $100).   This is also well removed from the extraordinary situation presented by suspected terrorist organizations, where courts have occasionally held that a traditional hearing is not necessary given the threat to national security.   *See National Council*, 251 F.3d at 207; *Palestine Information Office v. Shultz*, 853 F.2d 932, 942 (D.C. Cir. 1988).

\*          \*          \*

Given the magnitude of the private interests implicated by the Final Rule and the high risk of error, FinCEN had no adequate justification for denying FBME the robust notice and

hearing that are cornerstones of due process.   The Due Process Clause requires, in particular, that FinCEN provide proper notice and a hearing before a neutral factfinder before imposing the fifth special measure against FBME.    Its failure to do so is unconstitutional.

### C.    The Final Rule Is Arbitrary And Capricious

The grave procedural errors identified above should suffice to establish that FBME is likely to succeed on the merits.    But the Final Rule also needs to be set aside as a substantive matter because it is arbitrary and capricious.    *See* 5 U.S.C. § 706(2)(A).

An agency rule is "arbitrary and capricious" if (among other things) the agency (1) failed to "examine *the relevant data* and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," (2) failed "to consider an important aspect of the problem," or (3) offered "an explanation for its decision that runs counter to the evidence before it."    *District Hospital Partners, L.P. v. Burwell*, 786 F.3d 46, 56–57 (D.C. Cir. 2015) (quoting *Motor Vehicle Manufacturers Ass'n of the United States v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983); quotation marks omitted).    It follows from these requirements that "an agency cannot *ignore* new and better data."    *Id.* at 57; *see also Catawba County v. EPA*, 571 F.3d 20, 45 (D.C. Cir. 2009) (agencies "have an obligation to deal with newly acquired evidence in some reasonable fashion").    Likewise, "agencies do *not* have free rein to use inaccurate data."    *District Hospital*, 786 F.3d at 56.

Under these standards, The Final Rule is arbitrary and capricious in at least three glaring respects.

### i.    FinCEN failed to consider the relevant data

First, FinCEN failed to consider the relevant data submitted by the Bank and failed to articulate a rational connection between the facts and the Final Rule.    As detailed above, FBME submitted extensive information to FinCEN—including audits from neutral third parties KPMG

and Ernst & Young—documenting the conscientiousness of its anti-money-laundering controls and refuting specific allegations leveled against it in the Notice of Finding (at least those allegations which the Bank could make sense of from the Notice).   *See* Peters Decl. Exs. A–M, O–P, R–T; Background Sections III.B & III.C.   Much of the submitted evidence showed that FinCEN's Notice of Finding was based on inaccurate, outdated, or incomplete information.   But FinCEN ignored the best, most recent evidence before it.   After correcting merely two minor statements in the Notice regarding fines that FBME supposedly faced, FinCEN skipped past the remaining contrary evidence and blithely declared in the Final Rule that all of the other "statements made in the [Notice of Finding] remain true and accurate."   80 Fed. Reg. at 45060.

This pronouncement reflects FinCEN's studious disregard of the evidence.   For example, the Final Rule claims that KPMG's and Ernst & Young's audits "show a pattern of recurring AML [anti-money-laundering] deficiencies at the bank."   80 Fed. Reg. at 45059.   For support, FinCEN cites the 2011 Ernst & Young audit—a document that FinCEN *has never actually reviewed* (FBME never submitted this audit to FinCEN; instead, FinCEN is apparently relying on a summary of the document that FBME pasted into its Comment on the Notice of Finding, *see* FBME Comment at 17–18).   This 2011 audit noted that *pre-2011* versions of the Bank's due diligence procedures had not fully complied with all requirements of the Cypriot regulations, but that these procedures "*met the requirements*" by 2011.   80 Fed. Reg. at 45059 (emphasis added).   Finalizing a rule in 2015 based upon a deficiency identified and remedied *before* a 2011 audit violates the agency's obligation to incorporate "new and better data." *District Hospital*, 786 F.3d at 57.

Similarly, FinCEN notes—but disregards—the fact that KPMG's 2013 audit "found that FBME 'basically fulfills' its regulatory requirements set forth by [Cyprus] and the European

35

Union."   80 Fed. Reg. at 45059.   FinCEN emphasizes that the 2013 audit also identified "issues of 'high and medium' significance" with certain of the Bank's sanction screening procedures and anti-money-laundering measures for Approved Third Parties.   *Id.*   What FinCEN neglects to mention, however, is that the Bank remedied *all* of these issues after receiving KPMG's 2013 audit and informed FinCEN accordingly.   *See* Peters Decl. Exs. D at 2 & F.   Once again, therefore, FinCEN in the Final Rule is relying upon outdated (and at times, mischaracterized) evidence at the expense of the new—and purporting to find a pattern of recurring deficiencies, even where the actual evidence demonstrates a pattern of compliance and correction of identified deficiencies.

