## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FBME BANK LTD.**; and | |
| **FBME LTD.**, | |
| Plaintiffs, | |
| v. | Case No. 1:15-cv-01270 |
| **JACOB LEW**, in his official capacity as Secretary of the Treasury; | |
| **U.S. DEPARTMENT OF THE TREASURY**; | |
| **JENNIFER SHASKY CALVERY**, in her official capacity as Director of the Financial Crimes Enforcement Network; and | |
| **FINANCIAL CRIMES ENFORCEMENT NETWORK**, | |
| Defendants. | |

## <u>DECLARATION OF AYOUB-FARID SAAB</u>

I, **Ayoub-Farid M. Saab**, declare as follows:

1.      I am one of two ultimate beneficial shareholders of FBME Bank Ltd. ("FBME"). The other shareholder is my brother, Fadi M. Saab.  Unless otherwise indicated, the facts below are based on my personal knowledge obtained in my capacity as one of the ultimate beneficial owners of FBME.

2.      I was born in 1939 in Tehran, Iran.

3.      In 1952, when I was 12, I moved to Lebanon from Iran.

4.      I studied economics at the American University of Beirut.

5.      I speak English, French, Arabic, Russian, Persian, and some Armenian.

6.      My father, Michel Ayoub Saab, and his brother Joseph Ayoub Saab, established the Federal Bank of Lebanon ("FBL") in 1952.  FBL was among the first 16 banks incorporated in Lebanon and is the only remaining bank fully owned by Christian shareholders.

7.      At the age of 15, I started working at FBL during summer vacations.

8.      After leaving University, I joined the family construction company in Iraq.

9.      In the summer of 1977, my father and I moved to Cyprus in response to the deteriorating security conditions in Lebanon.

10.      Later that year, in the midst of the Lebanese civil war and the Syrian occupation of Lebanon, FBL opened a representative office in Cyprus because of Cyprus' (a) proximity to Lebanon; and (b) its political and economic stability.  The representative office did not provide any banking services.

11.      In 1982, my father, my brother and I incorporated the Federal Bank of the Middle East (now FBME) in Nicosia, Cyprus, as a subsidiary of FBL.

12.     FBL owned 51% of the shares of FBME.  My father, my brother and I owned the remaining 49% as the ultimate beneficial owners of FBL.

13.     In 1985, the security situation further deteriorated in Lebanon.

14.     Fearing nationalization of Lebanese banks by Syrian forces (as had occurred in Syria), my family, who are members of the Lebanese-Christian minority, decided to protect FBME by severing its ties to FBL.

15.     In 1986, my father, my brother and I acquired FBL's 51% share interest in FBME.

16.     As a result of the acquisition, FBME ceased to be a subsidiary of FBL.  The two banks, FBL and FBME, have remained separate since 1986.

17.     In 1991, my father passed away and my brother and I inherited equal shares of my father's interest in FBME and FBL.

18.     Today, my brother and I are equal owners of FBME via the Bank's holding company, FBME Limited; I as an ultimate beneficial owner, and my brother in his personal name.

19.     FBME Limited, which is incorporated in the Cayman Islands, holds 100% of the shares of FBME as its holding company.

20.     At present, I am Chairman of FBME, and my brother is Chief Executive Director.

21.     Since its inception, FBME has been an international commercial bank that, as of mid-2014, had some $2 billion in assets.

22.     Today, FBME is headquartered in Tanzania but operates primarily in Cyprus, consistent with its history there.

23.     To the best of my knowledge and understanding, FBME is the largest bank in Tanzania in terms of assets and the oldest international bank in Cyprus.

24.    FBME has four branches in Tanzania and two branches in Cyprus.

25.    FBME conducts 90% of its operations through its Cyprus branches, again due to its history there.  However, this is changing due to the globalization of the Tanzanian economy and increased business by the FBME branches in Tanzania.

26.    Until recently, FBME also had a representative office in Moscow.

27.    FBME has over 300 employees, with over 180 employees in Cyprus and 120 employees in Tanzania.

28.    FBME services customers around the world.  It offers a wide variety of financial products and services, including corporate and personal banking, trade finance, FX trading facilities, credit facilities, loans, investment services, and online banking on the domestic and international level.

29.    FBME does not operate retail branches.  Instead, it specializes in assisting its high-net-worth customers involved in international business transactions.

30.    As a result, cash transactions comprise only a miniscule fraction of FBME's transactions (1.9% of the total number of transactions and .067 % of transactions by value).  Almost all of the Bank's transactions flow electronically through major correspondent bank accounts.

31.    Because FBME's business consists primarily of providing commercial banking services to international companies, its functional currency is the U.S. dollar.

32.    FBME markets and distinguishes itself to customers by focusing on the high quality of the services it provides.  Clients receive personalized care, including regular contact with senior managers.  To attend to its customers' needs, the Bank employs staff with expertise in

international banking and familiarity with different cultures and languages.  Working hours span different global markets across different time zones in order to facilitate customer access.

33.     Many of FBME's customers like to bank in Cyprus because it (i) is a member of the European Union ("EU"); (ii) has advantageous tax laws, including one of the lowest corporate tax rates in the EU and favorable tax treaties with almost 50 countries; and (iii) is strategically located at the crossroads of Europe, Asia, the Middle East, and Africa.

34.     Although FBME is based in Tanzania and Cyprus, it has property in the United States and maintains important ties with a number of American companies.

35.     Over 150 of the Bank's customers reside or operate in the United States.

36.     The Bank currently maintains accounts with approximately 30 companies headquartered in the United States and owns various U.S.-based securities.

37.     The Bank also holds a mortgage interest in an approximately 3,000-acre residential community currently under development in North Carolina.  Per the loan terms, FBME receives a percentage of each property sale in partial satisfaction of the loan.

38.     These funds are presently held in escrow for FBME in a bank account in North Carolina.

39.     FBME employs a conservative business plan.  It pursues modest growth, low loan to deposit ratios, and high liquidity and solvency ratios.

40.     Throughout FBME's 30-year history, the shareholders have never declared a dividend, choosing instead to re-invest all funds to support the Bank's continued growth.

41.     Due to the Bank's conservative approach, the Bank was in exceptional financial health until July 2014, when the U.S. Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") issued the Notice of Findings ("Notice") against FBME.

42.     As of July 18, 2014, the Bank's total deposits amounted to approximately $2 billion, of which approximately 1.1 billion or 55% was denominated in U.S. dollars and 538 million or 36.4% was denominated in Euros.  On the same report date, on the Bank's asset side, total placements with various financial institutions was approximately $1.5 billion, of which approximately 975 million was denominated in U.S. dollars and 325 million was denominated in Euros.

43.     After the Notice, all of FBME's correspondent banks closed or froze the Bank's USD accounts and suspended execution of money transfers to and from FBME accounts in USD.

44.     The Notice did not prevent FBME from conducting business activities in Euros.

45.     As of August 7, 2015, the Bank's total deposits amount to approximately $1.6 billion, of which 500 million or 36% are denominated in Euros.  Due to the Notice, the Bank cannot access its U.S. dollar-denominated deposits.

46.     On the same report date, on the Bank's asset side, total placements with various financial institutions are $1.4 billion, of which approximately 800 million are denominated in U.S. dollars and 470 million are denominated in Euros.  Due to the Notice, the Bank cannot access the U.S. dollar-denominated placements.

47.     The day after FinCEN issued the Notice, the Cypriot government issued a decree granting the Bank's regulator, the Central Bank of Cyprus ("CBC"), authority over FBME's Cyprus branches.

48.     On July 21, 2014, CBC issued a decree ordering the sale of FBME's Cyprus branches (the "Resolution").  That same day, CBC appointed a Special Administrator to effectuate the sale.  The Special Administrator immediately took steps to identify a potential buyer, albeit unsuccessfully.

49.     The Special Administrator also imposed restrictions on the Bank as of September 2, 2014 including (1) limiting customer withdrawals to EUR 10,000 or less per day which subsequently dropped to as low as EUR 200 per day; and (2) requiring FBME customers to open an account at the Bank of Cyprus in order to cash or deposit checks.  Although the Notice did not require the Special Administrator to impose such restrictions, CBC used the Notice as a pretext to take such action against FBME.

50.     CBC's actions in response to the Notice—including, but not limited to, its attempts to sell the Bank's Cyprus operations and the restrictions imposed by the Special Administrator on customer withdrawals and deposits—unfairly prevented FBME from conducting business activities in Euros even though a number of correspondent banks were willing to transact with the Bank in Euros.

51.     Between July 25, 2014, and May 8, 2015, FBME brought three lawsuits against CBC in the Supreme Court of Cyprus challenging the (i) Resolution, (ii) the appointment of a second Special Administrator in April 2015, and (iii) other actions by CBC.  Each of these lawsuits is pending.  I have been advised by Cypriot counsel that these lawsuits may continue for several years before adjudication.  Indeed, there is currently a lawsuit in the Cyprus courts that has been pending for thirty years.

52.     On October 28, 2014, my brother and I brought an action before an arbitral tribunal constituted under the Rules of the International Chamber of Commerce in Paris (the "Tribunal") against the Republic of Cyprus pursuant to a bilateral treaty between Lebanon and Cyprus designed to protect Cypriot-based investments challenging actions by the Special Administrator and seeking damages therefrom.  The arbitration successfully halted CBC's efforts to sell the Bank (at least temporarily).

53.     According to interim relief that the Tribunal has ordered, CBC is to "abstain from taking any measures that would destroy irrevocably the business of FBME Cyprus . . . [including] measures such as the final liquidation or sale of the business and/or [its] assets and/or shares."  Per the order, if CBC deemed such action "absolutely necessary," CBC must provide all parties and the Tribunal with 30 days notice.

54.     Following the Notice, the Bank of Tanzania ("BOT") assumed control of FBME and authorized a Statutory Manager to oversee FBME, including by selling or liquidating the Tanzanian branches as and if necessary.

55.     The Statutory Manager informed FBME employees that the BOT considered FinCEN's findings to be a "compliance issue" which created no reason for alarm or overreaction from the BOT.

56.     FBME successfully convinced the BOT to temporarily refrain from following the same course as CBC.

57.     FBME's understanding with the BOT was reached, in large part, because of the BOT's recognition that the Notice was preliminary.  During meetings with the BOT, the BOT clearly explained that the BOT reserved its right to take action against FBME should FinCEN finalize the rule.

58.     On July 23, 2015, FinCEN issued the final rule entitled *Imposition of Special Measure Against FBME Bank Ltd., Formerly Known as the Federal Bank of the Middle East Ltd., as a Financial Institution of Primary Money Laundering Concern*, 80 Fed. Reg. 45057 (July 29, 2015) ("Final Rule").

59.     On July 24, 2015, CBC announced on its website that FinCEN's decision was final and that CBC was "studying its actions in view" of the FinCEN Final Rule.

60.     Just days later, the Special Administrator in Cyprus warned my brother and me that CBC intended to sell the Bank or liquidate its assets within days because FinCEN finalized the rule.

61.     On August 3, 2015, CBC sent FBME a "Notice of Intention" in which CBC "hereby gives one month's notice of its intention to take such steps as are required . . . in the exercise of CBC's powers," including "revocation of FBME's license and liquidation of FBME's Cyprus Branch" ("August 3 Letter").  According to CBC, "FinCEN's issuance of the Final Rule precludes any prospect that FBME Cyprus Branch will be able to resume normal operations and meet its obligations to depositors and creditors in the foreseeable future."  A true and correct copy of the August 3 Letter is attached as Exhibit A.

