**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FBME Bank Ltd., | ) |
| | ) |
| FBME Ltd., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| JACOB LEW | ) |
| in his official capacity as Secretary of the Treasury, | ) |
| | ) |
| U.S. DEPARTMENT OF THE TREASURY, | ) Civil Action No. 1:15-CV-1270 CRC |
| | ) |
| JENNIFER SHASKY CALVERY in her official capacity as Director of the Financial Crimes Enforcement Network, | ) |
| | ) |
| FINANCIAL CRIMES ENFORCEMENT NETWORK, | ) |
| | ) |
| Defendants. | ) |
| | ) |

<u>**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**</u>

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATUTORY AND REGULATORY BACKGROUND .............................................. 5

FACTUAL AND PROCEDURAL BACKGROUND ..................................................... 9

STANDARD OF REVIEW ............................................................................................ 14

ARGUMENT .................................................................................................................. 15

    I.   FBME Has Failed to Show a Likelihood of Success on the Merits .............................. 15

        A.  FinCEN's Section 311 Action Fully Complied With the APA. .............................. 16

            1.  The Final Rule is not arbitrary or capricious. .................................................. 18
               a.  FinCEN adequately considered all the information submitted
                   by FBME .................................................................................................. 20
               b.  FinCEN properly applied its own reasonable interpretation of
                   Section 311 in finding FMBE to be of primary money
                   laundering concern. ................................................................................. 23
               c.  FinCEN's decision not to impose alternative measures was
                   not arbitrary or capricious. .................................................................... 24

            2.  FinCEN provided FBME ample opportunity to comment on the
               Final Rule. ......................................................................................................... 26

        B.  FinCEN Has Not Violated Due Process. ............................................................... 32

            1.  FBME lacks constitutional presence. ................................................................ 32

            2.  Even if FBME is entitled to due process, FinCEN afforded FBME
               more than adequate notice and an opportunity to be heard. ............................ 34
                a.  FBME had more than enough notice in the Notice of Finding. ................... 36
                b.  FBME is not entitled to a hearing before a "neutral arbiter." ..................... 37

    II.  FBME Has Failed to Show that a Preliminary Injunction is Necessary to
         Prevent Irreparable Harm. .............................................................................................. 39

    III. The Balance of Equities Favors the Government, and an Injunction
         Would Harm the Public Interest. ................................................................................... 44

CONCLUSION ................................................................................................................ 47

**INTRODUCTION**

In the months following September 11, 2001, Congress passed extensive legislation amending federal laws against money laundering, with the broader goal of attacking the financial foundation of global terrorism. Among the financial counterterrorism tools introduced as part of this legislative package was section 311 of the PATRIOT Act, which authorizes the Secretary of the Department of the Treasury to take certain "special measures" against foreign jurisdictions or financial institutions operating outside of the United States that he or she finds to be of "primary money laundering concern." One of these measures, known as the fifth special measure, is to prohibit U.S. banks and financial institutions from opening or maintaining correspondent accounts on behalf of an identified primary money laundering concern—essentially, to cut off that entity's access, and thereby prevent further harm, to the U.S. financial system. This measure is not deployed frequently or lightly, and was done in this case only after extensive investigation and a full notice-and-comment rulemaking procedure that afforded the intended target an opportunity to respond to the finding that it is of primary money laundering concern.

Over one year ago, the Financial Crimes Enforcement Network ("FinCEN"), the bureau of the Treasury responsible for administering Section 311, filed a public notice of finding and proposed rulemaking for the designation of plaintiff FBME Bank, a bank headquartered in Tanzania but operating mainly in Cyprus, as a financial institution operating outside of the United States of primary money laundering concern. Based on a substantial amount of classified and statutorily privileged as well as public information, FinCEN found that FBME Bank had a long history of facilitating a substantial volume of illicit financial activity by international terrorist financiers, organized crime figures, and money launderers. These included, *inter alia*,

1

the head of an international narcotics trafficking and money laundering network, a Hezbollah

financier, a financial advisor for a major transnational organized crime figure, and a front

company for a Syrian entity that was designated by the U.S. as a proliferator of weapons of mass

destruction.  FinCEN further found that the bank's weak anti-money laundering controls

attracted a large number of shell company customers who were able to conduct a significant

volume of opaque and suspicious transactions through the U.S. financial system.

Over the course of the ensuing year, FinCEN engaged in a fully interactive process with

FBME Bank.  It accepted and considered multiple submissions of information from FBME Bank

that sought to rebut or otherwise address the agency's findings, and participated in an active,

long-running dialogue with the bank's counsel regarding the proposed designation.  Ultimately,

after reviewing the bank's submissions, as well as additional information obtained from various

non-public sources, FinCEN exercised its discretion in concluding that FBME Bank continued to

be of primary money laundering concern, issuing the Final Rule on July 29, 2015, and

determining that the only appropriate means of protecting the U.S. financial system was to

impose the fifth "special measure."  The final rule is scheduled to take effect within 30 days of

that date, or August 28, 2015.

FBME Bank and its affiliate, FBME Ltd. (collectively, "FBME"), have now brought suit

to overturn the rule and have moved for a preliminary injunction.  But by any measure, FBME

has failed to meet the high standard for obtaining a preliminary injunction.  The complaint shows

no likelihood of success on the merits: reduced to its essence, it charges that FinCEN violated

due process and the Administrative Procedure Act ("APA") because it (1) did not explain in

sufficient detail why it believed the bank was an institution of primary money laundering

concern, (2) did not provide FBME a hearing by a neutral arbiter; and (3) disregarded the countering evidence presented by FBME and therefore came to an arbitrary (and incorrect) conclusion.  All of these arguments, however, are fatally flawed.

First, the text of both the notice of finding and proposed rulemaking and the Final Rule alone belie the charge of insufficient detail, and FinCEN only withheld relevant supporting information to the extent it was classified and/or protected by the Bank Secrecy Act, as it is authorized and required to do.  Second, to the extent FBME, as a wholly foreign institution, is even entitled to constitutional rights, due process does not require a hearing by an independent third party for what is a statutorily mandated *rulemaking* that provided FBME full notice and opportunity to be heard.  Even if the decision is treated as an informal adjudication, the fact that FinCEN engaged in ongoing dialogue with FBME, considered all FBME's submissions, including those that were untimely submitted, gave FBME further information where possible, and made changes to the Final Rule based on information provided by the bank, demonstrated that it provided all the process to which FBME was entitled—and then some.  Finally, as to the decision itself, it is black letter law that FinCEN's decision is entitled to great deference under the APA, a deference heightened even further in the context of Executive decisions affecting national security and foreign policy and, in particular, the exceptional discretion that Congress granted to the Secretary of the Treasury in the statutory language of Section 311, which requires only a finding of primary money laundering "concern."  FBME has not shown anything other than that FinCEN weighed the evidence before it differently than FBME wanted it to, and that a substantial part of the evidence was not accessible to FBME because it was classified or

statutorily privileged.  None of FBME's arguments show that FinCEN's decision to proceed with the Final Rule was unreasonable, arbitrary, or capricious.

FBME has also failed to satisfy any of the other requirements necessary for obtaining a preliminary injunction.  Despite claiming that it will "cease to exist" if an injunction is not entered immediately, it has not shown that it will be irreparably harmed in the absence of a preliminary injunction.  Even before FinCEN issued the Final Rule, FBME had no U.S. correspondent accounts and is unlikely to be able to open any new ones if the Final Rule is temporarily enjoined, especially since it is currently under outside control in both Cyprus and Tanzania.  And although the Central Bank of Cyprus ("CBC") has given FBME a required 30 days' notice that it may take further action against the bank, including possible liquidation, this initial procedural step does not guarantee any particular course of action, nor has FBME shown that any immediate, dispositive action by the CBC is likely to be completed before this case can be litigated and decided on an expedited summary judgment schedule.

Finally, the balance of equities and the public interest weigh overwhelmingly in favor of the government, which has a strong interest in preventing the use of the U.S. financial system by international money laundering and terrorist financing networks.  The entire purpose of Section 311 is to allow effective prophylactic action against this real and continuing threat to national security and foreign relations, and the efficacy of this anti-money laundering and counterterrorism tool would be seriously undermined if it is perceived to be easily derailed by a lawsuit based on such weak legal grounds.  Entering an injunction under these circumstances would only embolden the very individuals and entities the statute was designed to combat and would ultimately make the U.S. financial system vulnerable to precisely the sorts of activities

that Congress sought to protect against.  For these reasons, the Court should deny the motion for

preliminary injunction.

## STATUTORY AND REGULATORY BACKGROUND

Congress enacted Title III of the USA PATRIOT Act, known as the International Money

Laundering Abatement and Anti-Terrorist Financing Act of 2001, shortly after September 11,

2001.  *See* Uniting and Strengthening America by Providing Appropriate Tools Required to

Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub. L. No. 107-56, 115

Stat. 272 (2001).  Congress made extensive findings about the threat posed by international

money laundering and corrupt foreign financial institutions.  For example, Congress indicated

that "money laundering . . . provides the financial fuel that permits transnational criminal

enterprises to conduct and expand their operations to the detriment of the safety and security of

American citizens" and that it is "critical to the financing of global terrorism and the provision of

funds for terrorist attacks."  *See* Pub. L. 107-56, at § 302(a), codified at 31 U.S.C. § 5311, note.

"[M]oney launderers subvert legitimate financial mechanisms and banking relationships by using

them as protective covering for the movement of criminal proceeds and the financing of crime

and terrorism, and, by so doing, can threaten the safety of United States citizens and undermine

the integrity of United States financial institutions and of the global financial and trading systems

upon which prosperity and growth depend."  *Id.*

Congress specifically identified correspondent banking facilities as "one of the banking

mechanisms susceptible in some circumstances to manipulation by foreign banks to permit the

laundering of funds by hiding the identity of real parties in interest to financial transactions."  *Id.*

A correspondent account is an account established to receive deposits from, make payments on

behalf of, or handle other financial transactions for another financial institution.  *See* 31 U.S.C. §

5318A(e)(1)(B); *see also* 80 Fed. Reg. 45061.  Foreign banks that wish to do any significant

volume of transactions in U.S. dollars typically do so via correspondent accounts with U.S.

banks.  Declaration of Jennifer Shasky Calvery ("Calvery Decl.") ¶¶ 14, 21  Because a foreign

bank then can conduct its transactions via the U.S. bank, it represents a potential vulnerability for

the U.S. bank if the foreign bank is not secured against illicit use.  *Id.*

To address the myriad threats posed by international money laundering, Congress

provided the Secretary of the Treasury "broad discretion, subject to the safeguards provided by

the Administrative Procedure Act under title 5, United States Code, to take measures tailored to

the particular money laundering problems presented by specific foreign jurisdictions, financial

institutions operating outside of the United States, and classes of international transactions or

types of accounts."  *See* Pub. L. No. 107-56 § 302(b)(5), codified at 31 U.S.C. § 5311, note.  In

Section 311 of the Act, codified at 31 U.S.C. § 5318A, Congress granted the Secretary of the

Treasury the authority, upon finding that reasonable grounds exist for concluding that a foreign

jurisdiction, foreign financial institution, class of transaction, or type of account is of "primary

money laundering concern," to require domestic financial institutions and financial agencies

(*e.g.*, banks) to take certain "special measures" against that entity.

