## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FBME Bank Ltd., <br><br> FBME Ltd., <br><br> Plaintiffs, <br><br> v. <br><br> JACOB LEW in his official capacity as Secretary of the Treasury, <br><br> U.S. DEPARTMENT OF THE TREASURY, <br><br> JENNIFER SHASKY CALVERY in her official capacity as Director of the Financial Crimes Enforcement Network, <br><br> FINANCIAL CRIMES ENFORCEMENT NETWORK, <br><br> Defendants. | Civil Action No. 1:15-CV-1270 CRC |

<u>DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION</u>

# EXHIBIT 1-
*Aero-Continente, SA v. Newcomb*, 04-01168, Dkt. 8 (July 16, 2004)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AERO CONTINENTE, S.A.,

        Plaintiff,

v.

R. RICHARD NEWCOMB, in his official capacity as Director, Office of Foreign Assets Control of the Department of the Treasury, et al.,

        Defendants.

Civil Action 04-01168 (HHK)

MEMORANDUM OPINION ON PLAINTIFF'S APPLICATION FOR
A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Before the court is the application of Aero Continente, S.A. ("Aero Continente" or "Airline") for a temporary restraining order ("TRO") and preliminary injunction. Aero Continente seeks a court order that would require defendants, R. Richard Newcomb, Director, Office of Foreign Assets Control of the Department of the Treasury, and the United States Treasury Office of Foreign Assets Control (collectively "OFAC") to revoke the Blocking Notice, FAC No. FNK-222558,[1] that was imposed upon the Airline pursuant to the Foreign Narcotics

---

[1] The Blocking Notice is addressed to Aero Continente and in pertinent part states:

On June 1, 2004, President Bush identified Fernando Melciades Zevallos Gonzales ("Fernando Zevallos") as a significant foreign narcotics trafficker pursuant to the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"), 21 U.S.C. 1901,1908, 8 U.S.C. 1182 (a)(2)(c). . . .

As a result of the President's action, all property and interests in property that are owned and controlled by Fernando Zevallos and that are in, or come within, the United States or that are in or come within, the possession or control of any U.S. person, including foreign branches, are blocked and may not be paid, transferred,

Kingpin Designation Act ("Kingpin Act"), 21 U.S.C. §§ 1901-1908, 8 U.S.C. § 1182(a)(2)(c).[2]

> exported, withdrawn or otherwise dealt in, except to the extent otherwise authorized by the Office of Foreign Assets Control ("OFAC"). The Kingpin Act and the Kingpin regulations also prohibit any U.S. person and any person within the United States from engaging in any transaction or dealing in any property or interest in property of Fernando Zevallos and from engaging in any transaction that evades or avoids the prohibitions of the law or the Kingpin Regulations, except to the extent otherwise authorized by OFAC.
>
> OFAC has reason to believe that Aero Continente S.A., located at 8940 NW 24 Terrace , Miami, FL, is owned and/or controlled by Fernando Zevallos. Therefore, Aero Continente S.A. is hereby notified that pursuant to the Kingpin Act and the Kingpin Regulations, the U.S. Department of the Treasury is blocking all property and interests in property that are owned or controlled by Aero Continente S.A., including, but not limited to, any motor vehicles registered in the name of Aero Continente S.A. and all funds and accounts in which Aero Continente S.A. has any interest, pending further investigation and resolution of this matter. . . .

Pl.'s Ex. 2.

---

[2] OFAC's Blocking Notice was issued pursuant to 21 U.S.C. §§ 1903 and 1905. Section 1903 (b) provides:

> Not later than June 1, 2000, and not later than June 1 of each year thereafter, the President shall submit a report to the Permanent Select Committee on Intelligence, and the Committees on the Judiciary, International Relations, Armed Services, and Ways and Means of the House of Representatives; and to the Select Committee on Intelligence, and the Committees on the Judiciary, Foreign Relations, Armed Services, and Finance of the Senate–
>
> > (1) identifying publicly the foreign persons that the President determines are appropriate for sanctions pursuant to this chapter; and
> >
> > (2) detailing publicly the President's intent to impose sanctions upon these significant foreign narcotics traffickers pursuant to this chapter.
>
> The report required in this subsection shall not include information on persons upon which United States sanctions imposed under this chapter, or otherwise on account of narcotics trafficking, are already in effect.

