# EXHIBIT 1



Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T  +1 202 637 5600
F  +1 202 637 5910
www.hoganlovells.com

September 22, 2014

*BY ELECTRONIC FILING AND ELECTRONIC MAIL*

Jennifer Shasky Calvery
Director
Financial Crimes Enforcement Network
U.S. Department of Treasury
P.O. Box 39
Vienna, VA 22183

Attention: Richard May, Director, FinCEN Office of Special Measures

Re:     Notice of Proposed Rulemaking -- Financial Crimes Enforcement Network (FinCEN)

        RIN 1506-AB27

Dear Director Shasky Calvery:

On behalf of our client, FBME Bank Ltd. ("FBME" or the "Bank"), we present the following comments with respect to the Notice of Proposed Rulemaking (the "NPRM") and Notice of Finding ("Notice") contained in RIN 1506-AB27, dated July 15, 2014 and published in the Federal Register on July 22, 2014.

FBME is committed to continuing to cooperate with the U.S. Government, as well as the governments of Cyprus and Tanzania, in the fight against money laundering and terrorist financing activities. FBME has devoted substantial resources to developing and enhancing its anti-money laundering ("AML") and sanctions compliance program ("Compliance Program" or "Program") to adhere to applicable European, Cypriot, and Tanzanian standards. Hogan Lovells LLP has retained Ernst & Young in the United States ("EY") to conduct a comprehensive, independent review of the Bank's Compliance Program and to make recommendations for improvement according to applicable regulatory standards and best practices. In its Assessment of FBME's Compliance Program dated September 22, 2014 ("Assessment"), which FBME will provide to FinCEN, EY observed that the Program "incorporates the requirements" of the EU's Third Money Laundering Directive (2005/60/EC) ("MLD3") and the fourth issue of the Central Bank of Cyprus ("CBC") Directive to credit institutions in accordance with Article 59(4) of the Prevention and Suppression of Money Laundering Activities Laws of 2007 to 2013, issued in December 2013 (the "CBC 4th Directive") (together the "Directives") 1/ EY's Assessment further reported that FBME "has protocols in place that allow the Bank to continuously keep the Program aligned with these legal requirements." Hogan Lovells and EY have also made recommendations in some areas where FBME's Compliance Program "could be improved." FBME is already working to implement these

---

1/      We note that the requirements of the CBC 4th Directive exceed the requirements of the MLD3 The CBC 4th Directive is in line with the draft of the EU's proposed Fourth Money Laundering Directive, which has not yet been enacted.

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia. "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in: : Alicante  Amsterdam  Baltimore  Beijing  Brussels  Caracas  Colorado Springs  Denver  Dubai  Dusseldorf  Frankfurt  Hamburg  Hanoi  Ho Chi Minh City  Hong Kong  Houston  Johannesburg  London  Los Angeles  Luxembourg  Madrid  Mexico City  Miami  Milan  Monterrey  Moscow  Munich  New York  Northern Virginia  Paris  Philadelphia  Rio de Janeiro  Rome  San Francisco  São Paulo  Shanghai  Silicon Valley  Singapore  Tokyo  Ulaanbaatar  Warsaw  Washington DC  Associated offices: Budapest  Jakarta  Jeddah  Riyadh  Zagreb. For more information see www.hoganlovells.com

recommendations, and the Bank will continue to enhance its Compliance Program to the satisfaction of FinCEN.

FBME has carefully reviewed the Notice and the NPRM.  On the basis of this review and FBME's ongoing enhancement of its Compliance Program, FBME respectfully requests that FinCEN withdraw the Notice and the NPRM.  Hogan Lovells respectfully submits that a complete review of the Bank's current Compliance Program and its plans for enhancing certain aspects of the Program will demonstrate that FinCEN should not impose the fifth special measure under Section 311 of the USA PATRIOT Act.

Rescission of the regulatory proposal here would be consonant with the purposes of Section 311. As the Department of the Treasury has noted, Section 311 special measures can spur rehabilitative conduct on behalf of the affected financial institution:

> "In some instances, the entities of primary money laundering concern have rehabilitated their practices and implemented significant reforms to mitigate some of the risks and vulnerabilities identified as supporting the finding of primary money laundering concern. In such circumstances where the continuing risks to the U.S. financial system appeared to be diminished, Treasury has decided not to pursue a final rule implementing special measures and notice has been given to rescind the regulatory proposal." 2/

At the outset of this comment, FBME wishes to make the following key points:

1. FBME's current Compliance Program incorporates the requirements of the Directives. FBME's compliance with these laws has been reviewed by EY and (also very recently) by KPMG AG WPG Frankfurt ("KPMG").  As described in section I.L.2. below, in 2013, KPMG determined that FBME's compliance policies were "comprehensive", and that the Bank's Compliance Program was "in principle in compliance" with the standards set by its regulators.

2. In response to program enhancement recommendations made by previous audits, FBME has substantially strengthened its Compliance Program over the last two years.

3. FBME and its officers and directors do not in any way condone the "use" of the Bank for illicit purposes and strive to prevent such misuse.

4. Some of the statements in the Notice are incorrect.  Others appear to be based on incomplete information.  FBME seeks to clarify these discrepancies in this comment and in its ongoing engagement with FinCEN.

5. In some cases, FBME filed a Suspicious Transaction Report to MOKAS (Republic of Cyprus' Unit for Combating Money Laundering) regarding events that appear to be related to those described in the Notice.

6. The Treasury Department's proposed rulemaking has had a significant adverse impact on the business activities of FBME and its customers and CBC's actions to place FBME

---

2/      U.S. Department of the Treasury, "Fact Sheet: Overview of Section 311 of the USA Patriot Act," (May 22, 2012), available at http://www.treasury.gov/press-center/press-releases/Pages/tg1591.aspx.

in resolution proceedings 3/ have not allowed the Bank to maintain its business. FBME's inability to function has, in turn, damaged the ability of thousands of FBME's business clients from operating their businesses. FBME therefore respectfully requests that FinCEN work with all appropriate dispatch in assessing FBME's response to the NPRM.

Section I of this comment describes FBME's Compliance Program. As EY found in its Assessment, "FBME's AML policies are in line with the applicable requirements of the Directives." The Bank's policies and procedures provide fulsome coverage of AML issues including KYC procedures, documentation for personal and corporate accounts, procedures for high-risk customers and approved third parties, monitoring of accounts and transactions, suspicious transaction reporting, employee training, and the role of the Money Laundering Compliance Officer. In January 2010, the Bank invested in industry-leading tools for transaction monitoring, employing Oracle's Mantas monitoring platform to review past transactions, and implementing CGI HotScan to screen all incoming and outgoing SWIFT transactions in real time against international sanctions lists. In March 2011, the Bank designated a new, highly qualified AML Compliance Officer and Global Head of Compliance, who has further invigorated the activities and increased the resources of the Compliance Department.

Section II of this comment addresses some of the specific statements in the Notice. This section responds to some statements in the Notice that are inaccurate, have been taken out of context, or require additional explanation. Unfortunately, FBME is unable to respond fully to other statements in the Notice because the Notice lacks information required for the Bank to identify the transaction(s) at issue, and the Treasury Department has not shared any additional information pertaining to the alleged transaction-specific activities with the Bank. The Bank takes seriously any allegation that its customers have used the Bank for illicit or illegal purposes. FBME looks forward to providing additional information to FinCEN and cooperating with U.S., Cypriot, and Tanzanian officials to halt any possible criminal or other illicit activities of third parties involving the Bank.

## I.    FBME'S ANTI-MONEY LAUNDERING COMPLIANCE PROGRAM

### A.    Overview of the Bank and the Program

FBME has been consistently operating in Cyprus for over 30 years. The Notices point out that during this time period, FBME has twice changed its country of incorporation. However, the Notices do not provide the context for these moves, which in both cases involved changing circumstances in FBME's country of incorporation that hindered FBME's ability to function as a legitimate international commercial bank.

In 1977, Michel Ayoub Saab and his son Ayoub-Farid M. Saab moved to Cyprus. Later that same year, the Federal Bank of Lebanon ("FBL"), a Lebanese retail bank owned by the Saab family, opened a representative office in Cyprus. Cyprus had close proximity to Lebanon, was a stable country, and had established good international communications networks.

In 1982, the Saab family sought to incorporate an international commercial bank in Cyprus. The CBC, however, was unwilling as a matter of policy to take on home supervisory responsibility over international banks that were not among the large international banks. Instead, the CBC required

---

3/      On July 18, 2014, the CBC announced that it was taking over management of the operations of the Bank's Cyprus branch. The Resolution Committee (appointed to manage the Bank) subsequently issued a Decree placing the branch under resolution and providing that the expressed purpose of the Decree was the sale of the Bank's operations in Cyprus.

September 22, 2014

the Saab family to establish its international bank in Cyprus as a subsidiary of a bank headquartered outside Cyprus. Accordingly, in 1982, the Saab family formed FBME (then named Federal Bank of the Middle East Ltd.) in Cyprus as a subsidiary of FBL, with fifty-one percent of the shares owned by FBL and forty-nine percent owned by Michel Ayoub Saab, Ayoub-Farid M. Saab, and Fadi M. Saab.

In 1985, security deteriorated in Lebanon due to the Syrian occupation. The Saab family, who are members of the Lebanese-Christian minority, became concerned about the possibility of the occupying power nationalizing Lebanese banks, including FBL, which had been occurring elsewhere in the region at the time. The Saab family therefore decided to protect FBME by removing FBL from its ownership structure. In 1986, Michel Ayoub Saab, Ayoub-Farid M. Saab, and Fadi M. Saab acquired FBL's fifty-one percent ownership interest in FBME. At that time, FBME and FBL became unrelated legal entities. FBME was no longer a subsidiary of FBL, and the two entities have remained separate to the present day, although they are both presently owned by Ayoub-Farid M. Saab and Fadi M. Saab.

In 1985, FBME discussed with the CBC its options for incorporating the Bank in a foreign jurisdiction and maintaining a Cyprus branch. The CBC expressed to FBME that it would be advisable if FBME approached the Cayman Islands Monetary Authority ("CIMA") for a full banking license. The CBC made the necessary introductions and the Saabs took steps to apply for a "Banking License B" for a Cayman Islands incorporated company, Federal Bank of the Middle East Ltd ("FBME-CY"), which would allow a fully operating branch then to be based in Cyprus. Consequently, in 1986 FBME-CY changed its country of incorporation and primary banking license to the Cayman Islands. FBME's international banking business operations remained in Cyprus.

With the approval of the CBC and CIMA, FBME therefore incorporated itself in the Cayman Islands, and the Cyprus operations became a branch of the Bank. In 1987, the Cyprus branch received a license from the CBC to carry out banking business in Cyprus. In 1991, Michel Ayoub Saab passed away, and Ayoub-Farid M. Saab and Fadi M. Saab inherited their father's shares and became equal owners of FBME.

FBME's decision to move its headquarters to Tanzania was not motivated by any attempt to escape Cayman regulation, as the Notice seems to suggest. In 2001, fifteen years after FBME was incorporated in the Cayman Islands, the Cayman Islands amended its banking legislation to require all banks headquartered in the Cayman Islands to establish a physical presence there or cease conducting business in the Islands after April 2003. 4/

CIMA viewed this change in the law as a requirement to have a substantial physical and management presence in the Cayman Islands, which would have involved at least one of the Saab brothers residing in the Islands. Given the Bank's international customer base (in particular its geographic spread) and the fact that its existing work force was located primarily in Cyprus, the Bank decided that it made little business sense to establish a substantial physical and management

---

4/      In April 2001, the Banks and Trust Companies Law (2001 Revision) was amended to require all banks that were not a subsidiary or branch of a bank licensed in a country or territory outside the Islands to establish a physical presence in the Cayman Islands by January 2002. In December 2002, the Cayman Islands Law was further revised so as to provide that a holder of a "B" license which is not a subsidiary or branch of a bank licensed in a country or territory outside the Islands, shall not after April 2003 carry on business in the Islands unless it has such resources (including staff and facilities) and such books and records as the Authority considers appropriate with regard to the nature and scale of the business.

presence in the Cayman Islands. It therefore, once again, became necessary for FBME to find a new jurisdiction from which it could obtain a "Home License."

By this time, the Bank had already been doing some business in Africa and had targeted the continent as a region for expansion. FBME investigated various countries and spoke with different regulatory authorities, including representatives from the International Monetary Fund and the World Bank while visiting the Central Bank in Tanzania. The opportunity arose in 2003 for FBME to acquire from the Bank of Tanzania certain assets of Delphis Bank, which the Bank of Tanzania then held in receivership. FBME did not acquire Delphis Bank, but purchased certain assets and assumed certain liabilities. CIMA enabled this process to be accomplished by extending the April 2003 deadline first to July 2003, and then again to September 2003. Neither of these two extensions was linked by CIMA to any change in the capital structure of the Bank.

FBME moved its headquarters to Tanzania, obtained a license from the Bank of Tanzania, and began operations on September 12, 2003. Due to these changes and the fact that its customer base was primarily from Europe and the Commonwealth of Independent States ("CIS"), the Federal Bank of the Middle East Ltd. formally changed and shortened its name to FBME Bank Ltd. on August 4, 2005.

FBME is headquartered in Tanzania 5/ and operates primarily in Cyprus, owing to its legacy connection to the island. FBME is the longest established international bank in Cyprus, having operated continuously on the island since 1982. As of July 15, 2014, FBME had 375 employees, including 225 in Cyprus. 6/

FBME has a geographically diverse client base of international companies and individuals located in more than fifty countries. The Bank specializes in international commercial transactions accommodating high net worth individuals' banking needs, ranging from portfolio management to payment solutions. Of FBME's current customers, approximately 33.2% of deposits are from Europe, 35.4% are from the CIS market, 13.0% are from Asia, 11.3% are from sub-Saharan Africa,

---

5/     The Financial Action Task Force ("FATF"), of which the United States is a member and cooperating and supporting nation, has found Tanzania's banking system to have sufficient AML/CFT controls in place. As FATF stated in a June 27, 2014 press release:

> "The FATF welcomes Tanzania's significant progress in improving its AML/CFT regime and notes that Tanzania has established the legal and regulatory framework to meet its commitments in its action plan regarding the strategic deficiencies that the FATF had identified in October 2010. Tanzania is therefore no longer subject to FATF's monitoring process under its on-going global AML/CFT compliance process. Tanzania will work with ESAAMLG as it continues to address the full range of AML/CFT issues identified in its mutual evaluation report."

FATF, "Improving Global AML/CFT Compliance: on-going process - 27 June 2014 (Tanzania)," available at http://www.fatf-gafi.org/countries/s-t/tanzania/documents/fatf-compliance-june-2014.html. The United States is an observer to the Eastern and Southern Africa Anti-Money Laundering Group ("ESAAMLG"), and Tanzania has been a member of the ESAAMLG since its inception in 1999. In fact, the ESAAMLG was launched in Arusha, Tanzania.

6/     FBME Card Services Ltd ("FBMECS") had employed an additional 105 people, but 75 of those were laid off in August 2014 due to the refusal by the Special Administrator (appointed by the CBC to administer the Cyprus branch while under resolution) to settle with card companies and local merchants, causing FBMECS to suspend all activity. FBMECS currently employs 30 people.

September 22, 2014

4.3% are from the Americas, 2.5% are from the Middle East and Northern Africa, and 0.3% are from other locations. In 2013, the Bank had assets (e.g. cash balances, customer loans, property, etc.) of approximately 2.78bn US Dollars; liabilities (e.g. customer deposits) of 2.6bn US Dollars and total capital and reserves of 173m US Dollars. FBME's prudent financial management has proven successful, allowing the Bank to maintain a healthy financial condition amidst recent financial crises both internationally and in Cyprus. As of July 18, 2014, FBME's Cyprus branch had a liquidity ratio of 104%.

FBME is committed to complying with the laws and regulations of the Bank of Tanzania and the CBC. The Bank's Compliance Program has evolved in response to developing legal authorities within Europe, including the EU's MLD3, as implemented in Cyprus by The Prevention and Suppression of Money Laundering Activities Law (which came into force in Cyprus on January 1, 2008) (the "Law"). The CBC subsequently issued local directives, most recently the CBC 4th Directive which sets forth specific policy, procedures and control systems that all credit institutions should implement for the effective prevention of money laundering and terrorist financing so as to achieve full compliance with the Law (as amended since 2008).

### B.    Anti-Money Laundering Compliance Policies

The Bank has an extensive Manual of Policies and Procedures (the "Manual") that includes a detailed Compliance section. According to EY's Assessment, the Manual "is in line with the applicable requirements of the [CBC and EU] Directives."

Adopted in its current form in October 2006, the Manual is provided to all employees and is available electronically on all employee computer desktops as a shortcut from the shared drive of all Bank departments. Compliance personnel annually review and revise the Manual to implement enhancements to the Bank's Compliance Program or as and when prompted by changes in legal and regulatory requirements, industry best practices, or the recommendations of internal or external audits. Since its adoption in 2006, the Manual has been approved by senior management and the Bank's Board of Directors at least annually and whenever there were changes to law or policy that required updates to the Manual.

The Manual's Compliance section provides detailed policies and procedures covering AML issues, including but not limited to: KYC procedures, required documentation for personal and corporate accounts, procedures for high-risk customers, monitoring of accounts and transactions, and the role of the Money Laundering Compliance Officer. Further discussion of these and other topics is below.

### C.    Money Laundering Compliance Officer

FBME's Board of Directors has appointed a Money Laundering Compliance Officer ("MLCO") to oversee the Compliance Program and to report regularly his or her assessment of such compliance to the Board. Following the retirement of her predecessor in March 2011, FBME's current MLCO took over the position with the benefit of her predecessor's assistance as an advisor for a short time period to facilitate a smooth transition and provide any necessary information and training.

The current MLCO received her M.B.A. from Harvard Business School and has over a decade of banking experience. She holds a diploma in Compliance from the International Compliance Association in the United Kingdom and has studied international law. She started working at the Bank in 2009 and in 2011 became the MLCO and Group Head of Compliance. As evidenced by the CBC correspondence approving her appointment in April 2011 and as noted by EY in its

Assessment, FBME's MLCO "has the requisite qualifications (e.g., knowledge, skills, experience) and seniority to discharge her duties."

The MLCO's duties include, among others, effective implementation of the Compliance Program. Thus, the MLCO oversees the provision of training to employees, and is responsible for assessing and managing the risks emanating from existing and new customers. The MLCO also serves as a first point of contact for AML regulators. The MLCO directs the submission of suspicious transaction reports to the appropriate authorities and the maintenance of a registry of all such reports.

The Compliance Department reports to the MLCO / Group Head of Compliance, who in turn reports directly to the Board of Directors. The MLCO / Group Head of Compliance has been a member of the Executive Committee, which is the most senior management committee in the Bank, since that committee was formed in 2012. The MLCO delivers an annual report on the state of the Compliance Program to the Board of Directors and the Executive Committee. The MLCO's report to the Board includes an overview of new measures implemented to comply with the CBC's applicable directives, the findings and recommendations of any new audit results, the number of suspicious transaction reports submitted to MOKAS with any particular trends identified, the number of suspicious transactions investigated by the MLCO for which no report was filed with MOKAS, preparation of any recent internal suspicion reports, the identification of any gaps in monitoring, due diligence or other compliance functions, a summary of key information related to high-risk customers, an update on AML employee training, and any other information necessary to keep the Board apprised of AML developments within the Bank. (Additionally, in her role as Group Head of Compliance, she reports to the Board semiannually on general compliance matters, including AML, for FBMECS and FBME's Tanzanian operations.)

In 2014, the Board appointed an Alternate MLCO to assist the MLCO with her duties or formally act in her place in the case of absence or illness. Before joining FBME, the Alternate MLCO worked in the credit department of Commerzbank in Berlin. She began working at FBME in July 2007 and has served in the Account Opening section assisting the Head of the section and the Compliance Department, where she is currently an Assistant Manager (in addition to her Alternate MLCO duties).

### D.    Compliance Department

FBME is committed to maintaining a compliance program in line with or exceeding regulatory requirements and industry best practices of comparably-sized, similarly-located banks. When it named its new MLCO in 2011, FBME empowered its MLCO with the authority and resources necessary to expand and enhance the Compliance Program.

FBME and its management welcome regular feedback from internal and external sources such as auditors, correspondent banks, and regulators in order to identify and implement any necessary program enhancements. In response to recommendations and requests by the CBC, internal and external auditors, and Compliance Department leadership, FBME has taken significant steps to bolster its policies, procedures, and practices and has dramatically augmented the Compliance Department's resources. FBME has steadily increased the size and capability of the Compliance Department, which has tripled in size in five years, from six employees in 2009 to eighteen employees in 2014.

The current Compliance Department consists of seasoned professionals who have broad experience across the Bank. They draw from their understanding of how other departments function in order to ensure a healthy, seamless relationship between the compliance and business functions. In June 2011, the MLCO restructured the Compliance Department to provide dedicated functions for specific

program requirements.  The Compliance Department is presently divided into three units: the New Accounts Approval Unit; the KYC Due Diligence Update Unit; and the Monitoring Unit.

### 1.   New Accounts Approval Unit

The New Accounts Approval Unit consists of three employees who review all applications for new accounts.  For each account, the New Accounts Approval Unit is required to perform a full KYC/background review of the prospective customer in accordance with the Bank's policies, described below in section I.F. Before approving the account, the Unit considers the prospective customer's business activities and risk level to determine whether such an account is consistent with the Bank's internal policies and the CBC 4th Directive.  For example, upon the recommendation of the Compliance Department, the Board banned the onboarding of Russian Politically Exposed Persons ("PEPs") in January 2013 in light of compliance risks.

### 2.   KYC Due Diligence Update Unit

The KYC Due Diligence Unit consists of seven employees responsible for completing annual reviews of all high-risk customers.  The Bank's policy is to review customers classified as normal risk every three years.  The KYC Due Diligence Unit is required to obtain up-to-date KYC documentation as part of the review.  In the case of corporate customers, the Unit will check that the customer remains of good standing (for example by requesting a Certificate of Good Standing or performing a company search); review the customer's business activities to ensure they align with its transactions; and perform World-Check searches, internet searches, and sanctions screening (which is conducted for the shareholding structure, including the ultimate beneficial owner(s)).  Should the KYC Due Diligence Unit encounter any questions or concerns, it involves other compliance personnel, such as the MLCO, to determine what further action should be taken.  These KYC reviews are described in more detail in section I.F below.

### 3.   Monitoring Unit

The Monitoring Unit consists of seven employees responsible for regularly monitoring payments being processed through the Bank's accounts.  The monitoring process encompasses several functions, including, but not limited to: monitoring of live payments by processing transactions through HotScan to signal any pending transactions warranting closer analysis by the Compliance Department; monitoring all card transactions; monitoring post-factum transactions through Mantas, which detects irregularities in past payments; monitoring all inward and outward transfers related to high-risk accounts, regardless of amount, through HotScan; and manual transaction monitoring for high-risk accounts with markers flagging transactions for manual review.  The Monitoring Unit is also required to prepare daily cash and check reports to determine whether there were any cash deposits in excess of 10,000 Euro or withdrawals in excess of 15,000 Euro (or equivalent), in which case documentation supporting the deposit / withdrawal is requested from the customer.  (Note: cash and check payments total only 0.3% of the total value of payments made and 0.8% of the total number of transactions.)  In addition, the Unit is required to prepare numerous other reports, such as monthly reports to the MLCO analyzing cash deposit patterns, reports of accounts closed by the Compliance Department, and suspicious transaction reports to MOKAS.

