# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FBME BANK LTD.**; and

**FBME LTD.**,

        Plaintiffs,

    v.

**JACOB LEW**, in his official capacity as
Secretary of the Treasury;

**U.S. DEPARTMENT OF THE
TREASURY**;

**JENNIFER SHASKY CALVERY**, in her
official capacity as Director of the Financial
Crimes Enforcement Network; and

**FINANCIAL CRIMES ENFORCEMENT
NETWORK**,

        Defendants.

Case No. 1:15-cv-01270-CRC

## REPLY MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................... iii

Introduction ................................................................................................................. 1

Argument ..................................................................................................................... 3

    I.       FBME Is Likely To Prevail On The Merits ........................................... 3

         A.     The Government Denied Meaningful Opportunity For Comment ............. 3

         B.     The Government Violated Due Process By Denying FBME Meaningful
              Notice And Opportunity To Be Heard ......................................................... 8

              1.     FBME is entitled to due process. ................................................. 8

              2.     FBME has not received due process. ............................................ 9

         C.     The Government's Procedural Errors Were Not Harmless. ...................... 12

         D.     The Final Rule Is Arbitrary And Capricious .............................................. 13

               1.     FinCEN failed to consider the relevant data .................................. 13

               2.     FinCEN failed to explain why the Final Rule satisfies
                    § 311's statutory requirements ...................................................... 20

              3.     FinCEN has still not addressed why the fifth special
                    measure is commensurate with FBME's alleged
                    transgressions. ............................................................................. 23

    II.     Absent An Injunction, FBME Will Suffer Irreparable Harm ................................. 26

    III.    The Equities Sharply Favor FBME .............................................................................. 28

    IV.    An Injunction Serves The Public Interest .................................................................. 29

Conclusion .................................................................................................................. 29

# TABLE OF AUTHORITIES

**Cases**

*32 County Sovereignty Committee v. Department of State*,
  292 F.3d 797 (D.C. Cir. 2002) ............................................................................. 8

*Abbott Laboratories v. Gardner*,
  387 U.S. 136 (1967) ........................................................................................... 2

*\*Al Haramain Islamic Foundation, Inc. v. U.S. Department of Treasury*,
  686 F.3d 965 (9th Cir. 2012) ................................................................. 9, 10, 13

*Al-Aqeel v. Paulson*,
  568 F. Supp. 2d 64 (D.D.C. 2008) ...................................................................... 7

*Alexander v. FBI*,
  186 F.R.D. 154 (D.D.C. 1999) ........................................................................... 7

*American Medical Ass'n v. Reno*,
  57 F.3d 1129 (D.C. Cir. 1995) ........................................................................... 4

*Bennett v. Spear*,
  520 U.S. 154 (1997) ......................................................................................... 28

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*,
  419 U.S. 281 (1974) ........................................................................................... 9

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ......................................................................................... 23

*Dickinson v. Zurko*,
  527 U.S. 150 (1999) ........................................................................................... 2

*Dinler v. City of New York*,
  607 F.3d 923 (2d Cir. 2010) .............................................................................. 7

*\*District Hospital Partners, L.P. v. Burwell*,
  786 F.3d 46 (D.C. Cir. 2015) ......................................................... 13, 14, 18, 23

*Electronic Privacy Information Center v. Department of Justice*,
  416 F. Supp. 2d 30 (D.D.C. 2006) ................................................................... 29

*Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*,
  2015 WL 1726435 (S.D.N.Y. Apr. 15, 2015) .................................................... 8

*Friedman v. Sebelius*,
  686 F.3d 813 (D.C. Cir. 2012) ......................................................................... 26

*Getty v. Federal Savings & Loan Insurance Corp.*,
805 F.2d 1050 (D.C. Cir. 1986)........................................................ 21

*\*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013)......................................................... 28

*In re Sealed Case*,
676 F.2d 793 (D.C. Cir. 1982)........................................................... 7

*KindHearts for Charitable Humanitarian Development, Inc. v. Geithner*,
647 F. Supp. 2d 857 (N.D. Ohio 2009) ......................................10, 11

*Klayman v. Obama*,
957 F. Supp. 2d 1 (D.D.C. 2013) .................................................... 29

*Londoner v. City and County of Denver*,
210 U.S. 373 (1908)........................................................................11

*Marsh v. Oregon Natural Resources Council*,
490 U.S. 360 (1989)....................................................................... 14

*Mathews v. Eldridge*,
424 U.S. 319 (1976)....................................................................... 12

*Michigan v. EPA*,
135 S. Ct. 2699 (2015)...................................................... 2, 20, 23

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009)...................................................... 28

*Missouri Public Service Commission v. FERC*,
234 F.3d 36 (D.C. Cir. 2000).......................................................... 21

*Motor Vehicle Manufacturers Ass'n of the United States v.*
*State Farm Mutual Automobile Insurance Co.*,
463 U.S. 29 (1983)................................................................... 13, 20

*National Council of Resistance of Iran v. Department of State*,
251 F.3d 192 (D.C. Cir. 2001).......................................................... 8

*National Shooting Sports Foundation, Inc. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013).......................................................... 23

*Ohio Bell Telephone Co. v. Public Utilities Commission*,
301 U.S. 292 (1937).................................................................... 9, 12

*\*People's Mojahedin Organization of Iran v. U.S. Department of State*,
613 F.3d 220 (D.C. Cir. 2010)................................................. passim

*Permapost Products, Inc. v. McHugh*,
    55 F. Supp. 3d 14 (D.D.C. 2014) ................................................................ 28

*Propert v. District of Columbia*,
    948 F.2d 1327 (D.C. Cir. 1991)................................................................11

*R.I.L-R v. Johnson*,
    --- F. Supp. 3d -----, 2015 WL 737117 (D.D.C. Feb. 20, 2015)........................................ 29

*Ralls Corp. v. Committee on Foreign Investment in the United States*,
    758 F.3d 296 (D.C. Cir. 2014)...................................................... passim

*United States Lines, Inc. v. Federal Maritime Commission*,
    584 F.2d 519 (D.C. Cir. 1978)................................................................ 5, 6

*United States v. Florida East Coast Railway Co.*,
    410 U.S. 224 (1973)................................................................11

*United States v. Owen*,
    415 F.2d 383 (8th Cir. 1969) ................................................................ 9

*Withrow v. Larkin*,
    421 U.S. 35 (1975)................................................................11

*Zevallos v. Obama*,
    10 F. Supp. 3d 111 (D.D.C. 2014),
    *aff'd*, --- F.3d ----, 2015 WL 4153882 (D.C. Cir. July 10, 2015)..................................... 13

**Statutes**

31 U.S.C. § 5318.................................................................................................. 7, 8

31 U.S.C. § 5318A (Section 311 of the USA PATRIOT Act) ................................................. passim

**Other Authorities**

H.R. Conf. Rep. 108-381 (2003)......................................................................... 8, 10

**Regulations**

31 C.F.R. § 1020.320 .......................................................................... 7, 8, 19, 20

70 Fed. Reg. 21362 (Apr. 26, 2005) ........................................................................ 25

71 Fed. Reg. 39606 (July 13, 2006)......................................................................... 26

72 Fed. Reg. 12730 (Mar. 19, 2007) ........................................................................ 25

79 Fed. Reg. 42639 (July 22, 2014) ("Notice of Finding") ........................................................... 21

80 Fed. Reg. 13304 (Mar. 13, 2015) ............................................................................................. 25

80 Fed. Reg. 45057 (July 29, 2015) ("Final Rule") ........................................................ 1, 6, 14, 15

# INTRODUCTION

The Government's opposition brief ("Opposition" or "Opp.") only underscores the procedural and substantive errors that infect FinCEN's Final Rule through root and branch.[1] Here, FinCEN perpetuates the secrecy that shrouded the administrative proceedings by relying heavily on purported evidence it still refuses to share with FBME or its counsel on the grounds that the evidence is classified or privileged. Although the Executive Branch receives appropriate deference when invoking national security, the deference is not absolute. Courts retain responsibility for ensuring that the Executive Branch abides by constitutional safeguards, including the Due Process Clause. And FinCEN is trampling that constitutional guarantee.

