```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2    - - - - - - - - - - - - - - - x
      FBME BANK LTD., et al.,
 3                               CA No:  1:15-cv-01270-CRC
              Plaintiffs,
 4                               Washington, D.C.
                                 Tuesday, August 25, 2015
 5    vs.                        10:30 a.m.

 6    JACOB J. LEW, et al.,

 7            Defendants.
      - - - - - - - - - - - - - - - x
 8    _____

 9        TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
        HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
10               UNITED STATES DISTRICT JUDGE
      _____
11    APPEARANCES:
      For the Plaintiff:      DEREK LAWRENCE SHAFFER, ESQ.
12                            JONATHAN G. COOPER, ESQ.
                              LAUREN H. DICKIE, ESQ.
13                            QUINN EMANUEL URQUHART &
                              SULLIVAN, LLP
14                            777 6th Street, NW, Suite 1100
                              Washington, DC 20001
15                            (202) 538-8123
                              derekshaffer@quinnemanuel.com
16
      For the Defendant:      LYNN YUHEE LEE, ESQ.
17                            AMY POWELL, ESQ.
                              U.S. DEPARTMENT OF JUSTICE
18                            Civil Division
                              Federal Programs Branch
19                            P.O. Box 883
                              Washington, DC 20044
20                            (202) 305-0531
                              lynn.lee@usdoj.gov
21
      Court Reporter:         Lisa A. Moreira, RDR, CRR
22                            Official Court Reporter
                              U.S. Courthouse, Room 6718
23                            333 Constitution Avenue, NW
                              Washington, DC  20001
24                            202-354-3187

25    Proceedings recorded by mechanical stenography;
      transcript produced by computer-aided transcription
```

P R O C E E D I N G S

THE COURTROOM DEPUTY:  Civil Case No. 15-1270,

*FBME Bank Ltd vs. Jacob Lew, et al.*

Counsel, will you please come forward and identify yourselves for the record.

MR. SHAFFER:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. SHAFFER:  Derek Shaffer from Quinn Emanuel. I'm here on behalf of the plaintiffs, joined today by my colleagues Jonathan Cooper and Lauren Dickie, as well as co-counsel from Hogan Lovells.

MR. SPIVACK:  ^   good morning, Your Honor, Peter Spivack from Hogan Lovells.

THE COURT:  Good morning.

Mr. Rice, Good to see you.  Been a long time.

MS. LEE:  Good morning, Your Honor; Lynn Lee for the government.  And with me at counsel's table is Amy Powell, also from DOJ.

Before we begin, I just wanted to let Your Honor know that we'll be splitting the argument for the government's side in terms of the prongs for preliminary injunction, so just so you know.

THE COURT:  That's fine.  Okay.  Well, welcome everyone.

Just so you know, we have a second court

reporter sitting in the witness box.  That's not license
to talk twice as fast as you would normally talk because
we only have one getting it down at one time, but
welcome.

We have a lot to cover this morning so let me
just set the stage a little bit.  I've reviewed all of
your materials.  That's how I spent part of my vacation
last week.  And this is the rare case where I have seen
more of the government's cards than the plaintiff's have
seen because some of the evidence that the government or
that FinCEN relied on in reaching its determination that
Special Measure 5 was appropriate is classified.

And I would just say that having reviewed both
the unclassified and the classified record and given the
relatively low bar for the necessary finding under
Section 311 of the Patriot Act, that a bank poses a,
quote-unquote, primary money laundering concern, as well
as the deference that I must afford to the agency in
making that determination, it's fair to say that the
plaintiffs have an uphill battle to establish that the
substance of FinCEN's imposition of Special Measure 5
was arbitrary and capricious.

I still have questions, however, as to whether
the agency adhered to the required procedures, both
under the APA and under the due process clause to the

extent that FBME is entitled to due process protection,
and those are the areas that I would like to focus most
on today, in addition to the question of irreparable
harm.

So with that setting of the stage, Mr. Shaffer,
do you want to start us off?  It's your motion.

MR. SHAFFER:  Thank you, Your Honor.  It would
be my pleasure.

And I'll say at the outset, Your Honor, I hope
to heed all of Your Honor's instruction, including as to
speed of delivery, but also the substantive issues to
focus on.

THE COURT:  Sure.

MR. SHAFFER:  We do respectfully submit, Your
Honor, as indicated in our papers, that by imposing upon
FBME the most drastic sanction available, the Fifth
Special Measure, as Your Honor referred to it, under
Section 311 of the Patriot Act, defendants violated both
the APA and the due process cause of the U.S.
Constitution in multiple respects.

Your Honor referred to various different strands
of that argument, but stated simply, Your Honor, FinCEN
refused, in our view, to play fair, to account for key
facts and to reason its way to a fair or sensible result
in how it treated the bank.  Instead, in our respectful

submission, it set out to reach a foreordained result
without due regard for the facts, law, and even basic
fairness.

I do wish, Your Honor, to briefly address each
of the procedural and substantive deficiencies that we
believe will, when analyzed individually, and certainly
when viewed in combination by the Court, ultimately
necessitate vacatur of the Final Rule.

THE COURT:  Let's start with the process issues,
okay?

MR. SHAFFER:  Very well, Your Honor.  And
starting with the process issues, I'd like to focus Your
Honor on the additional cards, as Your Honor put it,
that Your Honor's been able to review, and I address
this under the heading of "Secret Evidence."  But before
I turn to the classified materials that are before Your
Honor, I do need to note that only after the agency
process had concluded, only after we came to Your Honor
seeking judicial review under the APA, did we become
privy to unclassified, nonprivileged materials that the
government produced with its opposition brief.

THE COURT:  Okay.  Let's start there.  Let's
talk about that.

Ms. Brooker submits a number of exhibits to her
declaration.  Did you not receive any of those exhibits?

It's somewhat unclear as to what you all received during

the rulemaking process and what you did not receive.

MR. SHAFFER:  Forgive me, Your Honor, because I

don't know that I can give you a precise and exhaustive

list of what was new in accompanying the Brooker

declaration.  What I can tell you is a significant and

important portion of that had not been seen previously,

and I can walk Your Honor through what specific portions

I'm referring to.

The first is an article -- there are a series of

articles about suspicious -- supposedly suspicious

transfers that went through FBME, and these, Your Honor,

related to Italian political corruption, according to

the articles.  You'll see no mention of that in the

notices or in the Final Rule, although, according to the

Department of Justice's submission, FinCEN was relying

upon that as part of this stew of allegations that were

not specifically teased out in full.

And as to that, Your Honor -- and I, of course,

don't have an administrative record to help me on this,

but I can tell you with assurance that in connection

with that transaction, when it came to FBME, FBME

identified it as suspicious.  They flagged it, Your

Honor, because of the political party that was behind

it.

1      So they investigated it.  They insisted upon

2  meeting with the customer to get an explanation of what

3  that transaction was about to assure itself of its

4  legitimacy.  They were not satisfied, Your Honor.

5  Following that -- they suspended the transfer in the

6  meantime.  And when they were not satisfied by the

7  results of that meeting, they sent the money back and

8  reported it to the authorities as suspicious.

9      THE COURT:  What is the basis for your argument

10  that that particular incident was one of the bases for

11  the Final Rule?  It's not in the Final Rule, correct?

12      MR. SHAFFER:  That's correct, Your Honor, but

13  there's a lot -- as Your Honor averred to, I come here

14  with the premise that Your Honor has, that there's a lot

15  that informs the Final Rule that we don't know about;

16  some of it because it's classified.  But I also

17  understand, again from the Department of Justice's Page

18  37, Note 15 of the opposition, that these are materials

19  that FinCEN was relying upon, even though they were

20  non -- unclassified, nonprivileged and not provided to

21  us.  So this back-and-forth between the agency and FBME

22  never happened.

23      In addition, Your Honor -- I'm just looking at a

24  couple of salient examples that jump out.  There was a

25  *Wall Street Journal* article supposedly about money

launderers using Cypriot banks, and it kind of paints
Cyprus as a money launderer's haven and refers to FBME
there.  But, Your Honor, that was part of the same kind
of cloud that Cypriot banking was being placed under in
this proceeding, and we would have emphasized to FinCEN,
if we could have emphasized any further, that FBME came
to Cyprus through totally legitimate channels.  They
basically were fleeing risks for them as Lebanese
Christians in Lebanon at the time.  They came to Cyprus.
It's at the intersection of a lot of their clientele.
There are a lot of people who do business there for
legitimate reasons.

        THE COURT:  You explained that all to FinCEN
during the process.

        MR. SHAFFER:  We did, Your Honor, but I think we
would have explained why you can't put Cypriot banking
generally under this cloud and why it was inconsistent
with FinCEN's approach to its reliance upon, for
instance, the Central Bank of Cyprus and so forth.  And,
Your Honor, I have to emphasize that the way that the
D.C. Circuit has approached this issue of was there
unclassified, nonprivileged information that was
withheld during the administrative process -- and I'd
point Your Honor specifically to cases like the *NCRI*
case.

1          THE COURT:  And those are all due process cases.

2          MR. SHAFFER:  They're all due process cases.

3          THE COURT:  We'll get there.

4          MR. SHAFFER:  But I believe, Your Honor, that

5    their reasoning applies square under the APA because the

6    D.C. Circuit has said the same thing in the context of

7    the APA process.  It said that in cases like the

8    *Radio* -- the *American Radio* case that specifically --

9    the agency can't be hiding the ball about what it's

10   relying upon and then come forward with that after the

11   fact.  So if Your Honor prefers to rule on this

12   statutorily, we think it's still a violation and the

13   problem remains.

14          But in any event, Your Honor, I think that the

15   due process reasoning applies squarely in the following

16   sense, Your Honor:  The D.C. Circuit has said that we

17   cannot presume, in connection with judicial review, how

18   the agency would have acted had there been a back-and-

19   forth on this, and even when the D.C. Circuit was

20   confronting a body of classified information -- it's

21   true in each of those cases; it's true in the *NCRI* case.

22   It's true in the *Ralls Corporation* case; it's true in

23   *People's Mojahedin* -- it said exactly what Your Honor

24   said at the outset.

25          We can't presume to say what the agency would

have done.  Maybe it would have found basis to arrive at this same final disposition having reviewed all the evidence.  But there's nothing harmless about denying the commentor, the respondent, the chance to see this evidence and comment on the basis of it.  That's what the administrative process and the deference are all about.  That's the premise for why the Court accepts agency action when it comes to it.

THE COURT:  So I've read those cases, and it seems to me that, clearly, the principle set forth in those cases is that the government must provide the unclassified basis for the action.  It's not clear to me that that requires it to provide the actual documentation, as opposed to a summary and the underlying information from those documents or from that evidence, as long as it provides, you know, the summary in the notice of finding and the Final Rule.

MR. SHAFFER:  Your Honor, I guess it's a little clear --

THE COURT:  Am I wrong about that?

MR. SHAFFER:  Well, I would respectfully disagree.  I do read those -- because I think in all those cases the respondent knew what the basic designation was.  They were essentially associated with being complicit in terrorism or the agents of terrorism

1    themselves.  So in that -- reduced to generality, they

2    knew what they were responding to, Your Honor, but --

3         THE COURT:  Well, but in those cases, there was

4    not a rulemaking.  There wasn't an explanation for the

5    basis of the rulemaking so they really had much less to

6    work on in responding, when your client did in this

7    case, notwithstanding the fact that there may be some

8    unclassified documents that were not provided.

9         MR. SHAFFER:  And, Your Honor, I just submit

10   that when we have something like this case of Italian

11   corrupt -- and I want to offer up a couple more exhibits

12   from that, Your Honor.  But when you have that, it's

13   clearly something that the agency is relying upon.  It's

14   clearly part of the stew of illicit activity that flows

15   through the bank, and the bank is somehow tainted by.

16        And there's no clue that they were relying upon

17   it, but we know from the government's brief that they,

18   in fact, were.  And you don't know, Your Honor, with all

19   due respect, what would FinCEN do if we had been able to

20   recount to FinCEN what I just recounted to Your Honor in

21   connection with this episode.

22        THE COURT:  So you have the Italian politician.

23   You have general background about Cyprus being a money

24   laundering haven.

25        MR. SHAFFER:  There's a blog report --

THE COURT:  What else?

        MR. SHAFFER:  There's a blog report from a

University of California, Santa Barbara study that,

according to the blogger, said FBME processed

transactions on behalf of perpetrators of a fake

antivirus scam.

        Now, Your Honor, it's the blog report.  It's not

the study.  So we had to go back to dig up that study, a

2011 study from UCSB which says nothing about FBME, from

what we can tell, and FinCEN wasn't asked, of course, to

go to the underlying study.  We didn't have the

opportunity to point it out to it.  We don't know what

the data set was that the 2011 study was relying upon.

We would have noted that to FinCEN as well.

        And in fact, the study focuses on other banks.

One in particular, ChronoPay --

        THE COURT:  Let me just make sure I get this

right.  The underlying incident is summarized in the

notice of finding, but the blog report that describes

the incident was not provided?

        MR. SHAFFER:  It's all -- all that we have from

the notices, Your Honor, is that there were illicit

transactions that were processed.  And there is

reference, I believe, to anti -- a phishing scheme.

There's reference to the fact that there were -- we

don't -- we haven't been able to match all these up,
Your Honor, to specific incidents.  Some of it may be
based on classified information that we're not privy to.

And Ernst & Young, when they went back to
specific allegations in the notice of finding, didn't
necessarily know what they were.  So I don't know to
what extent this connects up to what was in FinCEN's
mind when it referred to various specific allegations in
the notices and in the Final Rule.

THE COURT:  And the bottom line is you didn't
get the blog post that formed the basis for this
allegation.

MR. SHAFFER:  That's right, Your Honor.  But I
don't want to overclaim in the sense that I can't show
you smoking-gun proof that in the Final Rule FinCEN was
expressly referring to this incident because we don't
know exactly what's behind certain allegations.

THE COURT:  Okay.

MR. SHAFFER:  What I do know, thanks to the
government's opposition, is that this was relied upon in
some sense.  It's, in part, the basis for the Final Rule
that comes before the Court.

There's also, Your Honor, an interview with
FBME's Tanzania head, and it's published on a website
called the Offshore Company Forum, and this seems to

connect, Your Honor, to a specific FinCEN allegation
which was that FBME was basically being advertised on
various third-party sites for illicit activity as an
easy place to park money, in essence.  We hadn't seen
this particular article, Your Honor; I should say the
posting.  It's a website's posting of an interview that
was conducted by Tanzania Invest, which no one's
claiming is disreputable or in any way suspect.  They
simply reprinted that on the site.

Now, had FBME known this was being reprinted on
the site, they could have taken exception.  They could
have issued requests that it be taken down, like they've
done in instances like this.  But we didn't even know it
was up there, much less that FinCEN was relying upon it.

THE COURT:  Right.

MR. SHAFFER:  And given how much we have to
cover, Your Honor, I won't say that that's an exhaustive
review of what's new, but those are things that jump out
as exhibits to Mr. Brooker's [sic] declaration that
everyone will agree, Your Honor, they were not shared as
part of the administrative processes, even as we did
everything within our -- we think it was incumbent upon
FinCEN in the first instance to disclose these as part
of its administrative record, as part of its basis for
the rule.

1    But even if that was not enough, Your Honor, in

2    request after request, in an in-person meeting, we

3    implored FinCEN, please, share with us what's behind

4    these allegations, both because we want to be able to

5    address those, and also because we want to be able to

6    root out underlying problems.  Please share with us.

7    The only response we got was that they could

8    not.  They could not share.  And now we know that they

9    could have, at least in these respects.

10   And if your Honor doesn't have other questions

11   about that category, I propose --

12   THE COURT:  Now that you've seen all of the

13   information attached to Ms. Brooker's declaration, how

14   specifically were you prejudiced by that?  And this goes

15   to whether there is, in effect, a harmless error

16   doctrine associated with either a due process procedural

17   violation or an APA procedural violation.  Address that

18   issue.

19   MR. SHAFFER:  Your Honor, you will note that

20   FinCEN, although we characterize it as begrudgingly, in

21   the Final Rule did acknowledge instances where it was

22   wrong, by its own account, in how it had characterized

23   the bank.

24   THE COURT:  They were very minor.

25   MR. SHAFFER:  They were very minor.  But, Your

Honor, we wanted a chance to add to that list, to say to FinCEN you're wrong in some of your premises and we can demonstrate that conclusively. When we have a hard target, something that's firm, we know what we're talking about. We can hit that.

These are targets that we could have hit, Your Honor. And I point Your Honor to the *People's Mojahedin* case, the 2010 installment of it.

