# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**FBME BANK LTD., <u>et al.</u>,**

         Plaintiffs,

         v.

**LEW, <u>et al.</u>,**

         Defendants.

</td><td>

Case No. 15-cv-01270 (CRC)

</td></tr>
</table>

## MEMORANDUM OPINION

On July 29, 2015, the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN") promulgated a Final Rule under Section 311 of the USA PATRIOT Act of 2001 imposing a "special measure" against FBME Bank Ltd. ("FBME" or "the Bank"), a Tanzanian-chartered commercial bank that operates mainly in Cyprus. The measure—the fifth and most serious authorized by the statute—prohibits domestic financial institutions from maintaining correspondent bank accounts with FBME. The Final Rule, which is scheduled to take effect tomorrow, August 28, 2015, is designed to prevent FBME from continuing to do business in the United States or in U.S. dollars. Congress empowered the Secretary of the Treasury to impose this special measure through notice-and-comment rulemaking, following a finding that a nondomestic financial institution is of "primary money laundering concern" and thus a threat to national security and the U.S. financial system. 31 U.S.C. § 5318A. Congress also empowered the agency to consider classified information in formulating a rule under this section, and to provide that information "to the reviewing court *ex parte* and *in camera*." <u>Id.</u> § 5318A(f) (italics added). In other words, the imposition of this special measure involves a quasi-adjudicative rulemaking process through which the agency may rely on classified information unavailable to the target of the rule.

After the Secretary issued a Notice of Finding that FBME is an institution of primary money laundering concern and a Notice of Proposed Rulemaking to impose this special measure, U.S. banks holding correspondent accounts on behalf of FBME terminated their relationships with the Bank, and other banks abroad held FBME's U.S. dollar correspondent accounts in suspension pending imposition of the Final Rule.  In the event the Final Rule takes effect on August 28, 2015, U.S. banks will be wholly prohibited from transacting with, or processing transactions on behalf of, FBME.  FBME contends that this will prompt remaining banks with which FBME maintains U.S. dollar correspondent accounts to liquidate those accounts, effectively excommunicating FBME from the global financial system, and potentially permanently depriving the Bank of its U.S. dollar assets.  Put differently, FBME maintains that it currently exists in a state of purgatory, and will cross the Styx tomorrow, barring this Court's grant of its Motion for a Preliminary Injunction.

To avoid that predicament, FMBE and its Cayman Islands holding company have filed suit and moved to preliminarily enjoin the Final Rule.  The Bank alleges that the Rule is invalid because (1) FinCEN failed to provide it adequate notice of the basis of its findings as required by the Administrative Procedure Act ("APA"); (2) FinCEN acted arbitrarily and capriciously under the APA by, among other things, not considering all relevant facts or the imposition of less punitive measures; and (3) FinCEN violated the Bank's constitutional due process rights.  FBME argues that a preliminary injunction is warranted because it is likely to prevail on the merits of its claims and it will be irreparably harmed should the Final Rule go into effect.  The Bank also argues that the balance of the equities and the public interest weigh in favor of an injunction.

The Court has reviewed both the public and nonpublic materials upon which FinCEN relied in issuing the Final Rule, as well as the submissions and arguments of the parties.  Based on the present record, the Court is not inclined to second guess FinCEN's exercise of its broad

discretion in finding that FBME poses a primary money laundering concern, or its resulting imposition of the fifth special measure.   The Court therefore finds that FBME has not established a likelihood of success on the merits of its claim that FinCEN's ultimate finding is arbitrary and capricious under the APA.   That conclusion, however, does not relieve the agency of its obligation to adhere to the APA's procedural requirements.   If anything, FinCEN's reliance on nonpublic and classified evidence to impose a serious sanction against a single institution required it to hew even more closely to the APA's demands than it might have in a garden-variety rulemaking.   These requirements included providing and enabling FMBE to respond to all the public information upon which FinCEN relied and explaining in the rule why potentially viable but less drastic alternative penalties were not chosen.   Because the agency does not appear to have satisfied those requirements, and because FBME has demonstrated that it will likely be irreparably harmed should the Final Rule take effect, the Court will grant FBME's Motion for a Preliminary Injunction.

## I.      Background

### A.      Statutory Background

Following September 11, 2001, Congress enacted legislation amending federal money-laundering laws in an effort to combat the financing of global terrorism.   As part of this effort, Congress passed the USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001).   Section 311 of the Act authorizes the Secretary of the Treasury to direct domestic financial institutions and agencies to take an array of "special measures" if the Secretary "finds that reasonable grounds exist for concluding" that a financial institution "operating outside the United States . . . is of primary money laundering concern."   31 U.S.C. § 5318A(a)(1).

Before "making a finding that reasonable grounds exist for concluding" that a foreign financial institution is of primary money laundering concern, the Secretary must consider any information that he or she deems relevant, in addition to the following factors:

(i)     the extent to which such financial institutions . . . are used to facilitate or promote money laundering . . . , including any money laundering activity by organized criminal groups, international terrorists, or entities involved in the proliferation of weapons of mass destruction or missiles;

(ii)    the extent to which such institutions . . . are used for legitimate business . . . ; and

(iii)   the extent to which such action is sufficient to ensure . . . that the purposes of this subchapter continue to be fulfilled, and to guard against international money laundering and other financial crimes.

Id. § 5318A(c)(2)(B).

Once the Secretary determines that reasonable grounds exist to deem a particular foreign financial institution of primary money laundering concern, he or she may take any of five "special measures" imposing obligations on U.S. financial institutions.  Id. § 5318A(b).  The first four special measures involve obtaining information from domestic financial institutions, and include requiring those institutions to provide (1) additional recordkeeping and reporting of certain financial transactions, (2) information relating to beneficial ownership of accounts, (3) information relating to certain payable-through accounts, and (4) information relating to certain correspondent accounts. Id.  In the most severe cases, the Secretary may—by notice-and-comment rulemaking only— impose a fifth special measure.  This measure "prohibit[s], or impose[s] conditions upon, the opening or maintaining in the United States of a correspondent account . . . by any domestic financial institution or domestic financial agency for or on behalf of a foreign banking institution,"

deemed by the Secretary to be of primary money laundering concern.  Id. § 5318A(a)(1).[1]  In other words, imposing this measure has the effect of eliminating or curtailing a foreign banking institution's access to the U.S. financial system and to transactions involving the U.S. dollar.  See A Fearful Number, The Economist (June 6, 2015), http://www.economist.com/news/finance-and-economics/21653673-bank-rejects-american-accusations-it-abetted-financial-crime-fearful.

