**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**FBME BANK LTD.**; and

**FBME LTD.**,

        Plaintiffs,

    v.

**JACOB LEW**, in his official capacity as
Secretary of the Treasury;

**U.S. DEPARTMENT OF THE
TREASURY**;

**JENNIFER SHASKY CALVERY**, in her
official capacity as Director of the Financial
Crimes Enforcement Network; and

**FINANCIAL CRIMES ENFORCEMENT
NETWORK**,

        Defendants.

Case No. 1:15-cv-01270-CRC

**OPPOSITION TO DEFENDANTS' MOTION FOR VOLUNTARY REMAND**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................3

ARGUMENT .......................................................................................................................6

    I.     BECAUSE THIS CHALLENGE IS PROPERLY BEFORE THE COURT, IT IS
         DUE TO BE DECIDED ON ITS MERITS. ...........................................................6

    II.    THE VOLUNTARY REMAND REQUESTED BY FINCEN IS UNJUSTIFIED.10

        A.     FinCEN's Proposed Voluntary Remand Improperly Deprives FBME Of
            The Relief To Which It Is Entitled. ...........................................................10

        B.     The Proposed Voluntary Remand Is Inappropriate Because It Threatens To
            Tax More, Rather Than Less, Judicial Resources. ....................................12

        C.     Specific, Pending Disputes Should Be Decided As Prelude To Remand. .15

            1.     FinCEN Continues To Rely Upon, While Withholding
                   From FBME, Unspecified Categories Of Unclassified
                   Information Without So Much As Specifying Any Basis For
                   Its Withholding. ...........................................................................15

            2.     To The Extent FinCEN Claims Privilege Over Suspicious
                   Activity Reports, That Claim Is Unsupportable. ..........................22

            3.     FinCEN Has Suggested It May Rely *Entirely* On
                   Allegations To Which FBME Will Not Be Permitted To
                   Respond. ......................................................................................26

    III.   VOLUNTARY REMAND POSES GRAVE PREJUDICE TO FBME .................27

CONCLUSION ...................................................................................................................31

# TABLE OF AUTHORITIES

**Cases**

*A.L. Pharma, Inc. v. Shalala*,
   62 F.3d 1484 (D.C. Cir. 1995) ...................................................................14, 27

*Al Haramain Islamic Foundation, Inc. v. U.S. Department of Treasury*,
   686 F.3d 965 (9th Cir. 2012) ...............................................................................26

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
   988 F.2d 146 (D.C. Cir. 1993) ............................................................................12

*Allina Health Services v. Sebelius*,
   746 F.3d 1102 (D.C. Cir. 2014) ..........................................................................11

*American Equity Investment. Life Insurance Co. v. SEC.*,
   613 F.3d 166 (D.C. Cir. 2010) ............................................................................12

*\*American Forest Resource Council v. Ashe*,
   946 F. Supp. 2d 1 (D.D.C. 2013), *aff'd*, 601 F. App'x 1 (D.C. Cir. 2015) .................10, 11, 27

*\*American Petroleum Institute v. EPA*,
   906 F.2d 729 (D.C. Cir. 1990) ...............................................................................8

*American Petroleum Institute v. EPA*,
   683 F.3d 382 (D.C. Cir. 2012) ...............................................................................8

*American Radio Relay League, Inc. v. FCC*,
   524 F.3d 227 (D.C. Cir. 2008) .............................................................................23

*Black Warrior Riverkeeper, Inc. v. Alabama DOT*,
   2013 U.S. Dist. LEXIS 75766 (M.D. Ala. May 30, 2013) .....................................17

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*,
   419 U.S. 281 (1974)...............................................................................................22

*California Native Plant Society v. EPA.*,
   251 F.R.D. 408 (N.D. Cal. 2008).........................................................................17

*Campbell v. U.S. Department of Justice*,
   164 F.3d 20 (D.C. Cir. 1998)...............................................................................16

*Caperton v. A.T. Massey Coal Co.*,
   556 U.S. 868 (2009)...............................................................................................22

*Chamber of Commerce v. SEC*,
   443 F.3d 890 (D.C. Cir. 2006).............................................................................24

*Chlorine Chemistry Council v. EPA*,
   206 F.3d 1286 (D.C. Cir. 2000)...........................................................................11

*\*City News & Novelty, Inc. v. City of Waukesha*,
   531 U.S. 278 (2001)..................................................................................................7

*Commissioner of INS v. Jean,*
  496 U.S. 154 (1990)................................................................................................30

*Connecticut Light & Power Co. v. NRC,*
  673 F.2d 525 (D.C. Cir. 1982)...............................................................................24

*Dupre v. FBI,*
  2002 WL 1042073 (E.D. La. May 22, 2002).........................................................25

*Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.,*
  No. 09-cv-3701, 2015 WL 1726435 (S.D.N.Y. Apr. 15, 2015) .............................25

*Humane Society of U.S. v. Kempthorne,*
  579 F. Supp. 2d 7 (D.D.C. 2008)...........................................................................12

*International Counsel Bureau v. U.S. Department of Defense,*
  723 F. Supp. 2d 54 (D.D.C. 2010).........................................................................16

*Jordan v. Wiley,*
  2009 WL 2913231 (D. Colo. Sept. 8, 2009)..........................................................17

*In re JPMorgan Chase Bank, N.A.,*
  --- F.3d ----, 2015 WL 4979594 (1st Cir. Aug. 21, 2015) .....................................25

*Judicial Watch, Inc. v. U.S. Department of Defense,*
  715 F.3d 937 (D.C. Cir. 2013)...............................................................................16

*In re Kellogg Brown & Root, Inc.,*
  796 F.3d 137 (D.C. Cir. 2015)...............................................................................18

*King v. U.S. Department of Justice,*
  830 F.2d 210 (D.C. Cir. 1987)...............................................................................16

*Knox v. Service Employees International Union,*
  132 S. Ct. 2277 (2012)............................................................................................7

*Mata v. Lynch,*
  135 S. Ct. 2150 (2015)............................................................................................6

*NLRB v. Wyman-Gordon Co.,*
  394 U.S. 759 (1969)..............................................................................................14

*National Association of Chain Drug Stores v. Department of Health & Human Services,*
  631 F. Supp. 2d 23 (D.D.C. 2009).........................................................................17

*New Orleans Public Service, Inc. v. Council of City of New Orleans,*
  491 U.S. 350 (1989)................................................................................................6

*New York v. Salazar,*
  701 F. Supp. 2d 224 (N.D.N.Y. 2010)...................................................................17

*Ohio Bell Telephone Co. v. Public Utilities Commission,*
  301 U.S. 292 (1937)..............................................................................................22

*People's Mojahedin Organization of Iran v. U.S. Department of State,*
  613 F.3d 220 (D.C. Cir. 2010) ........................................................................26

*\*Portland Cement Association v. Ruckelshaus,*
  486 F.2d 375 (D.C. Cir. 1973) ...................................................................18, 19

*SEC v. Yorkville Advisors, LLC,*
  300 F.R.D. 152 (S.D.N.Y. 2014) .....................................................................24

*St. Lawrence Seaway Pilots Association, Inc. v. United States Coast Guard,*
  85 F. Supp. 3d 197 (D.D.C. 2015) ....................................................................11

*Stand Up for California! v. U.S. Department of Interior,*
  71 F. Supp. 3d 109 (D.D.C. 2014) ....................................................................16

*Spiller v. Walker,*
  2002 WL 1609722 (W.D. Tex. July 19, 2002), *aff'd*, 353 F.3d 235 (5th Cir. 2003) .............17

*The Navajo Nation v. Peabody Holding Co.,*
  255 F.R.D. 37 (D.D.C. 2009) ............................................................................18

*U.S. Lines, Inc. v. Federal Maritime Commission,*
  584 F.2d 519 (D.C. Cir. 1978) ..........................................................................18

*Wheaton College v. Sebelius,*
  703 F.3d 551 (D.C. Cir. 2012) ............................................................................8

*Withrow v. Larkin,*
  421 U.S. 35 (1975) ..........................................................................................21

**Statutes**

28 U.S.C. § 2412 .................................................................................................30

31 C.F.R. § 1020.320 ....................................................................................24, 25

31 U.S.C. § 5318 .................................................................................................24

31 U.S.C. § 5318A ..................................................................................16, 19, 24

5 U.S.C. § 552 .....................................................................................................16

5 U.S.C. § 702 .......................................................................................................6

5 U.S.C. § 706 .......................................................................................................6

**Regulations**

73 Fed. Reg. 19452 (Apr. 10, 2008) ...................................................................29

75 Fed. Reg. 707 (Dec. 29, 2009) ......................................................................16

75 Fed. Reg. 75593 (Dec. 3, 2010) ....................................................................25

Withdrawal of Proposed Rulemaking against Lebanese Canadian Bank SAL, *available at* http://www.fincen.gov/statutes_regs/frn/pdf/20150928.pdf (Sept. 28, 2015) ........................29

