**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| FBME Bank Ltd., | ) | |
| | ) | |
| FBME Ltd., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JACOB LEW | ) | |
| in his official capacity as Secretary of the | ) | |
| Treasury, | ) | |
| | ) | |
| U.S. DEPARTMENT OF THE | ) | Civil Action No. 1:15-CV-1270 CRC |
| TREASURY, | ) | |
| | ) | |
| JENNIFER SHASKY CALVERY in her | ) | |
| official capacity as Director of the Financial | ) | |
| Crimes Enforcement Network, | ) | |
| | ) | |
| FINANCIAL CRIMES ENFORCEMENT | ) | |
| NETWORK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendants Jacob J. Lew in

his official capacity as Secretary of the Treasury, the United States Department of the Treasury,

Jennifer Shasky Calvery in her official capacity as Director of the Financial Crimes Enforcement

Network, and the Financial Crimes Enforcement Network hereby move for summary judgment

on the grounds that there are no genuine issues of material fact and defendants are entitled to

judgment as a matter of law.  This motion is based on the accompanying memorandum of points

and authorities.

Dated: April 29, 2016.                    Respectfully submitted,

                                          BENJAMIN C. MIZER
                                          Principal Deputy Assistant Attorney General

                                          CHANNING D. PHILLIPS
                                          United States Attorney

                                          JOSEPH H. HUNT
                                          Director

                                          DIANE KELLEHER
                                          Assistant Branch Director

                                          */s/ Lynn Y. Lee*
                                          LYNN Y. LEE (CA Bar No. 235531)
                                          AMY E. POWELL
                                          Trial Attorney
                                          United States Department of Justice
                                          Civil Division, Federal Programs Branch
                                          20 Massachusetts Avenue, N.W.
                                          Washington, D.C. 20530
                                          Telephone: (202) 305-0531
                                          Fax: (202) 616-8470
                                          Email: lynn.lee@usdoj.gov

                                          *Attorneys for Defendants*

## <u>TABLES OF CONTENTS</u>

**INTRODUCTION**..................................................................................................................... 1

**STATUTORY AND REGULATORY BACKGROUND** .......................................................... 5

I.   Section 311 ............................................................................................................................. 6

II.  FinCEN and Section 311 ........................................................................................................ 9

**FACTUAL AND PROCEDURAL BACKGROUND** ............................................................. 10

I.   Notice of Finding................................................................................................................... 10

II.  The First Comment Period and the 2015 Final Rule ............................................................ 12

III. Plaintiffs' Lawsuit and Preliminary Injunction Motion ....................................................... 14

IV. Remand and Reopening of Final Rule .................................................................................. 15

V.   The New Final Rule.............................................................................................................. 17

**STANDARD OF REVIEW** .................................................................................................... 20

**ARGUMENT**........................................................................................................................... 22

I.   FinCEN's Section 311 Action Fully Complied With the APA. ............................................ 23

     A.  There is a Rational Basis for the Final Rule.................................................................. 23

         1.  FinCEN reasonably determined that FBME is of primary money
             laundering  concern…………………………………… ……………………………...24
         2.  FBME cannot establish that the Final Rule was arbitrary or capricious……………27

             a.  FinCEN adequately considered all the information submitted by FBME……27

             b.  FinCEN adequately considered the Section 311 factors in finding FMBE
                 to be of primary money laundering concern……………………………………31

             c.  FinCEN's decision against imposing alternative measures was reasonable….33

     B.  FinCEN provided FBME ample opportunity to comment on the Final Rule................ 37

         1.  Classified evidence……………………………………………………………… 40
         2.  Statutorily protected evidence   …………………………………………………...41
         3.  Unclassified, non-protected evidence   ………………………………………… 43

II.  FinCEN Has Not Violated Due Process. ............................................................................. 45

     A.  FBME lacks constitutional presence. ............................................................................ 45

     B.  Even if FBME is entitled to due process, FinCEN afforded FBME more than adequate
         notice and an opportunity to be heard. .......................................................................... 49

         1.  FBME had more than enough notice of the factual basis for FinCEN's findings….50

         2.  FBME is not entitled to a hearing before a "neutral arbiter"……………………… 51

**CONCLUSION**………………………………………………………………………………53

i

## <u>TABLES OF AUTHORITIES</u>

**CASES**

*32 Cty. Sovereignty Comm. v. Dep't of State*,
  292 F.3d 797 (D.C. Cir. 2002)................................................................. 46, 47, 48

*Air Transp. Ass'n of Am. v. FAA*,
  169 F.3d 1 (D.C. Cir. 1999)................................................................................. 40

*Al-Aqeel v. Paulson*,
  568 F. Supp. 2d 64 (D.D.C. 2008).............................................................. 43, 50

*Al-Haramain Islamic Found. v. U.S. Dep't of Treasury*,
  686 F.3d 965 (9th Cir. 2012)....................................................................... 49, 51

*Alaska Airlines Inc. v. TSA*,
  588 F.3d 1116 (D.C. Cir. 2009)......................................................................... 30

*Alaska Dep't of Env't Conservation v. EPA*,
  540 U.S. 461 (2004)............................................................................................. 21

*Arbelaez v. Newcomb*,
  Civ. No. 00-5217, 1 Fed. App'x 1 (D.C. Cir. 2001) .................................... 47

*AT&T Corp. v. FCC*,
  220 F.3d 607 (D.C. Cir. 2000)........................................................................... 23

*Bean Dredging, LLC v. United States*,
  773 F. Supp. 2d 63 (D.D.C. 2011)................................................................... 53

*Caperton v. A.T. Massey Coal Co.*,
  556 U.S. 868 (2009)............................................................................................. 52

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)............................................................................................. 20

*Chamber of Commerce v. SEC*,
  443 F.3d 890 (D.C. Cir. 2006)........................................................................... 39

*Chem. Waste Mgmt. v. EPA*,
  873 F.2d 1477 (D.C. Cir. 1989)......................................................................... 52

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)............................................................................................. 31

*Chrebet v. Cty. of Nassau*,
  24 F. Supp. 3d 236 (E.D.N.Y. 2014)................................................................ 49

*Citizens to Preserve Overton Park v. Volpe*,
  401 U.S. 402 (1971)............................................................................................. 20

*Clifford v. Pena*,
  77 F.3d 1414 (D.C. Cir. 1996)............................................................................. 6

*Cotton v. PrivateBank & Trust Co.*,
  235 F. Supp. 2d 809 (N.D. Ill. 2002) .............................................................. 42

*Dep't of the Navy v. Egan*,
  484 U.S. 518 (1988)............................................................................................. 40

*Envtl. Def. Fund, Inc. v. Costle*,
  657 F.2d 275 (D.C. Cir. 1981)........................................................................... 24

ii

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985)................................................................................ 16, 20

*Fla. Power & Light Co. v. United States*
846 F.2d 765 (D.C. Cir. 1988) ....................................................................... 38

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010)....................................................................................... 22, 37

*Holy Land Found. for Relief &Dev. v. Ashcroft*,
219 F. Supp. 2d 57 (D.D.C. 2002) ........................................................... passim

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
333 F.3d 156 (D.C. Cir. 2003) .................................................................. passim

*In re City of New York*,
607 F.3d 923 (2d Cir. 2010).............................................................................. 43

*Islamic Am. Relief Agency  v. Unidentified FBI Agents ("IARA I")*,
394 F. Supp. 2d 34 (D.D.C. 2005) ....................................... 21, 25, 41, 49

*Islamic Am. Relief Agency  v. Gonzales ("IARA II")*,
477 F.3d 728 (D.C. Cir. 2007) ............................................... 21, 22, 29

*Jifry v. FAA*,
370 F.3d 1174 (D.C. Cir. 2004) ............................................................. 22, 41

*Johnson v. Eisentrager*,
339 U.S. 763 (1950)........................................................................................... 46

*Kadi v. Geithner*,
42 F. Supp. 3d 1 (D.D.C. 2012) .............................................................. passim

*Mathews v. Eldridge*,
424 U.S. 319 (1976)........................................................................................... 53

*MD Pharm. Inc. v. DEA*,
133 F.3d 8 (D.C. Cir. 1998) ........................................................................... 23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..................................................................................... 21, 23

*Nat'l Council of Resistance of Iran v. Dep't of State ("NCRI")*,
251 F.3d 192 (D.C. Cir. 2001)……………………………………………… …...passim

*Nat'l Shooting Sports Found., Inc. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013) ................................................................. 21, 33

*New Life Evangelistic Ctr., Inc. v. Sebelius*,
753 F. Supp. 2d 103 (D.D.C. 2010) ............................................................ 53

*Olivares v. Transp. Sec. Admin.*,
No. 15-1001, 2016 WL 1535072 (D.C. Cir. Apr. 15, 2016)...................... 6

*Global Relief Found., Inc. ("GRF") v. O'Neill*,
207 F. Supp. 2d 779 (N.D. Ill. 2002) ..................................................... 21, 22

*People's Mojahedin Org. of Iran v. Dep't of State*,
182 F.3d 17 (D.C. Cir. 1999) ......................................................................... 46

*People's Mojahedin Org. of Iran v. Dep't of State ("PMOI")*,
613 F.3d 220 (D.C. Cir. 2010)……………………………       …………………passim

*Pub. Citizen v. Nuclear Reg. Comm'n*,
573 F.3d 916 (9th Cir. 2009) ......................................................................... 41

iii

*Pub. Citizen, Inc. v. FAA*,
    988 F.2d 186 (D.C. Cir. 1993) ............................................................... 38
*Ralls Corp. v. CFIUS*,
    758 F.3d 296 (D.C. 2014) ..................................................................... 44
*Regan v. Wald*,
    468 U.S. 222 (1984) ........................................................................ 21, 22
*Schweiker v. McClure*,
    456 U.S. 188 (1982) ............................................................................ 52
*Stivers v. Pierce*,
    71 F.3d 732 (9th Cir. 1995) .................................................................. 52
*United States v. All Assets Held In Account No. 80020796*,
    83 F. Supp. 3d 360, 2015 WL 1285791 (D.D.C. 2015) ..................... 46, 48
*United States v. Sum of $70,990,605*,
    128 F. Supp. 3d 350 (D.D.C. 2015) ...................................................... 48
*United States v. Verdugo–Urquidez*,
    494 U.S. 259 (1990) ............................................................................ 46
*Van Hollen, Jr. v. FEC*,
    811 F.3d 486 (D.C. Cir. 2016) ......................................................... 33, 37
*Veterans for Common Sense v. Shinseki*,
    678 F.3d 1013 (9th Cir. 2013) .............................................................. 53
*Vt. Yankee Nuclear Power Corp. v. NRDC*,
    435 U.S. 519 (1978) ............................................................................ 38
*Whitney Nat'l Bank v. Karam*,
    306 F. Supp. 2d 678 (S.D. Tex. 2004) .................................................. 42
*Withrow v. Larkin*,
    421 U.S. 35 (1975) .............................................................................. 52
*Zarmach Oil Servs., Inc. v. Dep't of Treasury*,
    750 F. Supp. 2d 150 (D.D.C. 2010) ...................................................... 21
*Zevallos v. Obama*,
    10 F. Supp. 3d 111 (D.D.C. 2014) ........................................................ 21
*Zevallos v. Obama*,
    793 F.3d 106 (D.C. Cir. 2015) ......................................................... 30, 37

**STATUTES**

5 U.S.C. § 706 ......................................................................................... 20
8 U.S.C. § 1189(c)(2) ................................................................................ 8
12 U.S.C. § 1829b .................................................................................... 10
12 U.S.C. §§ 1951-59 .............................................................................. 10
31 U.S.C. § 310 ......................................................................................... 9
31 U.S.C. § 5311 .............................................................................. 6, 7, 10
31 U.S.C. §§ 5311-14 ................................................................................ 9
31 U.S.C. §§ 5316-32 ................................................................................ 9
31 U.S.C. § 5318 .................................................................................. 10, 42
31 U.S.C. § 5318A ............................................................................. passim

iv

50 U.S.C. § 1702(c) ........................................................................................................... 8

**RULES**

Fed. R. Civ. P. 56 ............................................................................................................. 20

**REGULATIONS**

31 C.F.R. § 1020.320 ....................................................................................................... 42

71 Fed. Reg. 39606-01 (July 13, 2006)…………………………………………………36

75 Fed. Reg. 707 (Dec. 29, 2009) .................................................................................... 40

79 Fed. Reg. 42486-01 (July 22, 2014) ........................................................................... 10

79 Fed. Reg. 42639-01 (July 22, 2014) ..................................................................... passim

80 Fed. Reg. 45057-01 (July 29, 2015) …………………………………………….13, 39

80 Fed. Reg. 74064-01 (Nov. 27, 2015) ................................................................... 15, 16

81 Fed. Reg. 18480-01 (Mar. 31, 2016) .................................................................... passim

**OTHER AUTHORITIES**

Pub. L. No. 107-56 .................................................................................................. 5, 6, 7, 8

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

As this Court has already recognized, the rulemaking challenged here is exactly the kind that should be trusted to the specialized expertise and broad, statutorily authorized discretion of the Financial Crime Enforcement Network ("FinCEN"). FinCEN is the agency charged by Congress with the weighty task of identifying foreign financial institutions it finds to be of primary money laundering concern and taking appropriate measures to protect the U.S. financial system from the threat they pose. FinCEN does not take such action lightly, as amply demonstrated by this case. Here, it has issued a rule prohibiting U.S. financial institutions from opening or maintaining correspondent accounts with FBME Bank, Ltd., only after a thorough analysis and consideration of the factual evidence obtained during both the original administrative process and the reopened process ordered by this Court. Substantively, therefore, there can be no doubt that that decision was carefully considered, well supported, and ultimately reasonable. Procedurally, it is beyond dispute that plaintiffs have fully availed themselves of multiple opportunities to respond to the proposed rulemaking and offer additional information prior to FinCEN's final decision. And to the extent that there were any procedural omissions during the original rulemaking, these have now been fully addressed on remand and in the new rule.