For Ernst & Young's audits, FinCEN played the same game of disregarding contrary evidence and cherry picking snippets.   In its 2014 audit (*see* Peters Decl. Ex. B), Ernst & Young made a number of minor recommendations, which FinCEN calls "deficiencies."   80 Fed. Reg. at 45059.   In doing so, FinCEN misses the forest for the trees, failing to take into account Ernst & Young's ultimate conclusion that FBME has an anti-money-laundering program in place that satisfies all EU and Cypriot regulatory requirements.   *See* Peters Decl. Ex. D at 3.   Moreover, FinCEN fails to acknowledge—just as it did with the other audits FBME submitted—that FBME has either already implemented each recommendation in the audit, or was in the process of doing so.   *Id.* Ex. G.

In other words, FinCEN's methodology when it came to the Final Rule was to pluck out of context old, inaccurate, and incomplete data that supposedly supported its desired outcome, and to pass over, without any explanation, extensive contrary evidence.   Construed fairly, the KPMG and Ernst & Young audits show that, although *in the past* the Bank may have fallen short in its controls in certain respects, FBME had overhauled its procedures and remedied all

deficiencies identified by the auditors since at least 2012.   Rather than credit FBME for the remedial steps it had taken, however, FinCEN relied on the outdated reports of isolated past deficiencies to support its conclusion that the Bank has inadequate anti-money-laundering controls *today*.   It is the epitome of unreasonableness to condemn someone based on old accusations when fresher evidence shows those accusations are no longer true.

The Final Rule also contains a bevy of other allegations that FBME showed in its submissions are inaccurate, incomplete, or outdated.   These include:

- The Final Rule generally contends that the Suspicious Transaction Reports ("STRs") FBME filed to notify authorities of questionable transactions were "incomplete, inaccurate, or untimely."   80 Fed. Reg. at 45060.   Yet Ernst & Young conducted a very detailed analysis of FBME's STRs and found no such insufficiencies.   *See* Peters Decl. Ex. B at 20 (AML Program Element: Suspicious Transaction Reporting).   FinCEN ignored this contrary evidence when it issued the Final Rule.

- The Final Rule states that the Central Bank of Cyprus fined FBME 80,000 euros "for customer identification, due diligence, and automated monitoring deficiencies."   80 Fed. Reg. at 45059.   But as FBME informed FinCEN, this fine was for *missing a deadline* for updating customer files for new requirements, not for deficiencies in its anti-money-laundering policies. FBME Comment at 20–21.   Moreover, by 2011 at the latest, the Central Bank had not identified any further issues related to customer identification concerns. *Id.* at 21.

- Finally, as previously explained, the Final Rule completely ignores the evidence FBME submitted refuting FBME's involvement in the specific transactions alleged in the Final Rule, such as a purported transaction involving a financier for Lebanese Hezbollah.   *See* Argument Section I.A.

In sum, the Final Rule was arbitrary and capricious in relying upon evidence of supposed deficiencies identified years ago, without taking fair account of the consistent, demonstrable strides the Bank has since made, and is continuing to make, to address those issues, to maintain its current compliance, and to improve still further if given a chance.

ii.      **FinCEN failed to explain why the Final Rule satisfies § 311's statutory requirements**

Second, FinCEN did not articulate how the Final Rule satisfies the criteria of § 311. Section 311 authorizes the fifth special measure if the Secretary of Treasury finds that reasonable grounds exist to conclude that a financial institution is of "primary money laundering concern." 31 U.S.C. § 5318A(a)(1).   FinCEN never explained how FBME satisfies the statutory predicate that it be of *primary* money laundering concern.   Admittedly, the statute does not define the phrase "primary money laundering concern."   The wording suggests two possible definitions: (1) financial institutions engaged *primarily* in money laundering—*e.g.*, a bank that is little more than a front for money launderers; or (2) financial institutions that are of *primary* concern to the Secretary of Treasury in the fight against money laundering—*e.g.*, a bank that launders money in a way that is especially concerning to the Secretary.