62.     Counsel to CBC in the arbitration provided a copy of the Notice of Intention to the Tribunal (the "transmittal letter").  A true and correct copy of the transmittal letter is attached as Exhibit B.

63.     On August 5, 2015, my brother and I sent a letter ("August 5 Letter") responding to CBC and stating our view that the August 3 Letter does not constitute notice pursuant to the Tribunal's order.  The letter also discusses the disproportionality of CBC's response to the Final Rule.  Furthermore, the letter asks CBC to assist the Bank in restructuring, before the effective date of the Final Rule, the small but viable portion of the business that still remains.  Last, the letter apprises CBC that liquidation of the Bank's Cyprus branches will destroy what remains of the Bank.  A true and correct copy of the August 5 Letter is attached as Exhibit C.

64.     FBME intends to file a lawsuit against CBC in Cyprus to prevent CBC from liquidating the Bank.  I have been advised by Cypriot counsel that this litigation may last for several years before adjudication.

65.     The Final Rule also now threatens FBME's previous understandings with the BOT.  Shortly after the Final Rule, the BOT issued a public announcement on its website stating that "The Bank of Tanzania is aware that the Final Rule issued by FinCEN will affect the future of FBME and currently is reviewing the situation with the view of determining an appropriate course of action for the bank including resolution options as governed by law."  I understand "resolution options" to include liquidation or sale.

66.     In sum, the Final Rule will have devastating consequences for FBME.  CBC has positioned itself to liquidate FBME's Cyprus operations after the Final Rule becomes effective on August 28, 2015.  And the BOT has positioned itself to liquidate or sell what remains of FBME after liquidation of the Cyprus branches.

67.     Even if FBME is successful in preventing CBC from liquidating the Cyprus branches and lifting the restrictions imposed by the Special Administrator, the Final Rule will result in severe losses for the Bank and force FBME to cease conducting business as an international commercial bank.  Based on my over forty-years of experience in banking and on my conversations with experienced FBME managers and staff and with the Special Administrator, I understand that when the Final Rule is implemented the large, international correspondent bank[s] with whom the Bank still has a relationship[s] will sever ties on account of its [their] connection to U.S. financial institutions.  As a result, FBME will have to use small, regional correspondent banks to transact in Euros and other currencies.  FBME will, in essence, be cut off from the global financial market.  It will be forced to restructure, lay off employees, redesign its business model, and cease providing vital client services.  FBME will suffer substantial but as of yet unquantifiable financial losses associated with significant reductions in

(1) customer deposits, (2) the interest earned therefrom, and (3) returns on the Bank's placements in correspondent banks.

68.     This restructuring, however, could only take place with the support of CBC, but CBC has already indicated that the Final Rule will lead it to take opposite measures, such as liquidation.

69.     In addition, if the Final Rule takes effect, FBME will not be able to access the funds held in escrow in North Carolina or to foreclose on the property if the borrower defaults.

70.     My brother and I are committed to doing everything within our power to ensure the survival of FBME as an international commercial bank (which it has been for decades), even in the face of adversity that has mounted over the past year. Implementation of the Final Rule, however, threatens to make that impossible.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.


Executed in Nicosia, Cyprus on August 7, 2015     _____

Ayoub-Farid M. Saab

10

# EXHIBIT A

# AUGUST 3 LETTER



## CENTRAL BANK OF CYPRUS

EUROSYSTEM

THE GOVERNOR

**3 August 2015**

FBME Bank Ltd – Cyprus Branch
90 Arch. Makarios III Avenue
1077 Nicosia
Cyprus

Professor Benno Ndulu
Governor
Bank of Tanzania
2 Mirambo Street
11884 Dar es Salaam
P.O.Box 2939
Tanzania

Mr. Lawrence N. Mafuru
Statutory Manager FBME Bank Ltd
FBME HOUSE, 85 Block K, Klnondoni Road,
P.O.Box 8298
Dar es Salaam, Tanzania

Mr. Ayoub-Farid Michel Saab and Mr. Fadi Michel Saab
90 Arch. Makarios III Avenue
1077 Nicosia
Cyprus

Quinn Emanuel Urquhart & Sullivan UK LLP
Attn: Mr. Philippe Pinsolle and Mr. Thomas Voisin
6 rue Lamennais
75008 Paris
France

Madkour Law Firm
Attn: Mr Roy Michel Madkour and Ms. Rita Abouzeid
Achrafieh
Sodeco Center
Bloc 6, 1st and 3rd floors
Beirut, Lebanon

**CENTRAL BANK OF CYPRUS**
EUROSYSTEM

-2-

Hogan Lovells US LLP
Attn: Mr. Peter S. Spivack, Mr. Evans J. Rice, Mr. Ethan G. Kate, Ms. Beth Peters
Columbia Square, 555 Thirteenth Street
NW, Washington, DC 20004
USA

George Z. Georgiou & Associates LLC
Attn: Mr. George Z. Georgiou
1st Floor, 1 Eras Street
1060 Nicosia
Cyprus


Dear Sirs and Mesdames,

## Re: **FBME Bank Ltd ("FBME") - Notice of intention**

### 1.    **Introduction**

1.1    We refer to the arbitration proceedings brought by Mr. Ayoub-Farid Michel Saab and Mr. Fadi Michel Saab ("Claimants") against The Republic of Cyprus, being Arbitration Case No. 20588/ZF (the "Arbitration"). We also refer to Procedural Order No. 3 made in the Arbitration on Claimants' Request for Interim Measures dated 13 May 2015 (the "Order"). In particular, we refer to paragraph 2 of the Order which, in relevant part, is in the following terms:

"... Respondent (with its regulatory organs) is invited to abstain from taking any measures that would destroy irrevocably the business of FBME Cyprus pending completion of this arbitration, and ordered to notify one month in advance the Arbitral Tribunal, Claimants, their Counsel, Mr Mafuru and all other concerned authorities and/or entities of any such measure",

(the "Notification Order").

1.2    Please treat this letter as one month's notice by the CBC of its intention to take certain steps (as detailed in section 3 below) in the exercise of its rights, powers and obligations as the competent resolution and regulatory/supervisory authority in the Republic of Cyprus for FBME's branch operations ("FBME Cyprus Branch").

.../3

**CENTRAL BANK OF CYPRUS**
EUROSYSTEM

-3-

## 2.   Background

2.1    As recipients of this notice will be aware, on 17 July 2014, the US Department of Treasury's Financial Crimes Enforcement Network ("FinCEN"), issued a Notice of Finding ("NOF") that reasonable grounds existed for concluding that FBME is a financial institution "of primary money laundering concern", pursuant to Section 311 of the USA Patriot Act.  On 22 July 2014, FinCEN published a Notice of Proposed Rulemaking ("NPRM") to propose the imposition of a special measure authorized by 31 U.S.C. § 5318A(b)(5) (the fifth special measure) that, if adopted as a final rule, would prohibit covered US financial institutions from opening or maintaining correspondent or payable-through accounts for FBME itself, and for other foreign banks being used to process transactions involving FBME.

2.2    On 21 July 2014, CBC issued Decree ΚΔΠ 356/2014 ordering the sale of operations of  FBME Cyprus Branch (the "Resolution Measure of Sale"), pursuant to section 7 of the Resolution of Credit and Other Institutions Laws of 2013 and 2014 (the "Resolution Law").

2.3    The CBC so acted because FinCEN's NOF and NPRM resulted in FBME Cyprus Branch being unable to conduct normal banking operations and to meet its obligations as they fall due by reason of its correspondent and intermediary banks, as well as other counterparties, cutting their lines and refusing to transact business with FBME (including FBME Cyprus Branch).  As a consequence, the conditions set forth in section 6 of the Resolution Law were satisfied, namely, that FBME Cyprus Branch would not be able to meet its obligations as they become due and, therefore, not be viable in the very near future; that in the absence of resolution measures, it would be unable to observe its liquidity requirements; and that, in order to protect depositors and avoid financial instability, a resolution measure was necessary to safeguard the public benefit or to serve the public interest.

2.4    On 23 July 2015, FinCEN issued a final rule pursuant to Section 311 of the USA Patriot Act, determining that FBME is a bank "of primary money laundering concern" to the US financial system (the "Final Rule").  The Final Rule imposes the fifth special measure against FBME, which prohibits US financial institutions from opening or maintaining correspondent accounts or payable-through accounts for or on behalf of FBME.  In issuing the Final Rule, FinCEN stated  that it had  considered

…/4

Case 1:15-cv-01270-CRC Document 3-4 Filed 08/07/15 Page 17 of 41
CENTRAL BANK OF CYPRUS
EUROSYSTEM

-4-

all relevant comments and other information available to the agency, including both public and non-public.

2.5    The Final Rule was published in the Federal Register on 29 July 2015 and will become effective on 28 August 2015.

## 3.    Notice

3.1    In the circumstances (comprised, among other things, by the NOF and NPRM and the reaction thereto by FBME's correspondent banks and other counterparties, the adoption of the Resolution Measure of Sale which to date has not been fulfilled, and the issuance by FinCEN of the Final Rule), the CBC apprehends that it is likely to be required to take further steps shortly in relation to FBME Cyprus Branch to comply with Cypriot and European Union law, protect the interests of depositors and other creditors, and maintain stability in the financial sector. In the judgment of the CBC, FinCEN's issuance of the Final Rule precludes any prospect that FBME Cyprus Branch will be able to resume normal operations and meet its obligations to depositors and creditors in the foreseeable future, and makes fulfillment of the Resolution Measure of Sale more difficult and likely impossible. Deferring action in these circumstances would not comport with the requirements of the Resolution Law and other applicable directives/regulations of the European Union, and would cause additional harm to depositors and other creditors who have been unable to access their funds.

3.2    Accordingly, CBC hereby gives one month's notice of its intention to take such steps as are required, appropriate or necessary in the exercise of CBC's powers and duties as the competent resolution and regulatory/supervisory authority for FBME Cyprus Branch, including but not limited to the following:

(a)    Terminating and/or suspending the Resolution Measure of Sale;

(b)    Variation of FBME's licence (whether by the imposition of conditions, or otherwise);

(c)    Revocation of FBME's licence and liquidation of FBME Cyprus Branch.

3.3    In giving this notice, the CBC does not concede that any of the foregoing steps would destroy irreparably the business of FBME or FBME Cyprus Branch, particularly as the business of FBME and FBME Cyprus Branch has already been irreparably

...

…/5

**CENTRAL BANK OF CYPRUS**
EUROSYSTEM

-5-

destroyed by FinCEN's actions and the reactions of FBME's counterparties to those actions. Further, by giving this notice, the CBC does not waive or otherwise commit to refrain from taking such steps as may be necessary to exercise its rights, powers and obligations pursuant to applicable Cyprus law and the directives/regulations of the European Union.