In "making a finding that reasonable grounds exist" for concluding that a financial

institution operating outside the United States is of "primary money laundering concern," the

Secretary "shall consider … such information as the Secretary determines to be relevant,

including, but not necessarily limited to, the following potentially relevant factors:  (i) the extent

to which such financial institutions … are used to facilitate or promote money laundering in or

through the jurisdiction, including any money laundering activity by organized criminal groups, international terrorists, or entities involved in the proliferation of weapons of mass destruction or missiles; (ii) the extent to which such institutions … are used for legitimate business purposes in the jurisdiction; and (iii) the extent to which such action is sufficient to ensure, with respect to transactions involving the jurisdiction and institutions operating in the jurisdiction, that the purposes of this subchapter continue to be fulfilled, and to guard against international money laundering and other financial crimes." 31 U.S.C. § 5318A(c)(2). Any Section 311 action is based on the totality of information available to the Secretary, including, where appropriate, classified information. The use of classified information is explicitly contemplated in the statute, *see* 31 U.S.C. § 5318A(f) (permitting *ex parte, in camera* review of classified information used under Section 311), and is similar to provisions authorizing the use and judicial review of classified information in other contexts. *See* 50 U.S.C. § 1702(c) (authorizing such review in cases involving executive actions under International Emergency Economic Powers Act ("IEEPA")); 8 U.S.C. § 1189(c)(2) (same, for designations of foreign terrorist organizations pursuant to Antiterrorism and Effective Death Penalty Act ("AEDPA")).

The "special measures" authorized by Section 311 are prophylactic in nature, designed to guard against the risk that money launderers and terrorist financiers will be able to gain access to the U.S. financial system. Calvery Decl. ¶ 23. The five available special measures impose obligations on U.S. financial institutions. The first four special measures are focused on gathering additional information, and include: (1) requiring additional recordkeeping and reporting of certain financial transactions, (2) requiring information relating to beneficial ownership, (3) requiring information relating to certain payable through accounts, and (4)

7

requiring correspondent account customer information.  The fifth special measure allows the Secretary to impose prohibitions or conditions on opening or maintaining certain correspondent or payable through accounts.  Pub. L. No. 107-56 § 311, codified at 31 U.S.C. § 5318A(b).  The fifth special measure, regarding prohibitions on the opening or maintenance of correspondent accounts, may be imposed only by regulation.  31 U.S.C. § 5318A(a)(2)(C).[1]

In "selecting which special measure or measures to take," the Secretary considers "(i) whether similar action has been or is being taken by other nations or multilateral groups; (ii) whether the imposition of any particular special measure would create a significant competitive disadvantage . . . for financial institutions organized or licensed in the United States; (iii) the extent to which the action or the timing of the action would have a significant adverse systemic impact on the international payment, clearance, and settlement system, or on legitimate business activities involving the particular jurisdiction, institution, class of transactions, or type of account; and (iv) the effect of the action on United States national security and foreign policy." 31 U.S.C. § 5318A(a)(4).

The fifth special measure, the prohibition on U.S. correspondent accounts, prevents access to the U.S. financial system by specific, identified threats of money laundering and terrorist financing.  Calvery Decl. ¶¶ 20-23.  This measure applies, by its terms, to U.S. financial institutions, which may be prohibited from holding or maintaining correspondent accounts with the institutional of primary money laundering concern.  In accordance with the statutory requirement that the agency impose the fifth special measure "by regulation," the agency acts by notice and comment rule-making. 31 U.S.C. § 5318A(a)(2)(C).  Upon review of the comments

---

[1] The first four special measures may be imposed by regulation or immediately by order.  When imposed by order, they must be issued together with a notice of proposed rulemaking, and the order may not remain in effect beyond 120 days except pursuant to any rule promulgated on or before the expiration of that 120-day period.  31 U.S.C. §§ 5318A(a)(2)(B), (a)(3).

8

received after publication of the proposed rule, and after considering any other information available to the agency, the agency can continue to review the information before making a final decision, proceed with a final rule, or withdraw the finding and proposed rule.

The Secretary has delegated implementation of Section 311 to the Director of FinCEN. Treasury Order 180-01 § 3(a).  FinCEN is a bureau of the U.S. Department of the Treasury tasked with safeguarding the United States financial system from illicit use and combating money laundering and promoting national security through the collection, analysis, and dissemination of financial intelligence and strategic use of financial authorities.  Calvery Decl. ¶ 4.  FinCEN administers the Bank Secrecy Act ("BSA"), a legislative framework including provisions established by the Currency and Financial Transactions Reporting Act of 1970, as amended by Title III of the USA PATRIOT Act of 2001 and other legislation, and codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951-59, and 31 U.S.C. §§ 5311-5314 and 5316-5332, which authorizes the Secretary of the Treasury to issue regulations requiring banks and other financial institutions to take a number of precautions against money laundering and other financial crime. This includes requiring banks and other financial institutions to establish anti-money laundering ("AML") programs and to maintain certain records and file certain reports that have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, or in the conduct of intelligence and counter-intelligence activities, including analysis, to protect against international terrorism.  *See* 31 U.S.C. §§ 5311, 5318(h).

## FACTUAL AND PROCEDURAL BACKGROUND

On July 22, 2014, FinCEN published a notice in the Federal Register explaining its July 15, 2014 finding that reasonable grounds exist to conclude that FBME is of primary money

laundering concern, *see* 79 Fed. Reg. 42639 (July 22, 2014) (the "Notice of Finding"), along

with a related Notice of Proposed Rulemaking ("NPRM") proposing to impose against FBME

the fifth special measure authorized by Section 311.  Calvery Decl. ¶ 34.  FinCEN found that

"FBME facilitated a substantial volume of money laundering through the Bank for many years"

and was "used by its customers to facilitate money laundering, terrorist financing, transnational

organized crime, fraud, sanctions evasion, and other illicit activity internationally and through

the U.S. financial system."  79 Fed. Reg. 42639.  FBME's clients included:

- the head of an international narcotics trafficking and money laundering network who used shell companies' accounts at FBME to conduct financial transactions;
- an FBME customer who received a deposit of hundreds of thousands of dollars from a financier for Lebanese Hezbollah;
- a financial advisor for a major transnational organized crime figure who maintained a relationship with the owners of FBME;
- an FBME account holder involved in a High Yield Investment Program fraud against a U.S. person, which led to a federal indictment;
- several accounts that received the proceeds in the hundreds of thousands of dollars resulting from cybercriminal activity against U.S. victims;
- a front company for the Scientific Studies and Research Center ("SSRC"), a front company for a Syrian entity that the U.S. government has designated as a proliferator of weapons of mass destruction, and that shares a British Virgin Islands address with over 100 other shell companies, including another FMBE customer that is subject to international sanctions; and
- a British shell company that received $7.2 million from the treasury of Equatorial Guinea that were likely the proceeds of foreign corruption offenses perpetrated by the President of Equatorial Guinea, his son, and associates.

79 Fed. Reg. 42639-640.

FinCEN further found that FBME's weak AML controls encouraged the use of the bank

by shell companies and allowed its customers to perform a significant volume of obscured and

suspicious transactions and activities through the U.S. financial system.  FBME customers were

involved in at least 4,500 suspicious wire transfers totaling at least $875 million through U.S.

correspondent accounts between November 2006 and March 2013, and other financial

institutions involved in the transfers reported that they were unable to verify the identities of

FBME's customers.  79 Fed. Reg. at 42640.  And from April 2013 through April 2014, FBME

conducted at least $387 million in wire transfers through the U.S. financial system that similarly

exhibited indicators of high risk money laundering, including widespread shell company activity,

short-term "surge" wire activity, and high-risk business customers.  *Id.*  FinCEN also found that

from 2007 to 2013, over 70 entities used FBME's address to conduct transactions through the

U.S. financial system—a practice that is highly unusual and often indicative of the bank's

potential complicity in its customers' illicit activities.  *Id.*

      Following the July 22, 2014 Notice of Finding and NPRM, FinCEN reviewed additional

unclassified information obtained by FinCEN after publication of the Notice of Finding and

NPRM, including public comment on the Notice of Finding and NPRM and other submissions

by FinCEN, and additional classified and statutorily privileged information obtained by FinCEN

after publication of the Notice of Finding and NPRM.  Since the Notice of Finding and NPRM,

FinCEN has been in regular communication with FBME and its counsel regarding issues related

to the Notice of Finding and NPRM, and has answered questions from FBME where it could

without disclosing classified or statutorily privileged information.  Calvery Decl. ¶ 35.

      FinCEN conducted a phone call with FBME's U.S. counsel, Hogan Lovells, as early as

the July 2014 weekend following the publication of the Notice of Finding and NPRM on

FinCEN's website on July 15, 2014, and before they were published in the Federal Register.

What ensued during and beyond the close of the comment period was a continued, collegial and

responsive dialogue between FinCEN and FBME's counsel through numerous phone calls,

emails, and an in-person meeting.  *Id.* ¶ 36.  That dialogue continued for a year, as FBME

continued to provide (and FinCEN continued to consider) information submitted well after the close of the comment period on the proposed rule.  FinCEN repeatedly responded to FBME's phone calls, emails, and letters, providing information to the extent it could consistent with the non-disclosure of classified and statutorily privileged information.  *Id.*

FBME submitted a 28-page comment on the Notice of Finding and Notice of Proposed Rulemaking dated September 22, 2014, the last date of the comment period.  FinCEN also received several other comments from other groups.  *Id.* ¶¶ 37-39.  Notwithstanding that the comment period had closed, FinCEN also received and considered six additional submissions of information from FBME comprising hundreds of pages of additional documents dated September 24, 2014; November 17, 2015; November 21, 2015; two submissions on December 1, 2015; and December 5, 2015, despite the fact that these were submitted outside of the comment period.  *Id.* ¶ 38.  These included audits conducted by KPMG and Ernst & Young in 2013 and 2014, respectively, that examined the effectiveness of FBME's AML compliance controls and, in the case of Ernsy & Young's 2014 audit, purported to address the specific factual findings in FinCEN's Notice of Finding.  *Id.*

Not only did FinCEN allow FBME to submit additional materials months following the close of the comment period, it also, in response to FBME's requests, conducted an in-person meeting with the bank to allow FBME the opportunity to present additional information, to answer its questions to the extent possible, and to articulate any concerns it had.  In November 2014, FBME requested a meeting with FinCEN.   FinCEN officials granted FBME's request and hosted a meeting with FBME's counsel on January 21, 2015.  *Id.* ¶ 43.