21 U.S.C. § 1903. Section 1905 (a) provides:

Upon consideration of the application, the opposition thereto, the exhibits and attachments that accompanied the application and opposition, the oral argument of counsel, and the administrative record, the court concludes that the application for a Temporary Restraining Order and Preliminary Injunction should be denied.[3]

## I. BACKGROUND

---

> To carry out the purposes of this chapter, the Secretary of the Treasury may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise–
>
>> (1) investigate, regulate, or prohibit--
>>
>>> (A) any transactions in foreign exchange, currency, or securities; and
>>>
>>> (B) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interests of any foreign country or a national thereof; and
>>
>> (2) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent, or prohibit any acquisition, holding, withholding, use, transfer, withdrawal, transportation, placement into foreign or domestic commerce of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest,
>
> by any person, or with respect to any property, subject to the jurisdiction of the United States.

21 U.S.C. § 1905(a).

[3] Aero Continents's application for a Temporary Restraining Order was denied by an order docketed July 14, 2004. The order indicated that the court would set forth its reasons for denying the application in a future memorandum. This memorandum sets forth the courts reasons for the courts decision on the application for a Temporary Restraining Order. The same rational explains why the application for a preliminary injunction also is denied.

Plaintiff Aero Continente S.A. is Peru's largest domestic and international air carrier. On June 1, 2004, without notice to Aero Continente, OFAC entered Blocking Notice FAC No. FNK-222558 against Aero Continente, asserting that OFAC had reason to believe that the Airline was "owned and/or controlled" by Fernando Zevallos, an individual who has been identified by the President as a significant foreign narcotics trafficker pursuant to the Kingpin Act. Pl.'s Ex. 2. The Blocking Notice "block[ed] all property and interests in property that are owned or controlled by Aero Continente S.A. . . . pending further investigation and resolution of this matter." *Id.*

Starting on June 18, 2004, Aero Continente representatives met with OFAC to determine the nature of the specific allegations against the Airline, and thereafter, attempted to persuade OFAC that the Blocking Notice was improvidently issued. On June 23, 2004, the Airline submitted evidence to OFAC that it is neither owned nor controlled by Fernando Zevallos. This evidence purportedly shows that: (1) Fernando Zevallos has not been a shareholder of the company since January 15, 1995, when he transferred ownership to his brother-in-law, Jorge Portilla, who subsequently transferred it to Lupe Zevallos, Mr. Zevallos's sister, (2) Fernando Zevallos resigned as Chairman of the Aero Continente on May 8, 1997, and resigned as Director on September 17, 1997, (3) roughly 91 % of the Airline is owned by Lupe Zevallos (86 %) and her brother Ricardo Zevallos (4 %), with the remaining shares owned by small shareholders who are neither owned nor controlled by Fernando Zevallos, (4) Fernando Zevallos is not authorized to conduct any business for Aero Continente, and (5) on July 3, 2004, the Airline formally terminated an agreement with I.A.C., International, Inc., a company owned by Fernando Zevallos that previously provided support services to the Airline and severed all business relationships

with Fernando Zevallos on June 21, 2004.

Aero Continente also presented evidence demonstrating that absent immediate relief from the Blocking Notice, the continued safe operation of the Airline was seriously jeopardized because of the inability of the Airline to obtain any technical support or maintenance services, spare parts, or new or used aircraft and that its economic survival was unlikely because it could not receive financial service or assistance from any U.S. company or person at its banks or credit facilities. Aero Continente proposed that it adopt any internal monitoring or auditing controls OFAC deemed necessary to show that it was not owned or controlled by Fernando Zevallos. This proposal was rejected.