### E.   Customer Acceptance and Know Your Customer Policies

FBME's policy requires the Bank to conduct a thorough KYC exercise, including obtaining documentation to confirm the customer's identity, and the Bank uses standardized account opening

forms to complete this process.  For corporate accounts, such documentation is required for all parties, including shareholders with an interest over 10% of each entity up to and including the ultimate beneficial owner(s).  Required documentation includes passports and certified true copies thereof (or other legal alternatives), references, proof of address, certificates of incorporation, statutory documents, and other items consistent with industry best practices.  Individual customers complete an Activity Profile, and corporate customers complete a Business Profile, which contains information on the purpose for which the account is required; the anticipated annual account turnover and method of deposits; a detailed description of the customer's main business activities; the expected sources of incoming funds (including countries and principal counterparties); and expected destination of outgoing payments (including countries and principal counterparties). Further, since 2007, the Bank has used the World-Check® database to screen customers not only for sanctions exposure, but also to help identify reputational risk (the background check includes a search of adverse media).  See http://thomsonreuters.com/world-check-risk-intelligence/.  The Bank conducts its own KYC on all customers, even those referred by its most trusted Approved Third Parties ("ATPs").

Some aspects of the Bank's KYC practices exceed U.S. regulatory requirements.  For example, consistent with EU best practices and CBC requirements, FBME has required the identification and verification of ultimate beneficial owners since at least 2000.  FinCEN proposed just last month to require U.S. financial institutions to identify ultimate beneficial owners. 7/  Moreover, FinCEN's proposal sets a threshold of a 25% equity interest for the identification of ultimate beneficial owners. FBME adheres to a far stricter threshold, defining ultimate beneficial owners as "persons with direct or indirect ownership or control or voting rights of 10% plus one share of the company's share capital." 8/

EY's Assessment notes that, "FBME applies [Enhanced Due Diligence ("EDD")] measures on its high-risk customers" in accordance with the requirements of the Manual.  The Compliance Department is required to classify customers as high-risk if they are: PEPs (public functionaries or related individuals who present higher risks for bribery and corruption due to their position); bearer share companies; trusts; foundations; non-face-to-face customers; customers from countries that do not apply FATF's Recommendations; correspondent banks outside the EU; or if they meet any of several other factors listed in the Compliance section of the Manual.  FBME does not employ a one-size-fits-all approach to EDD for high-risk clients.  Instead, as EY points out, EDD measures "are tailored to address the unique risk(s) posed by each . . . customer type."  The Manual defines appropriate EDD measures, which may include, for example, completing Bearer Share Questionnaires (e.g., to identify changes in corporate ownership structure), conducting a further analysis of PEP relationships (e.g., additional background checks on the PEP focusing on source of wealth), and verifying the validity of business / professional licenses. All high-risk customers must be approved by the MLCO or Alternate MLCO prior to account opening.

FBME recognizes the importance of regularly reviewing its KYC procedures in order to eliminate any potential gaps and ensure the Bank utilizes evolving technologies.  In its 2013 external audit of FBME (discussed below), KPMG noted that a Customer Relationship Management System ("CRMS") ought to be implemented to enable better oversight of all customer-related data, and the Bank did so in 2013.  Similarly, KPMG recommended that FBME add specific markers in FlexCube

---

7/      See Notice of Proposed Rulemaking, Customer Due Diligence Requirements for Financial Institutions, 79 Fed. Reg. 45151-74 (Aug. 4, 2014).

8/      FBME Manual of Policies and Procedures, § 3.2.3.2.

(FBME's core banking system) describing the nature of all high-risk accounts. The Bank also made this upgrade in 2013. (Previously, the version of FlexCube the Bank was using did not provide for the nature of the high risk to be identified in the system; it only allowed for the categorization of accounts as high-risk. However, the Compliance Department maintained spreadsheets which assigned specific categories to the high-risk accounts. The current version of FlexCube enables this categorization detail.)

KPMG also identified a limited number of customer files containing some expired due diligence documentation and, as a result, KPMG recommended adding a function to the Bank's automated system to alert compliance officers whenever a document expires. The Bank is in the process of implementing an alert functionality in the CRMS.

In September 2014, EY reviewed FBME's Manual and reported that FBME's policies, procedures, and processes are in line with the Directives. EY then tested a statistically relevant sample of recent and older corporate and individual customer files in order to determine whether the procedures are properly carried out in line with the Manual. For almost all of the reviewed customer files, FBME conduced sufficient due diligence and collected all necessary information from its customers.

EY identified certain enhancements FBME could implement, such as more consistently documenting its verification of the sources of funds/wealth and its internet and database searches for customer identification. FBME is enhancing its procedures in accordance with EY's recommendations.

### F.   Updates to Customer Due Diligence

As noted in section I.D above, FBME has a separate unit dedicated to reviewing and updating KYC. The team of seven officers is devoted exclusively to the updating and maintenance of customer files.

#### 1.   All customers

All customer files are reviewed regularly to ensure the adequacy and validity of relevant identification documents and information. The outcome of such review is recorded in a separate note kept in the customer file. Each non-high-risk customer file is reviewed every three years. Additional due diligence is undertaken whenever, for example, an individual transaction appears to be unusual or significant compared to the normal pattern of transactions or the business profile of the customer; there is a change in the legal status, corporate structure; or there is a change in the way the account operates. The Compliance Department maintains files that compare transactions executed against anticipated or usual turnover.

#### 2.   High-risk customers

FBME's Manual requires the review of high-risk customer files on an annual basis. Transactions executed are compared against anticipated or usual turnover (this annual comparison is kept on file). The KYC team also reconfirms the customer's business activities, location, and status as an entity in good legal standing and not subject to international sanctions.

In addition, certain types of high-risk accounts (such as accounts held for PEPs or companies with bearer shares, etc.) are subject to annual all-encompassing review by the Monitoring Team and approval by the MLCO or Alternate MLCO for continuation of the relationship.

PEPs must fill out a supplemental due diligence form, which probes their involvement in public administration as well as their professional background and source of wealth. The form also contains

questions about close associates and the visibility of immediate family members in public life.  As stated above, for example, the onboarding of Russian PEPs has been prohibited since January 2013.

### G.    Approved Third Parties

In accordance with its applicable policies and procedures and as permitted by the CBC 4th Directive, the Bank engages certain ATPs to develop potential new customer relationships.  FBME seeks lawyers, accountants, and other licensed professionals from trusted occupations who can refer potential customers, and who are subject to supervision with regard to their compliance with the requirements of MLD3 or are from selected jurisdictions determined by the Cyprus Advisory Authority for Combating Money Laundering and Terrorist Financing to have AML/CTF measures equivalent to those within the EU.

Business development personnel attend professional conferences to develop relationships with these potential partners.  FBME recognizes significant value in utilizing licensed professionals to identify potential customers, and as a result, around 90% of the Bank's customers are introduced by ATPs.  The Bank identifies potential ATPs through one of six ways: membership of a professional association; internet research; business magazines and newspapers; referral by existing associates or clients; attendance at conferences or seminars relating to tax planning or the offshore industry; or recommendation by FBME staff or an existing ATP.

####     1.    *ATP Due Diligence*

The Bank's engagement with these ATPs is governed by its Manual.  Upon identifying a prospective ATP, the Bank must ensure that the country of operation of the ATP falls within the target areas designated by the CBC 4th Directive.  FBME then registers the ATP on a "prospective list" for record-keeping purposes.  All ATPs must hold membership in a professional association that regulates and supervises the ATP for AML compliance.

Before engaging a new ATP, FBME policy requires that the prospective ATP complete a due diligence questionnaire.  This questionnaire requests information about the regulatory environment surrounding the ATP; its customer acceptance, identification and verification policies; its record-keeping and reporting procedures; and its training program.  The Bank reviews the ATP's AML/CTF policies to confirm they adhere to the Bank's requirements.

Additionally, all ATPs must complete a profile form.  Prospective ATPs acting in a personal capacity must include general information, including their name, their business and correspondence addresses, and contact information.  These prospective ATPs must also explain their business activities, including areas of expertise and industry sector.  The prospective ATP must also provide information about their clientele, including nationality, industry sector, and net worth.  In addition to all of this information, prospective corporate ATPs must provide additional information, including the names of all partners and directors, whether the ATP acts as a nominee director and/or shareholder, and detailed company information.

All prospective ATPs must also provide sufficient supporting documentation.  Personal ATPs must provide: policies and procedures for preventing money laundering and terrorist financing, as noted above; a certified copy of a passport or national identification card; proof of residential address; a personal reference letter from a bank, lawyer, or chartered/certified accountant; and a regulatory license.  Corporate ATPs must provide: the company's written policies and procedures for preventing money laundering and terrorist financing; a certified copy of statutory documents for the

corporate entity; a certified copy of statutory documents for any nominee companies; certified copies of passports for all directors, shareholders, and beneficial owners; proof of residential address for all directors, shareholders, and beneficial owners; reference letters from a bank, lawyer, or chartered/certified accountant for all directors, shareholders, and beneficial owners; and a regulatory license.

The Bank performs due diligence on all ATPs in accordance with the Manual, including contacting professional organizations to ensure that the prospective ATP is a member and is supervised for AML compliance purposes. The Bank also performs KYC of the ATP, including World-Check searches, URU passport verification, and internet searches. If the ATP clears all due diligence and KYC processes, the file is sent to the MLCO/Group Head of Compliance for final approval.

### 2.    MLCO Approval of ATPs

If the ATP satisfies the requirements of FBME policy, the Group Head of Compliance may approve the engagement. According to EY's Assessment, "the MLCO assesses the adequacy of the third party by reviewing the ATP's policies and procedures." In all the ATP files that EY tested, the MLCO approved the ATP before it began a relationship with the Bank.

### 3.    ATP Contracts and Guidance Documents

All ATP relationships are governed by the Bank's Business Introducer Agreement, with which ATPs must agree to comply. The agreement provides that the ATP must comply with all laws, rules, and regulations and may not refer any client which could violate any laws, rules, and regulations that might breach the terms and conditions of FBME's banking license, Cypriot law, the rules and regulations of the CBC, or FBME's internal policies and practices

FBME requires that the ATP ensure strict compliance with the Bank's customer identification and due diligence procedures for all clients. ATPs must continue to follow the Bank's updated identification and due diligence procedures whenever those procedures are amended by the Bank. The Bank further reserves the right to check and verify the due diligence performed by the ATP. The Bank may also refuse to accept any new clients referred by any ATP, terminate any clients referred by any ATP, and refuse further business from any ATP. The Bank may also terminate its relationship with any ATP. Notably, the Bank has terminated ATPs where the ATP has failed to satisfy the Bank's expectation for referring compliant customers. The Bank also declines to open new accounts for potential customers referred by ATPs when those customers fail to meet the Bank's compliance requirements. FBME welcomes the opportunity to provide more specific information on these points to FinCEN.

Additionally, the Bank provides each ATP with a document titled "Customer Acceptance – Guidance Notes," ("The Guidance"), which describes the types of business that FBME seeks and that which it does not permit. The Guidance provides that clients of the Bank are corporate entities or higher net-worth individuals actively involved in the international trade of goods and services, or managing their global wealth and assets. The document also specifically describes unacceptable client relationships. The form describes unacceptable clients in a number of categories: (1) certain clients, including persons or entities on US, EU, UK, and UN sanctions lists and anonymous accounts; (2) certain activities, including production or trade of weapons, gaming and gambling related business, adult entertainment, and unlicensed trade of pharmaceutical products; and (3) certain geographical locations, currently Iran, Syria, North Korea, Cuba, and North Sudan.

4.     *Customer Due Diligence*

All of the Bank's customers are subject to the due diligence procedures required by the Manual. The Bank's policies permit it to rely on ATPs to implement certain customer identification and due diligence procedures. These procedures are generally limited to the ATP certifying customer documents as true copies of originals. In order to accept this data, the Bank also must confirm that the ATP implemented these policies in line with the requirements of the law and directives issued by the relevant supervisory authorities.

After the Bank opens an account, FBME's policies require the Bank to obtain all ongoing due diligence directly from the directors or beneficial owners on the customer's account. These policies prescribe the minimum standards Bank personnel may follow. In practice, the Bank performs complete due diligence for all prospective clients referred by ATPs, including performing World Check and internet searches. For example, when the Bank accepts certified copies of a customer's passport via an ATP, the Bank still confirms the authenticity of the document though an identify check in the URU database maintained by GB Global PLC.

5.     *ATP Monitoring*

The Bank's Business Development Team maintains a close relationship with ATPs. Business development personnel regularly visit ATPs to cultivate the relationship, ensure the ATP understands the Bank's practices, and confirm that the ATP is operating as described in its ATP Profile. FBME employees are encouraged to contact the ATP at least every three months. FBME monitors ATPs annually not only in terms of the quality of the customers they introduce, but also the occurrence of account closures and suspicious transaction reports submitted to MOKAS. Their registrations or licenses are verified regularly to confirm validity. The MLCO further performs an annual reassessment of ATPs in accordance with the current Directive. In appropriate cases, the Bank terminates ATPs that do not satisfy the Bank's requirements.

H.     **Transactional and Account Monitoring**

As noted above, the Compliance Department was restructured in 2011, resulting in the creation of a dedicated Monitoring Unit. FBME also has been consistently enhancing its Compliance Program through the introduction and use of electronic solutions in addition to the manual review of transaction and account activity. FBME uses automated monitoring systems that detect unusual or suspicious activities or types of transactions by setting limits on certain types of transactions or categories of accounts, while considering the customer's business profile, country of origin and source of funds, nature of transaction, and other factors.

1.     *HotScan*

Since January 2010, FBME has used the CGI HotScan Intelligent Self Learning sanctions screening solution, an interdiction filter that monitors the Bank's outgoing and incoming SWIFT transactions in real-time (*see* http://www.cgi-group.co.uk/solutions/HotScan). HotScan screens all payments against current sanctions lists from the U.S. Department of Treasury Office of Foreign Assets Control ("OFAC"), the United Nations, the EU, HM Treasury (UK), and other regulatory bodies, as well as lists maintained by financial agencies such as the Financial Action Task Force, the Financial Conduct Authority (UK), the Cyprus Securities and Exchange Commission, and others. The lists are updated daily from their sources and uploaded into HotScan. HotScan also enables manual entry of individuals and internal watchlists, such as lists of high-risk accounts, into the system. In addition to

the above, HotScan stops all inward/outward transfers as per the value thresholds set in the system (500,000 Euro and 100,000 US Dollars or equivalent in Tanzania) for investigation and so that documents can be obtained before processing. Although HotScan does not review internal transfers between existing Bank client accounts, the Compliance Department generates a report of and reviews manually such transfers on a daily basis.

Transactions that contain a positive match to HotScan's list are put on hold (i.e. frozen and reported or rejected, depending on the nature of the match). Partial matches trigger an investigation, and the payment will be processed only in the event of a false positive match. The investigation may include obtaining supporting documents such as contracts, invoices, bills of lading, etc., as well as a review of the account holder's past activity, information regarding the account holder's ultimate beneficial owner(s), internet search results, and additional documentation sought from the account holder.  For outgoing payments, two different investigators must review the alert, and HotScan has a control in place to ensure this double-review takes place. All alerts are documented in an Excel spreadsheet.

      2.    *Mantas*

Since January 2010, FBME has also used Oracle's industry-leading Mantas AML monitoring platform, which evaluates past transactions and tracks the following pre-populated scenarios: fund transfers between customers and external entities, focal high-risk entity, high-risk counterparty, rapid movement of funds, large depreciation of account value, and large reportable transactions (*see* http://www.oracle.com/us/industries/financial-services/mantas-anti-money-laundering-ds-046161.pdf). Up-to-date transaction and account information data from the core banking system, FlexCube, is imported into Mantas, which runs an automated script to detect any activity under these scenarios and generate an alert if there is such activity.

If an alert is generated, FBME Compliance staff conducts an investigation, which is tracked and documented in an Excel spreadsheet.  An investigator may draft an internal report or may add a "marker" to an account, which will notify personnel monitoring accounts when the client attempts to transact further. The monitoring personnel can then review the transaction or request further information from the client before any transaction is processed. If a decision is taken to close an account, a marker is placed on the account to indicate this decision.  FBME promptly notifies the client and terminates the relationship within the minimum notice period required by law.

Although FBME has adequately tracked alerts and their investigation and disposition in Excel spreadsheets, EY recommended that the Bank introduce an automated system to perform these tasks. An electronic case management system would register alerts, track the progress of the related investigation, and automatically update the report when an investigation was closed. It would also generate case reports. FBME plans to introduce this system by the end of 2014.

      3.    *Manual Review*

In addition to utilizing electronic resources, the Compliance Department manually reviews a list of cash and check transactions on a daily basis, and retains transaction records and supporting documentation in hard copy format. Documentation of the source of funds is required for deposits over 10,000 Euro which have historically been and still are at very low levels due to the non-retail model of the Bank. Withdrawals of over 15,000 Euro require a stated purpose and over 30,000 Euro require documentation that justifies the economic / business purposes of such withdrawals.

Monthly reports of cash and check transactions are also kept in the same file and are reviewed for patterns of suspicious activity, in conjunction with the previous three months' activity.

September 22, 2014

### I.   Suspicious Transaction Reporting to MOKAS

The Bank has an effective process to escalate suspicious activities to the MLCO and (where appropriate) to MOKAS. Thus, after EY reviewed this process, it made no recommendations for improvement. When the Compliance Department is investigating a customer for suspicious activity, the Bank places a marker on the relevant account to denote that the customer is under investigation. If the Compliance Department determines that a customer's activities are suspicious, the MLCO prepares a Suspicious Transaction Report ("STR") and files the report with MOKAS. The Bank maintains a spreadsheet of all STRs that have been filed with MOKAS. The Bank keeps a copy of the STR, MOKAS' acknowledgment of receipt, and the disposition of the STR by MOKAS. If it does not receive a response from MOKAS within 14 days, the Bank will close the client's account unless otherwise advised by MOKAS. The Bank has engaged with MOKAS on a regular basis, and its relationship with MOKAS is characterized by frequent communication and swift resolution of concerns. On multiple occasions, MOKAS staff has verbally complimented FBME employees on their helpfulness and cooperation.

### J.   Training

Bank employees, including those in back office and support functions, receive training relating to compliance matters, including AML and sanctions policies and procedures. Employees maintain a "Training Passport" containing stamps for each training session that they attend. These trainings consist of on-site and off-site programs. In 2004, the Head of Compliance and Audit created an education plan for all Bank employees. According to Bank policy, all newly hired employees are required to receive initial induction training featuring these AML and sanctions-related topics. Under current procedures, the MLCO conducts these trainings on an ad hoc basis. Consistent with EY's recommendation, the MLCO is documenting a formal induction training curriculum for all new employees.

The trainings cover both high-level AML concepts as well as procedural and substantive issues. To ensure that participants actually process the material instead of simply passively absorbing it, quizzes and other interactive exercises are given to confirm mastery of the content.

Furthermore, supplemental training is provided to customer-facing employees in accordance with the CBC 4th Directive. For example, on July 12, 2014, FBME held AML training at the Hilton Hotel in Nicosia, Cyprus, signaling the importance of the subject matter and differentiating it from a routine information session on Bank premises. In this session, the MLCO provided training on the changes in AML law and the CBC 4th Directive to all staff in customer-facing departments. EY reviewed the July 12, 2014 training provided to customer-facing employees. EY determined that the content met the key requirements of the Directives and addressed the following subjects, among others: customer due diligence / customer acceptance, handling of PEPs and other high-risk customers, ongoing monitoring of customer relationships, updating customer records, and reliance on third parties (e.g. key business introducers). The Bank also conducted a more general AML e-training for staff employed in the back office and support functions. FBME had also been planning a September 2014 general knowledge training course for all Bank employees, but this has been delayed since the installment by the CBC of a Special Administrator over the Bank.

This supplemental training is also combined with interface between groups so that other departments within the Bank can gain visibility into daily compliance functions. For example, in March 2013, a team of employees from the Client Relationship Management Unit spent a half day in the Compliance Department during the course of a business day in order to better understand routine compliance functions and activity.

All employees within the Compliance Department also have attended external AML trainings, including those offered by other institutions, to stay informed about key regulatory developments and industry practices. For example, four employees (including employees from FBMECS) attended a December 2013 seminar held by KPMG that covered changes to AML requirements under the CBC 4th Directive and the impact of those changes on Cyprus. FBME also sent an employee to the Association of Certified Anti-Money Laundering Specialists AML/CTF seminar and workshops in London in May 2014, as it has done in several years past. The MLCO maintains a Training Register that documents past trainings (2012-2014) taken by Compliance staff. In accordance with EY's recommendations, FBME is working to implement a streamlined system to replace the Training Register as a method of documenting these trainings. FBME will be pleased to provide more information to FinCEN regarding the nature and content of the Bank's training.

### K.   Risk Assessment

Following the advice of KPMG discussed below in section I.L.2, the MLCO enhanced the Compliance Program by creating a formal AML/CTF risk assessment in addition to the Risk Department's assessment of operational risk. This first AML/CTF risk assessment of FBME's Cyprus branch was completed in February 2014.

The AML/CFT risk assessment examined risks posed by the following areas: the Bank's customers; customers' behavior; distribution channels; the Bank's products and services; the nature and profile of customers, nature of business transactions and products and services offered; the customers' geographical location and the origin and destination of customers' funds; the scale and complexity of the Bank's operation and geographical spread of its operations, staffing of compliance department, storage of KYC data and record retention; and deviations from the anticipated level, volume and size of transactions from the stated business activities of customers. The MLCO assessed several potential risk areas within each of these broader categories, ultimately investigating approximately fifty-five areas of potential risk. The assessment determined that additional controls were unnecessary for fifty of these potential risk areas and identified five areas requiring follow up.

First, the risk assessment concluded that additional control measures ought to be applied to accord with newly issued CBC guidelines regarding PEPs. The assessment found that PEPs are identified through World Check and internet searches, and the Bank performs full checks to ensure that the PEP has not been involved in any cases of corruption, embezzlement, etc. and does not have any criminal track record. The Bank also requires the Head of Compliance to sign a PEP profile document, and twice yearly reviews of PEP customers are conducted by the AML Monitoring and KYC Due Diligence teams. All PEP transactions are closely monitored. The risk assessment generally suggested additional control measures relating to the identification of source of wealth and funds for PEPs, and FBME implemented them in March 2014, earlier than the suggested due date of mid-2014.

The risk assessment also found that the Bank refuses all potential non-face to face customers as defined in the Directives, including any customers approaching the Bank via telephone, internet, or mail. The very few non-face-to-face customers are categorized as high risk, such that all transactions are closely monitored. It has always been the Bank's business model not to accept customers who approach the Bank via telephone, internet or mail, and the Bank has only five non-face-to-face customers, all of whom were recommended by existing clients. The risk assessment recommended that efforts be undertaken on an ongoing basis to make all such relationships face-to-face.

Additionally, the risk assessment concluded that the majority of the Bank's customers are introduced by ATPs, but that any risk associated with this is mitigated by having the accounts approved by a unit reporting to the Head of Compliance, who reserves the right to reject any account application. In addition, should ATPs fail to introduce quality customers, the ATP is subject to termination. As noted in section I.G.4, the Bank does due diligence on all customers referred by ATPs. The MLCO has declined to open accounts for customers who did not provide complete documentation or where the due diligence otherwise triggers compliance concerns. In addition, the MLCO has terminated relationships with ATPs for referring potential customers who fail the due diligence process. FBME is happy to provide further detail to FinCEN regarding these account declinations and ATP terminations.