Even if FinCEN were justified in secreting away the classified and privileged data underlying the Final Rule—which it is not—FinCEN has played a bigger game of "Hide the Ball" by withholding *unclassified*, *nonprivileged* materials it relied on. Buried in a footnote near the end of its brief, FinCEN concedes that it is now, *for the first time*, producing "the actual unclassified, nonprivileged documents [it] relied upon" to promulgate the Final Rule. Opp. 37 n.15, ECF 23-1; *see* Brooker Decl. Attachs. A–B, ECF 21-1 & 21-2. Governing law confirms that an agency violates due process when—as FinCEN did here—it "permit[s] access to the unclassified portion of the record only *after* the decision was final." *People's Mojahedin Organization of Iran v. U.S. Department of State*, 613 F.3d 220, 227 (D.C. Cir. 2010).

Just as FinCEN's factual justification for the Final Rule comes impermissibly late, so does its statutory justification. In a declaration accompanying its brief, FinCEN now offers, *for the first time*, its analysis of the key statutory term, "primary money laundering concern."

---

[1] We recycle our opening brief's abbreviations: FBME Bank Ltd. is "FBME" or "the Bank"; the "Final Rule" is 80 Fed. Reg. 45057 (July 29, 2015); "FinCEN" is the Financial Crimes Enforcement Network; and "§ 311" is § 311 of the PATRIOT Act, 31 U.S.C. § 5318A.

Shasky Calvery Decl., ECF 20.  The declaration is meant, it appears, to make up for the omission of any such analysis by FinCEN in the actual administrative record.  Yet it is "the foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action."  *Michigan v. EPA*, 135 S. Ct. 2699, 2710 (2015).  FinCEN cannot stave off an otherwise appropriate preliminary injunction by using a *post hoc* declaration to patch up legal deficiencies in the Final Rule.

Even if its after-the-fact submissions are considered, however, FinCEN's Final Rule would *still* be arbitrary and capricious.  In the Final Rule, FinCEN has relied on outdated, incomplete, and inaccurate data; it has imposed an excessive and disproportionate penalty without considering intermediate alternatives; and it has failed to explain itself in reference to the statutory factors.  On this last point, it is telling that FinCEN omits from its Opposition any response to FBME's argument that FinCEN unreasonably failed to consider the § 311 factors prescribed by statute—such as "the extent to which" FBME was "used to facilitate or promote money laundering."  *Compare* Plaintiffs' Memorandum ("PI Brief") at 38–39, ECF 3-1 (quoting 31 U.S.C. § 5318A(c)(2)(B)(i)), *with* Opp. 16–32 (FinCEN's APA arguments).

At bottom, FinCEN's defense of the Final Rule depends upon abject deference— deference under which FinCEN's say-so would suffice to justify maximal sanction under § 311.  But such deference is out of place in this case.  "The APA requires meaningful review," *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999), as a basic, important right of any party aggrieved by agency action.  *See, e.g.*, *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–41 (1967).  So it is only appropriate for FinCEN to be held to account before this Court as other agencies would—for its process, its record, its reasoning, and its sanction.  For reasons that will be

apparent when the Court evaluates the merits, FinCEN's § 311 determination does not pass muster under either the U.S. Constitution or the Administrative Procedure Act.

For all the merits disagreements that divide the parties, a key aspect of the process ahead unites us:  We agree that the merits can be briefed and adjudicated swiftly.  Specifically, we embrace the Government's proposal (*see* Opp. 47 & n.26) to brief the merits within 30 days of the ruling on the preliminary injunction, and we will be glad to work with the Government to propose a briefing schedule towards that end.  The question then becomes whether this Court should preserve the *status quo* by enjoining the Final Rule on a short-term basis, as it adjudicates important merits issues in a matter of mere weeks.  The answer is a resounding "yes."

There should be no denying that a preliminary injunction would avert pronounced, irreparable harm that is otherwise days away.  The Final Rule by its terms will cut the Bank off from U.S. dollars and correspondent banks on which the Bank continues to depend for its existing business.  Sworn declarations so attest.  Were that not enough, foreign regulators, particularly the Central Bank of Cyprus, are relying on the Final Rule to impose additional adverse actions on the Bank, potentially including liquidation.  No remotely commensurate urgency weighs on the other side of the scale.  Because FinCEN itself took a full year before arriving at the Final Rule, it cannot credibly insist that the Final Rule take effect before judicial review runs its course—as it will in a matter of weeks.  In sum, the equities no less than the merits weigh overwhelmingly in favor of the preliminary injunction now sought.

## ARGUMENT

## I.     FBME IS LIKELY TO PREVAIL ON THE MERITS

### A.     The Government Denied Meaningful Opportunity For Comment

As FBME explained in its opening brief, the Government violated the APA by withholding specifics of its allegations against FBME along with its underlying evidence,

thereby frustrating FBME's ability to comment meaningfully. PI Brief 23–28. In response to FBME's persistent requests for more information, FinCEN stonewalled. Its constant refrain was: "FinCEN is unable to release additional information in response to this question beyond the statements within the Notice of Finding." Peters Decl. Ex. Q.

FinCEN nonetheless argues that FBME had "ample" opportunity to comment; in particular, FinCEN notes that FBME filed its public comment, made multiple additional submissions, and attempted to communicate with FinCEN by phone and email. Opp. 26–28. Although this opportunity to comment may have been numerically "ample," it was not substantively "meaningful and informed," as required by the APA. *E.g.*, *American Medical Ass'n v. Reno*, 57 F.3d 1129, 1132 (D.C. Cir. 1995). In its various submissions, FBME did all it could to hit the right targets, but FinCEN kept hiding them in the dark. The opportunity to present evidence and interact with the agency "is plainly not enough to satisfy due process" where the plaintiff "never had the opportunity to tailor its submission to the [agency's] concerns or rebut the factual premises underlying [its] action." *Ralls Corp. v. Committee on Foreign Investment in the United States*, 758 F.3d 296, 319–20 (D.C. Cir. 2014).[2]

FinCEN does not deny that it withheld the factual evidence it relied on to promulgate the Final Rule. Instead, it argues that the APA's normal disclosure requirements were inoperative because the information FinCEN withheld was classified or privileged. Opp. 28–32. This argument does not fly, for at least two reasons.

**First**, FinCEN inexplicably failed to produce *unclassified*, *nonprivileged* information. As FinCEN concedes in its brief, it "has not until now provided FBME the actual unclassified,

---

[2] Although *Ralls Corp.* was decided under the Due Process Clause, its reasoning has equivalent force under the APA; in the interests of constitutional avoidance, it is preferable to locate the error under the statute rather than the Constitution.

nonprivileged documents relied upon." Opp. 37 n.15. This new bundle of material contains claims that are at best tendentious and would have naturally sparked responsive comments: By way of example, one source indicates that Cyprus is a haven for money launderers and other illicit financiers, and another indicates that an Italian political official made suspicious transfers through FBME in 2012. Brooker Decl. Attach. B at 61–66, 155–58. Because FinCEN never previously identified these allegations and sources as informing its § 311 determinations, however, FBME had no opportunity to address them.

In cases like this that involve both classified and unclassified materials, the D.C. Circuit holds that the agency commits reversible error if it takes its final action without having produced all of the unclassified record. *E.g.*, *Ralls Corp.*, 758 F.3d at 320. To produce belatedly denies "opportunity to respond to that material *before* [the agency issues its decision]," which is a prerequisite for meaningful commentary. *People's Mojahedin*, 613 F.3d at 228; *see also United States Lines, Inc. v. Federal Maritime Commission*, 584 F.2d 519, 535 (D.C. Cir. 1978) (an agency decision based on secret information "simply cannot withstand scrutiny" under the APA).