THE COURT: Footnote 6.

MR. SHAFFER: Footnote 6; Your Honor's there. I think that suggests very strongly, Your Honor, especially when you have classified evidence in play, and we're not going to have the chance to look into that black box, we need to have the chance to engage everything that's there nonclassified; everything, Your Honor, because that's the only fighting chance we have.

THE COURT: Okay.

MR. SHAFFER: And we didn't have it here.

THE COURT: Now, *PMOI* is a due process case.

MR. SHAFFER: It is, Your Honor.

THE COURT: And I've read Footnote 6. And I think it fairly says, at least in the D.C. Circuit, you know, there doesn't seem to be a harmless error exception for procedural due process violations in the civil context.

Now, what if we're not in the due process world?
What if we're in the APA world?  Isn't the standard a
different one?  In a garden variety notice-and-comment
rulemaking case, isn't the standard that the public be
given the material information or the critical
information underlying the rulemaking?

        MR. SHAFFER:  Two points about that, Your Honor.
The first point is -- I don't want to fight Your Honor's
hypothetical, but I don't think it's fair to say this is
a garden variety APA case, even if we take due process
out of it.  This is a case where the agency's pointing
at one entity, saying it is complicit in money
laundering, and is deserving of the most severe sanction
that the United States government can impose in this
circumstance; to be cut off completely from the U.S.
financial system with hundreds of millions of dollars
and billions of dollars at stake, and this one entity is
directly impacted.

        That's not garden variety, Your Honor, and I
would submit if there's a thumb on the scale in the APA
context, here it has to be for more disclosure, more
process, more opportunity to comment.

        But there's a second point, too, Your Honor --

        THE COURT:  Even if the subject, I find, is not
entitled to due process?

1        MR. SHAFFER:  Even if that's so, Your Honor,

2    because Congress told you -- well, two things that

3    Congress made clear in 311 itself.  Number one, it's

4    subject to the APA.  This is to be a rulemaking.  And

5    they said that explicitly for the Fifth Special Measure.

6        Number two, in the committee report, and I don't

7    know how disposed Your Honor is when it comes to

8    committee reports, but it says absolutely, in terms that

9    the Congress understands, that due process will be

10   afforded to the extent that someone is aggrieved and

11   comes to court.  And it says that without qualification,

12   that due process protections will be afforded.  I think

13   it's fairly baked into the statute, Your Honor, in both

14   of those respects.

15       But let's put that aside, Your Honor.  Let's

16   take garden variety APA.  As to harmless error, how do

17   we think about harmless error in the administrative

18   context?

19       Your Honor, I think it matches up perfectly,

20   because for the same reason that Your Honor gives

21   deference to an agency at the end of its process, it has

22   considerable discretion.  It's gone through a

23   rulemaking.  I'm not going to second-guess its

24   substantive judgment.  The premises of that are it's

25   done notice-and-comment rulemaking.  It's come clean in

relevant respects so that commenters were properly informed, and they can engage.  So you can see a record of that, the back-and-forth, and determine whether the upshot is arbitrary and capricious.

And, Your Honor, if we're right -- and I don't think there's any contestation that we're right, that there were unclassified, nonprivileged portions of this that were material to their decision, and they deliberately held back, that's inimicable to the APA, and it means it has to go back to FinCEN without you necessarily saying, "You can't do this next time around."

All you will be saying is this rule is vacated because there was procedural noncompliance with the Administrative Procedures Act as to noticing comment, and you need to do it right, and allow that record to be built so that FinCEN can make its decision based upon that and then you can review based upon all of that.

That's my submission as to the unclassified, nonprivileged, Your Honor.

But there's another category that I'd like to address, and this is the unclassified and privileged materials.  And, again, Your Honor has me at a disadvantage.  I have not seen what is in the black box that you're reviewing, but I have every reason to

understand, Your Honor, from the way that the government
has characterized its submission, that it relied at the
FinCEN level and it is relying here upon privileged but
unclassified information that to this day we haven't
seen and we're not being permitted to see here.

          And the first thing I'd note about this, Your
Honor, is that Section 311 by -- just taking the
statute, is very clear that classified information can
be relied upon in this way, and I think it's equally
clear by implication that privileged information cannot.
So we think this is a statutory transgression at the
threshold.

          THE COURT:  Focus on SARs, as opposed to
generally privileged material.

          MR. SHAFFER:  Focus on the law enforcement
privilege, which I think would have to be proved up in a
way that's not been proved up.  So we'll just take SARs.

          Now, I have substantive concern about SARs
reports.  But Your Honor is asking, I think, about the
privilege; the privilege that supposedly protects these
materials against disclosure.

          THE COURT:  Well, privilege is an inapt term, I
think.  The government takes the position that it was
prohibited from disclosing not only the SARs, but
information that would review the existence to the SAR

1    by regulation, and you've challenged that proposition.

2         MR. SHAFFER:  We have, Your Honor.  And the

3    first basis on which we challenge it is, first, if that

4    proposition is correct, it follows -- and I think it

5    would follow substantively in any event -- that FinCEN

6    should not be relying upon SARs reports.  They're not

7    designed to prove that there was something illicit or

8    some impropriety.  The threshold is set quite low for

9    filing one of those reports, and then they are not to be

10   disclosed.  And we think it follows from that --

11        THE COURT:  What's the purpose of the SAR, if

12   not that the agency can take them into account in

13   sanctioning entities that it has jurisdiction over?

14        MR. SHAFFER:  Your Honor, to investigate and to

15   alert banks.  To say -- to basically monitor patterns.

16   But I don't believe that the government could come in

17   and try to convict someone or take adverse action

18   against someone based on a secret undisclosed SAR

19   report, as though it's proof of any underlying guilt.

20   So I do -- I think that that has implications beyond --

21        THE COURT:  But the standard is not proof of

22   guilt here.  The standard is, you know, a concern.

23   Don't SARs raise a concern, notwithstanding the fact

24   that they may not be dispositive of whether money

25   laundering is taking place?

MR. SHAFFER:  If that's true, Your Honor, it
would have drastic implications for banks around the
world because SARs reports are meant to be followed
routinely.  And if they're not disclosed, other banks,
by definition and by design, won't know about that.
It's a routine incident --

          THE COURT:  But over a five-year period, if one
bank has two SARs filed with respect to it and another
bank has a thousand, doesn't that raise a concern?

          MR. SHAFFER:  And if FinCEN had said that in its
Final Rule, Your Honor, I could understand that
reasoning.  But you won't find any reasoning like that,
I don't believe, from FinCEN in the notices or in the
Final Rule that says we've done some sort of a
comparison of incidents of SARs among different banks
based upon whatever they might want to compare and said
this comes -- this bank comes out badly.

          As I understand what they've done -- and, again,
I don't claim anything approaching insight into this,
Your Honor.  They've just looked at SARs reports in a
vacuum, as though their basis for saying this bank is of
concern, and there's a substantive basis for finding it
to be of concern, even though we haven't seen those SARs
reports and we can't contest them individually, and on
aggregate, we don't have any point of comparison

whatsoever.

        But, Your Honor, my submission to you is that the SARs reports can't simultaneously be relied upon and also withheld. They're not classified. It's the classified information that falls into that very unique, extraordinary and carefully limited category, and SARs reports are not among it.

        THE COURT: Okay.

        MR. SHAFFER: But even if you look at the statute, Your Honor, even if you look at the statute, it's clear that SARs reports can be disclosed by government officials in performance of their official duties. That's, we believe, what they're --

        THE COURT: Well, your belief leaves out the remainder of that sentence. It's performance of official duties consistent with Title II of the Bank Secrecy Act; it's not just any official duties, as I read the regulation.

        MR. SHAFFER: And, Your Honor, our submission is if they're going to rely upon SARs reports for purposes of this sort of a proceeding, either they're not authorized to rely upon them that way or it is pursuant to Title 2. I did not mean, by the way, to omit that sentence. We were going over the Court's page limit.

        THE COURT: I understand. Having read the reg,

1    it's not clear to me that that official duty would --

2    that official duty language would authorize it to

3    disclose a SAR in a 311 proceeding.

4          MR. SHAFFER:  Understood, Your Honor.

5          THE COURT:  As opposed to in connection with its

6    official duties under Title 2 of the Bank Secrecy Act.

7          MR. SHAFFER:  And something further, Your Honor.

8    The statute does say -- and it's not circumscribed to

9    Title 2 in this regard -- that the underlying facts are

10   not in any way covered.  Why -- how can it be --

11         THE COURT:  I agree with you on that.

12         MR. SHAFFER:  -- that we would not have even the

13   chance to know, here's a transaction, here's a date,

14   here's something about it, or just some general

15   categorization that, again, removes the darkness, Your

16   Honor, and shines some light on what the agency is

17   relying upon.

18         We understand that here, in substantial part, it

19   has relied upon SARs at the expense of the bank, and,

20   Your Honor, I note we didn't even know, until the

21   opposition brief was filed, that SARs reports were a

22   substantial part of what the agency was considering.

23   Why couldn't we have been able to launch a critique --

24   why shouldn't we have been able to launch a critique to

25   the agency, much as I am before Your Honor, about how

unreliable and inappropriate a SARs report is in this
context as a basis for presuming that there is
substantive concerns surrounding this bank and looking
at it in a vacuum, without looking at other banks?
Perhaps we could have -- if the agency was not going to
look at points of comparison, Your Honor, we would have
appreciated that opportunity, to do what we could.

      And if Your Honor doesn't have further questions
about this category, I'd like to turn to the classified
material.

      THE COURT:  Okay.

      MR. SHAFFER:  And I'll be clear with the Court,
Your Honor.  We're not here challenging the proposition
that the government can, in cases like this, rely upon
classified information.  Assuming that it's properly
classified, it needs to be withheld and so forth.

      We do think it triggers due process problems, to
be sure, but also APA problems.  When there's no
summary, there's nothing that really clues us in to
what's in that classified information.  And what could
the government have done, Your Honor?  The *Al-Haramain*
case in the Ninth Circuit is clearest about that.  We
think it could have prepared unclassified summaries of
the classified materials.  It could have admitted one
person of our team -- we have people who are classified

1    for security clearances to look at whatever classified

2    information could be shared.

3           And if they're not going to do that, Your Honor,

4    we would say that they ought to at least provide for an

5    adversarial hearing before some neutral arbiter at the

6    agency level who can look at that evidence with a

7    critical eye and determine is it out?  Is it on point?

8    Are there things that FBME is identifying in the

9    unclassified information that has implications for the

10   classified?

11          THE COURT:  You don't have any authority, I take

12   it, for the proposition that a neutral arbiter is

13   required or even has been used in CFIUS cases or in SFO

14   cases?

15          MR. SHAFFER:  I won't say that I have no

16   authority for it, Your Honor, because I think I have a

17   negative implication authority for it.  In *Withrow v.*

18   *Larkin*, which it -- I believe it's a decision of the

19   U.S. Supreme Court.  I may have to correct myself on

20   that.  But *Withrow* basically says that one is not

21   required -- that is, a full hearing before a neutral

22   decision-maker -- unless the actual decision-maker is

23   biased.  That's not required by due process.  But the

24   assumption that it's based upon is that the regulated

25   party had a full adversary hearing.

1        I'll quote the relevant portion of the opinion,

2    Your Honor.  It says, quote, A substantial due process

3    question would be raised, close quote, if, open quote,

4    the initial view of the facts based on the evidence

5    derived from nonadversarial processes as a practical or

6    legal matter foreclosed fair and effective consideration

7    at a subsequent adversary hearing leading to ultimate

8    decision, period, and close quote.

9        And that's the premise, Your Honor, that unites

10   *Withrow*, I believe, with the D.C. Circuit cases that we

11   were citing earlier.  The premise is we at least had the

12   opportunity to know what we were shooting at, certainly

13   as to the unclassified information.  And here we didn't,

14   Your Honor.  We did not have the full set of targets.

15   And that does call into question, in our view, the

16   fairness of this entire process.

17        THE COURT:  Let's just take a step back for a

18   second.  Isn't it fair to assume that Congress required

19   Special Measure 5 determinations to go through notice

20   and comment in order to provide the subject more due

21   process than would ordinarily be present in things like

22   CFIUS designations or foreign terrorist organization

23   designations, and that by requiring comment-and-notice

24   procedures, that that was meant to provide a process

25   that was due?

1    MR. SHAFFER:  Well, Your Honor --

2    THE COURT:  And is there any indication of that

3 in the legislative history or in the statute or

4 otherwise?

5    MR. SHAFFER:  Let me be fair to Your Honor's

6 question because there's no question we got more process

7 -- FBME got more process than respondents typically do

8 in the cases that Your Honor is referring to.

9    THE COURT:  Or in cases where Special Measures 1

10 through 4 are imposed.

11    MR. SHAFFER:  Although there haven't been many

12 cases like that, Your Honor, so I can't speak to them

13 with the same confidence.  I assume Your Honor's correct

14 in that assumption.

15    Congress doesn't decide, with all due respect to

16 the Congress, what due process requires.  And the

17 *Mathews* factors really do -- are sensitive, by design,

18 to the question of what is the governmental interest.

19 What is the burden upon the government?  What is the

20 nature of their private interest?  And when you get to

21 a -- this Fifth Special Measure, Your Honor, the private

22 interests are at their zenith.

23    The governmental interests, certainly in speed,

24 were such that FinCEN didn't need to act any more

25 swiftly than it did over the course of an entire year.

And, Your Honor, there wouldn't have been any particular
burdens on just having one person within FinCEN, even if
this person was going to be within FinCEN, who was not
essentially prosecuting the ruling-making who would take
a look.

And we think in this circumstance, especially,
Your Honor, where you have so much classified
information that we know nothing about, you have
unclassified information that concededly is material and
withheld. You have us asking for that material in the
context of the rulemaking and not seeing it. Your
Honor, I have to say I have not seen an administrative
process like this one with these sorts of interests at
stake and these sorts of deprivations that accompany it.

That's why we think -- I acknowledge, Your
Honor, that this is a rare case. And I don't have an
on-point precedent that says it violates due process to
deny the neutral arbiter in this case, but my respectful
submission to Your Honor is there is a real
constitutional question.

And if I'm right about --

THE COURT: But the private interests at stake
in the terrorist designation cases and the CFIUS cases
are stronger than they are here, are they not? There
the funds are actually frozen.

MR. SHAFFER:  I'm weighing imponderables, Your
Honor, and that's why I'm measuring it.  I do want to
note that FBME had, before the initial notices, some
$2 billion in assets in accounts around the globe.  It
had a vast international customer base.  It had numerous
correspondence accounts and was a real player in our
global financial system.

I just can't calibrate that, Your Honor.  I
certainly acknowledge that there are liberty interests
in those cases that can be impacted in a different way.
And to be called a terrorist organization carries an
even worse taint.  Those I would acknowledge, Your
Honor.

But as to whether the private interests here
weighed on the scale balanced more heavily, I'd
respectfully submit that they did.

THE COURT:  Okay.

MR. SHAFFER:  But in those cases, Your Honor,
we're talking about terrorists.  We're talking about
enemies of the United States.  We're talking about a
process that draws a laser beam on those sorts of
entities.

That's not the process.  That's not the
designation.  That's not the interest that FinCEN can
claim here, with all due respect to FinCEN.

I don't mean to trivialize their law enforcement
responsibilities, and I don't mean to deny that there's
some connection to these sorts of activities that's
there within their purview.  But that's not, Your
Honor -- they can't be equated fairly with OFAC when it
comes to the interests that are at work in these cases.
And, in fact, you wouldn't have even OFAC play out in
public over the course of a year the way that FinCEN did
here, which I think is a telltale sign that you don't
have the same sort of interests and certainly the same
sort of exigencies that foreclose this additional
measure of process that I'm submitting to Your Honor
should have been provided here.

THE COURT:  Okay.

MR. SHAFFER:  And, Your Honor, I did want to
note one other aspect of the *People's Mojahedin* case.
Again, this is a 2010 chapter.

There the D.C. Circuit was clear that although
they have not specifically held in a case that the
denial of any ability to see classified evidence was a
constitutional deprivation, they did say, Your Honor,
that if the classified information was critical, played
a critical role to the agency's decision, that would
make for a different case, and it would be open to say
that there needs to be some accommodation of the due

process interests.

　　And here, Your Honor, we'd submit it's summarizing the basic facts, it's providing some ability to access, through people who have authorized security clearances, some subset of that material.

　　And, Your Honor, there's one other thing that I think, in terms of a bottom line, needed to happen here, and that's for FinCEN, in its public notices or its public Final Rule, to say here's why we are finding this bank to have been culpable, in light of the classified information.