In selecting which special measure to impose, the Secretary must consider the following factors:

> (i) whether similar action has been or is being taken by other nations or multilateral groups;

> (ii) whether the imposition of any particular special measure would create a significant competitive disadvantage, including any undue cost or burden associated with compliance, for financial institutions organized or licensed in the United States;

> (iii) the extent to which the action or the timing of the action would have a significant adverse systemic impact on the international payment, clearance, and settlement system, or on legitimate business activities involving the particular jurisdiction, institution, class of transactions, or type of account; and

> (iv) the effect of the action on United States national security and foreign policy.

31 U.S.C. § 5318A(a)(4)(B).

The Secretary of the Treasury has delegated implementation of this statutory provision to the Director of FinCEN, a bureau of the Department "tasked with safeguarding the United States financial system from illicit use and combating money laundering."  Defs.' Opp'n Mot. Prelim. Inj. at 9.

---

[1] A correspondent account is "an account established to receive deposits from, make payments on behalf of a foreign financial institution, or handle other financial transactions related to such institution."  31 U.S.C. § 5318A(e)(1)(B).

B.      Factual and Procedural Background

On July 15, 2014, FinCEN made a finding that reasonable grounds existed to conclude that

FBME Bank Ltd. was an institution of primary money laundering concern, and it published a notice

explaining this finding in the Federal Register on July 22, 2014. See 79 Fed. Reg. 42639 (July 22,

2014) ("Notice of Finding" or "NOF"). In this finding, FinCEN concluded that "FBME [had]

facilitated a substantial volume of money laundering through the Bank for many years" and that it

had maintained weak anti–money laundering controls. Specific findings in the Notice include:

- "[T]he head of an international narcotics trafficking and money laundering network has used shell companies' accounts at FBME to engage in financial activity."

- "[A]n FBME customer received a deposit of hundreds of thousands of dollars from a financier for Lebanese Hezbollah."

- "[A] financial advisor for a major transnational organized crime figure . . . banked entirely at FBME in Cyprus [and] maintained a relationship with the owners of FBME."

- "FBME facilitated the transfer of over $100,000 to an FBME account involved in a High Yield Investment Program ("HYIP") fraud against a U.S. person. . . . [T]he FBME customer operating the alleged HYIP was indicted in the United States District Court for the Northern District of Ohio for wire fraud and money laundering related to the HYIP fraud."

- "FBME facilitated the unauthorized transfer of over $100,000 to an FBME account from a Michigan-based company that was the victim of a phishing attack."

- "[A]n FBME account holder operating as a shell company was the intended beneficiary of over $600,000 in wire transfers generated from a fraud scheme, the majority of which came from a victim in California."

- "[A]t least one FBME customer is a front company for a U.S.-sanctioned Syrian entity, the Scientific Studies and Research Center ("SSRC"), which has been designated as a proliferator of weapons of mass destruction. The SSRC front company used its FBME account to process transactions through the U.S. financial system[,] . . . [and it] shared a Tortola, British Virgin Islands ("BVI") address with at least 111 other shell companies, including at least one other additional FBME customer that is subject to international sanctions."

- "FBME's offshore bank account services were featured prominently on a Web site that facilitates the formation of offshore entities. . . . One Web site that encourages the opening of offshore bank accounts to gamble online notes that FBME in Cyprus is '[a]nother Europe-based bank [we've] found particularly easy to deal with.'"

- An FBME account held by a British shell company received $7.2 million as part of a "pattern of transactions" which were "consistent with . . . allegations in [a] DOJ complaint" filed "against approximately $70.8 million in real and personal property alleged to be the proceeds of foreign corruption offences perpetrated by the President of Equatorial Guinea, Teodoro Obiang's son and his associates and laundered through the United States."

- "FBME conducted at least $387 million in wire transfers through the U.S. financial system that exhibited indicators of high-risk money laundering typologies, including widespread shell company activity, short-term 'surge' wire activity, structuring, and high-risk business customers."

- "FBME was involved in at least 4,500 suspicious wire transfers through U.S. correspondent accounts that totaled at least $875 million between November 2006 and March 2013."

- "FBME customers, including its many shell company customers, have frequently used FBME's Cyprus address to conduct collectively tens of millions of dollars of transactions," a practice that FinCEN noted is "highly unusual and indicative of the bank's potential complicity in its customers' illicit activities" because "[o]bscuring the true address of the customer inhibits compliance checks by counterparty or intermediary financial institutions."

79 Fed. Reg. 42639, 42639–40; see also Defs.' Opp'n Mot. Prelim. Inj. at 10.

Accompanying this finding was a Notice of Proposed Rulemaking ("NPRM") to impose the fifth special measure's prohibition of FBME's access to correspondent accounts with U.S. financial institutions.  Id.  Following the NPRM, FinCEN received public comment on the finding and proposed rule and began a process of regular communication with FBME.  The Bank submitted a 28-page comment on September 22, 2014, the last day of the comment period, in addition to six additional comments, which it submitted after the comment period had closed.  On July 29, 2015, after consideration of comments from the public, all submissions from FBME (including those received after the deadline), classified information, information statutorily protected from disclosure, and information that was neither classified nor protected, FinCEN promulgated a Final Rule imposing the fifth special measure's prohibition against FBME.  80 Fed. Reg. 45057 (July 29, 2015) ("Final Rule"); see also Defs.' Opp'n Mot. Prelim. Inj. at 12. This rule is set to take effect on August 28, 2015.  80 Fed. Reg. 45057.  Because FBME's "functional currency has always been the

U.S. dollar," Mem. Supp. Mot. Prelim. Inj. at 4, the Bank claims that this rule will deprive it of access to the U.S. financial system, that its current U.S. dollar accounts will face liquidation after the rule takes effect, Reimer Decl. ¶¶ 7–9, and that it will therefore "cease to exist as an international commercial bank," Mem. Supp. Mot. Prelim. Inj. at 1.