**Rules**

Fed. R. Civ. P. 26(b)(5).................................................................................................16

**Miscellaneous**

Hon. Henry J. Friendly, *Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders,* 1969 Duke L.J. 199, 210-11 ........................................................14, 27

Hon. Merrick B. Garland, *Deregulation and Judicial Review,* 98 Harv. L. Rev. 505, 570-71 (1985) .............................................................................14, 27

## INTRODUCTION

FinCEN's motion for voluntary remand ("Mot.," ECF 38) bids to deny Plaintiffs their fair day in court.   Only after a year of administrative proceedings, after weathering terrible cloud and stain on their reputations, and after expending countless hours and dizzying sums in a futile effort to engage with FinCEN did Plaintiffs at last reach this Court.   Then, only by obtaining a preliminary injunction—which FinCEN fought tooth and nail against, insisting at every turn upon immediate implementation of its Final Rule—did Plaintiffs sustain their operations long enough to see this Court's final judgment, which all agreed could be forthcoming in a matter of weeks, following highly expedited merits briefing.   All that remains is for FinCEN to file the official administrative record, for expedited briefing to run its course, and for this Court to render its final judgment.   But FinCEN has dealt itself yet another magic card from what seems to be a stacked deck:   By FinCEN's account, FBME can now be sent back down to the administrative process for months of "do over" before this Court adjudicates critical, pending questions that go to whether FBME is being denied its administrative and constitutional rights, particularly to address *un*classified material that FinCEN continues to withhold based on unspecified privilege(s).   In the meantime, FinCEN would leave the Final Rule intact and in place, with notice and comment simply reopened.   Law, fairness, and common sense all commend that voluntary remand be denied and final judgment rendered without ado.

FinCEN dresses up its remand proposal as meant to further judicial economy.   With all due respect, that does not ring true.   FinCEN was not concerned with judicial economy when it rejected initial proposals from Plaintiffs that might have delayed, very briefly, implementation of the Final Rule so as to avoid burdening this Court with a preliminary injunction fight.   Nor was FinCEN concerned with judicial economy when it carried that preliminary injunction fight through intensive briefing, hearing, and deliberations.   Nor was FinCEN concerned that

expedited merits briefing, which it repeatedly embraced, would pose any problem for judicial economy.   Nor is FinCEN concerned *now* with judicial economy to the degree that it would simply agree to reasonable terms that Plaintiffs have proposed[1] in an effort to minimize dispute over the contours of the administrative process ahead.   Make no mistake, what FinCEN seeks is *not* judicial economy but tactical advantage—the chance to improve its litigation position by undertaking minimal, begrudging procedural corrections while otherwise remaining locked in.

By no stretch of the imagination does judicial economy point towards remand.   Notably, FinCEN cites no case, and we have found no case, in which a court has gone as far as this Court has towards rendering a final judgment, specifically by issuing a preliminary injunction, only then to order a remand.   At this point, massive resources have already been sunk and any further expenditure *en route* to a final judgment, which promises unique returns, will be marginal.   If this Court proceeds to final judgment here and now, it will either reiterate the views reflected in its analysis of likelihood of success (ECF 33 at 9–22 (Prelim. Inj. Op.)) or else it will alter or expand on them.   If the Court does the former, the expenditure of judicial resources will be small and well warranted to ensure clarity and shared understanding between the parties (not to mention interested observers) about how the administrative process should proceed.   If the Court does the latter, then the expenditure of judicial resources may be not only well warranted but *essential* to prevent recurrence of the same mistakes and deprivations that prompted this challenge—and that would necessitate resumption of this challenge, assuming that Plaintiffs survive that long.

---

[1]   As explained *infra*, Plaintiffs asked FinCEN to represent that (1) the classified materials it is withholding are not dispositive of imposing the fifth special measure under Section 311 and (2) it will disclose unclassified material it is withholding so as to permit comment by Plaintiffs.   Plaintiffs had also understood that the Final Rule would necessarily be *withdrawn* in connection with voluntary remand.   But FinCEN has rejected any such compromise.

It is clear that the voluntary remand FinCEN proposes does not afford Plaintiffs the legal relief they seek from this Court, nor anything close.   Even apart from their legal arguments, Plaintiffs are opposing voluntary remand because FinCEN has refused to accept terms that would make such a remand *meaningful* in the grand scheme of things.   In this profile, the Court has every reason, and, indeed, obligation to decide, up or down, via final judgment, the real and important legal questions before it, which continue to divide the parties.   Otherwise, an agency such as FinCEN, when finally subjected to judicial review (as it so rarely is), will effectively be able to cut short any challenger's day in court.   The agency could look to exit court in opportunistic and self-serving fashion, pushing the "eject" button only when staring at an adverse final judgment, and only for the sake of making the most begrudging (very likely cosmetic) adjustments to its administrative record.   That is not how administrative law and judicial review should work.

If anything, the climb through FinCEN's Section 311 process and up to this Court for a final judgment is already too steep, too long, too costly, and too perilous.   Granting FinCEN's instant motion threatens to make it altogether impossible, even for the hardiest of challengers. For the reasons stated herein, we respectfully urge this Court to see this case through to expedited merits briefing and final judgment.

## BACKGROUND

On August 27, 2015, this Court preliminarily enjoined Defendants from implementing a final rule, imposing against FBME the fifth special measure under Section 311 of the USA PATRIOT Act (the "Final Rule"), and instructed the parties to "meet and confer as to an expedited briefing schedule on the merits of Plaintiffs' Complaint and to file as soon as practicable a joint proposed briefing schedule."   ECF 32.   That instruction followed the parties' shared representations throughout the preliminary injunction briefing and at oral

argument that expedited summary judgment briefing was appropriate, practicable, and expected following the Court's ruling on the preliminary injunction.[2]

After the Court preliminarily enjoined the Final Rule, however, FinCEN abruptly slammed on the brakes, first stalling about a schedule for expedited summary judgment briefing and then insisting upon seeking a voluntary remand in lieu of further merits proceedings. FBME indicated it would not oppose such a remand, provided only that FinCEN would commit to a remand procedure that would respect core rights FBME is now asserting to this Court under the Administrative Procedures Act ("APA") and under the Due Process Clause of the U.S. Constitution. In particular, FBME requested assurance from FinCEN that (1) the classified information and material FinCEN is withholding is not itself dispositive of FinCEN's decision to impose the fifth special measure and (2) FinCEN will enable FBME to understand and respond to any information and material that is *not* designated as classified but FinCEN is nonetheless claiming as otherwise protected while relying upon it (including Suspicious Activity Reports ("SARs"), communications with the Central Bank of Cyprus ("CBC"), and any foreign reports or audits that FinCEN may be relying upon). But FinCEN refused.

By all indications, FinCEN remains committed to following the very same course that has necessitated resort to this Court and sparked the disputes now pending before the Court. For example, FinCEN made clear that it intends to rely upon and withhold unspecified categories of *unclassified* information based solely upon a bald, amorphous assertion that such information is

---

[2]    *See, e.g.*, ECF 23-1 at 47 (Gov't Prelim. Inj. Opp.) ("[I]n order to facilitate expeditious judicial review, the government is willing to brief summary judgment on an expedited basis, and would be ready to . . . move for summary judgment within 30 days of resolution of the motion for a preliminary injunction."); ECF 25 at 3 (FBME Prelim. Inj. Reply) ("[W]e embrace the Government's proposal to brief the merits within 30 days of the ruling on the preliminary injunction . . . ." (citation omitted)); Aug. 25, 2015 Hr'g Tr. 101:9–11 (COUNSEL FOR DEFENDANTS: "[W]e have recommended and are certainly willing to undertake this expedited briefing schedule so that this matter could be resolved quickly . . . .").

somehow subject to absolute, sweeping "privilege."   Although in its motion FinCEN suggests (contrary to representations made between counsel) that these unclassified but purportedly privileged documents are limited to "Bank Secrecy Act protected information," Mot. at 7, counsel for FinCEN repeatedly answered pointed inquiries by indicating that information within this category extends well beyond SARs.   Indeed, FinCEN has made clear to FBME (but not the Court) that FinCEN will withhold as privileged *any* document or other information received from *any* third party, even if it is *not* classified and FinCEN is relying upon it for the Final Rule. Declaration of Derek Shaffer ¶ 5.