Following the attacks of September 11, 2001, Congress vested the Executive with extensive powers to combat the financial foundation of terrorism. Among these tools was Section 311 of the USA PATRIOT Act, which authorizes the Secretary of the Treasury to take certain special measures against financial institutions that he or she finds to be of primary money laundering concern—including the prohibition of U.S. banks and financial institutions from

opening or maintaining correspondent accounts on behalf of such institutions.  While the statute grants the agency wide discretionary authority to impose such a prohibition, the measure is only applied after a thorough evaluation of the evidence and a notice-and-comment rulemaking process.

In July 2014, the Financial Crimes Enforcement Network ("FinCEN"), the bureau of the Treasury Department responsible for administering Section 311, issued a public notice of finding that plaintiff FBME Bank Ltd. ("FBME Bank"), a bank headquartered in Tanzania but operating mainly in Cyprus, is a financial institution operating outside of the United States of primary money laundering concern, along with a notice of proposed rulemaking.  Based on classified and statutorily protected as well as public information, FinCEN found that FBME Bank had a long history of facilitating a substantial volume of illicit financial activity by international terrorist financiers, organized crime figures, and money launderers.  FinCEN additionally found that the bank's weak anti-money laundering controls attracted a large number of shell company customers who were able to conduct a significant volume of opaque and suspicious transactions through the U.S. financial system.  Over the following year, FinCEN reviewed multiple submissions of information from FBME Bank and participated in an active, long-running dialogue with the bank's counsel regarding the proposed rule.  Ultimately, after considering the bank's submissions, as well as additional information obtained from various non-public sources, FinCEN concluded that FBME Bank continued to be of primary money laundering concern and that the only appropriate means of protecting the U.S. financial system was to prohibit U.S. financial institutions from maintaining correspondent accounts for FBME under the fifth "special

measure."  It issued a final rule to this effect on July 29, 2015, prompting the present suit by plaintiffs FBME Bank and FBME, Ltd. (collectively, "FBME").

In August 2015, this Court granted plaintiffs' motion for a preliminary injunction, finding no substantive flaw in the agency's reasoning but holding that plaintiffs were likely to succeed on the merits of their claims that FinCEN violated the Administrative Procedure Act ("APA") by providing insufficient notice of the unclassified, non-protected information that it "relied on" and by not considering one "obvious potential alternative" to the measure it imposed.  However, the Court subsequently granted the government's motion for voluntary remand to allow FinCEN to address these procedural issues and take a fresh look at the evidence before making a new final decision.

This is precisely what FinCEN did.  It reopened the rulemaking for a new comment period; provided relevant unclassified and non-protected materials to plaintiffs and the public; received and considered new comments (including lengthy and late additional submissions from FBME); and thoroughly analyzed  all of the evidence before it.  FinCEN also carefully considered other potential measures to a prohibition under the fifth special measure, including the option of placing conditions on correspondent accounts that was flagged by the Court, as well as other alternatives proposed by FBME.  Based on the totality of the evidence before it, FinCEN concluded that FBME Bank is an institution of primary money laundering concern and that a prohibition on correspondent accounts remains the only viable measure that would adequately protect the U.S. financial system from the threat posed by the bank.  The new Final Rule was published on March 31, 2016.

Throughout its comments and communications during the remand period, FBME has largely reiterated the same arguments against FinCEN's proposed rulemaking that it made in its Complaint and preliminary injunction motion.  FBME claims that FinCEN has violated both the APA and due process because it allegedly (1) did not give sufficient weight to the evidence presented by FBME or adequately explain why it could not impose a lesser alternative measure; (2) did not provide sufficiently detailed notice as to why it believes the bank to be an institution of primary money laundering concern; and (3) did not provide FBME a hearing before a neutral arbiter.  However, as discussed herein, the record of FinCEN's rulemaking clearly demonstrates that these claims have no merit.

First, weighing the evidence and evaluating what measure is most appropriate to address the level of risk at issue are matters that lie within FinCEN's expertise and exclusive discretion. The reasons for FinCEN's assessment are laid forth in substantial detail in its newly promulgated Final Rule and the underlying administrative record.  A Section 311 decision is entitled to a particularly high level of deference under the APA both because it relates to issues of national security and foreign policy and because of the broad discretion granted by Congress in the language of Section 311, which requires only a finding of primary money laundering concern to impose any of the special measures available under the statute.  FBME's opinions about the proper conclusions to be drawn from the evidence are not entitled to deference; by statute and case law, it is the Executive Branch that is charged with these sensitive determinations.  Most importantly, FBME cannot show that the agency's ultimate decision was unreasonable, arbitrary, or capricious.  Second, FinCEN has now made available all unclassified, non-protected information which it considered, thus fully remedying any possible issues of notice in the

original rulemaking.  The only relevant supporting information that has been withheld is either classified and/or protected by the Bank Secrecy Act, which cannot lawfully be disclosed and which this Court has held was adequately summarized in the agency's notice of finding.  Finally, a wholly foreign institution such as FBME is not entitled to constitutional rights, and even if plaintiffs could identify a sufficient presence to invoke constitutional protections (which to date they have not), due process does not require a hearing by an independent third party for a statutorily mandated *rulemaking* that provided FBME full notice and opportunity to be heard. The fact that FinCEN engaged in dialogue with FBME, considered all of FBME's submissions, including those that were untimely submitted, and provided FBME as much information as it possibly could, demonstrated that it provided all the process to which FBME was entitled, and more.

For these reasons, the Court should grant summary judgment for the government.

## STATUTORY AND REGULATORY BACKGROUND

Congress enacted Title III of the USA PATRIOT Act, known as the International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, shortly after September 11, 2001.  *See* Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub. L. No. 107-56, 115 Stat. 272 (2001).  Congress made extensive findings about the threat posed by international money laundering and corrupt foreign financial institutions.  For example, Congress indicated that "money laundering . . . provides the financial fuel that permits transnational criminal enterprises to conduct and expand their operations to the detriment of the safety and security of American citizens" and that it is "critical to the financing of global terrorism and the provision of

funds for terrorist attacks."  *See* Pub. L. No. 107-56, at § 302(a)(1)-(2), codified at 31 U.S.C. §

5311, note.  "[M]oney launderers subvert legitimate financial mechanisms and banking

relationships by using them as protective covering for the movement of criminal proceeds and

the financing of crime and terrorism, and, by so doing, can threaten the safety of United States

citizens and undermine the integrity of United States financial institutions and of the global

financial and trading systems upon which prosperity and growth depend."  *Id.* § 302(a)(3).

## I.    <u>Section 311</u>

Congress specifically identified correspondent banking facilities as "one of the banking

mechanisms susceptible in some circumstances to manipulation by foreign banks to permit the

laundering of funds by hiding the identity of real parties in interest to financial transactions."  *Id.*

§ 302(a)(6).  A correspondent account is an account established to receive deposits from, make

payments on behalf of, or handle other financial transactions for another financial institution.

*See* 31 U.S.C. § 5318A(e)(1)(B).  Foreign banks that wish to do any significant volume of

transactions in U.S. dollars typically do so via correspondent accounts with U.S. banks.  Decl. of

Jennifer Shasky Calvery ("Calvery Decl.") (ECF No. 20) ¶ 21.[1]  Because a foreign bank then can

conduct its transactions via the U.S. bank, it represents a potential vulnerability for the U.S. bank

if the foreign bank is not secured against illicit use.  *Id.*

To address the myriad threats posed by international money laundering, Congress

provided the Secretary of the Treasury "broad discretion, subject to the safeguards provided by

---

[1] The Calvery Declaration, submitted with defendants' opposition to plaintiffs' motion for
preliminary injunction, is appropriately considered in an APA action as background information
useful for illuminating the administrative record.  *See, e.g., Olivares v. Transp. Sec. Admin.*, No.
15-1001, 2016 WL 1535072, *7 (D.C. Cir. Apr. 15, 2016) (finding that background declaration
that "contains no new rationalizations" but is "merely explanatory of the original record," is
admissible for the Court's consideration); *Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996)
(similar).

the Administrative Procedure Act under title 5, United States Code, to take measures tailored to the particular money laundering problems presented by specific foreign jurisdictions, financial institutions operating outside of the United States, and classes of international transactions or types of accounts." *See* Pub. L. No. 107-56 § 302(b)(5), codified at 31 U.S.C. § 5311, note.  In Section 311 of the Act, codified at 31 U.S.C. § 5318A, Congress granted the Secretary of the Treasury the authority, upon finding that reasonable grounds exist for concluding that a foreign jurisdiction, foreign financial institution, class of transaction, or type of account is of "primary money laundering concern," to require domestic financial institutions and financial agencies (*e.g.*, banks) to take certain "special measures" against that entity.  *Id.* § 5318A(a)(1).

In "making a finding that reasonable grounds exist" for concluding that a financial institution operating outside the United States is of "primary money laundering concern," *id.* § 5318A(c)(1), the Secretary "shall consider … such information as the Secretary determines to be relevant, including the following potentially relevant factors," including

> (i) the extent to which such financial institutions … are used to facilitate or promote money laundering in or through the jurisdiction, including any money laundering activity by organized criminal groups, international terrorists, or entities involved in the proliferation of weapons of mass destruction or missiles; (ii) the extent to which such institutions … are used for legitimate business purposes in the jurisdiction; and (iii) the extent to which such action is sufficient to ensure, with respect to transactions involving the jurisdiction and institutions operating in the jurisdiction, that the purposes of this subchapter continue to be fulfilled, and to guard against international money laundering and other financial crimes.

*Id.* § 5318A(c)(2).  Any Section 311 action is based on the totality of information available to the Secretary, including, where appropriate, classified information.  The use of classified information is explicitly contemplated in the statute, *see* 31 U.S.C. § 5318A(f) (permitting *ex parte, in camera* review of classified information used under Section 311), and is similar to

provisions authorizing the use and judicial review of classified information in other contexts.

*See* 50 U.S.C. § 1702(c) (authorizing such review in cases involving executive actions under

International Emergency Economic Powers Act ("IEEPA")); 8 U.S.C. § 1189(c)(2) (same, for

designations of foreign terrorist organizations pursuant to Antiterrorism and Effective Death

Penalty Act ("AEDPA")).

The special measures authorized by Section 311 are prophylactic in nature, designed to

guard against the risk that money launderers and terrorist financiers will be able to gain access to

the U.S. financial system.  Calvery Decl. ¶ 23.  The five available special measures impose

obligations on U.S. financial institutions.  The first four special measures are focused on

gathering additional information, and include:  (1) requiring additional recordkeeping and

reporting of certain financial transactions, (2) requiring information relating to beneficial

ownership, (3) requiring information relating to certain payable through accounts, and (4)

requiring correspondent account customer information.  The fifth special measure allows the

Secretary to impose prohibitions or conditions on opening or maintaining certain correspondent

or payable through accounts.  Pub. L. No. 107-56 § 311, codified at 31 U.S.C. § 5318A(b).  The

fifth special measure, regarding prohibitions on the opening or maintenance of correspondent

accounts, may be imposed only by regulation.  31 U.S.C. § 5318A(a)(2)(C).[2]  In "selecting

which special measure or measures to take," the Secretary considers

> (i) whether similar action has been or is being taken by other nations or multilateral
> groups; (ii) whether the imposition of any particular special measure would create a
> significant competitive disadvantage . . . for financial institutions organized or licensed in
> the United States; (iii) the extent to which the action or the timing of the action would
> have a significant adverse systemic impact on the international payment, clearance, and

---

[2] The first four special measures may be imposed by regulation or immediately by order.  When imposed
by order, they must be issued together with a notice of proposed rulemaking, and the order may not
remain in effect beyond 120 days except pursuant to any rule promulgated on or before the expiration of
that 120-day period.  31 U.S.C. §§ 5318A(a)(2)(B), (a)(3)(B).

settlement system, or on legitimate business activities involving the particular jurisdiction, institution, class of transactions, or type of account; and (iv) the effect of the action on United States national security and foreign policy.

31 U.S.C. § 5318A(a)(4)(B).

The fifth special measure applies, by its terms, to U.S. financial institutions, which may be prohibited from holding or maintaining correspondent accounts with the institution of primary money laundering concern or required to impose conditions on such accounts.  In accordance with the statutory requirement that the agency impose the fifth special measure "by regulation," the agency acts by notice and comment rulemaking.  *Id.* § 5318A(a)(2)(C).  Upon review of the comments received after publication of the proposed rule, and after considering other information available to the agency, the agency can continue to review the information before making a final decision, proceed with a final rule, or withdraw the finding and proposed rule.