FinCEN has ascribed no meaning whatsoever to the term and made no effort to explain why it applies to FBME under any reasonable definition.   Nothing in the Final Rule indicates that FBME is of special or primary concern to the Secretary.   Nor is there anything to suggest that FBME exists primarily to launder funds.   To the contrary, the record leaves no doubt that the overwhelming number of FBME account transactions are legitimate business transactions (a fact that the Notice of Finding and Final Rule neglect to mention).   Peters Decl. Ex. M at 20.

Moreover, FinCEN also failed to appropriately consider the requisite § 311 factors for concluding that a bank is of "primary money laundering concern."   *See* 31 U.S.C. § 5318A(c)(2)(B).   To take one example, to determine whether the Bank was a *primary* money laundering concern, FinCEN had to consider "the *extent* to which" FBME was "used to facilitate or promote money laundering."   § 5318A(c)(2)(B)(i) (emphasis added).   Yet aside from perfunctorily *saying* that the Bank was "used" for these ill ends, 80 Fed. Reg. at 45058, the Final

Rule never considered or discussed the "extent" of that use.   An agency decision that fails to consider the applicable statutory factors is arbitrary and capricious.   *State Farm*, 463 U.S. at 43. By not evaluating the *extent* of the Bank's alleged money laundering, much less placing it in the context of the Bank's overall history and activities, FinCEN could not reasonably conclude that FBME was a "primary" money laundering concern.   To put the point another way, it is wholly unreasonable for FinCEN to interpret "primary money laundering concern" as though it encompasses any entity that has failed, in discrete instances, to detect isolated incidents of money laundering over a band of prior years.

There should be no excusing FinCEN's perfunctory treatment of the statutory factors or its failure to explain why the facts establish that FBME satisfies the "primary" element of the statutory standard.   An agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," and it cannot ignore "an important aspect of the problem," such as the statutory elements.   *District Hospital*, 786 F.3d at 56–57.   For FinCEN to impose the harshest possible sanction under § 311 without explaining how the facts satisfy the statutory predicate was arbitrary and capricious in the extreme.

### iii.   FinCEN imposed an excessive penalty without adequately considering the obvious alternatives

Third, FinCEN failed to explain why it was imposing an excessive and disproportionate penalty while failing to consider obvious alternatives.   Section 311 authorizes a variety of statutory penalties, well short of cutting off a financial institution from accessing U.S. dollars. *See* 31 U.S.C. § 5318A(b)(1)–(b)(5).   Indeed, FinCEN has previously imposed fines and other lesser penalties against financial institutions that have engaged in conduct comparable to FinCEN's allegations against the Bank, and FBME specifically proposed to FinCEN numerous

alternative measures, such as the appointment of a special monitor, the imposition of heightened reporting requirements for FBME, or levying a fine.   *See* Peters Decl. ¶¶ 15, 17 & Exs. P at 2, S, T.

Especially given the numerous exculpatory and mitigating facts that FBME brought to FinCEN's attention after it issued the Notice of Finding (*see* Argument Section I.C.i, above), FinCEN should have considered these significant, viable, and obvious alternatives to the fifth special measure.   Yet it did not do so.   The Final Rule contains no discussion whatsoever of alternative penalties.   It simply states that FinCEN is authorized by § 311 to impose the fifth special measure for a financial institution that is a "primary money laundering concern," asserts that FBME meets that criterion, and orders the harshest of penalties.   80 Fed. Reg. at 45060.

This failure to evaluate reasonable alternatives is arbitrary and capricious.   The D.C. Circuit does not "uphold agency action if it fails to consider 'significant and viable and obvious alternatives.'"   *District Hospital*, 786 F.3d at 59 (quoting *National Shooting Sports Foundation, Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013)).

The lack of evidence in the Final Rule of systemic problems at FBME or knowing facilitation of money laundering also renders the punishment FinCEN meted out wholly disproportional to the offense—and therefore unlawful—given that other organizations with records comparable to that of FBME received only fines and lesser penalties.   *See* Peters Decl. Ex. R at 1–3 & n.2; *see also id.* Ex. M at 21–25 (describing why the fifth special measure would be a disproportional punishment).   The issuance of a punishment that is out of line with the agency's decisions in similar cases is arbitrary and capricious.   *Friedman v. Sebelius*, 686 F.3d 813, 827–28 (D.C. Cir. 2012).