Sincerely,

Chrystalla Georghadji

cc:  Attorney-General of the Republic of Cyprus
     Minister of Finance of the Republic of Cyprus
     Curtis, Mallet-Prevost, Colt & Mosle LLP (Attn: Mr. Mark O'Donoghue, Mr. Peter
     M. Wolrich, Mr. Justin Jacinto)
     Special Administrator of FBME Bank Ltd, Cyprus Branch, Mr. Andrew
     Andronikou

# EXHIBIT B

# TRANSMITTAL LETTER

# CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

| | | | |
|---|---|---|---|
| Almaty | Istanbul | **ATTORNEYS AND COUNSELLORS AT LAW** | TELEPHONE 212-696-6000 |
| Ashgabat | London | | FACSIMILE 212-697-1559 |
| Astana | Mexico City | 101 PARK AVENUE | WWW.CURTIS.COM |
| Beijing | Milan | NEW YORK, NEW YORK 10178-0061 | |
| Buenos Aires | Muscat | | |
| Dubai | Paris | | |
| Frankfurt | Rome | | |
| Houston | Washington, D.C. | | |

4 August 2015

<u>*Via*</u> **e-mail**

| | | |
|---|---|---|
| Prof. Pierre Tercier | Prof. Ibrahim Fadlallah | Van Vechten Veeder QC |
| 5, Chemin Guillaume Ritter | 61, rue La Boétie | Essex Court Chambers |
| 1700 Fribourg | 75008 Paris | 24 Lincoln's Inn Fields |
| Switzerland | France | London WC2A 3EG |
| | | United Kingdom |

Re:    **Ayoub-Farid Michel Saab and Fadi Michel Saab v. The Republic of Cyprus, ICC Case No. 20588/ZF**

Dear Members of the Tribunal:

Please find enclosed a notification issued by the Governor of the Central Bank of Cyprus, dated 3 August 2015, giving notice of the intention of the Central Bank of Cyprus to take certain steps in the exercise of its obligations and powers as the competent resolution and regulatory/supervisory authority in the Republic of Cyprus for the operations of the Cyprus branch of FBME Bank Ltd.

The Central Bank's notice refers to the issuance by FinCEN on 23 July 2015 of a final rule pursuant to Section 311 of the USA Patriot Act, finally determining that FBME is a bank "of primary money laundering concern".   In issuing that final rule, FinCEN stated that it had considered all relevant comments and other information available to the agency, including public and non-public submissions made on behalf of FBME.   FinCEN stated: "This information continues to provide reason to believe that FBME's AML compliance efforts are not adequate to address the risks faced by FBME, and that FBME facilitates illicit financial activity".   A copy of FinCEN's final rule is enclosed for your reference.

The Central Bank's notification is issued in full compliance with the Tribunal's Procedural Order No. 3 and commences the one month notice period provided for therein.

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**
Attorneys and Counsellors at Law

Prof. Pierre Tercier
Prof. Ibrahim Fadlallah
Van Vechten Veeder QC

Page 2                                                                                                 4 August 2015

Yours sincerely,

Mark H. O'Donoghue

cc (*via* e-mail):        Philippe Pinsolle (philippepinsolle@quinnemanuel.com)
                          Thomas Voisin (thomasvoisin@quinnemanuel.com)
                          Roy Michel Madkour (info@madcour.com)
                          Rita Abouzeid (rita.abouzeid@madcour.com)
                          Živa Filipič, Asli Yilmaz (ica5@iccwbo.org)



# CENTRAL BANK OF CYPRUS
EUROSYSTEM

THE GOVERNOR

**3 August 2015**

FBME Bank Ltd – Cyprus Branch
90 Arch. Makarios III Avenue
1077 Nicosia
Cyprus

Professor Benno Ndulu
Governor
Bank of Tanzania
2 Mirambo Street
11884 Dar es Salaam
P.O.Box 2939
Tanzania

Mr. Lawrence N. Mafuru
Statutory Manager FBME Bank Ltd
FBME HOUSE, 85 Block K, Klnondoni Road,
P.O.Box 8298
Dar es Salaam, Tanzania

Mr. Ayoub-Farid Michel Saab and Mr. Fadi Michel Saab
90 Arch. Makarios III Avenue
1077 Nicosia
Cyprus

Quinn Emanuel Urquhart & Sullivan UK LLP
Attn: Mr. Philippe Pinsolle and Mr. Thomas Voisin
6 rue Lamennais
75008 Paris
France

Madkour Law Firm
Attn: Mr Roy Michel Madkour and Ms. Rita Abouzeid
Achrafieh
Sodeco Center
Bloc 6, 1st and 3rd floors
Beirut, Lebanon

80 Kennedy Avenue, CY-1076 Nicosia, Cyprus – Telephone:  +357 22714471 –  Fax: +357 22378151
Email: governor@centralbank.gov.cy – Website: www.centralbank.gov.cy

**CENTRAL BANK OF CYPRUS**
EUROSYSTEM

-2-

Hogan Lovells US LLP
Attn: Mr. Peter S. Spivack, Mr. Evans J. Rice, Mr. Ethan G. Kate, Ms. Beth Peters
Columbia Square, 555 Thirteenth Street
NW, Washington, DC 20004
USA

George Z. Georgiou & Associates LLC
Attn: Mr. George Z. Georgiou
1st Floor, 1 Eras Street
1060 Nicosia
Cyprus

Dear Sirs and Mesdames,

## Re: FBME Bank Ltd ("FBME") - Notice of intention

### 1. Introduction

1.1    We refer to the arbitration proceedings brought by Mr. Ayoub-Farid Michel
Saab and Mr. Fadi Michel Saab ("Claimants") against The Republic of Cyprus, being
Arbitration Case No. 20588/ZF (the "Arbitration"). We also refer to Procedural Order
No. 3 made in the Arbitration on Claimants' Request for Interim Measures dated 13
May 2015 (the "Order"). In particular, we refer to paragraph 2 of the Order which, in
relevant part, is in the following terms:

"... Respondent (with its regulatory organs) is invited to abstain from taking any
measures that would destroy irrevocably the business of FBME Cyprus pending
completion of this arbitration, and ordered to notify one month in advance the Arbitral
Tribunal, Claimants, their Counsel, Mr Mafuru and all other concerned authorities
and/or entities of any such measure",

(the "Notification Order").

1.2    Please treat this letter as one month's notice by the CBC of its intention to take
certain steps (as detailed in section 3 below) in the exercise of its rights, powers and
obligations as the competent resolution and regulatory/supervisory authority in the
Republic of Cyprus for FBME's branch operations ("FBME Cyprus Branch").

.../3

CENTRAL BANK OF CYPRUS
EUROSYSTEM

-3-

## 2.    Background

2.1     As recipients of this notice will be aware, on 17 July 2014, the US Department of Treasury's Financial Crimes Enforcement Network ("FinCEN"), issued a Notice of Finding ("NOF") that reasonable grounds existed for concluding that FBME is a financial institution "of primary money laundering concern", pursuant to Section 311 of the USA Patriot Act.   On 22 July 2014, FinCEN published a Notice of Proposed Rulemaking ("NPRM") to propose the imposition of a special measure authorized by 31 U.S.C. § 5318A(b)(5) (the fifth special measure) that, if adopted as a final rule, would prohibit covered US financial institutions from opening or maintaining correspondent or payable-through accounts for FBME itself, and for other foreign banks being used to process transactions involving FBME.

2.2     On 21 July 2014, CBC issued Decree ΚΔΠ 356/2014 ordering the sale of operations of  FBME Cyprus Branch (the "Resolution Measure of Sale"), pursuant to section 7 of the Resolution of Credit and Other Institutions Laws of 2013 and 2014 (the "Resolution Law").

2.3     The CBC so acted because FinCEN's NOF and NPRM resulted in FBME Cyprus Branch being unable to conduct normal banking operations and to meet its obligations as they fall due by reason of its correspondent and intermediary banks, as well as other counterparties, cutting their lines and refusing to transact business with FBME (including FBME Cyprus Branch).  As a consequence, the conditions set forth in section 6 of the Resolution Law were satisfied, namely, that FBME Cyprus Branch would not be able to meet its obligations as they become due and, therefore, not be viable in the very near future; that in the absence of resolution measures, it would be unable to observe its liquidity requirements; and that, in order to protect depositors and avoid financial instability, a resolution measure was necessary to safeguard the public benefit or to serve the public interest.

2.4     On 23 July 2015, FinCEN issued a final rule pursuant to Section 311 of the USA Patriot Act, determining that FBME is a bank "of primary money laundering concern" to the US financial system (the "Final Rule").  The Final Rule imposes the fifth special measure against FBME, which prohibits US financial institutions from opening or maintaining correspondent accounts or payable-through accounts for or on behalf of FBME.  In issuing the Final Rule, FinCEN stated  that it had  considered

…/4

CENTRAL BANK OF CYPRUS
EUROSYSTEM

-4-

all relevant comments and other information available to the agency, including both public and non-public.

2.5    The Final Rule was published in the Federal Register on 29 July 2015 and will become effective on 28 August 2015.

## 3.    Notice

3.1    In the circumstances (comprised, among other things, by the NOF and NPRM and the reaction thereto by FBME's correspondent banks and other counterparties, the adoption of the Resolution Measure of Sale which to date has not been fulfilled, and the issuance by FinCEN of the Final Rule), the CBC apprehends that it is likely to be required to take further steps shortly in relation to FBME Cyprus Branch to comply with Cypriot and European Union law, protect the interests of depositors and other creditors, and maintain stability in the financial sector.  In the judgment of the CBC, FinCEN's issuance of the Final Rule precludes any prospect that FBME Cyprus Branch will be able to resume normal operations and meet its obligations to depositors and creditors in the foreseeable future, and makes fulfillment of the Resolution Measure of Sale more difficult and likely impossible.  Deferring action in these circumstances would not comport with the requirements of the Resolution Law and other applicable directives/regulations of the European Union, and would cause additional harm to depositors and other creditors who have been unable to access their funds.

3.2    Accordingly, CBC hereby gives one month's notice of its intention to take such steps as are required, appropriate or necessary in the exercise of CBC's powers and duties as the competent resolution and regulatory/supervisory authority for FBME Cyprus Branch, including but not limited to the following:

(a)    Terminating and/or suspending the Resolution Measure of Sale;

(b)    Variation of FBME's licence (whether by the imposition of conditions, or otherwise);

(c)    Revocation of FBME's licence and liquidation of FBME Cyprus Branch.

3.3    In giving this notice, the CBC does not concede that any of the foregoing steps would destroy irreparably the business of FBME or FBME Cyprus Branch, particularly as the business of FBME and FBME Cyprus Branch has already been irreparably

.../5

**CENTRAL BANK OF CYPRUS**

EUROSYSTEM

-5-

destroyed by FinCEN's actions and the reactions of FBME's counterparties to  those actions.  Further, by giving this notice, the CBC does not waive or otherwise commit to  refrain from taking  such steps as may be necessary to exercise its rights,  powers and obligations pursuant to applicable Cyprus law and the directives/regulations of the European Union.

Sincerely,

Chrystalla Georghadji

cc:  Attorney-General of the Republic of Cyprus
Minister of Finance of the Republic of Cyprus
Curtis, Mallet-Prevost, Colt & Mosle LLP (Attn: Mr. Mark O'Donoghue, Mr. Peter M. Wolrich, Mr. Justin Jacinto)
Special Administrator of FBME Bank Ltd, Cyprus Branch, Mr. Andrew Andronikou

(2) Indirect costs are a proportionate share of the following A&CC costs:

(i) Compensation and benefit hours worked in support of all A&CC activities;

(ii) A&CC building and equipment depreciation costs;

(iii) A&CC utilities, facility and equipment maintenance, and supplies and materials; and

(iv) Information Technology and other services the Department of Labor provides to the A&CC.