Where FinCEN could, consistent with its obligation not to disclose classified or statutorily privileged information, it confirmed when FBME correctly identified transactions with which FinCEN was concerned.  FBME submitted a letter to FinCEN on January 26, 2015, asking for confirmation as to whether Ernst & Young had correctly identified accounts and customers in question in the Notice of Finding.  FinCEN responded to that letter on or about February 24, 2015, and confirmed FBME's correct identification of one account.  FinCEN also noted in that response where it was unable to release protected non-public information beyond the statements contained in the Notice of Finding for the other transactions about which FBME had inquired.  In those cases, FinCEN was unable to release the additional information because it was privileged by statute or because it was classified.  Calvery Decl. ¶ 44.

FinCEN staff reviewed and considered all of the comments submitted during the comment period, as well as information available to it after the issuance of the NPRM, before deciding to issue a final rule imposing the fifth special measure.  Calvery Decl. ¶ 41.  The Final Rule was issued and published in the Federal Register on July 29, 2015.  *See* 80 Fed. Reg. 45057 (July 29, 2015).  It summarized the Notice of Finding and addressed the comments by FBME and others, as well as FBME's additional submissions. 80 Fed. Reg. at 45058.  It noted that both the KPMG and E&Y audits identified several critical deficiencies in FBME's AML compliance program, particularly related to customer identification and due diligence, which served to confirm FinCEN's concerns that FBME was still susceptible to being used for money laundering and other illicit activity by its customers.  *Id.* at 45058-60.  The Final Rule also issued two technical amendments resulting from FinCEN's dialogue with FBME, but overall concluded that, on the basis of the evidence before it, the bank remained an institution of primary money

laundering concern. *Id.* at 45059-60. The rule also considered the statutory factors set forth in

Section 311 for deciding which special measure to impose, including whether similar actions

have been or will be taken by other nations or multilateral groups against FBME, whether the

imposition of the fifth special measure would create a significant competitive disadvantage for

U.S. financial institutions, the extent to which the action or its timing would have a significant

adverse systemic impact on the international payment, clearance, and settlement system or on

legitimate business activities involving FBME, and the effect of the action on national security

and foreign policy, and concluded that imposition of the fifth special measure was appropriate.

*Id.* at 45060-61. The rule is scheduled to become effective August 28, 2015. *Id.* at 45057.

On July 30, 2015 counsel for FBME contacted FinCEN and the Department of Justice

("DOJ") informing them of its intent to bring suit, including a possible motion for emergency

relief, if it could not come to an agreement with FinCEN whereby the Final Rule would be

rescinded or its effective date delayed. Compl. ¶ 63. Because FinCEN concluded that it could

not agree to any delay of the effective date of the rule, FBME filed the instant suit and a motion

for preliminary injunction on August 7, 2015.

## **STANDARD OF REVIEW**

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded

as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citations omitted). A preliminary

injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such

relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a

preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to

suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his

favor, and that an injunction is in the public interest." *Id.* at 20; *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (citation omitted).

In the past, courts in this Circuit used a "sliding scale" approach in analyzing the four preliminary injunction factors, meaning a particularly strong showing in one factor could outweigh weakness in another. *See Sherley v. Sebelius*, 644 F.3d 388, 393, 398-99 (D.C. Cir. 2011); *Save Jobs USA v. DHS*, No. 15-cv-615 (TSC), 2015 WL 2454274, at *3 (D.D.C. 2015). It is not clear, however, whether this approach survives the Supreme Court's decision in *Winter*, which suggested that a likelihood of success on the merits must always be shown regardless of the strength of the other factors. *See Save Jobs USA*, 2015 WL 2454274, at *3; *United States Ass'n of Reptile Keepers, Inc. v. Jewell*, No. 13-cv-2007 (RDM), --- F. Supp. 3d ----, 2015 WL 2207603, at *3 (D.D.C. May 12, 2015); *Arpaio v. Obama*, 27 F. Supp. 3d 185, 196–98 (D.D.C. 2014), *aff'd*, No. 14-5325, 2015 WL 4772774 (D.C. Cir. Aug. 14, 2015). Regardless of which test the court employs here, for the reasons discussed below, FBME cannot meet its heavy burden of establishing an entitlement to a preliminary injunction.

## ARGUMENT

### I. FBME Has Failed to Show a Likelihood of Success on the Merits.

FBME challenges the final rule under both the APA and the Fifth Amendment of the Constitution. First, FBME contends that the final rule "failed to provide adequate notice and a meaningful opportunity for Plaintiffs to comment on the Final Rule." *See* Compl., Count I, ¶¶ 66-70. Second, FBME argues that FinCEN "failed to consider the relevant data submitted by the Bank, failed to articulate a rational connection between the facts and the Final Rule, and failed to account for the contrary evidence before it." *Id.*, Count II, ¶¶ 71-79. Finally, FBME

seeks to recast its APA claims as due process violations and claims that FinCEN has "refused to provide effective notice of [its alleged deprivation of a protected property interest]," and that FinCEN failed to offer or provide any hearing, "let alone a hearing before a neutral arbiter." *Id.*, Count III, ¶¶ 80-87. As discussed below, each of these claims is fatally flawed, and FBME cannot establish a likelihood of success on the merits.

### A.      FinCEN's Section 311 Action Fully Complied With the APA.

Under the APA, a court reviews an agency decision based on the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)). An agency decision should be upheld unless it is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). The Court's review under this standard is narrow and highly deferential, and the Court does not substitute its judgment for that of the agency. *See Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416; *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency's decision should be affirmed as long as it is supported by a rational basis. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013); *Jifry v. FAA*, 370 F.3d 1174, 1181 (D.C. Cir. 2004) ("The court must affirm the agency's findings of fact if they are supported by 'substantial evidence' and there is a 'rational connection between the facts found and the choice made.'") (citation omitted).

Because FinCEN's decisions under Section 311 implicate foreign affairs and national security, the deference it is due is even greater than ordinarily applies under the APA. *See Regan v. Wald*, 468 U.S. 222, 242 (1984) ("Matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or inference. . .'") (citation omitted).[2]  The Supreme Court has emphasized the need for courts to afford this heightened deference, even when considering constitutional claims; such deference is required because courts should respect the Executive Branch's expertise in the national security and foreign policy arena. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010); *see also IARA*, 477 F.3d at 734 ("we reiterate that our review—in an area at the intersection of national security, foreign policy, and administrative law —is extremely deferential").[3]  APA and foreign policy deference are even more crucial when considered in

---

[2] *See also, e.g., Zevallos v. Obama*, 10 F. Supp. 3d 111, 119 (D.D.C. 2014), *aff'd*,  --- F.3d ----, 2015 WL 415388 (D.C. Cir. 2015) ("In addition to the deference accorded to agency action under the APA, in the special context of an executive designation like the one at issue in this case, the D.C. Circuit has suggested that an even more deferential review applies when matters of foreign policy and national security are concerned."); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 10 (D.D.C. 2012) ("Courts are particularly mindful that their review is highly deferential when matters of foreign policy and national security are concerned.") (citing cases); *Zarmach Oil Servs., Inc. v. Dep't of Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) ("courts owe a substantial measure of 'deference to the political branches in matters of foreign policy,' including cases involving blocking orders") (quoting *Regan*, 468 U.S. at 242); *Islamic Am. Relief Agency ("IARA") v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 45 (D.D.C. 2005), *aff'd in part and remanded in part on other grounds*, 477 F.3d 728 (D.C. Cir. 2007) ("Thus,'[a]s a general principle, . . . this Court should avoid impairment of decisions made by the Congress or the President in matters involving foreign affairs or national security.'") (quoting *Global Relief Found., Inc. ("GRF") v. O'Neill*, 207 F. Supp. 2d 779, 788 (N.D. Ill. 2002)), *aff'd*, 315 F.3d 748 (7th Cir. 2002).

[3] *See also Holy Land Found. for Relief and Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002) ("Blocking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference."), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003); *GRF*, 207 F. Supp. 2d at 787 (construing challenge to asset blocking of assets pending investigation as "in essence challenging the power of the Executive Branch of the United States government to conduct foreign policy" and finding that "[i]n so doing, [GRF] is asking this Court to approach the outer limit of its constitutional authority"); *Cooperativa Multiactiva de Empleados de Distribuidores de Drogas (Cooperativa) v. Newcomb*, No. 98-cv-0949, slip op. at 5 (D.D.C. Mar. 29, 1999) ("The deference accorded agency action arguably is enhanced where, as here, the action involved 'the conduct of foreign

conjunction with the extraordinary discretion found in Section 311 itself, which requires the consideration of various factors but does not require a particular outcome under any of them, or preclude consideration of additional factors at the Secretary's discretion, and which requires only a finding of primary money laundering "concern" as the basis for imposition of special measures.

FBME contends that FinCEN failed to provide enough information to allow for a "meaningful" opportunity to comment and that the Final Rule was arbitrary and capricious because it effectively ignored FBME's comments and submissions contesting FinCEN's findings. However, FBME's own exhibits submitted in connection with its motion for a preliminary injunction demonstrate that FinCEN went above and beyond what is procedurally required by the APA and that the final decision was carefully considered and eminently reasonable. Particularly in light of the heightened deference that is due to agency decisions in the sensitive areas of national security and foreign relations, as well as the deference built into Section 311 itself, FBME cannot show any likelihood of success on the merits of its APA claims.

### 1.    The Final Rule is not arbitrary or capricious.

The Court need look no further than the Final Rule itself to easily conclude that it is reasonable. As explained above, the designation of FBME is based on FinCEN's finding that FBME "is used to facilitate money laundering, terrorist financing, transnational organized crime, fraud, sanctions evasion, and other illicit activity internationally and through the U.S. financial system," "has systemic failures in its AML controls that attract high-risk shell companies," and "performs a significant volume of transactions and activities that have little or no transparency and often no apparent legitimate business purpose." 80 Fed. Reg. 45058; *see also* 79 Fed. Reg. 42639-42640 (Notice of Finding). The activity ranged from as early as 2006 to as recently as

---

relations,' which is 'so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'") (quoting *Regan*, 468 U.S. at 243).

2014.  *Id.*; *see also* Calvery Decl. ¶ 51.  The Final Rule also took into account comments

received from FBME and other entities, and the additional submissions by FBME made after the

close of the comment period, and addressed them to the extent consistent with its limitation upon

disclosing classified and statutorily privileged information.  *See* 80 Fed. Reg. 45058-45060.

The Final Rule is supported by a robust administrative record totaling several hundreds of

pages of source exhibits and over 40 pages of written analysis.  Much of the underlying source

material is either classified or otherwise prohibited from disclosure under the BSA.  As noted

above, Section 311 expressly contemplates the reliance on classified information, consistent with

other statutes that have authorized the issuance of Executive Branch actions against entities who

pose a threat to national security.  *See, e.g., Kadi*, 42 F. Supp. 3d at 6, 23-24; *IARA*, 394 F. Supp.