Subsequently, on July 1, 2004, the Airline submitted additional evidence demonstrating that the Airline's insurance would be cancelled as of July 10, 2004, because of the Blocking Notice, and that the Airline would therefore be forced to cease operations. In response OFAC advised that there were pending indictments against Fernando Zevallos, and that there may be alternative justifications for the Blocking Notice, including allegations of wrongdoing by Lupe Zevallos herself.[4] Thereafter, on July 7 and 8, 2004, Aero Continente submitted evidence to

---

[4] The allegations of wrongdoing by Lupe Zevallos were based on press accounts in two newspapers. On May 13, 2004, the Peruvian newspaper *El Comercio* reported that Lupe Zevallos fled when she learned of her imminent arrest and extradition to Chile while one of her American lawyers was negotiating with U.S. authorities for a possible surrender. *See* Defs.' Ex. 55. *El Comercio* further reported that on May 4, 2004, Lupe Zevallos registered two entries in Peru using different passports and that her exit from the United States was not officially registered. *Id.* On May 20, 2004, *El Comercio* published an article entitled, "The six falsifications and contradictions which Lupe Gonzalles incurs," that outlined false statements Lupe Zevallos made concerning, *inter alia*, the proceedings against her in Chile and her departure from the United States. *See* Defs.' Ex. 56. The record also indicates that OFAC referred to reports of an outstanding warrant for Lupe Zevallos's arrest in the United States. *See* Pl.'s Ex. 5.

OFAC information rebutting the allegations regarding Lupe Zevallos.[5]

## II. ANALYSIS

Aero Continente contends that the OFAC Blocking Notice, issued without advance notice, deprives it of its right to due process of law under the Fifth Amendment and violates the Administrative Procedure Act, ("APA"), 5 U.S.C. § 701 *et seq.,* because it is arbitrary, capricious, and an abuse of discretion. If the Blocking Notice is permitted to stand, Aero Continente asserts that it will be destroyed, resulting in 2000 people being put out of work and leaving several cities in Peru without any airline service.[6] Consequently, Aero Continente contends that it is entitled to temporary and preliminary injunctive relief. Aero Continente's request is denied for the reasons that follow.

---

[5] The Airline's rebuttal evidence consisted of a ruling from the Chilean Supreme Court dated May 18, 2004 that set aside the Chilean authority's request for Lupe Zevallos's detention, which the Airline understood was the sole basis for the issuance of the arrest warrant for Lupe Zevallos in the United States. *See* Pl.'s Exs. 5, 5.A. Aero Continente also submitted the report of an administrative investigation that concluded that two of the witnesses who had testified against Lupe Zevallos in the Chilean investigation had engaged in improper conduct. *See* Pl.'s Ex. 5.B. In addition, Aero Continente presented evidence that money laundering allegations from 2001 were not brought against Aero Continente or Lupe Zevallos, and that an investigation by the Peruvian government in 2001 concluded that the Airline was not created through funds derived from narcotics and was not owned or controlled by Fernando Zevallos. *See* Pl.'s Exs. 5.C, 5.D.

[6] Among the circumstances adverse to Aero Continente's business since the issuance of the Blocking Notice include companies that lease fleet aircraft to the Airline demanding their return, the Airline's source for spare parts for maintenance of its fleet being cut off, and losing access to various international financial and reservations services, thus forcing Aero Continente to cut back its international and domestic routes, including suspending service to some cities. Perhaps most significantly, Aero Continente's Aircraft Hull and Liability insurance has been cancelled, effective July 10, 2004. The Airline's insurer stated that if the "prohibitions on dealing with Aero Continente were removed, we would be happy to consider becoming involved in Aero Continente's insurance programme once again." Pl.'s Ex. 1.

Preliminary injunctive relief is an extraordinary remedy. In evaluating a request for such relief a court must consider whether: (i) the movant is substantially likely to succeed on the merits of its case; (ii) the movant will suffer irreparable harm if the injunctive relief is not granted; (iii) the relief sought would substantially impair the rights of other interested parties; and (iv) the relief sought would be in the public interest. *See, e.g.*, *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995). Although "[t]hese factors interrelate on a sliding scale and must be balanced against each other," *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998), "it is especially important for the movant to demonstrate a likelihood of success on the merits." *Nat'l Head Start Ass'n v. Dep't of Health & Human Servs.*, 297 F. Supp. 2d 242, 246 (D.D.C. 2004) (citing *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360, 366 (D.C. Cir. 1999); *CityFed Fin.*, 58 F.3d at 747). Further, when, as here, a plaintiff seeks a mandatory injunction that would accord it all the relief it seeks in its complaint, the court should "sparingly" afford such relief and only when "an overwhelming case in the plaintiff's favor is present on the merits and equities of the controversy." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969). While Aero Continente has clearly shown that it will suffer irreparable harm in the absence of the relief it seeks, it fails to present a compelling case on any of the other factors that must be considered.