The risk is further reduced by FBME's use of a document called the Customer Acceptance – Guidance Notes, which lists the type of business the Bank seeks (always subject to the customer meeting the Bank's due diligence requirements). The Bank also circulates to all ATPs a list of unacceptable activities, jurisdictions, and types of client. Many customers also visit the Bank or are visited by members of FBME staff at the onset or during the course of the relationship. The risk assessment recommended making ongoing efforts to see more customers in person. The Bank's practice is to meet all customers who have balances of more than 100,000 US Dollars (or equivalent) in person, although Bank personnel also meet other clients with smaller balances.

The risk assessment further found that all fiduciary loans are co-signed by the Head of Credit and the Head of Compliance after they pass compliance screening and due diligence checks. The MLCO recommended that the Bank gradually reduce the number of fiduciary customers by mid-2015. The Bank has recognized this recommendation and the number of fiduciary customers has been reduced since.

The AML/CTF report has been discussed both at the Executive Committee and Board of Director meetings and approved by both bodies. FBME was pleased to see that potential risk areas continue to be effectively mitigated. However, the Bank takes seriously the recommendations for additional controls made by its MLCO and continues to take steps to work to reduce its risks.

## L.    Recent Third Party Reviews of FBME's Compliance Program

FBME has benefited from the findings and recommendations of the third party auditors that have reviewed its policies and procedures. EY reports in its Assessment that "All previously identified money laundering and sanctions-related issues have been addressed by the institution. For those corrective actions that have yet to be fully implemented, FBME has documented project plans with milestone dates in place." FBME's work to implement or improve procedures relating to the areas identified in past audit reports is described below.

### 1.    Ernst & Young audit (2011)

In 2011, EY released the results of an audit that consisted of reviewing AML policies, procedures, reports, and other related documents; interviewing senior Bank employees; and reviewing 95 customer files selected by the Bank's Compliance Department (the "EY 2011 audit"). The goal was to assess whether the documents that FBME's Cyprus branch obtained during the client acceptance process as part of the Bank's KYC and due diligence work were consistent with the CBC Directive in existence at the time.

The EY 2011 audit noted that the standard Business Profile in use at the time for all new accounts included all the required information sufficient to meet the requirements of the CBC Directive. EY

September 22, 2014

noted that older versions of the Business Profile template used at different points in time did not have all of the required information. The EY 2011 audit noted that the Compliance Department had advised that it used the (then) current standard Business Profile as part of process of updating the information for existing customers.

The EY 2011 audit also reviewed whether FBME obtained appropriate documentation, including company incorporation documents, passports, and utility bills, and ensured that the certifications of such documents were valid. It noted that in certain cases incorporation documents for corporate customers, and passports and utility bills for individuals, were not appropriately certified, due in part to requirements of the CBC, which did not hold apostille to be an acceptable means of certification. The EY 2011 audit noted that the Bank compared actual against anticipated turnover for high-risk customers but observed that there was no evidence in non-high-risk files that actual transactions executed were being compared against anticipated or usual turnover on the account. The EY 2011 audit report further noted that the comparison of anticipated and actual turnover was being done annually by the Bank's Compliance Department for all clients, using an automated report extracted by the Bank's system.

      2.    *KPMG audit (2013)*

In April 2013, KPMG released the results of an audit that consisted of reviewing documentation (including 68 customer files and two bank files selected randomly from lists of new and/or high-risk customers), walkthroughs, interviews with Bank personnel, and an assessment of the Bank's AML/CTF policies, procedures and practices. The goal was to assess whether FBME's AML/CTF policies and practices were compliant with EU and Cypriot law, as well as in accordance with good industry practice in Europe.

The review concluded that "FBME basically fulfills requirements as set out by the Cyprus regulator and is in principle in compliance with EU standards." KPMG found that FBME employed AML-compliant procedures, including using standardized account opening forms, assigning risk ratings to customers, verifying customer and UBO information, and performing database searches on all customers, and that the Bank's internal policies were comprehensive. KPMG also made a number of suggestions to further improve the Bank's Program. In addition to the enhancements described above (i.e., hiring an alternate MLCO and amending the Manual), the Bank has also focused on addressing other recommendations as well as the broader categories of concerns described below.

KPMG made observations, including those related to the accessibility of ownership information, documentation of information, and risk assessment. KPMG noted, for example, that FBME's core banking system (FlexCube) does not capture the names of UBOs. Instead the Bank stores that information in an Excel file that is screened on a monthly basis and as and when there are changes in current sanctions lists of designated parties (e.g. OFAC, EU, HMT). The spreadsheet can be accessed by middle and senior management in Compliance, IT, Audit, and Customer Service Departments, and has been screened regularly since 2011. KPMG also recommended better presentation of ownership information to demonstrate links between group entities for older customers, in line with a new structure that had been introduced for new customers. KPMG also found that certain customer files reviewed did not have sufficient information to gain a complete understanding of the customers' activities or business rationale. In response to such findings, FBME has increased its efforts to document the information obtained and reviewed.

Although it found that the Bank's strategy addressed a number of risk-related issues, KPMG recommended rethinking the approach to money-laundering and terrorist-financing to develop a

comprehensive risk analysis. As described above in section I.K., the Bank has adopted the AML/CTF risk assessment report and implemented this recommendation.

### M.    FBME Card Services

FBMECS was founded as a subsidiary of FBME Bank in 2002 to offer a range of charge card-related products and services to businesses. A member of VISA Europe and MasterCard International, FBMECS provides acquiring, issuing, and processing services to merchants across Europe, enabling them to authorize, settle, and manage transactions. FBMECS's card products include payout, payroll, and co-branded programs. FBMECS also offers related operational support for its customized processing services.

FBMECS has a separate AML Compliance Program, which has been audited multiple times by several independent auditors. Recent reports have praised FBMECS' "strong commitment to compliance" and noted that "past problems have been successfully remediated" (SightSpan, 2013). A 2014 RiskSkill audit that measured FBMECS policies and procedures against VISA standards gave resoundingly positive reviews to the program; in fact, RiskSkill stated that FBMECS had "overcompensated" for past failings, "driven by a strong compliance team/function and clear leadership directing [its] approach." A Deloitte audit, also in 2014, found that FBMECS was in compliance with Cyprus' requirements for a License to Operate an Electronic Money Institution, stating that the company had in place correct and appropriate management and accounting procedures, had sufficient internal control mechanisms, and had taken all auditing and governance arrangements necessary to ensure reliable issue of electronic money.

The Bank acknowledges that it has had prior gaps in the AML program of FBMECS and has been fully committed to closing those gaps. FBMECS voluntarily sought the suspension of its VISA e-commerce license while it addressed these issues, and audits in 2012 identified the specific gaps in the program. In response, FBMECS implemented the recommendations of its auditors, including updating its customer files and creating an additional weekly report monitoring transactions above a certain threshold. In light of what it called "the significant progress made since May 2012," VISA had in turn reinstituted FBMECS' e-commerce license to acquire merchants on a provisional basis in June 2014. These substantial efforts and progress in 2014 took place prior to the issuance of the NPRM.

Not only has FBMECS continued to enhance its compliance program, but it also restructured the management of the company from 2012 to 2014, including in 2012 replacing the CEO who had led the company during the period in which there were (FBMECS accepts) compliance gaps. Prior to the issuance of the NPRM, the new leadership of FBMECS had been committed to the rigorous compliance program described in recent audit reports, had been well-reviewed by auditors, and had continued to enhance its compliance program. FBMECS also had named a new MLCO with extensive experience and other qualifications. The current FBMECS MLCO earned an M.B.A. from Hawaii Pacific University and spent one year as an operations specialist at an investment bank in New York. He then joined FBME, where he spent more than seven years, working his way up to Anti-Money Laundering Manager and Assistant MLCO before moving to FBMECS.

FBME would be pleased to provide further information on this subject.

## II.    LACK OF CONTEXT AND CERTAIN INACCURACIES IN FINCEN NOTICE

As stated above, FBME believes that the Notice contains a number of points purporting to justify the NPRM that are inaccurate, are taken out of context, or are less relevant with additional explanation.

September 22, 2014

We appreciate FinCEN considering this additional information.  We will be pleased to provide further support for the points in this comment and to take all necessary steps to resolve these matters.  The Notice statements addressed below include references to the Notice as it appeared in the Federal Register Volume 79 on Tuesday, July 22, 2014.

A.    **Statements in the Notice regarding FBME**

FBME's preliminary responses to certain statements in the Notice are set forth below.

> 1.    *Notice Statement: "The Central Bank of Cyprus ("CBC") . . . has found FBME's compliance with Cypriot banking laws and AML regulations deficient on at least two occasions." 79 Fed. Reg. 42639 (July 22, 2014)*

FBME strives to comply with all requests of the CBC.  There have been two occasions where FBME was held to be not entirely compliant with CBC demands.  In both circumstances, however, FBME openly communicated to the CBC its difficulties and objections to these demands.  FBME continued to attempt to engage in dialog to avoid these issues.

> a.    Notice Statement:  "FBME's weak AML controls and customer due diligence resulted in a fine by the CBC in 2008." 79 Fed. Reg. 42639 (July 22, 2014)

FBME was not fined by the CBC in 2008.  In 2010, the CBC imposed an administrative fine on FBME.  Following one of its regular on-site examinations of FBME, in March 2009 the CBC identified certain issues requiring corrective action including: making amendments to the Manual's customer identification processes; implementing an electronic management information system for monitoring accounts and transactions; and updating customer due diligence files.  FBME immediately began addressing these issues.  Among other measures, in April 2009 the Bank informed the CBC that it planned to amend its Manual and that it planned to install and implement Mantas by the end of June 2009 (which, following technical delays, went active in January 2010).  As explained in detail below, the Bank further worked diligently to update its customer due diligence files.  FBME kept the CBC informed of its progress.  Throughout the process, the Bank closed the accounts of those dormant clients who declined to provide certified updated documents.  Although the Bank ultimately failed to meet the CBC's deadline for updating its files because it did not receive all its customers' responses in time, it did complete its review of all files and requested the necessary documents from its customers before the deadline passed.

In March 2009, the CBC wrote to the Bank following one of its regular on-site examinations of the Cyprus branch.  As part of its examination, the CBC had reviewed a sample of customer files and had identified areas for improvement with respect to the KYC information held on certain files.  By way of example, the CBC felt that, in some cases, the information collected with respect to the customers' business activities or the occupation of UBOs was too broad.  As a result, the CBC made certain recommendations to the Bank. It required the Bank to take steps to rectify the deficiencies which it had identified across the sample files, and to institute procedures to review and update customer files more generally.  The Bank responded in April 2009 and confirmed that it would review and update its customer files as requested. Over the course of the following months, the Bank met with and wrote to the CBC to keep it informed of progress.

In December 2009, the CBC imposed a deadline of March 31, 2010 for completion of the review and update of all customer files (regardless of risk rating or dormancy).  Given the size of the project, the Bank promptly informed the CBC that it would not be able to meet the deadline and sought a short

extension of time. Its request was refused. In late January 2010, the Bank wrote to the CBC and confirmed that it had fully reviewed and updated the sample of customer files identified during the 2009 on-site examination and that it was continuing to review and update the balance of its customer files. The Bank noted that it had ten employees working intensively (including nights and weekends) to complete the task and was making every effort to meet the CBC's deadline. However, the Bank explained that it had to review approximately 9,000 files and that the project was time-consuming, in particular because many of the Bank's customers were located abroad. The CBC did not permit FBME to accept certified identity documentation through apostille and notarization for international customers, instead requiring documents certified either by a bank officer or an ATP from all of FBME's many international clients.

Notably, the Bank was able to complete its review of all files and contact all relevant customers by the deadline set by the CBC, but it did not receive all updated records by the deadline. On March 31, 2010, the Bank told the CBC that, despite its best efforts and serious commitment, it was unlikely to complete the task before the end of June 2010.

In November 2010, the CBC imposed an administrative fine. FBME notified the CBC in September 2011 of the actions taken to address the areas for improvement identified by the CBC. The CBC next conducted an on-site examination in November 2011 where they reviewed, *inter alia*, a large sample of customers of different types, risk-rating, and on-boarding in different years. The CBC did not identify any further concerns with respect to the customer identification issues referenced in its 2009 on-site examination.

> b.   Notice Statement: "[I]n 2013, FBME took active steps to evade oversight by the Cypriot regulatory authorities. In November 2013, the CBC stated that FBME may be subject to sanctions and a fine of up to 240 million Euro for alleged violations of capital controls." 79 Fed. Reg. 42639 (July 22, 2014)

This statement is neither accurate nor supported by credible sources. FBME never sought to evade oversight by the Cypriot regulatory authorities. Rather, it consistently and promptly communicated with the CBC in real time about the payments affected by capital controls directives at issue. The CBC never stated that FBME may be subject to a fine of up to 240 million Euro; the only support for the statement in the Notice is a November 2013 article in the Cyprus Mail relying on "sources at the central bank . . . who wished to remain anonymous." 9/ We note that it is a criminal offense in Cyprus for a CBC employee to leak confidential bank information gained through CBC employment. When the CBC did eventually impose a fine, it was for reasons totally unrelated to AML issues, the fine was approximately one quarter of one percent of the amount referenced in the article, and it is being disputed by FBME in the Supreme Court of Cyprus on the basis that it is legally infirm.

In early 2013, Cyprus experienced a financial crisis. In mid-March 2013, the CBC suspended the payment system until further notice and then declared a series of consecutive bank holidays (effectively closing the banks). When banks reopened on March 28, 2013, the Minister of Finance (following the recommendation of the Governor of the CBC) issued the first of a series of Restrictive Measures Decrees ("Decrees"), imposing blanket capital controls on all banks operating in Cyprus without regard to any particular bank's liquidity and capital stability. At the time of these Decrees, FBME was entirely solvent and posed no risk to the financial system. In fact, during the crisis,

---

9/      "CBC threatens FBME with €240m fine," Elias Hazou, Cyprus Mail (Nov. 29, 2013), available at
http://cyprus-mail.com/2013/11/29.cbc-threatens-fbme-with-e240m-fine/.

FBME loaned the Republic of Cyprus over 200 million Euro, evidencing its stable financial conditions and its willingness and readiness to support the Cypriot economy. The early Decrees required all banks, including FBME, to obtain approval from a designated committee of the CBC ("CBC Committee") for any transfers of money out of Cyprus. The Decrees required the CBC Committee to approve or decline banks' payment requests within 24 hours of receiving the request. On March 16, 2013, the Association of International Banks (the "Association"), on behalf of FBME and its 25 other member banks, sent a letter to the CBC, stressing that foreign banks should be exempt from the Decrees' restrictions because, among other reasons, the foreign banks did not have the liquidity problems of the local Cypriot banks. The Association sent a similar letter to the Governor of the CBC on March 24, 2013.

Following the twelve-day suspension of business, FBME began sending transfer requests to the CBC Committee. The CBC Committee repeatedly failed to respond to FBME's requests in a timely fashion. The CBC Committee regularly missed the deadline, and in some cases the CBC Committee never responded at all. As a result of the CBC Committee's inaction, on April 3, 2013, FBME wrote to the Governor of the CBC, explaining that the Bank had not received any responses to its payment notifications within the time limits prescribed by the Decree.

On April 5, 2013, FBME wrote to the Cyprus Minister of Finance that the Decrees' restrictions were damaging its business and exacerbated the risk of capital flight from Cyprus. The Bank therefore requested a suspension of the Decrees with respect to FBME. FBME also notified the CBC that it would not comply with all of the Decrees' requirements with respect to certain international customers. In a letter to the Minister of Finance on April 5, 2013, FBME explained that it would "notify, but not seek the permission or approval of, the [CBC] on transaction dates and amounts" for international clients. However, FBME explained to the Ministry of Finance that it would employ a process to comply with the Decrees' objectives to prevent capital flight from Cyprus. Among other things, this process included FBME's refusal to transfer its Cypriot clients' money out of Cyprus. FBME also refused to open any accounts with funds transferred from other Cypriot banks. In addition, the Bank submitted to the CBC all the liquidity and solvency reports required by the Decrees, and it notified the CBC of its daily transactions affected by the Decrees. The Ministry of Finance did not respond to FBME's proposal.

After providing this clear written notice to the CBC and the Ministry of Finance, from at least April 30 through August 16, 2013, FBME promptly informed the CBC in writing about all of its payment transfers out of Cyprus. FBME also sent numerous letters to the CBC and continually offered to meet in person to discuss the CBC's concerns, if any, with FBME's proposal. The CBC never responded to FBME efforts to communicate. FBME interpreted the CBC's silence as approval of the Bank's proposal. During this period, FBME's deposit base increased by 3%, consistent with the aims of the Decrees.

As noted above, FBME is unaware of any public statement by the CBC that it considered imposing a 240 million Euro fine on the Bank; however, FBME is aware of the single Cypriot newspaper article reporting that anonymous sources purporting to be from the CBC had said that the Governor of the CBC had discretion to decide whether to impose such a fine. 10/ On February 28, 2014, the CBC issued a decision imposing a fine on FBME of 652,320 Euro for these alleged violations. Immediately thereafter, FBME filed an application before the Supreme Court of Cyprus for administrative review of the fine because the CBC's application of the Decree violated Cyprus law

---

10/      "CBC threatens FBE with €240m fine," Elias Hazou, Cyprus Mail (Nov. 29, 2013), available at http://cyprus-mail.com/2013/11/29.cbc-threatens-fbme-with-e240m-fine/.

and the constitution and European law.   FBME continues to litigate this matter in the courts of Cyprus, is seeking to refer the matter to the European Court of Justice, and is confident that it will ultimately prevail on the merits.

Throughout this process, FBME actively sought to maintain constructive dialogue with the CBC and the Ministry of Finance, but those agencies declined to respond.  The Bank then openly communicated its plan to satisfy the objectives of the Decrees.  Regardless of the outcome under Cypriot and EU law, we respectfully submit that FBME was not seeking to "evade oversight" by its regulator.

> 2.   *Notice Statement:  "FBME is used by its customers to facilitate money laundering, terrorist financing, transnational organized crime, fraud, sanctions evasion, and other illicit activity internationally and through the U.S. financial system."  79 Fed. Reg. 42639 (July 22, 2014)*

FBME has controls in place that are audited annually by its regulator, the CBC.  The CBC has not identified to the Bank a single case in which FBME facilitated any of the above activities.  As described in more detail below, FBME is not aware that it is being "used" in this manner.  If it is in fact being used in connection with money laundering or other illicit activity, the Bank is not knowingly or intentionally participating in such activities. The Bank might have been the victim of sophisticated criminal activities, notwithstanding the Bank's serious efforts to detect and prevent such activities.  FBME would welcome the opportunity to review the evidence in the possession of the Treasury Department, to provide additional information, and to take action, together with U.S., Cypriot, and Tanzanian officials, to prevent any criminal activities.  FBME remains ready, willing, and able to work with any regulator to ensure that such activities are not facilitated.

> 3.   *Notice Statement:  "FBME has systemic failures in its AML controls that attract high-risk shell companies, that is, companies formed for the sole purpose of holding property or funds and that do not engage in any legitimate business activity."  79 Fed. Reg. 42639 (July 22, 2014)*

Cyprus' favorable tax and fiscal environment attracts many businesses to establish asset holding companies that take advantage of the double tax treaties with almost 50 countries (*See* www.mof.gov.cy).  This business climate explains why many of FBME's customers are holding companies, businesses with nominee structures, or "brass plate" companies with addresses in Cyprus.  It is not uncommon for banks to service these types of companies; indeed, favorable Cypriot banking laws attract such customers.  As set forth in the Bank's policies and procedures, upon the opening of an account, FBME collects information (from all customers) that is designed to ensure that the Bank knows the identity of its accountholders and the beneficial owners of those accountholders and ensures that accounts are not used for illicit purposes.  In particular, the Bank has policies and procedures in place that are designed to identify customers that pose "high-risk" and to monitor the activities of such customers accordingly.

FBME recently has undergone independent third party audits, none of which has identified the "systemic failures in its AML controls" that the Notice asserts.  Indeed, the contrary is true.  In its most recent independent third party audit predating the FinCEN Notice, auditors determined that the Bank is "in principle in compliance" with Cypriot and EU standards.  These independent audits identified certain areas for improvement, many of which FBME has either already implemented or for which FBME has documented project plans with milestone dates in place.  In its Assessment, EY found that FBME's Compliance Program incorporates the requirements of the Directives, and that its Manual is in line with the requirements of the Directives.  EY has identified certain

enhancements related to documentation, training, and other processes, and FBME is committed to further strengthening its Program in accordance with these recommendations. However, EY's recommended enhancements to the Program are far from "systemic failures in its AML controls."

FBME has a documented record of cooperation with regulatory and law enforcement authorities. Cypriot regulatory and law enforcement authorities, as well as financial institutions in other countries with which FBME maintains correspondent relationships, on many occasions have requested information from FBME pertaining to certain customers, accounts, or transactions. FBME has cooperated fully and provided the requested information in a timely manner. FBME would be pleased to provide documentary evidence of such cooperation.

> 4.   *Notice Statement: "FBME solicits and is recognized by its high-risk customers for its ease of use. FBME advertises the Bank to its potential customer base as willing to facilitate the evasion of AML regulations. Separately, FBME is recognized for the ease of its account creation. In September 2013, FBME's offshore bank account services were featured prominently on a website that facilitates the formation of offshore entities." 79 Fed. Reg. 42639, 42640 (July 22, 2014)*

FBME does not facilitate the evasion of AML regulations; the Bank has never advertised its willingness to do so. FBME regularly monitors the internet for any inaccurate or misleading claims which might be made about the Bank. As discussed below in section II.A.5, FBME demands – in writing and, when appropriate, through outside counsel – that inaccurate statements be removed from websites, but there are legal limits to what the Bank can do to prevent misstatements by third parties. Thus, FBME cannot always ensure that the false statements are removed.

Indeed, in contrast to the statement in the Notice, FBME has a reputation among prospective clients and third party introducers for being particularly stringent relative to other banks both in Europe and particularly in Cyprus in its on-boarding of new customers and processing of payments. The Bank routinely receives complaint letters from customers and third party introducers bemoaning the stringent guidelines to which FBME adheres and its unwillingness to expedite account openings. FBME also works to the best of its ability to ensure that contrary messages are not advanced in any forum.

The Bank primarily markets itself to third party introducers at professional conferences and relies upon personal introductions through existing relationships. As part of its "Business Introducer Agreement" with third party introducers, FBME insists that such introducers obtain the Bank's prior written approval before using its name in any materials. The Bank enforces this rule and sends third party introducers letters demanding the removal of any unapproved advertising, regardless of the content.

FBME does limited advertising to the general public, such as posting signage at Larnaca airport in Cyprus and through its extensive local Corporate Social Responsibility program. FBME's promotional materials do not advertise the Bank's ease of use or evasion of regulations. Marketing materials primarily emphasize benefits related to the Bank's extensive international banking experience, and highlight its international network of correspondent banks, multi-lingual personnel, expanded working hours for different global markets, and geographically diverse client base. Besides its focus on international accessibility, FBME's promotional materials also emphasize a strong customer focus with individualized attention, a history of high liquidity, cutting-edge services, confidentiality, collaboration, and the benefits of a Cypriot presence, such as low corporate tax rates,

an EU regulated banking environment, and its strategic geographic location between Europe, Asia, the Middle East, and Africa.