Rather astonishingly, FinCEN now tries to blame FBME for the agency's failure to divulge these materials. As FinCEN puts it, FBME did not ask the right "specific questions" (using magic words?) to unlock these hitherto unseen documents. Opp. 37 n.15.[3] Of course the APA obliges the *agency* to produce materials it is relying upon—not a *commenter* to divine what those materials are and demand them. In any event, FBME *did* ask for this material the

---

[3] The Government's current explanation for its withholding is at odds with its prior statements that FinCEN was *unable* to disclose additional information. *See* Shasky Calvery Decl. ¶ 44 (FinCEN "unable" to produce more "because it would reveal information that was classified or otherwise protected from disclosure by statute"); Peters Decl. Ex. Q ("FinCEN is unable to release additional information in response to this question beyond the statements within the Notice of Finding.").

only way it could; without knowing *what* specifically was being withheld, FBME pressed again and again for relevant specifics, to no avail.[4]

FinCEN also asserts that the newly released materials add nothing to what was in the Notice of Finding. Opp. 37 n.15. This assertion squares neither with the documents themselves (the Notice of Finding did not, for example, mention allegedly suspicious transfers with an Italian political official), nor with FinCEN's acknowledgement that these are documents it "*relied upon*," Opp. 37 n.15. The law requires that "an affected party be informed of the official action, be given access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence." *Ralls Corp.*, 758 F.3d at 319.[5] Because FinCEN disregarded that requirement, FBME is likely to prevail on the merits.

**Second**, FinCEN has no legal basis for both relying on privileged (but unclassified) information *and* withholding it. The default rule under the APA is that critical factual material relied on by the agency must be disclosed to interested parties, and not just a reviewing court, for that is the only way to ensure meaningful commentary on the agency action. *See United States Lines*, 584 F.2d at 534; PI Brief 23–26. Section 311(f) carves out an exception to that rule by expressly authorizing FinCEN to submit "classified information" *ex parte* for judicial review. 31 U.S.C. § 5318A(f). Yet nothing in § 311 or any other authority that FinCEN cites authorizes it to submit *privileged* but *unclassified* information *ex parte*, as it apparently has done here. *See* ECF 16 ("the Government is lodging for submission . . . privileged information" *ex parte*).

---

4   *See, e.g.*, Peters Decl. Ex. O at 2 ("[W]e seek general information sufficient to help FBME identify and deter the activity alleged in the NOF."), Ex. P at 2 ("[W]e reaffirm our request for additional information beyond the general assertions in the NOF to help identify, report, and close [problematic] accounts."); *see also id.* Exs. C, D, H, J, L, M.

5   Far from being theoretical, the importance of the opportunity FinCEN denied FBME is vividly demonstrated by this administrative record: In the one instance that FinCEN *disclosed* that it was basing an allegation on a specific news article, FBME debunked the allegation to the point that FinCEN acknowledged its mistake. *See* 80 Fed. Reg. at 45060.

FinCEN may properly invoke an evidentiary privilege to *withhold* a document, but it cannot simultaneously use that document as secret evidence against FBME. Otherwise, the Government could do what no litigant can: wield privilege as both sword and shield. *See, e.g.*, *In re Sealed Case*, 676 F.2d 793, 818 (D.C. Cir. 1982) ("Courts need not allow a claim of privilege when the party claiming the privilege seeks to use it in a way that is not consistent with the purpose of the privilege."). Whatever privileged information FinCEN has submitted to the Court should either be stricken from this Court's consideration or deemed nonprivileged and disclosed to FBME. *See, e.g.*, *Dinler v. City of New York*, 607 F.3d 923, 946–47 (2d Cir. 2010) (use of law-enforcement-privileged material as both a sword and a shield can waive privilege, although no waiver occurred under the particular facts of *Dinler*).[6]

In any event, the Government has not borne its burden of showing that a privilege applies here. Indeed, the Government has not even specified *which privileges* it purportedly relies on. One appears to be the law-enforcement privilege, *see* Opp. 28 n.9, but the Government has not even attempted to satisfy the requirements for invoking this privilege, such as by providing the requisite affidavits from government officials and showing that the need to withhold trumps the need to disclose under the applicable 10-factor test. *See Alexander v. FBI*, 186 F.R.D. 154, 167 (D.D.C. 1999).

FinCEN also claims that a statute (31 U.S.C. § 5318(g)) and a regulation (31 C.F.R. § 1020.320(e)(1)) bar it from disclosing Suspicious Activity Reports ("SARs") that formed part of "the basis" for the Final Rule. Opp. 29–30. Far from it. That regulation authorizes government officials to disclose SARs "as necessary to fulfill official duties," 31 C.F.R.

---

[6] To support its sword-and-shield approach to privilege, the Government cites (Opp. 31 n.10) *Al-Aqeel v. Paulson*, which did no more than recognize existence of the law-enforcement privilege. 568 F. Supp. 2d 64, 72–73 (D.D.C. 2008). Unlike the plaintiff in that case, FBME is arguing that privilege was waived or is inapplicable, not that it is nonexistent.

§ 1020.320(e)(2), which would encompass producing those materials in this judicial proceeding to the extent that they underlie the Government's case. *See also* 31 U.S.C. § 5318(g)(2)(A)(ii) (authorizing disclosure when "necessary to fulfill . . . official duties"). The regulation further provides that banks can freely disclose the "underlying facts, transactions, and documents upon which a SAR is based." 31 C.F.R. § 1020.320(e)(1)(ii)(A)(2); *see Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, 2015 WL 1726435, at *2–3 (S.D.N.Y. Apr. 15, 2015). FinCEN thus has no basis for withholding the SARs, much less their underlying facts.

### B. The Government Violated Due Process By Denying FBME Meaningful Notice And Opportunity To Be Heard

#### 1. FBME is entitled to due process.

FinCEN argues that FBME cannot invoke the Due Process Clause because FBME supposedly lacks sufficient contacts with the United States. Opp. 32–34. But any entity with "property" in the United States is entitled to due process. *Ralls Corp.*, 758 F.3d at 316. And FBME, among other things, holds substantial funds in a bank account in North Carolina. Saab Decl. ¶¶ 34–38. That U.S. bank account—even if it were a "small bank account," which this one is not—itself triggers due process. *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192, 206, 208–09 (D.C. Cir. 2001); *see also 32 County Sovereignty Committee v. Department of State*, 292 F.3d 797, 799 (D.C. Cir. 2002) (foreign entity entitled to due process if it possesses a "controlling interest in property located within the United States").

Furthermore, Congress made clear that due-process protections attach to *any* entity designated under § 311. When Congress amended § 311 in 2003 to authorize the use of classified information, it explained that it intended courts to assure "due process of law" to all parties confronting classified evidence. H.R. Conf. Rep. 108-381, at 55 (2003). To the extent

there were any doubt as a matter of constitutional law, therefore, § 311 should be read as building in the requirement of due process as a matter of statute.

### 2. FBME has not received due process.

According to blackletter law, an agency violates the Due Process Clause when it uses evidence "in a way that forecloses an opportunity to offer a contrary presentation." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 288 n.4 (1974); *accord, e.g.*, *United States v. Owen*, 415 F.2d 383, 388 (8th Cir. 1969) ("Inherent in the most narrow view of due process is the right to know of adverse evidence and the opportunity to rebut its truth and relevance."). Accordingly, due process generally forbids agencies from relying on secret evidence. *E.g.*, *Ohio Bell Telephone Co. v. Public Utilities Commission*, 301 U.S. 292 (1937).