　　And my best submission to Your Honor on that point is the contrast with the Banco Delta Asia case. That's one, Your Honor, where there were North Korean fronts that were basically moving money through that bank. And FinCEN went out of its way to say, based upon a mix of classified and unclassified information, we know that there were audits that were done at the bank and there was information that was requested and the bank didn't share; and when the auditors came back with recommendations, the bank was nonresponsive to that; and when low-level people said we have a problem here, management was nonresponsive to that; and when they had the FinCEN proceeding, it was clear that they were just doing things as window dressing before getting back to

1    their old selves.  And FinCEN spelled all that out.

2          So even without benefit of the classified

3    information, the bank had some sense of why that

4    classified information was damning for it.

5          Here, Your Honor --

6          THE COURT:  Did FinCEN disclose the source of

7    that information?

8          MR. SHAFFER:  I can't claim that level of

9    familiarity with that administrative record, Your Honor.

10   My suspicion is no.  My suspicion is that some of those

11   sources, at least, were withheld.  And I would have a

12   different case, Your Honor, if I knew what were the

13   allegations in that classified information.

14         Even if I didn't know source, even if I didn't

15   know particulars about how it was gathered, even if I

16   didn't see the native pages, I could still note here's

17   something that FinCEN thinks was illicit going through

18   the bank and I could do my due diligence, just as I

19   have, Your Honor, for so many other cases, and just as

20   Ernst & Young did, in painstaking detail.

21         But, Your Honor, there's one other point of

22   comparison that I offer to you.  It's not a Final Rule.

23   It's just a notice of rulemaking as to *Banca Privado*

24   *D'Andorra*.  And there, what FinCEN has said is we have

25   high level managers A, B, and C.  At least from the

final -- at least from the proposed rule, we don't know
who they are.  Presumably that's classified.  Presumably
it would be sensitive.

But we do know, Your Honor, that they've traced
wrongdoing to specific high-level managers who were
complicit in specific transactions to a specific degree.
It even goes into the amounts that were at issue, where
that fell in relation to the bank's overall activities.
All of these details that, to Your Honor's point,
perhaps the respondents in those cases, they don't know
exactly what they're shooting at.  There's some measure
of specifics that has to be withheld as classified, but
they have a better sense, Your Honor, of what the case
is against them, what the premises are.

We did not have that, with all due respect, as
to the body of classified information that Your Honor's
been privy to.  And in our view, that deprivation is
gratuitous and glaring given the circumstances and given
the stakes.

Now, I recognize -- I was going to move on, Your
Honor, from the procedural points to briefly cover what
we think is the substantive reason why the rule is
arbitrary and capricious, but I don't want to move on
hastily.

THE COURT:  Let's talk about the property

interests and whether the bank is entitled to due
process protection.

I read the affidavit from Mr. Saab, and frankly
it doesn't tell me a whole lot about this North Carolina
property, the purported bank account, which makes it
difficult to compare this case to other cases in which a
due process interest has been held to exist or not to
exist.  So why don't you start there.  What is the
standard, and why is it that the representations of
Mr. Saab have, you think, satisfied that standard?

MR. SHAFFER:  Okay.  Thank you for the question,
Your Honor.  I had meant to cover that.

Let me begin with this:  The law on this is not
crystal clear, as I'm sure Your Honor has seen, and I
think the D.C. Circuit has acknowledged that there's
some haziness surrounding it.  I would note that in each
of the cases we're talking about, Your Honor, including
the OFAC cases, including the ones where you have
terrorist designations at issue, in each one the D.C.
Circuit has analyzed the due process concerns.  And we
think, again, that's fairly built into the statute, so
Your Honor can rely upon that.

THE COURT:  They didn't in the one involving the
IRA organization, correct?

MR. SHAFFER:  Your Honor, you're correct.  I

stand corrected.  I stand corrected as to that one.  I

believe --

THE COURT:  Because the entity had no physical

presence in the United States and only had members who

had post office boxes or bank accounts or something of

such in the United States, which appears to be analogous

to your argument, or at least the representation that

the bank has U.S.-based depositors.

MR. SHAFFER:  And I want to be clear about this,

Your Honor.  My understanding -- let me begin with the

context.  It's basically a land development deal that

the bank has extended the loans for; so it is financing

it.  It has rights to the property, just as any

mortgager would have rights to the property.

THE COURT:  Is it one of many --

MR. SHAFFER:  No, it is not one --

THE COURT:  -- financiers?  It's the sole

financier?

MR. SHAFFER:  Your Honor, it's not just that

I'm --

THE COURT:  A substantial financier.

MR. SHAFFER:  Yes, that's correct, to the extent

that it holds the right to foreclose on the property, as

I understand it.  In addition to that --

THE COURT:  It has made a loan to a property

1    developer secured by the property.

2         MR. SHAFFER:  Correct.  Correct, Your Honor.  It

3    is sole -- I've been told it is the sole -- it provides

4    the sole financing on this.

5         THE COURT:  Okay.

6         MR. SHAFFER:  The bank account --

7         THE COURT:  And this is the bank and not the

8    holding company?

9         MR. SHAFFER:  That's my understanding.  It is

10   FBME, the bank, that is the sole financier.

11        THE COURT:  Okay.

12        MR. SHAFFER:  And it has done it in its capacity

13   as a bank, as a lender.

14        And, Your Honor, the bank account basically is

15   one where proceeds from -- as different parcels of the

16   property are sold off, the bank gets paid off with a

17   portion of those proceeds.  So those are --

18        THE COURT:  Who holds the bank note?

19        MR. SHAFFER:  It is the attorney for the bank,

20   as I understand it.  He holds this in an escrow account

21   for the bank.

22        THE COURT:  So it's his account?

23        MR. SHAFFER:  It's in his name, Your Honor.

24        THE COURT:  FBME Bank?

25        MR. SHAFFER:  I believe that's right, Your

Honor.  And it's -- but it is, in our view, a
collectible interest, one that the law would protect.
As I understand it, it is their attorney acting on
behalf of the bank who holds the money in escrow, and
the amount is just north of $200,000, or it was when
last I was able to check.

And I'd note, Your Honor, that the U.S. doesn't
have any contrary evidence on this point.  And as to the
larger point, I would submit to Your Honor, although the
case law is, at best, hazy, that I would marshal in
support that the fact that FBME has correspondent
accounts, has U.S. dollars that sit in those
correspondent accounts to the tune of $800 million
worth, should give it a protectable interest, at least
as where that entire amount of money stands to be
deprived from it, based upon cutting it off from the
U.S. financial system.

THE COURT:  So you anticipated my next question.
How would the Final Rule impair FBME's interest in that
North Carolina bank account, if it goes into effect on
Friday?

MR. SHAFFER:  Our understanding, Your Honor --
and I'm sure Your Honor can sympathize with this -- from
the perspective of banks, especially those in the United
States -- but we'll talk about banks around the world in

a moment -- nobody wants to be on the wrong side of FinCEN.  And FinCEN has, by its own account, a very broad definition of "correspondent bank" and what it means to be doing business with FBME.  And in essence, if there's a suspicion, a reason to suspect that funds from a U.S. dollar account are going to flow to FBME, the sanctions for a U.S. bank are to be basically, again, at odds with the U.S. government and FinCEN.

But even for a correspondent bank, one that would be doing the transmitting from abroad, they stand to lose their access to U.S. dollars, Your Honor, because the U.S. correspondent banks have an obligation -- this is in the Final Rule.  It's entitled "Special Due Diligence of Correspondent Accounts to Prevent" -- "To Prohibit Indirect Use."  If they believe that some in-between bank is doing business in U.S. dollars in a way that touches FBME, they need to cut them off, too.

THE COURT:  Okay.  Let's assume that it's a Wells Fargo account in Charlotte, okay?  And there's $200,000 sitting in it in U.S. dollars that are the proceeds of the sale of this property that FBME has a mortgage interest in.  So that's -- it's their money in this account.  Could Wells Fargo transfer that money to FBME in Cyprus on Monday?

1          MR. SHAFFER:  And, Your Honor, regardless of

2     what I think is the answer to that question -- and I

3     won't pretend to be expert enough to give you a

4     confident answer -- I can tell you, from everything that

5     I know, that Wells Fargo will not.  Wells Fargo will not

6     because that's exposure they don't want.

7          THE COURT:  What happens to the money?

8          MR. SHAFFER:  Our understanding is it will

9     basically sit there unusable.  In context -- I have a

10    clear answer for Your Honor as to the U.S. dollars

11    accounts that are right now in suspension abroad; but as

12    to those, I can tell you, those banks will not send the

13    money to FBME, nor will they continue to hold it so long

14    as the Final Rule takes effect.

15         If the Final Rule takes effect, their

16    disposition of any U.S. dollars held for FBME or any of

17    its customers, those will either be returned to the

18    regulators -- and there's a fight between CBC and the

19    Bank of Tanzania about who the responsible regulator is,

20    so they're not confident that they can send -- we're

21    adverse, I have to note, to the CBC, Central Bank of

22    Cyprus right now.  They'll have to either choose between

23    those regulators; or if they can't make that choice,

24    they fear exposure there, they have to basically send it

25    to a court, their local court, to decide what is to be

```
 1   done with that money.

 2        THE COURT:  Okay.  Putting aside what will be

 3   done with the $200K in the account, would the Final Rule

 4   impair the ability of the property developer to make

 5   further deposits into that account?

 6        MR. SHAFFER:  Well, I can't answer the further

 7   deposits end, Your Honor.  I think --

 8        THE COURT:  Further transfers.

 9        MR. SHAFFER:  Yes.  That's our understanding,

10   that the borrower -- and, in fact, the bank, as a

11   prophylactic measure, has basically said -- forgive me,

12   Your Honor.  I can't tell you whether the borrower can't

13   put the money in -- I believe the borrower can't put the

14   money in because this is known to be an FBME account, or

15   whether the money that goes in FBME can't touch.

16        But in either event, Your Honor, the bank has

17   not been accepting loan payments that would otherwise be

18   FBME's to claim because the Final Rule was pending.

19   Even during the pendency of it, Your Honor, they took

20   that measure.

21        But I would note, Your Honor, of all the things

22   you're wrestling with, there are two things you don't

23   need to wrestle too hard, at least before granting your

24   preliminary injunction, on this question of does the

25   bank does have threshold presence or property here.
```

The first reason, Your Honor, is the D.C.

Circuit's instruction in *Gordon* is quite clear and it

follows the Supreme Court in *Ashcroft v. ACLU*.  And that

instruction, Your Honor, is consistent with

constitutional avoidance and the reluctance of courts to

adjudicate constitutional questions prematurely, without

proper development of the facts if it's a close

question.

          The close question goes in favor of the

preliminary injunction, certainly if the D.C. Circuit

would be looking at a preliminary injunction granted by

you, Your Honor.  Any close question -- I know there's

questions about the *Winters* sliding scale and whether it

still obtains, but not when there's a constitutional

question, and the *Gordon* case is clear about that.

          THE COURT:  But by the same token, you bear the

burden of persuasion or burden of proof that you have,

or that the bank has, a due process interest, correct?

          MR. SHAFFER:  I do, Your Honor.  And if Your

Honor wants more proof than is in Mr. Saab's

declaration, I will gather that.  But I just need time

and opportunity to do that.

          THE COURT:  Okay.

          MR. SHAFFER:  I'm not going to be able to do

that today.

THE COURT:  Putting aside the North Carolina property and bank account, is there any authority for the proposition that U.S. depositors are sufficient to establish a constitutional presence in the United States?  I have not seen it.

MR. SHAFFER:  I haven't seen it either, Your Honor.  I think the -- you cited the one case that's the exception to the rule.  The rule in all the other cases is they've found sufficient presence here through other means or simply by taking it for granted, as some of those cases appear to, because the entity had already been found to have presence, I presume.  But, Your Honor, that question just hasn't been reached.  It's not that there's bad precedent on it that I'm aware of either.

And I'd note one other thing, Your Honor, about why I don't think Your Honor needs to wrestle too hard with this question with the North Carolina property and so forth.  If Your Honor agrees that there's some recognizable property there, there is enough to give -- and this is true in the other cases we're talking about. It wasn't that the entity was much here.  They had done a lot of things to distance them selves from the United States, but they had just enough for the Constitution to be in play.

1    Your Honor, whether that North Carolina property

2    is going to be taken away from the bank or frozen or

3    somehow prejudiced, what matters to the U.S.

4    Constitution is that the bank's here, that the due

5    process clause is not completely indifferent to them and

6    their arguments.  And I think just having property or

7    presence here is enough to trigger due process.  There

8    doesn't have to be the additional nexus.

9    THE COURT:  So they could have a nonfinancial

10   presence that is completely unaffected by the Final

11   Rule, and that, in your view, would be sufficient to

12   confer due process protections in this proceeding?

13   MR. SHAFFER:  That's correct, Your Honor.  And

14   then you'd have to ask, is there some confiscation of

15   property?  Is there some deprivation of property to

16   trigger due process?  No one, I don't think -- I don't

17   think anyone's questioning that.

18   So I haven't seen the nexus requirement in these

19   cases.  And I don't think the nexus requirement follows

20   because, of course, if we're talking about any other

21   constitutional protection, we generally think of that in

22   terms of an individual or an entity to which

23   constitutional protections attach.  And if so, we

24   entitle them to the protection of constitutional

25   jurisprudence.

THE COURT:  Okay.  I understand.

                    MR. SHAFFER:  I have one last point, Your Honor.
I do think when we talk about the 311 process, as a
policy matter, Your Honor, I don't think it makes sense
for the 311 process to be structured differently, to
proceed differently based upon whether the entity
happens to have property or presence in the United
States.

                    And I'm not suggesting, Your Honor, that the
constitutional jurisprudence bends to this.  I'm simply
submitting to Your Honor that it makes a lot of sense.
As a practical matter, if the due process requirement is
relatively -- is not particularly onerous, it is
presumed, as Congress presumed, that it would attach,
and that it should be the rule that the agency affords
due process to affected entities in connection with 311.

                    THE COURT:  While we're on what will happen
after Friday, if this rule is not enjoined or delayed --

                    MR. SHAFFER:  And my friendly amendment to that,
Your Honor, is I fear it would happen on Friday.  On
Friday.

                    THE COURT:  What time?

                    MR. SHAFFER:  Well, we're talking about time
zones around the world so that's an interesting
question.

THE COURT:  Understood.

                    Let's talk about irreparable harm.  There was
quite a bit of back-and-forth in the briefing.  What is
the current state of FBME's business operations and how,
if at all, will they change -- will that change on
Friday?  The government takes the position that the bank
has no correspondence accounts, they're not able to
conduct business in U.S. dollars now, and so the status
quo on Monday will be the same as it is on Thursday.
Address that.

                    MR. SHAFFER:  Yes, Your Honor.  We believe --
things are bad now, Your Honor.  They will get much
worse, and potentially gravely worse, in all likelihood,
on Friday.  And let me explain why, Your Honor.

                    To give the government its due, the bank -- its
correspondent accounts that are U.S. dollar denominated,
those have been in a state of suspension in large part
for just under $800 million worth of those.

                    THE COURT:  For a year now?

                    MR. SHAFFER:  Yes, Your Honor, for essentially a
year.  Shortly following the notices, banks basically
decided -- they decided that they would do what they
thought was the prudent thing, Your Honor, and brace for
a Final Rule.

                    THE COURT:  Right.

MR. SHAFFER:  But they didn't dispose of those
accounts.  Those remain the bank's accounts, and they
remain held in a state of suspension in U.S. dollars.

         What those correspondent banks have told us they
will do to the extent of those U.S.-dollar-denominated
accounts, some $800 million worth, nearly that, it's as
I explained to Your Honor, they, to protect themselves,
those correspondent banks, are either going to choose
one or another regulator, the CBC or the Bank of
Tanzania, and they're going to send that money to the
regulator to determine how it should be disposed off.

         Or, number two, they're going to look for some
statutory mechanism and provide it to a court, to their
local court, and say, "Here's the money.  Here are the
circumstances.  Allow litigation to ensue over what is
to be done with this money all around the world."

         THE COURT:  What is the basis for that
suggestion or that proposition?

         MR. SHAFFER:  As you can imagine, Your Honor,
the bank has had intensive extended dialogue with the
major correspondent banks, and there are some 20-plus of
those, and the most important of those that remains and
is in the profile that I was just describing is
Commerzbank.  And Commerzbank, Your Honor, has indicated
that based upon the Final Rule alone, they were going to

do what I just said to Your Honor.  And the dialogue
was --

          THE COURT:  And is there an affidavit in the
record of someone who has spoken with Commerzbank and
has relayed what Commerzbank intends to do?