On July 30, 2015, counsel for FBME reportedly contacted FinCEN and the Department of Justice, seeking to come to an agreement to rescind or delay implementation of the Final Rule. Id. at 14. After the parties failed to reach an agreement, FBME filed suit and now seeks a preliminary injunction to prevent the Final Rule from taking effect as scheduled on Friday, August 28, 2015. The Court held a hearing on the preliminary injunction motion on August 25, 2015.

## II.     Standard of Review

A preliminary injunction is "an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, 555 U.S. 7, 24 (2008). In order to obtain a preliminary injunction to prevent the Final Rule from taking effect, FBME must establish that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." Id. at 20. The D.C. Circuit has indicated that, even after the Supreme Court's decision in Winter, "[a] district court must balance the strength of a plaintiff's arguments in each of the four elements when deciding whether to grant a preliminary injunction." Mills v. D.C., 571 F.3d 1304, 1308 (D.C. Cir. 2009). Nonetheless, "it is especially important for the movant to demonstrate a likelihood of success on the merits." Nat'l Head Start Ass'n v. U.S. Dep't of Health & Human Servs., 297 F. Supp. 2d 242, 246 (D.D.C. 2004) (citing Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 360, 366 (D.C. Cir. 1999)).

### III.    Analysis

##### A.    Likelihood of Success on the Merits

FBME asserts three claims in its Complaint.  In Count I, FBME contends that the Final Rule was promulgated without observance of the procedures required by the APA, because the notice FinCEN provided did not include sufficient detail of the rule's factual and legal basis to allow for meaningful and informed comment.  Compl. ¶¶ 66–70.  In Count II, FBME claims that the Final Rule is arbitrary and capricious because, among other things, FinCEN did not sufficiently consider relevant evidence submitted by the Bank, failed to consider the requisite statutory factors or explain why FBME is of primary money laundering concern, and imposed an excessive and disproportionate penalty while failing to consider obvious alternatives.  Compl. ¶¶ 71–79.  In Count III, FBME argues that FinCEN, having deprived FBME of a property interest in accessing U.S. correspondent accounts, violated FBME's constitutional due process rights by providing it with neither effective notice nor a meaningful opportunity to be heard.  Compl. ¶¶ 80–87.

As explained more fully below, the Court finds that FBME is likely to prevail on the merits of Count I because FinCEN provided insufficient notice of non-classified, non-protected information during the rulemaking proceeding, in violation of the APA's notice-and-comment requirement.  The Court also finds that FBME is likely to prevail on Count II insofar as the Final Rule reflects FinCEN's failure to adequately consider at least one potentially significant, viable, and obvious alternative to the sanction it imposed.  The Court does not decide, however, whether FBME is likely to succeed on the merits of its due process claim, Count III, because the record is currently unclear as to whether FBME has sufficient presence or property in the United States to establish an entitlement to due process at all.  And because the Court has determined that FBME

is likely to succeed on certain aspects of its APA claims, the principle of constitutional avoidance counsels against examining the merits of FBME's constitutional claim.

1.    APA Notice-and-Comment Requirements

FBME leads off with the claim that "FinCEN did not live up to its procedural obligations under the APA." Mem. Supp. Mot. Prelim. Inj. at 23. At the most basic level, the APA requires that before an agency may promulgate a rule, it must provide "[g]eneral notice" of the rule and "give interested persons an opportunity to participate in the rule making." 5 U.S.C. § 553(b)-(c). "Notice of a proposed rule must include sufficient detail on its content and basis in law and evidence to allow for meaningful and informed comment . . . ." Am. Med. Ass'n v. Reno, 57 F.3d 1129, 1132 (D.C. Cir. 1995). The crux of FBME's complaint is that FinCEN never divulged all of the documents or facts on which its rulemaking was premised, thereby violating its duty under the APA to provide detail on the rule's evidentiary basis and the information it used to reach its conclusions. The Government replies that the APA does not require it to disclose all information at the level of detail that FBME requested, "particularly where the specific information sought by FBME is classified or prohibited from disclosure by [statute]." Defs.' Opp'n Mot. Prelim. Inj. at 28. The Government seeks further support in the well-established principle "that agencies may rely on certain sensitive information without disclosing it." Id. at 29.

a.    Classified Evidence on Which FinCEN Relied

The Government has ample precedent to support its claim that agencies may use certain sensitive information, without disclosing it, in proceedings imposing targeted financial measures on persons and organizations. See, e.g., Holy Land Found. For Relief & Dev. v. Ashcroft, 333 F.3d 156, 164 (D.C. Cir. 2003) (approving the use and nondisclosure of classified information in labeling an organization a Specially Designated Global Terrorist and blocking its assets); Islamic

Am. Relief Agency v. Unidentified FBI Agents, 394 F. Supp. 2d 34, 41 n.8, 45–46 (D.D.C. 2005) (same); Kadi v. Geithner, 42 F. Supp. 3d 1, 5, 23–24 (D.D.C. 2010) (same).  The Government also points to Jifry v. FAA, 370 F.3d 1174, 1182 (D.C. Cir. 2004), where the D.C. Circuit upheld the use of classified information in Federal Aviation Administration proceedings related to national security.

While none of the authority the Government cites involves a rulemaking, consideration of this kind of nonpublic information is not unheard of in the rulemaking process.  In Public Citizen v. Nuclear Regulatory Commission, 573 F.3d 916 (9th Cir. 2009), the plaintiffs "argue[d] that the [Nuclear Regulatory] Commission improperly relied on non-public information when engaging in . . . rulemaking," id. at 928.  The Ninth Circuit disagreed, noting that the cases on which plaintiffs relied involved situations in which an "agency relie[d] on *general* factual information not provided to the public, and do not govern" rulemakings where sensitive nonpublic or classified information is involved.  The court went on to hold that "[t]he Commission cannot be required to reveal classified information about nuclear facilities, nor would it be able to do so while fulfilling its duty to maintain the common defense and security of classified information."  Id.  Nevertheless, the court found it permissible for the Commission to conduct a rulemaking using this nondisclosed, nonpublic information.  Id.  The same principle applies to FinCEN's rulemaking and its consideration of nonpublic information pursuant to Section 311.