Nor would FinCEN entertain any compromise solution short of full disclosure of the unclassified information it is relying upon.   FinCEN refuses to log such information.   FinCEN refuses to provide any description or summary of such information.   Most incredibly, FinCEN refuses even to specify its claimed privilege or other basis for withholding such information. *Id.*

With respect to information and documentation received and relied upon from third parties, FinCEN has refused to confirm what role information provided by the CBC had played previously and stands to play going forward.   Specifically, FBME asked about purported reports from the CBC, which reports CBC had inexplicably withheld from FBME.   There are indications that certain CBC audit reports prepared in summer of 2014 by PricewaterhouseCoopers, with the knowledge and cooperation of FBME—even though they were then withheld from FBME—in fact influenced FinCEN's previous rulemaking.   After just recently representing that it "does not have [the PWC reports] in its possession and therefore does not plan to rely on them," FinCEN would *not* represent that it never possessed, reviewed, or relied upon such reports.   Shaffer Decl., Ex. B.   Nor is FinCEN illuminating the nature of the

third-party information—including summaries, compilations, or second-hand accounts—that it may be continuing to rely upon as derived from CBC.[3]

In this profile and for the reasons explained below, FBME must respectfully oppose voluntary remand as now sought by FinCEN and urge this Court to proceed, expeditiously, to the final judgment that would properly set up and inform an administrative remand.

## ARGUMENT

I.   **BECAUSE THIS CHALLENGE IS PROPERLY BEFORE THE COURT, IT IS DUE TO BE DECIDED ON ITS MERITS.**

This Court is properly positioned to render its final judgment and has every good reason now to proceed apace to it.   Voluntary remand, where deemed appropriate, simply affords a narrow exception to the general rule that "[t]he courts of the United States are bound to proceed to judgment and to afford redress to suitors before them in every case to which their jurisdiction extends."   *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 358 (1989) (citation and quotation marks omitted); *see also Mata v. Lynch*, 135 S. Ct. 2150, 2152 (2015) ("[A] federal court has a virtually unflagging obligation to assert jurisdiction where it has that authority." (citation and quotation marks omitted)).   Here, there is no question that this Court has jurisdiction.   The Administrative Procedure Act makes "judicial review" available to any person who suffers "legal wrong because of agency action" or who is "adversely affected or aggrieved by agency action," 5 U.S.C. § 702, and obliges a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . [or] (D) without observance of procedure required by law," 5 U.S.C. § 706(2).

---

[3]      Indeed, FinCEN indicates that it is honoring an unspecified assertion of confidentiality by CBC.   Defendants' Motion for Leave to File Under Seal ¶ 2, Aug. 26, 2015.

Nor can a defendant, absent extraordinary circumstances, destroy a court's jurisdiction by voluntarily ceasing to engage in offending behavior.  *See, e.g.*, *Knox v. Service Employees International Union*, 132 S. Ct. 2277, 2287 (2012) ("The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed.").  "[T]hat rule traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior."  *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001).  It follows that FinCEN cannot evade this Court's forthcoming final judgment unless it demonstrates a real commitment to potentially avoiding the same course of conduct—the full course of conduct—that has occasioned FBME's instant challenge to the Final Rule.  Absent such a demonstration, this Court remains obliged to exercise its jurisdiction and to decide, up or down, the arguments now before it as to why FinCEN cannot impose the fifth special measure as it has against FBME.

FinCEN apparently recognized as much in submitting (even while the prospect of a preliminary injunction loomed) that it was "willing to brief summary judgment on an expedited basis, and would be ready to submit the administrative record, including those parts that would be submitted *ex parte* and under seal, and move for summary judgment within 30 days of resolution of the motion for a preliminary injunction."  ECF 23-1 at 47 (Gov't Prelim. Inj. Opp.).  In fact, FinCEN even cited its willingness to proceed "on an expedited summary judgment schedule" as a reason the Court should *deny* a preliminary injunction.  *Id.* at 4; Aug. 25, 2015 Hr'g Tr. 101:9–17 ("[W]e have recommended and are certainly willing to undertake this expedited briefing schedule so that this matter could be resolved quickly, but I think -- but I think that actually cuts in favor of not entering a PI . . . .").

Only after this Court sent FinCEN a negative signal on the merits did the path to final judgment become cluttered and slow.[4]   Now FinCEN questions whether the Court even has jurisdiction to proceed without leave of FinCEN, suggesting the agency can itself turn FBME's challenge off like a light-switch.   *See* Mot. at 2 (a "concurrent rulemaking [relating to FBME] could raise justiciability concerns").   FinCEN's suggestion is as offensive as it is wrong.   A federal court cannot flinch from adjudicating an administrative challenge merely because an agency conjures a new rulemaking:   "If the possibility of unforeseen amendments were sufficient to render an otherwise fit challenge unripe, review could be deferred indefinitely." *American Petroleum Institute v. EPA,* 906 F.2d 729, 739–40 (D.C. Cir. 1990); *cf. American Petroleum Institute v. EPA*, 683 F.3d 382, 388 (D.C. Cir. 2012) ("All of this is not to say an agency can stave off judicial review of a challenged rule simply by initiating a new proposed rulemaking that would amend the rule in a significant way.   If that were true, a savvy agency could perpetually dodge review.").[5]

The one case FinCEN relies upon, *Wheaton College v. Sebelius*, 703 F.3d 551 (D.C. Cir. 2012), does not support FinCEN's instant request.   There, the government "represented to the court that it would *never* enforce" the challenged rule, and the court declined to exercise

---

[4]    To be clear, if FinCEN took the preliminary injunction ruling as tantamount to *invalidating* imposition of the fifth special measure and necessitating overhaul of the ensuing process, that would be one thing—likely sufficient to moot this challenge from the perspective of both parties.   Or, short of that, if FinCEN simply agreed to terms, as proposed by FBME, that would make a voluntary remand meaningful, that would suffice to obviate FBME's opposition. But FinCEN is instead taking a different tack, one that smacks of mere tactics and gamesmanship.   FinCEN proposes to do only what it calculates is the bare minimum it must in order to stave off or at least delay an adverse judgment, while leaving FBME in precisely the same practical predicament—except that FBME would now suffer additional months of expense, burden, and limbo before returning for a final judgment (assuming that FBME can even survive long enough to return).

[5]    It should also be noted that the Court would almost certainly render final judgment before FinCEN completes notice-and-comment procedures that must attend any new rulemaking.

jurisdiction "based expressly upon the understanding that the government will not deviate from its considered representations to this court." *Id.* at 552–53. Far from making such a representation here, FinCEN is reserving rights to continue, at least in the main, the same procedural and substantive course that is the subject of FBME's pending challenge and arguments. As such, this Court has jurisdiction and obligation to proceed to final adjudication, just as FBME has corresponding entitlement and need for it to do so.

It bears emphasizing that FinCEN's instant approach to voluntary remand is especially novel and dangerous. It threatens to skew a playing field that already gives wide sweep to agency discretion and invocations of governmental interests; the upshot would be to prevent judicial precedent from establishing principled limits. We have found no prior case in which an agency was granted a voluntary remand after a court issued a preliminary injunction (and thus found a challenger likely to succeed) and before the court rendered final judgment. Here, FinCEN is approaching voluntary remand in the most begrudging and tactical way imaginable. FinCEN suggested no such prospect when alerted to FBME's challenge (to the contrary, FinCEN flatly refused to delay the Final Rule when urged to do so); when briefing the preliminary injunction; when agreeing to expedited merits briefing; when arguing the merits at hearing on the preliminary injunction; or when awaiting the Court's ruling on the preliminary injunction. Only *after* the Court ruled FBME likely to succeed on the merits did FinCEN first invoke a voluntary remand—and now *only* to contain and fix what it casts as discrete procedural deficiencies that are, by its lights, the sole concerns. If FinCEN succeeds with this "budge as little as possible and only when necessary to avert adverse judicial decision" strategy, then other agencies will

surely follow its lead.[6]   The result will be to throw off the established balance between federal agencies and federal courts that review them, and to stymy the development of precedent through cases like this one (already rare enough, by any measure) in which a viable challenge has not only been brought to something like the 311 process, but has been deemed meritorious.