## II.   FinCEN and Section 311

The Secretary has delegated implementation of Section 311 to the Director of FinCEN. Treasury Order 180-01 § 3(a).  FinCEN is a bureau of the U.S. Department of the Treasury tasked with safeguarding the United States financial system from illicit use and combating money laundering and promoting national security through the collection, analysis, and dissemination of financial intelligence and strategic use of financial authorities.  *See* 31 U.S.C. § 310; Calvery Decl. ¶ 4.  FinCEN administers the Bank Secrecy Act ("BSA"), a legislative framework including provisions established by the Currency and Financial Transactions Reporting Act of 1970, as amended by Title III of the USA PATRIOT Act of 2001 and other legislation, and codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951-59, and 31 U.S.C. §§ 5311-5314 and 5316-5332, which authorizes the Secretary of the Treasury to issue regulations

requiring banks and other financial institutions to take a number of precautions against money

laundering and other financial crime.  This includes requiring banks and other financial

institutions to establish anti-money laundering ("AML") programs and to maintain certain

records and file certain reports that are useful in criminal, tax, or regulatory investigations or

proceedings, or in the conduct of intelligence and counter-intelligence activities, including

analysis, to protect against international terrorism.  *See* 31 U.S.C. §§ 5311, 5318(h).

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      Notice of Finding

On July 22, 2014, FinCEN published a notice in the Federal Register of its July 15, 2014

finding that reasonable grounds exist to conclude that FBME is of primary money laundering

concern("Notice of Finding" or "NOF"), along with a related Notice of Proposed Rulemaking

("NPRM") proposing to impose against FBME the fifth special measure authorized by Section

311.  79 Fed. Reg. 42639-01 (July 22, 2014) (NOF); 79 Fed. Reg. 42486-01 (July 22, 2014)

(NPRM).  FinCEN found that "FBME facilitated a substantial volume of money laundering

through the Bank for many years" and was "used by its customers to facilitate money laundering,

terrorist financing, transnational organized crime, fraud, sanctions evasion, and other illicit

activity internationally and through the U.S. financial system."  79 Fed. Reg. at 42639.  FBME's

clients included:

- the head of an international narcotics trafficking and money laundering network who used shell companies' accounts at FBME to conduct financial transactions;
- a customer who received a deposit of hundreds of thousands of dollars from a financier for Lebanese Hezbollah;
- a financial advisor for a major transnational organized crime figure who maintained a relationship with the owners of FBME;
- an account holder involved in a High Yield Investment Program fraud against a U.S. person, which led to a federal indictment;

- several accounts that received the proceeds in the hundreds of thousands of dollars resulting from cybercriminal activity against U.S. victims;
- a front company for the Scientific Studies and Research Center ("SSRC"), a front company for a Syrian entity that the U.S. government has designated as a proliferator of weapons of mass destruction, and that shares a British Virgin Islands address with over 100 other shell companies, including another FMBE customer that is subject to international sanctions; and
- a British shell company that received $7.2 million from the treasury of Equatorial Guinea that were likely the proceeds of foreign corruption offenses perpetrated by the President of Equatorial Guinea, his son, and associates.

79 Fed. Reg. at 42639-40; *see generally* Memo Supp. NOF/NPRM (Ex. 26 to Mar. 25, 2016 Memo Supp. Final Rule) (redacted version at AR2706-23).

FinCEN further found that FBME's weak AML controls encouraged the use of the bank by shell companies and allowed its customers to perform a significant volume of obscured and suspicious transactions and activities through the U.S. financial system. FBME customers were involved in at least 4,500 suspicious wire transfers totaling at least $875 million through U.S. correspondent accounts between November 2006 and March 2013, and other financial institutions involved in the transfers reported that they were unable to verify the identities of FBME's customers. 79 Fed. Reg. at 42640; *see generally* Memo Supp. NOF/NPRM (Ex. 26 to Mar. 25, 2016 Memo Supp. Final Rule) (redacted version at AR2706-23). And from April 2013 through April 2014, FBME conducted at least $387 million in wire transfers through the U.S. financial system that similarly exhibited indicators of high risk money laundering, including widespread shell company activity, short-term "surge" wire activity, and high-risk business customers. *Id.* FinCEN also found that from 2007 to 2013, over 70 entities used FBME's address to conduct transactions through the U.S. financial system—a practice that is highly unusual and often indicative of the bank's potential complicity in its customers' illicit activities.

11

*Id.*

## II.      The First Comment Period and the 2015 Final Rule

Following the July 22, 2014 Notice of Finding and NPRM, FinCEN reviewed additional

unclassified information obtained by FinCEN, including public comment on the Notice of

Finding and NPRM and other submissions by FBME, and additional classified and statutorily

protected information obtained by FinCEN after publication of the Notice of Finding and NPRM.

During the year that followed, FinCEN maintained regular communication with FBME and its

counsel regarding issues related to the Notice of Finding and NPRM, accepted and considered

extensive submissions of information from FBME well after the close of the comment period,

and answered questions from FBME where it could without disclosing classified or statutorily

protected information.  *See* AR0016-40, 104-893, 913-2657, 2948-3021, 3061-98, 4408-10.

FBME submitted a 28-page comment on the Notice of Finding and NPRM dated

September 22, 2014, the last day of the comment period.  AR0016-17, 104-34.[3]  FinCEN also

received and considered six additional submissions of information from FBME, comprising

thousands of pages of documents, that were dated September 24, 2014; November 17, 2014;

November 21, 2014; two submissions on December 1, 2014; and December 5, 2014, even though

these were submitted outside of the comment period.  AR0030-40, 135-893, 943-2653, 2948-

3017, 3061-98.  These included audits conducted by KPMG and Ernst & Young in 2013 and

2014, respectively, that examined the effectiveness of FBME's AML compliance controls and, in

---

[3] FinCEN also received several other comments from other groups.  *See* AR0040.

an Ernst & Young review that purported to address the specific factual findings in FinCEN's Notice of Finding.  AR0742-824, 2953-3017, 3061-98.[4]

Where FinCEN could, consistent with its obligation not to disclose classified or statutorily protected information, it confirmed when FBME correctly identified transactions with which FinCEN was concerned.  FBME submitted a letter to FinCEN on January 26, 2015, asking for confirmation as to whether Ernst & Young had correctly identified accounts and customers in question in the Notice of Finding.  AR4408-10.  FinCEN responded to that letter on or about February 24, 2015, and confirmed FBME's correct identification of one account.  FinCEN also noted in that response where it was unable to release protected non-public information beyond the statements contained in the Notice of Finding for the other transactions about which FBME had inquired.  In those cases, FinCEN was unable to release the additional information because it was protected by statute or because it was classified.  AR2655-57.

FinCEN reviewed and considered all of the comments submitted during the comment period, as well as information available to it after the issuance of the NPRM, before deciding to issue a final rule imposing a prohibition of U.S. correspondent accounts pursuant to the fifth special measure of Section 311.  This final rule ("the 2015 Rule") was issued and published in the Federal Register on July 29, 2015.  *See* 80 Fed. Reg. 45057-01 (July 29, 2015).  It addressed the comments by FBME and others, as well as FBME's additional submissions.  *Id.* at 45058.  FinCEN also considered the statutory factors set forth in Section 311 for deciding which special measure to impose, including whether similar actions have been or will be taken by other nations or multilateral groups against FBME, whether the imposition of the fifth special measure would

---

[4] In addition to considering additional materials submitted by FBME months after the close of the comment period, FinCEN conducted an in-person meeting with the bank to allow FBME the opportunity to present additional information, and for the agency to answer questions to the extent possible and articulate any concerns it had.  *See* AR0914-42, 4399-402.

create a significant competitive disadvantage for U.S. financial institutions, the extent to which

the action or its timing would have a significant adverse systemic impact on the international

payment, clearance, and settlement system or on legitimate business activities involving FBME,

and the effect of the action on national security and foreign policy, and concluded that imposition

of the fifth special measure was appropriate.  *Id.* at 45060-61.

### III.     Plaintiffs' Lawsuit and Preliminary Injunction Motion

Shortly after the issuance of the 2015 Rule, counsel for FBME informed FinCEN and the

Department of Justice ("DOJ") that it intended to bring suit, along with a possible request for

emergency relief if FinCEN would not agree to rescind or delay the effective date of the rule.

Because FinCEN concluded that it could not put off the effective date, plaintiffs filed the present

suit and a motion for a preliminary injunction on August 7, 2015.  Compl. (ECF No. 1).  On

August 27, 2015, this Court granted the motion and preliminarily enjoined the 2015 Rule,

holding that FBME was likely to succeed on the merits of its claims that (1) "FinCEN provided

insufficient notice of non-classified, non-protected information during the rulemaking

proceeding, in violation of the APA's notice-and-comment requirement," and (2) FinCEN failed

"to adequately consider at least one potentially significant, viable, and obvious alternative to the

sanction it imposed," specifically, the imposition of *conditions*, rather than an outright

prohibition, on the opening or maintaining of correspondent accounts.  PI Mem. Op. at 9 (ECF

No. 33); *see also id.* at 13-18, 20-21.  However, the Court noted with respect to plaintiffs' due

process claim that "the record is currently unclear as to whether FBME has sufficient presence or

property in the United States to establish an entitlement to due process at all," *id.* at 9, and that

FinCEN's non-disclosure of the classified and Bank Secrecy Act-protected evidence on which it

was relying did not violate FBME's notice rights under the APA. *Id.* at 10-13. The Court also

indicated that it was "not inclined to second guess FinCEN's exercise of its broad discretion in

finding that FBME poses a primary money laundering concern, or its resulting imposition of the

fifth special measure," and that FBME was therefore *not* likely to prevail on its claim that

FinCEN's finding was arbitrary and capricious under the APA. *Id* at 2-3; *see also id.* at 21-22.

### IV.    Remand and Reopening of Final Rule

Following the entry of the preliminary injunction, the government moved for a voluntary

remand and stay of the case to engage in further rulemaking regarding FBME. ECF No. 38.   In

particular, FinCEN proposed reopening the rule for a new notice and comment period to give

plaintiffs and others an opportunity to respond to the unclassified, non-protected information that

it was considering, and submit additional information they believed FinCEN should consider. *Id.*

at 4. FinCEN also pledged to take into account all such additional information, and to consider

more thoroughly whether the imposition of conditions on correspondent accounts would be an

adequate alternative measure, before making its final decision. *Id.* On November 6, 2015, the

Court granted the government's (opposed) motion and set a schedule for completing the remand.

Remand Mem. Op. & Order at 8-9 (ECF No. 49).

Pursuant to the Court's remand order, FinCEN published a notice of the reopening of the

rule for 60 days to solicit additional comments, particularly with respect to the unclassified, non-

protected materials it intended to consider in its rulemaking and whether any alternatives to the

prohibition of the opening or maintaining of correspondent accounts with FBME would

effectively mitigate the risk to domestic financial institutions. 80 Fed. Reg. 74064-01, 74064-

065 (Nov. 27, 2015). In connection with this notice, FinCEN made available for public view the

unclassified, non-protected evidence that it was considering, as well as the redacted version of

the memorandum underlying the July 2015 Rule.  *Id.* at 74065.  During the reopened comment

period, which closed on January 26, 2016, FinCEN received thirteen comments (including an

additional comment from FBME submitted on January 26, 2016), all but one of which were

made public and considered by the agency before it made its final decision.  81 Fed. Reg. 18480-

01, 18485-88 (Mar. 31, 2016) (Final Rule); AR0042 n.13.[5]

In its January 26 comment, which included hundreds of pages of documents and exhibits,

FBME: (1) reiterated the claims in its Complaint that FinCEN had failed to afford it adequate

process under the Constitution and the APA; (2) argued that FinCEN should not rely on

information provided by the Central Bank of Cyprus ("CBC") because the CBC had a history of

subjecting FBME to inequitable regulatory treatment, and asserted that FinCEN and the CBC

were improperly acting in concert against FBME; and (3) argued that it had rebutted all of the

identifiable allegations in the Notice of Finding, pointing again to its AML compliance program

and the independent audit reports it had previously submitted to FinCEN.  81 Fed. Reg. at

18485-87; AR0050-58, 3281-352.[6]  FBME subsequently supplemented its comment to address

---

[5] The one comment that was *not* considered or relied upon in FinCEN's final decision has already come up before this Court in connection with FBME's assertion that this comment, as well as certain unsolicited materials previously submitted by the same persons to FinCEN ("Unsolicited Materials"), contained privileged and confidential material.  *See* Joint Notice & Request for Hearing (ECF No. 51); Motion for Leave to File [Disputed Materials] Under Seal (ECF No. 52).  Plaintiffs' counsel demanded, *inter alia*, that these documents be destroyed and not reviewed or considered.  Pursuant to discussions with plaintiffs' counsel, while the government does not concede that any of these materials are privileged, it has destroyed all copies of the Unsolicited Materials (except one, which is being retained in the event of further litigation regarding the alleged privilege issue), and has refrained from publicly posting or otherwise disseminating the comment any further.  Because FinCEN has not considered or relied upon either the comment or the Unsolicited Materials, they are not part of the administrative record.  *See, e.g., Fla. Power & Light Co. v. Lorion*, 470 U.S. 729,744 (1985) (purpose of "the record the agency presents to the reviewing court" is to "support the agency action").