Such arbitrariness and caprice is all the more conspicuous, and all the more problematic, because FinCEN's approach seems contrary to core goals—namely, to promote candor, compliance, cooperation, and rehabilitation among international banks.   *See* Peters Decl. ¶ 4. Here, FBME made demonstrated, concerted efforts to do everything FinCEN might ask of it to move in the right direction—bringing in the leading auditors, reviewing and re-reviewing its compliance processes and procedures, addressing specific concerns raised by FinCEN, soliciting suggestions and recommendations from FinCEN, *etc.*   Yet FinCEN, when deciding among a spectrum of statutory penalties, opted to do its very worst.   Such action sends exactly the wrong message to banks around the world—that they should sweep any compliance issues under the rug because FinCEN may seize on *any* identified deficiency (even a self-identified and remedied deficiency) to act mercilessly.   In this critical respect, the sanction at issue reflects arbitrariness and caprice that are palpable.

## II.   ABSENT AN INJUNCTION, FBME WILL SUFFER IRREPARABLE HARM

That FBME faces irreparable harm should be beyond serious dispute.   The Final Rule is set to cut FBME off from any transaction that touches United States dollars.   FBME depends on U.S. dollars just as virtually any participant in the global financial system does.   Once it loses access to correspondent accounts traceable to the United States—as it will as soon as the Final Rule becomes effective on August 28—it will cease being able to function as an international commercial bank.   Wyllie Decl. ¶¶ 18–20; *see also* Declaration of Charles Kyriacos Charalambous ¶¶ 8–12.   "Major disruption of a business" is irreparable harm, *Blom ASA v. Pictometry International Corp.*, 757 F. Supp. 2d 238, 244–45 (W.D.N.Y 2010) (quoting *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1186 (2d Cir. 1995)), as is "a substantial loss of business," *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975); *5455 Clarkins Drive, Inc. v. Poole*, 2009 WL 2567761, at *7 (N.D. Ohio Aug. 17, 2009).   The irreparable nature of this injury is especially

pronounced here because sovereign immunity likely precludes Plaintiffs from obtaining damages from the Defendants to be made whole.  *See Brendsel v. Office of Federal Housing Enterprise Oversight*, 339 F. Supp. 2d 52, 66 (D.D.C. 2004) (monetary injury caused by federal government was irreparable because sovereign immunity rendered the plaintiff "unable to sue to recover any monetary damages").

Were that not enough, foreign regulators are threatening to liquidate FBME as a result of the Final Rule.  *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) ("destruction" of a business is "irreparable harm"); *Art-Metal USA, Inc. v. Solomon*, 473 F. Supp. 1, 4 n.4 (D.D.C. 1978) (same).  Specifically, the Central Bank of Cyprus notified FBME by letter on August 3, 2015, that it was planning to take adverse actions against FBME in 30 days, up to and including revocation of FBME's license and liquidation of its Cyprus branches.  Saab Decl. ¶ 61 & Ex. A; *see also* Background Section IV.B.  There is thus a grave and growing threat that foreign regulators will take the Final Rule, so long as it remains operative, as precluding FBME from remaining viable, such that it must be either liquidated or sold without delay.

What is more, the deprivation of a constitutional right (here, the right to due process) by itself constitutes irreparable harm.  *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998).  The combined threat of the loss of its constitutional rights, the fundamental alteration and impairment of its business, and possible liquidation, establish beyond doubt that the Bank will likely suffer irreparable injury absent a preliminary injunction.

## III.   THE EQUITIES TIP SHARPLY FOR FBME

With all due respect for FinCEN's perceived interests, there is no commensurate need for *immediate* sanction that weighs on the other side of the equities scale.   Here, we recognize that

42

this Court will ultimately decide, for purposes of the merits, whether or not to leave in place FinCEN's designation of FBME as a "primary money laundering concern."   That is a designation no one takes lightly.   What matters for present purposes, however, is that such a weighty question need not and should not be decided precipitously.   Through its request for a preliminary injunction, FBME simply seeks to maintain the status quo and prevent the implementation of the Final Rule that will destroy its ability to function as an international commercial bank.   The balance of equities usually favors preserving the status quo until a trial on the merits can be held.   *See Texas Children's Hospital v. Burwell*, --- F. Supp. 3d ----, 2014 WL 7373218, at *16 (D.D.C. Dec. 29, 2014).