(c) *Fees are charged for—*

(1) Application processing (*e.g.,* administrative and technical review of applications, computer tracking, and status reporting);

(2) Testing and evaluation (*e.g.,* analysis of drawings, technical evaluation, testing, test set up and test tear down, and internal quality control activities);

(3) Approval decisions (*e.g.,* consultation on applications, records control and security, document preparation); and

(4) Two post-approval activities: changes to approvals and post-approval product audits.

(d) *Fees are not charged for—*

(1) Technical assistance not related to processing an approval application;

(2) Technical programs, including development of new technology programs;

(3) Participation in research conducted by other government agencies or private organizations; and

(4) Regulatory review activities, including participation in the development of health and safety standards, regulations, and legislation.

(e) *Fee estimate.* Except as provided in paragraphs (e)(1) and (2) of this section, on completion of an initial administrative review of the application, the A&CC will prepare a maximum fee estimate for each application. A&CC will begin the technical evaluation after the applicant authorizes the fee estimate.

(1) The applicant may pre-authorize an expenditure for services, and may further choose to pre-authorize either a maximum dollar amount or an expenditure without a specified maximum amount.

(i) All applications containing a pre-authorization statement will be put in the queue for the technical evaluation on completion of an initial administrative review.

(ii) MSHA will concurrently prepare a maximum fee estimate for applications containing a statement pre-authorizing a maximum dollar amount, and will provide the applicant with this estimate.

(2) Where MSHA's estimated maximum fee exceeds the pre-

authorized maximum dollar amount, the applicant has the choice of cancelling the action and paying for all work done up to the time of the cancellation, or authorizing MSHA's estimate.

(3) Under the Revised Acceptance Modification Program (RAMP), MSHA expedites applications for acceptance of minor changes to previously approved, certified, accepted, or evaluated products. The applicant must pre-authorize a fixed dollar amount, set by MSHA, for processing the application.

(f) If unforeseen circumstances are discovered during the evaluation, and MSHA determines that these circumstances would result in the actual costs exceeding either the pre-authorized expenditure or the authorized maximum fee estimate, as appropriate, MSHA will prepare a revised maximum fee estimate for completing the evaluation. The applicant will have the option of either cancelling the action and paying for services rendered or authorizing MSHA's revised estimate, in which case MSHA will continue to test and evaluate the product.

(g) If the actual cost of processing the application is less than MSHA's maximum fee estimate, MSHA will charge the actual cost.

## § 5.40   Fee administration.

Applicants and approval holders will be billed for all fees, including actual travel expenses, if any, when approval program activities are completed. Invoices will contain specific payment instruction, including the address to mail payments and authorized methods of payment.

## § 5.50   Fee revisions.

The hourly rate will remain in effect for at least one year and be subject to revision at least once every three years.

[FR Doc. 2015–18617 Filed 7–28–15; 8:45 am]

**BILLING CODE 4510–43–P**

# DEPARTMENT OF THE TREASURY

## Financial Crimes Enforcement Network

### 31 CFR Part 1010

### RIN 1506–AB27

## Imposition of Special Measure Against FBME Bank Ltd., Formerly Known as the Federal Bank of the Middle East Ltd., as a Financial Institution of Primary Money Laundering Concern

**AGENCY:** Financial Crimes Enforcement Network (FinCEN), Treasury.

**ACTION:** Final rule.

**SUMMARY:** In a Notice of Finding (NOF) published in the **Federal Register** on July 22, 2014, the Director of FinCEN found that reasonable grounds exist for concluding that FBME Bank Ltd. (FBME), formerly known as the Federal Bank of the Middle East, Ltd., is a financial institution of primary money laundering concern pursuant to the United States Code (U.S.C.). On the same date, FinCEN also published in the **Federal Register** a Notice of Proposed Rulemaking (NPRM) to propose the imposition of a special measure authorized by the U.S.C. against FBME. FinCEN is issuing this final rule imposing the fifth special measure against FBME.

**DATES:** This final rule is effective August 28, 2015.

**FOR FURTHER INFORMATION CONTACT:** The FinCEN Resource Center at (800) 767–2825.

**SUPPLEMENTARY INFORMATION:**

## I. Background

### A. Statutory Provisions

On October 26, 2001, the President signed into law the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107–56 (the USA PATRIOT Act). Title III of the USA PATRIOT Act amends the anti-money laundering provisions of the Bank Secrecy Act (BSA), codified at 12 U.S.C. 1829b, 12 U.S.C. 1951–1959, and 31 U.S.C. 5311–5314, 5316–5332, to promote the prevention, detection, and prosecution of international money laundering and the financing of terrorism. Regulations implementing the BSA appear at 31 CFR chapter X. The authority of the Secretary of the Treasury (the Secretary) to administer the BSA and its implementing regulations has been delegated to the Director of FinCEN.

Section 311 of the USA PATRIOT Act (Section 311), codified at 31 U.S.C. 5318A, grants the Director of FinCEN the authority, upon finding that reasonable grounds exist for concluding that a foreign jurisdiction, financial institution, class of transaction, or type of account is of "primary money laundering concern," to require domestic financial institutions and financial agencies to take certain "special measures" to address the primary money laundering concern. This rulemaking imposes the fifth special measure, codified at 31 U.S.C. 5318A(b)(5), against FBME. The fifth special measure allows the Director to prohibit or impose conditions on the opening or maintaining of

correspondent or payable-through accounts for the identified institution by U.S. financial institutions.

*B. FBME*

FBME was established in 1982 in Cyprus as the Federal Bank of the Middle East, Ltd., a subsidiary of the private Lebanese bank, the Federal Bank of Lebanon. Both FBME and the Federal Bank of Lebanon are owned by Ayoub-Farid M. Saab and Fadi M. Saab. In 1986, FBME changed its country of incorporation to the Cayman Islands, and its banking presence in Cyprus was re-registered as a branch of the Cayman Islands entity. In 2003, FBME left the Cayman Islands and incorporated and established its headquarters in Tanzania. At the same time, FBME's Cypriot operations became a branch of FBME Tanzania Ltd. In 2005, FBME changed its name from the Federal Bank of the Middle East, Ltd. to FBME Bank Ltd.

FBME's headquarters in Tanzania is widely regarded as the largest bank in Tanzania based on its $2 billion asset size, but it has only four Tanzania-based branches. While FBME is presently headquartered in Tanzania, FBME transacts over 90 percent of its global banking business and holds over 90 percent of its assets in its Cyprus branch. FBME has always maintained a significant presence in Cyprus. FBME has stated, however, that it is not in direct competition with local retail banks in Cyprus for several reasons, including that it does not issue checks, it has no retail counters there, and its Cypriot customers are limited mainly to staff, contractors, and professionals providing services to FBME.

## II. The 2014 Finding and Subsequent Developments

*A. The 2014 Finding*

In a NOF published in the **Federal Register** on July 22, 2014, the Director of FinCEN explained her finding that reasonable grounds exist for concluding that FBME is a financial institution of primary money laundering concern pursuant to 31 U.S.C. 5318A.[1] FinCEN's NOF identified two main areas of concern: (1) FBME's facilitation of money laundering, terrorist financing, transnational organized crime, fraud schemes, sanctions evasion, weapons proliferation, corruption by politically-exposed persons, and other financial crime, and (2) FBME's weak anti-money laundering (AML) controls, which allow its customers to perform a significant volume of obscured transactions and

activities through the U.S. financial system. In particular, the Director found that FBME is used to facilitate money laundering, terrorist financing, transnational organized crime, fraud, sanctions evasion, and other illicit activity internationally and through the U.S. financial system and has systemic failures in its AML controls that attract high-risk shell companies (*i.e.,* companies formed for the sole purpose of holding property or funds and that do not engage in any legitimate business activity). FBME performs a significant volume of transactions and activities that have little or no transparency and often no apparent legitimate business purpose.

As detailed in the NOF, these activities have included (1) an FBME customer receiving a deposit of hundreds of thousands of dollars from a financier for Lebanese Hezbollah; (2) providing financial services to a financial advisor for a major transnational organized crime figure; (3) FBME's facilitation of the transfers to an FBME account involved in fraud against a U.S. person, with the FBME customer operating the alleged fraud scheme later being indicted in the United States District Court for the Northern District of Ohio; and (4) FBME's facilitation of U.S. sanctions evasion through its extensive customer base of shell companies, including at least one FBME customer that was a front company for a U.S.-sanctioned Syrian entity, the Scientific Studies and Research Center (SSRC) and which used its FBME account to process transactions through the U.S. financial system.

On the same date it published the NOF, FinCEN also published in the **Federal Register** a related NPRM to propose the imposition of the fifth special measure against FBME and to seek comment.[2]

*B. FBME Subsequent Developments*

On July 21, 2014, the Central Bank of Cyprus (CBC) issued a decree announcing that it would formally place FBME's Cyprus branch ''under resolution,'' allowing the CBC to take numerous unilateral measures to protect FBME's depositors. On July 24, 2014, the Bank of Tanzania took over management of FBME's headquarters in Tanzania because of the potential effects of the CBC's actions on the Tanzanian banking system.

After considering all relevant comments and other information available to the agency, including both public and non-public reporting,

FinCEN is issuing this final rule imposing the fifth special measure against FBME, which prohibits the opening or maintaining of correspondent or payable-through accounts for FBME by U.S. financial institutions. This information continues to provide reason to believe that FBME's AML compliance efforts are not adequate to address the risks faced by FBME, and that FBME facilitates illicit financial activity. As described below, audits performed by third parties in 2013 and 2014 that were provided to FinCEN by FBME to demonstrate the effectiveness of its AML compliance program instead identified significant, recurring weaknesses in FBME's compliance program. Several deficiencies were identified by one of the third party auditors as being of ''high or medium significance.'' These deficiencies, which FinCEN has reason to believe continue to exist following the issuance of the NOF, facilitate the illicit financial activities of FBME's customers.

## III. FBME's September 22, 2014 Comment and Other Comments

FBME, through outside counsel, submitted comments, dated September 22, 2014, during the comment period. FBME made six additional submissions of information related to comments made during the comment period after the close of the comment period. FBME's September 22, 2014, comments were received during the comment period and accordingly made a part of the public record. The six additional submissions were not made a part of the public record, based in part on FBME's claim that these additional submissions contained sensitive commercial and business information and FBME's corresponding request that the additional submissions be afforded confidential treatment. However, FinCEN reviewed and considered each of these submissions in drafting this final rule.

FBME's September 22, 2014 comment consists of an introduction followed by two major sections. In its introduction, FBME makes six key points. First, FBME states that its AML compliance program policies are in line with applicable requirements, including the requirements of the European Union's Third Money Laundering Directive and the CBC's Fourth Directive. FBME contends that this alignment has been the case since at least 2013, according to third party audits. Second, FBME states that, in response to recommendations made as a result of audits conducted by Ernst & Young (EY) in 2011 and KPMG in 2013, FBME has

---

[1] *See* 79 FR 42639 (July 22, 2014).