2d at 45-46; *Holy Land Found.*, 333 F.3d at 164; *People's Mojahedin Organization of Iran v.*

*U.S. Dep't of State ("PMOI")*, 613 F.3d 220, 229-30 (D.C. Cir. 2010); *Nat'l Council of*

*Resistance of Iran v. Dep't of State ("NCRI")*, 251 F.3d 192, 208-09 (D.C. Cir. 2001).  Pursuant

to 31 U.S.C. § 5318A(f), the government is providing separately at this stage a portion of the

administrative record, including classified and BSA material for the Court's *ex parte, in camera*

review.[4]  At the same time, the government is also filing with this Opposition certain

unclassified, non-privileged supporting materials that comprised part of the administrative

---

[4] Although the government, due to the shortened time frame imposed by plaintiffs' motion for preliminary injunction, is still in the process of obtaining the necessary internal approvals to use certain items of classified information in this litigation, it is providing the Court the substantial majority of the classified record for *ex parte, in camera* review, as authorized by 31 U.S.C. § 5318(f).  As discussed below in Part I.A.2, plaintiffs are not entitled to access this information.  However, the government is providing plaintiffs, as well as the Court, the unclassified, non-privileged record materials it is able to provide at this time.

record, although it maintains that the Final Rule, together with the Notice of Finding, provide an

adequate summary of those materials.[5]

Notwithstanding the heavily deferential standard accorded agency decisions that, like this

one, directly implicate national security, FBME claims that the Final Rule is arbitrary and

capricious because FinCEN: (1) failed to consider the relevant data submitted by FBME,

including "neutral" audits by KPMG and Ernst & Young; (2) failed to consider the factors set

forth in Section 311 for finding "primary money laundering concern"; and (3) failed to consider

lesser, alternative penalties besides the fifth special measure.  FBME Mem. at 34-41.  None of

these arguments has any merit.

   a. *FinCEN adequately considered all the information submitted by FBME.*

FBME first contends that "FinCEN failed to consider the relevant data that it submitted

and failed to articulate a rational connection between the facts and the Final Rule."  FBME Mem.

at 34.  In support of this argument, FBME claims that FinCEN ignored the findings of audits

prepared by Ernst & Young and KPMG.  *Id.* at 34-35.  There is no dispute that FinCEN accepted

and considered these audits, despite the fact that they were submitted after the deadline for the

comment period.  Calvery Decl. ¶¶ 38, 41; Plf's Declaration of M. Elizabeth Peters ("Peters

Decl.") ¶ 6-8.  Nor is it disputed that the Final Rule discusses these audits—although its

---

[5] Because some of these materials may implicate information that plaintiffs wish to keep confidential, out of an abundance of caution the government is filing them under seal.  In addition, the government is not filing FinCEN's post-NPRM correspondence with FBME, in light of the fact that FBME already has full access to this information and has indeed provided much of it with its preliminary injunction motion.  *See* ECF No. 5 (plaintiffs' motion to file under seal); Plfs' Peters Decl. Exs. B-T.  The only significant portions of the correspondence omitted by FBME consist of (1) a 600+ page attachment to a letter dated November 17, 2015 letter from FBME to FinCEN (letter attached as Exhibit C to plaintiffs' Peters Declaration), containing information related to FBME's AML compliance program; and (2) over 1,500 pages of documents from FBME's arbitration proceedings before the International Chamber of Commerce ("ICC") that FBME provided to FinCEN on December 1, 2015.  These materials are voluminous and the government is not relying on them in its opposition to plaintiffs' preliminary injunction motion.  The government can provide these materials upon request, however, and will include them as part of the full administrative record when it moves for summary judgment.

discussion was necessarily limited by *FBME*'s request that the full content of the 2013 KPMG and 2014 E&Y audits be kept confidential—and concluded they did not alter FinCEN's assessment that FBME was still an institution of primary money laundering concern meriting imposition of the fifth special measure to guard against the specific money laundering and terrorist financing risks it posed.  Instead, FBME complains, in effect, that FinCEN "cherry-picked" the bad parts of these audits and ignored the good parts in its Final Rule.[6]

In so arguing, FBME fails to recognize the significant deference due to FinCEN under the APA, particularly to the extent its Section 311 decision relates to matters of foreign relations and national security, *IARA*, 477 F.3d at 734, and the gravity of the threat posed to the U.S. financial system by international money laundering and terrorist financing networks.  Moreover, it is well-settled law that "the agency [is not required] to discuss every item of fact or opinion included in the submissions made to it in informal rulemaking … Instead, the agency's response to public comments need only 'enable us to see what major issues of policy were ventilated ... and why the agency reacted to them as it did.'"  *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993).

Under the APA's deferential standard, FinCEN was not required to adopt the KPMG or E&Y audits' conclusions as its own, or to interpret them in the way that FBME would, without consideration of other evidence.  Nor is it appropriate for the Court to apply its own judgment on these questions.  *See Holy Land Found.*, 219 F. Supp. 2d at 75 ("[T]he purpose of the Court's inquiry is not to determine whether each and every piece of evidence in the record independently supports [Treasury's] determination."); *Zevallos*, 2015 WL 4153882 at *6 ("[W]hen we evaluate

---

[6] FBME makes much to-do about the fact that the Final Rule refers to a 2011 E&Y audit that FinCEN "never actually reviewed," instead "apparently relying on a summary of the document that FBME pasted into its Comment on the Notice of Finding."  FBME Mem. at 35.  This claim lacks merit because it was FBME who chose to provide FinCEN with a summary rather than the entire 2011 audit.

agency action, 'we do not ask whether record evidence could support the petitioner's view of the issue, but whether it supports the [agency's] ultimate decision.'") (citation omitted). The fact that FinCEN gave weight to certain recurring AML deficiencies identified in the audits, rather than whether the auditors described FBME's AML program as being generally in compliance with European Union and Cypriot standards, is precisely the sort of assessment as to which the Court should defer to FinCEN.[7] Perhaps recognizing this, FBME also argues that the "minor" deficiencies identified in the audits are no longer at issue, as it has implemented or is in the process of implementing all of KPMG and E&Y's recommendations for addressing them. FBME Mem. at 36. But just because FBME says the problems are fixed does *not* mean that FinCEN must take FBME's word for it. Nor does it mean that FinCEN should disregard the other data it has considered that demonstrates a consistent pattern of substantial money laundering activity by FBME's customers, and lax controls by FBME itself, over many years.

Relatedly, FBME contends that the finding that the bank has been used to facilitate illicit activity, and of AML problems there, as detailed in the Section 311 notice and reprised in the Final Rule, are based on inaccurate, incomplete, or outdated information, and that FinCEN is essentially ignoring "new and better data" that the bank has improved its AML compliance so as to eliminate any such problems. FBME Mem. at 36-37. (citing *Dist. Hosp. Partners, LP v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015)). But these assertions, again, are based on FBME's characterization of KPMG and E&Y's findings, which FinCEN is not required to treat as authoritative. Indeed, the underlying administrative record contains evidence that directly rebuts

---

[7] Even setting aside the fact that non-public evidence available to FinCEN suggests that FBME is *not* in compliance with these standards, compliance with a foreign jurisdiction's AML standards is not the standard for whether to impose special measures under Section 311. Rather, the standard is whether the institution continues to pose a risk of facilitating money laundering and terrorist financing, regardless of whatever AML steps it has put in place. That continued risk is abundantly demonstrated by the evidence in the administrative record.

those findings (including evidence that dates as recently as 2014, but, being classified, could not be disclosed to FBME or discussed in the Final Rule).  When reviewed by the Court, the record will only confirm the conclusion that the Final Rule was reasonable and well substantiated.  *Cf. Kadi*, 42 F. Supp. 3d at 23 (in designating plaintiff as global terrorist, agency "relied on more information than Kadi's own voluminous statements and submissions," and claim that unclassified evidence provided to him had errors and deficiencies "is beside the point" because "these items do not represent the whole picture" and "the information relied on…is further supported by the classified record.").

> b. *FinCEN properly applied its own reasonable interpretation of Section 311 in finding FMBE to be of primary money laundering concern.*

FBME's assertion that FinCEN "did not articulate how the Final Rule satisfies the criteria of Section 311," because it never "explained how FBME satisfies the statutory predicate that it be of '*primary* money laundering concern,'" FBME Mem. at 38, reveals a fundamental misapprehension regarding Section 311.  Although the statute requires the Director, acting by delegation of the Secretary, to consider certain prescribed factors in making a finding that an entity is of primary money laundering concern and imposing a special measure, *see* 31 U.S.C. §§ 5318A(a)(4)(B), (c)(2)(B), it does not require any particular outcome under these factors.  Nor does it direct that any one factor be given more weight than other information the Director might choose to consider or preclude consideration of other, additional factors at the Director's discretion.  Most significantly, contrary to FBME's suggestion, Section 311 does not require a determination that the designated entity be engaged in money laundering—only that the entity must be of money laundering *concern*.

FBME, after briefly conceding that "primary money laundering concern" is not defined in the statute and is subject to multiple reasonable interpretations, advances its own interpretation that conveniently skips over "concern" and instead focuses on the word "primary," and finds the Final Rule deficient because it does not explicitly adopt either of FBME's proposed definitions of the term. FBME Mem. at 38. Nothing in Section 311 or the APA supports FBME's interpretation. To the extent that Congress left ambiguous what precisely being of "primary money laundering concern" entails, the implementing agency's interpretation is entitled to *Chevron* deference. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Given that each Section 311 action is of necessity fact-specific, no "one size fits all" definition is necessary or even appropriate. Here, FinCEN found that FBME was of primary money laundering concern because it "is used to facilitate money laundering, terrorist financing, transnational organized crime, fraud, sanctions evasion, and other illicit activity internationally and through the U.S. financial system and has systematic failures in its AML controls that attract high-risk shell companies" and "performs a significant volume of transactions and activities that have little or no transparency and often no apparent legitimate business purpose." 80 Fed. Reg. 45058. Thus, FinCEN's conclusion that FBME is an institution of primary money laundering concern had an entirely sound and rational basis that is consistent with what the APA requires.

          c.       *FinCEN's decision not to impose alternative measures was not arbitrary or capricious.*

Finally, FBME complains that FinCEN refused to consider alternative, lesser penalties besides the fifth special measure, despite FBME's entreaties and its demonstrated willingness to enact remedial measures and strengthen its AML controls. FBME Mem. at 39-41. It is well-settled that an agency "need not consider every alternative proposed" during the rulemaking

process, but rather "must consider only 'significant and viable' and 'obvious' alternatives."

*Shooting Sports Found.*, 716 F.3d at 215 (citing cases).  The alternatives proposed by FBME

were neither viable nor obvious, given the seriousness of the concerns the bank's record raised,

and the urgency of FinCEN's (and Section 311's) larger mission of preventing the infiltration of

the U.S. financial system by international money laundering.  Moreover, FBME's argument that

FinCEN "has previously imposed fines and other lesser penalties against financial institutions

that have engaged in conduct comparable to FinCEN's allegations against the Bank," FBME

Mem. at 39, mixes apples and oranges.  FBME is a foreign bank based in Tanzania and Cyprus.

FinCEN is not FBME's regulator, and does not have the same authority to examine, issue civil

money penalties, or require special monitors against foreign financial institutions such as FBME

as it does against financial institutions located or doing business within the United States.