### A.    Likelihood of Success on Due Process Claim

Aero Continente has failed to demonstrate a likelihood of success on the merits on its claim regarding deprivation of property without Due Process.[7] Assuming that Aero Continente is

---

[7] Although the parties have not briefed the issue, the court notes that it is not entirely clear that the Airline, a foreign entity, is entitled to Due Process protections. "A foreign entity without property or presence in this country has no constitutional rights, under the due

entitled to the protection of the Due Process clause, under the balancing test of *Mathews v. Eldridge*, 424 U.S. 319 (1976), the court determines what process is due by weighing "the private interest that will be affected by the official action," "the risk of an erroneous deprivation" of the private interest, the "probable value, if any, of additional or substitute procedural safeguards," and the Government's asserted interest, including the burdens the Government would face in providing greater process. *Id.* at 335. Pre-deprivation notice and hearing are not required in a case that "presents an extraordinary situation." *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679-80 (1974) (internal quotation marks and citation omitted). To show extraordinary circumstances the government must establish that:

> (1) the deprivation was necessary to secure an important governmental interest;
> (2) there has been a special need for very prompt action; and
> (3) the party initiating the deprivation was a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.

*Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 76 (D.D.C. 2002) (citing *Calero-Toledo*, 416 U.S. at 678), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003), *cert. denied*, 124 S. Ct.

---

process clause or otherwise." *People's Mojahedin Org. of Iran v. United States Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999). "'[A]liens receive constitutional protections [only] when they have come within the territory of the United States and developed substantial connections with this country.'" *Id.* (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990)). In *Arbelaez v. Newcomb*, Civil Action No. 98-2813 (LFO), slip. op. at 6 (D.D.C. May 16, 2000), Judge Oberdorfer held that bank accounts having a combined value of less than $2000 did not create a "substantial connection" to the United States. *See* Defs.' Ex. 16. Evidence in the record reflects that Aero Continente's connections to the United States are greater than those of the entity in *Arbelaez*. A wholly owned subsidiary of Aero Continente, Aero Continente Services, Inc., is incorporated in and maintains and office in Florida. Ex. 3 to Mot. for TRO (Lupe Zevallos Gonzales Decl. ¶ 4). Aero Continente also has approximately $1.2 million in U.S. bank accounts, and currently owns landing rights at Miami International Airport. *Id.* One of the four directors of the Airline is a U.S. resident and provides services to the Airline from the United States. *Id.* Thus, Aero Continente's connections with the United States may be substantial enough to afford it constitutional protections.

1506, 158 L. Ed. 2d 153 (2004). The court is likely to find that OFAC has made the requisite showing here.

Relying on *National Council of Resistance of Iran v. Dep't of State ("NCRI")*, 251 F.3d 192 (D.C. Cir. 2001), Aero Continente argues that before OFAC issues a blocking notice, it "must afford the limited due process available . . . *prior* to the deprivation worked by designating that entity as such with its attendant consequences, unless [OFAC] can make a showing of particularized need." *Id.* at 208 (emphasis added). The court disagrees.

*NCRI* involved the designation of an organization as a foreign terrorist organization under the Anti-Terrorism and Effective Death Penalty Act, which effectively deprives an organization of property because it can no longer hold bank accounts and receive material support or resources from anyone in the United States. *See id.* at 204. *NCRI*, however, is distinguishable because the designation in *NCRI* did not occur under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*[8], which is the model for the Kingpin Act. *See* 21 U.S.C. § 1901(a). Courts that have considered applications for preliminary relief in actions dealing with the IEEPA have indicated that "[t]he actions taken by the Executive Branch pursuant to these statutes are procedurally and substantively different from other types of government conduct in that they first require a declaration of war or national emergency arising, at least in substantial part, outside the United States." *Global Relief Found., Inc. v. O'Neill*, 207 F. Supp. 2d 779, 803-04 (N.D. Ill. 2002), *aff'd*, 315 F.3d 748 (7th Cir. 2002), *cert. denied*, 124 S. Ct. 531, 157 L. Ed.

---

[8] The IEEPA grants the President authority "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a).

2d 408 (2003); *see Holy Land Found.*, 219 F. Supp. 2d at 76 (stating that "this case differs significantly from *NCRI* where neither a declaration of war (as required by the [Trading With the Enemy Act]) nor a Presidentially declared national emergency (as required by the IEEPA) existed to justify the absence of notice and an opportunity to be heard").