> 5.    *Notice Statement: "FBME is also popular with online gamblers, particularly U.S. gamblers that seek to engage in unlawful internet gambling.  One website that encourages the opening of offshore bank accounts to gamble online notes that FBME in Cyprus is '[a]nother Europe-based bank [we've] found particularly easy to deal with.'"  79 Fed. Reg. 42639, 42640 (July 22, 2014)*

The Notice accurately quotes this misstatement by an unauthorized third party on a website unaffiliated with FBME.  But the Notice fails to acknowledge that in January 2008, FBME identified this false statement and took action on multiple occasions to eliminate it.  In fact, as explained in detail below, FBME has a documented record of opposing these sorts of misstatements because of the damage they do to the Bank's reputation.

Although FBME cannot control all the misstatements of others, it consistently seeks the removal of any false, maligning statements about the Bank that third parties publish on the internet.  The Bank regularly searches the internet for references to FBME and sends letters requesting the removal of false statements to the parties who make or maintain them.  Some examples of the Bank's efforts in this regard are as follows:

- With respect to the statement quoted in the Notice, FBME identified this statement in January 2008 and sent a letter to the website host on January 31, 2008, requesting the reference to FBME be removed.  FBME's letter provided, "The statement regarding 'FBME Bank of Cyprus' is not accurate and since our name is mentioned in the article we are asking you to remove the reference to our name.  Moreover, it is particularly harmful to FBME because FBME is being portrayed on this website as an institution participating in a gambling activity."  The website making this statement, www.blackjackforumonline.com/Complete_Guide_to_Offshore_Bank_Accounts.htm, is unaffiliated with FBME.  It is worth noting that FBME was not the only bank attacked in the statement.  Identical allegations were made against five other banks alongside FBME.

- On January 31, 2008, FBME sent a letter to GoDaddy.com, the company that hosts blackjackforumonline.com, and similarly requested the removal of the false and defamatory statements on this website.

- On January 31, 2008, FBME sent a nearly identical letter to Domains by Proxy Inc. regarding its website.  Despite FBME's efforts, the statement about FBME was never edited or removed.

- In 2010 and 2011, FBME sent several similar letters to the owners of a website entitled searchnfindarticles.com regarding false and defamatory statements about FBME involvement in gambling activity.

- On August 3, 2012, FBME sent letters to two UK companies (a website and a website host company) requesting the removal of an article referencing FBME on the grounds that it was "inaccurate, misleading, and posted without [FBME's] authority" from www.armadaboard.com.

- In October 2012, FBME's external counsel in the UK sent a Letter of Claim to the owner of the website www.cityclub-casino.com, Imperial e-club Limited in Antigua, its service provider, Paragon Internet Inc. in Canada, and its host, WebFusion Internet Solutions in the UK, threatening legal action if false statements instructing customers to wire money to an FBME account were not removed. The fund transfer related to the commencement of online gambling, and the stated recipient of the funds had not been an FBME accountholder since 2004.

- In October 2013, FBME sent letters to two Russian companies (a website and a website host company) demanding removal of false and defamatory statements from http://bankir.ru.

- On May 27, 2014, FBME sent a letter to GoDaddy.com regarding an unauthorized advertisement of a card purportedly owned by FBME.

- On June 11, 2014, FBME sent letters to two UK companies (a website and a website host company) demanding removal of defamatory statements from the website www.cypriot.org.uk.

Whenever FBME uncovers inaccurate or potentially defamatory information about it on third party websites, the Bank sends letters requesting that the entity remove the false information. In many cases, these letters have resulted in removal of the inaccurate mention of FBME from the website. If the websites do not remove the inaccurate information, FBME considers its options on a case-by-case basis. FBME regularly works with internal and external legal counsel with regards to these situations and has obtained legal opinions to aid in these decisions. In certain instances, FBME has pursued the matters in courts (both in Cyprus and abroad); however, the Bank often faces limitations to its ability to require the removal of these statements.

> 6.  *Notice Statement: "FBME facilitated transactions for entities that perpetrate fraud and cybercrime against victims from around the world, including in the United States. For example, in 2009, FBME facilitated the transfer of over $100,000 to an FBME account involved in a High Yield Investment Program ("HYIP") fraud against a U.S. person." 79 Fed. Reg. 42639 (July 22, 2014)*

FBME did not knowingly facilitate this transfer. To the contrary, in May 2009 FBME identified the relevant transactions as suspicious and made appropriate inquiries, consistent with its KYC policy, to understand the nature and purpose of the transfer, the relationship of the parties, and the business activities of the remiters. The client provided information sufficient to establish the apparent legitimacy of the transactions.

However, in July 2010, FBME received notification from another bank that a July 2010 transfer to the same client was fraudulent. Upon receiving this notice, FBME immediately froze the account. FBME conducted an investigation and concluded that the client may have been involved in fraudulent activities. Accordingly, FBME filed an STR on the transfer with MOKAS, and it kept the account frozen. In 2014, FBME delivered the frozen funds to the victim's lawyer's account in compliance with a court order. FBME has been required by law to maintain the account, keeping the remaining funds frozen due to pending litigation. At the conclusion of the litigation, FBME will disburse the funds in compliance with any court order that may be issued and close the account.

FBME has not willingly or knowingly associated itself with criminals or permitted known criminals to open accounts with FBME. In fact, the Bank has in place a Fraud Task Force Group ("FTG"),

consisting of the Group Head of Compliance, Group Head of Audit, Legal Counsel, Group Head of Operations, Head of Customer Services and Business Development, and Head of Risk. The FTG is focused on fraud perpetrated against the Bank and also receives updates about cases relating to fraud against Bank customers. The FTG educates all Bank departments about fraud risk indicators, as well as raises general awareness of potential fraud.  The Bank is confident that its policies and procedures in place today permit the Bank to monitor customer activities in such a way as to detect illicit behavior.

### B.    Other Specific Statements regarding FBME

The Notice contains a number of other statements regarding specific transactions involving FBME. FBME in certain cases cannot respond directly to the cited examples without more specific information from the Treasury Department.  However, the Bank would be pleased to provide any additional information and assistance possible to U.S., Cypriot and Tanzanian officials in their investigations of criminal activity and enforcement of related laws.

### C.    Additional Section 311 factors

According to Section 311 of the USA PATRIOT Act, the U.S. Government should consider, among other factors, the impact of the imposition of the fifth special measure upon the legitimate business activities of FBME.  In its discussion of this factor, FinCEN notes that the "[l]egitimate activity at FBME's Cyprus branch is difficult to assess."  FBME believes that a full assessment of its Compliance Program demonstrates that FBME's Cyprus branch is a legitimate member of the international banking community.  Furthermore, the statements relied on by FinCEN in the Notice, including that FBME has a limited number of customers in Cyprus, that the Bank holds 90% of its assets in Cyprus or even that the Bank has a significant number of holding companies as customers in no way establish that the vast majority of FBME's customers do not use the Bank for legitimate business purposes.

FBME respectfully requests that the U.S. Government consider that FBME supports its customers' legitimate business activities and that the imposition of the fifth special measure will have a significant impact on the legitimate business activities of those customers and FBME itself.  FBME's almost 10,000 customers make legitimate use of the Bank's services every day.  And FBME's approximately 375 employees work hard to serve those customers in a reliable, compliant manner.

## III.    CONCLUSION

FBME has sought to demonstrate in this public comment its strong commitment to compliance, its firm opposition to the use of the Bank for illicit purposes, and its unequivocal resolve to work in cooperation with its regulators and with FinCEN to prevent financial crime whenever and wherever possible.  As demonstrated by the reviews of independent third parties, the Bank has substantially strengthened its Compliance Program over recent years, and it has implemented a Program that is in line with applicable regulatory requirements.  FBME recognizes, however, that every compliance program – including its own – can be improved, and the Bank is entirely committed to continuing to enhance its Compliance Program to FinCEN's satisfaction.  To this end, Hogan Lovells and EY are working with the Bank to implement all appropriate compliance enhancements.  In light of all these facts, FBME respectfully requests that the Notice and NPRM be withdrawn.

We understand from representations made by Mr. May of your office that, upon conclusion of the comment period, FinCEN and the Treasury Department, in consultation with other agencies of the U.S. Government, will review all of the comments received.  We also understand that we will

September 22, 2014

engage in exchanges of additional information and points of view with FinCEN.  We look forward to
cooperating with FinCEN in this regard, and we respectfully request that FinCEN work with all
appropriate dispatch to assess FBME's Compliance Program and enhancement plans so that
FBME and its customers can return to their legitimate business activities as soon as possible.

Thank you for your consideration of the foregoing.

Sincerely,

Peter Spivack
Beth Peters
Evans Rice
Hogan Lovells US LLP
Counsel to FBME Bank Ltd.

cc:     FBME Bank Ltd.
        Jeanne Archibald
        Louise Lamb
        Anthony Capobianco

# EXHIBIT 2



# Department of Justice

STATEMENT FOR THE RECORD OF

JENNIFER SHASKY CALVERY
CHIEF
ASSEST FORFEITURE AND MONEY LAUNDERING SECTION
CRIMINAL DIVISION

BEFORE THE

SUBCOMMITTEE ON CRIME, TERRORISM, AND HOMELAND SECURITY
COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES

ENTITLED

"COMBATING TRANSNATIONAL ORGANIZED CRIME: INTERNATIONAL
MONEY LAUNDERING AS A THREAT TO OUR FINANCIAL SYSTEMS"

FEBRUARY 8, 2012

Statement for the Record
Jennifer Shasky Calvery
Chief
Asset Forfeiture and Money Laundering Section
Criminal Division
U.S. Department of Justice

Subcommittee on Crime, Terrorism, and Homeland Security
Committee on the Judiciary
United States House of Representatives

"Combating Transnational Organized Crime: International Money Laundering as a
Threat to Our Financial Systems"
February 8, 2012

## INTRODUCTION

Mr. Chairman, Ranking Member Scott, and distinguished Members of the Subcommittee, thank you for inviting me to speak with you this morning about transnational organized crime, and specifically the threat international money laundering poses to our financial system. In my testimony, I will describe the nature of this threat, the variety of methods transnational organized crime groups use to generate and launder money, the efforts of the Department of Justice to address the threat, and steps Congress can take that will assist in these efforts.

In his recent testimony on worldwide threats, Director for National Intelligence Clapper characterized transnational organized crime as "an abiding threat to U.S. and national security interests." Therefore, the fight against transnational organized crime is one of the highest enforcement priorities of the Department of Justice and the Administration. As chief of the Department of Justice's Asset Forfeiture and Money Laundering Section (AFMLS), I know firsthand the seriousness of the danger posed by transnational organized crime generally, and to our financial system in particular.

Transnational organized crime represents a uniquely modern threat to our financial and national security. While global markets and technology combine to make the world seem smaller, transnational criminal organizations have exploited these advancements to expand their operations and influence and to evade justice. As a result, these organizations are growing increasingly more sophisticated in both their ability to commit revenue-generating crime and to subsequently launder the proceeds of that crime. I commend you for holding this hearing and shining a spotlight on an often overlooked and underappreciated threat that demands the full attention of the U.S. government.

### Transnational Organized Crime Threatens U.S. and International Security

In December 2009, the United States government completed a comprehensive review of transnational organized crime (TOC) – the first such assessment since 1995. The Administration concluded that TOC networks continue to expand dramatically in size, scope, and influence,

posing significant new and increasing threats to U.S. national security.  Striking new and powerful alliances and engaging in a range of illicit activities as never before, transnational organized criminals threaten our interests in a variety of new and sinister ways.  In years past, TOC was largely regional in scope and hierarchically structured.  Today's TOC groups have adapted to the realities and opportunities of globalization, and have evolved from traditional hierarchical structures toward looser networks that are more complex, volatile, and destabilizing.

TOC groups have also become increasingly sophisticated in penetrating financial systems, manipulating securities and commodities markets, harnessing cyberspace to perpetrate high-tech crimes, and carrying out numerous other schemes that exploit our institutions, and threaten the national security of the United States.  TOC in its highest form is far removed from the streets.  The use of fast-paced trading, the Internet and electronic payments – money, communications and inducements can be exchanged in milliseconds – allows leaders of TOC groups to operate from foreign safe havens to exploit international borders and regulatory gaps.  Transnational organized criminals perpetrate a broad array of crimes significantly impacting the average U.S. citizen, ranging from cyber crime, drug trafficking and associated violence, identity theft, intellectual property theft, and sophisticated frauds which include schemes targeting government programs like Medicare.  In October 2010, the Department of Justice announced charges against 73 members and associates of an Armenian-American organized crime group, with ties abroad, in five states for a scheme responsible for more than $163 million in fraudulent billing to Medicare.  Among those convicted of racketeering was Armen Kazarian, who is alleged to be a "Vor," a term translated as "Thief-in-Law" and refers to a member of a select group of high-level criminals from former Soviet Union countries, including Armenia.  This was the first time a Vor had been convicted of racketeering in the United States.

In some jurisdictions, transnational criminal organizations also undermine political institutions and stability, by insinuating themselves into the political process through bribery, even becoming alternate providers of governance, security, and livelihoods to win popular support.  TOC penetration of foreign governments is deepening, leading to co-option in some jurisdictions and weakening of governance in many others.  The nexus in some jurisdictions among TOC groups and elements of government – including intelligence services personnel – and big business figures threatens the rule of law and transparent business practices, and undermines our ability to compete in key world markets.

Crime, in general, and TOC, in particular, have always been an important source of funding for some terrorist organizations and their deadly acts.  In FY 2010, the Department of Justice identified 29 of the 63 top drug trafficking organizations as having links to terrorist organizations.  In July 2011, the Department announced charges resulting from a DEA narco-terrorism undercover operation, charging three defendants with conspiring to provide various forms of support to Hizballah, the PKK, and Pejak. Two defendants were arrested in Bucharest, Romania, where they were detained pending extradition to the United States; the third was arrested in the Republic of the Maldives. This investigation was supported by Romanian authorities who identified Kurdish PKK members that were selling heroin to support their terrorist organization. It also identified Pejak elements in Iran that were utilizing the drug trade to finance operations and Hizballah elements that were attempting to purchase military-grade weaponry. This investigation is continuing.

**TOC Strategy and the Threat to the U.S. and Global Economy**

In response to the growing threat posed by TOC, in July, 2011, the Administration released its Strategy to Combat Transnational Organized Crime ("TOC Strategy"), which sets forth a whole-of-government response to these pervasive threats. Among the threats identified in the TOC Strategy, the most relevant for this hearing is the threat to the U.S. and world economy. Through the profits of its illicit activities, TOC is increasing its subversion of legitimate financial and commercial markets, threatening U.S. economic interests, and raising the risk of significant damage to the world financial system.

As evidence of TOC's global economic might, one need only consider the most recent estimates of the amount of money laundered in the global financial system - $1.6 trillion, of which an estimated $580 billion is related to drug trafficking and other TOC activities, according to the United Nations Office on Drugs and Crime's Research Report published in 2011. These staggering amounts of money in the hands of some of the worst criminal elements create a terrifyingly vicious cycle – money enables TOC to corrupt the economic and political systems in which they operate, thereby allowing them to consolidate and expand their power and influence, which gives rise to more opportunity to commit crime and generate revenue.

To cite just one example of an elaborate TOC financial scheme, in August 2009, Italian police and prosecutors thwarted a multi-billion dollar securities scheme orchestrated by the Sicilian Mafia which targeted financial firms in the United States and elsewhere. The local authorities arrested as many as twenty people across the globe, including in Italy, Spain, Venezuela and Brazil. Among those arrested was Leonardo Badalamenti, son of a famous organized crime boss who died in a U.S. prison in 2004. According to investigators, Badalamenti and his crew planned to use phony securities to obtain credit lines totaling as much as $2.2 billion from several reputable financial firms, including HSBC in London, and the Bank of America in Baltimore. As part of the scheme, false Venezuelan bonds were allegedly authenticated by corrupt officials within the Central Bank of Venezuela.

But while the ability to generate vast sums of money motivates, sustains, and empowers TOC, it can also be their Achilles heel. Transnational organized crime is a business, and like any business, profit is the primary motivation. Profit drives their diversification into whatever area of criminal activity and with whatever criminal alliance generates proceeds. Those proceeds then fuel the organizations as operating capital and allow them to continue to grow their criminal activity, their personal wealth, their influence, and their ability to corrupt on a national scale. Because money is the foundation on which these criminal organizations operate, our money laundering laws are our primary means to stop them. It is their core vulnerability. By taking their operating capital through money laundering prosecutions and forfeiture, we take away their ability to operate.

**Specific TOC Money Laundering Techniques**

Generally speaking, money laundering involves masking the illegal source of criminally derived proceeds so they appear legitimate, or masking the source of monies used to promote illegal conduct. This process is of critical importance, as it enables criminals to enjoy these profits without compromising themselves or jeopardizing their ongoing criminal activities. To

3

accomplish this, money laundering generally involves three stages. It begins with the placement of illicit proceeds into the financial system. For cash proceeds, placement usually happens either via direct placement through structured deposits or indirectly by smuggling illicit proceeds out of the U.S. and back in order to allow the money to be deposited in U.S. banks. The next stage is layering, which is the process of separating the proceeds of criminal activity from their origin. The final stage is integration, which is the process of using an apparently legitimate transaction to disguise the illicit proceeds. Once illegal proceeds have entered the banking system the integration and layering stages make it very difficult to track and trace the money as it moves globally, often through a web of shell companies.

Money launderers have what seems like an infinite number of ways to disguise and move money, and there appears to be no limit to their ingenuity. Disguised in the trillions of dollars that is transferred between banks each day, banks in the U.S. are used to funnel massive amounts of illicit funds. But rather than address the full landscape of money laundering techniques employed by today's criminals and the critical role that our banking system plays in that landscape, I will instead focus on those methods most frequently utilized by TOC networks to move money around the globe, including into and out of the United States, and where we have specific vulnerabilities that we need Congress to address.

<u>Tools for Concealment</u>

There are countless variations on money laundering schemes and they are only limited by the imaginations of those who perpetrate them. Nonetheless, there are certain tools for concealment that are common to such schemes.

### *i.    Shell Companies*

One common vehicle used to conceal the source, ownership, and control of illegal proceeds as they move through the financial system is a shell company. A shell company can be loosely defined as a legal entity that exists primarily on paper, with no place of business or significant operations or assets. Many jurisdictions around the world – including the United States – allow individuals to form and operate such companies without providing any information about the beneficial owner. Organized criminals exploit this weakness and establish bank accounts in the names of shell companies, and then send money globally from one financial institution to the next, disguised as legitimate business activity, which may include import-export or other trade transactions.

In addition to the United States, the British Virgin Islands, Seychelles, Belize, and Panama are some other popular jurisdictions for the creation of shell companies with little or no information about who owns or controls the entity. None of these countries are fully compliant with the international standards set forth by the Financial Action Task Force on the transparency of legal entities. This marks an unfortunate role reversal for the United States, which historically has led by example when it comes to the implementation of rigorous anti-money laundering standards.

### ii.    *Front Companies*

TOC groups also use front companies to mask their crimes and conceal their profits. Unlike shell companies, which are merely an artifice, front companies are actual functioning businesses that may be wholly or in part legitimate, but are controlled or operated on behalf of criminals. Front companies serve not only to obscure the source, ownership, and control of illegal proceeds involved in trade transactions, but the commingling of legitimate money with illegal proceeds can frustrate our ability to untangle the legitimate monies from the criminal proceeds. Such commingling is a purposeful technique used by some of the most advanced money launderers as a means to confuse law enforcement and exploit gaps in anti-money laundering regimes.

### iii.    *Offshore Financial Centers*

An offshore financial center is a country or jurisdiction that provides financial services to nonresidents on a scale that is disproportionate with the size and the financing of its domestic economy. Typically associated with strict commercial and bank secrecy laws and a low tax environ, offshore financial centers specialize in providing corporate and commercial services to non-resident companies. Because money is taxed at a low rate and the identities of bank accounts holders are strictly protected, such offshore havens are a magnet for TOC to hold their illegal proceeds for the long-term. Thus, it is not uncommon to see the money trail for any particular series of money laundering transactions end in such a locale.

### iv.    *Free Trade Zones*

Free trade zones (FTZs) are designated areas within a country in which incentives are offered to support the development of exports, foreign direct investment, and local employment. Along with the positive aspect of boosting economic opportunity comes the unfortunate reality that these incentives also create opportunities for money laundering. Some of the systemic weaknesses that make FTZs vulnerable to abuse include: weak procedures to inspect goods and register companies, including inadequate record-keeping and information technology systems; lack of adequate coordination and cooperation between zone and Customs authorities; relaxed oversight; and a lack of transparency.

### v.    *Jurisdictions Offering an Air of Legitimacy*

One of the goals in using any money laundering scheme is to conceal the money's illegal past. However, money that moves through certain offshore havens or originates in certain high crime jurisdictions is likely to garner more law enforcement and regulatory attention. In order to avoid this unwanted attention and give their money an air of legitimacy, transnational organized criminals commonly design transactions so that money flows through jurisdictions that are active in foreign trade and have a reputation for integrity in their financial systems. The United States, in particular, is popular for this reason. It is far easier for TOC groups needing to move significant amounts of money to hide it in the wide stream of legitimate U.S. commerce. The efficiency of our banking system and the ease of obtaining anonymous U.S. shell companies add to the popularity of the United States as a place to and through which to launder money.

5

Trade-Based Money Laundering

One of the most popular methods used by TOC groups to move their money around the world is through trade-based money laundering schemes. Trade-based money laundering is a method by which criminals move illegal proceeds, often through the formal banking system, disguised as legitimate trade transactions. In the process, criminal organizations are able to exploit the complex and sometimes confusing documentation that is frequently associated with legitimate trade transactions.

This method is utilized extensively by Colombian drug cartels to repatriate drug proceeds through a trade-based scheme commonly referred to as the Black Market Peso Exchange. These organizations can accomplish settlement by purchasing commodities in one country and then transferring them to another country where the commodity is sold and the proceeds remitted to the intended recipient. The Black Market Peso Exchange has been copied and adapted to local conditions by numerous criminal organizations all across the globe. Recently, we have also seen evidence of a trade-based money laundering schemes involving the illegal trade of pirated goods.

The Ayman Joumaa DTO/Lebanese Canadian Bank case illustrates a trade-based money laundering scheme. Cocaine shipments were sent from South America, through West Africa, and on to markets in Europe and the Middle East. Proceeds from the drug sales, in the form of millions of dollars in bulk currency, were sent back to West Africa and on to Lebanon via money couriers. These undeclared cash shipments were then transferred to exchanges houses throughout Lebanon, and later deposited into Lebanese banks. Wire transfers were then sent to the United States to purchase used vehicles, which were in turn shipped to West Africa and sold. Proceeds from the car sales were co-mingled with drug proceeds and the cycle began anew.

In addition, wire transfers were also sent throughout the world to pay for goods that were subsequently shipped to Colombia and Venezuela and sold. These payments are representative of the Black Market Peso Exchange, and the Black Market Bolivar Exchange trade-based schemes.

Money Remitters

Despite the continuing prevalence of money laundering through banks, criminals also use non-bank, financial institutions, such as money remitters, check cashers, and issuers of prepaid access. Unregistered money transmitters that settle through the transfer of value, which masks that they are in the business of transferring funds through the international financial system, have been a particular challenge for the Department of Justice to prosecute. These remitters often relay transaction information to foreign counterparts only through e-mails or text that without wiretap authority make it difficult for investigators to follow the money and connect to underlying criminal activity and organizations.