There is, to be sure, a narrow exception to this general rule, one that permits agencies to act on classified information without divulging it. *E.g.*, *Ralls Corp.*, 758 F.3d at 319. The exception accommodates national-security concerns that would arise from divulging classified material. But that narrow exception can go no further than necessary.

Due process requires agencies using classified information to take affirmative steps to mitigate the inherent unfairness of relying on secret evidence. *Al Haramain Islamic Foundation, Inc. v. U.S. Department of Treasury*, 686 F.3d 965, 982–84 (9th Cir. 2012). The more an agency relies on classified material, the more the agency must do to level the playing field. *See People's Mojahedin*, 613 F.3d at 230–31 (noting that certain procedures for the use of classified material satisfied due process so long as "the Secretary has not relied critically on classified material and the unclassified material provided to the [regulated entity] is sufficient to justify the [agency action]"). So, for example, when an agency uses classified information to designate an entity a terrorist organization, due process requires the agency to prepare unclassified summaries of the classified material or to share the classified materials with

attorneys for the designated entity (if they have appropriate security clearances), where doing so would not compromise national security. *Al Haramain*, 686 F.3d at 982–84.

Congress was keenly aware of the due-process concerns implicated by an agency's use of classified information in a § 311 proceeding. The relevant conference report explained that, when "administering a proceeding in which classified information is submitted to a court under this provision, the Conferees intend that *a court will fashion procedures*, necessary to assure a moving party *due process of law*, that resemble those already required in similar situations in which the government, or another party, seeks to base a claim or defense on classified information." H.R. Conf. Rep. 108-381, at 55 (emphasis added). This Court thus has an obligation to "fashion procedures" that afford FBME "due process of law."

Here, FinCEN admits its action was based on a "substantial amount" of classified information. Opp. 1; *id.* at 3. This "substantial" reliance necessitated *some* effort at accommodating FBME's rights. But FinCEN went the opposite direction, withholding even the *un*classified administrative record before issuing its Final Rule, thereby flouting due process. *Ralls Corp.*, 758 F.3d at 320; *People's Mojahedin*, 613 F.3d at 228; *KindHearts for Charitable Humanitarian Development, Inc. v. Geithner*, 647 F. Supp. 2d 857, 897–908 (N.D. Ohio 2009). Even setting that aside, FinCEN eschewed reasonable measures for protecting FBME's rights, such as making classified materials available to FBME's attorneys with appropriate security clearances or providing unclassified summaries of classified information. *See Al Haramain*, 686 F.3d at 982–84. Its approach was inimical to due process.

FinCEN floats a few justifications for its constitutionally deficient process, but none withstands scrutiny. For example, FinCEN argues (Opp. 37) that FBME had no right to a hearing because § 311 calls for the fifth special measure to be imposed by "regulation" without

also specifying that a hearing is required.   31 U.S.C. § 5318A(a)(2)(C).   Consistent with the Supremacy Clause, however, the statute yields to the Constitution, rather than *vice versa*.   And the Due Process Clause requires notice *and an opportunity to be heard* whenever the Government targets a particular individual for a deprivation of property, even when that deprivation is accomplished through a rulemaking.   *Londoner v. City and County of Denver*, 210 U.S. 373, 385–86 (1908); *see United States v. Florida East Coast Railway Co.*, 410 U.S. 224, 244–45 (1973).   Irrespective of whether *§ 311* calls for a hearing, therefore, *due process* certainly required one under the facts of this case.   PI Brief 28–34.

Next, citing *Withrow v. Larkin*, 421 U.S. 35, 47 (1975), FinCEN argues that due process never requires an agency to appoint an independent third-party arbiter to preside over the requisite hearing unless the agency's chosen decisionmaker has a pecuniary or personal bias. Opp. 37–38.   But *Withrow* rests on the assumption that the regulated party would receive an "adversary" hearing at which it had a meaningful opportunity to contest all of the evidence against it.   421 U.S. at 57–58.   In a case like this, where the agency relied on secret evidence that the regulated party could not examine, let alone refute, there was no *adversarial* process, so the Government has never been put to its proof.   Reliance upon untested evidence creates such "an enormous risk of error," *KindHearts*, 710 F. Supp. 2d at 659, that a neutral third-party arbiter distinct from the Government's investigators is essential to afford some semblance of fairness. Without a neutral arbiter who could review *all* the evidence afresh—including the secret evidence—FBME lacked a *meaningful* opportunity to be heard.   *See Propert v. District of Columbia*, 948 F.2d 1327, 1333–34 (D.C. Cir. 1991).

FinCEN also contends that FBME received due process because it received more process that an entity designated in emergency proceedings as a terrorist organization.   Opp. 35–36

(discussing FTO and SDGT designations). This kind of argument by analogy does not belong in the due-process context, where applicable procedures vary according to the particular circumstances surrounding the governmental deprivation. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). When the Executive Branch confronts a terrorist organization, national-security concerns tend to be so great that they justify an immediate deprivation of the organization's property, with only minimal notice and a post-deprivation hearing afterwards. In terms of the seminal *Mathews* factors, the Government's interest in designating a terrorist organization (factor three), is so great as to trump both the private entity's interest (factor one) and the risk of erroneous deprivation (factor two). But that is a far cry from this case, where FinCEN acted unilaterally, pursuant to a statute that Congress subjected to APA review, in circumstances where FinCEN was content to wait a full year to publish a Final Rule. Given the lack of urgency in this proceeding, the *Mathews* test required FinCEN to provide a more robust process than is called for in the terrorist context or than it gave to FBME. *See* PI Brief 28–34.[7]

## C. The Government's Procedural Errors Were Not Harmless.

The Government suggests in passing that its failure to afford FBME adequate process was harmless. Opp. 32 n.11. It is well established, however, that an agency's failure to reveal the entire unclassified administrative record or otherwise afford meaningful opportunity to comment is not harmless. *E.g.*, *People's Mojahedin*, 613 F.3d at 228–30 & n.6. The decisions FinCEN cites are not to the contrary. In *Zevallos v. Obama*, Judge Contreras rejected the plaintiff's challenge under the APA's prompt-notice requirement because, "whether [the agency]

---

[7] The Government also asserts, without benefit of any citation, that FBME waived any due-process claim by failing to raise the issue during the administrative process. Opp. 39 n.18. In fact, FBME *repeatedly* requested that FinCEN provide it adequate notice and a meaningful opportunity to be heard. *See, e.g.*, Peters Decl. Exs. C, D, H, J, L, M, O, P. In any event, due-process claims are not waived just because they are not invoked at the administrative level. *See, e.g.*, *Ohio Bell*, 301 U.S. at 306–07.

took one month, one year, or one decade to decide his case, the length of time it took did not change the outcome for [plaintiff] at all." 10 F. Supp. 3d 111, 124 (D.D.C. 2014), *aff'd*, --- F.3d ----, 2015 WL 4153882 (D.C. Cir. July 10, 2015).[8] Here, FBME complains not about "the length of time" FinCEN took, but the way FinCEN hid the ball from start to finish. Had FinCEN provided fair opportunity to contest the allegations, "a convincing response" by FBME "might [have] affect[ed]" the outcome, which shows the errors were not harmless. *People's Mojahedin*, 613 F.3d at 229 n.6.

### D.    The Final Rule Is Arbitrary And Capricious

#### 1.    FinCEN failed to consider the relevant data

In addition to its procedural defects, the Final Rule is also arbitrary and capricious. PI Brief 34–41. In response to this point, the Government's Opposition betrays the same flaws as the agency's underlying action: both fail to consider the depth of "*relevant data* and articulate a satisfactory explanation for [the] action including a rational connection between the facts found and the choice made." *District Hospital Partners, L.P. v. Burwell*, 786 F.3d 46, 56–57 (D.C. Cir. 2015) (quoting *Motor Vehicle Manufacturers Ass'n of the United States v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983)). The Government asserts that "FinCEN adequately considered all the information submitted by FBME." Opp. 20. For support, however, the Government focuses on FinCEN's (flawed) analysis of just two aspects of the administrative record: KPMG's 2013 audit report and Ernst & Young's 2014 audit report. Far from affording adequate basis for the Final Rule, however, those reports should be fatal to it.