          MR. SHAFFER:  We have counsel from Hogan Lovells
who has done that, Your Honor.  I didn't want counsel to
be in the position of providing this sort of factual
testimony.  But if Your Honor desires that, we can
memorialize that in an affidavit.  And we can attach, if
Your Honor desires it -- I would ask that it be reviewed
in camera -- contemporaneous emails that report this
understanding.

          But, Your Honor, what Commerzbank bank then
recognized, given the pendency of this lawsuit and their
request for a preliminary injunction, they were willing
to remain in wait-and-see mode, essentially, to see if
the Final Rule takes effect.  If the Final Rule takes
effect, their options are as I've outlined, according to
them; to send it back to one of the regulators or else
to dispose of this through a court and leave it to
separate litigation to determine what follows.  That's
where Commerzbank is.  And they're huge from -- in terms
of the bank's persisting relationships with
correspondent banks.

```
 1          THE COURT:  Give me a -- quantify that.  What

 2   percentage, or roughly?

 3          MR. SHAFFER:  I wish I -- I can't give -- I may

 4   be able, in a moment, to give Your Honor some numerical

 5   sense of that, but what I can tell you in terms of their

 6   capacities, their capabilities, their ability to be at

 7   the center of transactions around the world, they're a

 8   lifeline for the bank.  And I've just been provided --

 9   the denomination, I think, is something like

10   $132 million plus.  That's the U.S. dollar

11   denominations, Your Honor.

12          I want to take separately the question of the

13   non --

14          THE COURT:  So these are accounts, and it's FBME

15   money in those accounts that are sitting in New York?

16          MR. SHAFFER:  New York --

17          THE COURT:  Wherever.

18          MR. SHAFFER:  I think it's elsewhere in the

19   world.  But, yes, Your Honor.  And some of that -- to be

20   really precise, it's FBME money.  Some of it is customer

21   deposits; some of it is the bank's own money, its own

22   accounts.

23          THE COURT:  Okay.

24          MR. SHAFFER:  The second category, Your Honor,

25   is the non-U.S. dollar denominations that are in
```

correspondent accounts, and the bank has retained at
least some measure of access to transacting those.  They
go through a special administrator, who's been appointed
by the Central Bank of Cyprus.  So that special
administrator has a measure of control over individual
transactions.

          THE COURT:  Let me cut you off there.  What, in
the Final Rule, or Special Measure 5, prohibits domestic
banks from holding non-U.S. dollar accounts on behalf of
FBME?

          MR. SHAFFER:  It's -- Your Honor, the concept is
the one that I was talking about in this special due
diligence or correspondent accounts to prohibit indirect
use.

          THE COURT:  Okay.

          MR. SHAFFER:  And to sum that up, Your Honor, as
I understand the language there, what FinCEN has said is
if you're a U.S. bank, and you're doing any sort of
business in U.S. dollars with a foreign correspondent
account, it's incumbent upon you, U.S. bank, to make
sure that there is no nexus between what that bank is
doing with FBME and what it has in your U.S. dollars.
And every bank, Your Honor -- I don't know of an
exception to this among the persisting correspondent
bank accounts, or at least it's the rule among them;

they do not want this exposure, Your Honor.

And the U.S. banks have told them, we want you to discontinue any business with FBME because otherwise they can't police, necessarily, what FBME is drawing upon at that bank, and everyone believes that they need prophylaxis.

And Your Honor asked the question in terms of direct effects of the Final Rule. But I would like, Your Honor, to quote a press release from FinCEN, July 23rd, 2015, in the immediate aftermath of the Final Rule, and this is a quote -- this quotes Director Shasky Calvery, and the remainder is from FinCEN. And let me quote it, Your Honor. It starts from a quote from the director.

"The finalization of this rule is significant," said FinCEN Director Jennifer Shasky Calvery, "because it demonstrates the United States will not allow a compromised foreign bank to send dirty funds to the U.S. financial system." And it continues -- now, this is FinCEN, "FinCEN's imposition will guard against international money laundering directly by restricting the ability of FBME to access the U.S. financial system and indirectly by public notification to the international financial community of the risk posed by dealing with FBME."

1      And I think what the quote encapsulates, Your

2 Honor, is that FinCEN is not only aware of the very

3 profound indirect consequences of its Final Rule, it

4 embraces them.  And, in fact, Your Honor will have

5 benefit of redacted portions of the memorandum that

6 accompanied the Final Rule that I don't have, but it

7 talks specifically about interactions that have been

8 extensive between FinCEN and the Central Bank of Cyprus

9 about what is to be done based upon the Final Rule.

10      In the wake of that, in fact, Your Honor, after

11 we alerted FinCEN and the Department of Justice that

12 this lawsuit would be forthcoming, you've seen a letter

13 from the Central Bank of Cyprus that refers to its

14 position not impacting any showing of irreparable harm.

15 It's hand-in-glove, Your Honor.  It is hand-in-glove.

16 That's the reality of it.  And FinCEN not only

17 acknowledges that, but encourages it.

18      And, Your Honor, in terms of what happens on --

19      THE COURT:  So just to make explicit what I

20 think you're suggesting is that the department

21 influenced the content of that Central Bank letter to

22 address the irreparable harm prong of what we're dealing

23 with?

24      MR. SHAFFER:  I wouldn't say that in those

25 terms, Your Honor.  I would say it's the predictable

1    outgrowth of this proceeding that regulators in Cyprus

2    who have life-or-death say over this bank are cueing off

3    of it; cueing off of it with keen awareness, not only of

4    what the results are of FinCEN's Final Rule --

5            THE COURT:  I've read the letter.  And what the

6    letter says is that they took the action or they

7    issued -- they are providing notice of their action in

8    September as a result of what happened as a result of

9    the notice of finding and the notice of proposed

10   rulemaking.

11           MR. SHAFFER:  That was the initial action, Your

12   Honor.  And then subsequently, in the immediate

13   aftermath of the Final Rule, that's when the CBC sent

14   its letter that threatened additional measures,

15   including -- specifically it references liquidation as

16   one of the options it's contemplating.

17           I'd point, Your Honor, to Paragraph 18 of the

18   Wyllie declaration that Your Honor has, and I don't

19   believe this is contradicted, that basically attests to

20   what I was describing, Your Honor, about how many of the

21   correspondent banks that have not yet terminated its

22   relationship with FBME, including Commerzbank, will stop

23   working with the bank when the Final Rule goes into

24   effect on August 28th, 2015.

25           THE COURT:  Who is Wyllie?

MR. SHAFFER:  Mr. Wyllie is the vice president at FBME, and he's the head of the correspondent banking department.  So he's essentially managing these relationships.

THE COURT:  Okay.

MR. SHAFFER:  But what I was referring to earlier, Your Honor, was subsequent.  An even sharper point has been put on this by Commerzbank.  As the bank implores Commerzbank to await the final outcome of this proceeding, Commerzbank has made clear that it treats effectiveness of the Final Rule as finality.

And that brings me to a third dimension of all this, Your Honor, which is FBME's customers.  And those customers, many of them left.  More than a thousand left in the wake of the notices, but others have been standing by patiently to see how this situation is resolved and whether it's resolved in a way that keeps the bank's ability to maintain correspondent accounts and ability to operate.  They're in wait-and-see mode, too.

And if, Your Honor, $800 million worth of the bank's U.S. dollars are completely cut off in the fashion that I was describing, if it loses its major relationships with correspondent banks that it would depend upon to transact internationally, those

customers, Your Honor, who have been willing to be
patient are, we fear, going to take that as a very
ominous sign about the status of their money, and it
will create a clamor for those customers to get that
money out.

They're regulated, Your Honor.  They can't make
unlimited withdrawals.  That's something that the CBC
and the special administrator are sitting on top of.
But they can do it to a specified degree at a specified
rate each day.  We're afraid they will max out beyond
that, and they, too, will add to the clamor for CBC to
do what would essentially end this bank; a sale, a
liquidation, or something that fundamentally changes the
nature of this business.  And that is classic
irreparable harm.  Any of those things.

And I'll make one further submission on that,
Your Honor, if you'll permit it.  We're here to
vigorously represent the bank throughout this
proceeding, and we intend to do everything in our power
to carry this case to final decision.

THE COURT:  That has not gone unnoticed.

MR. SHAFFER:  Probably over the course of a
vacation, I understand, Your Honor, and apologize.  But
I don't know that we'll be able to get there.  I do not
know that we will still be here before Your Honor after

1    August 28th because there are so many things that are

2    beyond our control once that Final Rule takes effect,

3    and there are regulators who have their say in Tanzania

4    and in Cyprus.

5          THE COURT:  Mr. Shaffer, if I conclude that

6    FinCEN did not adhere to the procedures required under

7    the APA during the notice and comment period, what is

8    the -- what is the remedy for that?  What are the range

9    of remedies?

10          MR. SHAFFER:  I see it -- I see one, Your Honor,

11    and it's consistent with what we're discussing --

12          THE COURT:  I know the one you're going to give

13    me.

14          MR. SHAFFER:  But, Your Honor --

15          THE COURT:  Short of rescission of the rule,

16    couldn't I remand to the agency to better explain its

17    reasoning, to give you further opportunity to comment on

18    any non-unclassified materials that you were not

19    provided in a timely fashion before the ruling was

20    finalized, and then go from there?

21          MR. SHAFFER:  Your Honor, I believe it's always

22    the "V" word when we're talking about the APA and we're

23    talking about violations of process, and I don't think

24    it makes a practical difference.  It may, Your Honor,

25    but I think, as a matter of law, the correct answer is

the Final Rule is vacated because it was arrived at in a
way that violated the Administrative Procedures Act
and/or the U.S. Constitution.  The premises that
judicial review would be predicated upon do not hold.

So the rule is vacated as a nullity.  And as
Your Honor -- that's not a reversal.  That's not saying
FinCEN -- and at the end of a much longer day, Your
Honor, perhaps I would venture to make an argument for
reversal of FinCEN that says you cannot impose a 311
sanction.  That's not what I'm going to be arguing for
at the end of this case.

What I'm arguing for at the end of this case,
and I think we have a likelihood of succeeding on, is
that FinCEN's rule, as issued, is invalid and therefore
due to be vacated, and, just as Your Honor said, the
case remanded back to FinCEN to revisit.  And that
doesn't foreclose a particular outcome.  It just ensures
that the agency proceeds as it should have proceeded all
along, in compliance with law.

THE COURT:  Okay.

MR. SHAFFER:  And just -- if I could make two
more points, Your Honor, about the equities, and then I
will, if Your Honor will permit it -- you've been very
tolerant of me, and I appreciate -- to argue the
substantive points on arbitrary and capricious review.

And I will be brief.

On the balance of equities, Your Honor, there's no disputing that FinCEN took a year to issue its Final Rule, and they say we shouldn't fault them because that shows how deliberate they were.  I don't mean to fault the agency for how long it took.  I simply mean to note that as a fact, that FinCEN did not perceive any particular urgency to that extent.  And I'd also note, Your Honor, that, as I said, things have been bad since the notice has issued, and that's understated.  They're not as bad as they're about to get, but they've been bad.

And so Hogan, in the administrative process, was respectfully urging FinCEN, "Won't you please resolve this, one way or another?  We think that the bank should be vindicated, and you should not be sanctioning under 311.  But either way, we need FinCEN's answer."  And even then, FinCEN took the time that it did.

Here, Your Honor, we're finally in court.  We have our day in court.  For FinCEN to contend that this case has -- that the rule has to take effect within a matter of weeks, where we're asking for very expedited briefing, this case can be finally resolved quite quickly, and FinCEN can't wait that long for judicial review to run its course.  That just doesn't square,

Your Honor.  Respectfully, it does not square.  That's
the equities.

And as to the public interest, there's good law
that we've cited that says violations of the
Constitution, including the due process clause
correcting them, is always in the public interest.  And
here, as I've indicated, the harm will be suffered and
there will be no rectifying it if August 28th hits
without a preliminary injunction.  It's, likewise, in
the public interest to ensure that agencies comply with
the APA.  There's a line of authority we've cited for
that.

And finally, Your Honor, when we talk about the
311 process and the ramifications of it.  I submit it's
important to the public in the global financial
community that FinCEN, too, answers to the rule of law,
and that FinCEN can't, absent extraordinary
justification, at least, trigger major disruptions in
international banking and the financial system that it's
part of under Section 311 until review in court has had
its fair say, as Your Honor is positioned to have fair
say.

THE COURT:  Thank you.

MR. SHAFFER:  Your Honor, the steep hill.  I'll
try to climb it, and I'll try to climb it in a sprint,

1    but not in terms of how quickly I speak.

2          THE COURT:  Okay.

3          MR. SHAFFER:  The first reason we think that it

4    is substantively arbitrary and capricious, Your Honor,

5    is that FinCEN ignored the best, most on-point and

6    recent data.  There's no dispute that this bank had

7    brought in auditors from Ernst & Young, from KPMG, had

8    them undertake a rigorous, thorough review of its AML

9    procedures, systems, its technologies, and it was making

10   improvements.  It was following those recommendations.

11   It was addressing deficiencies.

12          FinCEN essentially, Your Honor, ignored all of

13   that.  You won't see reasoning that grapples with that

14   or a meaningful acknowledgement of that in the Final

15   Rule.  Instead --

16          THE COURT:  The Final Rule acknowledges the E&Y

17   and KPMG audits and points out ways in which they

18   actually support FinCEN's determination; is that

19   correct?

20          MR. SHAFFER:  That's correct, Your Honor.

21          THE COURT:  So they certainly took it into

22   account.  They may have --

23          MR. SHAFFER:  I -- it's so overused, Your Honor,

24   I don't want to use the word "cherry-pick" but what Your

25   Honor just articulated, I think, is cherry-picking, at

least to the extent that FinCEN did not acknowledge, to
be sure, the conclusions were positive, the trends were
positive, improvements were being made and being found.

Here's why we think the deficiencies are so
serious as to overcome that.  Here's why we think
deficiencies indicate high level -- as the cases we talk
about say, Your Honor, FinCEN went out of its way to say
that the bank was incorrigible.  It said that and it
said why in *Banca Privado D'Andorra*.  It said that.  It
explained why.  In *Banca Privado D'Andorra* and in the
*Multibank*a case, where there were similar allegations
and concerns in the initial notice, Your Honor, FinCEN
agreed to take back the 311 and not impose any sanction
on the Final Rule, precisely because it acknowledged
things that are reflected, we think, in this case.  But
you haven't heard from FinCEN on them, Your Honor.

You haven't seen the Final Rule fairly
grappling, what we think -- what we think is the best,
most recent on-point data.  And I think that this is
especially concerning, Your Honor, because banks are
watching this case.  And for a foreign bank that sees
the way that FinCEN handled these audits in this case --

THE COURT:  And the best and most recent data,
in your view, are the elements of the E&Y and KPMG
reports that FinCEN, in your view, disregarded?

1          MR. SHAFFER:  Correct, Your Honor.  In terms of --

2          THE COURT:  There's nothing else out there

3    besides that?

4          MR. SHAFFER:  Again, Your Honor has the benefit

5    of the classified information.  But I'm going to

6    hazard -- this is incredibly dangerous, Your Honor, and

7    I may be wrong based on facts that I don't know, but

8    everything I know about this case and everything I think

9    I know about this case tells me that the trend was one

10   of improvement; constant, continuous improvement.

11         This is during a timeframe when banks around the

12   world are getting the message from FinCEN about

13   heightened vigilance, heightened compliance, how to use

14   technology, how to expand staffs.  This bank's staff

15   tripled from 2009 on forward.  It was bringing in

16   state-of-the-art technology from Oracle.  Oracle, in the

17   wake of the notice of proposed rulemaking, Your Honor,

18   basically bailed on the bank because it thought it

19   couldn't do business with them.  And then we brought

20   Oracle back into the fold and then we needed to get

21   regulators to approve, and all of that has been

22   complicated.  But all of that was happening.

23         And Ernst & Young, Your Honor, the audit from

24   2013 found that FBME had corrected deficiencies.  It

25   actually went through a very detailed checklist of here

1    are the things that the bank has done.  And FinCEN

2    hasn't said anything to the contrary of that, Your

3    Honor.  They haven't denied that the bank is getting

4    better.