Notably, the USA PATRIOT Act explicitly contemplates that the Treasury Department may rely on classified information when imposing special measures against entities of primary money laundering concern.  See 31 U.S.C. § 5318A(f) (providing for *ex parte* and *in camera* judicial review of classified information on which a finding of the existence of a primary money laundering concern is based).  FBME concedes as much.  Tr. Prelim. Inj. Hr'g at 20:6–9.  In this

same section of the law, Congress also required that the fifth special measure "be imposed only by regulation." Id. 5318A(a)(2)(C).  Congress therefore clearly contemplated a rulemaking procedure that would involve agency reliance on classified information, despite the fact that the Treasury Department would not be able to disclose that information.  Therefore, the notice that FinCEN provided as part of its rulemaking was not defective simply because FinCEN withheld substantial amounts of classified information yet relied on that information in promulgating its rule.[2]

        b.     Statutorily Protected Information on Which FinCEN Relied

FinCEN did not withhold only classified information.  It also withheld the Suspicious Activity Reports ("SARs") on which it relied,[3] invoking its obligation under the Bank Secrecy Act not to disclose such reports or their existence.[4]  But to the extent that FinCEN may have relied on information contained in SARs, as FinCEN's counsel indicated at the hearing, Prelim. Inj. Hr'g Tr. at 80:14–21, FinCEN attempted to summarize that information in its Notice of Finding, see 79 Fed. Reg. 42640.  For instance, FinCEN devotes several paragraphs of the Notice

---

[2] FBME contends that FinCEN was obligated to provide unclassified summaries of the classified information on which the agency relied.  While courts have recognized that unclassified summaries of classified information on which an agency relied may be helpful to litigants, they are not required and "disclosure may not always be possible."  Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury, 686 F.3d 965, 983 (9th Cir. 2011).  The Court is satisfied that the Notices adequately summarized the conclusions FinCEN drew from the classified evidence and that providing further unclassified summaries would be difficult, if not impossible, without revealing the underlying classified information.

[3] SARs are reports by banks and other financial institutions disclosing transactions that the institution "knows, suspects, or has reason to suspect" involve possible illegal activity.  Defs.' Opp'n Mot. Prelim. Inj. at 29 (quoting 31 C.F.R. § 1020.320(a)).

[4] FinCEN is not permitted to "disclose a SAR, or any information that would reveal the existence of a SAR, except as necessary to fulfill official duties consistent with Title II of the Bank Secrecy Act." 31 C.F.R. § 1020.320(e)(2).

to summarizing aggregate information derived from SARs and describing the conclusions that it drew from that information.  In providing this information, FinCEN details the "volume of suspicious wire activity conducted by FBME customers through the U.S. financial system."  Id. In particular, FinCEN states that from "April 2013 through April 2014, FBME conducted at least $387 million in wire transfers through the U.S. financial system that exhibited indicators of high-risk money laundering typologies, including widespread shell company activity, short-term 'surge' wire activity, structuring, and high-risk business customers."  Id.  And FinCEN continues:  "FBME was involved in at least 4,500 suspicious wire transfers through U.S. correspondent accounts that totaled at least $875 million between November 2006 and March 2013."  Id.  This summary information was sufficient to allow FBME to respond to FinCEN's accompanying concerns—namely, that FBME's wire transfers involved suspicious levels of shell company activity, short-term surge wire activity, structuring, and high-risk business customers.

Moreover, the Notice of Finding explicitly referred to reports from "other financial institutions involved in the transfers" as the source of the foregoing information.  Id.  In other words, FinCEN reviewed SARs filed by banks on the other side of transactions involving FBME. That statement, and the summary information that FinCEN provided, would appear to be sufficient to put FBME—which is a bank, after all—on notice at the NOF/NPRM stage that FinCEN might rely on information derived from SARs.  As a result, FBME cannot credibly claim now to have suffered unfair surprise in learning that "a portion of the information that formed the basis of FinCEN's finding consisted of Suspicious Activity Reports ('SARs') by banks and financial institutions."  Defs.' Opp'n Mot. Prelim. Inj. at 29.

c.   <u>Other, Non-Classified Evidence on Which FinCEN Relied</u>

In addition to withholding classified information and information protected from disclosure by the Bank Secrecy Act, FinCEN apparently also withheld large portions of the non-

classified and non-protected information upon which it relied.  With its opposition to FBME's preliminary injunction motion, the Government filed numerous unclassified documents that FinCEN acknowledges having relied upon in reaching the finding captured in the NOF/NPRM. These documents had not been disclosed to FBME previously.  While some of the documents were otherwise available to the Bank during the rulemaking process, others were not.  Among these undisclosed documents is an article describing "Cyprus's reputation as a transit point for shady cash," Brooker Decl. Attach. B at 61 (NOF/NPRM Evidentiary Exhibit 2); an article describing a transfer made from an Italian political party through FBME "under dubious circumstances," id. at 155 (NOF/NPRM Evidentiary Exhibit 39); and a blog post, citing a study by researchers at the University of California–Santa Barbara, stating that FBME had agreed to process payments for fake antivirus scam network affiliates, id. at 168 (NOF/NPRM Evidentiary Exhibit 42).

FinCEN's acknowledgement that it "relied upon" these documents and its failure to provide them to FBME until this litigation indicate that it had not in fact "provided FBME with [all] the unclassified, nonprivileged information on which it relied" during the rulemaking process.  Defs.' Opp'n Mot. Prelim. Inj. at 36–37 n.15.  And contrary to FinCEN's claim that these documents do not "add any relevant information not covered by the Notice of Finding and Final Rule," id., there is no mention in the Notice of suspicious transactions involving Italian politicians or detail about FBME's processing of payments in connection with online scams. While this information—considered and relied upon by FinCEN—might support FinCEN's statement that "FBME is used by its customers to facilitate . . . fraud . . . and other illicit activity," 79 Fed. Reg. 42639, FBME evidently never saw it or any supporting documents until well after the close of the comment period.  As a result, FBME never had the opportunity to contest the veracity, credibility, or relevance of the information contained in these documents.