## II.   THE VOLUNTARY REMAND REQUESTED BY FINCEN IS UNJUSTIFIED.

### A.   FinCEN's Proposed Voluntary Remand Improperly Deprives FBME Of The Relief To Which It Is Entitled.

Because FBME is entitled to vacatur of the Final Rule whereas FinCEN proposes now to leave the Final Rule intact (albeit while reopening it for comment), voluntary remand should be a non-starter.   Voluntary remand is inappropriate where it withholds the remedy a plaintiff would obtain upon final judgment, as this Court implicitly acknowledged in *American Forest Resource Council v. Ashe*, 946 F. Supp. 2d 1 (D.D.C. 2013), *aff'd*, 601 F. App'x 1 (D.C. Cir. 2015).   In *Ashe*, the plaintiff argued that voluntary remand should be denied because, among other things, it withheld the vacatur the plaintiff would be due on the merits.   *Id.* at 44.   After noting that the plaintiff's "argument about the likely result on the merits, if reached, deserves discussion," the Court devoted two-and-a-half pages to analyzing whether that plaintiff would, in fact, be entitled to vacatur.   *Id.* at 44–46.   Only after determining that the plaintiff would *not* necessarily be entitled to vacatur (and that the plaintiff had not provided "concrete examples" of the harm voluntary remand would pose) did the Court arrive at a voluntary remand.   *Id.* at 43–47.

---

[6]   FinCEN claims that it would "make[] no sense" for an agency to pursue voluntary remand after entry of a preliminary injunction.   Mot. at 7.   To the contrary, it makes *tons* of sense for any agency or other governmental defendant staring at an adverse final judgment to "voluntarily" accede—thereby warding off adverse precedent, permanent relief, *etc.*   The reason why governmental defendants have not tactically mooted cases through short-term, half-hearted voluntary cessation is *not* that they have not *tried*—it is because courts have not let them succeed, per the precedents and principles cited *supra*.

FinCEN dismisses all this by saying that "[n]othing in [*Ashe*] suggests that whether or not to grant remand turned on whether a remand would provide the same remedy as an adjudication on the merits."   Mot. at 6 n.1.   Of course, it defies credulity to suppose that this Court would devote such careful, extended discussion to a stray aside that had no bearing upon its decision in *Ashe*.   In any event, the D.C. Circuit has likewise paid heed to whether a voluntary remand afforded the vacatur available on the merits.   *See also Chlorine Chemistry Council v. EPA*, 206 F.3d 1286, 1288 (D.C. Cir. 2000) (denying motion for voluntary remand because "EPA made no offer to vacate the rule; thus EPA's proposal would have left petitioners subject to a rule they claimed was invalid.").

Notably, FinCEN does not deny that FBME would be entitled to vacatur if it prevails on the merits, as the Court found it is likely to do.   Indeed, settled law points to vacatur: "deficient notice" surrounding an agency rule such as FinCEN's imposing the fifth special measure against FBME "is a 'fundamental flaw' that almost always requires vacatur."   *Allina Health Services v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (citation omitted); *see also* ECF 33 at 9 (Prelim. Inj. Op.) (ruling that "FBME is likely to prevail on the merits of Count I because FinCEN provided insufficient notice of the non-classified, non-protected information during the rulemaking proceeding, in violation of the APA's notice-and-comment requirement.").

Furthermore, the Court's conclusion that FinCEN was arbitrary and capricious in "fail[ing] to explain its consideration of potentially viable alternatives" should independently seal a vacatur.   ECF 33 at 21 (Prelim. Inj. Op.).   "The typical remedy for an arbitrary and capricious agency action is to vacate the rule."   *St. Lawrence Seaway Pilots Association, Inc. v. United States Coast Guard*, 85 F. Supp. 3d 197, 208 (D.D.C. 2015).

The rare exception to vacatur arises where the agency can readily cure the deficiencies on remand *and* vacatur would threaten damaging disruption.   *See American Equity Investment. Life Insurance Co. v. SEC.*, 613 F.3d 166, 179 (D.C. Cir. 2010) (citing *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1993)).   Here, neither factor, much less both, would save FinCEN's Final Rule from the black-letter remedy of vacatur.   As to the first factor, because "the Final Rule's deficiency" is not only "procedural [but] also fundamental," "the Court cannot be sure that the agency will arrive at the same conclusion after further consideration—let alone whether, on further judicial review, this or a similar Final Rule will withstand challenge under the APA."   *Humane Society of U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 21 (D.D.C. 2008).   As to the second, there can be no threat of disruption, because the Final Rule "has not yet gone into effect."   *American Equity*, 613 F.3d at 179.   In these circumstances, the prospect of vacatur is clear.   It follows that FinCEN should not be permitted to forestall that prospect and shield the Final Rule from impending review under the auspices of a voluntary remand.

### B.     The Proposed Voluntary Remand Is Inappropriate Because It Threatens To Tax More, Rather Than Less, Judicial Resources.

Although FinCEN justifies voluntary remand as conserving judicial resources, that promise rings false.   Indeed, a remand at this point would impose a greater drain on resources, assuming that (a) FBME is able to survive the remand process (any contrary assumption seems improper as a legal matter, not to say unfounded as a practical matter) and (b) FinCEN remains committed to following the same course, with only the specified tweaks (all indications from FinCEN are that it is so committed).   This Court should expect the upshot of a voluntary remand to be that the parties will spend additional months skirmishing at the administrative level over the same disputes now pending, before then returning to re-brief the same disputes and re-

orient the Court around them.   The more efficient course would be for the Court simply to decide the issues, as it is right now poised to do and very close to doing.   If its final judgment does not then enable complete and definitive resolution between the parties (as FBME hopes that it would), then the parties could at least return to the administrative proceedings with a clear, shared sense of the operative legal framework.

By devoting additional *weeks* to final judgment, the Court would ensure that *months* of remand proceedings are either obviated, or at least profoundly better informed and streamlined. No intelligent observer of FinCEN's conduct to this point (including, *e.g.*, its press releases, its briefing, its arguments at hearing) can believe that its voluntary remand will moot the pending disputes—on both procedural and substantive points—that continue to divide the parties.

Notably, FinCEN in its motion hardly feigns openness to substantively revisit whether it should impose the fifth special measure.   Its principal justification for remand is that it would "narrow" the issues to be litigated after it reimposes the fifth special measure.   *See, e.g.*, Mot. at 2, 5, 8.   That FinCEN would approach its own remand so begrudgingly is unsurprising considering that FinCEN and Defendant Shasky Calvery have publicly committed themselves to the position already taken.   *See, e.g.*, Press Release, FinCEN, FinCEN Severs Access to U.S. Financial System for FBME Bank Ltd. (July 23, 2015), *available at* http://www.fincen.gov/news_room/other/pdf/20150723.pdf ("'The finalization of this rule is significant,' said FinCEN Director Jennifer Shasky Calvery, 'because it demonstrates that the United States will not allow a compromised foreign bank to send dirty funds through the U.S. financial system.'"); Press Release, FinCEN, FinCEN Takes Action to Protect U.S. Financial System (July 17, 2014), *available at* http://www.fincen.gov/news_room/nr/pdf/20140716.pdf ("'But today's action, effectively shutting FBME off from the U.S. financial system . . . send[s]

the message that the United States will not stand by while financial institutions help those who intend to harm or threaten Americans.'" (quoting Defendant Shasky Calvery)).[7]

The real question, therefore, is whether the Court should resolve the parties' core disputes now or later.   If the Court does so now, then remand may proceed just one bend further down the road, with the benefit of total clarity—and with a final judgment that truly shifts the legal ground on which remand proceeds.   If it does so later, however, then the predictable result will be that the parties and Court will need to get back up to speed on the same issues months from now—after which a decision in favor of FBME would result in a *third* rulemaking to rectify the very problems FBME is *right now* spotlighting.   In such a case, voluntary remand is the enemy, not the friend, of judicial economy.[8]

To argue otherwise, FinCEN warns that proceeding to summary judgment would require the Court and the parties to expend resources "litigating the potential procedural issues already identified by the Court."   Mot. at 5; *see also id.* at 2, 6–7, 8.   But no one previously feared

---

[7]   FinCEN's submissions to this Court have been of a piece.   After refusing to delay the effective date of the Final Rule pending FBME's challenge (Complaint ¶¶ 63–64, ECF 1), FinCEN justified itself by pointing to catastrophic consequences that would otherwise result. Declaration of Jennifer Shasky Calvery ¶ 64, ECF 20 ("Delaying the effective date of the FBME Final Rule . . . may affect the willingness and ability of U.S. banks to take actions needed to protect against the specific threats of terrorism finance, fraud, and WMD proliferation . . . ."); ECF 23-1 at 45 (Gov't Prelim. Inj. Opp.) ("Entry of a preliminary injunction would frustrate action against a foreign bank that poses a potentially significant threat to the U.S. financial system."), *id.* at 46 ("The seriousness of the illicit activity flowing through the bank makes it appropriate to take immediate steps to prevent exposure of U.S. institutions to the bank.").