[6] Several of the other commenters during the reopened comment period largely echoed FBME's legal arguments and/or its complaints about the CBC.  81 Fed. Reg. at 18487; AR0044-48.  Others objected

and expound at length upon its disagreement with an on-site AML examination of its Cyprus

branch that was conducted by the CBC from June to September 2014 and that identified "serious

and systemic" failures in FBME's AML compliance.  81 Fed. Reg. at 18482; AR0012-15, 3959-

88.  Although this "supplement" was submitted three days after the comment period closed,

FinCEN still considered and responded to it in its Final Rule.

## V.   **The New Final Rule**

After carefully considering the information it received during the reopened comment

period, and conducting an entirely new analysis of the evidence already before it,[7] FinCEN

decided that FBME remained an institution of primary money laundering concern, and that only

a prohibition of correspondent accounts would afford sufficient protection against the threat it

posed to the U.S. financial system.  As set forth in greater detail in both the Final Rule and the

underlying record, the information provided by FBME failed to allay FinCEN's concerns

regarding the bank's AML controls for many reasons, including but not limited to the following:

- The KPMG and E&Y audits submitted by FBME actually identified significant recurring *weaknesses* in its AML compliance program—in particular, FBME's inadequate due diligence of its customers' identities and deficient monitoring of

that FinCEN was relying on unreliable sources of information such as articles on the Internet, or expressed concern that FinCEN was unfairly targeting FBME rather than U.S. persons or other institutions.  81 Fed. Reg. at 18487-88; AR0042-44, 48-50.  However, as FinCEN has explained in the Final Rule and as reflected in the administrative record, it relies on a wide variety of sources to support its rulemaking, and is continuously vetting those sources for accuracy and making corrections as needed; it can find only foreign financial institutions to be of primary money laundering concern under Section 311; and it is always monitoring money laundering activity to make appropriate findings that an entity is of primary money laundering concern.  *Id.*

[7] As previously disclosed to the Court, there were three documents in the original administrative record that FinCEN did not consider or make public on remand and were therefore not part of the administrative record for the March 31, 2016 Rule.  Two, which were included in the original record supporting the Notice of Finding, were law enforcement sensitive documents that FinCEN lacked internal authorization to submit, and one was an irrelevant document mistakenly included with the evidentiary memo for the 2015 Rule.  *See* Defs.' Notice re Withheld Documents (ECF No. 47) at 3 n.2.  In addition, there is one classified document included in the original record supporting the Notice of Finding that was withdrawn from consideration because FinCEN was unable to obtain internal authorization to submit it.

the AML practices of third parties the bank relied on to introduce new customers (81 Fed. Reg. at 18482-18483; AR0022-24, 27, 29, 31);

- Although FBME asserted that it had implemented the recommendations identified by its auditors for strengthening its AML compliance program, it failed to provide any meaningful information or documentation that would allow FinCEN to verify such implementation (81 Fed. Reg. at 18486; AR0023, 29, 54-55);

- As of early 2015, many months *after* the Notice of Finding, an alleged Hezbollah associate and his Tanzanian company continued to bank with FBME (81 Fed. Reg. at 18482, 18483; AR0009-11 (redacted));

- There was evidence in late 2014 that FBME employees took certain measures to obscure information, which FinCEN assesses may have been intended to evade scrutiny of the bank's operations following the issuance of the Notice of Finding (81 Fed. Reg. at 18482, 18483; AR00009-11 (redacted));

- The CBC's 2014 audit identified many of the same red flags in FBME's AML compliance that FinCEN had, and led to its imposition of a €1.2 million fine on FBME for these deficiencies (81 Fed. Reg. at 18482; AR0011-12, 3931-58).

With respect to FBME's complaints regarding the fairness and objectivity of the CBC, FinCEN noted that the CBC had received positive reviews for its monitoring of money laundering and terrorist financing issues in the Cypriot financial system from the Committee of Experts on the Evaluation of Anti-Money Laundering and the Financing of Terrorism ("MONEYVAL") and assessed that as a government authority with regulatory powers over FBME's Cyprus branch, the CBC had relevant information related to whether FBME was of primary money laundering concern.  81 Fed. Reg. at 18485; AR0052.  FinCEN also reaffirmed that it was exercising its independent authority under Section 311 to protect the U.S. financial system, not coordinating inappropriately with the CBC.  *Id.*  With respect to the CBC's 2014 audit, FinCEN conducted a point-by-point review of FBME's counterarguments and concluded that they failed to refute the genuine concerns regarding FBME's AML deficiencies that were

identified by the audit.  FinCEN noted by way of example that FBME in some cases conceded that it had not maintained sufficiently comprehensive or up-to-date files on its customers; that according to the CBC audit, as of June 2014, FBME had completed review of only three percent of its high-risk customer files; and that in one case FBME accepted false or incomplete identifying information regarding beneficial ownership of customers it should have known were high-risk.  81 Fed. Reg. at 18483; AR0012-15.

Consideration of Alternatives

FinCEN also gave renewed consideration to the alternatives to a prohibition under the fifth special measure, namely, special measures one through four, the conditions option of the fifth special measure, and a range of other remedies proposed by FBME, including a monetary fine, an independent monitor, regular reports to FinCEN regarding FBME's operations, consultation with FinCEN or a FinCEN-appointed expert on adopting specific policies to supplement FBME's AML compliance program, and restrictions on particularly "worrisome" transactions.  81 Fed. Reg. at 18489-90; AR0064-68.  However, FinCEN noted that the efficacy of most of these alternatives, including the imposition of conditions on FBME's correspondent accounts, would necessarily depend on the reliability of the information provided by FBME to the party responsible for ensuring compliance.  *Id.*  Given FBME's history of AML deficiencies and its active efforts to evade regulatory oversight, even *after* FinCEN highlighted its concerns in the Notice of Finding, FinCEN expressed concern that FBME's previous conduct demonstrated that the bank could not be relied upon to provide complete and accurate

information to a third party responsible for compliance with the alternative special measure, condition, or remedy, or to effectively implement any specific policies or procedures. *Id.*[8]

Accordingly, on March 31, 2016, FinCEN issued a new Final Rule reimposing the fifth special measure's prohibition of U.S. correspondent accounts for FBME. 81 Fed. Reg. at 18480. The Final Rule is to take effect on July 29, 2016.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and other record evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also* Fed. R. Civ. P. 56(a). Under the APA, a court reviews an agency decision based on the administrative record. *Fla. Power & Light Co.*, 470 U.S. at 743-44 (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)). An agency decision should be upheld unless it is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). The Court's review under this standard is narrow and highly deferential, and the Court does not substitute its judgment for that of the agency. *See Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416; *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency's decision should be

---

[8] FinCEN also expressed little confidence that it would be able to identify or police all of the potentially "worrisome" transactions FBME might conduct, given the lack of transparency surrounding so many of these transactions, and noted that refraining from these transactions would not address the broader concerns regarding the bank's weak AML controls. Similarly, payment of a monetary fine would also not address these broader concerns or mitigate the risk they pose to the U.S. financial system. 81 Fed. Reg. at 18490; AR0066, 68.

affirmed as long as it is supported by a rational basis.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S.

at 43; *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013); *Jifry v.

FAA*, 370 F.3d 1174, 1181 (D.C. Cir. 2004) ("The court must affirm the agency's findings of fact

if they are supported by 'substantial evidence' and there is a 'rational connection between the

facts found and the choice made.'") (citation omitted); *see also Alaska Dep't of Env't

Conservation v. EPA*, 540 U.S. 461, 497 (2004) (Even when an agency explains its decision with

"less than ideal clarity," a reviewing court will not upset the decision on that account "if the

agency's path may reasonably be discerned.").

Because FinCEN's decisions under Section 311 implicate foreign affairs and national

security, the deference it is due is even greater than the level of deference ordinarily required

under the APA.  *See Regan v. Wald*, 468 U.S. 222, 242 (1984) ("Matters relating 'to the conduct

of foreign relations . . . are so exclusively entrusted to the political branches of government as to

be largely immune from judicial inquiry or inference ….'") (citation omitted).[9]  The Supreme

Court has emphasized the need for courts to afford this heightened deference, even when

considering constitutional claims; such deference is required because courts should respect the

---

[9] *See also Epsilon Electronics, Inc. v. U.S. Dep't of the Treasury* , No. 14-cv-02220-RBW, ECF No. 26  at 8-9 (citing *Regan* in order granting summary judgment for Treasury's Office of Foreign Assets Control); *Zevallos v. Obama*, 10 F. Supp. 3d 111, 119 (D.D.C. 2014), *aff'd*,  793 F.3d 106 (D.C. Cir. 2015) ("In addition to the deference accorded to agency action under the APA, in the special context of an executive designation like the one at issue in this case, the D.C. Circuit has suggested that an even more deferential review applies when matters of foreign policy and national security are concerned."); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 10 (D.D.C. 2012) ("Courts are particularly mindful that their review is highly deferential when matters of foreign policy and national security are concerned.") (citing cases); *Zarmach Oil Servs., Inc. v. Dep't of Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) ("Courts owe a substantial measure of 'deference to the political branches in matters of foreign policy,' including cases involving blocking orders") (citing *Regan*); *Islamic Am. Relief Agency  v. Unidentified FBI Agents* ("*IARA I*"), 394 F. Supp. 2d 34, 45 (D.D.C. 2005), *aff'd in part and remanded in part on other grounds*, 477 F.3d 728 (D.C. Cir. 2007) ("Thus,'[a]s a general principle, . . . this Court should avoid impairment of decisions made by the Congress or the President in matters involving foreign affairs or national security.'") (quoting *Global Relief Found. ("GRF") v. O'Neill*, 207 F. Supp. 2d 779, 788 (N.D. Ill. 2002)), *aff'd*, 315 F.3d 748 (7th Cir. 2002).

Executive Branch's expertise in the national security and foreign policy arena. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010); *see also Islamic Am. Relief Agency v. Gonzales* ("*IARA II*"), 477 F.3d 728, 734 (D.C. Cir. 2007) ("[W]e reiterate that our review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential").[10]  APA and foreign policy deference are even more crucial when considered in conjunction with the extraordinary discretion found in Section 311 itself, which requires the consideration of various factors but does not require a particular outcome under any of them, or preclude consideration of additional factors at the Secretary's discretion, and which requires only a finding of primary money laundering "concern" as the basis for imposition of special measures.

## <u>ARGUMENT</u>

FBME's lawsuit challenges the final rule under both the APA and the Fifth Amendment of the Constitution.  First, FBME contends that the final rule "failed to provide adequate notice and a meaningful opportunity for Plaintiffs to comment on the Final Rule."  Compl. ¶ 68; *see generally* ¶¶ 66-70 (Count I).  Second, FBME argues that FinCEN "failed to consider the relevant data submitted by the Bank, failed to articulate a rational connection between the facts and the Final Rule, and failed to account for the contrary evidence before it."  *Id.* ¶ 77; *see generally id.* ¶¶ 71-79 (Count II).  Finally, FBME seeks to recast its APA claims as due process

---

[10] *See also Holy Land Found. for Relief & Dev. v. Ashcroft* ("*Holy Land I*"), 219 F. Supp. 2d 57, 84 (D.D.C. 2002) ("Blocking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference."), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003); *GRF*, 207 F. Supp. 2d at 787 (construing challenge to asset blocking of assets pending investigation as "in essence challenging the power of the Executive Branch of the United States government to conduct foreign policy" and finding that "[i]n so doing, [GRF] is asking this Court to approach the outer limit of its constitutional authority"); *Cooperativa Multiactiva de Empleados de Distribuidores de Drogas (Cooperativa) v. Newcomb*, No. 98-cv-0949, slip op. at 5 (D.D.C. Mar. 29, 1999) ("The deference accorded agency action arguably is enhanced where, as here, the action involved 'the conduct of foreign relations,' which is 'so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'") (quoting *Regan*, 468 U.S. at 242).

violations and claims that FinCEN has "refused to provide effective notice of [its alleged deprivation of a protected property interest]," and that FinCEN failed to offer or provide any hearing, "let alone a hearing before a neutral arbiter."  *Id*. ¶¶ 85-86; *see generally id.* ¶¶ 80-87 (Count III).  All of these claims fail for the reasons set forth below.

## I.      FinCEN's Section 311 Action Fully Complied With the APA.

FBME contends in its submissions to the agency, and seems likely to argue to this Court, that FinCEN failed to provide enough information to allow for a meaningful opportunity to comment and that the Final Rule was arbitrary and capricious because it effectively ignored FBME's comments and submissions contesting FinCEN's findings.  FBME is essentially arguing backwards from the outcome: because the Final Rule imposed the fifth special measure—an outcome the bank opposed—it must mean that the bank's arguments and objections were ignored.  Far from it, the record demonstrates that FinCEN went above and beyond what is procedurally required by the APA and that the final decision was carefully considered and eminently reasonable, particularly in light of the heightened deference that is due to agency decisions in the sensitive areas of national security and foreign affairs, as well as the deference Congress built into Section 311 itself.

### A.      There is a Rational Basis for the Final Rule.

It is well-settled that "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  Under this "highly deferential" standard, *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000), a court "will not disturb the decision of an agency that has examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," *MD Pharm. Inc. v.*

*DEA*, 133 F.3d 8, 16 (D.C. Cir. 1998) (quotation marks omitted). The court considers only

"'whether the decision was based on a consideration of the relevant factors and whether there has

been a clear error of judgment.'"  *State Farm*, 463 U.S. at 43 (citation omitted).  It must affirm

"if a rational basis for the agency's decision is presented, even though [the court] might

otherwise disagree." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981)

(internal citation omitted).