Far from indicating that it perceives any urgency or emergency that requires upending the status quo, FinCEN waited a *full year* after publishing its Notice of Finding (on July 22, 2014) before arriving at the Final Rule (on July 29, 2015).   There is no good reason now to deny corresponding time for proper judicial review.   In no event can the government claim sufficient interest in enforcing a final rule so as to justify the serious deprivation threatened here.   *See Gordon*, 721 F.3d at 653.

## IV.   AN INJUNCTION SERVES THE PUBLIC INTEREST

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights."   *Klayman v. Obama*, 957 F. Supp. 2d 1, 42 (D.D.C. 2013) (collecting cases).   Indeed, the Federal Government can never elevate a policy goal "over the Due Process Clause." *Gordon*, 721 F.3d at 653; *see also Merck Sharp & Dohme Corp. v. Conway*, 861 F. Supp. 2d 802, 817 (E.D. Ky. 2012) ("There is, of course, a strong public interest in the protection of due process rights.").   Likewise, "[t]he public interest is served when administrative agencies comply with their obligations under the APA."   *R.I.L.-R v. Johnson*, --- F. Supp. 3d ----, 2015 WL 737117, at *19 (D.D.C. Feb. 20, 2015) (quoting *Northern Mariana Islands v. United States*,

686 F. Supp. 2d 7, 21 (D.D.C. 2009)); *see also Sierra Club v. Eubanks*, 335 F. Supp. 2d 1070, 1083 (E.D. Cal. 2004) ("an injunction requiring Defendants to comply with the statutory obligations of the . . . APA . . . is clearly in the public interest").

It should also be emphasized just how many innocent stakeholders face jeopardy alongside FBME.   Their interests, too, belong on the balancing scale, and they weigh heavily in favor of a preliminary injunction.   If FinCEN's Final Rule becomes effective, then many of FBME's employees stand to lose their jobs, which is not in the public interest.   *See, e.g.*, *Navajo Health Foundation—Sage Memorial Hospital, Inc. v. Burwell*, 2015 WL 1906107, at *62 (D.N.M. Apr. 9, 2015) (granting a preliminary injunction in part because "if injunctive relief is not promptly granted, [the plaintiff hospital's] approximately 200 employees will likely lose their jobs.").   Likewise, FBME's borrowers will have the rug pulled out from under them, to the point that they can no longer finance projects that are underway, and depositors' funds will be placed at risk, in the sense that liquidation would entail uncertain prospects and may result in heavily discounted payouts.   Such consequences are contrary to the public interest.   *See, e.g.*, *National Railroad Passenger Corp. v. International Ass'n of Machinists & Aerospace Workers*, 1987 WL 18469, at *1 (D.D.C. Oct. 5, 1987) (considering effect on third-party customers in course of granting preliminary injunction); *Automotive Finance Corp. v. EEE Auto Sales, Inc.*, 2011 WL 2580399, at *8 (E.D. Va. June 28, 2011) (same); *IDS Financial Services, Inc. v. Smithson*, 843 F. Supp. 415, 419 (N.D. Ill. 1994) (same).

More broadly, the overall effect of FinCEN's action will be to disrupt and destabilize global financial markets, as entities at home and abroad will be left guessing as to when FinCEN may invoke § 311—and trembling at the prospect that FinCEN may do its worst even before an administrative record can be compiled and reviewed by a court.   All FBME requests is orderly

judicial review.    And only entry of a preliminary injunction will afford full and fair opportunity for that.    Surely the public interest benefits from grant of a preliminary injunction in such a case.

### CONCLUSION

For the foregoing reasons, Plaintiffs FBME Bank Ltd. and FBME Ltd. respectfully request that the Court grant a preliminary injunction prohibiting FinCEN's final rule from taking effect pending resolution of the merits.

Dated:    August 7, 2015

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN LLP

*/s/ Derek L. Shaffer*

Derek L. Shaffer (D.C. Bar No. 478775)
William A. Burck (D.C. Bar No. 4015426)
Lauren H. Dickie (IL Bar No. 6286037)
Jonathan G. Cooper (D.C. Bar No. 999764)
777 Sixth Street NW, 11th Floor
Washington, DC 20001
(202) 538-8000

HOGAN LOVELLS US LLP

*/s/ Peter S. Spivack*

Peter S. Spivack (D.C. Bar No. 453731)
J. Evans Rice III (D.C. Bar No. 481768)
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5600

*Attorneys for Plaintiffs*
*FBME Bank Ltd. and FBME Ltd.*