[2] *See* 79 FR 42486 (July 22, 2014) (RIN 1506–AB27).

substantially strengthened its compliance program over the last two years. Third, FBME states that FBME and its officers and directors do not condone the use of FBME for illicit purposes and strive to prevent such misuse. Fourth, FBME contends that some of the statements made in the NOF are incorrect or are based on incomplete information, which FBME also describes in the second section of its comment. Fifth, FBME states that, in some cases, FBME filed Suspicious Transaction Reports (STRs) with the Cypriot Financial Intelligence Unit (MOKAS) on activity described in the NOF and NPRM. Sixth, FBME claims that the NOF and NPRM have had a significant adverse impact on FBME and its customers.

The first section of FBME's September 22, 2014 comment then describes aspects of its AML compliance program, and the second section responds to statements made in the NOF that FBME asserts are inaccurate or based on incomplete information.

In this final rule, FinCEN is focusing its response on the six points in the introduction, which summarize FBME's concerns with the NOF and the NPRM. In responding to the first three points of FBME's introduction, FinCEN also refutes the first section of FBME's comment because the first three points of FBME's introduction and the first section of FBME's comment all refer to FBME's AML compliance program, its policies, audits conducted by third parties, and FBME's management. In responding to the fourth point of FBME's introduction, FinCEN is also addressing the second section of FBME's comment because both the fourth point of the introduction and the second section of the comment refer to the same statements in the NOF that FBME asserts are inaccurate or based on incomplete information.

With regard to FBME's first and second points, the information provided by FBME on the audits conducted by KPMG and EY in 2013 and 2014, respectively, show a pattern of recurring AML deficiencies at the bank. These included failures to maintain adequate customer identification files, along with other customer due diligence weaknesses, failure to ensure that third parties the bank relied on to establish new customer relationships employed appropriate AML controls with regard to such persons, and issues with sanctions-related screening.

According to FBME's comment, EY conducted an audit in 2011 (the 2011 EY Audit). During that audit, according to FBME, EY found that FBME's due diligence procedures with respect to

obtaining information from new clients met the requirements of the CBC Directive at the time, but also noted that some customer information requirements of the Directive had not been fully met by FBME in previous iterations of its AML procedures and policies. According to FBME's comment, EY subsequently conducted another audit in 2014 (the 2014 EY Audit), which found that, although FBME had an AML compliance program in place that incorporated the requirements of both the CBC Fourth Directive and the European Union Third Directive, FBME nevertheless had deficiencies in its customer due diligence, automated alerts system, and AML training areas.

According to FBME's September 22, 2014 comment, KPMG also conducted an audit in 2013 (the 2013 KPMG Audit) which found that FBME "basically fulfills" its AML regulatory requirements set forth by the CBC and the European Union, but also identified issues of "high or medium" significance with FBME's use of Approved Third Parties and FBME's sanction screening procedures. As FBME stated in its September 22, 2014 comment, FBME uses its relationships with Approved Third Parties, some of which are in foreign jurisdictions, to develop potential new customer relationships. According to the KPMG 2013 Audit, FBME has never attempted to ensure the adequacy of its Approved Third Parties' AML measures. In addition, the 2013 KPMG Audit found that FBME only screened the related parties of its Approved Third Parties when the customers were initially onboarded.

The 2013 KPMG Audit also found FBME's customer due diligence deficient. As FBME disclosed in its September 22, 2014 comment, in its 2013 audit, KPMG "recommended better presentation of ownership information to demonstrate links between group entities for older customers, in line with a new structure that had been introduced for new customers. KPMG also found that certain customer files reviewed did not have sufficient information to gain a complete understanding of the customers' activities or business rationale." In its 2013 audit, KPMG further found that FBME's use of hold-mail accounts and post office boxes managed by Approved Third Parties should be reconsidered by FBME in order to "avoid potential anonymisation."

The 2014 EY Audit identified numerous deficiencies in FBME's compliance program. Specifically, the 2014 EY Audit found that the following

recommendations were necessary for FBME's compliance program: Consistently documenting the efforts taken to verify the sources of funds and business purpose of accounts from prospective customers; more thoroughly investigating relationships among FBME customers, especially when inordinate volumes of internal transfers are identified; modifying FBME's periodic customer due diligence process to align with industry practices (*e.g.*, moving to a rolling 12 or 36-month review cycle, depending on the customer's risk); implementing an automated case management system to record the alerts generated, stage of investigation, and ultimate disposition of the alerts generated by FBME's screening software, as opposed to the current process of manually entering the alerts/outcome on several different spreadsheets; and more thoroughly documenting the AML/sanctions training given for new hires and providing general awareness training to all employees on an annual basis.

The numerous AML compliance program deficiencies described in the 2013 KPMG Audit and the 2014 EY Audit in particular are similar to AML deficiencies FinCEN identified in the NOF. All of these findings follow action against FBME by the CBC for similar issues. As FBME acknowledged in its September 22, 2014 comment, in 2010, the CBC fined FBME 80,000 euros for customer identification, due diligence, and automated monitoring deficiencies. According to the 2013 KPMG Audit, FBME also undertook an extensive Know Your Customer (KYC) remediation project from 2009 through 2011 that was ordered by the CBC and resulted in the closure of thousands of FBME accounts.

Finally, FBME's argument that its AML compliance program is now adequate is weakened by the list of illicit actors identified in the NOF that have continued to make use of FBME as recently as 2014, including narcotics traffickers, terrorist financiers, and organized crime figures.

With regard to FBME's third point, information available to FinCEN makes it reasonable to conclude that FBME's management facilitated, either actively or passively, the illicit activities of its customers, as FinCEN set forth in the NOF.

With regard to FBME's fourth point, in which FBME has argued that portions of the eight statements in the NOF were incorrect or based on incomplete information, FinCEN believes that it is appropriate in two cases to amend the NOF based on these comments. In the first case, FBME stated that it was not

fined by the CBC in 2008, but that the CBC imposed an administrative fine on FBME in 2010. FinCEN agrees that the fine in question was imposed in 2010, not in 2008.

In the second case, FBME argued that the report that FBME may be subject to a fine of up to 240 million euros is from a November 2013 article in the Cypriot press that relied on anonymous sources at the CBC. FinCEN agrees that the source of this statement was an article that appeared in the Cypriot press that referenced statements by a CBC official speaking anonymously. Neither these two cases nor any of FBME's remaining claims of incompleteness and factual inaccuracy presents any new information or in any way cause FinCEN to doubt the accuracy of the information presented in the NOF.

With regard to FBME's fifth point, FinCEN notes that the filing of STRs on suspicious activities or transactions by a financial institution is not, taken in isolation, an adequate indicator of the robustness and comprehensiveness of a compliance program. Although the filing of STRs is a critical component of any financial institution's AML compliance program, if STRs are filed in an incomplete, inaccurate, or untimely manner, their usefulness to authorities responsible for investigating money laundering and other illicit activities is greatly diminished. Moreover, filing STRs does not excuse a financial institution's failure to adequately implement other areas of its AML program, such as, for example, customer due diligence procedures.

With regard to FBME's sixth point, as part of FinCEN's consideration of the statutory factors supporting its selection of the fifth special measure, FinCEN has considered "the extent to which the action or the timing of the action would have a significant adverse systemic impact on . . . legitimate business activities involving" FBME. This is discussed in Part IV, section A below.[3]

In addition to its public comment, FBME has submitted a substantial volume of supplemental information regarding FBME's policies and procedures, and reports of the audits conducted by KPMG in 2013 and EY in 2014. FinCEN has carefully considered these materials, which outline some of the steps that FBME has taken to strengthen its compliance program. However, after a thorough review of these materials, FinCEN believes that, except as acknowledged above, the statements made in the NOF remain true and accurate, and that FBME is of "primary money laundering concern."

FinCEN continues to have serious concerns regarding FBME's potential to be used wittingly or unwittingly for illicit purposes. As FinCEN explained in its NOF, FBME customers continue to exhibit shell company attributes and many are located in high-risk jurisdictions. FinCEN continues to have concerns with FBME's AML compliance program, in particular with the aforementioned customer due diligence deficiencies, which were identified over a number of years and which enable FBME customers to conduct financial activity in relative obscurity.

FinCEN also considered a comment received from the American Bankers' Association (ABA), dated September 22, 2014; a joint comment received from the Securities Industry and Financial Markets Association (SIFMA) and The Clearing House (TCH), dated September 22, 2014; and a separate comment received from SIFMA, dated September 22, 2014. FinCEN notes that these comments were procedural in nature and did not address the underlying conclusion surrounding the risk of money laundering through FBME.

FinCEN appreciates the thoughtful comments that were submitted and has addressed these comments, as appropriate, in the section-by-section analysis below.

## IV. Imposition of Special Measure Against FBME as a Financial Institution of Primary Money Laundering Concern

As described in the NOF and this final rule, the Director of FinCEN found that reasonable grounds exist for concluding that FBME is a financial institution of primary money laundering concern. Based upon that finding, the Director of FinCEN is authorized to impose one or more special measures. Following the required consultations and the consideration of all relevant factors discussed in the NOF, the Secretary, through the Director of FinCEN, proposed the imposition of the fifth special measure in an NPRM published on July 22, 2014. The fifth special measure authorizes a prohibition against the opening or maintaining of correspondent accounts by any domestic financial institution or agency for, or on behalf of, a financial institution found to be a primary money laundering concern.

Consistent with the finding that FBME is a financial institution of primary money laundering concern and in consideration of additional relevant factors, this final rule imposes the fifth special measure with regard to FBME. The prohibition on the maintenance of correspondent accounts imposed by the fifth special measure will help to guard

against the money laundering risks that FBME presents to the U.S. financial system as identified in the NOF, NPRM, and this final rule.

### A. Discussion of Section 311 Factors

In determining which special measure to implement to address the primary money laundering concern posed by FBME, FinCEN has considered the following factors.

#### 1. Whether Similar Actions Have Been or Will Be Taken by Other Nations or Multilateral Groups Against FBME

Other countries or multilateral groups have not yet taken action similar to those proposed in this rulemaking that would prohibit domestic financial institutions and agencies from opening or maintaining a correspondent account for, or on behalf of, FBME and that would require those domestic financial institutions and agencies to screen their correspondents in a manner that is reasonably designed to guard against indirect use by FBME, including access through the use of nested correspondent accounts held by FBME.

#### 2. Whether the Imposition of the Fifth Special Measure Would Create a Significant Competitive Disadvantage, Including Any Undue Cost or Burden Associated With Compliance, for Financial Institutions Organized or Licensed in the United States

The fifth special measure imposed by this rulemaking prohibits covered financial institutions from opening and maintaining correspondent accounts for, or on behalf of, FBME. As a corollary to this measure, covered financial institutions also are required to take reasonable steps to apply special due diligence, as set forth below, to all of their correspondent accounts to help ensure that no such account is being used indirectly to provide services to FBME. FinCEN does not expect the burden associated with these requirements to be significant. Additionally, there is only a minimal burden involved in transmitting a one-time notice to correspondent account holders concerning the prohibition on indirectly providing services to FBME. U.S. financial institutions generally apply some level of transaction and account screening, often through the use of commercially available software. As explained in more detail in the section-by-section analysis below, financial institutions should, if necessary, be able to easily adapt their current screening procedures to support compliance with this final rule. Thus, the prohibition on the maintenance of correspondent accounts that would be required by this

[3] 31 U.S.C. 5318A(a)(4)(B)(iii).

rulemaking is not expected to impose a significant additional burden upon U.S. financial institutions.