Calvery Decl. ¶ 59.  Furthermore, even if FinCEN were able to impose a civil money penalty

against FBME, such a penalty would not remedy the ongoing use of the bank by narcotics

traffickers, terrorist financiers, and the other illicit actors FinCEN has identified through its

investigation in the Notice of Finding and Final Rule.

The same problem applies to FBME's argument that FinCEN should have applied a

lesser "penalty" by applying one of the special measures other than the fifth special measure.  As

noted above, all of these other special measures are focused on gathering additional information.

Calvery Decl. ¶ 55.  None of them would ensure that U.S. banks are not exposed to illicit actors

through dealings with FBME.  FBME's repeated characterization of the fifth special measure as

a "punishment" also ignores the fundamental intent of the statute, which is prophylactic in nature

and designed to guard against risk to U.S. financial institutions from foreign actors.  None of the

25

various special measures impose civil or criminal liability against any foreign jurisdiction or foreign financial institution found to be of primary money laundering concern, but rather are solely intended to protect the U.S. economy from terrorists and criminals through the identification and countering of risks associated with designated entities.  Calvery Decl. ¶ 26.  In the case of FBME, FinCEN assessed that the first four special measures would not ensure that U.S. banks would not be exposed to the very serious risks of money laundering and terrorist financing flowing through the bank.

Again, given the high degree of deference to which FinCEN is entitled in this context, its ultimate decision against imposing an alternative measure to protect the U.S. financial system was reasonable and in no way arbitrary or capricious.  *See Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 497 (2004) (Even when an agency explains its decision with "less than ideal clarity," a reviewing court will not upset the decision on that account "if the agency's path may reasonably be discerned.").

### 2. FinCEN provided FBME ample opportunity to comment on the Final Rule.

While FBME attempts to find fault with the manner in which FinCEN conducted the rulemaking process, it bears emphasizing that notice-and-comment procedures are meant to be relatively straightforward and not unduly onerous.  *See Pub. Citizen*, 988 F.2d at 197 ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result, and respond to 'relevant' and 'significant' public comments. However, neither requirement is particularly demanding.").  Courts may not impose procedural requirements on agencies beyond the requirements in the APA or the agency's organic statute. *See Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524 (1978) (APA "established the

maximum procedural requirements which Congress was willing to have the courts impose upon

agencies in conducting rulemaking procedures").  Courts should be deferential towards the

agency's choice of procedures absent statutory constraints.  *Id.* at 543-44.

When an agency undertakes notice and comment rulemaking, the APA requires a notice

of proposed rulemaking that "afford[s] 'interested parties a reasonable opportunity to participate

in the rulemaking process,'" meaning it must  "give adequate time for comments" and provide

sufficient factual detail and rationale for the rule to permit interested parties to comment

meaningfully."  *Fla. Power & Light Co. v. U.S.*, 846 F.2d 765, 771 (D.C. Cir. 1988).  FinCEN

has more than met this standard, as evident from the face of both the Notice of Finding and the

Final Rule.  The Notice of Finding stated that FBME was used to facilitate substantial money

laundering and terrorist financing activities, as well as transnational organized crime, evasion of

sanctions imposed under IEEPA, and corruption of foreign public political figures.  It listed

specific examples and noted that these activities were further enabled through relationships

developed by its management and a large shell company customer base attracted by its weak

AML controls. 79 Fed. Reg. 42639-640; FBME Mem. at 25.  The Final Rule was issued a year

later, only after FinCEN had accepted and considered, in addition to the public comments

(including one submitted by FBME on September 22, 2014), *six* additional submissions from

FBME that were made outside of the comment period, and after extensive communications via

telephone, e-mail, and one in-person meeting between FinCEN officials and counsel for FBME.

*See* Calvery Decl. ¶¶ 36, 43; Plf's Peters Decl. ¶¶ 3-19.

The Final Rule addressed the public comments and discussed FBME's September 22,

2014 comment at length.  80 Fed. Reg. 45059-45060.  It also confirmed that FinCEN had

"carefully considered" FBME's follow-up submissions, noting that "these materials…outline some of the steps that FBME has taken to strengthen its compliance program," but that they did not alter FinCEN's conclusion that FBME continued to be used by bad actors and was thus of primary money laundering concern.  *Id.* at 45060.  The Final Rule did not discuss the contents of FBME's additional submissions in detail, based on FBME's representations to FinCEN that the materials contained commercial or financial information that was privileged or confidential.  *Id.*[8]

FBME's chief grievance appears to be that throughout this rulemaking process FinCEN was not able to disclose all information at a sufficiently granular level of factual detail as to satisfy FBME.  FBME Mem. at 24-26.  But that is not what the law requires, particularly where the specific information sought by FBME is classified or prohibited from disclosure by the BSA.  *See Holy Land Found.*, 333 F.3d at 164 ("The due process clause requires only that process which is due under the circumstances of the case."); *see also Kadi*, 42 F. Supp. 3d at 23-24.[9] FBME does not dispute that FBME had the right to rely on such information in its decision, nor would it have any valid basis for objecting: Section 311 expressly provides for the reliance on classified information in findings of primary money laundering concern, while the disclosure and confidentiality provisions of the BSA were clarified and strengthened in the same legislation that

---

[8] Requesting that FinCEN not publicly discuss certain information that FBME provided in the rulemaking process is inconsistent, to say the least, with challenging FinCEN's decision to respect that request. FBME cannot have it both ways.

[9] Plaintiff cites a line of D.C. Circuit case law that holds that agencies are required to make the "most critical factual material" they have relied upon in their rulemaking available for public comment.  *See, e.g., Chamber of Commerce v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006).  However, these cases do not address agency decisions that are based in significant part on classified, law enforcement sensitive, or statutorily privileged information.  Moreover, the D.C. Circuit has observed that "the focus in… rulemaking cases is primarily on whether the final rule changes critically from the proposed rule rather than on whether the agency relies on supporting material not published for comment.  The question is typically whether the agency's final rule so departs from its proposed rule as to constitute more surprise than notice."  *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999).  There is no question here that the Final Rule is consistent with the proposed rule announced in the notice.

established Section 311, as part of the same broader legislative push to strengthen Treasury's tools for combating money laundering and terrorist financing.

Nor can FBME claim any right to access the protected information.  It is well-established that agencies may rely on certain sensitive information without disclosing it to the complainant. Courts in this Circuit have upheld this practice repeatedly in reviewing the government's imposition of targeted financial measures, including those imposed on U.S. persons.  *See, e.g., Holy Land Found.*, 333 F.3d at 163-64; *IARA*, 394 F. Supp. 2d at 41 n.8, 45-46; *Kadi*, 42 F. Supp. 3d at 5, 23-24; *see also Jifry*, 370 F.3d at 1182 (upholding use of classified administrative record in FAA proceedings related to national security).  Moreover, the Executive Branch has the exclusive authority to determine who may have access to classified information, and under well-established separation of powers principles, decisions about who may access or use classified information and under what circumstances are not subject to judicial review.  *See Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988); *see also* Exec. Order 13,526, 75 Fed. Reg. 707 (Jan. 5, 2010).  Thus, a federal district court may not compel the Executive Branch to grant an opposing party, or any other person, access to classified information.  *See, e.g., Holy Land Found.*, 333 F.3d at 164 (emphasizing "the primacy of the Executive in controlling and exercising responsibility over access to classified information").

In addition, a portion of the information that formed the basis of FinCEN's finding consisted of Suspicious Activity Reports ("SARs") by banks and financial institutions.  Under the SAR reporting requirement, banks and other financial institutions are required to report transactions that the institution "knows, suspects, or has reason to suspect" involve possible illegal activity and which meet other specified threshold requirements.  *See, e.g.*, 31 C.F.R.

§ 1020.320(a) (SAR reporting requirement for banks).  Communicating information about potential criminal activity is sensitive and carries the potential for significant risk to the institution and to its employees if it is disclosed publicly that the institution or its employees reported such information.  Calvery Decl. ¶ 9.  Disclosure also has the potential to alert illicit actors that their transactions are subject to reporting, and to aid them in evading BSA requirements and other methods to detect their activities.  *Id.*

To protect reporting financial institutions and their employees, and to encourage honest and open reporting of suspicious activity, the BSA and its implementing regulations prohibit financial institutions and their employees from disclosing SARs, or any information that would reveal the existence of a SAR, in response to subpoenas or otherwise.  *See, e.g.*, 31 U.S.C. § 5318(g); 31 C.F.R. § 1020.320(e)(1).  It is especially important that parties to a reported transaction not be notified that a SAR has been filed.  *See Whitney Nat'l Bank v. Karam*, 306 F. Supp. 2d 678, 682-83 (S.D. Tex. 2004); *Cotton v. Private Bank and Trust Co.*, 235. F. Supp. 2d 809, 814-815 (N.D. Ill. 2002).  Protection of such information is necessary to minimize the risks of, *inter alia*, notifying persons involved in the reported transaction that might compromise any investigations being conducted in connection with the SAR; reducing willingness of all financial institutions to file SARs;  providing insight into how an institution uncovers potential criminal conduct that could be used by others to circumvent detection; compromising personally identifiable information or commercially sensitive information; damaging the reputational interests of companies that may be named; and/or increasing the risk that an institution's employees or others involved in the preparation and filing of SARs could become targets for retaliation by persons whose criminal conduct has been reported.  *Id.*  For these reasons, FinCEN

could not (and cannot) divulge to FBME the BSA protected information it relied upon in its assessments.[10]

The Final Rule reflects the agency's careful balance in providing FBME with as much information as possible, while ensuring that it fulfills its obligation to safeguard the public disclosure of classified and statutorily privileged information. Despite these restrictions, FinCEN's aim in its communications with FBME throughout the comment period was to be helpful, not obstructive. Where FinCEN could do so, it confirmed when FBME correctly identified transactions with which FinCEN was concerned. For example, FBME submitted a letter to FinCEN on January 26, 2015, a copy of which is attached as Exhibit O to the declaration of FBME's counsel, Elizabeth Peters, seeking confirmation as to whether Ernst & Young had correctly identified accounts and customers in question in the Section 311 notice and seeking more details as to other information. FinCEN responded in kind on or about February 24, 2015, and confirmed FBME's correct identification of one account, though it was unable to provide further information as to FBME's other questions without disclosing classified or BSA-protected information. Calvery Decl. ¶ 44. FinCEN also made corrections to its findings based on information provided by FBME. *See* 80 Fed. Reg. at 45059-60.