In enacting the Kingpin Act, Congress found that "[t]here is a national emergency resulting from the activities of international narcotics traffickers and their organizations that threatens the national security, foreign policy, and economy of the United States." 21 U.S.C. § 1901(a)(4).  This interest clearly constitutes an important governmental interest. The Blocking Notice cuts off funding to entities related to designated narcotics kingpins during this time of national emergency, and thus the deprivation is necessary to secure the governmental interest at stake.  OFAC persuasively argues that there is a need for very prompt action in this case because the assets blocked by the Blocking Notice, i.e. money, records, and property, are of the "sort that could be removed to another jurisdiction, destroyed, or concealed if advance warning of confiscation were given." *Calero-Toledo*, 416 U.S. at 679-80.  Requiring pre-deprivation notice and hearing would appear to frustrate the sanctions program established by the Kingpin Act. Finally, it is evident that the party initiating the deprivation was a government official in the instant case.  As a result, the court concludes that it is unlikely that it will determine that the Due Process clause requires pre-deprivation notice and hearing.

    **B.**    **Likelihood of Success on APA Claim**

Aero Continente's APA claim that OFAC acted arbitrarily and capriciously likewise is unlikely to succeed.  An agency's decision is arbitrary and capricious unless "the agency's path [in arriving at the decision] may reasonably be discerned."  *Bloch v. Powell*, 348 F.3d 1060, 1068

(D.C. Cir. 2003) (citing *Common Cause v. Fed. Election Comm'n*, 906 F.2d 705, 706 (D.C. Cir. 1990)) (internal quotation marks omitted). An agency is not allowed to rationalize agency action *post hoc*. *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983); *Johnson v. Office of Thrift Supervision*, 81 F.3d 195, 205 (D.C. Cir. 1996). Plaintiff contends that defendants' failure to explain the basis for the decision to issue the Blocking Notice, failure to respond to the evidence the Airline submitted regarding the lack of a connection to Fernando Zevallos, and attempt to alter the reasons for the Blocking Notice from connections with Fernando Zevallos to Lupe Zevallos without explanation are not rational. The Kingpin Act expressly authorizes the Secretary of the Treasury to block assets during the pendency of an investigation. 21 U.S.C. § 1905(a)(2). Given that blocking can occur while an investigation is still pending, it does not appear that defendants' incomplete explanation for the entry of the Blocking Notice to date will be found to be arbitrary and capricious. Based on the unclassified and non-privileged record provided to the court, there is sufficient evidence to believe that Fernando Zevallos played a role in international narcotics trafficking and had control over the Airline in the past. While Aero Continente has now severed formal ties with Fernando Zevallos, the record contains some indication that Lupe Zevallos may have assisted and may still be assisting her brother in narcotics trafficking activities. The court also notes that Fernando Zevallos and Lupe Zevallos have been or currently are the subject of criminal proceedings in Chile, including efforts to effect their extradition.

    **C.    Remaining Factors to be Considered**

The court recognizes that the denial of Aero Continente's application for preliminary injunctive relief will likely result in irreparable harm. The loss of the Airline's insurance due to

the Blocking Notice has and will continue to cause the Airline to cease operations if it is unable to procure insurance from a non-U.S. entity or entity that does not have interests in the United States, essentially forcing the Airline into bankruptcy. Further, there are undoubtedly parties whose legitimate interests will be adversely affected by the court's decision, including members of the Peruvian public who would suffer the loss of airline service to otherwise unserved areas of Peru, and Aero Continente employees who might lose their jobs. On the other hand, granting the relief sought by Aero Continente would operate to limit severely the effectiveness of a carefully-crafted law enacted to "aggressively and creatively . . . combat international crime" and address the congressionally found and declared "national emergency resulting from the activities of international narcotics traffickers and their organizations that threatens the national security, foreign policy, and economy of the United States." 21 U.S.C. § 1901(a)(1), (4). Such a result would not be in the public interest.

### III.  CONCLUSION

For the foregoing reasons, the court concludes that plaintiff's motion for a temporary restraining order and preliminary injunction must be **DENIED**.

> Henry H. Kennedy, Jr.
> United States District Judge

Dated: July 16, 2004