Money transmitting businesses, or money remitters, receive money from customers to send to the place or person designated by the customer. The transmission can be domestic or foreign and can be sent through a variety of means. Money remitters are particularly attractive as money launderers for a variety of reasons. They are subject to far less regulatory scrutiny than banks, generally have a more fleeting and limited relationship with their customers, and provide

the anonymity vital to criminal activities for lower value transactions. Money remitters therefore represent a key law enforcement vulnerability in the financial system because they are gateways to our financial system. They can be in the business of laundering money themselves, they can knowingly provide assistance to money launderers, and money launderers can use their services without the remitters' knowledge.

Because of this vulnerability, and to promote greater transparency for these businesses, the law requires that they register with the Financial Crimes Enforcement Network (FinCEN), in addition to many state licensing requirements to remit money. The registration requirement is intended to assist law enforcement and supervisory agencies and to prevent these businesses from engaging in illegal activities. Under 18 U.S.C. § 1960, a money laundering statute, it is a federal crime to operate a money transmitting business without registering with FinCEN, or complying with state licensing requirements, or to be involved in the transportation or transmission of funds the defendant knows are derived from a criminal offense or intended to be used to promote unlawful activity.

Check Cashers

Another trend is criminals using the check cashing industry as a method of money laundering. In particular, check cashing stores around the country are being used to cash large checks or a series of smaller checks on behalf of professional criminals. This is particularly prevalent in the health care arena, where check cashers are becoming a prime mechanism to convert billions of dollars in fraudulently obtained Medicare reimbursement checks into cash – which is in turn used to pay kickbacks to complicit doctors, durable medical equipment providers, and for profit. Many of those identified as laundering proceeds of healthcare fraud through check cashing companies have been linked to Eurasian organized crime groups.

In summary, the scheme works as follows: federal regulations require a report to be filed anytime a check is cashed for over $10,000. This report is known as a Currency Transaction Report or a "CTR." The reporting obligation falls on the person or entity receiving and providing cash for the check – such as a check cashing business. Specifically, the check cashing company receiving a check to be cashed over $10,000, or series of checks exceeding $10,000, must fill out a CTR that contains the identity of the person cashing the check, and the identity of the person or entity on whose behalf the check is being cashed. Once this information and other background information is obtained, the CTR is filed with FinCEN at the Department of Treasury and used by law enforcement to detect money laundering activities.

In order to avoid detection, check cashers are either knowingly filing CTRs that include false identifying information, or are avoiding filing CTRs altogether. Because they are exempt from Suspicious Activity Report and recordkeeping requirements, check cashers can purport to be blind to fraudulent activity even as they process inherently suspicious transactions. The money laundering of healthcare fraud checks is just one example of how check cashers are being utilized by professional criminals. More often than not, the same check cashers who launder the proceeds of health care fraud are also involved in the laundering of proceeds of other crimes as well.

Prepaid Access Devices

In the past decade, the use of electronic transactions, both for personal and business purposes, has increased dramatically. While only a few years ago most payments went through some type of banking institution, that is no longer the case today. Mobile payments, virtual and digital currencies, online payment systems, mobile wallets, and prepaid cards have emerged as the payments vehicles of the future. These new payments offer TOC the ability to move money easily and expeditiously across jurisdictions that may not have effective regulations.

Prepaid access devices essentially allow access to monetary value that is represented in digital format and that is stored or capable of being stored on electronic media in such a way as to be retrievable and transferable electronically – such as through prepaid cards or mobile wallets. While the most recognizable form of prepaid access in the United States is a prepaid card, it is becoming increasingly apparent that the plastic card entails only one possible method of enabling prepaid access. Today, prepaid access can be provided through a card, a mobile phone, a key fob or any other object to which relevant electronic information can be affixed. In some contexts, there may even be no physical object, as access to prepaid value can be enabled through the provision of information over the telephone or the Internet. Prepaid cards appear in many forms – the most recognizable being the ubiquitous gift cards that can be purchased almost anywhere. However, the prepaid card that is the most likely to be used in money laundering is the open system general purpose reloadable card. This card, which is normally branded using a Visa, MasterCard, American Express or Discovery logo, allows the user to make purchases and access the global payment networks through ATMs worldwide. These cards can be loaded with cash, drained, and then re-loaded.

The United States only began to define providers and sellers of prepaid access as money services businesses and to impose anti-money laundering obligations on these providers and sellers last year, and has yet to require the reporting of monies represented by prepaid cards to be declared when they are taken across the border in substantial amounts. Despite our new regulations, we believe prepaid cards present abundant opportunities for criminals to launder money. Prepaid cards can be purchased for currency, transferred from one person to another, reloaded, resold or monies transferred from one card to another with a telephone call or a computer stroke. Prepaid cards are often used in tandem with the digital or virtual currencies as a mechanism to either purchase the digital currency or to change the digital currency into a country's currency. Digital or virtual currencies are a form of online payment service that involves the transferring of value from one person to another through the Internet. These currencies may be backed by gold, silver, platinum, or palladium, such as the digital currencies offered by Liberty Reserve or Webmoney, or, as in the case of Bitcoin, they may be backed by nothing at all. Criminals use these currencies because they often allow anonymous accounts with no limit on either the account or the value of the transaction.

The Royal Bank of Scotland (RBS) case provides an example of how TOC hackers were able to manipulate a bank's internal accounting systems and then use prepaid cards and digital currencies to access the funds in tampered accounts and to launder money computer hackers operating in Estonia, Moldova, and Russia were able to infiltrate RBS's prepaid payroll card system and issue themselves 44 prepaid payroll cards with the loading limits removed. In just 12 hours, "cashers" used the cards to withdraw almost $9 million from 2100 ATMs throughout the

world. The cashers were allowed to keep a percentage of the cash but the remainder was moved into one of the digital currencies and transferred to the hackers.

While the vulnerabilities presented by the new payment methods vary by the type and provider, all present a high risk for money laundering, terrorist financing, and other financial crimes. The primary advantage that they give the criminal is speed with which to move illegal proceeds from one jurisdiction to another, often anonymously. This ability to move money so quickly from card to card, from card to phone, from phone to a digital currency, presents a significant challenge for law enforcement. Eventually our laws will need to be updated to give law enforcement the flexibility to respond to these ever evolving payment methods.

**Updating our Anti-Money Laundering Laws to Combat TOC**

Adopting the TOC Strategy's whole-of-government approach, the Department of Justice is part of a multifaceted effort to disrupt the ability of these criminal organizations to move and access their funds. The Departments of Justice, Treasury, Homeland Security, and State all employ their unique authorities in anti-money laundering enforcement, forfeiture, sanctions, regulatory enforcement, customs, and international standard setting and engagement toward this end. Of course, the effort is not limited to the government, as we also rely on the private sector, and particularly the banking community, as a true partner in preventing criminal elements from exploiting our financial system. Only through a coordinated effort can we hope to succeed in diminishing the financial strength and resources of TOC.

By leveraging these coordinated efforts, and through aggressive use of our anti-money laundering laws, the Department of Justice can report some notable successes in combating the financial networks of TOC. But in far too many instances, investigations of TOC have revealed deficiencies in our current legal regime that limit or undermine completely our ability to dismantle these organizations, prosecute their members, and seize their assets. Accordingly, the Administration has put forward a comprehensive anti-money laundering and forfeiture legislative proposal entitled the Proceeds of Crime Act (POCA). As I will now discuss, POCA includes a number of provisions that would address existing gaps in our law and significantly enhance our ability to combat TOC.

Modernizing Anti-Money Laundering Laws to Account for Globalization of TOC

While TOC criminal conduct predominantly takes place abroad, the proceeds of those crimes are often directed toward the United States, as I have previously explained. The purpose may be to move the money through the U.S. financial system to cleanse it of the taint of illegality, to purchase real estate or other assets in the United States, or to promote further illegal conduct. While any of these scenarios amount to *de facto* money laundering, whether they actually constitute a violation of our money laundering laws depends on the nature of the underlying criminal conduct.

Congress has recognized certain foreign offenses as money laundering predicates under U.S. law, so long as the activity is a crime in the foreign jurisdiction. *See* 18 U.S.C. § 1956(c)(7)(B). Thus, an individual who commits one of the listed offenses abroad, for example, extortion, and then moves the proceeds of that offense into or through the United States, can be

charged with money laundering under U.S. law. A notable case brought under this provision involved Pavel Lazarenko, Ukraine's Prime Minister from 1996-1997, who in 2004 was convicted of money laundering in U.S. district court for moving the proceeds of his extortion crimes in Ukraine through the U.S. financial system.

Unfortunately, section 1956(c)(7)(B) does not cover the full range of foreign offenses, including a number of revenue-generating crimes favored by TOC, such as computer fraud and the trading of pirated goods. Indeed, in the Lazarenko case, although we could trace millions of dollars that he obtained from fraud in the Ukraine, we were unable to charge those transactions as money laundering because general fraud committed in a foreign jurisdiction is not a predicate under our money laundering statutes. The effect of such gaps, in both our domestic and foreign money laundering predicates, is to provide TOC and other criminals with a roadmap for how to launder money in the United States with impunity.

To address this gap we have put forward a legislative proposal that would make all domestic felonies, and foreign crimes that would be felonies in the United States, predicates for money laundering. This amendment would enable us to more readily prosecute trade-based money laundering schemes that rely on customs fraud and the trade of pirated goods, and in the process bring the United States into greater compliance with relevant international standards.

In addition to moving criminal proceeds into the United States, TOC is also able to exploit a gap in our law to launder proceeds of crime committed in the United States abroad. If criminal proceeds generated in the U.S. are deposited directly into a foreign account, and then laundered in the foreign country by a non-U.S. citizen with no part of the laundering occurring in the U.S., we lack jurisdiction to prosecute the money launderers. Our proposed amendment to section 1956 would extend extraterritorial jurisdiction to address this gap.

Harmonizing the Definition of Money Transmitting Businesses

Because the movement of money, particularly internationally, is an essential part of money laundering by TOC groups, money remitters play a vital role in their operations. The successful prosecution of Victor Kaganov for operating an illegal money transmitting business under 18 U.S.C. § 1960 illustrates how money transmitters are used by transnational organized criminals. Kaganov operated out of his residence in Oregon as an independent money transmitter without registering with FinCEN and without a state license. In order to move money into and out of the United States, Kaganov created various shell corporations under Oregon law and then opened bank accounts into which he deposited money he received from his Russian clients. He would then wire the money out of the accounts based on wire instructions he received from his clients. From July 2002 through March 2009, Kaganov conducted over 4,200 transfers, moving more than $172 million into and out of the United States.

Although section 1960 is a powerful tool to combat money laundering by TOC, some remitting businesses, such as check cashers, currency exchangers, and the providers of prepaid access devices, are not included in the scope of section 1960. Thus, while these remitters are still technically required to register with FinCEN, they are not subject to prosecution under section 1960 for failing to do so. Our proposed amendment closes this gap by harmonizing the

definition of "money transmitting business" in section 1960 with the full scope of the registration requirement.

## Extending Wiretap Authority to Schemes Reliant on Electronic Communications

Our enforcement of money laundering activity is further hampered by a gap in our wiretap authority, which extends to virtually all money laundering offenses but not to section 1960. Arguably, it is section 1960 cases in which wiretap authority is *most* needed, given that remitting schemes invariably require telephonic or electronic communication among multiple individuals to direct the movement of the transmitted funds. Consider, for instance, the use of hawala to transfer money. Not only is the communication the only evidence of the transaction, but the communication effectively is the transaction. And yet because there is no wiretap authority for section 1960, law enforcement has no means of obtaining this critical evidence when this technique is used to launder money. Our proposed amendment would add section 1960 and bulk cash smuggling to the list of offenses for which we have wiretap authority.

## Confronting the Problem of Commingled Funds

The use of front companies by TOC serves not only to obscure its criminal activity, but whatever legitimate money is generated by such companies can frustrate our ability to bring money laundering charges when it is commingled with illegal proceeds. Section 1957 of title 18 prohibits the spending of more than $10,000 of illegally derived money. In both the Fifth and Ninth Circuits, courts have held that when a defendant transfers over $10,000 from a commingled account containing clean and dirty money, the defendant is entitled to a presumption that the first money moved out of the account is legitimate. This "criminal proceeds -- last out" standard is contrary to all other accepted rules of tracing, and effectively prevents the government from pursuing section 1957 charges where illegal proceeds are moved through a commingled account – such as in the trade-based money laundering scheme discussed earlier.

To prevent this marginalization of section 1957, we have proposed an amendment that would clarify that when a defendant transfers funds from a bank account containing commingled funds, the presumption is that the transfer involves the illegally obtained money.

## Promoting Corporate Transparency

The final legislative proposal I would like to highlight is not in POCA but is necessary to identify a problem specifically identified in the TOC Strategy – the lack of beneficial ownership information about companies formed in the United States.

As previously noted, one way in which transnational criminal organizations are able to penetrate into the U.S. financial system is through the use of shell companies. For example, Viktor Bout, notoriously known as the "Merchant of Death" and recently convicted of conspiracy to sell weapons to kill Americans, used U.S. shell companies to further his illegal arms trafficking activities. The Sinaloa Cartel, one of the major Mexican drug trafficking organizations, is believed by U.S. law enforcement to use U.S. shell companies to launder its drug proceeds. And Semion Mogilevich, an individual based in Russia and named to the FBI's

Ten Most Wanted Fugitives List, and his criminal organization, are charged with using U.S. shell companies to hide their involvement in investment activities and money laundering.

We are also seeing an increase in the use of shell companies as vehicles to conduct human trafficking. In 2001, in a case in the Western District of Missouri, a number of individuals pleaded guilty to charges involving illegal importation and forced labor after establishing two shell companies to obtain work authorization for foreign nationals and to conceal the unlawful proceeds of the criminal enterprise.

These examples all involve the relatively rare instances in which law enforcement has been able to identify a criminal using a shell company to further a criminal enterprise. In the vast majority of cases, the lack of available ownership information means that investigations involving U.S. shell companies hit a dead end. This same lack of information also hampers our ability to respond to requests for assistance from our foreign counterparts, thus undermining the U.S. role in the global offensive against the financial networks of TOC.

We believe the solution to this problem is a legal requirement that mandates disclosure of beneficial ownership information in the company formation process that will enable us to identify the living, breathing beneficial owner of a legal entity in the United States at its incorporation.

**Other TOC Legislative Fixes**

Exterritorial application of the RICO and VICAR statutes

As I have stated, today's criminal activity does not respect boundary lines, and we are increasingly confronting serious criminal conduct that routinely crosses national borders. The United States is the target of criminal activity emanating from all parts of the world, as member and leaders of organized criminal groups direct and conduct criminal activity from abroad that threatens the United States, its citizens, its instrumentalities of commerce, its institutions, and its national security. Transnational organized crime groups engaged in drug trafficking, violent crimes, cybercrime, money laundering, smuggling, counterfeiting, and other criminal activity all reach into the United States from outside to commit their crimes and move and hide the proceeds of their crimes.

The Racketeer Influenced and Corrupt Organizations (RICO) (18 U.S.C. §§1961-1968) and Violent Crimes in Aid of Racketeering (VICAR), (18 U.S.C. § 1959), statutes have long been, and continue to be, among the most powerful tools in the fight against organized criminal conduct and other types of serious criminal activity. The United States has used the RICO and VICAR statutes in criminal prosecutions where part of the criminal conduct and/or some of the defendants were outside of the United States. Convictions under RICO in this context include the leaders and many members of several major international drug trafficking organizations responsible for multi-ton shipments of cocaine being imported and distributed in the United States; numerous members of smuggling schemes emanating from Asia that brought in millions of dollars of counterfeit United States currency and that agreed to bring in military-grade weaponry; individuals who embezzled millions of dollars from the Bank of China and laundered

the money in the United States; and members and leaders of an organization that trafficked in fraudulent identification documents and arranged for the commission of a murder in Mexico.

Pending indictments in this context include the 2003 indictment of the aforementioned Semion Mogilevich for directing from Eastern Europe a multi-million dollar securities fraud and money laundering scheme that targeted U.S. citizens; the indictment of leaders of MS-13 for, while incarcerated in El Salvador, ordering murders and other attacks by MS-13 members in the Washington, D.C., area by cellular telephone; and the indictment of leaders and members of the Barrio Azteca gang that operates on both sides of the U.S.-Mexico border selling drugs, laundering money, and committing acts of violence, including the murder of a U.S. consulate employee in Mexico.

Given the increasing cross-border nature of crime and the threats posed by transnational organized crime, it is vital that the RICO statute and its companion VICAR statute continue to be applicable to enterprise leaders and members who direct the affairs of a criminal enterprise from a foreign country and order criminal conduct, including violent crimes, in the United States, as well as enterprise leaders and members in the United States who order murders in foreign countries or send criminal proceeds to foreign countries. However, recent decisions in several United States District Courts and in the United States Court of Appeals for the Second Circuit in the context of private civil RICO cases have held that the RICO statute does not apply extraterritorially. While at least some of the courts have explicitly expressed no opinion on the extraterritoriality of RICO in cases brought by the government, these cases have the potential to create confusion and uncertainty as to the extraterritorial application of RICO in criminal prosecutions. Indeed, the United States Court of Appeals for the Second Circuit held that RICO does not apply extraterritorially even though Congress included in the definition of racketeering activity several statutes that themselves have extraterritorial application. In fact, some of these statutes apply *only* extraterritorially, such as Section 2332 relating to murder and other violence against United States nationals occurring *outside* of the United States.

Once these courts determine that RICO does not apply extraterritorially, they look at the particular case to determine if it involves a permissible territorial application or an impermissible extraterritorial application of the statute. In making this determination, some courts have held that the "nerve center," or upper level management and decision making authority of the enterprise, must be located within the United States or the case is dismissed as an impermissible extraterritorial application. The Department disagrees with this test and believes that a RICO claim involves a territorial application of RICO either if the enterprise is located or operating in the United States or if a pattern of racketeering activity occurs within the United States. Moreover the "nerve center" test is inconsistent with the Supreme Court's requirements relating to the attributes of an enterprise under RICO. Nevertheless, court holdings such as this have the potential to wreak havoc with our ability to prosecute leaders and members of some of the very groups that pose the greatest threat to the United States today. Leaders and members of terrorist groups, organized crime groups, violent gangs, cyber crime organizations, and drug trafficking groups would be able to escape prosecution under some of our most useful criminal statutes simply because the leadership of the group directed its activities from outside of the United States, even where the enterprise is itself operating in the United States and a pattern of racketeering activity is committed within the United States.

Among the Department's legislative proposals are clarifications that both the RICO and VICAR statutes have extraterritorial application in cases brought by the United States. The clarification of RICO's extraterritorial reach and the addition of some new types of racketeering activity will allow us to prosecute the members and leaders of transnational groups for the full range of their criminal activity. The proposed legislation includes provisions that this extraterritorial application of RICO is limited to cases brought by the United States and is not available in private civil RICO cases. The legislative proposal also includes several other amendments to update and clarify RICO and VICAR that the Department would be happy to discuss with you at a later date.

## Narcotics

South America is the primary source of cocaine (and significant amount of the heroin) that is illegally imported into the United States. Particularly with regard to cocaine, international drug trafficking organizations (International DTOs or TOC) based in Colombia and Peru manufacture the illicit drug and then transport it to Central America and Mexico, where Mexican traffickers take possession. Another significant route includes the distribution of the drug from Colombia to buyers in the Caribbean. The Mexican or Caribbean traffickers then illegally import the drug shipment into the United States.

Under current law, to prosecute DTOs in the United States for their extraterritorial activities under the "long arm" statute, 21 U.S.C. § 959, we must demonstrate that the particular defendant manufactured or distributed the drug "knowing or intending" that the drug would be illegally imported into the United States. Years ago, the Colombian cartels controlled the routes from South America to the United States, and therefore, it was not a significant burden to acquire evidence in the course of the criminal investigation, and to present such evidence in court, that the defendants knew the ultimate destination of the cocaine. With the rise of the Mexican cartels, however, it has become much more difficult to prove that the South American traffickers knew the ultimate destination of the drugs that they have sold to their Mexican customers. In addition, because the traffickers have become much more sophisticated about how cases are prosecuted in the United States due to the success of our obtaining the extradition of foreign drug traffickers who have been prosecuted in the United States, the foreign traffickers now commonly avoid all discussion of the ultimate destination of their drug shipments.

The Targeting Transnational Drug Trafficking Act of 2011 addresses this problem by amending the Controlled Substances Act at 21 U.S.C. § 959 to render it unlawful for an individual to manufacture or distribute a controlled substance knowing, intending or "having reasonable cause to believe" that the substance will be illegally imported into the United States. This common sense amendment holds international drug traffickers accountable for their activities when the circumstances of the transaction would give them reasonable cause to believe that the ultimate destination of the illicit substance was the United States. For instance, if the drug transaction is financed using U.S. dollars, the package branding suggests a U.S. destination, and/or the drug route suggests that the ultimate destination is the United States, then the government can present that evidence to demonstrate that the traffickers violated the drug trafficking long arm statute.

This piece of legislation also would amend section 959 to better address the international trafficking in chemicals used to make the controlled substances that are unlawfully introduced into the United States. Presently, the United States' extraterritorial authority extends only if the overseas manufacture or distribution of the chemical results in the smuggling of the chemical itself into the United States. The amendment will prohibit manufacture and distribution of the chemical when an individual intends or knows that the chemical will be used to make a controlled substance and intends, knows, or has reasonable cause to believe that the controlled substance will be unlawfully brought into the United States. Thus, those who provide such critical material support to drug traffickers based abroad who target the United States will incur a term of imprisonment of up to 20 years.

In addition, as part of the TOC Strategy, we have asked Congress to direct the U.S. Sentencing Commission to establish a better defined sentencing scheme for violations of the Foreign Narcotics Kingpin Designation Act (the Kingpin Act). The Kingpin Act (21 U.S.C. §§ 1901 – 1908, 8 U.S.C. § 1182), administered by the Department of the Treasury, prohibits transactions by U.S. persons, or U.S.-based transactions, that involve property or interests in property of designated foreign narcotics traffickers, including foreign persons designated for materially assisting in, providing financial or technological support for or to, or providing goods or services in support of a designated foreign narcotics trafficker, and foreign persons designated for being owned, controlled, or directed by, or acting on behalf of, a designated foreign narcotics trafficker. A violation of the Kingpin Act carries a statutory penalty of 10 years imprisonment generally, but it can reach up to 30 years in some circumstances, in addition to a range of fines. Currently, there is no established sentencing scheme in the guidelines. We propose guidelines that would result in a sentence of approximately three years, with enhancements in cases where individuals know or have reasonable cause to believe that the assistance will further drug trafficking activity and in certain cases that involve the provision of weapons such as firearms or explosives.

**CONCLUSION**

In closing, I would like to once again thank this Subcommittee for holding this hearing and bringing attention to the threat transnational organized crime poses to our financial system. The first step in combating this threat is to understand the nature and scope of TOC and the myriad ways in which it generates and then launders its vast profits. The term "TOC" encompasses a wide swath of organizations engaged in a diverse range of criminal activity all around the world, and yet what unites them all is their need for money. Going forward, with the help of this Committee, and in conjunction with our domestic and international partners, disrupting the financial infrastructures of TOC will remain a top priority of the Department of Justice.