---

[8]    The Ninth Circuit's decision in *Al Haramain* is likewise inapposite as to harmless error, because the known facts in that case were themselves dispositive. 686 F.3d at 989–90.

### i. The Government continues to cherry pick facts

The Government continues to cherry pick select facts from the reports while improperly "ignor[ing] new and better data" on the significant reforms FBME initiated, per suggestions from both auditing firms.[9] *District Hospital*, 786 F.3d at 57. The upshot is profoundly distorting and impermissible. An agency acts arbitrarily and capriciously if it selectively disregards new information. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989). While an agency deserves some deference in its analysis, it must indicate that new information has been reviewed and state reasons *why* it rejects such evidence. *Id.*; *District Hospital*, 786 F.3d at 56–57. Moreover, when considering whether an agency action is arbitrary and capricious, courts should "carefully review[] the record and satisfy themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information." *Marsh*, 490 U.S. at 378.

FinCEN's detailed breakdown of the various "deficiencies" that KPMG and Ernst & Young ("EY") supposedly documented in their audits spans almost an entire page of the Final Rule. *See* 80 Fed. Reg. at 45059. After emphasizing select findings (while simultaneously ignoring the reports' ultimate *conclusions*),[10] the Final Rule mentions only in passing "the steps

---

[9] The Government concedes that FinCEN cherry picked select aspects of both reports, but asserts it may do so because the APA affords FinCEN "significant deference . . . [in] matters of foreign relations and national security." Opp. 21. While agency actions are subject to some degree of deference, it is not without limits. *See District Hospital*, 786 F.3d at 56–57. The requirement that an agency cannot ignore new data is among those limits. *See id.*

[10] The Government dismisses KPMG's and EY's conclusions by arguing that complying with anti-money-laundering regulations is insufficient to satisfy § 311. Opp. 22 n.7. This reasoning is unsettling. Financial institutions around the world obviously look to their primary regulators for controlling, if not exclusive, guidance on how to comply with anti-money-laundering requirements. Peters Decl. Ex. D at 3. By the Government's account, however, good-faith compliance with foreign regulators' instruction is no help with FinCEN. Such a view is especially problematic in this case: The applicable European Union and Cypriot requirements that EY found FBME compliant with reflect standards set by the Financial Action

that FBME has taken to strengthen its compliance program." 80 Fed. Reg. at 45060. Such a fleeting, offhand reference falls well short of grappling with the body of evidence FBME submitted showing that (1) at no time did KPMG or EY determine that FBME lacked an anti-money-laundering program and (2) the Bank swiftly implemented corrective measures in response to all of the auditors' applicable recommendations, as soon as they were identified. *See* Peters Decl. at Exs. B, D, E, F, G. That the auditors had recommendations is unsurprising as the entire purpose of any independent audit is to identify potential areas for improvement and suggest enhancements to keep up with the ever-changing anti-money-laundering best practices. FinCEN's dogged focus on these expected and swiftly-implemented recommendations is a classic example of an agency preferring, without adequate explanation, outdated information over new and better data that was staring it in the face. *See District Hospital,* 786 F.3d at 56.

Notably, the APA violation in this case is especially pernicious: By seizing items identified by outside auditors and using them against this Bank for purposes of § 311 sanctions, without due regard for context, conclusions, and trends, FinCEN may be pushing other banks in exactly the wrong direction—*away* from consulting auditors about potential improvements as well as from sharing the resulting reports with FinCEN as part of a constructive dialogue.

FinCEN is unpersuasive in now trying to justify the agency's disregard for this new information. First, FinCEN alleges it has classified information showing FBME customers

_____

Task Force, an inter-governmental body to which the United States belongs. *See* Revision of the Third Anti Money Laundering Directive and the Fund Transfers Regulation (Dec. 2012), *available at* http://goo.gl/PPWEWi (last visited August 21, 2015, as were all websites cited in this brief); Central Bank of Cyprus, Licensing & Supervision, Prevention of Suppression of Money Laundering Activities, http://goo.gl/LLZ4eT. By arguing that FBME's policies are nonetheless deficient, FinCEN is casting doubt on anti-money-laundering procedures *endorsed by the **United States itself**.* *See* U.S. Department of the Treasury, Financial Action Task Force, http://goo.gl/v8j1BK (discussing the Task Force and the United States' role therein).

engaged in suspicious activity "as recently as 2014," and such issues "directly rebut[]" FBME's assertions that it has significantly enhanced and improved its anti-money-laundering policies. Opp. 22–23. Of course, FBME has been unable to examine this classified material or assess its veracity. In any event, the EY report was released only in late September 2014, *see* Peters Decl. Exs. B, C, while FBME was still implementing its recommendations (as it did through November 2014), with some changes not expected to be fully operational until the end of 2014 or early 2015, *see id.* Ex. G. Given this timing, it is unfair for FinCEN to disregard FBME's battery of corrective measures because of conduct that ostensibly predates FBME's completion of its reforms. FinCEN does not point to suspicious money-laundering activity in 2015, after FBME's latest reforms went into effect. And, even as to 2014, FinCEN does not specify whether or how FBME should have detected an issue with any particular customer—much less that any failure to detect evinces a systemic problem. In fact, FBME suspects (though of course is unsure since FinCEN will not confirm) that FinCEN's focus on 2014 conduct may relate to one FBME customer added to the U.S. sanctions list in October 2014. Peters Decl. Ex. L at 20. But FBME established that its standard screening programs flagged the newly sanctioned person the very next day and his FBME accounts were immediately frozen within hours. *Id.*

Second, the Government contends that "just because FBME says the problems are fixed does not mean that FinCEN must take FBME's word for it." Opp. 22. The Government thus continues to give short shrift to a robust record documenting FBME's "fixe[s]." FBME submitted over 30 pages of charts detailing the exact measures taken in response to each of KPMG and EY's recommendations. Peters Decl. Exs. F, G. Moreover, the reforms' success is confirmed by EY's September 2014 report. *Id.* Ex. B. EY's ***very first*** observation was that "[a]ll previously identified money laundering and sanctions-related issues have been addressed

by the institution.  For those corrective actions that have yet to be fully implemented, documented project plans with milestone dates are in place."  *Id*. at FBME00000009.

And FinCEN misleads when it suggests (Opp. 28) that it was excused from discussing these reform efforts in the Final Rule because such summaries were submitted confidentially. While the materials were initially submitted confidentially and the documents, in their entirety, remain confidential, FBME agreed to confidentiality waivers as to significant portions of the materials.  *See, e.g.*, Letter from Hogan Lovells to FinCEN at 2 (June 2, 2015) (exhibited to this brief).[11]  By no means did confidentiality preclude FinCEN from articulating what it did or did not find on specific points *favoring* FBME—much as FinCEN did for a litany of allegations *against* FBME (albeit without specifying its evidence).

### ii.  The Government also ignores other aspects of FBME's submissions and rely on outdated and misleading information

### a.  Holding Companies

FinCEN repeatedly argues that the mere existence of a large number of shell or holding companies amongst FBME's client base is suspect all by itself.  *See* Opp. 2, 10.  Despite placing primary importance on this aspect of FBME's business, FinCEN overlooked readily available, on-point evidence that bears upon the question and supports FBME.