5         The bank is moving in the right direction.  And

6    unless the classified information shows something that

7    basically makes that all look like a fig leaf, I don't

8    believe that FinCEN has taken any account of that

9    whatsoever.  And even if it had that in the classified

10   information, it hasn't given us or Your Honor an

11   indication that that's part of the reason in the Final

12   Rule.

13        The second reason why we think it's arbitrary

14   and capricious is the 311 factors, Your Honor, and as to

15   whether the bank is, quote, of primary money laundering

16   concern, close quote.  The only thing you have from

17   FinCEN is what the Department of Justice argues about

18   the interpretation of that and what is in an affidavit

19   that Ms. Shasky Calvery's affidavit explains how FinCEN

20   has been interpreting that term.  It's not in the Final

21   Rule, and it's not in the notices.

22        THE COURT:  I read that section in your brief.

23   What requires FinCEN, if anything, to define that term

24   in the notice?

25        MR. SHAFFER:  Your Honor, I think that's the key

1   fight that we're having here, is what is it that

2   justifies determining that this bank, as opposed to

3   having had some transactions that despite good faith and

4   good efforts and continuous improvements, they went

5   undetected and saying that this is a bank that is of

6   primary money laundering concern so as to warrant this

7   sort of a proceeding and sanction.

8        THE COURT:  Is that term not susceptible to a

9   common understanding, such that it needs to be defined

10  by the agency?  It's not a technical term, is it?

11       MR. SHAFFER:  Your Honor, *Chevron* deference all

12  the time when we have common sense terms, and I would

13  say the common sense around the room may differ on this,

14  because my submission to Your Honor is that the bank is

15  not of primary money laundering concern, unless, as the

16  factors indicate to us, you look at what is of concern

17  in the context of the bank's overall activities and say

18  what is the legitimate business that it's doing --

19       THE COURT:  Right.

20       MR. SHAFFER:  -- and what is illegitimate?  Is

21  this of primary money laundering concern?

22       They could also make an argument, Your Honor,

23  that perhaps some banks, because of a certain type of

24  money laundering, that implicates primary concern.  We

25  don't know what the agency has done with that key

statutory phrase in this rulemaking because it hasn't
said.  And that lack of explanation is a classic reason
why agency action fails as arbitrary and capricious.

THE COURT:  Okay.

MR. SHAFFER:  And that brings me to the factors,
Your Honor.  And I would simply note that FinCEN, by its
own account, hasn't given any credit to the bank for any
measure of legitimate activity, even though I believe
it's beyond question that most of what this bank is
doing, if not all of it, is beyond taint.  There's no
illicit transaction in it.  It has, as we've indicated,
a large scale of operations.

It's been operating over a long period of time
and the recent trends have all been positive.  We don't
know what basis FinCEN thinks it has in 2015 for
treating this bank as a primary money laundering
concern.  And in terms of looking at those two key
factors, what is the extent of the money laundering
activity, what is the extent of legitimate business
activity.  FinCEN has not done that balancing, Your
Honor, not in any meaningful way.

The last point, Your Honor, is the punishment.
And here I would point Your Honor to the Friedman
decision by the D.C. Circuit that says squarely, where
even where everything else that the agency did was

correct, everything was justifiable, every argument is
rejected save for one, Your Honor, which is that there
the party had indicated to the agency, "Look at how
disproportionate your penalty is in this case, as
compared to other cases decided under this same
subsection."  And the D.C. Circuit said simply, and
unanimously, that the agency hadn't explained why it was
imposing this penalty -- particular penalty, especially
stiff penalty, in that case as compared to others that
were similarly situated.

        And here, Your Honor, this point was made to
FinCEN in the administrative process.  We cited them to
the cases that involve a real bad actor.  We cited them
to cases where the penalties were much less, and FinCEN
didn't say --

        THE COURT:  So are you referring to Special
Measures 1 through 4, or are you referring to other
penalties associated with a Special Measure 5
designation?

        MR. SHAFFER:  It's not special -- well, let me
explain it this way, Your Honor:  We pointed to a raft
of different cases.  Some of them involved fines.  They
were not decided under Section 311 at all.  They were
potential 311 cases that had been handled well short of
311.

THE COURT:  But how could FinCEN fine or impose
a monitorship over FBME under 311?  As I read it, that's
not -- that's not an available remedy under Special
Measure 5 or otherwise?

MR. SHAFFER:  And, Your Honor, the first point I
would make, if FinCEN does not think that Special
Measures 1 through 4 are available in a case like this,
they should say that.

You won't find that in a Final Rule.  You won't
find that in the notices.  I've looked across everything
FinCEN has said about foreign banks.  They've never said
it.  I believe that they might want one day to settle on
some measure short of a Section 5 prohibition, but they
certainly haven't explained to Your Honor that they read
the statute that way.  That's the first point.

THE COURT:  Well, they've said here.

MR. SHAFFER:  They've said here.

THE COURT:  I haven't gone back to the rule, but
they've certainly said here that 1 through 4 involve
recordkeeping and would not be sufficient or viable to
remedy the laundry list of violations that are noted in
the rule.

MR. SHAFFER:  Section 5 itself talks about
conditioning of the domestic bank's opening of an
account or maintenance of an account.  And in our -- we

don't see a reason why it is statutorily foreclosed to
FinCEN to say the domestic bank cannot be doing that
unless there's been a showing made to FinCEN's
satisfaction that the bank has come into compliance, and
they could do that through measures X, Y, and Z.  That's
another way that they could approach it.

They could approach it, Your Honor, the way they
did in the *Multibanka* case where FinCEN did this.  They
proposed a possible 311 sanction.  They engaged with the
bank.  They obtained assurances and demonstrations that
the bank was righting itself, and based upon that, came
back in a Final Rule and said, given that showing,
there's no need for a 311 sanction; the bank is
rehabilitating itself.

There's no explanation from FinCEN as to why
this bank doesn't fall into that category except they
say there are indications that problems continue.  I
don't know what the basis of that is, Your Honor.  Your
Honor may know, but it needs to be strong in order to
marry up with that rationale.

And the last point is, Your Honor, in this case,
FinCEN has relied a lot upon what the Central Bank of
Cyprus has said about this bank.  It has, in some sense,
looked at the Central Bank of Cyprus as a proxy.  As
we've discussed, Your Honor, there's nothing invidious

about that.  FinCEN does that all the time in
cooperating with international regulators and having
international regulators carry their share of the water.

There's no reason why, at least for an interim
period, a probationary period, something like that,
FinCEN could not have said, "Central Bank of Cyprus,
we're going to await further instruction and feedback
from you about this bank, and here are things we're
going to suggest need to be demonstrated to your
satisfaction and ours."  And there could have been that
sort of a partnership, but that was not attempted.

THE COURT:  We're sort of mixing process and
substance.  It's one thing for FinCEN to explain why
they chose this alternative over others.  It's another
thing to argue that they were not within their
discretion to choose Special Measure 5 in the way that
they did.  And you're arguing both.

MR. SHAFFER:  I am arguing both, Your Honor, but
I would retreat to the latter if -- because I think it
is good enough basis to vacate.

THE COURT:  The latter is a much harder
argument.

MR. SHAFFER:  I'm sorry, I meant the former,
then, Your Honor.  In this sense, let FinCEN explain.
We've floated alternatives to them.  They didn't grapple

with those alternatives.  We said Special Measure 5 is
specially reserved.  It's not warranted here given the
exculpatory showing, the prospect of rehabilitation.
That's not something that FinCEN grappled with in our
case the way it did in other 311 cases, and I think that
those cases are my best demonstration of that, Your
Honor.

With that, Your Honor, you've been more than
permissive of me, I'm going to retreat.  And I apologize
to the court reporter once again.

THE COURT:  That's all right.  You've worn me
out for the time being.  Let's take a five-minute
recess.  You guys can relax a little bit, and we'll kick
off with the government when we get back.  Okay.
Thanks.

(Recess taken)

THE COURT:  Okay.  Ms. Lee.

MS. LEE:  Your Honor, before I begin, I just
wanted to explain that I'm going to be discussing the
likelihood of success on the merits.  So all of the
process questions, I guess, fall under that.  And my
colleague, Ms. Powell, will be discussing irreparable
harm and also the balancing of the equities.

THE COURT:  Okay.

MS. LEE:  So just in case that influences how

1    you want to ask your questions.

2            THE COURT:  Okay.

3            MS. LEE:  So I will start by addressing the

4    process argument, since that was what Your Honor

5    indicated you wanted us to focus on.  And I'd like to

6    start with what the plaintiff admitted and what is not

7    in dispute, which is that they admit that FBME got far

8    more process than is generally actually ever accorded in

9    any cases that are similar to this; cases involving

10   designations of terrorist organizations or narcotics

11   traffickers under IEEPA, the International Economic

12   Emergency Powers Act.  They also can't deny what process

13   was actually given to them in this case.

14           As Your Honor noted, under the statute, 311, the

15   special measure in connection -- the Fifth Special

16   Measure could only be done according to regulation,

17   which meant the full notice and comment rulemaking.  So

18   what they got was a full notice of finding that laid out

19   in substantial detail the basis of the director of

20   FinCEN's concerns as to why they were a primary money

21   laundering concern.  And in addition, they were allowed

22   to submit comments, both during and beyond the time

23   period, including extensive submissions which FinCEN was

24   not obligated to consider, but did consider.

25           FinCEN also engaged in a very ongoing dialogue

with FBME through telephone and email and even an
in-person meeting where they attempted to -- they
received FBME's questions and they tried to answer them,
and they did answer them to the extent they could
without disclosing classified or privileged information.

THE COURT: But giving a subject of a
determination like this more process than they were due
in one area -- for instance, you know, accepting
comments past the deadline -- does not entitle FinCEN to
give it less process than is due in other areas,
correct?

You can't say, "Well, we did one, but that
explains why we didn't give them the other." Is that a
fair statement?

MS. LEE: I wouldn't dispute that. If Your
Honor --

THE COURT: If the D.C. Circuit says that they
have to be provided the unclassified record upon which
the agency relied upon, you're not suggesting, I don't
think, that you would be relieved of that obligation
just because you accepted comments beyond the comment
period.

MS. LEE: No, Your Honor, if that, in fact, is
what the D.C. Circuit said.

THE COURT: Well, talk about that.

MS. LEE:  Right.  So the cases in the *NCRI*, *PMOI*

and most recently *Ralls* indicate that the plaintiffs

were the target should be provided with the unclassified

basis for the designation.  And we would submit that

that was done here in the notice of finding and, you

know, was also supplemented by what information was

disclosed, albeit limited, to the plaintiffs during the

process.

          THE COURT:  You say the unclassified basis.

I've read those cases, and the language, I have to

admit, is not entirely consistent.  In some of the cases

it says the unclassified evidence.  In some cases it's

the unclassified information.  And the question that I'm

grappling with is what does that mean?  Does that mean

that the underlying documents must be disclosed, or is

it sufficient, as I anticipate you will tell me, to

summarize the unclassified evidence in the rulemaking?

What do those cases actually require the agency to

provide?

          MS. LEE:  Your Honor's correct that we believe

whatever is required by the D.C. Circuit was provided in

the notice of finding.  I agree that the case law isn't

explicit about what the unclassified information that

needs to be provided entails.  We would submit that it

does not extend to all the underlying unclassified

exhibits.

And I would also like to point out that looking at the facts of those particular cases is important because, in all of those cases, the targets basically got nothing. And that's very different from this situation where, again, they got a very detailed summary of what the basis of the finding was and the concerns; so we think that's more than enough.

Now, as to -- you know, if you want to say that we didn't give them everything because they pointed to some of the specific exhibits that were maybe not specifically cited in the finding, I would say, and Your Honor, of course, has seen -- I don't know if you had a chance to review it particularly thoroughly, but none of those individual items of unclassified evidence standing alone were what I would consider to be material or really they were only relevant in conjunction with the evidence that is classified or privileged.

So if plaintiffs are trying to say that if they had known this, they would have somehow been able to -- and this is getting a little into the harmless area inquiry, but if they're saying that they would have been able to rebut it and say, "Look, there is evidence in contrary," the problem is they can't speak to the evidence that they haven't seen that would in some -- I

1  think in all of these cases render whatever their

2  rebuttal is moot.  So --

3       THE COURT:  But that's -- how does that position

4  square with Footnote 6 of *PMOI* where the Circuit, I

5  think, was pretty clear in saying there was no harmless

6  error standard, at least in the due process context

7  because, you know, the Court should not be in a position

8  to guess what responses the bank would have made, had it

9  known of all of the information.

10      MS. LEE:  Respectfully, Your Honor, we didn't --

11  I may have to -- and I did actually look at *PMOI* again

12  during the break.

13      THE COURT:  Okay.

14      MS. LEE:  But I'm not convinced that it says

15  that you can't -- that there is no such thing as

16  harmless error in the due process context.  I believe

17  the footnote you're referring to was referring

18  specifically to that particular case that was before

19  them.  But I think, to your larger question about, well,

20  you know, how can the Court really know what they would

21  have been able to do with this?  That may depend on the

22  individual facts of the case.

23      But in this case, again, Your Honor has reviewed

24  the record.  And plaintiffs really can't show that --

25  let's put it this way:  If there was anything --

anything that was important and material that the agency

relied on was in the finding, and plaintiffs had full

notice and knowledge of that, so to the extent that the

smaller items that might have contributed to that were

not available, even if they had had them and were able

to rebut them, that would not have made a difference to

the ultimate outcome.

THE COURT:  Okay.  The plaintiffs mention

this -- the article or the information regarding the

Italian politician, which is nowhere mentioned in the

rule, but the agency has acknowledged that it relied on

that information in making the determination.  How could

they have responded to that allegation if it weren't in

the rule or otherwise provided to them?

MS. LEE:  Just at the risk of repeating myself,

I don't believe it's correct to view that one newspaper

article in isolation, and I do think it's significant

that the fact that it wasn't cited in the finding means

that while it may have been part of the record, and in

that sense the agency relied on it, it was not -- it was

not the item that was, again, material to the final

decision.

THE COURT:  So your position is that there's a

materiality gloss on the requirement to provide

information relied on by the agency that's unclassified?

MS. LEE:  I believe that's a fair reading of
*Ralls*.

THE COURT:  Okay.

MS. LEE:  Again, it's up to Your Honor to decide
the theory of that.

THE COURT:  I understand.

I'm curious, why didn't the agency simply
provide materials that they've now provided in the
Brooker affidavit?

MS. LEE:  I -- well, I hesitate to speak for my
agency without asking them that myself, but my guess
would be that it -- and some of the case law in similar
context speaks to this.  It would give a somewhat
misleading picture to plaintiffs, I think, to just give
them the unclass and have them under the impression that
this is the kind of thing that they were relying on.
And, again, I think that they believed that what was in
the notice of finding really highlighted what were the
most -- the major concerns.

THE COURT:  So you did it for their benefit?

MS. LEE:  For --

THE COURT:  The agency did it for the bank's
benefit, so as not to confuse them and mislead them?

MS. LEE:  I mean, the whole purpose of the
notice of finding is to make clear what the basis for

the finding is.  And, yes, to the extent that we don't
want to give a misleading or incomplete picture, the
notice of finding was probably -- is a far more reliable
indicator than piecemeal parts of the unclassified
record.

          THE COURT:  Okay.  How was the agency -- the
materials that were disclosed to the bank, how were they
disclosed?  You know, sometimes the agency will post on
Regulation.com or otherwise make public the materials
upon which it relied.  Was there a process in this case
like that?  Or was it just in response to, you know,
interaction and meetings and comments with the bank?

          MS. LEE:  I don't think any of those -- whatever
was discussed with FBME, to my knowledge, was not made
public.

          THE COURT:  Okay.

          MS. LEE:  So the plaintiffs also raised
questions about the propriety of withholding the Bank
Secrecy Act evidence.

          THE COURT:  Yes.

          MS. LEE:  I would like to take issue with one
factual point where they act as -- they say that they
had no knowledge or expectation that FinCEN was relying
on suspicious activity reports when, in fact, the notice
of finding does make reference to suspicious

transactions.  Of course, it doesn't say specifically
what they are because that's precisely the information
that needs to be protected, and also the fact that
Congress, in Section 311, did not specifically address
BSA evidence does not mean that the logical conclusion
is that that should not be relied upon.

I do think FinCEN gets *Chevron* deference in
interpreting the statute, and in this case they
interpret it to mean -- especially when you consider
that the confidentiality provisions of the Bank Secrecy
Act were strengthened at the same time and in the same
legislative package as the Section 311 legislation.

So all of this was supposed to be part of an
overall effort to combat money laundering, and --

THE COURT:  As I read those regs, government
authorities are not authorized to disclose the SAR
itself or information that would reveal the existence of
the SAR.

MS. LEE:  That is correct, Your Honor.