Given FinCEN's reliance on these non-classified, non-protected documents, its failure to publicly disclose them during the notice-and-comment period appears to constitute a procedural error under the APA. To fulfill its obligation to provide adequate notice, an agency must "make available to the public, in a form that allows for meaningful comment, the data the agency used to develop [its] proposed rule." Am. Med. Ass'n, 57 F.3d at 1133 (quoting Chamber of Commerce v. SEC, 443 F.3d 890, 899 (D.C. Cir. 2006)). Agencies are required to make these disclosures in order to "allow[] the parties to focus on the information relied on by the agency and to point out where that information is erroneous or where the agency may be drawing improper conclusions from it." Id. (quoting Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC, 737 F.2d 1095, 1121 (D.C. Cir. 1984)). Additionally, the D.C. Circuit has set a floor for disclosure, holding that, "in informal rulemaking, *at least* the most critical factual material that is used to support the agency's position on review must have been made public *in the proceeding* and exposed to refutation." Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys., 745 F.2d 677, 684 (D.C. Cir. 1984) (emphases added). The touchstone remains whether the agency has disclosed enough of the evidentiary basis and supporting documentation for its rule to allow parties to comment *meaningfully* and contest the basis on which an agency reached the result that it did. See Am. Med. Ass'n, 57 F.3d at 1129. Especially in light of the fact that FBME was not and could not have been privy to the classified and statutorily protected material on which FinCEN relied, it was entitled at a minimum, it would seem, to view and comment on all of the non-classified, non-protected material on which FinCEN relied.

FinCEN attempts to explain its failure to disclose the public documents supporting its rule by noting that they "d[id] not contain the answers to FBME's specific questions." Defs.' Opp'n Mot. Prelim. Inj. at 36–37 n.15. Plaintiffs correctly counter that "the APA obliges the

*agency* to produce materials it is relying upon—not a *commenter* to divine what those materials are and demand them." Pls.' Reply at 5. It is the agency's affirmative obligation to make this material publicly available and expose it to refutation during the rulemaking proceeding. See Air Transp. Ass'n v. FAA, 169 F.3d 1, 7 (D.C. Cir. 1999).

While acknowledging that it "based" its decision in part on "public information," the agency also appears to argue that the nonpublic information was most critical to its determination and its decision to impose the fifth special measure. Defs.' Opp'n Mot. Prelim. Inj. at 1. This may well be true. FinCEN's counsel also surmised at the hearing that, given the extent of FinCEN's reliance on classified material and its obligation not to disclose that material, providing FBME with the unclassified evidence would "give [them] a somewhat misleading picture." Prelim. Inj. Hr'g Tr. at 77:10–19. Plaintiffs no doubt will always lack a complete picture of the agency's reasoning in the absence of access to classified or otherwise protected information. But FinCEN has it backwards. Its obligation to disclose the unclassified material on which it relied is only heightened when it also relies on a substantial amount of classified information that it is unable to share.

Case law in this area is limited, due in large part to the rarity of a rulemaking that is so focused on one particular entity and that involves the use of classified information. Several cases from the constitutional due process context are thus instructive here, as they discuss what level of notice and access to information are needed for an entity to meaningfully comment on a designation imposed on it based substantially on classified information. In Ralls Corp. v. Committee on Foreign Investment in the United States, 758 F.3d 296 (D.C. Cir. 2014), for example, the D.C. Circuit held that, when an entity has restrictions imposed upon it under the Defense Protection Act, proper notice involves access to "the unclassified support therefor and the opportunity to rebut the unclassified supporting evidence," id. at 318. The same holds true

before an entity may be designated a foreign terrorist organization ("FTO") pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"). <u>See</u> <u>People's Mojahedin Org. of Iran v. U.S. Dep't of State</u>, 613 F.3d 220, 230 (D.C. Cir. 2010); <u>Nat'l Council of Resistance of Iran v. U.S. Dep't of State</u>, 251 F.3d 192, 209 (D.C. Cir. 2001). In <u>National Council</u>, the Court explained that due process required that the entity in question be "provide[d] notice of those unclassified items upon which [the Secretary] proposes to rely." 251 F.3d at 209. Similarly, in <u>People's Mojahedin</u>, the Court held that the entity in question must be able to "review and rebut the unclassified portions of the record on which [the Secretary] relied." 613 F.3d at 230. These principles hold equally true here.

Yet, FinCEN failed to disclose or otherwise identify large portions of the unclassified record on which it relied. And while it is almost certainly true that FBME received substantially more process than any organization that is designated an FTO under AEDPA—and that FinCEN considered comments submitted by FBME after the deadline—that additional process cannot compensate for the defect in the notice that FinCEN provided to FBME. Because FBME necessarily could not have been privy to the classified and statutorily protected material, FBME's further inability to review and comment on the entirety of the non-classified and non-protected material on which FinCEN relied meant that FBME did not have the meaningful opportunity to comment that the APA requires. FinCEN properly withheld the large amounts of classified and protected information in the record. But by simultaneously withholding from FBME and the public the unclassified record on which it relied and which provided part of the evidentiary basis for its rule, FinCEN appears to have failed to comply fully with the APA's notice-and-comment requirements.

Although the Government insists that any procedural deficiencies in the rulemaking process were harmless, the Court declines to presume, one way or the other, whether any

17

response FBME could have provided would have changed the Secretary's mind.  See People's Mojahedin, 613 F.3d at 229 n.6 (D.C. Cir. 2010) ("[B]y declining to assume that the [designated entity] could not have changed the Secretary's mind in the absence of due process protections, we cast doubt on whether any denial could be found harmless, perhaps because a convincing response by the [entity] to the unclassified material might affect the Secretary's view not only of that evidence but of the classified material as well.").  And the Court need not now articulate what remedy it would order if it ultimately finds for FBME on the merits of its claim.  It is enough at this stage that FBME is likely to succeed in showing that FinCEN did not fulfill its procedural obligations under the APA.