[8]   Indeed, there should be no remand whatsoever unless and until there is prospect of meaningful movement by FinCEN.   *See A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1489 (D.C. Cir. 1995) ("We do not remand where '[t]here is not the slightest uncertainty as to the outcome of a[n] [agency] proceeding . . . .'" (quoting *NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 766–67 n. 6 (1969)); *see also* Hon. Henry J. Friendly, *Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders,* 1969 Duke L.J. 199, 210–11 (no requirement that "court and agency engage in a nigh endless game of battledore and shuttlecock"); Hon. Merrick B. Garland, *Deregulation and Judicial Review,* 98 Harv. L. Rev. 505, 570–71 (1985) (vacating and remanding is not logical where there is only one conceivable outcome).

those burdens, nor should they now.   The "procedural issues already identified by the Court" already have been briefed by the parties and considered by the Court; what remains on those points can be handled just as easily and expeditiously as everyone previously envisioned.   Far more time-consuming and onerous has been the instant dispute over voluntary remand.   Much as FinCEN's request for voluntary remand has increased the burdens to this point, granting FinCEN's request threatens exponential waste moving forward.

Lest there be any doubt, FBME welcomes economy, judicial and otherwise.   That is why FBME made every effort to engage FinCEN to address its concerns before FinCEN issued the Final Rule; that is why FBME then tried to engage FinCEN about short postponement of the Final Rule in an effort to avoid burdening this Court with a preliminary injunction request; that is why, most recently, FBME engaged with FinCEN about terms on which a voluntary remand might be meaningful; and that is why, even now, FBME is attempting to engage FinCEN in an effort at complete, permanent resolution.   Animating this opposition is a firm conviction that the voluntary remand FinCEN proposes would only advance myopic interests of the agency without furthering larger economy.

## C.    Specific, Pending Disputes Should Be Decided As Prelude To Remand.

Dispositive merits issues have yet to be finally decided by the Court and still await expedited merits briefing.   For present purposes, however, it is worth emphasizing specific disputes that are certain to vex remand proceedings unless they are resolved first.

### 1.    FinCEN Continues To Rely Upon, While Withholding From FBME, Unspecified Categories Of Unclassified Information Without So Much As Specifying Any Basis For Its Withholding.

FinCEN claims the right to rely on unspecified categories (not just SARs) of *un*classified information without giving FBME any notice of what it is, any opportunity to respond, and any opportunity to contest FinCEN's claimed basis for the withholding.   Again, FinCEN has

resisted concerted efforts by FBME and its counsel to identify, and perhaps narrow, the contours

of this dispute.   What we understand at this point is that FinCEN is intent upon withholding

unclassified documents as privileged; that this category encompasses anything and everything

FinCEN received from a third party; that no log or other summary will be provided to identify

specific information or even categories being withheld; and that no purported basis will be

specified for any such withholding.   *See supra*, at 4–6.

 We respectfully urge this Court now to decide whether FinCEN's position complies with

the law, and we further submit that it does not.   Setting aside special exceptions for classified

information that is properly and specially designated as implicating national security,[9]  an agency

cannot rely upon particular documents or information while simultaneously withholding it based

on *ipse dixit*.   *See* FED. R. CIV. P. 26(b)(5) (listing required disclosure when a party withholds

otherwise discoverable information on grounds of privilege); *Stand Up for California! v. U.S.

Department of Interior*, 71 F. Supp. 3d 109, 113 (D.D.C. 2014) (noting defendant agency

---

 [9]     There are strict substantive and procedural limits on what qualifies as "classified" information.   Executive Order 13526, which President Obama issued in 2009, establishes the framework governing classification.   *See* Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009); *see also Judicial Watch, Inc. v. U.S. Department of Defense*, 715 F.3d 937, 941 (D.C. Cir. 2013) (citing pertinent sections of Executive Order 13526).   In deciding administrative challenges brought under the Freedom of Information Act, this Court has specifically addressed withholding of classified information pursuant to 5 U.S.C. § 552(b)(1), which is in all relevant respects analogous to 31 U.S.C. § 5318A(f), at issue here.   Although the D.C. Circuit calls for deference to agency determinations about what is classified, it also instructs that "deference is not equivalent to acquiescence."   *Campbell v. U.S. Department of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998).   A document cannot be withheld as classified unless the Court confirms the propriety of the designation *in camera* or the agency submits a declaration that "provide[s] sufficient information to permit [the other party] and the district court to understand the foundation for and necessity of the [agency's] classification decisions."   *Id.* at 31; *see also King v. U.S. Department of Justice*, 830 F.2d 210, 219–28 (D.C. Cir. 1987) (rejecting an agency's submissions as insufficient to justify withholding certain materials as classified); *International Counsel Bureau v. U.S. Department of Defense*, 723 F. Supp. 2d 54, 63–64 (D.D.C. 2010) (same).   By all indications, the contents of FinCEN's "black box" have not been subjected to this process and would not, at least in their entirety, be properly withheld under it.

produced a privilege log for documents contained in the administrative record); *Jordan v. Wiley*, 2009 WL 2913231, at *3 (D. Colo. Sept. 8, 2009) (examining federal agency's use of privilege log in defense of regulation); *Spiller v. Walker*, 2002 WL 1609722, at *3 (W.D. Tex. July 19, 2002) (noting plaintiffs had filed objections to the defendants' privilege logs, after which court conducted *in camera* review and ordered production of non-privileged documents previously withheld), *aff'd*, 353 F.3d 235 (5th Cir. 2003). In *Jordan v. Wiley*, for instance, the court applied the standard from Rule 26(b)(5) and found the federal agency's privilege log satisfactory because it "provided Plaintiff with a privilege log that describes the documents, identifies the creators and recipients of the documents, and specifies the privilege claimed for each document." 2009 WL 2913231, at *3. Indeed, some courts outside this circuit have required agencies to produce privilege logs detailing the agencies' invocation of the deliberative-process privilege.[10]

In an apparent attempt to elide or at least minimize this issue, FinCEN suggests to this Court that the only unclassified materials over which it asserts privilege are SARs, saying this: "With respect to the 'non-classified' withheld material, plaintiffs appear to be referring to Bank Secrecy Act protected information . . . ." Mot. at 7. Note how carefully that is formulated. FinCEN does *not* say that "Bank Secrecy Act protected information" is *in fact* the only "'non-

---

[10]     *See, e.g., California Native Plant Society v. EPA.*, 251 F.R.D. 408, 414 (N.D. Cal. 2008) (ordering agencies to "supplement their privilege logs with more detailed information as to how the documents fit into the deliberative process"); *New York v. Salazar*, 701 F. Supp. 2d 224, 230 (N.D.N.Y. 2010) (in addition to producing administrative record, agency produced "a separate privilege log identifying documents withheld from the record"); *Black Warrior Riverkeeper, Inc. v. Alabama DOT*, 2013 U.S. Dist. LEXIS 75766, at *6 n.1 (M.D. Ala. May 30, 2013) ("The use of privilege logs is a common practice in federal district courts, even those deciding claims under the Administrative Procedure Act."); *but see National Association of Chain Drug Stores v. Department of Health & Human Services*, 631 F. Supp. 2d 23, 27 (D.D.C. 2009) (deliberative process privileged documents "do not need to be logged as withheld from the administrative record"). Here, FBME is not generally demanding documents subject to the deliberative-process privilege, because it understands that FinCEN would not have relied substantively upon those documents. These decisions simply illustrate how assertions of privilege are properly specified and logged in the context of administrative challenges.

classified' withheld material."   FinCEN instead limits itself to what "plaintiffs *appear* to be referring to."   Of course, something as important as this should not be decided based on appearances, much less mistaken appearances.   For the sake of dispelling any confusion, Plaintiffs want to make clear to this Court what we have already made clear to FinCEN: Plaintiffs are concerned about the *entire* category of unclassified information that FinCEN is simultaneously relying upon while withholding; although Plaintiffs have been denied the benefit of any privilege log or other specifics, there is every indication that this category of concern extends well beyond SARs.[11]