> 1.   <u>FinCEN reasonably determined that FBME is of primary money laundering concern.</u>

The Court need look no further than the text of the new Final Rule to conclude that, far

from being arbitrary or capricious, it is reasonable and well substantiated.  As explained above,

FinCEN's determination that reasonable grounds exist for concluding that FBME is a financial

institution of primary money laundering concern is based on substantial evidence that FBME had

been used to facilitate money laundering, terrorist financing, transnational organized crime, fraud

schemes, sanctions evasion, and other illicit activity internationally and throughout the U.S.

financial system, and that its weak AML controls attracted high-risk shell companies and

allowed its customers to perform a significant volume of obscured transactions and activities

with little or no transparency with regard to customer information and often no apparent

legitimate purpose.  81 Fed. Reg. at 18481; *see also* 79 Fed. Reg. 42639 (Notice of Finding).

The activity ranged from as early as 2006 to as recently as 2015.  79 Fed. Reg. at 42639-40; 81

Fed. Reg. at 18482.  The Final Rule also took into account comments received from FBME and

other entities, and the additional submissions by FBME made after the close of both comment

periods, and addressed them to the extent consistent with its limitation upon disclosing classified

and statutorily protected information.  *See* 81 Fed. Reg. at 18483-88.

The Final Rule is supported by a robust administrative record totaling several thousands of pages of source exhibits and over 60 pages of written analysis.  Much of the underlying source material is either classified or otherwise prohibited from disclosure under the BSA.  Section 311 expressly contemplates the reliance on classified information, consistent with other statutes that have authorized the issuance of Executive Branch actions against entities who pose a threat to national security.  *See, e.g., Kadi*, 42 F. Supp. 3d at 6, 23-24; *IARA I*, 394 F. Supp. 2d at 45-46; *Holy Land Found. for Relief & Dev. v. Ashcroft* ("*Holy Land II*"), 333 F.3d 156, 164 (D.C. Cir. 2003); *People's Mojahedin Org. of Iran v. U.S. Dep't of State ("PMOI")*, 613 F.3d 220, 229-30 (D.C. Cir. 2010); *Nat'l Council of Resistance of Iran v. Dep't of State ("NCRI")*, 251 F.3d 192, 208-09 (D.C. Cir. 2001).  At the preliminary injunction stage, this Court held that FinCEN could rely on such information.  PI Mem. Op. at 10-12.  Pursuant to 31 U.S.C. § 5318A(f), the government is separately lodging the classified and BSA-protected portions of the administrative record for the Court's *ex parte, in camera* review.  At the same time, the government has also made publicly available the unclassified, non-protected supporting portions of the administrative record for notice and comment.[11]

FinCEN re-evaluated evidence and arguments during the reopened rulemaking and reasonably determined again that FBME is of primary money laundering concern.  FBME is a foreign bank headquartered in Tanzania and operating in Cyprus with a long history of facilitating illicit transactions, failure to implement effective anti-money-laundering controls and a hostile relationship with their regulator.  In the Notice of Finding, FinCEN identified multiple instances in which FBME facilitated money laundering, terrorist financing, transnational

---

[11] Some of these materials were posted in redacted form because they contained information that plaintiffs claimed was confidential business information.  The unclassified, non-protected portion of the administrative record contains the unredacted versions of these materials and is therefore being filed separately under seal.

organized crime, fraud schemes, sanctions evasion and other financial crime, and assessed that FBME's weak anti-money-laundering controls allowed its customer to perform a significant volume of obscured transactions. *See* 79 Fed. Reg. at 42639-40; 81 Fed. Reg. at 18481; *see generally* Memo Supp. NOF/NPRM (Ex. 26 to Mar. 25, 2016 Memo Supp. Final Rule) (redacted version at AR2706-23). Audits of FBME's Cyprus branch in 2013 and 2014 confirmed that FBME has significant, recurring weaknesses. 81 Fed. Reg. at 18481; AR0011-12, 22-24, 27, 29. While FBME has made some efforts to address issues identified in recent years, FinCEN assesses that these efforts are inadequate. 81 Fed. Reg. at 18482; AR0023, 30-31, 54-55. The CBC has identified "serious and systemic" AML deficiencies at FBME, and these findings "reinforce and corroborate FinCEN's concerns regarding money laundering and terrorist financing risks associated with FBME." 81 Fed. Reg. at 18482-83; AR0011-12, 3933.

FinCEN further assesses that FBME has not made comprehensive or effective corrections to its deficient AML measures, and that it "has sought to evade AML regulations and has ignored the CBC's AML directives." 81 Fed. Reg. at 18482; AR0011-12, 25. FBME has long been recognized by its high risk customers for its ease of use and potential for evading AML regulations. 81 Fed. Reg. at 18482; AR0013-16, 27-29. More recently, it has ignored instructions from its regulator, and has taken action to obscure information, which may have been part of an effort to evade scrutiny after the Notice of Finding. 81 Fed. Reg. at 18482; AR0009-11 (redacted). FinCEN is further concerned that at least as late as 2015, there is evidence of financial activity related to Hezbollah at FBME. *Id.* FinCEN has plainly articulated a rational connection between the evidence and its concerns regarding FBME, and FinCEN considered all of Plaintiffs' submissions and found them insufficient to allay the Government's

concerns.  Based on the evidence that the bank operated at an alarmingly high level of risk and low level of transparency, it was entirely reasonable for FinCEN to conclude that FBME is an institution of primary money laundering concern, and precisely the type of bank that Congress intended to exclude from the U.S. financial system.

2.    FBME cannot establish that the Final Rule was arbitrary or capricious.

FBME claims that the Final Rule is arbitrary and capricious because FinCEN failed to adequately consider (1) the relevant data submitted by FBME; (2) the factors set forth in Section 311 for finding "primary money laundering concern"; and (3) lesser, alternative penalties besides the fifth special measure.  Compl. ¶¶ 74-79; *see also* AR3294-96, 3323-52.  None of these arguments has any merit, and must yield to the heavily deferential standard of review for agency decisions that, like this one, directly implicate national security and foreign relations.

a.    *FinCEN adequately considered all the information submitted by FBME.*

This Court already found, at the preliminary injunction stage, that "the present record, taken as a whole, supports FinCEN's exercise of its discretion in reaching its ultimate conclusion under Section 311 that FBME is an institution of primary money laundering concern" and "does *not* support FBME's contention that FinCEN arbitrarily disregarded the evidence it presented to rebut that conclusion."  PI Mem. Op. at 21-22 (emphasis added).  FinCEN nevertheless undertook to review all of the evidence again, including new information submitted by FBME, and again concluded that FBME continues to be of primary money laundering concern.[12]

---

[12]  FinCEN considered all of FBME's voluminous submissions to the agency before reaching its conclusions, and that consideration is reflected in the Final Rule and the underlying evidentiary memorandum.  81 Fed. Reg. at 18483-87; AR0012-40.  The government does not address each argument individually in this brief because it does not know what aspects of the rulemaking plaintiffs plan to challenge.

In asserting that "FinCEN failed to consider the relevant data submitted by the Bank, failed to articulate a rational connection between the facts and the Final Rule, and failed to account for the contrary evidence before it," Compl. ¶ 74, FBME presumably refers to the audit reports prepared by KPMG and Ernst & Young ("EY"), which it cites as evidence that the bank's AML compliance program met or exceeded applicable regulatory requirements, and the added compliance measures the bank claims to have undertaken at the recommendation of these firms. *Id.* In its January 26 comment, it continued to press this claim, arguing that FinCEN was ignoring the KPMG and EY reports and improperly relying on evidence provided by the CBC, which plaintiffs accused of being corrupt and unfairly biased against FBME. *See* AR3302-17, 3324-40.[13]  However, these arguments are specious and unsupported by the record.

As reflected in both the Final Rule and the underlying record, FinCEN considered the KPMG and EY reports, and they supported its assessment that FBME was still an institution of primary money laundering concern warranting the prohibition of the fifth special measure. 81 Fed. Reg. at 18483-84; AR0022-24, 27-29, 30-31.  The KPMG and EY audits, far from giving FBME a clean bill of health, revealed a pattern of recurring AML deficiencies at the bank consistent with those independently identified by FinCEN and the CBC, such as weaknesses in the bank's customer due diligence procedures and its failure to adequately screen the AML measures of the Approved Third Parties (ATPs) who were authorized to introduce new customers. 81 Fed. Reg. at 18483-84; AR022-24.  And any claim that FBME has a strong AML

---

[13] FBME also asserted that the 2014 EY transaction review submitted in December 2014 refuted the specifically identifiable allegations of money laundering in the Notice of Finding. AR3336-39.  While in some cases the EY review partially identified the activity of concern, in others it failed to correctly identify the activity of concern or identified additional illicit activity that FinCEN had not previously identified.  With the exception of two technical corrections, FinCEN continues to believe, based on both the public and non-public information available to it, that the concerns identified in the Notice of Finding were valid and accurate. 81 Fed. Reg. at 18484, 18486; AR0032-39.

compliance program that it improved by implementing the recommendations of its auditors was directly contradicted by the findings of the CBC. 81 Fed. Reg. at 18483-84, 18486; AR0011-15, 23. As for FinCEN's reliance on the CBC, it is eminently reasonable that the agency would give more credence to information from a government regulator in the relevant jurisdiction than the self-serving submissions of the entity that regulator had found deficient. As FinCEN noted in its analysis, the CBC has received positive reviews from intergovernmental organizations established to set standards and promote effective measures for combating money laundering and terrorist financing. 81 Fed. Reg. at 18485; AR00052. And as the U.S. regulator in this area, it is FinCEN, not FBME, that has the particular expertise to judge the credibility and reliability of other foreign regulators of money laundering.[14]

More broadly, FBME's arguments ignore the significant deference due to FinCEN under the APA, particularly to the extent its Section 311 decision relates to matters of foreign affairs and national security, and the gravity of the threat posed to the U.S. financial system by international money laundering and terrorist financing networks. *See IARA II*, 477 F.3d at 734. FinCEN was not required to adopt the KPMG or EY audits' conclusions, or to reject the CBC's, or to interpret any of these reports (or any of the other unclassified evidence) as FBME would. *See Zevallos v. Obama*, 793 F.3d 106, 114 (D.C. Cir. 2015) ("[W]hen we evaluate agency action, 'we do not ask whether record evidence could support the petitioner's view of the issue, but whether it supports the [agency's] ultimate decision.'") (citation omitted); *Holy Land Found. I,*

---

[14] The same principle applies to FinCEN's reliance on Suspicious Activity Reports ("SARs"). In its January 26 comment, FBME argued that FinCEN's reliance on SARs was "misconceived" because (1) the SARs when viewed in the "proper context" did not support FinCEN's findings; (2) FinCEN had not compared FBME's SAR rates to those of other similarly situated banks; and (3) reports by other financial institutions were unreliable to the extent those institutions were involved in the suspicious transfers and had incentive to shift blame to FBME. AR3340-43. However, it was well within FinCEN's expertise and discretion to decide how to interpret the SARs, given that it is the agency charged with regulating SARS filing requirements and routinely analyzes them. *See supra* at 6-10.

219 F. Supp. 2d at 75 ("[T]he purpose of the Court's inquiry is not to determine whether each and every piece of evidence in the record independently supports [the agency's] determination.").  It was entirely appropriate for the agency to review the same data as the bank but reach a different conclusion about the resulting implications, and it is the agency's view that is entitled to deference, not the bank's.  *Cf. Alaska Airlines Inc. v. TSA*, 588 F.3d 1116, 1120 (D.C. Cir. 2009) ("complex judgments about . . . data analysis that are within the agency's technical expertise," merits an "extreme degree of deference.").

The fact that FinCEN gave weight to certain recurring AML deficiencies identified in the audits, rather than whether the auditors described FBME's AML program as being generally in compliance with European Union and Cypriot standards, is precisely the sort of assessment on which the Court should defer to FinCEN.  Further, the fact that FBME says it implemented reforms does *not* mean that FinCEN must take FBME's word for it.  Nor does it mean that FinCEN should disregard the CBC 2014 audit or other data it has considered, some of which it could not disclose publicly but is available for the Court's *ex parte, in camera* review, that demonstrates a historical pattern of substantial money laundering activity by FBME's customers, and lax controls by FBME itself, over many years, that continued even past the 2014 Notice of Finding.  When the Court reviews the full administrative record, it will only confirm the conclusion that the new Final Rule was reasonable and well supported.  *See Zevallos*, 793 F.3d at 114; *Holy Land Found. I*, 219 F. Supp. 2d at 75; *cf. Kadi*, 42 F. Supp. 3d at 23 (in designating plaintiff as global terrorist, agency "relied on more information than Kadi's own voluminous statements and submissions," and claim that unclassified evidence provided to him had errors

and deficiencies "is beside the point" because "these items do not represent the whole picture" and "the information relied on…is further supported by the classified record.").

> **b.**    *FinCEN adequately considered the Section 311 factors in finding FMBE to be of primary money laundering concern.*

FBME asserts that FinCEN "failed to consider the requisite § 311 factors or explain why FBME is of 'primary' money laundering concern." Compl. ¶ 75; *see also* AR3346-48.  This claim is meritless.  Notably, the Court found in its preliminary injunction opinion that the 2015 Rule had adequately addressed the factors set forth in Section 311, PI Mem. Op. at 22, and the same is true of the new, post-remand Final Rule.