**3. The Extent to Which the Action or Timing of the Action Will Have a Significant Adverse Systemic Impact on the International Payment, Clearance, and Settlement System, or on Legitimate Business Activities Involving FBME**

FBME is not a major participant in the international payment system and is not relied upon by the international banking community for clearance or settlement services. Thus, the imposition of the fifth special measure against FBME will not have a significant adverse systemic impact on the international payment, clearance, and settlement system. In light of the underlying money laundering risks posed by FBME, FinCEN does not believe that the rule will impose an undue burden on legitimate business activities involving FBME. There are other banks in both Cyprus and Tanzania that could alleviate potential impact on legitimate business activities within those jurisdictions.[4] On July 21, 2014, the CBC, under the authority of the Cyprus Resolution Act, issued a decree announcing that it would formally place FBME's Cyprus branch "under resolution," allowing the CBC to take numerous unilateral measures regarding FBME, including selling off Cyprus-based FBME branch locations, to protect FBME's depositors. On July 24, 2014, the Bank of Tanzania took over management of FBME's headquarters in Tanzania because of the potential effects of the CBC's actions on the Tanzanian banking system. The control of FBME branches by state authorities in both jurisdictions also offers a means to support legitimate business activity involving FBME. Finally, FinCEN anticipates that its identification of the money laundering risks associated with FBME will assist banks in appropriately policing legitimate business involving FBME to guard against the use of their institutions for financial crime.

**4. The Effect of the Action on United States National Security and Foreign Policy**

The exclusion from the U.S. financial system of banks that, like FBME, serve as conduits for money laundering activity and other financial crimes will enhance U.S. national security by making it more difficult for terrorists, sanctions evaders, and money

launderers to access the substantial resources of the U.S. financial system. More generally, the imposition of the fifth special measure will complement the U.S. Government's worldwide foreign policy efforts to expose and disrupt international money laundering, and to encourage other nations to do the same. The United States has played a leadership role in combating money laundering and terrorist financing not only through action with regard to specific institutions but also through participation in international operational and standard-setting bodies such as the Egmont Group and the Financial Action Task Force.

**V. Section-by-Section Analysis for Imposition of the Fifth Special Measure**

*A. 1010.658(a)—Definitions*

1. FBME

Section 1010.658(a)(1) of the rule defines FBME to include all branches, offices, and subsidiaries of FBME operating in any jurisdiction, including Tanzania and Cyprus. Financial institutions should take commercially reasonable measures to determine whether a customer is a branch, office, or subsidiary of FBME. Currently, FBME's bank branches are located in Tanzania and Cyprus, with a representative office in Moscow, Russian Federation.

SIFMA, TCH, and the ABA noted that it would be useful for FinCEN to provide a list of FBME's subsidiaries; however, because subsidiary relationships can change frequently, covered financial institutions should use commercially-reasonable tools to determine the current subsidiaries of FBME.

2. Correspondent Account

Section 1010.658(a)(2) of the rule defines the term "correspondent account" by reference to the definition contained in 31 CFR 1010.605(c)(1)(ii). Section 1010.605(c)(1)(ii) defines a correspondent account to mean an account established to receive deposits from, or make payments or other disbursements on behalf of, a foreign bank, or to handle other financial transactions related to the foreign bank. Under this definition, "payable through accounts" are a type of correspondent account.

In the case of a U.S. depository institution, this broad definition includes most types of banking relationships between a U.S. depository institution and a foreign bank that are established to provide regular services, dealings, and other financial transactions, including a demand

deposit, savings deposit, or other transaction or asset account, and a credit account or other extension of credit. FinCEN is using the same definition of "account" for purposes of this rule as was established for depository institutions in the final rule implementing the provisions of section 312 of the USA PATRIOT Act requiring enhanced due diligence for correspondent accounts maintained for certain foreign banks.[5]

In the case of securities broker-dealers, futures commission merchants, introducing brokers-commodities, and investment companies that are open-end companies (mutual funds), FinCEN is also using the same definition of "account" for purposes of this rule as was established for these entities in the final rule implementing the provisions of section 312 of the USA PATRIOT Act requiring enhanced due diligence for correspondent accounts maintained for certain foreign banks.[6]

3. Covered Financial Institution

Section 1010.658(a)(3) of the rule defines "covered financial institution" with the same definition used in the final rule implementing section 312 of the USA PATRIOT Act,[7] which, in general, includes the following:

• An insured bank (as defined in section 3(h) of the Federal Deposit Insurance Act (12 U.S.C. 1813(h));
• A commercial bank;
• An agency or branch of a foreign bank in the United States;
• A Federally insured credit union;
• A savings association;
• A corporation acting under section 25A of the Federal Reserve Act (12 U.S.C. 611);
• A trust bank or trust company;
• A broker or dealer in securities;
• A futures commission merchant or an introducing broker-commodities; and
• A mutual fund.

4. Subsidiary

Section 1010.658(a)(4) of the rule defines "subsidiary" as a company of which more than 50 percent of the voting stock or analogous equity interest is owned by another company.

*B. 1010.658(b)—Requirements for Covered Financial Institutions With Regard to the Fifth Special Measure*

For purposes of complying with the final rule's prohibition on the opening or maintaining in the United States of correspondent accounts for, or on behalf of, FBME, covered financial institutions

---

[4] *See* Central Bank of Cyprus (Web site: *http://www.centralbank.gov.cy/*) and Bank of Tanzania (Web site: *http://www.bot-tz.org/*) for lists of banks in Cyprus and Tanzania, respectively.

[5] *See* 31 CFR 1010.605(c)(2)(i).
[6] *See* 31 CFR 1010.605(c)(2)(ii)–(iv).
[7] *See* 31 CFR 1010.605(e)(1).

should take such steps as a reasonable and prudent financial institution would take to protect itself from loan or other fraud or loss based on misidentification of a person's status.

### 1. Prohibition on Opening or Maintaining Correspondent Accounts

Section 1010.658(b)(1) of the rule imposing the fifth special measure prohibits all covered financial institutions from establishing, maintaining, administering, or managing a correspondent account in the United States for, or on behalf of, FBME. The prohibition requires all covered financial institutions to review their account records to ensure that they maintain no accounts directly for, or on behalf of, FBME.

### 2. Special Due Diligence of Correspondent Accounts To Prohibit Indirect Use

As a corollary to the prohibition on maintaining correspondent accounts directly for FBME, § 1010.658(b)(2) of the rule imposing the fifth special measure requires a covered financial institution to apply special due diligence to its correspondent accounts that is reasonably designed to guard against processing transactions involving FBME. As part of that special due diligence, covered financial institutions must notify those foreign correspondent account holders that covered financial institutions know or have reason to know provide services to FBME that such correspondents may not provide FBME with access to the correspondent account maintained at the covered financial institution. Covered financial institutions should implement appropriate risk-based procedures to identify transactions involving FBME.

A covered financial institution may satisfy the notification requirement by transmitting the following notice to its foreign correspondent account holders that it knows or has reason to know provide services to FBME:

Notice: Pursuant to U.S. regulations issued under Section 311 of the USA PATRIOT Act, *see* 31 CFR 1010.658, we are prohibited from establishing, maintaining, administering, or managing a correspondent account for, or on behalf of, FBME Bank, Ltd., or any of its branches, offices or subsidiaries. The regulations also require us to notify you that you may not provide FBME Bank, Ltd., or any of its branches, offices or subsidiaries with access to the correspondent account you hold at our financial institution. If we become aware that the correspondent account you hold at our financial institution has processed any transactions involving FBME Bank, Ltd., or any of its branches, offices or subsidiaries, we will be required to

take appropriate steps to prevent such access, including terminating your account.

A covered financial institution may, for example, have knowledge through transaction screening software that a correspondent account processes transactions for FBME. The purpose of the notice requirement is to aid cooperation with correspondent account holders in preventing transactions involving FBME from accessing the U.S. financial system. However, FinCEN would not require or expect a covered financial institution to obtain a certification from any of its correspondent account holders that access will not be provided to comply with this notice requirement. Instead, methods of compliance with the notice requirement could include, for example, transmitting a one-time notice by mail, fax, or email to appropriate correspondent account holders of the covered financial institution, informing them that they may not provide FBME with access to the covered financial institution's correspondent account, or including such information in the next regularly occurring transmittal from the covered financial institution to those correspondent account holders.

In its comment to the NPRM, SIFMA requested reconsideration of the notice provision, specifically regarding the meaning of ''one-time notice,'' and further objected to the requirement to send such a notice as overly burdensome and possibly duplicative. SIFMA also requested further clarification with regard to the timing of the required notice. FinCEN emphasizes that the scope of notice requirement is targeted toward those correspondent account holders that the covered financial institution knows or has reason to know provide services to FBME, not to all correspondent account holders. The term ''one-time notice'' means that a financial institution should provide notice to all existing correspondent account holders who the covered financial institution knows or has reason to know provide services to FBME, within a reasonably short time after this final rule is published, and to new correspondent account holders during the account opening process who the covered financial institution knows or has reason to know provide services to FBME. It is not necessary for the notice to be provided in any particular form. It may be provided electronically, orally (with documentation), or as part of the standard paperwork involved in opening or maintaining a correspondent account. Given the limited nature of FBME's correspondent relationships,

FinCEN does not expect this requirement to be burdensome.

A covered financial institution is also required to take reasonable steps to identify any indirect use of its correspondent accounts by FBME, to the extent that such indirect use can be determined from transactional records maintained by the covered financial institution in the normal course of business. Covered financial institutions are expected to apply an appropriate screening mechanism to be able to identify a funds transfer order that on its face lists FBME as the financial institution of the originator or beneficiary, or otherwise references FBME. An appropriate screening mechanism could be the mechanism used by a covered financial institution to comply with various legal requirements, such as the commercially available software programs used to comply with the economic sanctions programs administered by the Office of Foreign Assets Control (OFAC).

Notifying certain correspondent account holders and taking reasonable steps to identify any indirect use of its correspondent accounts by FBME in the manner discussed above are the minimum due diligence requirements under the rule imposing the fifth special measure. Beyond these minimum steps, a covered financial institution must adopt a risk-based approach for determining what, if any, additional due diligence measures are appropriate to guard against the risk of indirect use of its correspondent accounts by FBME, based on risk factors such as the type of services it offers and the geographic locations of its correspondent account holders.

Under this rule imposing the fifth special measure, a covered financial institution that obtains knowledge that a correspondent account is being used by a foreign bank to provide indirect access to FBME must take all appropriate steps to prevent such indirect access, including the notification of its correspondent account holder per § 1010.658(b)(2)(i)(A) and, where necessary, terminating the correspondent account. A covered financial institution may afford the foreign bank a reasonable opportunity to take corrective action prior to terminating the correspondent account. Should the foreign bank refuse to comply, or if the covered financial institution cannot obtain adequate assurances that the account will no longer be available to FBME, the covered financial institution must terminate the account within a commercially reasonable time. This means that the covered financial

institution may not permit the foreign bank to establish any new positions or execute any transactions through the account, other than those necessary to close the account. A covered financial institution may reestablish an account closed under the rule if it determines that the account will not be used to provide banking services indirectly to FBME.