In short, FBME cannot identify a single legitimate deficiency in FinCEN's notice or its conduct during the comment process. The notice provided a clear and cogent description of the basis for FinCEN's findings, including specific examples of money laundering and other illicit financial activity. And as reflected in the parties' declarations and the Final Rule itself, FinCEN

---

[10] *Cf. In re City of New York*, 607 F.3d 923, 945-46 (2d Cir. 2010) (denying plaintiffs access to undercover police reports withheld as law enforcement privileged after reviewing reports and finding that they reinforced rather than undercut city's arguments); *Al-Aqeel v. Paulson*, 568 F. Supp. 2d 64, 72-73 (D.D.C. 2008) (rejecting argument of plaintiff challenging his designation as Specially Designated Global Terrorist under IEEPA that because IEEPA provides for *ex parte, in camera* review of classified portions of record, he was entitled to privileged and law-enforcement sensitive portions).

considered all the documentation submitted by FBME, including documentation submitted after the comment period had closed, and engaged directly with FBME multiple times to discuss the proposed rule.  It responded to FBME's queries to the extent possible without compromising classified and BSA-protected information.  Nothing more is required by the APA.[11]

## B.     FinCEN Has Not Violated Due Process.

As a foreign financial institution, FBME lacks sufficient presence in the U.S. to claim a constitutional right to due process.  Even assuming *arguendo* that it does have constitutional presence and could identify a protectable property right, it has failed to show any constitutional deficiency in the process it has received.  To the contrary, FBME has been afforded more process than is typically available to subjects of other types of targeted financial measures that have been upheld as constitutional.

### 1.     FBME lacks constitutional presence.

Foreign entities or nationals without minimum contacts with the United States lack due process or other constitutional rights.  *People's Mojahedin Org. of Iran v. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999) ("A foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise."); *32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002); *United States v. All Assets Held In Account Number 80020796*, No. 13-cv-1832, 2015 WL 1285791 at *7 (D.D.C. Mar. 19, 2015). *See also United States v. Verdugo–Urquidez*, 494 U.S. 259, 271 (1990) (in the context of the

---

[11] Even if plaintiffs were able to show FinCEN's rulemaking process were somehow procedurally deficient, they have not shown that correcting it would have altered the outcome of FinCEN's decision. As such, any such error is a harmless error.  *See Zevallos*, 10 F. Supp. 3d at 124, *aff'd* 2015 WL 4153882 at *6-7.  This applies equally to FBME's due process claim, discussed *infra*, which rests on alleged procedural flaws in FinCEN's decisionmaking process.  *See Al-Haramain*, 686 F.3d at 989-990 (finding harmless error in due process violation because plaintiff failed to "establish that, had it been provided the process it was due, it could have…taken steps…such that OFAC would not have made redesignation [as a SDGT] or that substantial evidence would not have supported the redesignation").

Fourth Amendment, "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country"); *Johnson v. Eisentrager*, 339 U.S. 763, 770–71 (1950) (non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment habeas protections).

FBME is a wholly foreign bank that lacks sufficient contacts with the United States to claim the protection of the Due Process Clause.  FBME is located in Tanzania and Cyprus, Compl. ¶ 18, and does not allege any significant interest in property or other interest in the jurisdiction of the United States.  FBME's vague allegations reflect that it has done business with U.S. persons, not that FBME is a U.S. entity entitled to the protections of the Constitution. FBME's chairman alleges that 150 of the Bank's customers reside or operate in the United States without any details as to their level of activity involving the Bank.  *See* Declaration of Ayoub-Farid Saab ("Saab Decl.") ¶ 35.  But this does not mean that FBME itself resides or does business in the United States.  Similarly, while Mr. Saab alleges that FBME "maintains accounts with approximately 30 companies headquartered in the United States," *id.* ¶ 36, it is not clear what these accounts are, whether they are in use, what, if any, property is involved, or whether they are even located in the United States.  Having done business with a U.S. company in the past does not transform a wholly foreign bank into a U.S. person entitled to constitutional rights. *See 32 County Sovereignty Comm.*, 292 F.3d at 799.

FBME claims two kinds of "property interests" in the United States:  unspecified "U.S. based securities" and some type of mortgage interest in a property in North Carolina, with interest proceeds paid into an escrow account there.[12]  Compl. ¶¶ 23-24.  Such tenuous assertions

---

[12] Plaintiffs would not, of course, be deprived of these alleged property interests as a result of the imposition of the Section 311 special measure; the Final Rule simply prohibits U.S. financial institutions from maintaining correspondent relationships; it does not take, vest or freeze any property of FBME.

are not enough to create any meaningful current contacts with the United States or property here. *See Arbelaez v. Newcomb*, Civ. No. 00-5217, 1 Fed. App'x 1, 1 (D.C. Cir. 2001) (appellants could not assert constitutional claims because they were "foreign nationals without a substantial connection to the United States" despite holding two U.S. bank accounts); *Aero Continente, S.A. v. Newcomb, C.A.*, No. 04-1168, Dkt #8, at 7-8 n.7 (D.D.C. July 16, 2004) (attached hereto) (expressing doubt about whether designee under the Foreign Narcotics Kingpin Designation Act with much greater connections to the United States was entitled to due process protections).[13]

> ## 2.    Even if FBME is entitled to due process, FinCEN afforded FBME more than adequate notice and an opportunity to be heard.

Even if the Court finds that FBME has constitutional presence, FBME simply has not shown a violation of its procedural due process rights. As an initial matter, it is not clear that FBME even has a protectable interest that has been deprived by FinCEN's action. Unlike the designation at issue in *NCRI*, the fifth special measure of Section 311 does not block or freeze any bank accounts belonging to a designated foreign financial institution; it simply prohibits or restricts the opening or maintaining of correspondent accounts that involve the institution. It is doubtful whether a foreign bank has a protectable property interest in having access to the U.S.

---

However, even when the minor property interests of an alien are wholly confiscated via civil forfeiture, it is an open question whether the Due Process Clause applies to the civil forfeiture proceedings. *United States v. All Assets Held In Account Number 80020796*, 2015 WL 1285791 at *7.

[13] FBME cites two cases for the proposition that it has constitutional presence, but neither supports FBME's entitlement to due process. In *32 County Sovereignty Committee*, the Court held that the organizational plaintiff did not have constitutional rights based on the presence of U.S.-based members who rented post office boxes and held accounts for the organization. 292 F.3d at 799. FBME's contacts are even more attenuated because it alleges only that it has some customers present in the United States, and does not even specify whether they have current accounts here. In *NCRI*, the D.C. Circuit emphasized that NCRI had "an overt presence within the National Press Building in Washington, D.C." 251 F.3d at 201-02. By contrast, FBME has not alleged that it resided or maintained an overt presence in the United States. On the contrary, it has always been a wholly foreign bank that serves mainly to facilitate international business transactions. The fact that it happens to have some customers with ties to the U.S. and a single partial interest in a bank account is simply not sufficient to establish a constitutional presence.

financial system, even if, as it claims, it cannot do business without such access.  *Cf. Chrebet v. County of Nassau*, 24 F. Supp. 3d 236, 245 (E.D.N.Y. 2014) (loss of future business opportunity not a protectable property interest).

But to the extent that it does, the fifth special measure of Section 311 should be viewed in the context of other kinds of Treasury targeted measures for activities affecting national security. Any such comparison confirms that FBME has been afforded far more process than was provided in most, if not all, cases challenging Treasury designations.  In fact, in cases involving challenges to Treasury's Office of Foreign Assets Control ("OFAC") designations of Specially Designated Global Terrorists ("SDGTs") under IEEPA, there has typically been no pre-deprivation notice at all—a practice that has consistently been found not to violate due process. *See, e.g., IARA*, 394 F. Supp. 2d at 49-50; *Holy Land Found.*, 219 F. Supp. 2d at 76-77; *Al-Aqeel*, 568 F. Supp. 2d at 67, 71; *see also Al-Haramain Islamic Found. v. U.S. Dep't of Treasury*, 686 F.3d 965, 985 (9th Cir. 2012) ("[A]s many courts have held, the potential for 'asset flight' almost certainly justifies OFAC's decision not to provide notice before freezing the assets.").  On the other hand, in cases involving challenges to designations by the Department of State of foreign terrorist organizations ("FTOs") pursuant to AEDPA, some form of pre-deprivation process is required.  *See NCRI*, 251 F.3d at 205-09; *PMOI*, 613 F.3d at 230-31.  However, no FTO designation is subject to the notice and comment rulemaking procedure, with the extended back-and-forth between target and designating agency, that FBME has enjoyed here.

Although FBME frames the due process inquiry in terms of the balancing test in *Mathews v. Eldredge*, 424 U.S. 319 (1976), its challenge amounts to whether it was provided adequate notice and opportunity to be heard.  The answer is a resounding "yes."

> a.     *FBME had more than enough notice in the Notice of Finding.*

FBME largely recycles its APA argument that FinCEN did not provide enough of the facts underlying its finding for FBME to have a meaningful opportunity to respond.  This argument fails for substantially the same reasons as its APA argument fails: FinCEN provided more than enough information in the notice of finding, which was published *over a year* before the Final Rule took effect, to provide sufficient notice for due process purposes.  Certainly the level of factual detail provided in the finding, as well as the amount of time given to FBME to respond, surpasses the type of notice found to be appropriate in similar national security contexts for designations under IEEPA.  *See, e.g., Al-Aqeel*, 568 F. Supp. 2d at 71; *Holy Land Found.*, 219 F. Supp. 2d at 64.  It is also more robust than the "truncated" administrative process for FTO designations under AEDPA, which, as the D.C. Circuit noted, gives the target "no opportunity to either add to or comment on the contents of [the] administrative record."  *NCRI*, 251 F.3d at 197. And as with IEEPA and AEDPA designations, Treasury is expressly permitted by statute to rely on classified information, and such reliance does not violate due process.  *Id.*; *PMOI*, 613 F.3d at 230-31; *Holy Land Found.*, 333 F.3d at 164.[14]  In any event, Treasury has provided FBME a detailed unclassified summary in the form of a detailed notice of finding as well as the Final Rule.[15]  In sum, the Section 311 designation of FBME more than meets the due process standard for notice and opportunity to be heard.

---

[14] While FBME cites the Ninth Circuit's opinion in *Al-Haramain Islamic Foundation*, even that case, in addition to being contrary to binding authority in this Circuit, acknowledged that "disclosure may not always be possible"; as the court noted, even "an unclassified summary may not be possible because, in some cases, the subject matter itself may be classified and cannot be revealed without implicating national security," and the government "might have a legitimate interest in shielding the materials even from someone with the appropriate security clearance."  686 F.3d at 983.

[15] The *NCRI/PMOI* line of cases also suggest that, at least in the context of FTO designations, due process requires the government to provide the target the unclassified portions of the record relied upon for the

b.     *FBME is not entitled to a hearing before a "neutral arbiter."*

The other chief prong of FBME's due process argument is that it was denied a hearing before a "neutral" decisionmaker.  Compl. ¶ 86; FBME Mot. at 31.  At the outset, this argument fails on its face because it is predicated on the challenged action being an adjudication when in fact it is unmistakably a rulemaking by <u>regulation</u>, as explicitly required by the implementing statute.  *See* 31 U.S.C. § 5318A(a)(2)(C).  FBME nevertheless glosses over this statutory provision, characterizing the rulemaking process as a *de facto* adjudication that never offered the bank "the opportunity to present evidence to a neutral arbiter responsible for evaluating the government's allegations and the propriety and proportionality of its proposed response."  FBME Mem. at 31.  Even if one characterizes the Section 311 procedure as an informal adjudication, however, the absence of an independent third-party adjudicator violates due process.