# EXHIBIT 3

Bankers Almanac.com

**ACCUITY**
**BANKERS ALMANAC**

---

**FBME BANK LTD**

☑ SWIFT

Bankersalmanac.com ID: ▉▉▉▉

## Head Office Details

**Head Office:**
PO Box 9208, FBME House, 85 Block K, Kinondoni Rd, Dar Es
Salaam, Tanzania

| | |
|---|---|
| Tel: | +255 22 2664761/2, 22 2126610 |
| Fax: | +255 22 2664763, 22 2126606 |
| Email: | headoffice@fbme.com |
| SWIFT/BIC: | FBME TZ TZ |
| CHIPS UID: | 415551 |
| TZ Bank Code: | 67030105 |
| TZ Sort Code: | 015001, 015065 |
| Reg No: | 48236 |
| Website: | http://www.fbme.com |

**Postal Address:**
(Cyprus), PO Box 25506, 1391 Nicosia, Cyprus

**Main Offices**
Cyprus Main Branch, 90 Archbishop Makarios III Ave, 1077
Nicosia, Cyprus

| | |
|---|---|
| Tel: | +357 22 888444 |
| Fax: | +357 22 888555 |
| Email: | nicosia@fbme.com |
| SWIFT/BIC: | FBME CY 2N |
| Reuters: | FBME |

**Other Address**
Limassol Sub-Branch, Omiros & Araouzos Tower, 25 Olympion
Str, 3035 Limassol, Cyprus

| | |
|---|---|
| Tel: | +357 25 377811 |
| Fax: | +357 25 747665 |
| Email: | limassol@fbme.com |

## Head Office Departments

**CB - CYPRUS MAIN BRANCH - HEAD OFFICE**
| | |
|---|---|
| Tel: | Cyprus +357 22 888444 |
| Fax: | Cyprus +357 22 888555 |

**CORR BKG**
| | |
|---|---|
| Tel: | +357 22 888115 |
| Fax: | +357 22 888449 |

**DOC CREDITS**
| | |
|---|---|
| Tel: | +357 22 888650 |
| Fax: | +357 22 898551 |

**FOREX**
| | |
|---|---|
| Tel: | +357 22 888566 |
| Fax: | +357 22 888577 |

**INTL DIV**
| | |
|---|---|
| Tel: | +357 22 888669 |
| Fax: | +357 22 888555 |

**TZ - HEAD OFFICE**
| | |
|---|---|
| Tel: | Dar Es Salaam Branch +255 22 2128000, Tanzania +255 22 2126000 |

## FATCA Compliance

| | |
|---|---|
| FATCA Compliance Status: | Participating FFI |
| GIIN: | 2X697N.99999.SL.834 |

## Status

| | |
|---|---|
| Rankings: | World Rank (2,266); Country Rank (1). |
| Ownership type: | Private Bank |
| Regulated: | Bank of Tanzania |
| Activities: | Commercial, Corporate, Private and Retail Bank. |

Bankersalmanac.com - **FBME BANK LTD** - Full Details          Page 2 of 5

| Services include: | Corporate Finance, Documentary Credits, Financial Advisory - Corporate, Foreign Exchange, Guarantees, International Settlements, Internet Banking, Letters of Credit, Lines of Credit - Personal, Lines of Credit - Business, Savings Accounts - Personal, Commercial Banking, Corporate Banking, Private Banking, Retail Banking. |
|---|---|
| Office summary: | Branches Tanzania 5; Cyprus 2<br>Representative Offices Russia 1 |
| Number of employees: 357. | |

## History

In 1982 FBME was established in Cyprus as a subsidiary of the Federal Bank of Lebanon SAL of Lebanon. In 1986 it changed its country of incorporation to the Cayman Islands and its banking presence in Cyprus was transformed to itself as a branch of the Cayman Islands entity. In 2003 FBME terminated its banking presence in the Cayman Islands by re-establishing itself as a legal entity in Tanzania, its Cyprus operations becoming, at the same time, a branch of FBME Tanzania. Since 1993 it has maintained a Representative Office in Moscow. On August 4, 2005 the bank's name changed as above

## Ownership

View group structure

Mr Ayoub-Farid M Saab, 50%; Mr Fadi N Saab, 50%

## Personnel

Personnel information for this institution was last verified on 19 June 2015

### BOARD OF DIRECTORS:

Chairman
Mr Ayoub-Farid M Saab

Chief Executive Director
Mr Fadi N Saab

Senior Independent Director
Mr Alenu T Absra

Independent Non Executive Director
Mr Dominic G B Dreyfus,
Mr Lars Gunnar Ljungdahl,
Mr Michel N Rowihab

### HEAD OFFICE:

General Manager
John N B Elster

Internal Audit
Limbu Gimbuya (Internal Auditor)

Human Resources
Lucia Qorro (Head)

Accounts
Abron Mchengo (Head)

Administration
Sharifa D Msami (Head)

### CYPRUS BRANCH:

Chief Executive Officer
Mr Fadi N Saab

Accounts
Marios Anastasiou (Chief Financial Officer & Group Head)

Compliance
Lilit Khachatryan (Group Head)

Customer Service & Business Development
Charles Charalambous (Group Head)

Human Resources & Administration
Costi Bifani (Group Head)

IT & Communications
Thomas Malayatoor (Group Head)

Operations
Thomas Antoniou (Group Head)

Assets Business Development
Mihail Stoca (Head)

Credit
Costas Kyriakides (Head)

Foreign Exchange & Treasury
George Ilinis (Head)

Internal Audit
Elena Hasoun (Head)

Marketing & Public Relations
Gabriela Samara Paphitis (Head)

Risk Management
George Karvounis (Head)

Trade Finance
Rado Krestev (Head)

Correspondent Banking
Scott Wyllie (Acting Head)

Recovery
Elisa Constantinou (Acting Head)

### FATCA:

FATCA
Lilit Khachatryan (FATCA Responsible Officer)

## Standard Settlement Instructions

This bank has multiple settlement centres, select the location of the operation you wish to settle with.

DAR ES SALAAM, TA...          NICOSIA, CYPRUS

| Dar Es Salaam, Tanzania, Head Office |
|---|
| See for Cyprus or Tanzania Operations |
| For settlement through FBME TZ TZ (CP, FX, MM) |
| SSI information for this institution was last provided on 28 July 2015 |

Bankersalmanac.com - FBME BANK LTD - Full Details

Filter  (Currency) ☑  and  (Country) ☑  and  (Product Type) ☑

CP = Commercial Payments FX = Foreign Exchange MM = Money Markets

| Curr | Bank | Swift/BIC | Account No | CP | FX | MM | Other |
|------|------|-----------|-----------|----|----|----|-------|
| AED | Commerzbank AG, Frankfurt am Main | COBA DE FF | 400 8721557 00 AED, via FBME SWIFT: FBME CY 2N | CP | | | |
| AUD | Commerzbank AG, Frankfurt am Main | COBA DE FF | 400 8721557 00 AUD | CP | | | |
| BHD | National Bank of Bahrain BSC, Manama | NBOB BH BM | 9900056?, via FBME SWIFT: FBME CY 2N | CP | FX | | |
| CAD | Commerzbank AG, Frankfurt am Main | COBA DE FF | 400 8868572 00 CAD, via FBME SWIFT: FBME 2Z 2Z | CP | | | |
| CHF | Commerzbank AG, Frankfurt am Main | COBA DE FF | 400721557 00CHF, via FBME SWIFT: FBME CY 2N | CP | FX | MM | |
| CNY | Commerzbank AG, Frankfurt am Main | COBA DE FF | 400 8721557 00 CNY, via FBME SWIFT: FBME CY 2N | CP | FX | MM | |
| CZK | Commerzbank AG, Frankfurt am Main | COBA DE FF | 400 8721557 00 CZK, via FBME SWIFT: FBME CY 2N | CP | FX | MM | |
| DKK | Danske Bank A/S, Copenhagen | DABA DK KK | S6901-5, via FBME SWIFT: FBME CY 2N | CP | | MM | |
| EUR | Commerzbank AG, Frankfurt am Main | COBA DE FF | 400 8868572 00 EUR, via FBME SWIFT: FBME 2Z 2Z | CP | FX | MM | |
| EUR | Intesa Sanpaolo SpA, Milan | BCIT IT MM | 10010000300S, via FBME SWIFT: FBME CY 2N | CP | | MM | |
| EUR | Raiffeisen Bank International AG, Vienna | RZBA AT WW | S0.027.920, via FBME SWIFT: FBME CY 2N | CP | FX | MM | |
| GBP | Commerzbank AG, Frankfurt am Main | COBA DE FF | 400 8868572 00 GBP, via FBME SWIFT: FBME 2Z 2Z | CP | FX | MM | |
| HKD | Commerzbank AG, Frankfurt am Main | COBA DE FF | 400 8721557 00, via FBME SWIFT: FBME CY 2N | CP | FX | MM | |
| JPY | Mizuho Bank Ltd, Tokyo | MHCO JP JT | 6651020, via FBME SWIFT: FBME CY 2N | CP | | | |
| JPY | The Bank of Tokyo-Mitsubishi UFJ Ltd, Tokyo | BOTK JP JT | 653-0433454, via FBME SWIFT: FBME CY 2N | CP | | | |
| KWD | Al Ahli Bank of Kuwait KSC, Kuwait City | ABKK KW KW | 0960-612340-010, via FBME SWIFT: FBME CY 2N | CP | | | |
| LBP | Federal Bank of Lebanon SAL, Beirut | FBLE LB BX | 01-000235-001, via FBME SWIFT: FBME CY 2N | CP | FX | MM | |
| NOK | Commerzbank AG, Frankfurt am Main | COBA DE FF | 400 8868572 00 NOK, via FBME SWIFT: FBME CY 2N | CP | | | |
| NZD | Commerzbank AG, Frankfurt am Main | COBA DE FF | 4008721557 00 NZD | CP | FX | MM | |
| PLN | Commerzbank AG, Frankfurt am Main | COBA DE FF | 400 8868572 00 PLN, via FBME SWIFT: FBME 2Z 2Z | CP | | | |
| QAR | The Commercial Bank (QSC), Doha | CBQA QA QA | 11-13-04130-4, via FBME SWIFT: FBME CY 2N | CP | FX | | |
| SAR | Riyad Bank, Riyadh | RIBL SA RI | 9350307006910, via FBME SWIFT: FBME CY 2N | CP | FX | | |

## Correspondents

| Town | Institution |
|------|-------------|
| Beirut | Federal Bank of Lebanon SAL |
| Copenhagen | Danske Bank A/S |
| Doha | The Commercial Bank (QSC) |
| Frankfurt am Main | Commerzbank AG |
| Kuwait City | Al Ahli Bank of Kuwait KSC |
| Manama | National Bank of Bahrain BSC |
| Milan | Intesa Sanpaolo SpA |
| Riyadh | Riyad Bank |
| Tokyo | The Bank of Tokyo-Mitsubishi UFJ Ltd Mizuho Bank Ltd |
| Vienna | Raiffeisen Bank International AG |

## Domestic Branches

| | |
|---|---|
| Aruba | Mariana |
| Dar Es Salaam | Zanzibar |

## Representative Offices

Russian Federation

### Moscow
7/11 3rd Lusinovsky Pereulok, Moscow 119049
Tel:        +7 495 6410150-93
Fax:        +7 495 6410194, 495 6410195
Email:      moscow@fbme.com, fbmem2@fbme.com

## Other Offices

### Main Branch

90 Archbishop Makarios III Ave, 1077 Nicosia, Cyprus
Tel:        +357 22 888444
Fax:        +357 22 888555
Email:      akoris@fbme.com
SWIFT/BIC:  FBME CY 2N
Reuters:    FMEII
CYBIC:      11501001
GIIN:       ZX9B7II.99999.BR.196
Corr Bkg:
Tel:        +357 22 888315
Fax:        +357 22 888449
Forex:
Tel:        +357 22 888588
Fax:        +357 22 888577
Loans/Dept:
Tel:        +357 22 888169
Fax:        +357 22 888555

More information, such as SSIs and services, on this branch

### Sub-Branch

Omiros & Araouzos Tower, 25 Olympion Str, 3035 Limassol, Cyprus
Tel:        +357 25 377811
Fax:        +357 25 347665
CYBIC:      11501002
GIIN:       ZX9B7II.99999.BR.196

## Financials



Liabilities          Assets          Profit & Loss Statement

## BALANCE SHEET

| Liabilities | Non-Consolidated Dec.31 2013 | Non-Consolidated Dec.31 2012 | Non-Consolidated Dec.31 2009 | Non-Consolidated Dec.31 2008 |
|---|---|---|---|---|
| | USD | USD | USD | USD |
| Capital | 43,233,100 | 43,233,100 | 43,233,100 | 43,233,100 |
| Subordinated Loan | - | - | 5,000,000 | 5,000,000 |
| Reserves | 14,107,853 | 12,681,105 | 5,974,729 | 4,927,664 |
| Deposits &c | 2,593,697,724 | 2,555,832,715 | 1,563,860,070 | 1,441,883,331 |
| Other Liabilities | 20,415,908 | 27,716,764 | 12,143,001 | 36,627,359 |
| Related Earnings | (09,015,351 | 80,035,350 | *58,980,122 | 149,171,926 |
| Profit/(loss) | 2,437,531 | 30,301,316 | | |
| Total | 2,787,927,462 | 2,750,000,350 | 1,688,191,785 | 1,580,699,380 |

‡ Held by FBME BANK LTD as Reserves and recognised as Tier 1 Capital
‡ Held by FBME BANK LTD as Reserves and recognised as Tier 1 Capital

## BALANCE SHEET

| Assets | Non-Consolidated | Non-Consolidated | Non-Consolidated | Non-Consolidated |
|---|---|---|---|---|

Bankersalmanac.com – FBME BANK LTD – Full Details

| | Dec.31 2013 | Dec.31 2012 | Dec.31 2009 | Dec.31 2008 |
|---|---|---|---|---|
| | USD | USD | USD | USD |
| Cash and Banks | 2,159,037,007 | 1,876,614,513 | 1,240,274,095 | 983,162,623 |
| Investments | 267,503,293 | 493,218,084 | 110,761,824 | 169,532,247 |
| Loans &c | 220,761,526 | 291,643,225 | 242,775,592 | 350,179,376 |
| Fixed Assets | 33,593,736 | 25,492,629 | 8,936,530 | 7,216,443 |
| Other Assets | 57,041,905 | 63,316,849 | 85,413,730 | 70,728,663 |
| Total | 2,787,937,467 | 2,750,000,350 | 1,688,191,785 | 1,580,899,360 |

**PROFIT & LOSS STATEMENT**

| | Non-Consolidated Dec.31 2013 | Non-Consolidated Dec.31 2012 | Non-Consolidated Dec.31 2009 | Non-Consolidated Dec.31 2008 |
|---|---|---|---|---|
| | USD | USD | USD | USD |
| Net Interest Income | 35,011,701 | 56,915,973 | 26,202,171 | 24,063,114 |
| Other Income | 49,265,483 | 41,338,302 | 37,545,269 | 40,921,759 |
| Other Expense | (26,839,653) | (67,980,959) | (53,438,053) | (45,598,668) |
| Net Profit/(Loss) | 7,437,531 | 30,301,316 | 10,329,337 | 29,386,185 |

**PERFORMANCE RATIOS**

| | Non-Consolidated Dec.31 2013 | Non-Consolidated Dec.31 2012 | Non-Consolidated Dec.31 2009 | Non-Consolidated Dec.31 2008 |
|---|---|---|---|---|
| Net Profit/Equity Capital | 4.28% | 18.20% | 9.13% | 28.70% |
| Net Profit/Total Assets | 0.27% | 1.10% | 0.61% | 1.86% |
| Equity Capital/Total Assets | 6.23% | 6.05% | 6.70% | 6.48% |

Auditors / Meetings

**AUDITORS**
Wilson Associates Certified Public Accountants
KTreppides & CoLimited

Subsidiaries

**WHOLLY-OWNED SUBSIDIARIES (100%)**                          View Group Structure

FBME Card Services Ltd

FBME Nominees Ltd

FBME Secretaries Ltd

FBME Trustee Ltd

Add to My Bookmarks

☑ Create a shortcut to this institution/page for future reference.

| 1. Title* | FBME BANK LTD - Full Details |
| 2. Comments (optional) | |
| 3. Save to folder* | Please select |
| 4. Save | SAVE >> |

* required fields                                    Manage My Bookmarks

© Reed Business Information Limited 2015                    Part of RBI ...... ℞ RELX Group™

8/17/2015                                    CHIPS Participant | CHIPS

# CHIPS Participant                                          *(close window)*

## Information Current as of: 08/14/2015

| UID | BIC/SWIFT | Name and Address |
|---|---|---|
| 222771 | FBMECY2N | FBME BANK LTD.<br>90 ARCHBISHOP MAKARIOS III AVENUE<br>P.O. BOX 25566<br>NICOSIA 1391, CYPRUS |

## No participants are attached to this UID.

© 2015. The Clearing House Payments Company, LLC            *(close window)*

The Global Banking Resource

## FBME BANK LTD
### Legal Head Office

General Information | Financial Information | Other Locations |   Correspondents | Officers | Payments | History

Limit search results to the following criteria:

All Currencies ▾  All Type Correspondents ▾  All Countries ▾  REFRESH MY SEARCH

| PAYMENT DETAIL | CURR | TYPE | TITLE | CITY | Payment Code | DEPT | ACCT |
|---|---|---|---|---|---|---|---|
| FBMEIZIZ | AED | General | Commerzbk | Frankfurt | COBADEFF | Coml Bnkg | 400 8721557 00 AED |
| FBMEIZIZ | AUD | General | Commerzbk | Frankfurt | COBADEFF | Coml Bnkg | 400 8721557 00 AUD |
| FBMEIZIZ | BHD | General | Natl Bk of Bahrain (B.S. | Manama | NBOBBHBM | Finl Mkts & Secur | 99003562 |
| FBMEIZIZ | BHD | General | Natl Bk of Bahrain (B.S. | Manama | NBOBBHBM | Coml Bnkg | 99003562 |
| FBMEIZIZ | CAD | General | Commerzbk | Frankfurt | COBADEFF | Coml Bnkg | 400 8868572 00 CAD |
| FBMEIZIZ | CHF | General | Commerzbk | Frankfurt | COBADEFF | Finl Mkts & Secur | 4008721557 00CHF |
| FBMEIZIZ | CHF | General | Commerzbk | Frankfurt | COBADEFF | Coml Bnkg | 4008721557 00CHF |
| FBMEIZIZ | CNY | General | Commerzbk | Frankfurt | COBADEFF | Coml Bnkg | 400 8721557 00 CNY |
| FBMEIZIZ | CNY | General | Commerzbk | Frankfurt | COBADEFF | Finl Mkts & Secur | 400 8721557 00 CNY |
| FBMEIZIZ | CZK | General | Commerzbk | Frankfurt | COBADEFF | Finl Mkts & Secur | 400 8721557 00 CZK |
| FBMEIZIZ | CZK | General | Commerzbk | Frankfurt | COBADEFF | Coml Bnkg | 400 8721557 00 CZK |
| FBMEIZIZ | DKK | General | Danske Bank | Copenhagen | DABADKKK | Finl Mkts & Secur | 50971-5 |
| FBMEIZIZ | DKK | General | Danske Bank | Copenhagen | DABADKKK | Coml Bnkg | 50971-5 |
| FBMEIZIZ | EUR | General | Commerzbk | Frankfurt | COBADEFF | Coml Bnkg | 400 8868572 00 EUR |
| FBMEIZIZ | EUR | General | Commerzbk | Frankfurt | COBADEFF | Finl Mkts & Secur | 400 8868572 00 EUR |
| FBMEIZIZ | EUR | General | Intesa Sanpaolo S.p.A. | Turin | BCITITMM | Finl Mkts & Secur | 100100003905 |
| FBMEIZIZ | EUR | General | Intesa Sanpaolo S.p.A. | Turin | BCITITMM | Coml Bnkg | 100100003905 |
| FBMEIZIZ | EUR | General | Raiffeisen Bank Intl AG | Vienna | RZBAATWW | Coml Bnkg | 50.027.978 |
| FBMEIZIZ | EUR | General | Raiffeisen Bank Intl AG | Vienna | RZBAATWW | Finl Mkts & Secur | 50.027.978 |
| FBMEIZIZ | GBP | General | Commerzbk | Frankfurt | COBADEFF | Coml Bnkg | 400 8868572 00 GBP |
| FBMEIZIZ | GBP | General | Commerzbk | Frankfurt | COBADEFF | Finl Mkts & Secur | 400 8868572 00 GBP |
| FBMEIZIZ | HKD | General | Commerzbk | Frankfurt | COBADEFF | Coml Bnkg | 400 8721557 00 |
| FBMEIZIZ | HKD | General | Commerzbk | Frankfurt | COBADEFF | Finl Mkts & Secur | 400 8721557 00 |
| FBMEIZIZ | JPY | General | Bk Tokyo-Mitsubishi UFJ | Tokyo | BOTKJPJT | Coml Bnkg | 653-0433454 |
| FBMEIZIZ | JPY | General | Mizuho Bank Ltd | Tokyo | MHCBJPJT | Coml Bnkg | 6651020 |
| FBMEIZIZ | KWD | General | AlAhli Bk of Kuwait | Kuwait | ABKKKWKW | Coml | 0900-612340-050 |

8/17/2015                                    The Global Banking Resource

| | | | | | | Bnkg | |
|---|---|---|---|---|---|---|---|
| FBME 1717 | LBP | General | Fed Bk of Lebanon, S.A.L. | Beirut | FBLELBBX | Finl Mkts & Secur | 01-000235-001 |
| FBME 1717 | LBP | General | Fed Bk of Lebanon, S.A.L. | Beirut | FBLELBBX | Coml Bnkg | 01-000235-001 |
| FBME 1717 | NOK | General | Commerzbk | Frankfurt | COBADEFF | Coml Bnkg | 400 8868572 00 NOK |
| FBME 1717 | NZD | General | Commerzbk | Frankfurt | COBADEFF | Coml Bnkg | 4008721557 00 NZD |
| FBME 1717 | NZD | General | Commerzbk | Frankfurt | COBADEFF | Finl Mkts & Secur | 4008721557 00 NZD |
| FBME 1717 | PLN | General | Commerzbk | Frankfurt | COBADEFF | Coml Bnkg | 400 8868572 00 PLN |
| FBME 1717 | QAR | General | Commercial Bank (QSC) | Doha | CBQAQAQA | Finl Mkts & Secur | 11-13-04230-4 |
| FBME 1717 | QAR | General | Commercial Bank (QSC) | Doha | CBQAQAQA | Coml Bnkg | 11-13-04230-4 |
| FBME 1717 | SAR | General | Riyad Bk | Riyadh | RIBLSARI | Coml Bnkg | 9250307809940 |
| FBME 1717 | SAR | General | Riyad Bk | Riyadh | RIBLSARI | Finl Mkts & Secur | 9250307809940 |

Report Changes On This Financial Institution

# D&B Report



**Decide with Confidence**

## FBME LIMITED

Subscriber No [redacted]

Delivery Date: Aug 17, 2015

**IDENTIFICATION & SUMMARY**

### Identification

| | |
|---|---|
| **DUNS:** | 64-406-4958 |
| **(Former Name:** | FEDERAL BANK OF THE MIDDLE EAST LIMITED) |
| **Address:** | J & P Building 90 Archbishop Makarios III Avenue 1077 Nicosia CYPRUS |
| **Telephone:** | 357 22880400 357 22880444 |
| **Telefax:** | 357 22880555 |
| **E-mail Address:** | nicosia@fbme.com |
| **Web Address:** | www.fbme.com |

### Summary

| | |
|---|---|
| **Started:** | 1987 |
| **Year Inc:** | 1987 |
| **Legal Form:** | Foreign Company |
| **Reg No:** | O507 |
| **Employs:** | Unknown |
| **SIC:** | 6719 |
| **Activity:** | Engaged as holding companies |

### Risk Summary

**RISK EVALUATION**

| | |
|---|---|
| **Risk Indicator** | 3 |
| **D&B Rating** | O3 |
| **Former Rating** | 4A2 |
| **Credit** | Non-Seeker |

**PRINCIPAL INFORMATION**

| | |
|---|---|
| **Principal(s)** | 2 |

**PAYMENT INFORMATION**

| | |
|---|---|
| **Payments** | No Complaints |

**FINANCIAL SUMMARY**

| | |
|---|---|
| **Sales/Turnover** | 25,749,385 USD |
| **Tangible Net Worth** | 49,385,000 USD |
| **Total Assets** | 020,057,000 USD |
| **Pre-Tax Profit** | 335,843 USD |

**CURRENCY**

All monetary amounts quoted in this report are shown in Euro unless otherwise stated.