Indeed, FinCEN need only have heeded its own acknowledgement that "[m]ost shell companies are formed by individuals and businesses for legitimate reasons."  FinCEN, Potential Money Laundering Risks Related to Shell Companies, Guidance (Nov. 9, 2006), *available at* https://goo.gl/jAJgEA.  Thus, for any financial institution, the issue is not the inherent nature of shell companies *per se* but whether an institution has adequate safeguards to determine the

---

[11]  This letter and related communications between FBME and FinCEN are part of the administrative record.  Attorneys for FBME contacted FinCEN's counsel and they expressed no objection to FBME attaching this letter to its reply brief as an exhibit.

identity of the account's beneficial owner and run checks on the individual and the account's transactions. The administrative record contains a wealth of evidence submitted by FBME documenting the legitimate reasons why certain customers use shell companies and that the Bank did precisely what it should to monitor these customers. FBME Public Comment at 8-15; Peters Decl. Ex. I. In fact, FBME's practice with respect to beneficial owners exceeds U.S. regulatory requirements. FBME Public Comment at 9.[12] FinCEN ignored these submissions.

Similarly, the Government makes much of FBME's historical practice of allowing certain customers to use the Bank's address in lieu of their own. *See* Opp. 11. But it is perfectly acceptable and legal for a customer to use a bank's address so long as it is not done to evade anti-money-laundering policies, a prospect that FBME appropriately guards against through its compliance measures. Peters Decl. Ex. L at 41–47. Furthermore, FinCEN omits that, ***as of 2009***, FBME had prophylactically ***changed*** its policy to require a customer's address be included on all wire transactions. *Id.* at 41, 42. FBME showed FinCEN that, as of August 2014, only 25 active FBME customers still used the Bank's address, in each instance because it related to internal FBME accounts. *Id.* at 42, 45. The agency cannot place such emphasis on a practice that was changed in 2009, without crediting data that is more recent and better illuminating. *See District Hospital*, 786 F.3d at 56–57.

### b. Alleged suspicious transactions from 2006 to 2013

FinCEN's discussion of alleged suspicious activity by the Bank's customers is similarly misconceived. FinCEN relies on outdated information to claim that FBME customers were

---

[12] Specifically, since 2000, FBME has required identification and verification for all beneficial owners, and the Bank classifies anyone who owns more than 10% of a company as a beneficial owner. FBME Public Comment at 9. In contrast, FinCEN proposed *only last year*, that U.S. banks track all beneficial owners, and it set a looser definition that treats a person as a beneficial owner only if he or she holds 25% or more equity interest in a company. *Id.*

involved in "4,500 suspicious wire transfers totaling at least $875 million through U.S. correspondent accounts between November 2006 and March 2013." Opp. 10. Yet FinCEN fails to mention that **94%** of these transactions occurred in 2008 alone. Peters Decl. Ex. I at 37. FinCEN also leaves out that **only 13** FBME customers were involved in all of these 2008 transactions—a fact thoroughly at odds with FinCEN's inference that a significant volume of the Bank's customers were implicated. *Id*. Furthermore, as of December 2014, 11 of the 13 accounts were closed, the majority since 2009. *Id*.

### c. Alleged suspicious "typologies" in 2013 to 2014

FinCEN merely repackages the same generalized, unsubstantiated concerns about FBME's business model when it alleges that, in 2013 to 2014, $387 million in FBME wire transfer exhibited suspicious "typologies" (such as use of shell companies, surge transfers, structuring, and high-risk business customers). Opp. 11. Significantly, the allegation does not specify a single instance of actual wrongdoing within this timeframe. As previously discussed, it is perfectly acceptable for a financial institution to have shell companies and other "high risk" customers as clients; what matters is that FBME maintains anti-money-laundering procedures adequate to monitor such clients and address such risk. *See* FBME Public Comment at 8–15; Peters Decl. Ex. I. Here, too, FinCEN overlooks that, as of November 2014, FBME had implemented plans for a further compliance mechanism specifically to address transactions questioned by FinCEN, and that such measures were scheduled to be ready by early 2015. Peters Decl. Exs. G at FBME00000707, I at 32.

### d. Suspicious Activity Reports

The Government now reveals (for the very first time) that FinCEN relied heavily on information in SARs to reach its negative conclusions about FBME. Opp. 29–30. But the threshold for filing a SAR is, by design, quite low. *See* 31 C.F.R. § 1020.320(a). A financial

institution is required to file a SAR when it knows, suspects, or even simply *"has reason to suspect"* a transaction may be illegitimate. 31 C.F.R. § 1020.320(a) (emphasis added). Therefore, mere filing of such a report cannot fairly be taken as proof that a violation occurred or even that there is even probable cause to believe one occurred. FinCEN well understands as much, for it did not issue *any* freezing request on FBME's accounts or otherwise take action to stanch any of the transactions it now puts under a SAR cloud. Placing secret reliance on unverified SARs for purposes of the Final Rule was, in sum, especially egregious.

**2. FinCEN failed to explain why the Final Rule satisfies § 311's statutory requirements**

The Government likewise falls short in trying to explain how the Final Rule satisfies § 311's statutory requirements. Section 311 mandates that FinCEN consider multiple factors when deciding whether an institution is of "primary money laundering concern." 31 U.S.C. § 5318A(c)(2)(B)(i)-(iii). These factors include (i) "the extent" to which an institution is "used to facilitate or promote money laundering;" (ii) "the extent" to which it is "used for legitimate business purposes in the jurisdiction;" and (iii) "the extent to which such action is sufficient to . . . guard against international money laundering." *Id.*

This statutory directive is explicit and controlling, yet the Government's Opposition skips past it. That is akin to the Final Rule, which likewise did not discuss these three factors. *See* PI Brief 38–39. An agency "may not 'entirely fai[l] to consider an important aspect of the problem' when deciding whether regulation is appropriate." *Michigan v. EPA*, 135 S. Ct. at 2707 (quoting *State Farm*, 463 U.S. at 43). When a statute requires an agency to consider certain factors, the agency must actually consider them—simply "[s]tating that a factor was considered . . . is not a substitute for considering it"—or else be reversed. *Getty v. Federal*

*Savings & Loan Insurance Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986); *accord, e.g.*, *Missouri Public Service Commission v. FERC*, 234 F.3d 36, 41 (D.C. Cir. 2000).

In the Notice of Finding, FinCEN did at least briefly discuss these statutory factors, but not in any substantive way. *See* 79 Fed. Reg. 42639, 42639–40 (July 22, 2014). Consider the second factor: The Notice of Finding says that "[l]egitimate activity at FBME's Cyprus branch is difficult to assess," before concluding that the Bank is not used for legitimate business in Cyprus because most of its clients are located outside of Cyprus. *Id.* FinCEN's necessary premise is that, for purposes of § 311, "the extent" to which an institution is "used for legitimate business purposes in the jurisdiction" 31 U.S.C. § 5318A(c)(2)(B)(ii) is confined *only* to legitimate business conducted by *residents* of that jurisdiction. So, if a bank in, say, Delaware concededly conducts legitimate business on behalf of thousands of foreign customers, it would have no legitimate business for purposes of this factor, according to FinCEN. That statutory interpretation is, with all due respect, patently unreasonable. What is more, FinCEN altogether ignored FBME's legitimate business in Tanzania, where it operates four branches and is the largest bank by asset size.

Similarly deficient is FinCEN treatment of § 311's third factor in the Notice of Finding. FinCEN made no attempt to explain why a special measure short of the fifth would not be "sufficient" to protect against "international money laundering and other financial crimes." 31 U.S.C. § 5318A(c)(2)(B)(iii). To the extent that FinCEN said anything about this, it did so in conclusory fashion unadorned by any substantive analysis or specifics. 79 Fed. Reg. at 42640.

Even if the considerations of the § 311 factors in the Notice of Finding were adequate— which they are not—FinCEN's failure to revisit these factors in the Final Rule is fatal. Over a year transpired between the Notice and the Final Rule, during which (as FinCEN elsewhere

trumpets) FBME made extensive submissions to FinCEN, refuting those allegations FBME was able to identify. For FinCEN not to reexamine these factors in light of the new and better data it received, distinguishing legitimate from illegitimate uses of FBME, was arbitrary and capricious—as FinCEN jettisoned reasoned, responsive analysis for a predetermined outcome.