THE COURT:  But they are authorized to disclose
the underlying transactions and facts that form the
basis of the SAR; is that correct?  Which banks are not
allowed to disclose, but government authorities are
allowed to disclose.  Is that fair?

MS. LEE:  I may -- I may have to defer to my

FinCEN client on that point.

THE COURT:  Okay.

MS. LEE:  I think we'd be hesitant to say that.
Basically --

THE COURT:  So long as doing so doesn't reveal
the existence of the SAR.

MS. LEE:  I think that's fair, yes.

THE COURT:  And I guess my question is, did
FinCEN attempt to do that in the notice of finding?

MS. LEE:  Yes, Your Honor.  The notice of
finding set forth very specific examples of the kinds of
suspicious activity and suspicious transactions.  Again,
they could not find --

THE COURT:  So when there are references to
suspicious wire transfer activity, 4,500 suspicious
wires over a certain amount of time, or surge activity
or whatever else is mentioned in that notice of finding,
that represents the agency's attempt to summarize
information that it may or may not have gotten from a
SAR?

MS. LEE:  That's fair to say, Your Honor.

THE COURT:  Okay.  Okay.  I have to be careful
about --

MS. LEE:  Yes.

THE COURT:  -- what we discuss, obviously.  But

it's fair to say that those sections of the notice of

finding is what we're talking about, whether the agency

complied with its disclosure obligations?

MS. LEE:  That's my understanding.  Now, it may

also be that some of the specific facts to do with a

particular client and suspicious accounts -- again, I

should also be careful here.

THE COURT:  Right.

MS. LEE:  You know, it wouldn't be out of the --

it would not surprise me if those were also linked to

reports of that kind.  But, again, I can't really

confirm or deny that here, so --

THE COURT:  Understood.

MS. LEE:  But I think the overall -- it is fair

to say that I think it's a disingenuous argument that

this blind-sided FBME.  I mean, they're also a bank,

so -- and they even talk about how they also -- they did

their own filing of suspicious activity reports.  So it

can't really have come as a huge surprise.

Now, on the classified evidence, I, again, just

want to reiterate that plaintiffs admit that they

basically have no precedent to point to for the kind of

extra process that they're asking for here.  In none of

the cases involving designations under either -- under

either designations of foreign terrorist organizations

or designations under IEEPA have the kind of adversarial hearing with a neutral arbiter ever been held or required.  So that, I think --

THE COURT:  I agree with you there, but there is precedent for unclassified summaries of classified information, the *Al Haramain* case in the Ninth Circuit. Why would -- what's your view as to whether that would be viable in this case?  Whether it's appropriate or viable?

MS. LEE:  Your Honor, as for the unclassified summary, I mean, I've already said, I believe, that was provided in the notice.

THE COURT:  I mean, unclassified summary of the classified information.

MS. LEE:  Right.  I do think the notice finding finds both -- it's an unclassified summary of everything, so that includes both the classified and unclassified.  So I think that was provided.

To the extent *Al Haramain* suggests that access by counsel to the -- counsel for plaintiffs is an option, I would only point out that this -- no D.C. case, D.C. Circuit case or, in fact, a district court case says that that's permitted.  In fact, it would, I think, be contrary to the legal precedent in this district.

So they haven't shown that they're entitled at

all to that.  And also, I just wanted to touch on

whether or not they're even entitled to due process in

the first place.  Your Honor had a pretty extended back

and forth with them about the nature of their contacts

and their interests, and it really does seem to boil

down to this one account in North Carolina, which it

became very clear -- it already was clear in their

submissions that we have almost no facts on what the

ties are or -- and also they haven't shown at all that

any of this would -- that they would lose the money in

this account if this were to ever go into effect.

          Your Honor needs no reminding that Section 311

does not freeze or block or seize any assets.  It just

means that they can't do --

          THE COURT:  Okay.  Assume for the moment that

the representations that counsel made regarding the

nature of that account could be substantiated through a

declaration of some sort.  You know, isn't it --

wouldn't the -- why wouldn't that be sufficient to

establish a due process interest, given the cases that

have held that a bank account -- a small bank account,

at that -- plus some other presence, perhaps, could meet

the standard?

          MS. LEE:  The one thing that I think I do agree

with plaintiffs on here is that the D.C. Circuit law is fairly unclear on what the exact standard is.  But I do believe that all the cases that have held there to be a U.S. presence have involved more than what we had here. Even in terms of the small bank account -- I believe that was *PMOI,* or maybe it was *NCRI*, but they also had, yes, an actual physical presence in a building, which there's no indication of that here.

So I'd say that there's less here than would justify finding contacts.  I mean, they are essentially a foreign bank.  They do most of their business -- they do all of their business internationally, so --

THE COURT:  Let's assume that I conclude that there is some property interest sufficient to establish due process protections.  Does there -- is a nexus required between that interest and the action that is being proposed?

MS. LEE:  That, I think, is also a little unclear in the law.  I'd say that it would make sense just because the rights --

THE COURT:  Why do I get the cases where everybody's unclear?

MS. LEE:  But in this context in particular, what's in dispute -- you know, I think it would make sense that there would be a nexus between, you know,

1    what they say they're losing and the United States, but

2    I can't point you to some specific case that --

3            THE COURT:  But if they have a U.S. dollar

4    account, and it's sitting in Wells Fargo bank in

5    Charlotte, North Carolina, that they're transacting

6    business through, wouldn't Special Measure 5 impair

7    their ability to continue that activity?

8            MS. LEE:  "Activity" meaning...?

9            THE COURT:  Sending them money from their

10   account in Charlotte based on sales of these development

11   lots.

12           MS. LEE:  Since this hasn't really been tested

13   yet, I can't really speak to that, but I do know that

14   they would -- they would get -- I think that they would

15   not lose their money.  That's all I can say on that.

16   But I can -- I can, of course, also follow up and see

17   what my client has to say about that.

18           I don't know if Your Honor wanted me to also

19   talk about the substantive allegations.

20           THE COURT:  Why don't we stick with process for

21   the moment.

22           MS. LEE:  Okay.

23           THE COURT:  Have we exhausted -- how about

24   consideration of alternatives?  Is there anywhere in the

25   Final Rule where FinCEN attempts to explain why Special

1    Measures 1 through 4 are not viable or appropriate or

2    some conditions short of prohibitions against

3    correspondent accounts in Special Measure 5?

4         MS. LEE:  It's not explicitly addressed in the

5    Final Rule, but that consideration, I believe, is

6    inherent to what's in the Final Rule.  And this also

7    goes back to a lot of the back-and-forth that went on in

8    the notice and comment period.  Special Measures 1

9    through 4 primarily focused on gathering information,

10   and in this case they had -- they got a lot of

11   information.  They had a lot of information, and the

12   conclusion was that this would not combat the problem

13   that they perceived, and so the Fifth Special Measure

14   was the one that was appropriate.

15        THE COURT:  That conclusion is completely

16   implicit in the rule.  It's not explained, is it?

17        MS. LEE:  It's not direct -- it's not explicitly

18   explained.

19        THE COURT:  Okay.

20        MS. LEE:  But I think the inference from what is

21   in the Final Rule naturally dictates that conclusion.

22        Also, I think it can't be stressed too much that

23   Section 311 does confer a really, really broad

24   discretion on the secretary and, by delegation, the

25   director to weigh these factors, all of the factors

1     to -- both in terms of finding a primary money

2     laundering concern and also which special measure to

3     impose.

4          So the fact that there isn't more -- that there

5     aren't more stringent requirements or specific

6     requirements built into the statute I think should also

7     influence the analysis here.

8          THE COURT:  Let's go back to special measures.

9     Your argument is that they are not viable options

10    because they only require recordkeeping and information

11    gathering.  Is that right?

12         MS. LEE:  That's correct, Your Honor.

13         THE COURT:  But why wouldn't requiring U.S.

14    correspondent banks to, for instance, obtain information

15    regarding beneficial owners and, you know, provide that

16    information -- you know, on corresponding accounts that

17    related to FBME, and then to provide that information to

18    FinCEN so that they could assess whether there are any

19    beneficial owners who are bad guys.  Why wouldn't that

20    relate to FinCEN's goals in this case, which is to

21    prevent money laundering?

22          I mean, I understand that they are different

23    types of remedies than Special Measure 5, but wouldn't

24    they relate in some way to the ultimate goal of money

25    laundering prevention?

MS. LEE:  They would relate -- my best
conclusion is that they would not sufficiently address
the risk posed here.

          THE COURT:  Okay.

          MS. LEE:  And that was the determination that
was made, and that was within the discretion of the
director to make that decision.

          THE COURT:  I'm not arguing with you whether it
was within the discretion to make that decision.  You
know, what the plaintiffs have argued is that it was
incumbent upon the director to explain why, in the rule,
those intermediate measures were not sufficient.  And
the ultimate question is whether there was an obligation
to do that.

          MS. LEE:  Yes, Your Honor, and I -- I believe
I've stated that there -- we don't think that there is
an obligation to specifically set forth any of the --

          THE COURT:  Because they aren't viable?

          MS. LEE:  Yes.

          THE COURT:  Isn't the standard that the agency
must consider significant, viable, and obvious
alternatives?

          MS. LEE:  That's correct.

          THE COURT:  It's an obvious alternative, because
it's in the rule.

Now, your position is it wasn't viable because
it would not be aligned with the dangers set forth in
the laundry list of concerns that the secretary -- does
that fairly --

        MS. LEE:  Yes, Your Honor.

        THE COURT:  Okay.  I just want to make sure I
understand your argument.

        I guess the same question goes with -- counsel
mentioned dispositions as to other banks and why certain
banks were fined, certain banks were not given the
so-called death penalty that's at issue here.  Why
wasn't the agency obliged to explain why?

        MS. LEE:  Why they treated --

        THE COURT:  Why they treated FBME differently
than other banks.

        MS. LEE:  Well, I'm pretty sure that is also not
in Section 311.  I don't even know if it's a factor --
well, let me take that back.

        It does not -- Section 311 does not require
FinCEN to specifically explain why it's treating FBME
in this -- or, decided to impose a measure in this way
and not the same measure on other institutions.  And
each time that the secretary -- I mean, sorry, the
director imposes these special -- one of the special
measures, it's going to be a very fact-specific case.

In the case of *Multibanka*, which I think is the main one that plaintiffs are relying on.  My understanding is that in that case, the circumstances were different because the bank was working very closely -- it was I believe a Latvian bank, and it was working very closely with the government of Latvia on its compliance measures.  And that sort of cooperation is, obviously, something that wasn't present here.

I think it's fair to say that the FBME has a very different banking relationship with the banking jurisdictions with which it's doing business.

It's also worth noting that at the same time that the Special Measure was -- well, when the notice was issued for *Multibanka*, there was another Latvian bank -- and the name escapes me at the moment -- that also had a notice.  And in the end, that bank was not -- that bank, they did proceed with the Final Rule.

So I actually think the fact that FinCEN was convinced to withdraw the notice for *Multibanka* actually shows that they aren't arbitrary or capricious in these processes.  They evaluate each case on the specific facts, and, you know, where they feel like it is actually a serious-enough threat, then they go through with the Final Rule.  But it's not some sort of one-size-fits-all blanket approach.

THE COURT:  Okay.  I'll give you five minutes on

the substance.

          MS. LEE:  Yes, Your Honor.  On the substance,

plaintiffs rely almost completely on their submissions

that were made, particularly the audits from KPMG and

Ernst & Young.  But just their whole approach to this

seems to indicate maybe not confusion, but some sort of

misapprehension of the standards here, which is that

it's not FinCEN -- it's FinCEN's judgment that's

entitled deference here, not FBME's auditors, and

certainly not FBME itself.

          And this was actually noted -- the Final Rule

did take into account the audits and everything else

that FBME submitted.  And the final rule notes that

there was evidence of money laundering activity that was

still going on, even after the audits -- even after the

recommendations from the audits were either being put in

place or about to be put in place.

          And contrary to FBME's assertions, I don't even

think it's a fair assessment to say that the audits gave

a completely clean bill of health and said that it was

all good.  They did point out deficiencies to do with

customer due diligence procedures.  And it's not enough

for FBME to say, Oh, well, we worked on that and we're

fixing it.  Because, again, the deference here is to

1    FinCEN's judgment and assessment of whether or not they

2    still posed a risk despite that.

3           And given the very high level of deference in

4    these types of cases, it's -- the Court is well aware

5    that it's not -- it's not the Court's job to

6    second-guess that assessment or to say that they were

7    arbitrary and capricious because they didn't adopt

8    FBME's characterization of the audits.

9           THE COURT:  This may be somewhat of an aside,

10   but clearly there is extra deference in matters of

11   national security and foreign relations.

12           MS. LEE:  Yes, Your Honor.

13           THE COURT:  And that's been established in --

14           MS. LEE:  A boat load of cases.

15           THE COURT:  -- terrorist organizations cases and

16   CFIUS cases.  And here, obviously, there are some

17   national security related allegations, sanctions

18   avoidance and things of that nature, but much of this is

19   pure international crime, right?  How does, you know, a

20   boiler room fraud case in Ohio where the proceeds wind

21   up -- and investment fraud in Ohio where the proceeds

22   wind up in Cyprus, how does that implicate national

23   security?

24           MS. LEE:  It's important to -- even though that

25   is part of the activity that FinCEN was concerned with --

THE COURT:  Or Equatorial Guinea and foreign corruption, foreign Corrupt Practices Act proceeds.  Those aren't issues that necessarily affect the national security.  Why should there be extra deference with respect to FinCEN's findings regarding allegations of that nature?

MS. LEE:  Respectfully, Your Honor, I believe those types -- that type of activity does implicate national security.  And you have to remember what Section 311 was designed to address, which is overall potential weaknesses in the U.S. and international financial system.  So if a bank or institution has enough weaknesses and holes in its oversight and compliance, that's not just going to let the money launderers and the criminals get away with illicit activity.  It is also going to --

THE COURT:  It makes it more likely that there will be terrorist funding.

MS. LEE:  Yes.  And again, there was evidence in the finding of such activity, and accounts being used for that purpose.

The other thing I'd also like to note is that in those other cases, there aren't just the terrorist financing, there's also the Kingpin Act which targets, you know, international drug trafficking.  So, you know,

you could argue that that's -- if you think that that
implicates national security, which I think we probably
would agree, then I think it's a pretty close analogy to
the type of activity that's being --

THE COURT:  Just curious.

MS. LEE:  Yes.

We've talked about alternative measures.  The
statutory factors, the only thing I'll say about that
is, again, there isn't -- the three statutory factors
for primary money laundering concern were, in fact, set
forth in the notice of finding.  So the idea that we
didn't address them, I think, is already debunked there.

But more broadly, again, the fact the primary
money laundering concern isn't defined just means that
this is something for the director to determine.  And
all the factors that she has to consider really just go
to the overall question whether, on balance, she finds
that this particular institution poses a serious-enough
level of money laundering concern that justifies the
special measure that she's issuing in this particular
case.  And I don't think there's any real argument that
that is accomplished and explained in the Final Rule.

So to the extent that plaintiffs try to make out
the case that the rule is arbitrary and capricious for
those reasons, I believe that argument really doesn't

have any merit.

Were there further questions on substance?

THE COURT:  No.

MS. LEE:  All right.  Well, again, I just want
to reiterate, I believe that Your Honor has, you know,
all of the relevant information before, but if there are
any specific questions on the classified record, we're
happy to submit some sort of explanatory -- one thing is
that if we do end up briefing this on summary judgment,
we would probably provide a more -- we would definitely
provide the full consolidated administrative record, and
we would probably try to say more on the classified --
on the high side about it.

THE COURT:  Okay.  Would it be possible to
provide an unclassified summary of the classified
material above and beyond what you believe has been
summarized in the Final Rule and the notice of findings
that would not disclose the classified -- the subject
matter of the classified material?

MS. LEE:  Your Honor, I think that would be
difficult because I do believe that every -- all that
could be said safely about the material is in the notice
of finding and the Final Rule.  I could, of course, ask
my client.  But I -- I don't -- I think the answer is
no, I don't think we can provide more than what's

1    already been provided.  But I can confer and see.

2           THE COURT:  Okay.  Thank you very much.

3           Ms. Powell, step right up.

4           MS. POWELL:  Sure.

5           THE COURT:  How are you?

6           MS. POWELL:  Good.  How are you all?

7           THE COURT:  You've been waiting.

8           MS. POWELL:  I want to discuss irreparable harm

9    and the balancing of harms to the extent we can on the

10   record we have.  I think one thing that is undisputed is

11   the Final Rule will prevent FBME from having U.S.