      2.      The APA's Prohibition of Arbitrary and Capricious Agency Action

In Count II of its Complaint, FBME claims that the Final Rule is arbitrary and capricious under the APA in that it reflects FinCEN's failure (1) to consider viable and obvious, less-punitive alternatives to the prohibition in the fifth special measure, such as the imposition of a fine or a special monitor; (2) to consider relevant data in promulgating the rule; and (3) to adequately explain how the rule satisfies Section 311's requirements.  The Court discusses each of these contentions below.

The APA provides that a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This standard of review is "narrow"; the "court is not to substitute its judgment for that of the agency."  FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).  Rather, it should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Id. (quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)).  The D.C. Circuit

has emphasized that "in an area at the intersection of national security, foreign policy, and administrative law," judicial review "is extremely deferential." <u>Islamic Am. Relief Agency v. Gonzales</u>, 477 F.3d 728 (D.C. Cir. 2007). Yet the deference owed to the agency is not unlimited: A reviewing court must consider whether the agency provided a "satisfactory explanation for its action including a rational connection between the facts found and the choice made." <u>Dist. Hosp. Partners, L.P. v. Burwell</u>, 786 F.3d 46, 56–57 (D.C. Cir. 2015) (quoting <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S. at 43). Among other things, the agency's explanation must reflect its consideration of "significant and viable and obvious alternatives." <u>Id.</u> at 59 (quoting <u>Nat'l Shooting Sports Found., Inc. v. Jones</u>, 716 F.3d 200, 215 (D.C. Cir. 2013)). FBME contends that the Final Rule fails to satisfy this requirement.

a.   <u>Consideration of Alternatives</u>

FBME first argues that the Final Rule is arbitrary and capricious because it demonstrates that FinCEN failed to consider obvious, viable, and less-punitive alternatives to the fifth special measure, such as imposition of a fine or special monitor. The government responds that those alternatives proposed by FBME were "neither viable nor obvious," given FinCEN's authority under Section 311 and the seriousness of the concerns the Bank's record raised. Defs.' Opp'n Mot. Prelim. Inj. at 25.

As explained previously, Section 311 of the USA PATRIOT Act provides that when the Secretary determines that there are reasonable grounds for concluding that a nondomestic financial institution is "of primary money laundering concern," he or she "may require domestic financial institutions . . . to take [one] or more special measures." 31 U.S.C. § 5318A(a)(1). The statute identifies five such special measures. <u>See id.</u> § 5318A(b). The first four set forth informational and recordkeeping requirements concerning the customers and activities of the institution deemed to be of primary money laundering concern. <u>See id.</u> § 5318A(b)(1)-(4). The

19

fifth, imposed here, may take the form of a prohibition of, or conditions on, the "opening or maintaining [of] certain correspondent or payable-through accounts" by domestic financial institutions on behalf of nondomestic institutions of primary money laundering concern.  Id. § 5318A(b)(5).

In the Final Rule, FinCEN explains that the agency "found that FBME is used to facilitate money laundering, terrorist financing, transnational organized crime, fraud, sanctions evasion, and other illicit activity internationally and through the U.S. financial system," and that it "has systemic failures in its [anti–money laundering] controls that attract high-risk shell companies."  80 Fed. Reg. 45057, 45058.  The agency further explains that imposition of "the fifth special measure will help guard against the money laundering risks that FBME presents to the U.S. financial system as identified in the NOF, NPRM, and this final rule."  Id. at 45060.  Inherent in this explanation is the agency's conclusion that the other four special measures available to it—which impose only recordkeeping and informational requirements, and which do not involve steps to eliminate or curtail the institution of primary money laundering concern's access to the U.S. financial system— would not help guard against such risks.  Given the agency's finding of ongoing money-laundering concerns threatening the U.S. financial system—which is entitled to significant deference—and the fact that only the fifth special measure provides for direct protection of the U.S. financial system, the Court cannot conclude at this stage that the Final Rule was arbitrary or capricious based on FinCEN's explanation of its choice to impose the fifth special measure, implicitly over the other four special measures.

However, the statute recognizes an alternative not addressed by the agency *within* the fifth special measure—namely, the imposition of *conditions* on the opening or maintaining of correspondent accounts, rather than the full prohibition of opening or maintaining such accounts.

While FBME does not point specifically to this alternative, it does urge the Court to find that measures less punitive than the full prohibition were available to the agency.

FinCEN's authority to impose conditions was an obvious potential alternative to a full prohibition on opening or maintaining correspondent accounts on behalf of FBME.  Indeed, the statute provides for this authority on its face, in the same subsection in which it provides for the authority to fully prohibit such accounts.  While it is implicit in the Final Rule why the first four special measures were not viable alternatives, nowhere in the record does the agency explain why conditions on the opening or maintaining of such accounts for FBME could not protect the U.S. financial system against the risks posed by FBME.  And given how rarely the fifth special measure is imposed, as well as the unusual procedural character of agency action Section 311 calls for, it was incumbent upon the agency, in the Court's view, to consider alternative forms the fifth special measure might take.  The Court therefore concludes that, at this stage of the proceedings and on the record before it, the agency's failure to explain its consideration of potentially viable alternatives appears to have run afoul of the APA, and thus that there is a substantial likelihood that FBME will succeed on the merits of this aspect of its claim.

b.   Consideration of Relevant Data

FBME also contends that the Final Rule is arbitrary and capricious in that it reflects FinCEN's failure to consider relevant data in promulgating the rule.  The Court cannot conclude that FBME is likely to succeed on the merits of this claim.  Upon consideration of the entire record—including classified information not available to FBME and reviewed *in camera*, see 31 U.S.C. § 5318A(f)—this Court finds that the present record, taken as a whole, supports FinCEN's exercise of its discretion in reaching its ultimate conclusion under Section 311 that FBME is an institution of primary money laundering concern.  Conversely, the record as it

stands does not support FBME's contention that FinCEN arbitrarily disregarded the evidence it presented to rebut that conclusion.

      c.    Consideration of the Statutory Criteria

Finally, FBME maintains that FinCEN failed to adequately consider the statutory criteria for imposition of the fifth special measure and to explain its determination that FBME is an institution of primary money laundering concern.  The Court also concludes that FBME is not likely to succeed on the merits of this contention.  Section 311 lays out four factors for the Secretary to consider in "selecting which special measure or measures to take under this subsection," id. § 5318A(a)(4), (a)(4)(B), and three factors for the Secretary to consider in "making a finding that reasonable grounds exist for concluding that a . . . financial institution[] operating outside of the United States . . . is of primary money laundering concern," id. § 5318A(c)(1), (c)(2)(B).  The Final Rule explicitly lists and addresses the first set of factors, see 80 Fed. Reg. 45057, 45060–61, and it addresses the second set of factors throughout the rule, see id. at 45058–61.  The Court is satisfied that the agency's reasoning with respect to these factors is grounded in the record, taken as a whole, and otherwise complies with the APA.