Although this Court has indicated that (contrary to FBME's respectful and continuing submission) FinCEN may be within its rights to rely upon SARs while withholding them under the Bank Secrecy Act, there has been no indication why FinCEN might do the same beyond that one category.   Certainly FBME knows of no legal basis that FinCEN might invoke, nor has FinCEN specified any.   To the contrary, federal courts forbid any party from "us[ing] privilege as a tool for manipulation of the truth-seeking process."   *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 145 (D.C. Cir. 2015) (citation and quotation marks omitted).   As we have noted, "privilege cannot be used both as a sword and as a shield . . . . [and] a party may not claim privilege over material that they place at issue in litigation."   *The Navajo Nation v. Peabody Holding Co.*, 255 F.R.D. 37, 44 (D.D.C. 2009) (citations and quotation marks omitted)); *see also U.S. Lines, Inc. v. Federal Maritime Commission*, 584 F.2d 519, 535 (D.C. Cir. 1978) ("[A]n agency decision based on 'reliable data reposing in the Commission's files' simply cannot withstand scrutiny."); *Portland Cement Association v. Ruckelshaus*, 486 F.2d 375, 393 (D.C. Cir. 1973) ("It is not consonant with the purpose of a rule-making proceeding to promulgate rules on

---

[11]   As discussed in Section II.C.2 *infra*, FBME respectfully continues to contest FinCEN's assertion of privilege over SARs reports.

the basis of inadequate data, or on data that, [to a] critical degree, is known only to the agency."). In this case, FinCEN is venturing still further beyond the pale, by concealing even its claimed basis for the withholding.   If nothing else, FinCEN surely should *identify* whatever privilege(s) it is invoking as prelude to any voluntary remand, yet FinCEN is steadfastly refusing to do so.

FinCEN's expansive approach to withholding seems foreclosed by Section 311 itself. Against the backdrop of the venerable principle that an agency cannot base its action on information that to a "critical degree[] is known only to the agency," *Ruckelshaus*, 486 F.2d at 393, Congress in Section 311(f) specified one exception to that rule by expressly authorizing FinCEN to submit "classified information" *ex parte* for judicial review.   31 U.S.C. § 5318A(f). That exception is thus confined to *classified* information.   The *absence* of any exception for purportedly privileged but *un*classified information should further confirm (if further confirmation were needed) that FinCEN cannot be withholding such information while relying upon it.   And FinCEN *a fortiori* cannot be relying upon such information under Section 311 while refusing even to specify what the nature of it is or why privilege supposedly attaches.

The harm FBME faces from any unjustified withholding is concrete and acute.   To take the most glaring example, FBME has every reason to believe that FinCEN plans to make its case against FBME by relying in substantial part upon CBC as its proxy.   As the Court is well aware, the CBC has been coordinating with FinCEN throughout these proceedings.   *See, e.g.*, Declaration of Ayoub-Farid Saab, Ex. A (letter from CBC in which it declares it will take action against FBME because of the Final Rule but that such action would not "irreparably destroy" FBME), ECF 3-4; *see also id.*, ¶¶ 60–61; Complaint ¶ 58; ECF 25 at 27–28 (FBME Prelim. Inj. Reply); Aug. 25, 2015 Hr'g Tr. 52:10–53:16, 68:21–24.   Indeed, FinCEN somehow managed to file correspondence from CBC the very same day that correspondence went to the arbitral

tribunal presiding over FBME's shareholders' claim against Cyprus.   *See* Declaration of Stephanie Brooker, ECF 28-1.   And one day after FinCEN, in the face of pointed inquiries from FBME, represented that it "does not have [the PWC reports] in its possession and therefore does not plan to rely on them," yet refused to say that FinCEN never had the reports, *CBC* happened to disclose to FBME the purported content of those reports, thereby affording FBME its first opportunity to respond.   *Compare* Shaffer Decl., Ex. B *with* Shaffer Decl., Ex. F.

This presents a situation in which FinCEN and CBC may *both* be joining forces to destroy FBME without *either* regulator being held to substantive account.   *Compare* ECF 23-1 at 42 (Gov't Prelim. Inj. Opp.) (**FinCEN**: "[A]ny potential liquidation by the [CBC] is not the *direct* result of the Final Rule . . . ."); Aug. 25, 2015 Hr'g Tr. 102:16–21 (**FinCEN:** "[W]hile they [the CBC] say they are motivated by the Final Rule, they do not say that their actions are contingent on the final date of that rule.   To the extent they are persuaded that the Final Rule is going to take effect, there is no reason for them not to take action, regardless of what this court does.") *with* Shaffer Decl., Ex. C at 3 (**CBC**:[12] "Once FinCEN [announced the Final Rule], any possibility of FBME returning to normal banking operations in the foreseeable future was eliminated."); Shaffer Decl., Ex. D at 7 (**CBC**: "In light of FinCEN's statements, [FBME] clearly is not viable, and has no possibility of surviving as a normal banking institution. . . . The actions of FinCEN are reason enough for the Central Bank to consider FBME and the Branch as irremediably damaged . . . ."); Shaffer Decl., Ex. E at 2 (**CBC**: "[T]he measures to be taken by the Central Bank of Cyprus, in its capacity as Resolution Authority, are necessary to resolve the substantial negative impact of FinCEN's actions on FBME . . . .").   Notably, CBC, which has

---

[12]   The actual Respondent in the arbitration proceeding is technically the Republic of Cyprus, of which the CBC is the relevant regulatory arm.   Thus, we, like the Government (*see* Brooker Decl. ¶ 3, ECF 30-1) refer to the respondent as CBC.

had purportedly confidential communications with FinCEN, *see supra* at 6 n.3, has the impression that any voluntary remand is a brief hiccup on the path to FinCEN wiping out FBME. *See, e.g.*, Shaffer Decl., Ex. D at 6 (**CBC:** "Since FinCEN has already confirmed its decision after previously reviewing the extensive comments provided by FBME, the strong likelihood is that FinCEN would then re-issue the Final Rule."); Shaffer Decl., Ex. E at 2 ("**CBC:** [G]iven the evidence that FinCEN has not changed its view as to FBME's conduct and the findings of the U.S. District Court in its opinion of 27 August 2015, there are no prospects of FBME returning to viability in the foreseeable future.").

      This problem—dire enough in any circumstance—is exacerbated by the overwhelming pecuniary motive CBC has to seal FBME's demise via FinCEN's proceeding.   In the pending arbitration, Cyprus stands potentially liable for the financial harm suffered by FBME's shareholders—to the tune of hundreds of millions of dollars.   *See* Saab Decl. ¶¶ 46–53; *see also* FBME Ltd., Press Release, Shareholders Seek $500 Million Damages, Nov. 28, 2014, *available at*   http://www.fbmeltd.com/shareholders-seek-500-million-damages/   (noting damages may exceed $500 million).   Central to Cyprus's defense is the argument that the Bank's demise was sealed by a different sovereign—the adverse actions the United States has taken through FinCEN.   *See, e.g.*, Brooker Decl., Ex. B (Aug. 26, 2015 letter from CBC arguing FinCEN's actions have crippled FBME by, for example, rending FBME "unable to properly conduct business in all currencies, including Euros").   Were that not enough to call into question CBC's motivations, the Bank of Tanzania has itself observed that the Special Administrator working for CBC appears to be trying, unfairly, to put FBME out of business for the sake of claiming its deposits for Cyprus.   Shaffer Decl., Ex. G.   For a decision-maker to *hold a pecuniary bias* is inimical to due process.   *See, e.g.*, *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (where "the

adjudicator has a pecuniary interest in the outcome" "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable"); *see also Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009).   For a decision-maker to rely on input *tainted by pecuniary bias*, without permitting fair scrutiny or testing, carries similar stench.

Suffice it to note, in light of all this, that CBC's submissions to FinCEN should not be passing unquestioned and unreviewed.   All FBME requests from this Court now is recognition that FBME is entitled to review and comment on such unclassified information that FinCEN may be relying upon and withholding.   The request is a small one, but its import to these proceedings is inestimably high.

### 2.    To The Extent FinCEN Claims Privilege Over Suspicious Activity Reports, That Claim Is Unsupportable.

As this Court noted in its preliminary-injunction opinion, FinCEN withheld unclassified "Suspicious Activity Reports ('SARs') on which it relied."   ECF 33 at 12 (Prelim. Inj. Op.). The Court indicated in its opinion that it would likely hold this withholding permissible because FBME had sufficient notice of the use of SARs from the Notice of Finding.   *Id.* at 12–13. Based upon that, FinCEN argues that there will be no prejudice to FBME if this Court grants its motion for a voluntary remand and FinCEN continues to withhold the SARs in a new administrative proceeding.   Mot. at 7.   While recognizing that this Court's preliminary ruling on this point favors FinCEN's view, FBME respectfully submits that merits briefing may yield a different result on final judgment.