Although the statute directs the agency to consider certain factors in making a finding that an entity is of primary money laundering concern and imposing a special measure, *see* 31 U.S.C. §§ 5318A(a)(4)(B), (c)(2)(B), it does not require any particular outcome under these factors.  Nor does it mandate that any one factor be given more weight than other information the agency might choose to consider or preclude consideration of other, additional factors at the agency's discretion.  Indeed, Section 311 does not even require a determination that the designated entity be engaged in money laundering—only that the entity must be of money laundering *concern*.  To the extent that Congress left ambiguous what precisely being of "primary money laundering concern" entails, the implementing agency's interpretation is entitled to *Chevron* deference.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).  Given that each Section 311 action is of necessity fact-specific, no "one size fits all" definition is necessary or even appropriate.

In determining whether a financial institution is of primary money laundering concern, Section 311 provides that the agency

31

shall consider…such information as the [agency] determines to be relevant, including the following *potentially* relevant factors:
…
(i) the extent to which such financial institutions…are used to facilitate or promote money laundering in or through the jurisdiction, including any money laundering activity by organized criminal groups, international terrorists, or entities involved in the proliferation of weapons of mass destruction…
(ii) the extent to which such institutions…are used for legitimate purposes in the jurisdiction; and
(iii) the extent to which [one of the special measures] is sufficient to ensure, with respect to…institutions operating in the jurisdiction, that the purposes of this subchapter continue to be fulfilled, and to guard against international money laundering and other financial crimes.

31 U.S.C. § 5318A(c)(2) (emphasis added), (c)(2)(B).

As to the first factor, FinCEN found that FBME was of primary money laundering concern based on evidence that the bank (1) had facilitated or been used by its customers for illegal financial activities, including sanctions evasion, money laundering, and provision of financial services to individuals affiliated with terrorist organizations, and (2) had weak AML controls that attracted a high volume of shell companies and transactions with little or no transparency and no apparent legitimate business purpose.  80 Fed. Reg. at 18481; AR0058-59. In weighing the extent to which FBME Bank was used for legitimate business purposes, FinCEN considered the fact that few of the bank's customers were Cypriot or Tanzanian citizens, that it was primarily an offshore bank with a significant number of shell entity customers and politically exposed persons ("PEPs"), and that potentially as many as 27% of its customers were high-risk customers.  AR0059-61.  Finally, as to the third factor, FinCEN concluded that imposing a prohibition under the fifth special measure would protect against international money laundering and other criminal financial activity through FBME and thereby enhance national security by making it more difficult for terrorists, sanctions evaders and money launderers to

32

access the U.S. financial system, consistent with the overall purpose of Section 311.  AR0061-
62.[15]

Thus, FinCEN's conclusion that FBME is an institution of primary money laundering
concern had an entirely sound and rational basis that is consistent with what the APA requires.

### c.   *FinCEN's decision against imposing alternative measures was reasonable.*

The APA does not require an agency to "consider every alternative proposed" during the
rulemaking process, but rather, the agency "must consider only 'significant and viable' and
'obvious' alternatives."  *Shooting Sports Found.*, 716 F.3d at 215 (citing cases); *see also Van
Hollen, Jr. v. FEC*, 811 F.3d 486, 499 (D.C. Cir. 2016) ("Since agencies are only required to
consider 'significant and viable' alternatives . . . , we find no error in the FEC's decision not to
adopt this only partially mitigating alternative.").  In ruling on plaintiffs' preliminary injunction
motion, this Court affirmed the agency's conclusion that special measures one through four were
not adequate to protect U.S. interests, "[g]iven the agency's finding of ongoing money-
laundering concerns threatening the U.S. financial system—which is entitled to significant
deference—and the fact that only the fifth special measure provides for direct protection of the
U.S. financial system."  PI Mem. Op. at 20.  The Court, however, found that FinCEN had failed
to adequately consider an additional alternative "*within* the fifth special measure—namely, the
imposition of *conditions* on the opening or maintaining of correspondent accounts, rather than

---

[15] FinCEN also properly and expressly considered the four statutory factors for choosing which of the
special measures to apply, namely "(i) whether similar action has been or is being taken by other nations
or multilateral groups; (ii) whether the imposition of any particular special measure would create a
significant competitive disadvantage, including any undue cost or burden associated with compliance, for
financial institutions organized or licensed in the United States; (iii) the extent to which the action or the
timing of the action would have a significant adverse systemic impact on the international payment,
clearance, and settlement system, or on legitimate business activities involving the particular…institution
… and (iv) the effect of the action on United States national security and foreign policy."  31 U.S.C.
§ 5318A(a)(4)(B).  *See* 81 Fed. Reg. at 18488-89 (discussing four factors); AR0062-64).

the full prohibition of opening or maintaining such accounts." *Id.* (emphasis in original).  The Court found that this possibility "was an obvious potential alternative to a full prohibition on opening or maintaining correspondent accounts on behalf of FBME" and that "nowhere in the record does the agency explain why conditions on the opening or maintaining of such accounts for FBME could not protect the U.S. financial system against the risks posed by FBME." *Id.* at 21.

On remand, FinCEN reconsidered the alternative measures available to the agency, and concluded that "a prohibition under the fifth special measure is the only viable measure to protect the U.S. financial system against the money laundering and terrorist financing threats posed by FBME." *See* 81 Fed. Reg. at 18489.  FBME's January 26, 2016 comment proposed a number of specific alternative conditions, including imposition of a monetary fine, appointment of an independent monitor, periodic reporting, use of "appropriate" conditions, further reforms to FBME's compliance program, refraining from "transactions that FinCEN deems most worrisome," or any combination of these alternatives.  AR3349-51.  FinCEN found that each proposed condition would "inherently rely on FBME to provide accurate, credible, and reliable information to the party responsible for assuring compliance" and that "[g]iven FBME's extensive history of AML deficiencies, including ignoring its own AML regulator's directives and its active efforts to evade AML regulations," FinCEN doubted the "accuracy, credibility or reliability of any information that FBME would provide in connection with compliance."  81 Fed. Reg. at 18489; *see also* AR0066-68.  Based on a significant history of "serious and systemic" deficiencies at FBME, which were not fully remedied even after the Notice of Finding, FinCEN concluded that it could not reasonably rely upon FBME to provide the necessary

information.  81 Fed. Reg. at 18489.  Lesser measures would thus fail to protect the U.S. financial system from abuse by money launderers and terrorists.

FinCEN further considered specific alternatives, such as the selection of an independent monitor to oversee FBME operations and report to FinCEN, the imposition of a monetary penalty and a prohibition on "worrisome" transactions, or any combination of FBME's proposed alternatives.  *See* AR0066-68.  FinCEN found such alternatives inadequate to protect the U.S. financial system from foreign threats.  For example, with respect to a monitor, FBME would have to provide a monitor with full access to "reliable, credible and accurate customer and transactional information" and FinCEN has a reasonable basis for doubting FBME's ability or willingness to do so.  81 Fed. Reg. at 18490; AR0067.  Given FBME's history of ignoring the recommendations of its own regulator and its active efforts to evade compliance, FinCEN reasonably remains concerned that FBME could not effectively implement new AML policies. *Id.*

With respect to a monetary penalty, FinCEN considered anew FBME's proposal that a civil monetary fine would adequately protect U.S. interests and has been imposed on other entities.  81 Fed. Reg. at 18490; AR0066.  FBME is an entirely foreign bank based in Tanzania and Cyprus, and it is not clear that FinCEN has the authority levy such a fine.  But even if FinCEN had authority to impose such a penalty on a wholly foreign bank, it found that "[p]ayment of a fine would not ameliorate the concerns that FinCEN has regarding FBME's deficient AML controls, which present risks to the U.S. financial system."  *Id.*  A civil penalty is punitive and does not correct or protect against systemic risks presented by an institution like FBME.

Finally, FBME argued during the administrative proceeding that its situation is analogous to that of Multibanka, another foreign financial institution that was subject to a notice of finding and notice of proposed rulemaking under Section 311.  AR0068, 3350.  FinCEN evaluates the adequacy of ameliorative measures on a case-by-case basis, considering the full range of information and remedies available to the agency.  In the case of Multibanka, FinCEN found that improved AML procedures were translated effectively into practice, and that Multibanka was both forthcoming and effective in its efforts to implement new AML controls.  81 Fed. Reg. at 18490; 71 Fed. Reg. 39606-01 (July 13, 2006).  At the same time, the Latvian entities with regulatory authority over Multibanka gained new regulatory authorities and took "significant steps to address the reported money laundering risks and corruption highlighted in the notice of proposed rulemaking."  71 Fed. Reg. at 39607.  Here, FinCEN reasonably assessed that FBME is neither forthcoming nor effective in its AML compliance efforts, and FBME has identified no intervening regulatory changes that might alter that analysis.  81 Fed. Reg. at 18490.  If anything, the withdrawal of the notice against Multibanka highlights the nuanced and unbiased nature of FinCEN's decisionmaking in this area.  FinCEN is willing and able to withdraw a Notice of Finding where significant progress and meaningful cooperation convinces FinCEN that the entity is no longer a threat.  That is not the case here.

In short, the alternatives proposed by FBME were neither viable nor obvious, given the seriousness of the concerns the bank's record raised, and the urgency of FinCEN's (and Section 311's) larger mission of preventing the infiltration of the U.S. financial system by international money laundering.  FinCEN assessed that the alternative measures suggested would not ensure that U.S. banks would not be exposed to the very serious risks of money laundering and terrorist

financing flowing through the bank.  Plaintiffs no doubt disagree with FinCEN's assessment that these alternatives are insufficient to protect U.S. interests.  But it is FinCEN, not plaintiffs, who are charged by Congress and the President with protecting the U.S. financial system, and the Court should defer to FinCEN's determination.  *See supra*, at 6-10.   Plaintiffs cannot reasonably maintain that FinCEN failed to consider the alternatives before it, which is all—indeed, arguably more than—it was required to do.  *See Van Hollen, Jr*, 811 F.3d at 499 (only consideration of significant and viable alternatives required); *Zevallos*, 793 F.3d at 114 ("[W]hen we evaluate agency action, we do not ask whether record evidence could support the petitioner's view of the issue, but whether it supports the [agency's] ultimate decision.") (citation omitted).  Like the plaintiffs in *Humanitarian Law Project*, plaintiffs here "simply disagree with the considered judgment of Congress and the Executive," but "[t]hat judgment . . . is entitled to significant weight, and we have persuasive evidence before us to sustain it." 561 U.S. at 36.  Given the ordinary deference agencies are entitled to under the APA, let alone the heightened deference to which FinCEN is entitled in this context, its ultimate decision against imposing an alternative measure to protect the U.S. financial system was reasonable and in no way arbitrary or capricious.

> **B.     FinCEN provided FBME ample opportunity to comment on the Final Rule.**

FBME contends that FinCEN failed to provide adequate notice under the APA of the basis for its proposed rulemaking.  Compl. ¶¶ 68-70.  However, the record demonstrates that FBME had more than adequate notice and opportunity to comment on both the original and the reopened rulemaking.

It bears emphasizing that notice-and-comment procedures are meant to be relatively straightforward and not unduly onerous.  *See Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result … and respond to 'relevant' and 'significant' public comments. … However, neither requirement is particularly demanding."). Courts may not impose procedural requirements on agencies beyond the requirements in the APA or the agency's organic statute.  *See Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524 (1978) (APA "established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures").  Courts should be deferential towards the agency's choice of procedures absent statutory constraints.  *Id.* at 543-44.  When an agency undertakes notice and comment rulemaking, the APA requires a notice of proposed rulemaking that "afford[s] 'interested parties a reasonable opportunity to participate in the rulemaking process,'" meaning it must "give adequate time for comments" and "provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully."  *Fla. Power & Light Co. v. United States*, 846 F.2d 765, 771 (D.C. Cir. 1988).

FinCEN has met—indeed, exceeded—this standard, as evident from the face of the Notice of Finding, the 2015 Rule, and the new Final Rule.  The Notice of Finding stated that FBME was used to facilitate substantial money laundering and terrorist financing activities, as well as transnational organized crime, evasion of sanctions imposed under IEEPA, and corruption of foreign public political figures.  It listed specific examples and noted that these

activities were further enabled through relationships developed by its management and a large shell company customer base attracted by its weak AML controls.  79 Fed. Reg. at 42639-40.

The 2015 Rule was issued only after FinCEN had accepted and considered, in addition to the public comments (including one submitted by FBME on September 22, 2014), six additional submissions from FBME that were made outside of the comment period, and after extensive communications via telephone, e-mail, and one in-person meeting between FinCEN officials and counsel for FBME.  It addressed the public comments and discussed FBME's September 22, 2014 comment at length.  80 Fed. Reg. at 45058-45060.  It also confirmed that FinCEN had carefully considered FBME's follow-up submissions, noting that "these materials … outline some of the steps that FBME has taken to strengthen its compliance program," but that they did not alter FinCEN's conclusion that FBME continued to be used by bad actors and was thus of primary money laundering concern.  *Id.* at 45060.