### 3. Reporting Not Required

Section 1010.658(b)(3) of the rule imposing the fifth special measure clarifies that the rule does not impose any reporting requirement upon any covered financial institution that is not otherwise required by applicable law or regulation. A covered financial institution must, however, document its compliance with the requirement that it notify those correspondent account holders that the covered financial institution knows or has reason to know provide services to FBME, that such correspondents may not process any transaction involving FBME through the correspondent account maintained at the covered financial institution.

## VI. Regulatory Flexibility Act

When an agency issues a final rule, the Regulatory Flexibility Act (RFA) requires the agency to "prepare and make available for public comment an initial regulatory flexibility analysis" that will "describe the impact of the Final Rule on small entities." (5 U.S.C. 603(a)). Section 605 of the RFA allows an agency to certify a rule, in lieu of preparing an analysis, if the final rule is not expected to have a significant economic impact on a substantial number of small entities.

### A. Proposal To Prohibit Covered Financial Institutions From Opening or Maintaining Correspondent Accounts With Certain Foreign Banks Under the Fifth Special Measure

1. Estimate of the Number of Small Entities to Whom the Proposed Fifth Special Measure Will Apply

For purposes of the RFA, both banks and credit unions are considered small entities if they have less than $500,000,000 in assets.[8] Of the estimated 7,000 banks, 80 percent have less than $500,000,000 in assets and are considered small entities.[9] Of the

estimated 7,000 credit unions, 94 percent have less than $500,000,000 in assets.[10]

Broker-dealers are defined in 31 CFR 1010.100(h) as those broker-dealers required to register with the Securities and Exchange Commission (SEC). Because FinCEN and the SEC regulate substantially the same population, for the purposes of the RFA, FinCEN relies on the SEC's definition of small business as previously submitted to the Small Business Administration (SBA). The SEC has defined the term small entity to mean a broker or dealer that: (1) Had total capital (net worth plus subordinated liabilities) of less than $500,000 on the date in the prior fiscal year as of which its audited financial statements, were prepared pursuant to Rule 17a–5(d) or, if not required to file such statements, a broker or dealer that had total capital (net worth plus subordinated debt) of less than $500,000 on the last business day of the preceding fiscal year (or in the time that it has been in business if shorter); and (2) is not affiliated with any person (other than a natural person) that is not a small business or small organization as defined in this release.[11] Based on SEC estimates, 17 percent of broker-dealers are classified as small entities for purposes of the RFA.[12]

Futures commission merchants (FCMs) are defined in 31 CFR 1010.100(x) as those FCMs that are registered or required to be registered as a FCM with the Commodity Futures Trading Commission (CFTC) under the Commodity Exchange Act (CEA), except persons who register pursuant to section 4f(a)(2) of the CEA, 7 U.S.C. 6f(a)(2). Because FinCEN and the CFTC regulate substantially the same population, for the purposes of the RFA, FinCEN relies on the CFTC's definition of small business as previously submitted to the SBA. In the CFTC's "Policy Statement and Establishment of Definitions of 'Small Entities' for Purposes of the Regulatory Flexibility Act," the CFTC concluded that registered FCMs should not be considered to be small entities for purposes of the RFA.[13] The CFTC's determination in this regard was based, in part, upon the obligation of registered

FCMs to meet the capital requirements established by the CFTC.

For purposes of the RFA, an introducing broker-commodities dealer is considered small if it has less than $35,500,000 in gross receipts annually.[14] Based on information provided by the National Futures Association (NFA), 95 percent of introducing brokers-commodities dealers have less than $35.5 million in adjusted net capital and are considered to be small entities.

Mutual funds are defined in 31 CFR 1010.100(gg) as those investment companies that are open-end investment companies that are registered or are required to register with the SEC. Because FinCEN and the SEC regulate substantially the same population, for the purposes of the RFA, FinCEN relies on the SEC's definition of small business as previously submitted to the SBA. The SEC has defined the term "small entity" under the Investment Company Act to mean "an investment company that, together with other investment companies in the same group of related investment companies, has net assets of $50 million or less as of the end of its most recent fiscal year." [15] Based on SEC estimates, seven percent of mutual funds are classified as "small entities" for purposes of the RFA under this definition.[16]

As noted above, 80 percent of banks, 94 percent of credit unions, 17 percent of broker-dealers, 95 percent of introducing brokers-commodities, no FCMs, and seven percent of mutual funds are small entities. The limited number of foreign banking institutions with which FBME maintains or will maintain accounts will likely limit the number of affected covered financial institutions to the largest U.S. banks, which actively engage in international transactions. Thus, the prohibition on maintaining correspondent accounts for foreign banking institutions that engage in transactions involving FBME under the fifth special measure would not impact a substantial number of small entities.

2. Description of the Projected Reporting and Recordkeeping Requirements of the Fifth Special Measure

The fifth special measure would require covered financial institutions to provide a notification intended to aid cooperation from foreign correspondent account holders in preventing transactions involving FBME from accessing the U.S. financial system.

---

[8] *Table of Small Business Size Standards Matched to North American Industry Classification System Codes,* Small Business Administration Size Standards (SBA Jan. 22, 2014) [hereinafter "*SBA Size Standards*"].

[9] Federal Deposit Insurance Corporation, *Find an Institution, http://www2.fdic.gov/idasp/main.asp; select* Size or Performance: Total Assets, *type* Equal or less than $: "500000" and *select* Find.

[10] National Credit Union Administration, *Credit Union Data, http://webapps.ncua.gov/customquery/; select* Search Fields: Total Assets, *select* Operator: Less than or equal to, *type* Field Values: "500000000" and *select* Go.

[11] 17 CFR 240.0–10(c).

[12] 76 FR 37572, 37602 (June 27, 2011) (the SEC estimates 871 small broker-dealers of the 5,063 total registered broker-dealers.)

[13] 47 FR 18618, 18619 (Apr. 30, 1982).

[14] SBA Size Standards at 28.

[15] 17 CFR 270.0–10.

[16] 78 FR 23637, 23658 (April 19, 2013).

FinCEN estimates that the time it takes institutions to provide this notice is one hour. Covered financial institutions would also be required to take reasonable measures to detect use of their correspondent accounts to process transactions involving FBME. All U.S. persons, including U.S. financial institutions, currently must exercise some degree of due diligence to comply with OFAC sanctions and suspicious activity reporting requirements. The tools used for such purposes, including commercially available software used to comply with the economic sanctions programs administered by OFAC, can easily be modified to identify correspondent accounts with foreign banks that involve FBME. Thus, the special due diligence that would be required by the imposition of the fifth special measure—*i.e.,* the one-time transmittal of notice to certain correspondent account holders, the screening of transactions to identify any use of correspondent accounts, and the implementation of risk-based measures to detect use of correspondent accounts—would not impose a significant additional economic burden upon small U.S. financial institutions.

*B. Certification*

For these reasons, FinCEN certifies that this final rulemaking would not have a significant impact on a substantial number of small businesses.

**VII. Paperwork Reduction Act**

The collection of information contained in the final rule has been approved by the Office of Management and Budget (OMB) in accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)), and has been assigned OMB Control Number 1506–AB19. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid control number assigned by OMB.

*Description of Affected Financial Institutions:* Banks, broker-dealers in securities, futures commission merchants and introducing brokers-commodities, and mutual funds.

*Estimated Number of Affected Financial Institutions:* 5,000.

*Estimated Average Annual Burden in Hours per Affected Financial Institution:* The estimated average burden associated with the collection of information in this rule is one hour per affected financial institution.

*Estimated Total Annual Burden:* 5,000 hours.

**VIII. Executive Order 12866**

Executive Orders 12866 and 13563 direct agencies to assess costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. It has been determined that the Final Rule is not a "significant regulatory action" for purposes of Executive Order 12866.

**List of Subjects in 31 CFR Part 1010**

Administrative practice and procedure, Banks and banking, Brokers, Counter-money laundering, Counter-terrorism, Foreign banking.

**Authority and Issuance**

For the reasons set forth in the preamble, chapter X of title 31 of the Code of Federal Regulations is amended as follows:

**PART 1010—GENERAL PROVISIONS**

■ 1. The authority citation for part 1010 is revised to read as follows:

**Authority:** 12 U.S.C. 1829b and 1951–1959; 31 U.S.C. 5311–5314, 5316–5332; title III, secs. 311, 312, 313, 314, 319, 326, 352, Pub. L. 107–56, 115 Stat. 307.

■ 2. Subpart F of chapter X is amended by adding § 1010.658 to read as follows:

**§ 1010.658   Special measures against FBME Bank, Ltd.**

(a) *Definitions.* For purposes of this section:

(1) *FBME Bank, Ltd.* means all branches, offices, and subsidiaries of FBME Bank, Ltd. operating in any jurisdiction.

(2) *Correspondent account* has the same meaning as provided in § 1010.605(c)(1)(ii).

(3) *Covered financial institution* has the same meaning as provided in § 1010.605(e)(1).

(4) *Subsidiary* means a company of which more than 50 percent of the voting stock or analogous equity interest is owned by another company.

(b) *Prohibition on accounts and due diligence requirements for covered financial institutions*—(1) *Prohibition on use of correspondent accounts.* A covered financial institution shall terminate any correspondent account that is established, maintained, administered, or managed in the United

States for, or on behalf of, FBME Bank, Ltd.

(2) *Special due diligence of correspondent accounts to prohibit use*—(i) A covered financial institution shall apply special due diligence to its foreign correspondent accounts that is reasonably designed to guard against their use to process transactions involving FBME Bank, Ltd. At a minimum, that special due diligence must include:

(A) Notifying those correspondent account holders that the covered financial institution knows or has reason to know provide services to FBME Bank, Ltd., that such correspondents may not provide FBME Bank, Ltd. with access to the correspondent account maintained at the covered financial institution; and

(B) Taking reasonable steps to identify any use of its foreign correspondent accounts by FBME Bank, Ltd., to the extent that such use can be determined from transactional records maintained in the covered financial institution's normal course of business.

(ii) A covered financial institution shall take a risk-based approach when deciding what, if any, other due diligence measures it reasonably must adopt to guard against the use of its foreign correspondent accounts to process transactions involving FBME Bank, Ltd.

(iii) A covered financial institution that obtains knowledge that a foreign correspondent account may be being used to process transactions involving FBME Bank, Ltd. shall take all appropriate steps to further investigate and prevent such access, including the notification of its correspondent account holder under paragraph (b)(2)(i)(A) of this section and, where necessary, termination of the correspondent account.

(iv) A covered financial institution required to terminate a correspondent account pursuant to paragraph (b)(2)(iii) of this section:

(A) Should do so within a commercially reasonable time, and should not permit the foreign bank to establish any new positions or execute any transaction through such correspondent account, other than those necessary to close the correspondent account; and

(B) May reestablish a correspondent account closed pursuant to this paragraph if it determines that the correspondent account will not be used to provide banking services indirectly to FBME Bank Ltd.

(3) *Recordkeeping and reporting.* (i) A covered financial institution is required to document its compliance with the

notice requirement set forth in paragraph (b)(2)(i)(A) of this section.