The Due Process Clause does not require a separation of functions in administrative actions: agencies may combine investigative and adjudicative functions.  *See Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *Chem. Waste Mgmt. v. EPA*, 873 F.2d 1477, 1484 (D.C. Cir. 1989).  To state a Fifth Amendment due process claim based on an inherently biased decisionmaker, plaintiffs must prove that due to some pecuniary or personal interest in the case, "experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable."  *Withrow*, 421 U.S. at 47; *see also Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883–84 (2009).  It is plaintiffs' burden to establish a disqualifying interest,

---

decision.  *See PMOI*, 613 F.3d at 227; *cf. Ralls Corp. v. CFIUS*, 758 F.3d 296, 319-320 (D.C. Cir. 2014).  Here, FinCEN provided FBME with the unclassified, nonprivileged information on which it relied.  FinCEN has not until now provided FBME the actual unclassified, nonprivileged documents relied upon because such documents do not contain the answers to FBME's specific questions or add any relevant information not covered by the Notice of Finding and Final Rule.  Nevertheless, as noted earlier, the government is providing plaintiffs the unclassified portions of the administrative record that plaintiffs do not already have in their possession with its opposition to the motion for preliminary injunction.

*Schweiker v. McClure*, 456 U.S. 188, 196 (1982), and in attempting to do so they must

"overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow*,

421 U.S. at 47; *Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995).  FBME has not even

attempted to meet this burden.

 Nor does the Due Process Clause inherently require adversarial proceedings.  *See NCRI*,

251 F.3d at 148 ("We do not suggest 'that a hearing closely approximating a judicial trial is

necessary'" for an FTO designation) (citing *Mathews v. Eldredge*); *see also Veterans for*

*Common Sense v. Shinseki*, 678 F.3d 1013, 1035-36 (9th Cir. 2013) (relying in part on the fact

"that Congress purposefully designed a non-adversarial system of benefits administration" for

veterans, and contrasting the likely reduction in remands and errors with the substantial "fiscal

and administrative burdens" of additional procedures).[16]  FBME cites *NCRI*, but that case does

not support the argument that the designation process must include a hearing by a decisionmaker

outside of the agency chain of command to satisfy due process.  It merely holds that the designee

is entitled to "*some* compliance with the hearing requirement of due process jurisprudence,"

including "the opportunity to present, at least in written form, such evidence as those entities

may be able to produce to rebut the administrative record or otherwise negate the proposition"

that the designation is justified—a standard that FinCEN has clearly met.  *NCRI*, 251 F.3d at 209

(emphasis added).  As for the other, factually inapposite cases FBME cites—*Hamdi v. Rumsfeld*,

---

[16] Further, under FBME's interpretation of what due process requires, *all* informal adjudications under the APA that implicate liberty or property rights are presumptively unconstitutional because they do not include formal hearings by administrative judges or some other objective third parties.  This is simply not the case.  *See, e.g., Bean Dredging, LLC v. United States*, 773 F. Supp. 2d 63, 75-77 (D.D.C. 2011) (due process does not "create procedural rights [to more trial-like proceedings] where the APA and the relevant legislation envision none"); *New Life Evangelistic Ctr., Inc. v. Sebelius*, 753 F. Supp. 2d 103, 108, 114, 125 (D.D.C. 2010) (rejecting argument that "the circumstances of HHS' decision making process [in informal adjudication] suggest that the agency was acting not out of a desire to act as a neutral decision maker").

542 U.S. 507, 533 (2004), *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951), *Parham v. J.R.*, 442 U.S. 584, 606 (1979), *Simms v. District of Columbia*, 872 F. Supp. 2d 90 (D.D.C. 2012)—there is no indication that the complainants received *any* sort of opportunity to be heard at all before they were deprived of the liberty or property right at issue.[17] Here, by contrast, FBME had a full and fair opportunity to contest the proposed rulemaking and present contrary evidence.  The fact that it was not able to persuade the agency to its position does not, in itself, cast doubt on the adequacy or integrity of the process; what matters is that it had ample notice and an opportunity to be heard by the decisionmaker.[18]  Accordingly, FBME cannot show a likelihood of success on its due process claim.

## II.  FBME Has Failed to Show that a Preliminary Injunction is Necessary to Prevent Irreparable Harm.

While FBME's inability to demonstrate a likelihood of success on the merits is fatal to its motion for a preliminary injunction, FBME has failed to meet another of the key requirements for the extraordinary relief of a preliminary injunction: proof of injury that is irreparable.

The D.C. Circuit "has set a high standard for irreparable injury."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  The injury to the movant "must be both certain and great," as well as "actual and not theoretical."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  The movant must also "substantiate" its "claim that irreparable injury is 'likely' to occur" with appropriate factual evidence.  *Id.*  Failure to meet this "high standard" renders a plaintiff ineligible for preliminary injunctive relief, regardless of the

---

[17] It also bears noting that *Hamdi* and *Parham* involved a liberty right rather than a property right, and nothing in *Joint Anti-Fascist Refugee Committee* specifically states that a neutral arbiter is required at all.

[18] The government notes that FBME was represented by counsel throughout the notice and comment period.  If it believed that a neutral adjudicator was required, it should have requested one.  Its failure to do so during the administrative process should be deemed a waiver.

remaining factors. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297; *see also Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1088 (D.C. Cir. 2011).

FBME predicts dire consequences for the bank, claiming it will "cease to exist" when the Final Rule goes into effect. More specifically, it identifies three allegedly "irreparable" injuries: loss of access to U.S. correspondent accounts, enforcement actions by foreign regulators, and loss of constitutional rights. However, none of these alleged harms meet the high standard for establishing irreparable injury.

First, FBME claims it will be cut off from U.S. correspondent accounts, which are necessary in order for it to do business at all. This apocalyptic prediction obscures the plain fact that FBME was cut off from U.S. correspondent accounts before the issuance of the Final Rule. FBME's own declarations establish that it does not currently have any U.S. correspondent accounts. *See* Saab Decl. ¶ 43 (all USD accounts are closed or frozen); Wyllie Decl. ¶¶ 15-16 (averring that FBME retains correspondent accounts, but not with U.S. banks). There is no indication it was able to do business in U.S. dollars at the time the Final Rule was issued, nor was it doing any significant business in any other currency. *See* Saab Decl. ¶¶ 48-50 (describing Cypriot and Tanzanian restrictions on FBME activity); Final Rule, at 80 Fed. Reg. at 45058 (describing Cypriot and Tanzanian actions); Calvery Decl. ¶ 52. Thus the Final Rule did not cause U.S. banks to cut off FBME, nor is their refusal to do business with FBME redressable by a preliminary injunction. It is at best highly speculative to presume that banks that cut off ties with FBME based on an assessment of the risk of doing business with the bank would suddenly rethink that assessment based on the entry of a preliminary injunction that merely *delayed* the

effect of the Final Rule without rescinding it.[19]  FBME has not identified a single transaction that

would go forward in the event the Court entered a preliminary injunction.  Even if it could, it is

"well settled that economic loss does not, in and of itself, constitute irreparable harm."  *Wisc.*

*Gas Co.*, 758 F.2d at 674.[20]  FBME therefore cannot carry its burden of establishing a certain

injury caused by the Final Rule and redressable by a preliminary injunction.  *See Arpaio*, 27 F.

Supp. 3d at 207-208 ("the inability to obtain redress from an order by this Court . . . dooms the

plaintiff's ability to show irreparable harm).[21]  Moreover, although the "injury" of being cut off

from the U.S. financial system is not caused by the Final Rule and cannot be "prevented" by

means of a preliminary injunction, it is not irreparable.[22]  An order vacating the Final Rule and

Notice of Finding could re-open U.S. markets to FBME.  FBME's prediction that the bank will

---

[19] FBME cites several cases for the proposition that "major disruption" of a business can constitute irreparable harm, but none of those cases presented a situation where the so-called "major disruption" had already happened and could not be cured by a preliminary injunction.  *See, e.g., Blom Asa v. Pictometry Int'l Corp.*, 757 F. Supp. 2d 238 (W.D.N.Y. 2010).

[20] FBME cannot, of course, recover money damages in this suit.  *See Bowen v. Massachusetts*, 487 U.S. 879, 892-93 (1988); 5 U.S.C. § 702.  "[S]ome judges on this Court" have, therefore, "distinguished recoverable economic loss from irrecoverable economic loss when assessing irreparable harm." *N. Air Cargo v. U.S. Postal Serv.*, 756 F. Supp. 2d 116, 125 n.6 (D.D.C. 2010).  But notwithstanding the solicitude some courts have shown some plaintiffs complaining of economic damages, FBME cannot show the degree or certainty of harm required.

[21] *See also Mott Thoroughbred Stables, Inc. v. Rodriguez*, No. 15-cv-333 (RBW), 2015 WL 1570167, at *8 (D.D.C. Apr. 8, 2015); *Sierra Club v. DOE*, 825 F. Supp. 2d 142, 153 (D.D.C. 2011); *Navistar, Inc. v. EPA*, No. 11-cv-449 (RLW), 2011 WL 3743732, at *3 (D.D.C. Aug. 25, 2011) (Wilkins, J.); *Hunter v. FERC*, 527 F. Supp. 2d 9, 15 (D.D.C. 2007).

[22] If such harm were irreparable because no bank is likely to do business with FBME again regardless of the existence of a Final Rule, the harm has already been done.  If it is not redressable, FBME lacks standing to bring the case at all.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992) (explaining that when the "existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," it "becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.").

"cease to exist" in the interim is demonstrably untrue because it has not maintained U.S. correspondent relationships for some time and still, clearly, exists.[23]

Second, FBME alleges that it will imminently "cease to exist" because of planned actions by the Central Bank of Cyprus. FBME Mem. at 42. The fifth special measure, of course, does not have the purpose or effect of dissolving or liquidating a foreign bank. Nothing in the Final Rule requires any action by the CBC or any other foreign regulator with respect to FBME and, indeed, FinCEN lacks the statutory authority to liquidate a foreign financial institution. Calvery Decl. ¶¶ 59-63. Accordingly, any potential liquidation by the CDC is not the *direct* result of the Final Rule and cannot be forestalled by a preliminary injunction. The Cypriot authorities investigated FBME and commenced the resolution action against FBME over a year ago. *Id.*; Saab Decl. ¶¶ 47-48. FBME alleges that it has managed to delay that outcome pending a final determination by FinCEN, Saab Decl. ¶¶ 51-53, but there is no evidence that Cypriot law hinges solely on a determination by FinCEN or that Cypriot authorities would be bound in any way by an order of this Court. And in any event, FBME's own declarations indicate that the final resolution of lawsuits in Cypriot courts can take years. Saab Decl. ¶ 64.