### Risk Assessment





The Dun & Bradstreet Rating of O3 indicates:

A Financial Strength which is Undisclosed (based on Net Worth) and a Risk Indicator which is Fair (slightly greater than average risk).

dun&bradstreet

## TREND/ANALYSIS

### Key Trends

| Risk Indicator | | No of Employees | |
| --- | --- | --- | --- |
| Statutory Debt | | | |

**Understanding Key trends:**
Using historical archive data we are able to plot the movement of key data elements.

| | Improving |
| --- | --- |
| | worsening |
| | static |

**Methodology:**
Where data availability allows we are monitoring six elements for key trends: solvency ratio, current ratio, statutory debts, employee figure, scores or rating.

Financial trends are based year over year using latest available financial statements or figures, whereas statutory debt comparisons are made quarterly as fresh information is released. Comparative employee data, typically collected directly from the subject company is therefore triggered by latest to last date of update. As our scores are recalculated on the basis of all fresh information these comparisons will also reflect latest to last date of update position.

dun&bradstreet

## PRINCIPALS

| | |
|---|---|
| Name: | **Mister Fadi Michel Saab** |
| Position: | Company director |
| Born: | Oct 01, 1949 in LEBANON |
| Nationality: | Lebanese |
| Language: | is stated to be fluent in English |

| | |
|---|---|
| Name: | **Mister Ayoub - Farid M. Saab** |
| Position: | Company director |
| | Authorised Person |
| Born: | Jul 14, 1939 in LEBANON |
| Nationality: | Lebanese |
| Language: | is stated to be fluent in English |

## BANKERS

## Secured Charges

No secured charges are registered.

## TRADE PAYMENTS

No complaints concerning subject's payments have been reported.

## PUBLIC RECORD INFORMATION

## Protested Bills

No protested bills have been reported.

## HISTORY

## Background

Business started in 1987 as a Foreign Company.

Subject moved from Santa Rosa Avenue & Mikinon Street, Megaron Lavinia, 1391 Nicosia, CYPRUS on Apr 01, 1999.

Subject's name was changed from 'FEDERAL BANK OF THE MIDDLE EAST LIMITED' on Sep 30, 2003.

## Legal Form

Foreign Company registered on May 28, 1987 in Nicosia.

Registration No:    O507

## References

Correspondent:Ms Stella Kemmitsi, 97 Prodromou Street, Office 41, 2063 Strovolos, Nicosia, Cyprus, Tel: 357 99689816.

| | |
|---|---|
| Auditors: | Horwart Philippides & Partners, 146, Archbishop Makarios III Avenue, 3507 Limassol, Cyprus |
| Solicitors: | Ms Stella Kammitsi, 97 Prodromou Street, Office 41, 2063 Strovolos, Nicosia, Cyprus, Tel: 357 99689816 |

## LINKAGE

dun&bradstreet

## Affiliates

The following are related through principal(s) and/or financial interest(s):

| | |
|---|---|
| **Name:** | **FBME BANK LIMITED** |
| Location: | Nicosia, Cyprus |
| Affiliate DUNS: | 56-548-8121 |
| Details: | This operates as International banking institution.<br>This concern is related through common principal(s) and/or shareholder(s).<br>Year started: 2003. |

| | |
|---|---|
| **Name:** | **FBME Trustee Limited** |
| Affiliate DUNS: | 49-928-0030 |
| Details: | This operates as Trustee Company.<br>This concern is related through common principal(s) and/or shareholder(s).<br>Year started: 1988. |

| | |
|---|---|
| **Name:** | **FBME Secretaries Limited** |
| Affiliate DUNS: | 56-548-8123 |
| Details: | This concern is related through common principal(s) and/or shareholder(s).<br>Year started: 1999. |

| | |
|---|---|
| **Name:** | **FBME Nominees Limited** |
| Affiliate DUNS: | 56-548-8125 |
| Details: | This concern is related through common principal(s) and/or shareholder(s).<br>Year started: 1999. |

| | |
|---|---|
| **Name:** | **FBME Card Services Limited** |
| Location: | Nicosia, Cyprus |
| Affiliate DUNS: | 35-695-3591 |
| Details: | This concern is related through common principal(s) and/or shareholder(s).<br>Year started: 2002. |

| | |
|---|---|
| **Name:** | **Tanpay Limited** |

## OPERATIONS

## Line of Business

Engaged as holding companies (6719)

Engaged as investment offices (6726)

FBME Limited operates within the Banking sector and most specifically deals with Personal Banking, Corporate Banking, Personalized Services, Card Services - International, Card Services - Tanzania, Bank's Tariff - Cyprus and Bank's Tariff - Tanzania. Country of Origin: Cayman Islands Authorized Person: AYOUB-FARID SAAB Address: Santa Roza & Mykinon Corner, Lavinia Bldg., Apt. 51, Nicosia Foreign Registered Office: HUNTLAW CORPORATE SERVICES LTD, Address: P.O. Box: 1350 GT, The Huntlaw Bldg., Fort Street, George Town, Grand Cayman, Cayman Islands Capital: Authorised Capital: 50,000,000 USD (Divided into 500,000 Shares x 100 USD), Issued: 200 USD (Divided 2 Shares x 100 USD) Subscribers: CARIBHAVEN SERVICES LTD, (1 Ordinary Share), Address: George Town, Grand Cayman, Cayman Islands, NORTHHAVEN SERVICES LTD, (1 Ordinary Share), Address: George Town, Grand Cayman, Cayman Islands The subject in question belongs to the FBME Group of Companies. The group engages in the provision of financial and banking services through its International banking institution that operates under the name FBME BANK Limited in Cyprus. Among the services provided are: corporate and personal banking, card services, internet banking, foreign exchange trading, and trust services. Additionally, it holds a Banking License under the Banking Laws of Tanzania and a Banking License issued by the Central Bank of Cyprus. FBME (Federal Bank of the Middle East Limited- Reg.No.:C19316) was established in Cyprus in 1982 and started its trading activities in 1983 as a subsidiary of the Federal Bank of Lebanon. In 1986 it changed its country of incorporation to the Cayman Islands and its banking presence in Cyprus was transformed to that of a branch of the Cayman Islands entity. (FBME Limited- Reg. No.:O507 - previous name Federal Bank of the Middle East Limited (1987-2003)). In 2003 FBME terminated its banking presence in the Cayman Islands by re-establishing itself as a legal entity in Tanzania. (FBME Bank Limited- Reg. No.:O1830 - previous name Federal Bank of the Middle East Limited (2003-2005)). The shares of stock of FBME Bank are owned by A-F M Saab (50%) and F M Saab (50%).

## Sales and Purchasing

Sells to general public, group companies on a regular basis.

dun&bradstreet

## Purchase Territory

| Area | Percent |
|---|---|
| International | 100% |

## Exports

Subject does not export.

## Imports

Subject does not import.

## Employees

Employs: Unknown

## Location

Operates from office at heading address.
Subject is located in a central business area on a main road near a major road network.
Registered office: At heading address.
Postal address: P O Box 25566, Nicosia, 1391.

## FINANCIAL INFORMATION

Financial accounts are available at the Department of Registrar of Companies, provided that the company has submitted the compulsory accounts. The annual general meeting of a company is convened within eighteen months of the date of its registration. Forty two days later the company should file its first annual return with the Registrar of Companies. Once a year, the annual return must be submitted. This should be done within fifteen months from the previous annual return, without disregarding the calendar year (sections 118, 120 and 125 cap. 113). All Cypriot Companies, whether local or international, must maintain accurate books of accounts, which should reflect the true and correct position of their conduct, as well as give adequate explanation of their operations. The Cypriot Company Law, which is closely modeled on its English counterpart, entails that company accounts must comprise of the following: - Directors' report. - Auditor's report. - Financial statements as prescribed by International Financial Reporting Standards (IFRS) and consolidated Financial Statements in case of parent companies (unless specifically exempted). Audited financial statements and an Income Tax Return are required for all companies, even companies with no taxable income and/or dormant companies. Registered Branches (in Cyprus) of foreign companies are not legally bound to compile full separate branch accounts however when taxed on the island, are obliged to do so for income tax purposes. Additionally they must submit accounts of the main company, translated into Greek, to the Department of Registrar of Companies. Partnerships are exempt from any requirement to prepare audited accounts, but they are legally bound to keep proper books of account which must be available for scrutiny by individual partners.

## Comparatives

| | Fiscal Dec 31, 2003 (US Dollar) | Fiscal Dec 31, 2004 (US Dollar) |
|---|---|---|
| Turnover | 7,626,169 | 26,749,385 |
| Pre-tax Profit | 3,176,339 | 336,643 |
| Net Worth | 46,198,000 | 49,385,000 |
| Fixed Assets | 3,432,000 | 4,137,000 |
| Total Assets | 441,261,000 | 628,057,000 |
| Current Assets | 391,424,000 | 575,034,000 |
| Current Liabilities | 390,063,000 | 573,672,000 |
| Working Capital | 1,361,000 | 1,362,000 |
| Long Term Debt | 5,000,000 | |
| Financial Assets | 46,405,000 | |
| Employees | 177 | |

Net Worth and Total Assets are tangible figures shown after the deduction of intangible assets.

## Ratios

dun&bradstreet

| | Dec 31, 2003 | Dec 31, 2004 |
|---|---|---|
| Current Ratio | 1.00 | 1.00 |
| Solvency Ratio (%) | 855.15 | 1,161.63 |
| Fixed Assets / Net Worth (%) | 7.43 | 8.38 |
| Current Liabs / Net Worth (%) | 844.33 | 1,161.63 |
| Asset Turnover (%) | 1.73 | 4.10 |
| Sales / Net Working Capital | 5.60 | 18.91 |
| Assets / Sales (%) | 5,786.13 | 2,439.11 |
| Profit Margin (%) | 41.65 | 1.31 |
| Shareholders Return (%) | 6.88 | 0.68 |
| Return on Assets (%) | 0.72 | 0.05 |
| Sales / Employees * | 43,085.81 | |
| Profit / Employees * | 17,045.42 | |
| * The ratios are in single units. | | |

## Balance Sheet

Abstract from individual fiscal balance sheet.

| Assets | As at Dec 31, 2004 (US Dollar) |
|---|---|
| Land/Buildings | 4,137,000 |
| **Total Fixed Assets** | 4,137,000 |
| Investments | 48,886,000 |
| **Total Fin'cl Assets** | 48,886,000 |
| **CURRENT ASSETS** | |
| Prepaid Expenses | 13,211,000 |
| Cash | 2,214,000 |
| Misc Current Assets | 559,609,000 |
| **TOTAL CURRENT** | 575,034,000 |
| **TOTAL ASSETS** | 628,057,000 |

| Liabilities | As at Dec 31, 2004 (US Dollar) |
|---|---|
| Capital | 43,233,000 |
| Retained Profits | 3,431,000 |
| Misc Reserves | 2,721,000 |
| Net Worth | 49,385,000 |
| **Misc Def Liabilities** | 5,000,000 |
| **CURRENT LIABILITIES** | |
| Accruals | 13,030,000 |
| Misc Current Liabilities | 560,642,000 |
| **TOTAL CURRENT** | 573,672,000 |
| **TOTAL LIABS & NET WORTH** | 628,057,000 |

## Profit & Loss

dun&bradstreet

| | Jun 01, 2004 to Dec 31, 2004 (US Dollar) |
|---|---|
| Total Income | 12,231,846 |
| Gross Profit | 12,231,846 |
| Selling/Admin Expenses | 13,702,852 |
| Misc Operating Income | 13,517,538 |
| Net Operating Income | 11,066,532 |
| Interest Payable | 6,166,859 |
| Misc Financial Expenses | 2,431,244 |
| Total Financial Expenses | 8,598,103 |
| Profit Before Taxes | 3,368,429 |
| Income Tax | 262,301 |
| Profit After Tax | 3,106,128 |
| Net Profit | 3,106,128 |

## Notes on Financials

The average number of employees during the year was 212.
According to the balance sheet as of Dec 31, 2004.
The above figures have been abstracted from accounts prepared by subject's accountant
Financial statement obtained from subject on Aug 09, 2012.
Signed by Mr Ayoub Farid M Saab, on behalf of the Company , chairman and chief executive.

## Accountant's Opinion

The financial statements have been prepared on a going concern basis assuming the continuing support of the
Subject to the foregoing, the financial statements give a true and fair view of the company's affairs.

## Financial Estimates

On Aug 09, 2012 the subject submitted the following official figures:

Sales for the 12 month period ending Dec 31, 2004 were 25,749,385.
Pre-tax profit for the 12 period ending Dec 31, 2004 were 3,368,430.
Net profit for the 12 month period ending Dec 31, 2004 were 3,106,128.

Sales for the 12 month period ending Dec 31, 2003 were 18,662,144.
Pre-tax profit for the 12 period ending Dec 31, 2003 were 3,480,159.
Net profit for the 12 month period ending Dec 31, 2003 were 3,176,339.

## Financial Interviews

Attempts to contact an official proved unsuccessful.

## Investigation Information

On Jun 04, 2014 local informants stated that:
Please note that, the information included in this report was obtained from the Official Companies' Registrar and from
subjects' Web-site. A check against our records revealed that no negative payment incidents against Subject Company,
such as unpaid invoices and utility bills, bankruptcies exist etc. METHODOLOGY USED FOR REPORT PREPARATION
A. PERFORM SEARCHES IN: The Registrar of Companies and Official Receiver of the Republic of Cyprus. In house
databases for Detrimental Information: - Bankruptcy and Dissolution procedures. - Issuers of Bounced Cheques. - Unpaid
Bills. Propietary databases and global subscription sites. Global and local media. Internet social networks.
Relationship/Directorship Search through Local Database. Other local databases as deemed appropriate. B. CONDUCT
INTERVIEWS WITH: Official(s) / correspondent(s) of the company under review. Supplier(s) or other associated entities
of the company. Other local resources with extensive knowledge of the market. C. ANALYSIS Process and analyse all
information gathered. Perform a thorough quality check of the report prior to sending it to the client.

## Press Clippings

| | |
|---|---|
| Date: | Sep 01, 2009 |
| Reported by: | http://www.centralbank.gov.cy/ |
| Detail: | FBME Bank Ltd (formerly 'Federal Bank of the Middle East Ltd'), Country of incorporation:Tanzania, Date of first banking business licence granted to the 'Federal Bank of the Middle East Ltd' Cyprus, subsidiary of the 'Federal Bank of Lebanon SAL' of Lebanon : 25.10.1982. |

dun&bradstreet

**Date:** Sep 01, 2009

**Reported by:** http://www.centralbank.gov.cy/

**Detail:** Date of second banking business licence granted to the 'Federal Bank of the Middle East Ltd' of the Cayman Islands (successor of the 'Federal Bank of the Middle East Ltd' of Cyprus) enabling it to take over the operations of the 'Federal Bank of the Middle East Ltd' of Cyprus and to establish a branch in Cyprus:6.3.1987.

**Date:** Sep 01, 2009

**Reported by:** http://www.centralbank.gov.cy/

**Detail:** Date of third (current) banking business licence granted to the 'Federal Bank of the Middle East Ltd' of Tanzania (successor of the 'Federal Bank of the Middle East Ltd' of the Cayman Islands), enabling it to take over the operations of the Cyprus branch of the 'Federal Bank of the Middle East Ltd' of the Cayman Islands and to establish a branch in Cyprus:8.9. 2003.

**Date:** Jun 02, 2009

**Reported by:** http://www.fbme.com/easyconsol

**Detail:** The new e-Banking has a fresh look and feel to it. Many of the features are simplified, aiming to enhance the experience for users when banking through FBME DIRECT.

**Date:** May 29, 2009

**Reported by:** http://www.fbme.com/easyconsol

**Detail:** FBME Bank has received both a USD and a EUR Straight Through Processing Excellence Award from Deutsche Bank for 2008, honoring outstanding quality of payment messages. This is the third consecutive year that FBME has been awarded from Deutsche Bank for the exceptional quality of its USD payment messages.

**Date:** May 20, 2009

**Reported by:** http://www.fbme.com/easyconsol

**Detail:** FBME Bank Ltd is pleased to announce the opening of a branch in Arusha, the fourth branch to open in Tanzania. This expansion will enable FBME to service the financial needs of clients in and around Arusha.

**Date:** Apr 14, 2009

**Reported by:** http://www.fbme.com/easyconsol

**Detail:** Additional Euro Correspondent Account for Tanzanian account holders As part of its continuous effort to better serve its client base, FBME Bank Ltd is pleased to announce the opening of a EUR Correspondent Account with Deutsche Bank AG, in addition to the Euro account currently available through Dresdner Bank AG Frankfurt.

**Date:** Apr 07, 2009

**Reported by:** http://www.fbme.com/easyconsol

**Detail:** FBME is pleased to announce that as of the 30th of March 2009 the Moscow Representative Office has re-located to a new building. 7/11, 3rd Lusinovsky Lane Moscow 117049 Russia.

**Date:** Oct 10, 2008

**Reported by:** www.bot-tz.org/BankingOperatio

**Detail:** Dar es Salaam Electronic House (DECH) was introduced in the year 2002 to handle cheque clearing for member banks.... During the period between 1995 - July 2008 DECH expanded its membership from 5 to 23, namely..... FBME Limited.

**Date:** Oct 10, 2008

**Reported by:** Correspondant

**Detail:** An affiliate of the subject, Federal Bank of the Middle East Limited which was registered in Cyprus under registration number 19316 as an Offshore Banking Unit has been voluntarily dissolved on the 4/2/09. It is under this company that Federal Bank started its operations in 1983 in Cyprus which were later transfered to the subject company.The sales figure in the Profit & Loss is made of Customer Loans and Bank Loans.

**Date:** Sep 29, 2008

**Reported by:** http://www.fbme.com/news/thecu

**Detail:** Sofar 2008 has been a year of market surprises. Most asset classes have performed poorly in relation to their historical track records and this may possibly continue. Despite commodities, in general, being the exception to the market retracement they have not proven to be safe havens because 'real assets" or 'hard assets" like residential and commercial real estate in many areas of the world have led the downward trend and, in some cases, can be considered the catalysts to the downward spiral..

**Date:** May 15, 2008

**Reported by:** http://www.fbme.com/news/14thm

**Detail:** FBME Bank Ltd has today announced the launch of its new website. Clients will be offered a completely new interface from which to contact its global offices and view products and services.

APPENDICES

dun&bradstreet

## Country Insight

The third-largest island in the Mediterranean, Cyprus became independent in 1960. Tensions between the Greek Cypriot majority and Turkish Cypriot minority came to a head in December 1963, when violence broke out in the capital, Nicosia. Despite the deployment of UN peacekeepers in 1964, sporadic inter-communal violence continued, forcing most Turkish Cypriots into enclaves throughout the island. In 1974, a Greek government-sponsored attempt to seize control of Cyprus was met by military intervention from Turkey, which soon controlled more than a third of the island. In 1983, the Turkish-held area declared itself the Turkish Republic of Northern Cyprus (TRNC, recognised officially only by Turkey).The island entered the EU in 2004, but EU law does not apply to the TRNC, and its citizens do not have the same rights as those accorded to citizens of EU states. UN plans for reunification were initially opposed by the Republic of Cyprus government until the election of the communist Dimitris Christofias in February 2008, since when progress has been made. However, the April 2010 election of the nationalistic Dervis Eroglu as the Turkish Cypriot president has slowed progress.

Quarterly growth is seen for the first time in five years, but the recovery remains embryonic and relapses are likely.

Should you require further information relating to D&B's Country Insight Products & Services please contact countryinsight@dnb.com.

## Customer Service

| | |
|---|---|
| Speed of service: | Typically 4 working days |
| SCN: | 201508175008010708 |
| Order Date: | Aug 17, 2015 |

Should you require any further information or have any questions, please contact your local Customer Service Centre.

Enquiries should always contain the below minimum details please:

- Full Company Name

- Full Headquarters Address (street, town, country)

- Telephone Number

- Business Identification Number (registration number, chamber of commerce number, VAT number, Government Gazette number)

- Contact Name

- SCN

- Order Date

The information in this report was last updated on Mar 23, 2015.

## D&B Rating Glossary

**D&B Rating -** The D&B Rating consists of two parts, the Financial Strength Indicator and the Risk Indicator.
For example: in the case of a 2A 4 rating, 2A means the financial strength of the business and 4 is the risk indicator.

The Risk Indicator is used in conjunction with the Financial Strength Indicator. The Risk Indicator reflects D&B's opinion of the risk associated with trading with a specific business, notably the likelihood of business continuance or failure over the next 12 months. Created from expert rules systems, the Risk Indicator is refreshed whenever data is loaded onto our databases. Please see the table below for the Risk Indicators and their corresponding values.