A distinct (albeit related) error is that the Final Rule never explains why FBME meets the statutory threshold of being an institution of "primary money laundering concern." *See* PI Brief 38. The Government tries to handle this by arguing that "Section 311 does not require a determination that the designated entity be engaged in money laundering—only that the entity be of money laundering *concern*." Opp. 23 (emphasis in original). That interpretation threatens to render the critical statutory threshold a nullity, insomuch as FinCEN's determinations would be self-justifying—FinCEN's expression of "concern" in initiating a § 311 proceeding would, by definition, always suffice to justify sanction. Moreover, FinCEN's instant interpretation *completely omits* the word "primary"—the very same word that FinCEN ignored throughout the administrative proceedings. Once each of the four words is given its due, it does not suffice simply to note that a designated entity is, according to the administrative record, of "money laundering concern"; FinCEN must go further in explaining why it is an entity of "*primary money laundering concern.*" 31 U.S.C. § 5318A(a) (emphasis added). FinCEN's failure to go that extra step in the Final Rule affords yet another ground for vacating it.

The Government tries to compensate for FinCEN's omission by offering a declaration that seeks to explain, for the first time and quite outside the administrative record, how FinCEN interprets "primary" and "money laundering concern" under § 311. *See* Shasky Calvery Decl. ¶ 17. But that will not work, for it is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked *when it took the action*."

*Michigan v. EPA,* 135 S. Ct. at 2710 (emphasis added).   Litigation affidavits are "merely 'post hoc' rationalizations" that "have traditionally been found to be an inadequate basis for review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419–20 (1971).

The failures identified above intertwine in a critical respect.   Had FinCEN analyzed the statutory factors—especially the first two factors, which call for an assessment of the "extent" to which a foreign bank is used for legitimate business and the "extent" to which it is used to promote money laundering, § 5318A(c)(2)(B)(i)–(ii)—that analysis would have informed any ultimate conclusion about whether FBME was of "primary" money laundering concern.   But FinCEN made no such effort to differentiate good from bad before branding the Bank a scofflaw.

### 3.   FinCEN has still not addressed why the fifth special measure is commensurate with FBME's alleged transgressions.

As to the sanction it has imposed, FinCEN attempts to ward off scrutiny by emphasizing "the high degree of deference to which FinCEN is entitled in this context."   Opp. 26.   But the D.C. Circuit, while respecting agency discretion and showing appropriate deference, requires agencies specifically "to consider 'significant and viable and obvious alternatives,'" *District Hospital*, 786 F.3d at 59 (quoting *National Shooting Sports Foundation, Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013)).   Here, FinCEN has not analyzed "viable and obvious" alternatives that stop short of freezing FBME out of the global financial system.   Nor has FinCEN explained why FBME's alleged conduct is more concerning than that of institutions that were spared the fifth special measure.

FinCEN's silence on these points speaks volumes.   FBME proposed numerous meaningful, concrete alternatives to the fifth special measure—including the appointment of a special monitor, the imposition of heightened reporting requirements for FBME and/or the levying of a fine.   *See* Peters Decl. ¶¶ 15, 17 & Exs. P at 2, S, T.   These alternatives were

derived from FinCEN's own prior actions and designed to further FinCEN's stated goal of rehabilitating rather than destroying financial institutions. Moreover, FBME demonstrated that the conduct at issue in prior FinCEN actions was far more egregious than any past shortcomings FinCEN cited against FBME. *Id.* Ex. R.

The Opposition now is of a piece with FinCEN's Final Rule in suggesting that no consideration, *none*, was given to these data points before FinCEN decided upon the fifth special measure. Instead, the Government suggests that imposition of the maximum statutory penalty was *automatic* for FBME because the other special measures authorized by § 311 are information-gathering mechanisms and FinCEN "does not have the same authority to examine, issue civil money penalties, or require special monitors against foreign financial institutions such as FBME." Opp. 25. But such reasoning is missing from the Final Rule, *see* 80 Fed. Reg. 45,060, and altogether perplexing. The fifth special measure authorizes the Secretary to "prohibit, *or impose conditions upon*, the opening or maintaining" of correspondent accounts in the United States by any designated entity, without limitation. § 5318A(b)(5) (emphasis added). Had FinCEN imposed such conditions as an intermediate measure, FBME would comply with them fastidiously (as FBME assured FinCEN it would throughout its extensive engagement, and as it reiterates now), or else suffer the fifth special measure *at that point*.

Ultimately, therefore, FinCEN's defense of the fifth special measure comes down to its supposed determination that nothing less was up to the task. *See, e.g.*, Opp. 25 (alternative penalties were "neither viable nor obvious, given the seriousness of the concerns the bank's record raised," and "the urgency" of FinCEN's mission of combatting international money laundering). But any such determination by FinCEN is sorely under-explained and out of step with its approach in other cases. By contrast, when FinCEN imposed the fifth special measure

on Banco Delta Asia, *see* 72 Fed. Reg. 12730, 12730–40 (Mar. 19, 2007), it explained in detail why alternative remedial measures were not viable. For example, "[e]ven after [FinCEN's] finding of primary money laundering concern, [Banco Delta Asia]'s management dismissed concerns presented by independent reviewers of the bank's shortcomings involving customer identification and ongoing due diligence obligations." *Id.* at 12734. That bank thereby continued its "historical pattern of disregard" for requests by regulators that the bank improve its due-diligence procedures. *Id.* at 12735. Indeed, a "senior bank official" even stated in a Forbes article "that Banco Delta Asia's cessation of business with North Korean accountholders was only a temporary measure to resolve the bank's dispute with FinCEN." *Id.* These and other corresponding indicators, as expressly relied upon by FinCEN, justified its conclusion that there was a "resultant likelihood of recidivism" so as to call for the fifth special measure as remedy. *Id*; *see also* 80 Fed. Reg. 13304, 13436 (Mar. 13, 2015) (notice of finding and notice of proposed rulemaking to impose the fifth special measure against Banca Privada d'Andorra, based on specific allegations that high-level managers not only facilitated but were personally complicit in money laundering, bribery, and other illicit financial dealings, including by systematically disguising transactions).

The Multibanka case offers an instructive counterpoint. There, FinCEN issued a notice of finding that Multibanka was of primary money laundering concern and a notice of proposed rulemaking to impose the fifth special measure. 70 Fed. Reg. 21362 (Apr. 26, 2005). Multibanka then contacted FinCEN, was "forthcoming in addressing the concerns that [FinCEN] identified in the notice of proposed rulemaking and . . . instituted measures to guard against money laundering abuses"; these measures included retaining an auditing firm to address weaknesses in its compliance programs, reviewing its accountholders, and overhauling its

information technology systems. 71 Fed. Reg. 39606, 39608 (July 13, 2006). FinCEN concluded that these "cumulative efforts demonstrate [Multibanka's] continuing commitment to fighting money laundering and other financial crimes," and "[i]n light of Multibanka's significant remedial measures," FinCEN withdrew the notice of finding and proposed rulemaking. *Id.*

One of the most striking and suspect aspects of the Final Rule now before the Court is the drastic sanction it imposes upon a Bank that has—according to a wealth of concrete evidence— been constructively engaging with FinCEN and moving in a positive direction, including with the benefit of input from outside auditors. Yet the Court will find no satisfying explanation from FinCEN, either in the Final Rule or even in the Opposition, as to why any § 311 sanction needed to go so far. At the very least, FinCEN should have to explain why it is placing FBME in a bucket with Banco Delta Asia as compared to Multibanka. *Compare* 71 Fed. Reg. at 39608 ("Multibanka has informed us that it has taken significant steps to address deficiencies in its anti-money laundering programs and controls. Although some of these efforts were initiated prior to the finding that Multibanka was a financial institution of primary money laundering concern, the bank is continuing to improve its anti-money laundering procedures"), *with* Peters Decl. Exs. E–F (describing at length the remedial steps taken by FBME, both before and after FinCEN's findings). This unexplained disparity in treatment is arbitrary and capricious, *see, e.g.*, *Friedman v. Sebelius*, 686 F.3d 813, 827–28 (D.C. Cir. 2012) (issuance of a punishment that is out of line with the agency's decisions in similar cases is arbitrary and capricious)—and it affords yet another reason why FBME is likely to prevail on the merits.