12   correspondent accounts that do not currently have any

13   U.S. correspondent accounts.  That is the only direct

14   effect of the rule.  And they have no current U.S.

15   correspondent accounts, and have not for many months.

16   Thus formalizing their exclusion from future U.S.

17   correspondent accounts has no direct effect at this

18   time.

19          THE COURT:  Well, address counsel's argument

20   that the conclusion of the rule will force banks which

21   now hold accounts on FBME's behalf to liquidate those

22   accounts or have a choice between sending them to the

23   regulator or otherwise disposing of them?

24          MS. POWELL:  Certainly.  Mr. Shaffer makes a

25   number of allegations which are not supported by the

declarations currently in the record.  But even
accepting them as true for these purposes at the moment
anyway, there's nothing in the Final Rule that forces
that result.

His claim, as I understand it, is that those --
that that would be the choice of those banks and their
attempt to comply with their own local jurisdiction's
rules and avoid the risk of exposing the bank to a money
laundering concern.

THE COURT:  That's no less harmful to the bank
than if it were required by the rule, correct?

MS. POWELL:  There are a few problems.  One is
there's nothing in the record to support those
allegations.  The only thing in the record is the bare
allegation that their current correspondent accounts
will consider closing those accounts.  That is
contingent on the action of third parties which cuts
against the redressability.  There's no way to be sure,
or even to be sure that it's likely that this Court
could redress those.  Those banks could decide to take
those actions now or yesterday, as many banks already
have, to close correspondent accounts months ago.  Or
they could do it in the future, even if there is a PI.

Consider the rational -- consider the actions of
a rational foreign bank that has corresponded accounts

with the U.S. and accounts with the FBME, albeit those

accounts are not with U.S. banks or necessarily in U.S.

dollars.  If they want to -- if they know the Final Rule

is coming, like, say, Commerzbank, they might decide to

wait on the outcome of a PI hearing, they might decide

to wait on the outcome of summary judgment, or they

might not.  They might decide to go ahead and close

accounts, depending on whether or not they think it's

likely that FBME is, in fact, a money laundering

concern, to which they would be exposing their bank.

I think for the purposes --

THE COURT:  Well, but wait, though, because

until the Final Rule goes into effect, there has been no

finding that -- I mean, there's been a finding, but

until it goes into effect, it doesn't carry any force.

The finding carries no force that they are a primary

money laundering concern.  Once that rule goes into

effect, then that's it, right?

MS. POWELL:  Well, neither the notice or --

THE COURT:  Aren't they in sort of purgatory

now, and they sort of go to hell on Friday when the rule

goes into effect?  Why isn't that fair?

MS. POWELL:  To be clear, neither the notice nor

the rule have any legal effect on these foreign banks.

It's more a matter of what they choose to do to protect

1    themselves, regardless of whether it is a notice with

2    legal effect or not.  Because even the Final Rule has no

3    legal effect on their ability to do business with FBME.

4        There's no evidence that a preliminary

5    injunction would prevent or dissuade foreign banks who

6    weren't regulated by it from acting.  And I think it's

7    worth noting that in Cyprus FBME is arguing the precise

8    opposite of what it is arguing here.  It is arguing to

9    Cyprus, according to the exhibit to the Saab

10   declaration, that FBME can do business regardless of the

11   Final Rule, and that the Central Bank's actions are not

12   legally contingent on the U.S. Final Rule.

13       The other --

14       THE COURT:  Isn't your argument that the Final

15   Rule really will have very little effect because they're

16   now frozen from doing business in U.S. dollars?  Doesn't

17   that undercut your argument that there's a public

18   interest in denying the injunction because of the need

19   for promptness and finality, et cetera?

20       MS. POWELL:  To some extent.

21       THE COURT:  I mean, if they're really on hold

22   now, then what's the harm of expedited briefing on the

23   merits in 60 days or 90 days?

24       MS. POWELL:  To some extent, yes, Your Honor,

25   and that if they're not doing business, they are less of

1     a threat to U.S. interests and have not exposed the

2     system.  That's true.  Until the Final Rule goes into

3     effect, nothing in U.S. law necessarily prevents them

4     from doing that kind of business with U.S. banks.

5          To the extent they're right, that they can do

6     any additional business or do business in U.S. dollars

7     somewhere else as a result of a preliminary injunction,

8     we think that would tip the balance dramatically in

9     favor of the government.  If that is not true, if the PI

10    does not allow FBME to do any additional business, that

11    means there are no interests of plaintiffs at stake, or

12    at least virtually no interests, but there are still two

13    important governmental and public interests at stake.

14         First is simply the orderly and efficient

15    implementation of rules.  The entry of a PI would create

16    regulatory uncertainty in an area where we think it's

17    really important, especially in the face of what we

18    considered to be really weak merits arguments in this

19    case.  It creates a perception that all a stanchioned

20    entity needs to do to avoid a 311 measure is file a

21    lawsuit and they can hold it off for weeks or months, or

22    in the event of an appeal, for years.

23         And second thing that remains in effect, even if

24    plaintiff got to do no additional business as a result

25    of a PI, is that -- is what plaintiff is attempting to

do here.  I think they are explicitly attempting to use
this Court to hold off actions by foreign regulators.
It wants the Court to take a side in its efforts to
prevent the Central Bank of Cyprus and the Bank of
Tanzania from taking action against it.  The Court
should thread lightly in areas of foreign affairs, I
think, much less charge in, as plaintiffs would have the
Court do here.

And as to -- we have recommended and are
certainly willing to undertake this expedited briefing
schedule so that this matter could be resolved quickly,
but I think -- but I think that actually cuts in favor
of not entering a PI because I think there's little
likelihood that anything -- that anything will destroy
the bank between now and three months from now when the
Court could reach a conclusion on summary judgment, if
not faster.

THE COURT:  Okay.

MS. POWELL:  The letter that they rely on
heavily from the Central Bank of Cyprus to show that the
bank is about to be destroyed, I mean, FBME here is a
sovereign with their own regulatory interest.

It is true, and I don't want to overstate our
case, it is true that they have said they are taking
additional action at this time motivated, in part, by

the Final Rule.  But it does not say, notably, that liquidation is impending any day now.  It lists several options of actions that the CBC might commence 30 days from the date of that letter.  That means it's not necessarily going to be liquidation.  It can merely be prohibitions or conditions on particular types of accounts.

That means it is commencing action, not ending action.  According to the Saab declaration, resolution of these matters in Cypriot court can take years.  They've already filed three lawsuits, he said, and intend to file a fourth in Cypriot courts in addition to the arbitration in Paris, all of which they say will take some time to resolve.

And finally, the things that that letter does not say is that while they say they are motivated by the Final Rule, they do not say that their actions are contingent on the final date of that rule.  To the extent they are persuaded that the Final Rule is going to take effect, there is no reason for them not to take action, regardless of what this court does.

THE COURT:  Okay.  The letter says, "In the judgment of CBC, FinCEN's issuance of the Final Rule precludes any prospect that FBME Cyprus branch will be able to resume normal operations and meet its

obligations to depositors and creditors in the
foreseeable future and makes fulfillment of the
resolution measures of sale more difficult and likely
impossible."

Why doesn't that constitute irreparable harm, if
the Final Rule -- I mean, it's saying that once the
Final Rule goes into effect, we don't believe that
there's any prospect for FBME to ever do business again
in Cyprus.  Isn't that the effect of that?

MS. POWELL:  Yes, though the state it is
describing is currently the state in effect.  The reason
they think the Final Rule will have that effect is
because it is being cut off from U.S. correspondent
accounts, which it does not currently have.  It is
saying it is taking action now, I understand it, because
they do not believe that FBME is going to get that
capability back with access to U.S. correspondent
accounts.

Whether or not CBC decides to commence action as
a result of that is ultimately entirely with their own
control as a regulator, and it can be done regardless of
how this Court rules on a preliminary injunction.

THE COURT:  Okay.

MS. POWELL:  There is a case which we cite in
the opposition, albeit I think in a footnote, which I

think is instructive in some ways.  It's *Hunter versus FARC*.

   THE COURT:  I'm sorry, which one?

   MS. POWELL:  *Hunter versus FERC*, in which FERC, among other regulatory agencies, took actions against an investor and trader, hedge fund manager, I think, who had engaged in some shady trading practices.  And it was undisputed that as a result of this FERC action, among the other actions, he was losing business, the business was going to be destroyed, he could not retain employees.  The Court, nonetheless, found that those injuries to Mr. Hunter were not redressable under the circumstances because nothing that the Court could do in terms of a PI would end the other investigations or restore his business reputation until the matter could be finally decided.

   I would like to reiterate before I close that Congress found that money laundering writ large and the type of money laundering at issue here specifically are a threat to national security.  And it is true that FinCEN took some time -- took its time, carefully coming to conclusion as to whether or not FBME posed that sort of threat.  But having found that they do, in fact, pose that sort of threat, I think it's incumbent on the government to proceed with due speed and cut them off

until -- that does not mean the Court does not get to
review those decisions.  It certainly does.  But it does
so with deference.  And until such time as -- unless and
until such time that the Court concludes that decision
is incorrect, we think it would be inappropriate to
vacate the Final Rule or to issue an injunction.

THE COURT:  Okay.  Let's -- I'll ask you the
same question I asked Mr. Shaffer.  If -- and I've not
prejudged this by any means, but if I were to decide
that there were certain procedural requirements that
were not adhered to strictly, what would the appropriate
remedy for that be?

MS. POWELL:  Well, presuming the Court also
found that any error was not harmless, we would argue
that the appropriate course would be to remand for
further proceedings without vacating.  That was, in
fact, what was done in *NCRI* and *PMOI*.  It left the
financial sanctions in those cases in effect while the
agency provided additional process to avoid threading on
the executive prerogative in that area.

THE COURT:  Okay.

MS. POWELL:  Does the Court have further
questions?

THE COURT:  No.

Mr. Shaffer, I'll give you the last bite.

MR. SHAFFER:  Thank you, Your Honor.  I will try
to be brief about it.  With Your Honor's permission,
I'll actually start with irreparable harm and the last
point about vacatur, or remand.

Your Honor, the comparison to *NCRI*, as I
understood my friend for the government, the sanction as
she put it was left in place.  Was left in place.  There
was a sanction, the Court did not disturb it.  As she
was just emphasizing with Your Honor in connection with
irreparable harm, there is no sanction, Your Honor.  The
Final Rule has yet to take effect.  And it's simply a
question of whether that status quo is preserved for
purposes of a preliminary injunction.  And if it is
preserved and Your Honor concludes that the rule was not
properly arrived at, we think the normal disposition
should obtain.

And with that observation, Your Honor, I'd like
to talk about irreparable harm.  And, as I said,
briefly.

This is the case, Your Honor, where Humpty
Dumpty will be broken and there's no putting him back
together.  If August 28th hits, given everything that we
know and what we've submitted to the court, and the
declarations do provide the bottom line, that
correspondent banks will close accounts, that existing

1     relationships will be severed, that is the reality, Your

2     Honor, and this is a suit brought --

3          THE COURT:  I'm not sure if your declarations

4     establish that.

5          MR. SHAFFER:  Well, Your Honor, they're not,

6     perhaps, as precise and up to date as they might be, and

7     if Your Honor wants supplementation, which the court's

8     rules generally contemplate would not be provided, I

9     would be glad --

10          THE COURT:  Okay.

11          MR. SHAFFER:  -- very expeditiously to submit

12     those for Your Honor.  But I want to note one thing that

13     I think simplifies it, Your Honor.  You pointed to one

14     inconsistency, and, I think, fairly in the government's

15     position.  I'd like to point to another.

16          The Final Rule, by its terms, takes effect on

17     August 28th.  Anyone can grasp what that rule does and

18     why it would be so calamitous for a bank like FBME.  The

19     government's only argument as to why the case for

20     irreparable harm is not that clean is because

21     independent third parties, for their own reasons, based

22     on prophylactic approaches, et cetera, et cetera, have

23     already gone some ways to cut FBME off.  And the

24     government just can't have it both ways, Your Honor.

25          Either Your Honor credits the legal effect of

the Final Rule as spelled out, which means the harm
hits, for purposes of the legal analysis, on August
28th, or we look at the practical ramifications.  And
either way, Your Honor, the case for irreparable harm is
clean because correspondent banks have indicated -- and
we've offered the best bottom line indication of this we
have -- that they're going to cut FBME off and there
will be no recovering those monies through any sound,
certain, secure mechanism to restore things to where
they were.  That's my first point, Your Honor.

          THE COURT:  Well, I thought that they've already
been cut off, and what you were representing before is
that they will now take another step and liquidate or
return the funds someplace where you may not be able to
recover them.

          MR. SHAFFER:  I have no quarrel with that
formulation, Your Honor.  I would say they're in a state
of suspension, they're in wait-and-see, they're frozen,
but they're not liquidated, as you said.

          THE COURT:  I'd like a declaration from someone
with personal knowledge of that fact.

          MR. SHAFFER:  And, Your Honor, if we submit, as
I was proposing earlier, an email from counsel to this
effect, I would just like to know that the Court -- and
perhaps we can work this out now -- would not take a

view that that is any waiver of privilege.  I think we
can provide that to Your Honor for in camera review
while maintaining privilege over it.  That's what I
would propose.

          THE COURT:  That's fine.  That's fine.

          MR. SHAFFER:  And, Your Honor, the other
submission --

          THE COURT:  Well, I want a declaration.  I don't
want an email from counsel.  I want a declaration from
someone, and if it's counsel, it's counsel, that has
personal knowledge of communications with correspondent
banks who will take the action that has been
represented.

          MR. SHAFFER:  And I understand Your Honor's
proposal.  It makes perfect sense.  I just want to be
sure that we're not waiving any privilege and everyone
would acknowledge there's no waiver of privilege if
counsel were to make --

          THE COURT:  Counsel's conversations with a third
party bank are not privileged, correct?

          MR. SHAFFER:  That's true, Your Honor.  That's
true.

          THE COURT:  Okay.

          MR. SHAFFER:  The other point that I would make
about irreparable harm, the idea that correspondent

banks are acting quite independent of the Final Rule,
Your Honor, I think is belied by the section that I was
referring to earlier entitled Special Due Diligence of
Correspondent Accounts to Prohibit Indirect Use.  And
that is instruction of the Final Rule that speaks to the
U.S. banks that FinCEN is regulating and tells those
banks it's incumbent upon them to ensure, through
prudent measures, that no correspondent bank that
they're transacting with is in any nexus to that
transacting with FBME.

         And I'd submit, Your Honor, the natural upshot
of that, given the stakes, given the way these
regulatory issues can work, can be resolved in the way
that lawyers advise their clients, the reality of that
is the correspondent banks are going to do what they're
going to do because the Final Rule is taking effect and
because they understand the consequences of that
provision, and the consequences have been explained to
them by the U.S. banks.

         The last point on irreparable harm, Your Honor.
The submission of the United States that you should
thread lightly on foreign affairs, that would make
sense, Your Honor, if we were asking you to enjoin CBC,
which, of course, we're not asking you to do.  We're
asking you, in the classic *Bennett v. Spears* sense, to

1     look at and preliminarily enjoin the U.S. regulatory

2     action that is triggering what is happening according to

3     the CBC's own...

4          And with that, Your Honor, I'd like to return to

5     the likelihood of success on the merits briefly.  The

6     government's position is that they are somehow -- I want

7     to speak to the SARs first.  The government's position

8     is that they were authorized to disclose to Your Honor

9     in connection with this proceeding the individual SARs.

10    The only way, Your Honor, that that makes sense, given

11    the provision that you and I were talking about earlier,

12    is if that is consistent with their official duties

13    under Title II.  That's the necessary premise for the

14    fact that they came into court with the SARs.

15         And I -- our submission is once they've

16    recognized as much as the basis for their submission, it

17    follows from the sword and shield cases that we've cited

18    for Your Honor that they can't simultaneously say that

19    it's not an authorized disclosure in connection with

20    their official duties where they simply provide, as they

21    would normally have to provide, the evidence that

22    they're relying upon to us.

23         They also submit, Your Honor, that we can't

24    claim surprise about the fact that FinCEN here is

25    relying upon the SARs as basis for the Final Rule.  Your

Honor, we are surprised.  And I've conferred with our
counsel who is there at the administrative level.  And I
can tell you that to the extent that there was
discussion of SARs, it was in connection with individual
transactions.  And when there was that, for instance
with the high-yield investment scheme and $100,000 that
went through FBME Bank, we were able, with assistance
from Ernst & Young, to investigate that, and explain,
yes, there was initially a suspicious transfer --

THE COURT:  Why wouldn't it have been reasonable
to assume that the discussion in the notice of finding
regarding suspicious wire activities were derived from
SARs?