      B.    Irreparable Harm

An injunction is appropriate only if the applicant has demonstrated irreparable harm and the inadequacy of legal remedies.  Sierra Club v. U.S. Army Corps of Eng'rs, 990 F. Supp. 2d 9, 38 (D.D.C. 2013).  "The party seeking injunctive relief must demonstrate that the claimed injury is 'both certain and great.'"  Id. at 38–39 (quoting Wis. Gas Co. v. Fed. Energy Regulatory Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Moreover, "the party seeking injunctive relief must show that '[t]he injury complained of [is] of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'"  Wisconsin Gas Co., 758 F.2d at 674 (quoting Ashland Oil, Inc. v. FTC, 409 F. Supp. 297, 307 (D.D.C. 1976), aff'd, 548 F.2d 977

(D.C. Cir. 1976)).   A plaintiff must present the Court with enough evidence to "substantiat[e]" its claim of irreparable injury.  Id. at 676.

FBME believes it "beyond serious dispute" that it will suffer irreparable harm in the absence of a preliminary injunction.  Mem. Supp. Mot. Prelim J. at 41.  The Bank claims that, without preliminary relief, it will "cease being able to function as a commercial bank."  Id.  It offers two main arguments in support of this assertion.  First, the Bank states that it depends on U.S. dollars to conduct business and indicates that it will be cut off from any transaction involving U.S. dollars once the Final Rule goes into effect, preventing it from accessing correspondent accounts.  Id.  Such "[m]ajor disruption of a business" can constitute irreparable harm.  Blom ASA v. Pictometry Int'l Corp., 757 F. Supp. 2d 238, 244–45.  Second, the Bank contends that "foreign regulators are threatening to liquidate FBME as a result of the Final Rule."  Mem. Supp. Mot. Prelim J. at 41.  FBME describes this threat as "grave and growing." Id. at 42.

In response, the Government focuses on the speculative nature of the injuries that FBME claims it will suffer in the absence of a preliminary injunction.  The Government points out, for instance, that FBME currently has no U.S. correspondent accounts and that "[t]here is no indication [FBME] was able to do business in U.S. dollars . . . or any significant business in any other currency" at the time that FinCEN promulgated the Final Rule.  Defs.' Opp'n to Mot. for Prelim J. at 40.  Many banks with which FBME had maintained correspondent accounts refused to do business with FBME after FinCEN issued its Notice of Proposed Rulemaking.  Wyllie Decl. ¶ 18.  The Government contends that "[i]t is at best highly speculative to presume that banks that cut off ties with FBME based on an assessment of the risk of doing business with the Bank would suddenly rethink that assessment based on the entry of a preliminary injunction that merely *delayed* the Final Rule without rescinding it."  Defs.' Opp'n to Mot. for Prelim J. at 41–

42.  The Government further asserts that "FBME has not identified a single transaction that would go forward in the event the Court entered a preliminary injunction." Id.  Additionally, the Government notes that "any potential liquidation by [FBME's regulators] is not the *direct* result of the Final Rule and cannot be forestalled by a preliminary injunction."  Defs.' Opp'n Mot. Prelim J. at 42.

Until the hearing, FBME had not adequately responded to FinCEN's assertion that FBME is currently unable to transact any business in U.S. dollars or any significant business in any other currency.  For if FBME can barely function as a bank at present, it is not obvious how a preliminary injunction would enable it to stave off any further harm or disruption to its business.  FBME has come forward, however, with evidence that the state of its business will suffer dramatically and irrevocably as soon as the Final Rule takes effect.  Specifically, FBME provides the declaration of Dr. Richard Karl Friedrich Reimer, a partner in the Frankfurt Office of Hogan Lovells International LLP and FBME's representative in connection with several of its European correspondent bank relationships.  Dr. Reimer attests that Commerzbank, a German bank which holds over $132 million U.S. dollars in an account for FBME, "has conveyed to [him] in no uncertain terms that, upon implementation of the Final Rule, [it] will (i) terminate its entire relationship with FBME, (ii) close all of the Bank's accounts, including non-USD accounts, and (iii) cease all other activities with FBME."  Reimer Decl. ¶¶ 6–7.  Moreover, Dr. Reimer attests that Commerzbank "perceives two options for closing FBME's accounts . . . (1) transfer[ing] the funds to one of FBME's regulators . . . or (2) transfer[ing] the funds to a statutory custodian, *i.e.* the competent local court, to determine what to do with the funds."  Id. ¶ 8.  In either case, it seems, FBME could well be permanently deprived of its assets at Commerzbank if the Final Rule takes effect.  Dr. Reimer also attests that, based on his communications with them and his experience with the industry, many other "international

correspondent banks that still have relationships with FBME will likewise cut ties with FBME when the Final Rule is implemented and close all USD accounts by transferring the funds to one of the regulators or a local court or statutory custodian."  Id. ¶ 10.