First, as a constitutional matter, due process generally forecloses FinCEN from using secret materials to promulgate public regulations.   *E.g., Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 288 n.4 (1974); *Ohio Bell Telephone Co. v. Public Utilities Commission*, 301 U.S. 292 (1937).   The adversarial process on which our

system depends does not function when only one side has access to the evidence before the Court.   FinCEN has yet to cite, and Plaintiffs have yet to find, any decision or other authority supporting the notion that an agency can, consistent with the Due Process Clause, both rely on and withhold SARs (or any other materials that fall outside the realm of "classified," as strictly defined and policed).   Although this Court has thus far reserved judgment on FBME's due-process claim, *see* ECF 33 at 9 (Prelim. Inj. Op.), FinCEN's continued reliance upon and withholding of SARs seemingly necessitates that the claim be resolved.

Second, as a statutory matter, FinCEN has no coherent theory for withholding the SARs themselves, much less the underlying information contained in them.   FinCEN reads the Court as having "held (albeit preliminarily) that the Government is prohibited from disclosing and has adequately summarized, for notice purposes, in its Notice of Finding" the SARs information.   Mot. at 7.   We respectfully read the Court somewhat differently.   In fact, this Court *did not* hold that the Government "is prohibited from disclosing" this material.   Instead, it indicated simply that the notice FBME received of this material should have sufficed.   ECF 33 at 12–13 (Prelim. Inj. Op.).[13]   To be sure, the Government generally "is prohibited" from disclosing

---

[13]   FBME respectfully reiterates its submission that FinCEN failed to provide sufficient notice of its reliance upon the SARs reports—which amounts to a further defect supporting vacatur of the Final Rule.   As the Court noted, statements in the Notices at most afforded FBME with only "aggregate information," without identifying the underlying transactions and data from which the aggregate information was tabulated.   Here, it should be telling that as to "aggregate" use of the SARs—which everyone agrees is not in any way protected by the Bank Secrecy Act—FinCEN failed to spell out that it was relying upon SARs, much less specify how or to what extent.   Moreover, even assuming *arguendo* that FinCEN came clean about its aggregate use of SARs so as to invite abstract methodological critique, that should not suffice. Without the underlying data, FBME lacked the meaningful opportunity to rebut the agency's findings that the APA demands.   *See American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) ("It would appear to be a fairly obvious proposition that studies upon which an agency relies in promulgating a rule must be made available during the rulemaking in order to afford interested persons meaningful notice and an opportunity for comment.   'It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of

SARs, just as FinCEN says.   Indeed, courts have held that agencies *cannot* waive the "statutory privilege afforded to SARs."   *SEC v. Yorkville Advisors, LLC*, 300 F.R.D. 152, 167 (S.D.N.Y. 2014).   Therefore, FinCEN could not disclose SARs to *anyone*—even this Court—unless authorized to do so.

That is where the statutory exception of 31 U.S.C. § 5318(g)(A)(ii) necessarily enters play.   The provision permits a government official or employee to disclose SARs "as necessary to fulfill the official duties of such officer or employee."   31 U.S.C. § 5318(g)(A)(ii). FinCEN's implementing regulation correspondingly permits its officials to disclose SARs when "necessary to fulfill official duties consistent with Title II of the Bank Secrecy Act."   31 C.F.R. § 1020.320(e)(2).   These provisions authorize FinCEN officials to release SARs when carrying out their duties under the Bank Secrecy Act, including when promulgating a rule to impose special measures under 31 U.S.C. § 5318A.   Presumably, FinCEN was acting pursuant to these provisions when it submitted the SARs to this Court for *in camera* review, *see* ECF 16 (providing notice of filing of privileged information with the Court); otherwise FinCEN would have been disclosing the very SARs that it is, it acknowledges, "prohibited from disclosing."

Just as it is part of FinCEN's official duties to provide the SARs to the Court, so it is part of its official duties to provide, as a matter of course, the materials to the financial institution it is using them against.   FinCEN appears to have acknowledged as much previously.   When promulgating its implementing regulation, FinCEN explained that "official duties consistent with

inadequate data, or on data that, [to a] critical degree, is known only to the agency.'") (quoting *Ruckelshaus*, 486 F.2d at 393); *Chamber of Commerce v. SEC*, 443 F.3d 890, 899 (D.C. Cir. 2006) ("Among the information that must be revealed for public evaluation are the 'technical studies and data' upon which the agency relies [in its rulemaking]." (citation omitted)); *Connecticut Light & Power Co. v. NRC*, 673 F.2d 525, 530 (D.C. Cir. 1982) ("In order to allow for useful criticism, it is especially important for the agency to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules.").

Title II of the BSA" includes releasing SARs in connection with litigation and other proceedings involving the Government, such as responding to a request from a law enforcement agency or pursuant to the Government's duty to disclose exculpatory information, though not to parties in a "private legal proceeding." 75 Fed. Reg. 75593, 75600 (Dec. 3, 2010).   In other words, FinCEN will not disclose SARs to one private party when two private parties are suing each other; in public litigation such as this, in contrast, release of SARs *is not* prohibited.   *See id.*[14]

Finally, even if FinCEN did have a valid basis to withhold the SARs themselves, it could not withhold the "underlying facts, transactions, and documents upon which a SAR is based," as such information is not within the scope of the statutory privilege. 31 C.F.R. § 1020.320(e)(1)(ii)(A)(2).   As the First Circuit recently noted, "courts uniformly have concluded" that "lists and descriptions of transactions" are "not encompassed by the Act or the regulations but, instead, constitute '[t]he underlying facts, transactions, and documents upon which a SAR is based,' which are expressly declared exempt from the confidentiality obligation."   *In re JPMorgan Chase Bank, N.A.*, --- F.3d ----, 2015 WL 4979594, at *6 (1st Cir. Aug. 21, 2015) (citation omitted); *see also Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, No. 09-cv-3701, 2015 WL 1726435, at *2–3 (S.D.N.Y. Apr. 15, 2015). Thus, at a bare minimum, before FinCEN could fairly engage in any further rulemaking, it must disclose to FBME a list of facts, transactions, and documents underlying the SARs it is relying upon.

---

[14]   To the extent FinCEN may be concerned that divulging the SARs would reveal private or confidential information about third parties, it can simply redact that information before producing it.   *See Dupre v. FBI*, 2002 WL 1042073, at *1–*2 (E.D. La. May 22, 2002) (ordering the Government to produce a SAR after certain portions are redacted).   And to the extent FinCEN is concerned that releasing certain SARs would tip off a third party about a pending investigation, it could produce that information to FBME under a protective order so as to prevent third parties from seeing it.

### 3.     FinCEN Has Suggested It May Rely *Entirely* On Allegations To Which FBME Will Not Be Permitted To Respond.

Finally, FinCEN should not be placing principal reliance on undisclosed material or information, whether classified or otherwise, that it altogether withholds from FBME. Although the Government is authorized to protect classified information as appropriate, the Government still violates due process if it relies on wholly undisclosed information as dispositive in imposing a regulation.   *See People's Mojahedin Organization of Iran v. U.S. Department of State*, 613 F.3d 220, 230–31 (D.C. Cir. 2010) (blessing procedures for the use of classified material where the Government "has not relied critically on classified material and the unclassified material provided to the [regulated entity] is sufficient to justify the [agency action]").   Inherent in Section 311 itself is a requirement that FinCEN enable FBME to rebut FinCEN's undisclosed evidence.   *See* H.R. Conf. Rep. 108-381, at \*55 (when "administering a proceeding in which classified information is submitted to a court under this provision, the Conferees intend that *a court will fashion procedures*, necessary to assure a moving party *due process of law*, that resemble those already required in similar situations in which the government, or another party, seeks to base a claim or defense on classified information" (emphases added)); *see also* ECF 25 at 9–10 (FBME Prelim. Inj. Reply) (discussing due process implications of classified information).

As this litigation presently stands, this Court has declined to opine as to FBME's due-process rights (because doing so was unnecessary to its grant of a preliminary injunction) and FinCEN has continued to maintain that FBME has none.   Yet whether FBME has a right to due process, as FBME contends, and, if so, how that right impacts the administrative process afforded to FBME will be important to any remand.   *See, e.g., Al Haramain Islamic Foundation, Inc. v. U.S. Department of Treasury*, 686 F.3d 965, 982–84 (9th Cir. 2012).   As

such, so long as FinCEN remains committed to its current course, adjudication of the pending due-process questions should come before remand, rather than *vice versa*.