And if that was not enough, on remand FinCEN offered FBME and the rest of the public yet another opportunity to submit additional information, and comment on all of the unclassified, non-protected evidence that FinCEN intended to consider.  As described above, during the reopened comment period FBME submitted another comment containing over a thousand pages of supporting materials, which the agency carefully reviewed and addressed in the new Final Rule.  *See supra* at 16-17.

Nevertheless, FBME's primary grievance appears to be that throughout the rulemaking process FinCEN was not able to disclose or describe *all* of the information it considered at a sufficiently granular level of factual detail to satisfy FBME.  *See* Compl. ¶ 68; AR3294, 3297-3300.  But that is not what the law requires, particularly where the specific information sought by

FBME is classified or prohibited from disclosure by the BSA.  *See* PI Mem. Op. at 10-13; *Holy Land Found. II*, 333 F.3d at 164; *Kadi*, 42 F. Supp. 3d at 23-24.[16]  Section 311 expressly provides for the reliance on classified information in findings of primary money laundering concern, while the disclosure and confidentiality provisions of the BSA were clarified and strengthened in the same legislation that established Section 311, as part of the same broader legislative push to strengthen the Treasury Department's tools for combating money laundering and terrorist financing.

        1.    <u>Classified evidence</u>

      It is well-established that the Executive Branch has the exclusive authority to determine who may have access to classified information, and decisions about who may access or use classified information and under what circumstances are not subject to judicial review.  *See Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988); *see also* Exec. Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009).  Thus, a federal district court may not compel the Executive Branch to grant an opposing party, or any other person, access to classified information.  *See, e.g., Holy Land Found. II*, 333 F.3d at 164 (emphasizing "the primacy of the Executive in controlling and exercising responsibility over access to classified information").  Despite this restriction, it is also widely accepted that agencies may rely on classified information in their decisionmaking

---

[16] Plaintiffs have previously cited a line of D.C. Circuit case law that holds that agencies are required to make the "most critical factual material" they have relied upon in their rulemaking available for public comment.  *See, e.g., Chamber of Commerce v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006).  However, these cases do not address agency decisions that are based in significant part on classified, law enforcement sensitive, or statutorily protected information.  Moreover, the D.C. Circuit has observed that "the focus in… rulemaking cases is primarily on whether the final rule changes critically from the proposed rule rather than on whether the agency relies on supporting material not published for comment.  The question is typically whether the agency's final rule so departs from its proposed rule as to constitute more surprise than notice."  *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999).  There is no question here that both the 2015 Rule and the new Final Rule are consistent with the proposed rule announced in the notice.

without disclosing it to the complainant.  Courts in this Circuit have upheld this practice repeatedly in reviewing the government's imposition of targeted financial measures, including those imposed on U.S. persons.  *See, e.g., Holy Land Found. II*, 333 F.3d at 163-64; *IARA I*, 394 F. Supp. 2d at 41 n.8, 45-46; *Kadi*, 42 F. Supp. 3d at 5, 23-24; *see also Jifry*, 370 F.3d at 1181-82 (upholding use of classified administrative record in FAA proceedings related to national security).

Although Section 311 decisions are unusual in that they are made through rulemaking, as the Court has noted, "consideration of this kind of nonpublic information is not unheard of in the rulemaking process."  PI Mem. Op. at 11 (citing *Pub. Citizen v. Nuclear Reg. Comm'n*, 573 F.3d 916, 928 (9th Cir. 2009)); *see also id.* at 12 ("Congress … clearly contemplated a rulemaking procedure that would involve agency reliance on classified information, despite the fact that the Treasury Department would not be able to disclose that information.").  And as the Court recognized in its preliminary injunction ruling, FinCEN summarized the classified evidence in as much detail as it reasonably could in the Notice of Finding and subsequent Final Rule.  *Id.* at 12 n.2 ("The Court is satisfied that the Notices adequately summarized the conclusions FinCEN drew from the classified evidence and that providing further unclassified summaries would be difficult, if not impossible, without revealing the underlying classified information.").

### 2.    Statutorily protected evidence

In addition to classified information, a portion of the information that formed the basis of FinCEN's finding consisted of Suspicious Activity Reports ("SARs") by banks and financial institutions.  Under the SAR reporting requirement, banks and other financial institutions are required to report transactions that the institution knows, suspects, or has reason to suspect

involve possible illegal activity and which meet other specified threshold requirements.  *See* 31 C.F.R. § 1020.320(a) (SAR reporting requirement for banks).  Communicating information about potential criminal activity is sensitive and carries the potential for significant risk to the institution and to its employees if it is disclosed publicly that the institution or its employees reported such information.  Calvery Decl. ¶ 9.  Disclosure also has the potential to alert illicit actors that their transactions are subject to reporting, and to aid them in evading BSA requirements and other methods to detect their activities.  *Id.*

To protect reporting financial institutions and their employees, and to encourage honest and open reporting of suspicious activity, the BSA and its implementing regulations prohibit financial institutions and their employees from disclosing SARs, or any information that would reveal the existence of a SAR, in response to subpoenas or otherwise.  *See, e.g.*, 31 U.S.C. § 5318(g); 31 C.F.R. § 1020.320(e)(1); Calvery Decl. ¶ 9.  It is especially important that parties to a reported transaction not be notified that a SAR has been filed.  *See Whitney Nat'l Bank v. Karam*, 306 F. Supp. 2d 678, 682-83 (S.D. Tex. 2004); *Cotton v. PrivateBank & Trust Co.*, 235 F. Supp. 2d 809, 814-15 (N.D. Ill. 2002).  Protection of such information is necessary to minimize the risks of, *inter alia*, compromising any investigations being conducted in connection with the SAR; reducing willingness of all financial institutions to file SARs; providing insight into how an institution uncovers potential criminal conduct that could be used by others to circumvent detection; compromising personally identifiable information or commercially sensitive information; damaging the reputational interests of companies that may be named; and/or increasing the risk that an institution's employees or others involved in the preparation

and filing of SARs could become targets for retaliation by persons whose criminal conduct has

been reported.  *Id.*

For these reasons, FinCEN could not (and cannot) divulge to FBME the BSA-protected

information it considered in its findings.[17]  However, as this Court found in its preliminary

injunction ruling,

> FinCEN attempted to summarize that information in its Notice of Finding, see 79 Fed.
> Reg. 42640.  For instance, FinCEN devotes several paragraphs of the Notice to
> summarizing aggregate information derived from SARs and describing the conclusions
> that it drew from that information.  In providing this information, FinCEN details the
> "volume of suspicious wire activity conducted by FBME customers through the U.S.
> financial system."  Id. … This summary information was sufficient to allow FBME to
> respond to FinCEN's accompanying concerns—namely, that FBME's wire transfers
> involved suspicious levels of shell company activity, short-term surge wire activity,
> structuring, and high-risk business customers.

PI Mem. Op. at 12-13.  As the Court also noted, FBME is, after all, a bank and therefore should

have had sufficient notice from this summary that FinCEN was relying on information derived

from SARs.  *Id.* at 13.

3.  <u>Unclassified, non-protected evidence</u>

Finally, to the extent that FBME or the Court found that the Notice of Finding did not

provide adequate notice of the unclassified, non-protected information FinCEN considered, any

such deficiency has been cured on remand.

As an initial matter, the government respectfully submits that in holding that FinCEN's

original failure to make the unclassified materials available for comment "*appears* to constitute a

procedural error under the APA," PI Mem. Op. at 15 (emphasis added), the Court relied on

---

[17] *Cf. In re City of New York*, 607 F.3d 923, 945-46 (2d Cir. 2010) (denying plaintiffs access to
undercover police reports withheld as law enforcement privileged after reviewing reports and finding that
they reinforced rather than undercut city's arguments); *Al-Aqeel v. Paulson*, 568 F. Supp. 2d 64, 72-73
(D.D.C. 2008) (rejecting argument of plaintiff challenging his designation as Specially Designated Global
Terrorist under IEEPA that because IEEPA provides for *ex parte, in camera* review of classified portions
of record, he was entitled to privileged and law enforcement sensitive portions).

inapposite cases that dealt with due process challenges to purely adjudicative, not rulemaking, procedures.  *Id.* at 16-17 (citing *Ralls Corp. v. CFIUS*, 758 F.3d 296, 318 (D.C. 2014), *PMOI*, 613 F.3d at 230, and *NCRI*, 251 F.3d at 209).  As the Court itself acknowledged, the process for designating foreign terrorist organizations ("FTOs") that was at issue in the *PMOI/NCRI* cases affords significantly less notice and opportunity to respond than the rulemaking process required for the fifth special measure of Section 311.  *Id.* at 17.  The D.C. Circuit has never ruled that unclassified evidence should be made available in both types of proceedings, nor has it ever imposed such a requirement upon other, non-FTO types of terrorism-related designations.

Moreover, the Court's preliminary conclusions are inconsistent with how agencies make decisions, particularly in the rulemaking context.  Being required to provide all information to the public in advance of a final decision (rather than simply providing a summary in the proposed rulemaking or providing critical information) could paralyze an agency by leaving it perpetually vulnerable to the charge that a late-received piece of information could and should have been disclosed to the public in advance of a final rule, or, if disclosed, result in yet another round of comments to be considered.  The possibility that the Court's reasoning will subject 311 actions to a never-ending cycle of notice and comment rulemaking is a real one, and such a development could threaten to undermine FinCEN's core mission of protecting the U.S. financial system by hamstringing its ability to exercise its statutory authority.

Nonetheless, in the present instance FinCEN did make the unclassified, non-protected information available to FBME and the public in connection with the reopened rulemaking and invited comment specifically on those materials.  It accepted and considered new comments from FBME and others regarding the unclassified materials, and incorporated its analysis of these

comments into its final decision.  FBME therefore cannot credibly claim that it lacks notice of the unclassified, non-protected evidence on which FinCEN relied.

In short, FBME cannot identify a single legitimate deficiency of notice in FinCEN's rulemaking.  The Notice of Finding provided a clear and cogent description of the basis for FinCEN's findings, including specific examples of money laundering and other illicit financial activity described to the extent possible without compromising classified and BSA-protected information.  FinCEN considered all the information submitted by FBME, including documentation submitted after both comment periods had closed, and engaged directly with FBME multiple times to discuss the proposed rule.  It provided, on remand, all of the unclassified, non-protected information it considered in its decision.  In short, it did far more than what was required by the APA.

## II.    FinCEN Has Not Violated Due Process.

As a foreign financial institution, FBME lacks sufficient presence in the U.S. to claim a constitutional right to due process.  Even assuming *arguendo* that it does have constitutional presence, and could identify a protectable property right, it has failed to show any constitutional deficiency in the process it has received.  To the contrary, FBME has been afforded more process than is typically available to subjects of other types of targeted financial measures that have been upheld as constitutional.

### A.    FBME lacks constitutional presence.

Foreign entities or nationals lacking minimum contacts with the United States cannot claim due process or other constitutional rights.  *People's Mojahedin Org. of Iran v. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999) ("A foreign entity without property or presence in this

country has no constitutional rights, under the due process clause or otherwise."); *32 Cty.*
*Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002); *United States v. All*
*Assets Held In Account No. 80020796*, No. 13-cv-1832, 83 F. Supp. 3d 360, 2015 WL 1285791
at *7 (D.D.C. 2015).  *See also United States v. Verdugo–Urquidez*, 494 U.S. 259, 271 (1990) (in
the context of the Fourth Amendment, "aliens receive constitutional protections when they have
come within the territory of the United States and developed substantial connections with this
country"); *Johnson v. Eisentrager*, 339 U.S. 763, 770–71 (1950) (non-resident aliens who have
insufficient contacts with the United States are not entitled to Fifth Amendment habeas
protections).

FBME is a wholly foreign bank that lacks sufficient contacts with the United States to
claim the protection of the Due Process Clause.  FBME is located in Tanzania and Cyprus,
Compl. ¶ 18, and does not allege any significant interest in property or other interest in the
jurisdiction of the United States.  FBME's vague allegations reflect that it has done business with
U.S. persons, not that FBME is a U.S. entity entitled to the protections of the Constitution.

During the course of moving for a preliminary injunction, FBME made new allegations
regarding its supposed connections with the United States.  The Court did not rule on the issue.
*See* PI Mem. Op. at 9-10 ("The Court does not decide, however, whether FBME is likely to
succeed on the merits of its due process claim, Count III, because the record is currently unclear
as to whether FBME has sufficient presence or property in the United States to establish an
entitlement to due process at all.").  FBME's chairman alleged that 150 of the bank's customers
reside or operate in the United States without any details as to their level of activity involving the
bank.  *See* Decl. of Ayoub-Farid Saab ("Saab Decl.") ¶ 35.  But this does not mean that FBME

46

itself resides or does business in the United States.  Similarly, while Mr. Saab alleged that FBME

"maintains accounts with approximately 30 companies headquartered in the United States," *id.*

¶ 36, it is not clear what these accounts are, whether they are in use, what, if any, property is

involved, or whether they are even located in the United States.  Having done business with a

U.S. company in the past does not transform a wholly foreign bank into a U.S. person entitled to

constitutional rights.  *See 32 Cty. Sovereignty Comm.*, 292 F.3d at 799.