(ii) Nothing in this paragraph (b) shall require a covered financial institution to report any information not otherwise required to be reported by law or regulation.

Dated: July 23, 2015.

**Jennifer Shasky Calvery,**

*Director, Financial Crimes Enforcement Network.*

[FR Doc. 2015–18552 Filed 7–28–15; 8:45 am]

**BILLING CODE 4810-2P-P**

## POSTAL SERVICE

**39 CFR Parts 261, 262, and 265**

## Records and Information

**AGENCY:** Postal Service™.

**ACTION:** Final rule.

**SUMMARY:** The Postal Service is amending its regulations concerning records and information management for administrative purposes, to clarify existing text, and to update and add definitions.

**DATES:** These regulations will be effective July 29, 2015.

**FOR FURTHER INFORMATION CONTACT:** Matthew J. Connolly, Chief Privacy Officer, 202–268–2608.

**SUPPLEMENTARY INFORMATION:**

### Overview

The Postal Service is amending 39 CFR parts 261, 262, and 265 to delineate more clearly the responsibility for managing postal records and ensuring compliance with the Freedom of Information Act (FOIA). *See* 5 U.S.C. 552; 39 U.S.C. 410(c). In general, these modifications should promote the coordination of activities among the Officers, Public Liaisons, Coordinators, and Records Custodians tasked with FOIA compliance, and facilitate the response to information requests by FOIA Requester Service Centers (RSCs).

### Records and Information Management (Part 261)

As required by 5 U.S.C. 552(a)(1), the amendments to part 261 provide descriptions of the Postal Service's central and field organization for FOIA processing. Specifically, the amendments clarify the position of the Postal Service's Privacy and Records Office within the General Counsel's Office. As further required by 5 U.S.C. 552(a)(6)(B)(ii), the amendments also describe the Postal Service's FOIA Public Liaisons and their responsibilities to requesters through the Postal Service's FOIA Requester Service Centers.

### Records and Information Management Definitions (Part 262)

As required by 5 U.S.C. 552(a)(6)(B), the amendments to part 262 provide further descriptions of the Postal Service's central and field organization for FOIA processing. Specifically, the amendments describe various officials involved in FOIA processing and their responsibilities.

### Release of Information (Part 265)

As required by 5 U.S.C. 552(a)(1), the amendments to part 265 provide descriptions of the established places at which, the employees from whom, and the methods whereby the public may obtain information, make submittals or requests, and obtain decisions regarding FOIA requests. Specifically, the amendments describe how and to whom a FOIA request must be submitted, and clarify that the regulations must be read in conjunction with the text of the FOIA, the Fee Schedule and Guidelines published by the Office of Management and Budget, and Postal Service Handbook AS–353, *Guide to Privacy, the Freedom of Information Act, and Records Management.* FOIA requests must now be sent to the appropriate FOIA Requester Service Center (RSC), as detailed in the regulations. A request that is not initially submitted to the appropriate FOIA RSC will be deemed to have been received by the Postal Service for purposes of computing the time for response at the time that it is actually received by the appropriate FOIA RSC or at the time the request is referred to the appropriate records custodians by a FOIA RSC, but in any case a request will be deemed to have been received no later than 10 days after the request is first received by a FOIA RSC.

### List of Subjects

*39 CFR Part 261*

Archives and records.

*39 CFR Part 262*

Archives and records.

*39 CFR Part 265*

Administrative practice and procedure, Courts, Freedom of information, Government employees.

For the reasons stated in the preamble, the Postal Service amends 39 CFR chapter I, subchapter D as follows:

## PART 261—[AMENDED]

■ 1. The authority citation for 39 CFR part 261 continues to read as follows:

**Authority:** 39 U.S.C. 401.

■ 2. Revise § 261.1 to read as follows:

**§ 261.1  Purpose and scope.**

Under 39 U.S.C. 410, as enacted by the Postal Reorganization Act, the U.S. Postal Service is not subject to the provisions of the Federal Records Act of 1950, or any of its supporting regulations which provide for the conduct of records management in Federal agencies. The objective of parts 261 through 268 of this chapter are to provide the basis for an organization-wide records and information management program affecting all Postal Service organizational components having the custody of any form of information and records.

■ 3. Revise § 261.2 to read as follows:

**§ 261.2  Authority.**

(a) As provided in 39 U.S.C. 401(5), the Postal Service has the power to acquire property it deems necessary or convenient in the transaction of its business and to hold, maintain, sell, lease or otherwise dispose of such property.

(b) Under § 262.2 of this chapter, the Postal Service Privacy and Records Office, located under the Associate General Counsel and Chief Ethics and Compliance Officer, is responsible for the retention, security, and privacy of Postal Service records and is empowered to authorize the disclosure of such records and to order their disposal by destruction or transfer. Included is the authority to issue records management policy and to delegate or take appropriate action if that policy is not adhered to or if questions of interpretation of procedure arise.

■ 4. Revise § 261.4 to read as follows:

**§ 261.4  Responsibility.**

(a) The Chief Freedom of Information Act (FOIA) Officer, whose duties are performed by the Associate General Counsel and Chief Ethics and Compliance Officer, is responsible for:

(1) Overseeing Postal Service compliance with the FOIA.

(2) Making recommendations to the Postmaster General regarding the Postal Service's FOIA program.

(3) Monitoring and reporting on FOIA implementation and performance for the Postal Service.

(b) The Chief Privacy Officer, under the Associate General Counsel and Chief Ethics and Compliance Officer, is responsible for administering records and information management policies, and the privacy of information programs, and for the compliance of all

# EXHIBIT C

# AUGUST 5 LETTER

# *Ayoub-Farid  M Saab and Fadi M Saab*

05 August 2015

<u>*Via email*</u>

<u>*By Hand*</u>

Ms. Chrystalla Georghadji
Governor
Central Bank of Cyprus
80 Kennedy Ave.
CY-1076, Nicosia
Cyprus

Dear Ms. Governor,

We refer to your letter dated 3 August 2015, sent by email on 4 August 2015, which gives notice of the Central Bank of Cyprus' intention to take certain measures in relation to FBME Cyprus Branch.  This letter purports to give effect to the Republic 's obligations arising under Procedural Order N° 3 dated 13 May 2015 and rendered in arbitration ICC Case No. 20588/ZF.

In this letter, you indicate that, following the Final Rule issued by FinCEN on 29 July 2015, the Central Bank of Cyprus:

"*... gives one month's notice of its intention to take such steps as are required, appropriate or necessary, in the exercise of CBC 's powers and duties, as the competent resolution and regulatory/supervisory authority, for FBME Cyprus branch, including but not limited to the following :*

*a)        Terminating and/or suspending the resolution measure of sale ;*

*b)        Variation of FBME's licence (whether by the imposition of conditions or otherwise) ;*

*c)        Revocation of FBME's licence and liquidation of FBME Cyprus branch.*"

1.  As a preliminary matter, we note that your letter cannot constitute a valid notice under Procedural Order N° 3 because it lacks any precision.  Your letter is a catalogue of regulatory powers that are vested with the CBC and does not indicate, in any detail, which power will be exercised and for what purpose. All that the letter does is to indicate that, negatively, the fulfillment of "the Resolution Measure of Sale" is "more difficult and likely impossible."  It does not indicate, however, what the CBC intends to do.

2

Moreover, the measures listed are inconsistent among themselves. To take only one example, a measure which would be a variation of the banking license under certain conditions is not consistent with a measure revoking the same banking license.

As a result, your letter deprives Procedural Order N° 3 of its evident essence and purpose, which is to enable the concerned parties and the Arbitral Tribunal to react in the event that any such measure is not, in the words of the Tribunal, "absolutely necessary."

Under Procedural Order N° 3, Respondent and its regulatory organs are bound to "*abstain from taking any measures that would destroy irrevocably the business of FBME Cyprus pending completion of the arbitration.*" Your letter gives an advance notice of a forthcoming breach of Procedural Order N° 3 since all of the measures suggested are inappropriate, unnecessary and would destroy irrevocably the business of FBME Bank in its entirety, and not only that of the Branch in Cyprus. In addition, the measures suggested in your letter would, if exercised, lead to a breach of the Republic 's obligations under the BIT between Cyprus and Lebanon.

To the extent that the Central Bank of Cyprus intends to take any measure in relation to the FinCEN Final Rule, we would urge you to give proper notice, under Procedural Order N° 3, indicating which measure will be taken, when, and for what purpose.

2. In deciding what measures should be taken, if any, the Central Bank of Cyprus should take into account the following factors which appear to have been disregarded in your letter:

First, as you know because we informed the Arbitral Tribunal on 3 August 2015, FBME Bank has retained US counsel to seek an injunction from the U.S. courts preventing the FinCEN Final Rule from taking effect. This is an urgent proceeding that will be decided rapidly. If the Central Bank of Cyprus were to take any measure affecting the Branch prior to the decision of the U.S. courts, it will prejudge the issue of the entry into force of FinCEN's Final Rule and thus aggravate considerably the damage it has already created over the past year.

Second, it is incorrect to suggest that, today, FinCEN's Final Rule precludes FBME Cyprus Branch from operating normally. FinCEN gave 30 days to all interested parties to take whatever measure they wanted prior to its decision becoming effective. As a result, the decision will become effective on 28 August 2015. There is thus time to restructure the unaffected portion of the business of the Bank between now and 28 August 2015 to make sure that the Bank continues to carry out its operation for the benefit of its depositors.

Third, FinCEN's Final Rule, even if it is confirmed by U.S. juridical authorities – which is uncertain today, does not prevent FBME Cyprus Branch from conducting its business activities in Euros had you not declared the Bank in Cyprus put up for sale, two days after the FinCEN's NOF. As you know, a substantial portion of the branch's business  was conducted in Euros. As you also know, there  was sufficient liquidity and the Bank continues to be highly liquid and has sufficient correspondent banks accepting to transact with it in Euros in order to function properly. As a result, the liquidation of the Branch would put an illegitimate end to a functioning financial institution.

Fourth, in your letter, you have mentioned that "*the business of FBME and FBME Cyprus Branch has already been irreparably destroyed by FinCEN's actions and the reactions of FBME's counterparties to those actions*" whereas we note that the actions taken by the CBC have not been founded on or related

3

to FinCEN's actions, were disproportionate, and have produced considerable damage to the business and operations of FBME Cyprus Branch before the issuance of the contested and unjustified Final Rule.

The Central Bank of Cyprus is not in a position to evaluate the business, operations and interests of FBME Bank as a whole, as it falls outside its jurisdiction, and we reserve all to take the necessary legal steps before the competent authorities in this regard.

Finally, we take issue without characterization of the listed measures as being the proper implementation of European Union applicable directives. The opposite is in fact true, but this will be discussed in the context of the arbitration.

As always, we are available to discuss this further. We would expect you to give due consideration to the above in order to come up with a meaningful solution. In the meantime, we will have no option but to inform the Arbitral Tribunal of our reply, as your counsel did for your letter.

Yours faithfully,

Ayoub-Farid Michel Saab                    Fadi Michel Saab

C.C:    -Prof. Benno Ndulu- Governor, Central Bank of Tanzania

        -Mr. Lawrence Mafuru- Statutory Manager FBME Bank Ltd, Tanzania

        -European Central Bank

        -President of the European Commission