FBME has submitted one document—a letter dated August 3, 2015 from the CBC—in support of its argument that the CBC's liquidation action is being triggered by issuance of the Final Rule. *See* Saab Decl. Exh. A. But FBME has overstated the import of the letter. As the

---

[23] In Cyprus, FBME seems to be arguing exactly the opposite of what it has argued here, namely that CBC's actions are *not* contingent on FinCEN's actions and that FBME *can* continue in business regardless of FinCEN's actions. *See* Saab Declaration, Exhibit C (Letter dated August 5, 2015, pgs. 2-3) (arguing Final Rule "does not prevent FBME Cyprus Branch from conducting its business activities in Euros had you not declared the Bank in Cyprus put up for sale, two days after the FinCEN's NOF" and that CBC's actions "have not been founded on or related to FinCEN's actions" and "produced considerable damage to the business and operations of FBME Cyprus Branch" before issuance of Final Rule).

letter itself notes, CBC was *required* to provide 30 days' notice before beginning further legal action against CBC. *Id.* The Bank does not automatically dissolve at the end of the 30 days; rather, CBC will at that time decide how to proceed under appropriate Cypriot and EU law. The letter expressly indicates that the CBC may take any of several actions at the expiration of the 30-day period, including for example, "the variation of FBME's license (such as the imposition of conditions or otherwise)" or the "revocation of FBME's license and the liquidation of the Cyprus branch." *Id.* Further, according to Mr. Saab's declaration, even before the issuance of the Final Rule, FBME commenced an arbitration in Paris and three separate lawsuits in Cyprus to avoid resolution under Cypriot law, and has plans to commence a fourth lawsuit in Cyprus for the same purpose. Saab Decl. ¶¶ 51-52, 64. While FBME no doubt hopes to obtain a preliminary injunction here to forestall any further action by the CBC (which may or may not be forthcoming), this hope is based on mere speculation as to what FBME can then persuade the Cypriot courts to do. Once again, the "irreparable harm" alleged by FBME is not caused by FinCEN and cannot be redressed by a preliminary injunction.

Finally, FBME alleges that any harm is necessarily irreparable because of the alleged deprivation of its constitutional right to due process. FBME Mem. at 42. As discussed above, FBME lacks any constitutional presence in the United States and cannot establish the deprivation of a constitutional right. *See supra* Part I.B. Moreover, the law regarding constitutional injury as irreparable harm presumes the ongoing deprivation of some constitutionally-guaranteed freedom, which has not been alleged here; the entry of a preliminary injunction would not return to FBME any freedom such as the right to speak or associate. *See Sweis v. U.S. Foreign Claims Settlement Comm'n*, 950 F. Supp. 2d 44, 48 (D.D.C. 2013) (finding no irreparable harm despite

constitutional claims where plaintiff did not claim the loss of some constitutional freedom); *Live365, Inc. v. Copyright Royalty Bd.*, 698 F. Supp. 2d 25, 45 (D.D.C. 2010) (plaintiff must show substantial likelihood of loss of personal constitutional right); *but see Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (finding irreparable harm based on ongoing loss of constitutionally guaranteed freedom with intangible effects); *Wrenn v. District of Columbia*, No. 1:15-cv-162 (FJS), 2015 WL 3477748, at *9 (D.D.C. May 18, 2015) (similar). Even in *Gordon v. Holder*, cited by FBME for the proposition that deprivation of due process can be irreparable harm, the D.C. Circuit upheld the injunction as originally properly entered but invited the district court to consider whether it was still necessary given that the plaintiff business had ceased operations.  721 F.3d 638, 653 (D.C. Cir. 2013).  Not every constitutional claim gives rise to a finding of "irreparable harm," and it certainly does not do so here.  *See, e.g., Brodie v. HHS*, 715 F. Supp. 2d 74 (D.D.C. 2010) (finding no irreparable harm despite existence of due process claim in debarment proceeding).

For these reasons, plaintiffs have not made the requisite showing of irreparable harm.

### III.     The Balance of Equities Favors the Government, and an Injunction Would Harm the Public Interest.

The final two factors in the standard for preliminary and injunctive relief—the balance of equities and the public interest—tend to "merge" in cases where the relief is sought against the United States.  *Nken v. Holder*, 556 U.S. 418, 435, 1 (2009); *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, No. 13-cv-2007 (RDM), 2015 WL 2207603, at *21-22 (D.D.C. May 12, 2015).  FBME has failed to demonstrate that "the threatened irreparable injury outweighs the threatened harm that the injunction would cause Defendants and third parties" and that "granting the preliminary injunction would be in the public interest."  *Whitaker v. Thompson*, 248 F. Supp. 2d 1, 7-8

44

(D.D.C. 2002) (citation omitted); *see also Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C. Cir. 1977).  Here, the balance of the equities and the public interest weigh heavily against FBME and its request for a preliminary injunction.

The United States has a substantial interest in protecting the integrity of its financial system from foreign threats, and Section 311 special measures were devised by Congress and imposed by FinCEN in order to accomplish exactly this purpose.  Entry of a preliminary injunction would frustrate action against a foreign bank that poses a potentially significant threat to the U.S. financial system.  Calvery Decl. ¶ 64.  Courts have generally held that the balance of interests tips sharply in favor of the government when dealing with issues, such as financial sanctions, that touch on foreign policy and national security.  *See Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978) (in case touching on foreign policy, "a court is quite wrong in routinely applying to this case the traditional standards governing more orthodox stays.") (citation omitted); *see also Regan*, 468 U.S. at 242 (citing "classical deference to the political branches in matters of foreign policy"); *Palestine Info. Office v. Shultz*, 674 F. Supp. 910, 918 (D.D.C. 1987) (requiring an "exceptionally strong" showing to receive a preliminary injunction), aff'd, 853 F.2d 932 (D.C. Cir. 1988).  More generally, it is not in the public interest to delay policies that promote public safety, national security, and administrative efficiency, as FBME seeks to do here.  *See, e.g., Nat'l Res. Def. Council, Inc. v. Pena*, 972 F. Supp. 9, 20 (D.D.C. 1997); *Hodges v. Abraham*, 253 F. Supp. 2d 846, 873 (D.S.C. 2002); *Gulf Oil Corp. v. FEA*, 391 F. Supp. 856, 864 (W.D. Pa. 1975).  It is in the interest of both the government and the public to formalize FBME's exclusion from the U.S. financial system in order to prevent ongoing and future abuses.

Notably, if FBME were correct that it could gain access to U.S. correspondent accounts as a result of a preliminary injunction, that possibility would tip the balance dramatically in favor of the government.  FinCEN, which is charged by Congress with assessing threats to the U.S. financial system, has deemed that FBME poses a significant risk to the United States financial system because of its history of being used by criminals and terrorists to access global financial markets.  Calvery Decl. ¶ 64.  The seriousness of the illicit activity flowing through the bank makes it appropriate to take immediate steps to prevent exposure of U.S. institutions to the bank. *Id.*  Delaying FinCEN's action would leave U.S. financial institutions vulnerable should they continue to engage with FBME.  *Id.*  The record reflects that FinCEN investigated FBME thoroughly and carefully and gave it ample time to make its case before reaching a conclusion.[24] But now that it has fairly concluded that FBME poses a threat to the U.S. financial system, the balance of harms tips sharply in favor of protecting the public from FBME.

On the other hand, FBME's alleged harms are entirely speculative or disconnected from the agency action it seeks to challenge.  Even before the Final Rule issued, FBME was not doing any significant business and has no current access to U.S. correspondent accounts.[25]  The Final Rule's prohibition of access to U.S. correspondent accounts does not, therefore, deprive FBME

---

[24] FBME now seeks to use the agency's alleged "delay" against it by arguing that the fact that it took FinCEN a year to finalize the rule demonstrates that it would not be harmed by entry of a preliminary injunction.  FBME ignores the fact that FinCEN permitted FBME to submit comments well after the close of the comment period, thus necessarily delaying the Final Rule.  FBME can hardly complain about FinCEN's willingness to consider FBME's late-filed comments and generally afford it far more process than it was due.  Having meticulously given due consideration to FBME's comments before reaching a final conclusion, FinCEN is both entitled and obligated to act swiftly, with due care for the public interest in protecting the U.S. financial system.

[25] FBME also alleges, implausibly, immediate negative consequences for its employees and customers. However, because FBME does not currently have access to the U.S. financial system, nothing necessarily changes for them after the rule is finalized or becomes effective.  The Cypriot government is taking action to protect depositors, whose interests are not served by continuing to allow FBME to continue to fail to protect the integrity of the bank.  FBME is not acting in the interests of the public; the government is.

of anything that it currently enjoys.  Actions by foreign regulators are not caused by the Final

Rule, and cannot be prevented by any action of this Court.  Nevertheless, in order to facilitate

expeditious judicial review, the government is willing to brief summary judgment on an

expedited basis, and would be ready to submit the administrative record, including those parts

that would be submitted *ex parte* and under seal, and move for summary judgment within 30

days of resolution of the motion for a preliminary injunction.[26]

Finally, it cannot be emphasized enough that it is neither the role of the Court nor the

purpose of a preliminary injunction to effect or alter policy in the area of national security or

foreign relations.  *Cf. Regan*, 468 U.S. at 242; *Harisiades v. Shaughnessy*, 342 U.S. 580, 589

(1952) "Matters related 'to the conduct of foreign relations ... are so exclusively entrusted to the

political branches of government as to be largely immune from judicial inquiry or

interference.'").  As a general principle, therefore, courts avoid impairment of decisions made by

the Congress or the Executive Branch in matters involving foreign affairs or national security.

*See Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and

national security are rarely proper subjects for judicial intervention"); *Palestine Info. Office v.*

*Shultz*, 674 F. Supp. 910, 918 (D.D.C. 1987), *aff'd*, 853 F.2d 932 (1988) (same); *see also GRF v.*

*O'Neill*, 207 F. Supp. 2d 779, 787-88 (N.D. Ill. 2002), *aff'd* 315 F.3d 748 (7th Cir. 2002).

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiff's motion for a preliminary

injunction.

---

[26] The U.S. Attorney's Office was served on August 11, 2015.  Accordingly, the government's response would not technically be due until October 12, 2015.  Because this is an administrative record case, the parties would presumably then cross-move for summary judgment.  Presuming the Court denies the motion for a preliminary injunction, the government would be willing to move to dismiss or in the alternative for summary judgment, within 30 days of that decision.

Dated: August 18, 2015.                      Respectfully submitted,

                                             BENJAMIN C. MIZER
                                             Principal Deputy Assistant Attorney General

                                             VINCENT H. COHEN, JR.
                                             Acting United States Attorney

                                             DIANE KELLEHER
                                             Assistant Branch Director

                                              */s/ Lynn Y. Lee*_____
                                             LYNN Y. LEE (CA Bar No. 235531)
                                             AMY POWELL
                                             Trial Attorneys
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             20 Massachusetts Avenue, N.W.
                                             Washington, D.C. 20530
                                             Telephone: (202) 305-0531
                                             Fax: (202) 616-8470
                                             Email: lynn.lee@usdoj.gov

                                             *Attorneys for Defendants*