**Risk Indicators**

| 4 | Significant level of risk | Take suitable assurances before extending credit |
|---|---|---|
| 3 | Greater than average risk | Proceed with transaction but monitor closely |
| 2 | Low risk | Proceed with transaction |
| 1 | Minimal risk | Proceed with transaction - offer terms required |
| - | Insufficient information to assign a risk indicator | No public information or D&B proprietary information available to indicate trading activity |

The Financial Strength Indicator is based on either Net Worth or Issued Capital. The table below contains the possible values.

| Financial Strength Indicator | | Range | |
|---|---|---|---|
| Net Worth | Capital | FROM | TO |
| 5A | 5AA | $60 million | And above |
| 4A | 4AA | $25 million | $60 million |

dun&bradstreet

| 3A | 3AA | $12 million | $25 million |
| 2A | 2AA | $2.5 million | $12 million |
| 1A | 1AA | $1.2 million | $2.5 million |
| A | AA | $600,000 | $1.2 million |
| B | BB | $345,000 | $600,000 |
| C | CC | $175,000 | $345,000 |
| D | DD | $120,000 | $175,000 |
| E | EE | $60,000 | $120,000 |
| F | FF | $35,000 | $60,000 |
| G | GG | $15,000 | $35,000 |
| H | HH | 0 | $15,000 |
| **Alternate Ratings Used** | | | |
| N | Financial Strength is negative | | |
| O | Financial Strength is undisclosed | | |
| NB | New Business: Less than 24 months | | |
| NQ | Out of Business: Business has ceased to trade | | |

## Financial Ratio Glossary

Key Business Ratios are used to identify irregularities in the status and future potential of a company.

| Name | Formula | Explanation |
|---|---|---|
| **Current Ratio (x)** | Total Current Assets / Total Current Liabilities | This ratio shows the cover by current assets of short term creditors, and the higher the ratio the more assurance there is that payment of creditors can be met. |
| **Solvency Ratio %** | ((Current Liabilities + Long Term Liabilities) / Tangible Net Worth) x 100 | From this can be seen the extent to which the company is financed by creditors and debt rather than permanent finance.<br><br>The higher the ratio the more likely it is that debt (either short term or long term) will be a burden to the company. The effect is higher interest charges, lower profits and a squeeze on liquidity to the disadvantage of creditors. |
| **Fixed Assets to Net Worth (%)** | (Total Fixed Assets / Tangible Net Worth)x 100 | The proportion of net worth that consists of fixed assets will vary greatly from industry to industry, but in general terms a company is under capitalised if fixed assets exceed net worth. In this case it is possible that the company has too much debt, and it should therefore be examined with care.<br><br>If on the other hand fixed assets are much lower than net worth the company is over capitalised and is either extremely cautious or in a position to expand, thus a ratio either well in excess of the median, or well below it, means that the company should be looked at with care. |
| **Current Liabilities to Net Worth (%)** | (Total Current Liabilities / Tangible Net Worth) x100 | This contrasts the funds that creditors are temporarily risking with a company with the funds permanently invested by the owners.<br><br>The higher the ratio the less security for creditors. Care should be exercised when selling to any company with creditors of less than one year exceeding two thirds of net worth. |
| **Asset Turnover (%)** | (Turnover / Total Assets(including Intangibles)) x 100 | This ratio measures how efficient the company's management has been in generating sales from the assets at its disposal.<br><br>The measure can vary considerably from industry to industry and should therefore be judged according to the industry norm. |
| **Sales to net working capital (x)** | Turnover / Net working capital * | This ratio indicates whether a company is overtrading (handling an excessive volume of sales in relation to working capital). Companies with substantial sales gains often reach a level where their working capital becomes strained.<br><br>Even if they maintain an adequate total investment for the volume being generated (assets to sales) that investment may be so centred in fixed assets or other non-current items that it will be difficult to continue meeting all current obligations. A ratio falling into either an extremely high or low position may indicate potential problems. |
| **Assets to Sales (%)** | (Total Assets(including Intagibles) / Turnover) x 100 | This correlates sales with the total investment that is used to generate those sales. By comparing a company's ratio with industry norms it can be be determined whether the business is overtrading or conversely, carrying more assets than needed for its sales volume.<br><br>Abnormally low ratios can indicate overtrading which may lead to financial difficulties if not corrected. Extremely high ratios can be the result of a too |

dun&bradstreet

| | | conservative management or too low a level of turnover. |
|---|---|---|
| Profit Margin (%) | (Profit before Tax / Turnover) x 100 | This reveals the profits earned per pound of sales and therefore measures the efficiency of the operation.<br><br>This ratio is an indicator of the business'ability to withstand adverse conditions such as falling prices, rising costs or declining sales |
| Shareholders' Return (%) | (Profit before Tax / Tangible Net Worth') x 100 | This ratio is used to analyse the ability of the company's management to realise an adequate return on the capital invested by the owners of the business. There is a tendency to look increasingly to this ratio as a final measure of profitability.<br><br>Generally, a relationship of at least 10% is regarded as desirable for providing dividends plus funds for future growth. |
| Return on assets (%) | (Profit before Tax / Total Assets) x 100 | This is the key indicator of profitability for a company it matches operational profits with the assets available to earn a return.<br><br>Companies using their assets efficiently will have a relative high return while less well run businesses will have a relatively low return |
| Sales per Employee (000) | Turnover / Employees | This gives an indication of the efficiency of the labour force. This ratio will vary considerable from industry to industry |
| Profit per Employee (000) | Profit before Tax / Employees | This ratio gives a guide as to how effectively the labour force is utilised, end is the best way to measure productivity of labour investment |

### Glossary of Legal Forms

| Legal Form | Legal Form (local) |
|---|---|
| Sole Proprietorship | Ατομική Επιχείρηση |
| Partnership | Συνεταιρισμός |
| Joint Venture | Κοινοπραξία |
| Societe European | Ευρωπαϊκή Εταιρεία |
| Private Limited Co | Ιδιωτική Εταιρεία Περιορισμένης Ευθύνης |
| Public Limited Co | Δημόσια Εταιρεία Περιορισμένης Ευθύνης |
| Foreign Co. | Αλλοδαπή Εταιρεία |
| Business Names | Εμπορική Επωνυμία |
| Co-Operative | Συνεργατισμός |

### Glossary of Currencies

| Abbrev. | Currency Name | Abbrev. | Currency Name |
|---|---|---|---|
| AMD | Armenian Dram | LAT | Latvian Lats |
| AZM | Azerbaijani Manat (Old) | LEI | Romanian Lei (Old) |
| AZN | Azerbaijani Manat (New) | LEK | Albanian Lek |
| BAM | Bosnia-Herzegovina Convertible Mark | LEV | Bulgarian Leva |
| BLR | Belarusian Rouble | LTS | Lithuanian Litas |
| RSD | Serbian Dinar | MAL | Maltese Lira |
| CYL | Cypriot Pounds | MLL | Moldovan Leu |
| DRA | Greek Drachma | RON | Romanian Lei (New) |
| EUR | Euro | ROU | Russian Roubles |
| EEK | Estonian Kroon | TJS | Tajik Somoni |
| GBL | Gibraltar Pounds | TKM | Turkmen Manat |
| GEL | Georgian Lari | TUL | Turkish Lira (old) |
| HRD | Croatian Dinar | UKL | Pounds Sterling UK |
| HRK | Croatian Kuna | USD | U S Dollars |
| HRY | Ukrainian Hryvnia | UZS | Uzbekistani Sum |
| IKR | Icelandic Krona | YTL | Turkish Lira (new) |
| KYS | Kyrgyzstani Som | YUD | Yugoslavian Dinar |
| KZT | Kazakhstani Tenge | ZWD | Zimbabwe Dollars |

### Glossary of Key Expressions

| National Revenue Agency | State body responsible for establishing, securing and collecting public receivables and certain statutory private receivables |
|---|---|
| Tax Debts | Debt associated with the failure to pay taxes to the federal or state government |
| Court Debt Settlement Procedure | Legal process of reorganization of the debtor in financial difficulties |



| Frozen Bank Accounts | Unpaid receivables can file to the court of justice for payment, the debtor's has a legal time period to settle debts or their bank accounts are and remain frozen until the debt is covered |
| SODRA | Delays in paying mandatory Social Security Tax (Lithuania) |

## Confidentiality

CONFIDENTIAL....THIS INFORMATION IS PROVIDED BY D&B EUROPE LTD SUBJECT TO THE TERMS AND CONDITIONS OF YOUR SUBSCRIPTION CONTRACT AND IS NOT TO BE DISCLOSED.

**Worldwide Network**
**D&B**
**Deal is with Confidence**

This report is forwarded to the Subscriber in strict confidence for the use by the Subscriber as one factor to consider in connection with credit and other business decisions. This report contains information compiled from information which Dun & Bradstreet does not control and which has not been verified unless otherwise indicated in this report. Dun & Bradstreet therefore cannot accept responsibility for the accuracy, completeness or timeliness of the report. Dun & Bradstreet disclaims all liability for any loss or damage arising out of or in anyway related to the contents of this report.

COPYRIGHT 2015 DUN & BRADSTREET. THIS REPORT MAY NOT BE REPRODUCED IN WHOLE OR IN PART IN ANY FORM OR MANNER WHATSOEVER.

# EXHIBIT 4

Central Bank of Cyprus http://www.centralbank.gov.cy/nqcontent.cfm?a_id=8088

Home › The Bank

# The Bank

The Central Bank of Cyprus was established in 1963, shortly after Cyprus gained its independence, as an autonomous institution in accordance with the *Central Bank of Cyprus Law 1963* and the relevant articles of the Constitution. Today the Bank is governed by the *Central Bank of Cyprus Laws 2002-2007,* which ensure the Bank's



independence as well as compatibility with the relevant provisions of the Treaty establishing the European Community and the Statute of the European System of Central Banks and of the European Central Bank. The law's amendment in March 2007 paved the way for the legal integration of the Bank into the Eurosystem in January 2008.

The main functions of the Central Bank include:

- implementing the European Central Bank's monetary policy decisions;
- holding and managing the official international reserves;
- supervising banks;
- safeguarding the stability of the financial system;
- promoting, regulating and overseeing the smooth operation of payment and settlement systems;
- acting as banker for the government.

During the early years of its operation, the Bank undertook fully the functions of banker to the government and the management of international reserves as well as the administration of

exchange controls. In parallel, the Bank strengthened its internal structure and prepared the regulatory framework for banking supervision, also setting up the operational framework for the implementation of monetary policy. In the late 1960s and early 1970s, monetary policy became more active, while bank supervision was formalised. During this period government stocks were first issued, with a view to promoting savings and the non-inflationary financing of fiscal deficits.

Following the economic dislocation and disruption caused by the Turkish invasion in 1974, the Central Bank was actively involved in the reactivation of the economy. Thus, the Bank pursued an expansionary monetary policy and facilitated the financing of the housing needs of the refugees and the replenishment of lost capital stock and infrastructure. The role of the Bank was instrumental in the achievement of a rapid improvement in economic conditions that took place subsequently. During the post-invasion period the Bank also assumed a leading role in promoting Cyprus as a regional financial and business centre. Over the years, the international business sector, in particular, has shown a rapid progress and expansion, making a significant contribution to foreign exchange earnings and employment in the island.

Prior to accession to the EU in 2004, the Central Bank began to intensify its efforts towards the liberalisation of the financial sector, which was necessitated both by economic considerations as well as by the need to harmonise Cypriot economic structures and policies with those of the EU.

In 1996 the Central Bank moved away from the use of direct instruments for monitoring liquidity in the economy in favour of market-based tools. Thus, the liquid assets ratio, which was the main instrument of monetary policy, was abandoned. Main refinancing operations allotted through tenders were introduced as the primary tool of liquidity management. Auctions for the acceptance of deposits were also introduced as a means to mop-up excess liquidity. Under the current monetary policy framework, the minimum reserve account is the only operational account banks need to maintain with the Central Bank and there are two standing facilities aimed at providing and absorbing overnight liquidity, respectively. Since the beginning of 1996 government paper has been issued by the auction technique, which allows the interest rate to reflect market conditions. Thus, the operational set-up of monetary policy is broadly in line with EU practices.

A landmark in the liberalisation process of the financial sector was the abolition of the statutory interest rate ceiling on 1 January 2001.

In the area of capital movement liberalisation, the *Capital Movement Law* was enacted in July 2003 and came into force on 1 May 2004, the date of Cyprus's accession to the EU. This law, *inter alia*, repealed the *Exchange Control Law* thus abolishing all remaining exchange control restrictions.

As regards banking supervision, the objective of the Central Bank is to ensure the stability of the banking system, the minimization of systemic risk and the protection of depositors. The rules, policies and practices of the Bank are in line with the EU directives and the recommendations of the Basel Committee on Banking Supervision. The *Banking Law 1997* as amended, which establishes the legal framework within which banking business can be pursued, reflects the principles and rules of the EU directives on credit institutions. Furthermore, in accordance with the *Prevention* and *Suppression of Money Laundering Activities Laws 1996 - 2004*, the Central Bank is the supervisory authority for banks in this respect. In this connection, the Central Bank has issued a series of directives to banks concerning strict customer identification procedures, record keeping, recognition and reporting of suspicious transactions, the appointment and duties of money laundering compliance officers, and education and training of bank employees in anti-money laundering matters and in combating the finance of terrorism.

On 2 May 2005 the Cyprus pound joined the Exchange Rate Mechanism II (ERM II) at the pre-existing central parity of €1=CY£0,585274, unchanged from the parity at which it had been unilaterally pegged to the euro since 1999. The standard fluctuation margins of $\pm$ 15% were maintained, although in practice the pound fluctuated within the narrower range of $\pm$ 2,25, both before and after ERM II entry.

On 1 January 2008 Cyprus joined the euro area thus bringing to fruition the island's goal of becoming a fully integrated member of the EU. The conversion rate between the euro and the Cyprus pound was set at CY£0,585274 by the ECOFIN Council on 10 July 2007, in other words the same rate at which the Cyprus pound joined ERM II.

# EXHIBIT 5

Bank of Tanzania https://www.bot-tz.org/AboutBOT/BOTFunction.asp

## About the Bank

Primary Objective and Function of the Bank

Due to increasing evidence of the negative effects of inflation in recent years, there has emerged a growing consensus throughout the world that a monetary policy geared towards the pursuit of Price Stability, in the longer term, is the Central Bank's most significant contribution to achieving maximum growth for a nation's economic prosperity.

Furthermore, experience suggests one important rule: a Central Bank with too many things to do is likely to find itself doing none of them well. This is exactly what happened with the Bank of Tanzania, which did not succeed in achieving its multiple-policy objectives.

This international consensus is also reflected in the Bank of Tanzania Act, 2006 and its predecessor Bank of Tanzania Act, 1995, in which, as compared to the Bank of Tanzania Act, 1965, there has been a move away from multiple-policy objectives to a single-policy objective, i.e., Price Stability.

According to the Act "The primary objective of the Bank shall be to formulate, define and implement monetary policy, directed to the economic objective of maintaining domestic price stability, conducive to a balanced and sustainable growth of the national economy of Tanzania".

In other words, it is the primary responsibility of the Bank to establish monetary conditions conducive to Price Stability over time. Empirical evidence throughout the world suggests that Inflation is mainly caused by excessive creation of money.

Thus, in order to achieve Price Stability, Central Banks -by virtue of their ability to exert influence over the Money Supply process-have been given the task of regulating the quantity of money in circulation and of credit supplied to the economy, i.e., they have to conduct Monetary Policy. In this connection, the following is needed:

a.a steady and acceptable rate of increase in the Money Supply

b.a rate of increase in domestic bank credit expansion that will not place undue demand pressures on production resources and that must be consistent with the Money Supply objectives

c.realistic interest rates that must at least be above the level of the rate of inflation

d.a level of foreign reserves sufficient to enable the Central Bank to intervene in the foreign exchange market from time to time to smoothen out reversible short-term fluctuations, to meet import requirements, external obligations, and unexpected foreign exchange requirements in times of crisis

e.a relatively stable exchange rate for the national currency

f.the protection and development of sound and well-managed banking institutions, and

g.the encouragement of well-functioning and effective financial markets, including an efficient payments system.

Commensurate with the legal commitment of the Bank of Tanzania and realising the seriousness of the inflationary situation in the Country, the Bank is pooling all its efforts towards achieving Price Stability and has declared Inflation the Nation's Economic Enemy Number One.

1.The Importance of Price Stability

Price Stability implies that the Rate of Inflation, which is measured by the rate of increase of the National Consumer Price Index, has to be kept as low as possible, optimally within a longer-term average range of 0-5% (percentage change on the previous year). With a high rate of inflation, increases in wages and salaries cannot keep pace with the resulting erosion of purchasing power, and, hence, there will be decreases in real incomes for a large part of the population, which may result in corruption, an expansion of the informal sector, social friction, increased crime, and as a consequence of these factors, a decrease in economic efficiency. Furthermore, a high rate of inflation is an incentive for currency substitution and capital flight, it leads to an unplanned redistribution of income and wealth, mostly in favour of the rich, and, in general, it adversely affects decisions on consumption, saving, borrowing, and investment in productive capacity, by increasing uncertainty about future prices. Excessive inflation is also an impediment for achieving interest and exchange rate stability, which is very important for facilitating smooth economic development. Therefore, a combination of these factors could seriously impede the timely achievement of the Financial and Economic Restructuring Program. In this connection, it has to be stressed again that Price Stability is the decisive cornerstone of a successful economic policy geared towards sustainable medium- and longer-term economic growth. In other words, economic growth in the Country will be severely curtailed in the medium and longer term, if inflation continues to prevail at a high rate.

2.Prerequisites and Limits of an Effective Monetary Policy

To achieve this objective, the Bank formulates and implements Monetary Policy, by using instruments, such as Refinancing Policy, Minimum Reserve Policy, Open Market Policy, Foreign Exchange Interventions, and other instruments. The Ultimate Objective of Price Stability, however, can only be realised over time, if there are well-coordinated Monetary, Fiscal, and General Economic Policies, i.e., there has to be a concerted national effort. Monetary Policy, by itself, cannot achieve Price Stability, no matter how strict a Monetary Policy Stance the BOT is pursuing, it can only dampen inflation to some degree, depending on the inflationary pressures emanating from Fiscal and General Economic Policies. Furthermore, the attainment of the Monetary Policy Objectives has to be facilitated by a continued application of market-oriented policies in the financial sector (the creation and maintenance of an efficient payments system is included here), the public sector, the industrial sector, the agricultural sector, and the external payments area.

Subsidiary Functions of the Bank of Tanzania

Apart from the primary function, the Bank of Tanzania has important subsidiary central banking functions.

1.The Bank of Issue

The Bank has the sole right to issue notes and coins in Tanzania for the purpose of directly influencing the amount of currency in circulation outside banks, thereby providing the economy with sufficient, but if possible, non-inflationary liquidity.

1.The Bankers' Bank

This function includes the acceptance of deposits to act as prudential reserves for these banks (i.e., the Minimum Reserves), the willingness to discount commercial and government paper, and the commitment to act as lender of last resort to these banks. It also involves the provision of central clearance facilities for interbank transactions.

1.The Governments' Bank

The Bank is the banker and the fiscal agent for the Governments, and may be the depository of the Governments. The Bank may make temporary advances to the Governments through its overdraft facility, subject to repayment within 180 days and through purchases (direct or rediscounting) of treasury bills issued by the Governments, which mature not later than 12 months from the date of issue. The total amount outstanding at any time of advances made in this manner shall not exceed one eighth of the average budgeted revenues (average of the actual collected revenues of the previous three fiscal years, excluding loans, grants, other forms of economic aid, and all borrowing, whether short-or long-term) of each Government.

1.The Advisor to the Governments

The Bank may advise the Governments on any matter relating to its functions, powers, and duties. The Bank may also be requested to advise the Governments on any matter related to its functions, powers, duties, the credit conditions in Tanzania, or any proposal, measures, and transactions relating thereto.

1.The Guardian of the Country's International Reserves

The Bank is the depository of the official external assets of Tanzania, including gold and foreign currency reserves. Guarding international reserves may imply the determination of buying and selling rates of gold and foreign exchange in foreign exchange markets and/or the buying and selling of reserve assets for the purpose of sustaining the national currency's external value. It also includes reserve management, with a view to the prudential investment of the funds, with due regard to safety, liquidity, and profitability, and external debt management.

1.Supervision of Banks and Financial Institutions

In general, this activity involves ensuring that commercial banks and other financial institutions conduct their business on a sound prudential basis and according to the various laws and

regulations in force. It includes the supervision of banking conduct and the licensing of financial institutions. According to the Banking and Financial Institutions Act of 1991, and the new BOT Act, the main responsibilities of the Bank of Tanzania are:

a.implementation of prudential controls concerning capital adequacy, liquidity, concentration of credit and risk diversification, asset classification and provisioning, and prohibited activities

b.licensing of banks and financial institutions

c.facilitation and monitoring of a Deposit Insurance Fund, the purpose of which is the protection of small depositors, and

d.modification and monitoring of the Minimum Reserve Requirements and foreign exchange exposure.

1.Promotion of Financial Development

This refers to the establishment of an effective financial system, with the aid of which financial transactions necessary for the smooth functioning of the economy can be carried out with a minimum amount of cost and time involved. In this connection, the Bank has to be a facilitator of advanced clearing and transfer systems. It also implies that the necessary banking services, as, for example, deposit facilities and loan facilities, are made available. Included here is also the availability of certain specialised institutions, which could be represented, for example, by an industrial development bank and/or an agricultural development bank and micro-finance institutions, and the facilitation of a money market, a capital market, and a foreign exchange market.

The Current Institutional Framework of the Bank of Tanzania

Relations with the Governments It has been generally accepted by now that there is quite a valid case for Central Bank independence, since price stability is an important public good, like peace and civil rights, and politicians in a multi-party system, who have to work within the constraints of an electoral timetable, will always be tempted to engineer pre-electoral booms (vote-maximising behaviour), regardless of the longer-run inflationary consequences. Politicians tend to prefer monetary expansion to monetary contraction, since the following short-term trade-off exists between inflation and production and employment:

a.monetary expansion first results in a stimulation of production and increased employment, and only later there is an increase in the rate of inflation, and

b.monetary contraction first results in reduced production and less employment, and only after some time there is a reduction in the rate of inflation

Within the framework outlined above, there is also a tendency among politicians to avoid expenditure cuts and tax increases by borrowing from the Central Bank, which is the most inflationary method of financing government deficits. It is, therefore, very important to separate the powers of spending from those creating money. Experiences the world over in the past decades unambiguously suggest that countries, in which Central Banks enjoyed considerable

autonomy in monetary policy, recorded low inflation, while the opposite was the case in countries where Central Banks were under government influence. However, it has also been generally recognised that the Central Bank has to be accountable. Accountability relates to the responsibility of the Central Bankers to explain to the Public (Government, Parliament, and the General Public) what they are doing and why, i.e., there should be a genuine two-way communication (close consultations) between the Public and the Central Bank. This also implies educating the public on economic principles, i.e., the harmful effects of inflation have to be explained, in order to maintain public support. Concerning day-to-day monetary policy operations, the Bank of Tanzania is autonomous. However, commensurate with the accountability postulate, regular consultations shall be held between the Governor and the Governments on monetary policy. Furthermore, twice a year, prior to the commencement of the new fiscal year, and not more than six months, thereafter, the Governor has to present to the Union Minister of Finance the Monetary Policy Statement, for submission to the National Assembly, giving an indication of monetary and economic developments at present and the recent past, and expected economic developments and the monetary policy stance during the next 12 months. In the case of irreconcilable differences between the Governor and the Union Minister of Finance, the Governor can be directed to formulate and implement Monetary Policy for a period not exceeding 12 months, as specified by the Minister. The directive shall be published in the Gazette. The Board of Directors, the Bank's top decision making body, consists of the Governor and the Deputy Governor, who are appointed by the President for a period of five years (they shall not hold office for more than two terms), one representative each for the Governments (Principal Secretaries to the respective Ministries of Finance), and six other Directors. The latter are appointed by the Union Minister of Finance for a term of three years; they shall not hold office for more than three terms. In order to keep Government borrowing from the Central Bank within reasonable limits, borrowing benchmarks have been established for the Governments on the basis of revenue collected. As indicated already, the Bank of Tanzania is the advisor to the Governments on matters relating to finance.

# EXHIBIT 6



## PUBLIC NOTICE

Further to the Bank of Tanzania ("Bank") Press Release, which was issued on 20th July 2014 regarding FBME Bank Limited, the Bank wishes to inform the general public that, Central Bank of Cyprus (CBC) on Friday, 18th July took over the management of the operations of the branch of FBME Bank Ltd in Cyprus, following the issuance of Notice of Findings by the USA's Financial Crimes Enforcement Network (FinCEN), indicating FBME Bank as a Financial Institution of Primary Money Laundering Concern.

In view of the decision by CBC to take over FBME Bank's branch in Cyprus and the effects these developments may have on the banking system in Tanzania, the general public is hereby notified that the Bank of Tanzania, in compliance with the provisions of Section 56(1)(g)(iii) of the Banking and Financial Institutions Act, 2006 has taken over the management of FBME Bank Tanzania effective **24th July 2014**. The objective underlying this decision of the Bank of Tanzania is to ensure safety of customers' deposits and safeguard the stability of the entire banking system.

While the bank is under the Bank of Tanzania management, the public is further notified that the bank's operations will continue smoothly.

**BANK OF TANZANIA**
**24th JULY 2014**