## II.    ABSENT AN INJUNCTION, FBME WILL SUFFER IRREPARABLE HARM

Irreparable injury is beyond dispute in this case. Indeed, the Government resorts to incoherence (sometimes arguing as though FBME has *already* been cut off from U.S. dollars,

and other times arguing as though it *must now* be cut off *posthaste*) in trying to deny the obvious. As soon as the Final Rule takes effect, it imperils FBME by (1) cutting off FBME from any transaction that flows through the U.S. financial system (whether upstream or downstream), thereby requiring FBME to fundamentally restructure and downsize (if it survives at all), Charalambous Decl. ¶ 11; Saab Decl. ¶¶ 67, 70; Wyllie Decl. ¶ 20; and (2) prompting foreign regulators, particularly the Central Bank of Cyprus, to take adverse actions, potentially as drastic as liquidation, Saab Decl. ¶¶ 60–61, 65–66. It is well settled that major disruptions to, or destruction of, a business is irreparable harm. *See* PI Brief 41–42 (collecting cases).

Yet FinCEN misreads the on-point declarations—as though the Final Rule will have *zero* effect because all of the Bank's U.S.-dollar correspondent accounts were already closed or frozen as a result of FinCEN's Notice of Proposed Rulemaking. Opp. 40–41, 46 n.25. If FinCEN truly believed that, then its zeal to speed implementation of the Final Rule would be incomprehensible. Certainly FBME's counterfactuals are no answer to FBME's sworn declarations, which attest that *remaining* correspondent banks have indicated they *will* sever ties with FBME, given their connections to U.S. financial institutions. Wyllie Decl. ¶¶ 17–18; Saab Decl. ¶ 67. Those indications have since become even more pointed: Commerzbank, one of FBME's largest remaining correspondent banks, just reported that it is awaiting ruling on the preliminary injunction before cutting ties. FinCEN also ignores that the Bank has $800 million frozen in U.S. dollar accounts, Saab ¶ 46, which will close once the Final Rule takes effect.

FinCEN dismisses threats the Central Bank of Cyprus ("CBC") has leveled against FBME by saying they are not a "direct" result of the Final Rule. Opp. 42–43. This blinks reality. By letter dated August 3, 2015, CBC stated that it would take action against the Bank because "FinCEN's issuance of the Final Rule precludes any prospect [of] resum[ing] normal

operations." Saab Decl. Ex. A at 4. It is thus clear, as a matter of fact, that the Final Rule had

a determinative or coercive effect on CBC's decision to move against FBME. It is likewise

clear, as a matter of law, that an agency is responsible if it had a "determinative or coercive effect

upon the action of someone else" that causes injury. *Bennett v. Spear*, 520 U.S. 154, 168–69

(1997); *accord Permapost Products, Inc. v. McHugh*, 55 F. Supp. 3d 14, 21 (D.D.C. 2014).[13]

Finally, "the loss of constitutional freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." *Mills v. District of Columbia*, 571 F.3d 1304,

1312 (D.C. Cir. 2009) (citation & quotation marks omitted). FinCEN nonetheless maintains

that due process is not a "constitutionally-guaranteed freedom." Opp. 43–44. Were the Fifth

Amendment not answer enough, the D.C. Circuit's on-point instruction surely is. *See Gordon v.

Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

## III.    THE EQUITIES SHARPLY FAVOR FBME

On the other side of the scale, FinCEN summons specters that seem thoroughly divorced

from reality. Asserting that criminals and terrorists bank with FBME, FinCEN reasons that

national security is compromised unless FBME is *immediately* cut off from transacting with U.S.

correspondent banks. Opp. 45–46. This line of argument is impossible to square with the fact

that FinCEN itself waited a full year before arriving at the Final Rule. Although FinCEN

rejoins that its delay was warranted while it considered FBME's submissions, Opp. 46 n.24, the

fact remains that FinCEN would not have waited that long if it perceived urgent need to roll out

the Final Rule. It follows *a fortiori* that a delay of a few more weeks is well warranted while

this Court completes its judicial review.

---

[13]    FinCEN notes that FBME's shareholders are pursuing recourse against CBC
through arbitration, and arguing that CBC stands liable for its own actions. Opp. 43. A fair
summary of FinCEN's position alongside that of CBC is that each regulator is ascribing
responsibility to the other so that neither may be held accountable.

Especially considering that (a) August 28 effectiveness poses such a damaging, irretrievable break from the *status quo* and (b) a preliminary injunction is expected to be of such short duration, the balance of equities sharply favors FBME's instant request.

## IV. AN INJUNCTION SERVES THE PUBLIC INTEREST

Finally, with respect to the public interest, FinCEN returns to invoking national security and foreign relations. *See* Opp. 45, 47. Those interests are strong, to be sure, but their application here is overstated. Again, FinCEN's invocation of them does not square with its willingness to wait a year before imposing the Final Rule. And this Court has on many occasions found that the public interest in vindicating the U.S. Constitution and the APA warrants entry of a preliminary injunction, notwithstanding national-security and foreign-relations concerns. *See, e.g.*, *R.I.L-R v. Johnson*, --- F. Supp. 3d -----, 2015 WL 737117, at *18–19 (D.D.C. Feb. 20, 2015) (preliminarily enjoining Government from detaining certain illegal aliens, despite national-security claims); *Klayman v. Obama*, 957 F. Supp. 2d 1, 42–43 (D.D.C. 2013) (preliminarily enjoining the Government's collection of bulk telephone metadata, despite national-security claims); *Electronic Privacy Information Center v. Department of Justice*, 416 F. Supp. 2d 30, 42 (D.D.C. 2006) (preliminarily enjoining the Government to produce certain documents swiftly, despite national-security claims). As we respectfully reiterate, the public interest benefits, not suffers, when interests and rights such as those that hang in the balance here are preserved pending the completion of orderly judicial review.

## CONCLUSION

For the foregoing reasons, Plaintiffs FBME Bank Ltd. and FBME Ltd. respectfully request that the Court grant a preliminary injunction prohibiting FinCEN's Final Rule from taking effect pending resolution of the merits, and that it order the parties to confer about proposing a highly expedited schedule for briefing the merits.

Dated:  August 21, 2015

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN LLP

*/s/ Derek L. Shaffer*

Derek L. Shaffer (D.C. Bar No. 478775)
William A. Burck (D.C. Bar No. 4015426)
Lauren H. Dickie (IL Bar No. 6286037)
Jonathan G. Cooper (D.C. Bar No. 999764)
777 Sixth Street NW, 11th Floor
Washington, DC 20001
(202) 538-8000

HOGAN LOVELLS US LLP

*/s/ Peter S. Spivack*

Peter S. Spivack (D.C. Bar No. 453731)
J. Evans Rice III (D.C. Bar No. 481768)
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5600

*Attorneys for Plaintiffs*
*FBME Bank Ltd. and FBME Ltd.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 21, 2015, I electronically filed the foregoing Reply Memorandum with the Clerk of the Court using the Court's ECF system, which will send notice of this filing to all parties.

*/s/ Derek L. Shaffer*
Derek L. Shaffer