MR. SHAFFER:  Because, Your Honor --

THE COURT:  Where else would it have come from?

MR. SHAFFER:  It could have come from analysis
of the underlying transactions.  It could have come from
Ernst & Young reports.  It could have come from data
that FinCEN was collecting.  It could have come from
classified sources, perhaps.  But there was not an
understanding, Your Honor, that that was just the math
of taking SARs reports that are filed with a low
threshold and are indicators of risk, that FinCEN was
assuming by virtue of that that a transaction was
illicit, was itself problematic.

The SARs is meant to alert vigilance and further follow-up inquiry.  And when there were instances of this that arose -- I want to take the $100,000 example, the high-yield investment scheme, Your Honor.  Where you're able to say, yes, there was a suspicious transaction report.  So we went to that customer and asked them to prove up the bona fides of that transaction.  And they were able to do that, at least ostensibly.  It looked legitimate, so it came through.

THE COURT:  Is that the one that the bank filed a SAR only after having been alerted by another bank who filed a SAR first?

MR. SHAFFER:  Correct, Your Honor.  But all these transactions happened in sequence.  So it's usually that monies are coming into this bank through other banks.  They don't do cash transactions except to an infinitesimally small degree.  So you will have upstream and downstream banks.  But they investigated.  And then, Your Honor, when another bank reported that there was a fraudulent transaction involving the same customer, they were cut off.

So we were able to grapple with those individual cases in terms of individual cases as best we could.  What we didn't know was that there was an aggregate conclusion drawn from the SARs that these were

1    problematic transactions.  And they could have simply
2    said that that was what they were doing and I could
3    have, Your Honor, provided some critique of that.  We
4    could have provided some critique of that in connection
5    with the administrative proceedings.
6            They emphasize the extent of the dialogue, and
7    that term is used in the briefs, and it's used here as
8    far as the process.  And I want to be clear, Your Honor,
9    there were a lot of submissions.  There was a meeting.
10   But the flow of information, of communication was very
11   much one way.  And as far as what FinCEN told FBME Bank
12   through its counsel about what was in the allegations
13   and what wasn't, there's really one instance where FBME
14   said, for the handful of specific instances that had
15   been alluded to in the notice, here's what we think
16   you're talking about, here's what Ernst & Young has
17   found is closest to the mark, is this right, and here is
18   this, our answer -- here's our answer to that.  FinCEN
19   had only one instance, Your Honor.  It was the one we
20   were just talking about because it was already the
21   subject of federal litigation where it said, okay, we
22   can tell you that's the one.
23           THE COURT:  Address Ms. Lee's -- the upshot of
24   Ms. Lee's due process argument, which is that *Ralls*
25   *Corp.* and *PMOI* and *NCRI* would have come out differently,

had the subjects in those cases been given the breadth

of process that your client was given in this case.  In

those cases, they were given nothing and, therefore, the

conclusion that the unclassified record evidence must be

provided to comport with due process.

Here there was notice and comment.  You may

object to the detail that was included in the notice of

finding, et cetera, but clearly there was this back and

forth over a number of months, and, you know, there were

opportunities to comment and to receive what FinCEN

viewed as notification for their rule.

MR. SHAFFER:  My first point --

THE COURT:  Would the Circuit have come out

differently had this case been there then?

MR. SHAFFER:  I won't presume to say that, Your

Honor.  But I do read them as saying as follows:  There

is a judicial reluctance, rightly and necessarily, to

permit reliance upon classified undisclosed evidence.

And that is very much on the Court's mind in all those

cases.

THE COURT:  Unclassified.

MR. SHAFFER:  Well, no, Your Honor, I believe in

each of those cases there's a mix of classified and

unclassified information.  And as I understood the

Court's holding in each of those cases, is we're not

going to question the government's ability to rely upon

the classified information, and we're going to ensure,

though, that we arrive at the best, fairest process we

can consistent with that.

And consistent with that, whether the word is

information or evidence, the nonclassified information

or evidence, that must be disclosed.  And it only -- it

becomes more paramount, Your Honor, than in any other

administrative case because we all accept, reluctantly,

going in that there is going to be a black box and we're

not going to get to peer inside it.  So what do we get,

Your Honor?  We get everything else.  We get everything

else.  Especially in a case where there are these sorts

of interests at stake.

THE COURT:  But in those cases, the subjects had

nothing else.

MR. SHAFFER:  Well, Your Honor, I don't think

that the government's position in those cases was that

the subjects got nothing.  I don't think that was the

government's position.  I think they said they know what

we've designated them as.  There's an indication that

they have certain connections and they can make a case

in response to that.  They didn't get enough.

I'm not suggesting, Your Honor, there isn't some

place to draw a line in between those.  But I am

suggesting, Your Honor, that the line ought to be drawn
on the rights protective, transparent side of that
spectrum.  Saying that if we're going to deprive you the
classified information, and that's going to be in play,
it becomes that much more imperative to focus on the
nonclassified.  And the D.C. Circuit says that, Your
Honor, in *People Mojahedin*.  I think that's the fair
thrust to Footnote 6 in particular.

     Let me quote, because I was paying close
attention to what Ms. Lee said about the nonclassified
components of the record.  She said, quote, "None of
those individual items of unclassified evidence standing
alone were what I would consider to be material.  Or,
really, they were only relevant in conjunction with the
evidence that is classified or privileged," close quote.
That's exactly what *People Mojahedin* said would be so
important about the disclosure of unclassified
information.  That's our best clue, Your Honor.  That's
our best clue as to what is really at work in the
agency's mind.

     And that brings me to the next point, Your
Honor, which is there is, on the one hand, such emphasis
on the deference that the agency is due.  It gets to
look at these considerations, the evidence in the course
of the administrative process, and then it comes to the

court saying trust us, we've got it right.

On the other hand, when it comes to materiality, the agency says, Well, that, really, you can be sure, Your Honor, was not relevant. It didn't matter to FinCEN. They would have come out the same way. And I think that there's at least detention there. Because if Your Honor accepts the premise that the agency has wide berth to make the substantive decision it thinks best based upon all the evidence available to it after taking a careful look, it follows, Your Honor, that if there's a procedural defect -- and I would submit that there are multiple procedural defects here that Your Honor could rely upon -- then the agency's -- you're not going to second guess their substantive decision at the end of this, although I think you have grounds to. But you want to make sure the agency gets the grounds right, especially when you have these sorts of due process considerations and these sorts interests that hang in the balance.

There was also, Your Honor, a statement that FBME facilitated transactions for entities that perpetrated fraud, cyber crime against victims around the world -- I'm sorry, I was quoting from the Final Rule. But, Ms. Lee's account of that is really they told us each of the instances that were of concern to

FinCEN.  And, Your Honor, that's not how I read the
rule -- I mean, certainly not how I read the notice.

I understand the notice to be saying here are
some illustrations of instances that are of concern, but
there's a larger pattern that concerns us.  And if
that's true, Your Honor, all we can do to get after
that, obviously, is to see those specifics.  But if
they're looking at a case of supposed Italian political
corruption and illicit proceeds that went through this
bank.  They have an article about that.  If they have a
blog post that suggests that the bank is being marketed
to third party money launderers, we need to see that,
Your Honor, because that is very much material to what
FinCEN is looking at.  And the only chance we have to
persuade FinCEN is by grappling with those specifics.

And here, in relevant, important part, that was
withheld.  It falls right within the D.C. Circuit's
instruction about not being able to presume harmless
error in cases like this, especially when you have
classified information being assessed in parallel.

The physical presence point, Your Honor.  FinCEN
won't, as I understand it, take a position as to whether
that property, that bank account, would be prejudiced.
We have, for the reasons I've suggested to Your Honor,
have indicated to Your Honor, we're concerned that that

money will be lost to the bank for all intents and purposes. As long as there's that question, that consideration, we think that that goes in favor of acknowledging the serious constitutional question and granting the preliminary injunction, especially consistent with *Gordon*. If it turns out that that property is lost, it's disposed of, and FinCEN's position is what we fear it to be, we're not going to have recourse otherwise at that point in time.

Again, I've got my APA claims. That doesn't mean that I'm going to be able to get money damages against the United States at the end of this day.

There was one -- there were a couple of suggestions that I just wanted to correct. The first was that FBME doesn't work with its regulators the way that Multibanka does. That was offered to you by Ms. Lee. I'm not going to deny, Your Honor, that there are issues between our client and the Central Bank of Cyprus, but the suggestion that it's not -- that our bank has not been compliant and working constructively with that regulator is not well taken. And I think that's at odds with the administrative record.

THE COURT: It was find 80,000 euros; is that correct?

MR. SHAFFER: 80,000 euros, Your Honor, it was

fined in 2010, because the bank was updating its
records, it was complying with an overhaul in Cypriot
law, and in the course of that process it needed to get
documentation for all of its customers.  And so it sent
out the request around the world.  It explained to the
Central Bank of Cyprus it would take some time for those
to come in, could they get an extension of the deadline.

They could not get an extension of the deadline
and so they came in somewhat late, with complete
documentation; 80,000 fined for the delay.  And
subsequent to that the CBC did an audit in 2011,
identified no issues whatsoever.

And in 2013 the issue with CBC was because there
was a financial crisis that struck Cyprus, struck the
banks there, and basically the CBC needed to micromanage
every single transaction going in and out.  As an
international bank, there needed -- there was a need to
continue transacting for FBME.  They sought prompt
approvals, they could not get prompt approvals.  They
explained that they would still need to go forward
because transactions needed to happen.  And CBC said
nothing about that until months after the fact, and that
was the second prong.

But the issues, I would submit, Your Honor,
between the Central Bank of Cyprus and FBME have a lot

to do with this bank not being Cypriot run.  They do not
have a lot to do with the anti-money laundering
concerns, the questions of compliance that are bringing
us here today.

       There was a reference to the evidence of money
laundering going on even while reforms were being
implemented.  And perhaps, Your Honor, that's a
reference to classified information that I cannot see.
But I would ask Your Honor, in looking at that
classified information, to see if there's any indication
that the bank was complicit, that the bank was derelict,
and basically not implementing in good faith the reforms
Ernst & Young found it was implementing.  Because of
course, Your Honor, the United States intelligence
service is privy to underlying facts that only it is
privy to.  Indeed, that's the premise of the classified
designation that it's insisting upon.

       It's not fair to take it as res ipsa loquitur
and basically say if there was an illicit transaction
happening that the United States knew about but didn't
tell the bank about, that the bank was somehow at fault.
That conflation may be happening here and I just want
to --

       THE COURT:  I appreciate that.

       MR. SHAFFER:  Finally, Your Honor, you referred

1   to sanctions being in place.  Sanctions violations, and,

2   of course, all of us, our client especially, take that

3   gravely seriously.  I know of one such issue that was

4   raised in the notices and in the Final Rule, and as to

5   that, Your Honor, it was this S --

6         THE COURT:  Syrian, right?

7         MR. SHAFFER:  Yes, that entity.  And that was an

8   updated designation of the listing of sanctioned

9   entities.  That's what the United States government does

10  to alert various different financial actors around the

11  world that these people need to be cut off.  And as soon

12  as there was that updating, the next day, the relevant

13  customer that we know to be of concern was cut off.  And

14  other than that, we don't know of another issue that

15  FinCEN has identified.

16        Oh, Your Honor, my colleague reminded me also of

17  the *Kind Hearts* case, which I didn't speak to earlier.

18        THE COURT:  Repeat that.  Which one?

19        MR. SHAFFER:  It's the *Kind Hearts* case from the

20  Northern District of Ohio.  And that was an instance

21  where the agency had, Your Honor, had provided some

22  unclassified materials.  But the Court still found that

23  it needed to provide more notice, it had not gone far

24  enough.  And in that case, as I would respectfully

25  submit as in this case, the deprivations were

gratuitous. The government could have gone further.

THE COURT:  Was it FTO case?

MR. SHAFFER:  I believe it was, Your Honor.

THE COURT:  Okay.

MR. SHAFFER:  And finally, Your Honor -- this really is my last point.  Ms. Lee said there's no denying that FinCEN properly addressed the statutory language, primary money laundering concern.  And, Your Honor, I submit in earnest that if you look at the notice, you'll find perfunctory treatment of that, but it won't be a meaningful treatment of what I consider to be the key question.  To what extent is this bank good, to what extent are there issues with it, to what extent are there legitimate transactions?  There was no such weighing of that.  In fact, there was a disavowal of it because FinCEN said they couldn't tell what legitimate activity was happening in Cyprus, and no explanation beyond that.

And then in the Final Rule, Your Honor --

THE COURT:  So you interpret "primary" to mean that its primary purpose is money laundering, as opposed to legitimate activity, versus primary concern as in chief or substantial or fundamental concern?

MR. SHAFFER:  I do, Your Honor.  But even if it's as Your Honor just articulated, even if it's that,

I think it's incumbent upon the agency not to say
because we've stated our concern, that means we have a
basis to have one.  They should still have to explain
why it's substantial in the larger context.  And that's
what I submit is missing from this case.

        And I think that there was some recognition of
that on FinCEN's part, which is why in director -- in
the director's declaration she offers a definition of
primary money laundering concern that you won't find
from FinCEN elsewhere.

        *Kind Hearts* is an OFAC designation of a
specially designated global terrorist, or SDGT.

        THE COURT:  Right.  Okay.  Thank you very much.

        We will take this under advisement.  I will
expect the declaration that we discussed on irreparable
harm.  We, obviously, are working on a truncated time
period here.  We will endeavor to get something out
before the witching hour.

        MR. SHAFFER:  Thank you, Your Honor.  We'll be
very prompt in submitting that.

        THE COURT:  Okay.  Anything else?

        MS. LEE:  Just a couple of points, very briefly.

        THE COURT:  Okay.

        MS. LEE:  Just -- one is just -- I didn't
address what -- even though I talked -- we both talked

about the various prongs for obtaining a preliminary

injunction, I would -- and this is addressed in our

brief.  I'd just like to note that it's not clear

whether the sliding scale approach still applies in

preliminary injunctions anymore after the Supreme

Court's decision in *Winter*.  And, in fact, there are

some D.C. Circuit cases, including *Sherley v. Sebelius*,

which -- it's in our brief, but the cite is 644 F.3d

388, which suggests that after *Winter* it's not enough to

make a particularly strong showing on one prong, even if

you can't -- and then not be able to show that you can

prevail on the others.

THE COURT:  This is the Judge Kavanaugh

concurrence?

MS. LEE:  Well, I would have to look that up

again.

THE COURT:  Okay.

MS. LEE:  But the case does suggest, and there's

others like it, that there isn't a sliding scale.  You

do have to satisfy probably all of the prongs, but

especially likelihood of success on the merits.  So I

just wanted to flag that issue for you.

THE COURT:  Understood.

MS. LEE:  Just -- I wanted to say one more thing

on multi -- well, two things.  One on harmless error.

```
 1    Again, I mentioned earlier that I don't really interpret
 2    PMOI as saying that you can't ever have harmless error
 3    in due process cases.  But to the extent Your Honor does
 4    believe that to be the case, I would only note that that
 5    would -- that seems to be in conflict with Supreme Court
 6    precedent.  And I would ask the Court to look at
 7    Shinseki versus Sanders, which is 551 U.S. 396.
 8             THE COURT:  One more time.
 9             MS. LEE:  Sorry, 551 U.S. 396.  It's also
10    discussed in the Al Haramain case, I believe, which also
11    a finding of harmless error.
12             On Multibanka, I just -- one thing I had
13    forgotten to note was that in addition to the working
14    with the -- you know, the authorities in Latvia, I think
15    it also goes without saying that they did not -- there
16    were no concerns raised there that they were doing --
17    implementing reforms and at the same time that there was
18    still activity of a concern going on at the same time,
19    which I think is probably one of the biggest
20    distinguishing factors here.
21             And I think that's it for me.
22             THE COURT:  Okay.  Okay.
23             MS. LEE:  Thank you, Your Honor.
24             THE COURT:  Okay.  Thank you folks very much.
25    We'll be in touch.
```

1  **<u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>**

2

3          I, LISA A. MOREIRA, RDR, CRR, do hereby

4  certify that the above and foregoing constitutes a true

5  and accurate transcript of my stenographic notes and is

6  a full, true and complete transcript of the proceedings

7  to the best of my ability.

8          Dated this 25th day of August, 2015.

9

10                          <u>/s/Lisa A. Moreira, RDR, CRR</u>
                           Official Court Reporter
11                          United States Courthouse
                           Room 6718
12                          333 Constitution Avenue, NW
                           Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25