While somewhat late in the game, FBME has taken steps to substantiate its claim that its business will suffer irreparable injury absent a preliminary injunction.  Dr. Reimer's declaration is not as persuasive as would be a declaration from a representative of Commerzbank itself or one of FBME's other correspondent banks, but the Court finds it sufficient to establish that FBME stands to lose a substantial portion of its assets once the Final Rule takes effect— above and beyond its current predicament of being denied access to assets being held in its name. A plaintiff may suffer irreparable harm if "the very existence of [its] business" is "threatened," Wisconsin Gas Co., 758 F.2d at 674.  The liquidation of FBME's remaining U.S. dollar correspondent accounts presents such a threat.  FBME therefore has met its burden to demonstrate that it is likely to suffer irreparable harm in the absence of a preliminary injunction.[5]

---

[5] FBME further contends that liquidation by its Cypriot regulator—the Central Bank of Cyprus ("CBC")—is likely to follow as a direct result of the Final Rule taking effect.  The present record is not clear, however, whether any action CBC might take against the Bank would be a direct result of the Final Rule or would occur regardless of whether the Final Rule goes into effect.  On one hand, CBC stated in an August 3, 2015 letter that "FinCEN's issuance of the Final Rule precludes any prospect that FBME Cyprus Branch will be able to resume normal operations and meet its obligations to depositors and creditors in the foreseeable future."  Saab Decl. Ex. A at 4. More recently, however, correspondence has been filed under seal because it may contain confidential business information or may otherwise be subject to certain privileges.  In that correspondence, CBC clarified that it is likely to take action against FBME regardless of whether the Court issues a preliminary injunction.  Given these somewhat conflicting statements, the Court cannot conclude that a preliminary injunction will enable FBME to avoid irreparable harm on the basis that CBC will change course in response to this litigation.

C.      The Balance of Equities and the Public Interest

A party seeking a preliminary injunction must demonstrate both "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20. "These factors merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009). FBME contends that whereas the Final Rule "will [immediately] destroy its ability to function as an international commercial bank[,] . . . there is no commensurate need for immediate sanction that weighs on the other side of the equities scale." Mem. Supp. Mot. Prelim. Inj. at 42–43. Further, FBME argues that it is in the public interest to prevent a violation of its due process rights and to ensure that FinCEN complies with its obligations under the APA. Finally, FBME underscores the harm that will befall its employees and borrowers if the Final Rule takes effect, and even goes so far as to claim that "the overall effect of FinCEN's action will be to disrupt and destabilize global financial markets." Id. at 44.

In response, the Government contends that the United States "has a substantial interest in protecting the integrity of its financial system from foreign threats," particularly when national security is at stake, an interest that will be undermined if the Court issues a preliminary injunction. Defs.' Opp'n Mot. Prelim. Inj. at 45. The Government also emphasizes the importance of "formaliz[ing] FBME's exclusion from the U.S. financial system," id., which it says will prevent ongoing and future abuses as well as protect "the orderly and efficient implementation of rules," Tr. Prelim. Inj. Hr'g at 100. According to the Director of FinCEN, Jennifer Shasky Calvery, "[d]elaying the effective date of the FBME Final Rule would affect the obligation, and, as a result, may affect the willingness and ability of U.S. banks to take actions needed to protect against the specific threats of terrorism finance, fraud, and WMD proliferation" created by FBME's operation. Calvery Decl. ¶ 64.

This Court recognizes the grave threat to national security that financing of terrorist activity and transnational crime poses.  Eliminating that financing, and extricating it from the U.S. financial system, are of paramount importance to the Government and the public.  But the parties agree that "FBME was cut off from U.S. correspondent accounts before the issuance of the Final Rule," and that as of last month, "[t]here is no indication [that FBME] was able to do business in U.S. dollars . . . [or] *any* significant business in *any* other currency."  Defs.' Opp'n Mot. Prelim. Inj. at 40 (emphasis added); see also Tr. Prelim. Inj. Hr'g at 46 ("MR SHAFFER [for FBME]: . . . [FMBE's] correspondent accounts that are U.S. dollar denominated . . . have been in a state of suspension in large part . . . for essentially a year.").  In other words, it appears beyond dispute that FBME does not currently pose a threat to the U.S. financial system due to the practical effect of the Notice of Finding and Notice of Proposed Rulemaking, to which FBME's U.S. correspondent banks reacted by holding its accounts "in a state of suspension."  Tr. Prelim. Inj. Hr'g at 47; see also Pls.' Reply at 27 (FBME "has $800 million frozen in U.S. dollar accounts.").  Moreover, the Government acknowledges as "highly speculative" the presumption "that banks that cut off ties with FBME based on an assessment of the risk of doing business with the bank [following the Notices] would suddenly rethink that assessment based on the entry of a preliminary injunction that merely *delayed* the effect of the Final Rule without rescinding it."  Defs.' Opp'n Mot. Prelim. Inj. at 40–41.  Indeed, the Government emphasizes:  "FBME has not identified a single transaction that would go forward in the event the Court entered a preliminary injunction."  Id. at 41.

By arguing that a preliminary injunction will have essentially no effect on FBME's operations or access to U.S. correspondent accounts, the Government has effectively conceded that the Court's granting a preliminary injunction will have little or no marginal effect on the exposure of U.S. banks to FBME's transactions pending a final decision on the merits.  By the same token, the Government is right to note that "if FBME were correct that it could gain access to U.S.

correspondent accounts as a result of the preliminary injunction, that possibility would tip the balance dramatically in favor of the government." Id. at 46.

In sum, FBME's current inability to access the U.S. banking system and transact business in U.S. dollars minimizes the harm to the Government and the public from granting a temporary injunction.   And holding the agency to its full procedural obligations—even where the present record suggests that its ultimate decision was a proper exercise of its discretion—is critically important in a quasi-adjudicative rulemaking grounded largely on classified evidence.   Weighing these considerations, the Court finds that merely delaying the Final Rule will provide the parties with additional time to litigate the contours of the agency's obligations without meaningfully affecting the important U.S. national security interests at stake in this proceeding.   This is especially true given the parties' agreement to expedite briefing of the merits.   Accordingly, the balance of equities tips toward FBME, and the public interest favors a preliminary injunction at this stage.

## IV.    Conclusion

For the foregoing reasons, the Court concludes that FBME has met its burden to establish each of the factors required to obtain a preliminary injunction of the Final Rule.   The Court will therefore grant FBME's Motion for a Preliminary Injunction.   An appropriate order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:    August 27, 2015