*     *     *

The preceding discussion is not meant to substitute for the more robust and complete argumentation FBME proposes to present on the merits.   Instead, it serves to demonstrate just how unsatisfying and inappropriate the voluntary remand FinCEN seeks would be in the context of this case.   The purpose of voluntary remand is to "allow agencies to cure their own mistakes," *Ashe*, 946 F. Supp. 2d at 40 (citation and quotation marks omitted), not to make cosmetic adjustments designed only to stave off judicial review while improving their litigation profile.   Here, it is all too telling that CBC considers FinCEN's compass to be set and forecasts that the outcome of its remand will be what FBME is right now challenging as an illegal rule. *See, e.g.*, Shaffer Decl., Ex. D at 6; Shaffer Decl., Ex. E at 2.   By no means would that be a proper use of voluntary remand.   *See A.L. Pharma*, 62 F.3d at 1489; Friendly, *Chenery Revisited*, at 210–11; Garland, *Deregulation and Judicial Review,* at 570–71 (1985).   To the extent that FBME's larger challenge may fall short, that should be up to this Court to decide— here and now, fair and square, up or down.   FinCEN should not be permitted to play Chutes and Ladders, however, for the sake of forestalling a final judgment, assuming it has prevailed on points not yet decided, and reiterating its imposition of the fifth special measure—this time after FBME has spent still more time, money, and energy trying to get its day in court.

## III.    VOLUNTARY REMAND POSES GRAVE PREJUDICE TO FBME.

As already indicated *supra*, the voluntary remand FinCEN proposes threatens extreme prejudice to FBME.   FinCEN is proposing that the Final Rule remain in place while notice and comment are reopened.   The absence of any vacatur or withdrawal will send the message to interested observers around the world that FBME remains in the same disabling state of limbo—

27

worse, peril—that preceded the preliminary injunction, as noted by FBME,[15] FinCEN,[16] and the Court.[17]   Indeed, the CBC has well stated why voluntary remand would be taken as reaffirmation of the Final Rule.   *See, e.g.*, Shaffer Decl., Ex. D at 6 ("Since FinCEN has already confirmed its decision after previously reviewing the extensive comments provided by FBME, the strong likelihood is that FinCEN would then re-issue the Final Rule."); Shaffer Decl., Ex. E at 2 ("[G]iven the evidence that FinCEN has not changed its view as to FBME's conduct and the findings of the U.S. District Court in its opinion of 27 August 2015, there are no prospects of FBME returning to viability in the foreseeable future.").

Anything short of vacatur in this case likely spells death for FBME as it exists today.   If that death is to come, it should come quickly, at the end of this Court's judicial review on forthcoming motions for summary judgment.   It should not come at the hands of FinCEN, via what amounts to an administrative filibuster.

---

[15]    *See, e g.*, Declaration of Graeme Wyllie ¶¶ 13–15, ECF 3-5 (describing loss of FBME's commercial relationships after the notice of finding and proposed rulemaking); Saab Decl. ¶¶ 41–45 (describing effect of FinCEN action prior to announcement of Final Rule); Declaration of Charles Charalambous ¶¶ 5–8, ECF 3-2 (same).

[16]    ECF 23-1 at 40 (Gov't Prelim. Inj. Opp.) ("FBME was cut off from U.S. correspondent accounts before the issuance of the Final Rule. . . . There is no indication it was able to do business in U.S. dollars at the time the Final Rule was issued, nor was it doing any significant business in any other currency."); Aug. 25, 2015 Hr'g Tr. 96:14–18 ("And [Plaintiffs] have no current U.S. correspondent accounts, and have not for many months. Thus formalizing their exclusion from future U.S. correspondent accounts has no direct effect at this time."); *id.* 103:6–14 (THE COURT: "[The CBC is] saying that once the Final Rule goes into effect, we don't believe that there's any prospect for FBME to ever do business again in Cyprus. Isn't that the effect of that?"   COUNSEL FOR DEFENDANTS: "Yes, though the state it is describing is currently the state in effect. The reason they think the Final Rule will have that effect is because it is being cut off from U.S. correspondent accounts, which it does not currently have.").

[17]    ECF 33 at 23–24 (Prelim. Inj. Op.) (noting that "[m]any banks with which FBME had maintained correspondent accounts refused to do business with FBME after FinCEN issued its Notice of Proposed Rulemaking" and accepting premise that "FBME can barely function as a bank at present").

The probability that FinCEN may effectively win through sheer force of its delay is that much more pronounced given the length of time FinCEN previously spent in its rulemaking in FBME's case (a full year) and has spent in other cases.   For example, there are four proposed rules under Section 311 on which FinCEN has yet to take final action, all of which have been pending for more than two years and one for nearly *five* years.   *See* Section 311 – Special Measures: Special Measures for Jurisdictions, Financial Institutions, or International Transactions of Primary Money Laundering Concern, http://www.fincen.gov/statutes_regs/ patriot/section311.html (last accessed Oct. 5, 2015).   Tellingly, the very same day FinCEN moved for voluntary remand in this case, it rescinded a notice of finding and proposed rulemaking regarding Lebanese Canadian Bank SAL that had been pending for more than four-and-a-half years.   Why did FinCEN rescind?   Because the target bank was already dead— specifically as a result of aggressive regulatory action a foreign regulator had taken following FinCEN's rule.   *See* Withdrawal of Proposed Rulemaking against Lebanese Canadian Bank SAL at 2, *available at* http://www.fincen.gov/statutes_regs/frn/pdf/20150928.pdf (Sept. 28, 2015) ("Because of the action taken by the Lebanese banking authorities and the liquidation of the LCB's assets, LCB no longer exists as a foreign financial institution.").   This has been a recurring pattern for FinCEN.   *See* 73 Fed. Reg. 19452, 19453 (Apr. 10, 2008) (withdrawing notice of proposed rulemaking regarding First Merchant Bank because foreign regulator terminated the subject bank's operations following notice of proposed rulemaking and FinCEN had "confirmed the dissolution" of the bank, its parent, and several subsidiaries ).

We recognize there is only so much that reviewing courts can to do address the problems that arise when agencies raise their Sword of Damocles, then delay, before a challenge can even reach court.   When a challenge such as this one finally *does* reach court, however, the agency

should not be permitted a quick retreat only to raise its Sword of Damocles once again in the hope of foreclosing any return.

Last of all, prevailing parties such as FBME have claim for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.   If an agency can elect voluntary remand in lieu of suffering an adverse judgment, that alone threatens to defeat or at least delay statutory recovery of fees, especially to the extent that a challenger may be wiped out in the course of remand.   And even if the challenger survives the remand, delay in receiving fees owed (without benefit of intervening interest) amounts to justice denied.   The very purpose of the Equal Access to Justice Act, however, is to "eliminate for the average person the financial disincentive to challenge unreasonable governmental actions."   *Commissioner of INS v. Jean*, 496 U.S. 154, 163 & n.11 (1990).   This is yet another reason why the Court should not succumb to a plea for voluntary remand—at least when it is as close to reaching a final judgment as it is now and when the proposed remand threatens to be as hollow as this one would be.

## CONCLUSION

For the foregoing reasons, Plaintiffs FBME Bank Ltd. and FBME Ltd. respectfully request that the Court deny Defendants' motion for voluntary remand and set an expedited schedule for summary judgment briefing.

Dated:    October 5, 2015

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN LLP

*/s/ Derek L. Shaffer*
Derek L. Shaffer (D.C. Bar No. 478775)
William A. Burck (D.C. Bar No. 4015426)
Lauren H. Dickie (IL Bar No. 6286037)
Jonathan G. Cooper (D.C. Bar No. 999764)
777 Sixth Street NW, 11th Floor
Washington, DC 20001
(202) 538-8000

HOGAN LOVELLS US LLP

*/s/ Peter S. Spivack*
Peter S. Spivack (D.C. Bar No. 453731)
J. Evans Rice III (D.C. Bar No. 481768)
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5600

*Attorneys for Plaintiffs*
*FBME Bank Ltd. and FBME Ltd.*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2015, I electronically filed the foregoing Opposition with the Clerk of the Court using the Court's ECF system, which will send notice of this filing to all parties.

/s/ Derek L. Shaffer
Derek L. Shaffer