Additionally, FBME claims two kinds of "property interests" in the United States:

unspecified "U.S. based securities" and some type of mortgage interest in a property in North

Carolina, with interest proceeds paid into an escrow account there.[18]  Compl. ¶¶ 23-24.  Such

tenuous assertions are not enough to create any meaningful current contacts with the United

States or property here.  *See Arbelaez v. Newcomb*, Civ. No. 00-5217, 1 Fed. App'x 1, 1 (D.C.

Cir. 2001) (appellants could not assert constitutional claims because they were "foreign nationals

without a substantial connection to the United States" despite holding two U.S. bank accounts);

*Aero Continente, S.A. v. Newcomb, C.A.*, No. 04-1168, ECF No. 8, at 7-8 n.7 (D.D.C. July 16,

2004) (expressing doubt about whether designee under the Foreign Narcotics Kingpin

Designation Act with much greater connections to the United States – including a U.S.

subsidiary, a $1.2 million bank account, and landing rights in the U.S. – was entitled to due

process protections).

Moreover, even if plaintiffs do own property within the United States, it is not at all clear

that such ownership would establish an entitlement to constitutional protections for this lawsuit.

Indeed, it would be odd for a foreign national's ownership of entirely unrelated, personally-

---

[18] Plaintiffs would not, of course, be deprived of these alleged property interests as a result of the imposition of the Section 311 special measure; the Final Rule simply prohibits U.S. financial institutions from opening or maintaining correspondent relationships; it does not take, vest or freeze any property of FBME.

owned property to translate to due process protections related to a special measure proposed by a U.S. agency for a wholly-foreign bank. Even when the minor property interests of an alien are wholly confiscated via civil forfeiture, it is an open question whether the Due Process Clause applies to the civil forfeiture proceedings. *All Assets Held in Account No. 80020796*, 2015 WL 1285791 at \*7. Thus, this case stands in stark contrast to *United States v. Sum of $70,990,605*, 128 F. Supp. 3d 350, 363 (D.D.C. 2015), where the court concluded that a foreign bank was entitled to due process protections because the specific "property at issue . . . was money located in U.S. bank accounts" and then proceeded to evaluate the sufficiency of the process that was used to deprive the foreign bank of those funds present in the United States. Here, plaintiffs aver no such connection to BPA or the bank's activities, even in their conclusory allegations of property ownership. Even assuming that plaintiffs have some property interest in this country, no court has held that a property interest standing alone entitles an alien living abroad to the full range of constitutional protections, including due process protections for government action that is unrelated to the property interest. *Cf. NCRI*, 251 F.3d at 204 (holding, after a review of the entire record including classified information, that an organization with both presence and property in the United States had "come within the territory of the United States and developed substantial connections with this country" sufficient to give rise to due process protections). Plaintiffs' allegations of property ownership fail to satisfy the standards for due process in this context. [19]

---

[19] The cases FBME previously relied upon for the proposition that it has constitutional presence do not support FBME's entitlement to due process. In *32 County Sovereignty Committee*, the Court held that the organizational plaintiff did not have constitutional rights based on the presence of U.S.-based members who rented post office boxes and held accounts for the organization. 292 F.3d at 799. FBME's contacts are even more attenuated because it alleges only that it has some customers present in the United States, and does not even specify whether they have current accounts here. In *NCRI*, the D.C. Circuit emphasized that NCRI had "an overt presence within the National Press Building in Washington, D.C."

**B.      Even if FBME is entitled to due process, FinCEN afforded FBME more than adequate notice and an opportunity to be heard.**

Even if the Court finds that FBME has constitutional presence, FBME simply has not shown a violation of its procedural due process rights.  At the outset, it is not clear that FBME even has a protectable interest that has been deprived by FinCEN's action.  Unlike the designation at issue in *NCRI*, the fifth special measure of Section 311 does not block or freeze any bank accounts belonging to a designated foreign financial institution; it simply prohibits or restricts the opening or maintaining of correspondent accounts that involve the institution.  It is doubtful whether a foreign bank has a protectable property interest in having access to the U.S. financial system, even if, as it claims, it cannot do business without such access.  *Cf. Chrebet v. Cty. of Nassau*, 24 F. Supp. 3d 236, 245 (E.D.N.Y. 2014), *aff'd,* 606 Fed. App'x 15 (2d Cir. 2015) (loss of future business opportunity not a protectable property interest).

But even assuming that FBME does have a protectable interest, the fifth special measure of Section 311 should be viewed in the context of other kinds of targeted measures imposed by the Treasury Department for activities affecting national security.  Any such comparison confirms that FBME has been afforded far more process than was provided in most, if not all, cases challenging Treasury Department designations.  In fact, in cases involving challenges to the Treasury Department's Office of Foreign Assets Control ("OFAC") designations of Specially Designated Global Terrorists ("SDGTs") under IEEPA, there has typically been no pre-deprivation notice at all—a practice that has consistently been found not to violate due process. *See, e.g., IARA I*, 394 F. Supp. 2d at 49-50; *Holy Land Found. I*, 219 F. Supp. 2d at 76-77; *Al-*

---

251 F.3d at 201.  By contrast, FBME has not alleged that it resided or maintained an overt presence in the United States.  On the contrary, it has always been a wholly foreign bank that serves mainly to facilitate international business transactions.  The fact that it happens to have some customers with ties to the U.S. and a single partial interest in a bank account is simply not sufficient to establish a constitutional presence.

*Aqeel*, 568 F. Supp. 2d at 67, 71; *see also Al-Haramain Islamic Found. v. U.S. Dep't of Treasury*, 686 F.3d 965, 985 (9th Cir. 2012) ("[A]s many courts have held, the potential for 'asset flight' almost certainly justifies OFAC's decision not to provide notice before freezing the assets.").  On the other hand, in cases involving challenges to designations by the Department of State of FTOs pursuant to AEDPA, some form of pre-deprivation process is required.  *See NCRI*, 251 F.3d at 205-09; *PMOI*, 613 F.3d at 230-31.  However, no FTO designation is subject to the notice and comment rulemaking procedure, with the extended back-and-forth between target and designating agency, that FBME has enjoyed here.

1.   <u>FBME had more than enough notice of the factual basis for FinCEN's findings.</u>

With respect to whether it received adequate notice for due process purposes, FBME's complaint largely adopts its APA argument that FinCEN did not provide enough of the facts underlying its finding for FBME to have a meaningful opportunity to respond.  *See* Compl. ¶ 85. This argument fails for the same reasons that its APA argument fails: FinCEN provided more than enough information to provide sufficient notice for due process purposes, engaged in a fully interactive process with FBME and answered the bank's questions to the extent it could during the original administrative period, and on remand disclosed all of the unclassified, non-protected information it was considering.  *See supra* at 13.  Certainly the level of factual detail provided in the Notice of Finding alone, as well as the amount of time given to FBME to respond, far surpasses the type of notice found to be appropriate in similar national security contexts for designations under IEEPA.  *See, e.g., Al-Aqeel*, 568 F. Supp. 2d at 71; *Holy Land Found. I*, 219 F. Supp. 2d at 64.  It is also far more robust than the "truncated" administrative process for FTO designations under AEDPA, which, as the D.C. Circuit noted, gives the target "no opportunity to

50

either add to or comment on the contents of [the] administrative record." *NCRI*, 251 F.3d at 197; *see also* PI Mem. Op. at 17 (noting "it is almost certainly true that FBME received substantially more process than any organization that is designated an FTO under AEDPA").  And as with IEEPA and AEDPA designations, the Treasury Department is expressly permitted by statute to rely on classified information; such reliance does not violate due process—particularly where, as here, the agency has provided FBME a detailed unclassified summary in its Notice of Finding. *NCRI*, 251 F.3d at 197; *PMOI*, 613 F.3d at 230-31; *Holy Land Found. II*, 333 F.3d at 164; PI Mem. Op. at 10-13.[20]  Finally, while the government does not concede that it was required to disclose the unclassified, non-protected information it relied upon for notice and comment, it did so during the reopened comment period, thus mooting any possible due process claim on that basis.  In sum, the Section 311 designation of FBME more than meets the due process standard for notice and opportunity to be heard.

2.   FBME is not entitled to a hearing before a "neutral arbiter."

The other chief prong of FBME's due process argument is that it was denied a hearing before a "neutral" decisionmaker.  Compl. ¶ 86; *see also* AR3300-01.  At the outset, this argument fails on its face because it is predicated on the challenged action being an adjudication when in fact it is unmistakably a rulemaking by regulation, as explicitly required by the implementing statute.  *See* 31 U.S.C. § 5318A(a)(2)(C).  Moreover, Congress could have mandated a hearing on the record, as is required for *formal* rulemakings, by saying as much in

---

[20] While FBME has cited the Ninth Circuit's opinion in *Al-Haramain Islamic Foundation*, even that case, in addition to being contrary to binding authority in this Circuit, acknowledged that "disclosure may not always be possible"; as the court noted, even "an unclassified summary may not be possible because, in some cases, the subject matter itself may be classified and cannot be revealed without implicating national security," and the government "might have a legitimate interest in shielding the materials even from someone with the appropriate security clearance."  686 F.3d at 983.

51

the statute, but chose not to do so.  Even if one characterizes the Section 311 procedure as an informal adjudication, the absence of an independent third-party adjudicator does not violate due process.

The Due Process Clause does not require a separation of functions in administrative actions; agencies may combine investigative and adjudicative functions.  *See Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *Chem. Waste Mgmt. v. EPA*, 873 F.2d 1477, 1484 (D.C. Cir. 1989).  To state a Fifth Amendment due process claim based on an inherently biased decisionmaker, plaintiffs must prove that due to some pecuniary or personal interest in the case, "experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable."  *Withrow*, 421 U.S. at 47; *see also Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883–84 (2009).  It is plaintiffs' burden to establish a disqualifying interest, *Schweiker v. McClure*, 456 U.S. 188, 196 (1982), and in attempting to do so they must "overcome a presumption of honesty and integrity in those serving as adjudicators."  *Withrow*, 421 U.S. at 47; *Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995).

FBME does not even come close to meeting this burden.  In its January 2016 comment, it appeared to argue that the *Withrow* principle does not apply where there is no adversarial process, *see* AR3300, but that is not what *Withrow* holds.[21]  The Due Process Clause does not inherently require adversarial proceedings.  *See NCRI*, 251 F.3d at 209 ("We do not suggest 'that

---

[21] In its January 26 comment, FBME reads one sentence of dicta in *Withrow* out of context to bootstrap the conclusion that it was impossible for FinCEN to provide a fair hearing because its decision was based in part on classified and statutorily protected evidence that FBME did not have a chance to contest.  *See Id.* (citing *Withrow*, 421 U.S. at 58 ("Clearly, if the initial view of the facts based on the evidence derived from nonadversary processes as a practical or legal matter foreclosed fair and effective consideration at a subsequent adversary hearing leading to ultimate decision, a substantial due process question would be raised.")).  But *Withrow* had nothing to say about a decisionmaking process that involves classified or protected evidence; the question before the court involved *bias*, which in that case did not rise to the level of foreclosing a fair hearing.  421 U.S. at 57-58.

a hearing closely approximating a judicial trial is necessary'" for an FTO designation) (citing

*Mathews v. Eldridge*, 424 U.S. 319 (1976)); *see also Veterans for Common Sense v. Shinseki*,

678 F.3d 1013, 1036 (9th Cir. 2013) (relying in part on the fact "that Congress purposefully

designed a non-adversarial system of benefits administration" for veterans, and contrasting the

likely reduction in remands and errors with the substantial "fiscal and administrative burdens" of

additional procedures).[22]   Here, FBME had a fair and more than adequate opportunity to contest

the proposed rulemaking and present contrary evidence.  The fact that it was not able to persuade

the agency to its position does not, in itself, cast doubt on the adequacy or integrity of the

process; what matters is that FBME had ample notice and an opportunity to be heard by the

decisionmaker.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should grant summary judgment for defendants.

---

[22] Further, under FBME's interpretation of what due process requires, *all* informal adjudications under the APA that implicate liberty or property rights are presumptively unconstitutional because they do not include formal hearings by administrative judges or some other objective third parties.  This is simply not the case.  *See, e.g., Bean Dredging, LLC v. United States*, 773 F. Supp. 2d 63, 75-77 (D.D.C. 2011) (due process does not "create procedural rights [to more trial-like proceedings] where the APA and the relevant legislation envision none"); *New Life Evangelistic Ctr., Inc. v. Sebelius*, 753 F. Supp. 2d 103, 108, 114, 125 (D.D.C. 2010) (rejecting argument that "the circumstances of HHS' decision making process [in informal adjudication] suggest that the agency was acting not out of a desire to act as a neutral decisionmaker").

Dated: April 29, 2016.                    Respectfully submitted,

                                          BENJAMIN C. MIZER
                                          Principal Deputy Assistant Attorney General

                                          CHANNING D. PHILLIPS
                                          United States Attorney

                                          JOSEPH H. HUNT
                                          Director

                                          DIANE KELLEHER
                                          Assistant Branch Director

                                          */s/ Lynn Y. Lee*
                                          LYNN Y. LEE (CA Bar No. 235531)
                                          AMY E. POWELL
                                          Trial Attorneys
                                          United States Department of Justice
                                          Civil Division, Federal Programs Branch
                                          20 Massachusetts Avenue, N.W.
                                          Washington, D.C. 20530
                                          Telephone: (202) 305-0531
                                          Fax: (202) 616-8470
                                          Email: lynn.lee@usdoj.gov

                                          *Attorneys for Defendants*