# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**FBME BANK LTD.**, *et al.*,

       Plaintiffs,

    v.

**JACOB LEW**, in his official capacity as
Secretary of the Treasury, *et al.*,

       Defendants.

Case No. 15-cv-01270 (CRC)

# MEMORANDUM IN SUPPORT OF
# PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Table of Authorities.................................................................................................v

Glossary ..............................................................................................................xi

Introduction...........................................................................................................1

Background ...........................................................................................................4

    I.      The Statute: § 311 of the USA PATRIOT Act ..........................................4

    II.     The Parties: FinCEN and FBME ............................................................6

          A.     The Financial Crimes Enforcement Network ("FinCEN").......................6

          B.     FBME Bank Ltd. ("FBME")...................................................................6

          C.     FBME's Anti-Money-Laundering Compliance Efforts and Audits ............7

          D.     FBME's Property in the United States .......................................................8

    III.    Procedural History: FinCEN's § 311 Action Against FBME ...................9

          A.     FinCEN's First Rulemaking....................................................................9

          B.     Court Proceedings: Lawsuit, Preliminary Injunction, and Remand ..........10

          C.     FinCEN's Reopened Rulemaking .............................................................11

          D.     FinCEN's Second Final Rule ...................................................................13

Argument .............................................................................................................14

    I.      Standards of Review .............................................................................14

    II.     FinCEN's Second Rulemaking Failed To Abide by Statutory and
          Constitutional Procedural Requirements ................................................16

          A.     FinCEN Has Procedural Obligations to FBME.........................................16

               1.     FBME is entitled to due process ..................................................16

               2.     The adjudicatory nature of FinCEN's rulemaking entitles
                     FBME to more process than the APA requires .............................19

           B.     FinCEN Unlawfully Relied on Secret Evidence.......................................20

                1.     FinCEN is withholding unclassified evidence..............................20

|      |      |      | i.   | FinCEN failed to produce consultation materials | 21 |

| | | | ii. | FinCEN is withholding suspicious activity reports ("SARs") | 22 |

| | | | iii. | FinCEN has not identified other documents it is withholding | 25 |

| | | 2. | FinCEN withheld new accusations and information until after FBME could comment on them............................................26 |

| | | | i. | New accusation: FBME hid information in late 2014 | 27 |

| | | | ii. | New information: FBME misidentified a problematic customer | 27 |

| | | | iii. | New accusation: FBME did not show improvement in Tanzania | 28 |

| | | | iv. | New information: FBME did not supply documentation | 29 |

| | | | v. | New accusation: Hezbollah associate banked at FBME in 2015 | 30 |

| | | | vi. | New accusation: FBME did not review enough high-risk files | 32 |

| | | | vii. | FBME would have rebutted these new accusations and responded to this new information if it had the chance | 32 |

| | | 3. | FinCEN failed to mitigate its use of classified evidence ..............35 |

| | C. | FinCEN Failed To Provide a Neutral Decisionmaker and Oral Hearing........................................................................................36 |

| | D. | FinCEN Failed To Conduct the Required Consultations ..........................39 |

| III. | FinCEN's Second Final Rule Is Arbitrary and Capricious ....................................40 |

| | A. | FinCEN Unreasonably Ignored Contrary Evidence ..................................41 |

| | | 1. | FinCEN failed to consider critical flaws in the use of SARs.........41 |

| | | 2. | FinCEN relied on information sourced from CBC, despite its awareness of CBC's unreliability..............................................43 |

| | | 3. | FinCEN continues to rely on discredited allegations....................47 |

| | B. | FinCEN Failed To Apply § 311's Statutory Factors Appropriately ..........50 |

C.     FinCEN Imposed an Excessive Penalty Without Adequately Considering Alternatives ........................................................................51

D.     FinCEN's Review of Privileged Materials Tainted the Rulemaking ........54

Conclusion ...............................................................................................................................55

# TABLE OF AUTHORITIES

## Cases

*Abourezk v. Reagan,*
    785 F.2d 1043 (D.C. Cir. 1986),
    *affirmed by an equally divided Court*, 484 U.S. 1 (1987)...................................................... 23

*Al Haramain Islamic Foundation, Inc. v. U.S. Department of Treasury,*
    686 F.3d 965 (9th Cir. 2012) .................................................................................................. 35

*Alaska Airlines, Inc. v. Civil Aeronautics Board,*
    545 F.2d 194 (D.C. Cir. 1976)........................................................................................ 19, 20

*Allina Health Services v. Sebelius,*
    746 F.3d 1102 (D.C. Cir. 2012)............................................................................................. 29

*American Medical Ass'n v. Reno,*
    57 F.3d 1129 (D.C. Cir. 1995)................................................................................................ 20

*American Radio Relay League, Inc. v. FCC,*
    524 F.3d 227 (D.C. Cir. 2008)................................................................................... 20, 24, 25

*Bismullah v. Gates,*
    501 F.3d 178 (D.C. Cir. 2007)................................................................................................ 35

*Bruce Packing Co. v. NLRB,*
    795 F.3d 18 (D.C. Cir. 2015).................................................................................................. 14

*Califano v. Yamasaki,*
    442 U.S. 682 (1979)................................................................................................................ 38

*California Wilderness Coalition v. U.S. Department of Energy,*
    631 F.3d 1072 (9th Cir. 2012)................................................................................................ 40

*Campanale & Sons, Inc. v. Evans,*
    311 F.3d 109 (1st Cir. 2002)............................................................................................ 22, 39

*Caperton v. A.T. Massey Coal Co.,*
    556 U.S. 868 (2009)................................................................................................................ 39

*Chamber of Commerce of the United States v. SEC,*
    443 F.3d 890 (D.C. Cir. 2006)................................................................................................ 21

*Concrete Pipe & Productions of California, Inc. v. Construction Laborers Pension Trust,*
    508 U.S. 602 (1993)......................................................................................................... 36, 37

*Connecticut Light & Power Co v. NRC*,
  673 F.2d 525 (D.C. Cir. 1982)........................................................................ 26

*Daimler AG v. Bauman*,
  134 S. Ct. 746 (2014)................................................................................... 18

*District Hospital Partners, L.P. v. Burwell*,
  786 F.3d 46 (D.C. Cir. 2015)................................................................... 34, 41

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*,
  485 U.S. 568 (1988).................................................................................... 17

*FBME Bank Ltd. v. Lew*,
  125 F. Supp. 3d 109 (D.D.C. 2015) ....................................................... passim

*FEC v. Rose*,
  806 F.2d 1081 (D.C. Cir. 1986)..................................................................... 50

*Food Marketing Institute v. ICC*,
  587 F.2d 1285 (D.C. Cir. 1979)..................................................................... 15

*Forcade v. Knight*,
  416 F. Supp. 1025 (D.D.C. 1976) .................................................................. 24

*Friedman v. Sebelius*,
  686 F.3d 813 (D.C. Cir. 2012)....................................................................... 53

*Getty v. Federal Savings & Loan Insurance Corp.*,
  805 F.2d 1050 (D.C. Cir. 1986)..................................................................... 39

*Goldberg v. Kelly*,
  397 U.S. 254 (1970)..................................................................................... 37

*Gomez v. Vernon*,
  255 F.3d 1118 (9th Cir. 2001) ...................................................................... 55

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011) .................................................................................... 18

*Gray Panthers v. Schweiker*,
  652 F.2d 146 (D.C. Cir. 1980)............................................................. 37, 38, 39

*Greene v. McElroy*,
  360 U.S. 474 (1959)................................................................................ 17, 21

*Greyhound Corp. v. ICC*,
  668 F.2d 1354 (D.C. Cir. 1981)..................................................................... 15

*GSS Group Ltd. v. National Port Authority*,
    680 F.3d 805 (D.C. Cir. 2012) ........................................................................ 18

*Home Box Office, Inc. v. FCC*,
    567 F.2d 9 (D.C. Cir. 1977) ........................................................................... 55

*Islamic American Relief Agency v. Gonzales*,
    477 F.3d 728 (D.C. Cir. 2007) ....................................................................... 15

*Judulang v. Holder*,
    132 S. Ct. 476 (2011) ................................................................................... 15

*Karuk Tribe of California v. U.S. Forest Service*,
    681 F.3d 1006 (9th Cir. 2012) (en banc) ........................................................ 40

*Kiareldeen v. Ashcroft*,
    273 F.3d 542 (3d Cir. 2001) .......................................................................... 35

*KindHearts for Charitable Humanitarian Development, Inc. v. Geithner*,
    710 F. Supp. 2d 637 (N.D. Ohio 2010) .......................................................... 35

*Latif v. Lynch*,
    2016 WL 1239925 (D. Or. Mar. 28, 2016) ..................................................... 35

*Lorillard, Inc. v. U.S. FDA*,
    56 F. Supp. 3d 37, 51 (D.D.C. 2014),
    *vacated on other grounds*, 810 F.3d 827 (D.C. Cir. 2016) ............................. 55

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ............................................................................... 20, 38

*MetLife, Inc. v. Financial Stability Oversight Council*,
    --- F. Supp. 3d ----, 2016 WL 1391569 (D.D.C. Mar. 30, 2016) ..................... 51

*Michigan v. EPA*,
    135 S. Ct. 2699 (2015) ........................................................................... 16, 51

*National Council of Resistance of Iran v. U.S. Department of State*,
    251 F.3d 192 (D.C. Cir. 2001) .................................................................. 19, 21

*National Parks Conservation Ass'n v. Jewell*,
    62 F. Supp. 3d 7 (D.D.C. 2014) .................................................................... 40

*Ohio Bell Telephone Co. v. Public Utilities Commission*,
    301 U.S. 292 (1937) ..................................................................................... 21

*Owner-Operator Independent Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Administration*,
  494 F.3d 188 (D.C. Cir. 2007)..................................................................... 26, 29, 32

*People's Mojahedin Organization of Iran v. U.S. Department of State*,
  182 F.3d 17 (D.C. Cir. 1997) ("*People's Mojahedin I*") ............................................. 17, 18

*People's Mojahedin Organization of Iran v. U.S. Department of State*,
  613 F.3d 220 (D.C. Cir. 2010) ("*People's Mojahedin II*") ............................. 21, 26, 29, 32

*Professional Air Traffic Controllers Organization v. FLRA*,
  672 F.2d 109 (D.C. Cir. 1982)............................................................................ 55

*Propert v. District of Columbia*,
  948 F.2d 1327 (D.C. Cir. 1991)......................................................................... 37

*Public Citizen v. Federal Motor Carrier Safety Administration*,
  374 F.3d 1209 (D.C. Cir. 2004)......................................................................... 50

*Ralls Corp. v. Committee on Foreign Investment in the United States*,
  2014 U.S. Dist. Lexis 177868 (D.D.C. Nov. 6, 2014) ....................................... 26

*Ralls Corp. v. Committee on Foreign Investment in the United States*,
  758 F.3d 296 (D.C. Cir. 2014) ................................................................. 1, 21, 25

*Ralpho v. Bell*,
  569 F.2d 607 (D.C. Cir. 1977)........................................................................... 21

*Sangamon Valley Television Corp. v. United States*,
  269 F.2d 221 (D.C. Cir. 1959)........................................................................... 55

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943)......................................................................................... 16

*States Marine Lines, Inc. v. Federal Maritime Commission*,
  376 F.2d 230 (D.C. Cir. 1967)...................................................................... 1, 24

*United States v. Bagcho*,
  --- F. Supp. 3d ----, 2015 WL 9216604 (D.D.C. Dec. 17, 2015) ...................... 35

*United States v. Brewer*,
  766 F.3d 884 (8th Cir. 2014) ............................................................................ 14

*United States v. Reynolds*,
  710 F.3d 498 (3d Cir. 2013) ............................................................................. 14

*United States v. Sum of $70,990,605*,
  128 F. Supp. 3d 350 (D.D.C. 2015) .................................................................. 19

*Van Bourg v. Nitze*,
    388 F.2d 557 (D.C. Cir. 1967).........................................................................35

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*,
    435 U.S. 519 (1978)........................................................................................20

*Westar Energy, Inc. v. FERC*,
    473 F.3d 1239 (D.C. Cir. 2007)....................................................................53

*Wint v. Yeutter*,
    902 F.2d 76 (D.C. Cir. 1990).........................................................................15

*Wirtz v. Baldor Electric Co.*,
    337 F.2d 518 (D.C. Cir. 1963)......................................................................23

*Withrow v. Larkin*,
    421 U.S. 35 (1975)..................................................................................36, 37

*Zweibon v. Mitchell*,
    516 F.2d 594 (D.C. Cir. 1975) (en banc).....................................................15

**Statutes**

31 U.S.C. § 310...................................................................................................6

31 U.S.C. § 5311.................................................................................................6

31 U.S.C. § 5318...............................................................................................23

31 U.S.C. § 5318A ("§ 311 of the USA PATRIOT Act") ..................................passim

5 U.S.C § 553..............................................................................................19, 20

5 U.S.C. § 706..............................................................................................14, 15

8 U.S.C. § 1534................................................................................................35

**Other Authorities**

31 C.F.R. § 1020.320 .......................................................................................23

71 Fed. Reg. 39606 (July 13, 2006)................................................................52

79 Fed. Reg. 42486 (July 22, 2014) ("Notice of Proposed Rulemaking") ...................................9

79 Fed. Reg. 42639 (July 22, 2014) ("Notice of Finding") .........................9, 28, 31, 50

80 Fed. Reg. 45057 (July 29, 2015) ("First Final Rule") .........................10, 31

80 Fed. Reg. 74064 (Nov. 27, 2015) ("2015 Notice") ..............................................................11, 29

81 Fed. Reg. 18480 (Mar. 31, 2016) ("Second Final Rule") .................................................. passim

*A Fearful Number*, THE ECONOMIST (June 6, 2015), https://goo.gl/kZXz6a........................... 5, 40

Brett Wolf, *U.S. Treasury anti-laundering head to join HSBC: sources*, REUTERS (Apr. 26, 2016),
http://goo.gl/dghI20 ......................................................................................................... 54

D.C. Bar Ethics Opinion 318: Disclosure of Privileged Material by Third Party (Dec. 2002),
https://goo.gl/l7k9lT......................................................................................................... 55

D.C. Rule of Professional Conduct 1.15........................................................................................ 55

D.C. Rule of Professional Conduct 8.4........................................................................................ 55

H.R. Conf. Rep. 108-381 (2003)............................................................................................ 17, 35

MONEYVAL, *Report of the Fourth Assessment Visit—Anti-Money Laundering and the
Combating of the Financing of Terrorism: CYPRUS* (Sept. 27, 2011),
https://goo.gl/UHO9U6 ................................................................................................... 46

Stephanie Brooker, Assistant Director for Enforcement, FinCEN, Remarks at 2015 Bank Secrecy
Act Conference 4 (June 18, 2015), https://goo.gl/gLbTtG ............................................... 27

Treasury Order 180-01 (July 1, 2014), https://goo.gl/xQARSA...................................................... 6

# GLOSSARY

The following abbreviations and defined terms appear in this brief:

2015 Notice:   80 Fed. Reg. 74064 (Nov. 27, 2015)

AML:   anti–money laundering

APA:   Administrative Procedure Act

AR:   Administrative Record

CBC:   Central Bank of Cyprus

CFT:   counter-terrorist financing

EY:   Ernst & Young

FBME:   FBME Bank Ltd.

FinCEN:   Financial Crimes Enforcement Network

First Final Rule:   80 Fed. Reg. 45057 (July 29, 2015)

MONEYVAL:   Committee of Experts on the Evaluation of Anti-Money Laundering and the Financing of Terrorism

NOF:   Notice of Finding

Notice of Finding:   79 Fed. Reg. 42639 (July 22, 2014), AR0075–77

Notice of Proposed Rulemaking:   79 Fed. Reg. 42486 (July 22, 2014), AR0079–84

NPRM:   Notice of Proposed Rulemaking

Privileged Materials:   ECF 52-5 & 52-6

PWC:   PriceWaterhouseCoopers

SARs:   suspicious activity reports

Second Final Rule:   81 Fed. Reg. 18480 (Mar. 31, 2016)

SSRC:   Scientific Studies and Research Center

USD:   United States dollar

## INTRODUCTION

Fundamental to our law is the principle that government cannot sanction a party without first providing fair notice of the case against it along with a meaningful opportunity to respond. The proceedings below have continued to flout that precept—along with several others.

Following this Court's remand, the Financial Crimes Enforcement Network ("FinCEN") has issued a new rule that repeats the old one while compounding its defects.  81 Fed. Reg. 18480 (Mar. 31, 2016) ("Second Final Rule" or "Rule").   Once again, FinCEN seeks to impose on FBME Bank Ltd. ("FBME") the fifth special measure under § 311 of the USA PATRIOT Act, a sanction that would imperil FBME's existence by permanently cutting it off from the United States financial system.   Once again, FinCEN has withheld unclassified information until after the fact.   The Second Final Rule is replete with new accusations and information never before disclosed, such as that FBME employees sought to hide information; that FBME misidentified the customer connected to a sanctioned Syrian entity; and that FBME's operations in Tanzania are problematic.   Other unclassified information still has yet to be revealed, including any substance of FinCEN's requisite consultations with various federal officials, as well as the suspicious activity reports ("SARs") that FinCEN relies upon at FBME's expense.

The D.C. Circuit has repeatedly held that any agency sanctioning a party based on classified information must release *all* unclassified evidence in time for comment.   *E.g.*, *Ralls Corp. v. Committee on Foreign Investment in the United States*, 758 F.3d 296, 317–21 (D.C. Cir. 2014).   Moreover, the D.C. Circuit has explicitly held that secret third-party complaints (such as SARs) cannot, consistent with due process, be used as basis for sanction.   *States Marine Lines, Inc. v. Federal Maritime Commission*, 376 F.2d 230, 238–40 (D.C. Cir. 1967).   Equally problematic, FinCEN has relied on undisclosed classified information without granting FBME or its counsel the limited access to such information that Congress and the Courts require to ensure

1

due process.   Simply put, FinCEN's liberal use of secret evidence is unfair and unconstitutional—better suited to a Kafka novel than to a United States legal proceeding.

The list of defects that render FinCEN's process unfair, unconstitutional, and illegal runs still longer.   FinCEN's central justification for reinstating the fifth special measure is that it now deems FBME and its management untrustworthy and incorrigible in ways and degrees that are anything but apparent from FinCEN's notices and seemingly insusceptible to comment.   If due process requires nothing else, it at least requires that such adverse, outcome-determinative credibility determinations be made only after a live hearing at which a neutral factfinder might observe the demeanor and tone of witnesses as they respond to pointed questioning.   Yet FinCEN refused FBME's request for such a hearing before such a fact-finder.   Instead, FinCEN allowed the government investigators who went after FBME to have final say.   The end result— re-imposition of the fifth special measure—is the natural upshot of letting the same FinCEN personnel serve as prosecutors, judges, and executioners.   The denial of any opportunity for FBME to rebut FinCEN's accusations at an adversarial hearing before a neutral arbiter falls far short of the process that is "due" before the U.S. government can destroy an international bank.

The procedures FinCEN used also violated statutory requirements.   In particular, § 311 requires FinCEN to undertake three levels of consultation with specified federal officials when deciding to impose the fifth special measure.   The administrative record does not reflect, however, that FinCEN ever consulted the correct officials or, for that matter, consulted anyone whatsoever externally in connection with the remand, when it was supposedly starting afresh.

The substance of the Second Final Rule is every bit as suspect as the procedures FinCEN employed to reach it.   The agency repeatedly failed to consider critical issues and on-point evidence submitted by FBME, including an extensive, unanswered critique of the SARs on

which FinCEN relies, and evidence that FinCEN's principal source—the Central Bank of Cyprus ("CBC")—is unreliable because it is corrupt, has a vested pecuniary interest, and is biased against FBME.   FinCEN also failed to consider statutory factors, such as the extent of FBME's legitimate business.   Finally, FinCEN again did not properly consider alternatives to the fifth special measure, beyond resorting to characterizations of FBME as incorrigible—based on charges that are at once new, cryptic, unsubstantiated, and at best untested.

Compounding these violations is FinCEN's astonishing receipt and review of attorney-client privileged information.   CBC, after collaborating hand-in-glove with FinCEN, effectively commissioned disgruntled private investigators who had worked with FBME's counsel to misappropriate privileged information and route it to FinCEN, which then proceeded to keep that information secret for six months and apparently use it before later disclaiming reliance upon it. Inserting privileged material into the rulemaking profoundly compromised the proceeding, only then to be swept under the rug by FinCEN.   According to the D.C. Circuit, the very least the agency is obliged to do in this worrisome circumstance is develop a record regarding the extent of the taint and whether it necessitates a new rulemaking.   But FinCEN blew past that too.

At stake here are the credibility and integrity of an administrative process authorizing FinCEN to wipe out any international bank, anywhere in the world, simply by designating it as being of "primary money laundering concern."   We do not expect this Court to take lightly the deference it owes FinCEN when confronting such designations.   But neither should it take lightly its review of the process and justification underlying this most extreme sanction. FinCEN's case depends on the premise that it can impose the harshest of sanctions following the shoddiest of processes, spelling out its substantive bases only after-the-fact while ignoring on-point refutation of the few specifics it actually exposed to comment.   That premise is as

repugnant to U.S. law as it is to the sensibilities of onlookers around the world—including foreign banks, regulators, and advisers—whose buy-in is essential to effective regulation over the long term.   From FinCEN's premise flows one of two worrisome corollaries:   Either a foreign bank can be squashed by U.S. regulators, just because it is foreign, without being afforded process, protection, and justification remotely approaching those due to an American bank, or else any given U.S. financial institution is vulnerable to such treatment absent the U.S. government's grace.   For the reasons that follow, FinCEN's aberrant premise should be rejected and its instant rule vacated on both procedural and substantive grounds.

## BACKGROUND

### I.    THE STATUTE: § 311 OF THE USA PATRIOT ACT

Section 311 of the USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001), which is codified at 31 U.S.C. § 5318A, empowers the Secretary of the Treasury to impose "special measures" against a foreign financial institution upon "find[ing] . . . reasonable grounds . . . for concluding" that the institution is "of primary money laundering concern."    § 5318A(a)(1).

Although § 311 does not define "primary money laundering concern," it specifies certain steps—consultation and consideration—that the Secretary must take before so designating an entity.   The Secretary must (1) "consult with the Secretary of State and the Attorney General," § 5318A(c)(1), and (2) "consider in addition such information as the Secretary determines to be relevant," § 5318A(c)(2), including the following three factors (§ 5318A(c)(2)(B)):

> (i) the extent to which such financial institutions . . . are used to facilitate or promote money laundering in or through [a particular] jurisdiction, including any money laundering activity by organized criminal groups, international terrorists, or entities involved in the proliferation of weapons of mass destruction or missiles;

> (ii) the extent to which such institutions . . . are used for legitimate business purposes in the jurisdiction; and

4

> (iii) the extent to which such action is sufficient to ensure, with respect to . . . institutions operating in the jurisdiction, that the purposes of this subchapter continue to be fulfilled, and to guard against international money laundering and other financial crimes.

After identifying an institution of primary money laundering concern, the Secretary chooses among five "special measures." The first four require U.S. agencies and financial institutions to report on the designated foreign financial entity. *See* § 5318A(b)(1)–(4). The fifth special measure is the most severe. Under it, the Secretary "may prohibit, or impose conditions upon, the opening or maintaining in the United States of a correspondent account . . . by any domestic financial institution or domestic financial agency for or on behalf of a foreign banking institution." § 5318A(b)(5). As this Court has explained, prohibiting a foreign bank from utilizing U.S. correspondent accounts "has the effect of eliminating or curtailing a foreign banking institution's access to the U.S. financial system and to transactions involving the U.S. dollar." *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 115 (D.D.C. 2015) (citing *A Fearful Number*, THE ECONOMIST (June 6, 2015), https://goo.gl/kZXz6a[1]). For a foreign bank, this penalty is "more often than not a death sentence." *A Fearful Number*, THE ECONOMIST.

Section 311 mandates further consultation and consideration when choosing a special measure. "In selecting which special measure or measures to take," the Secretary "shall consult with the Chairman of the Board of Governors of the Federal Reserve System, any other appropriate Federal banking agency . . . [,] the Secretary of State, the Securities and Exchange Commission, the Commodity Futures Trading Commission, the Nation Credit Union Administration Board, and . . . such other agencies and interested parties as the Secretary may find to be appropriate." § 5318A(a)(4)(A). The fifth special measure requires still more consultation: "with the Secretary of State, the Attorney General, and the Chairman of the Board

---

[1]     We have shrunk website links with Google's URL shortener, https://goo.gl.

of Governors of the Federal Reserve System." § 5318A(b)(5). As for consideration, the

Secretary "shall consider" four factors when selecting a special measure (§ 5318A(a)(4)(B)):

> (i) whether similar action has been or is being taken by other nations or multilateral groups;
>
> (ii) whether the imposition of any particular special measure would create a significant competitive disadvantage, including any undue cost or burden associated with compliance, for financial institutions organized or licensed in the United States;
>
> (iii) the extent to which the action or the timing of the action would have a significant adverse systemic impact on the international payment, clearance, and settlement system, or on legitimate business activities involving the particular . . . institution . . . ; and
>
> (iv) the effect of the action on United States national security and foreign policy.

Besides consultation and consideration, § 311 prescribes that the Secretary may impose

the fifth special measure "only by regulation." § 5318A(a)(2)(c). Accordingly, the

"safeguards provided by the Administrative Procedure Act" apply, and the Secretary must grant

"appropriate opportunity for comment by affected financial institutions." 115 Stat. at 297

(§ 302(b)(5) & (b)(6) of the USA PATRIOT Act, codified at note following 31 U.S.C. § 5311).

## II.   THE PARTIES: FINCEN AND FBME

### A.   The Financial Crimes Enforcement Network ("FinCEN")

FinCEN is a bureau in the U.S. Department of the Treasury charged with combatting

financial crimes. 31 U.S.C. § 310. The Secretary of the Treasury has delegated to FinCEN the

responsibility for administering § 311. Treasury Order 180-01 § 3(a) (July 1, 2014),

https://goo.gl/xQARSA. FinCEN issued the Second Final Rule pursuant to this delegation.

### B.   FBME Bank Ltd. ("FBME")

FBME is an international commercial bank that, as of mid-2014, had some $2 billion in

assets. Administrative Record ("AR") at 3302. Currently, the bank operates primarily in

Cyprus, with its headquarters in Tanzania.   But the bank's roots trace back to Lebanon, from whence the bank's founders (the Saab family, who are members of the Lebanese-Christian minority) relocated to Cyprus during the Lebanese civil war and the prevailing insecurity. AR3302–06, 3591–620, 4316–394.

### C.        FBME's Anti-Money-Laundering Compliance Efforts and Audits

FBME has a robust, bank-wide, anti-money-laundering ("AML") compliance program covering both its Cyprus and Tanzania branches.   FBME's compliance program has consistently evolved and improved to reflect ever-changing legal requirements in Europe and Africa. Specifically, FBME has (1) adopted a manual of policies and procedures compliant with local and international laws; (2) appointed a qualified money-laundering compliance officer who ensures that FBME effectively implements all AML and compliance-related policies and procedures; (3) developed a well-structured, multi-tiered compliance department with appropriate staffing and resources; (4) adopted detailed policies governing account-opening and know-your-customer procedures; and (5) implemented ongoing, rigorous customer due diligence procedures.   AR3324.   FBME has carried out these improvements in both its Cyprus *and* its Tanzania branches.   AR0107, 0113, 0135–736, 0817, 0916, 3326, 3328, 3338; Saab Decl. ¶ 14.

FBME regularly retains experts at the Big Four accounting firms to audit its compliance practices.   In recent years, FBME undisputedly commissioned the following compliance audits:

- **2011 Ernst & Young ("EY") Audit**:  Ernst & Young determined that FBME's compliance procedures satisfied the regulatory requirements applicable to FBME, and in areas in which Ernst & Young suggested further improvements, Ernst & Young noted that FBME already had improvement plans in place.   AR3330–31.

- **2013 KPMG Audit**:   KPMG found that "FBME basically fulfill[ed] the requirements as set out by the Cyprus regulator and [was] in principle in compliance with E.U. standards."   AR3621–718.

- **2014 EY Audit**:  Ernst & Young found that "FBME has developed, administered, and maintained an AML/sanctions compliance program [that] incorporates the

> requirements of both the [Central Bank of Cyprus] and the [European Union] and there are protocols in place that allow the Bank to continuously keep the program aligned with these legal requirements."   AR3786.

FBME took to heart these audit findings as well as additional recommendations and requests by CBC, internal auditors, and Compliance Department leadership, making marked strides to bolster its bank-wide compliance policies, practices, and procedures.   AR3330–35. For example, based on recommendations in the 2013 KPMG Audit, FBME changed its risk assessment procedures, appointed an alternate money laundering compliance officer, amended its manual of policies and procedures, upgraded its core banking software, and implemented additional procedures to enhance its know-your-customer process.   Based on recommendations in the 2014 EY Audit, FBME enhanced its AML/sanctions employee training program (including by providing AML and counter-terrorist-financing training to members of FBME's board of directors, thereby exceeding regulatory requirements), and adopted a new software platform to centralize maintenance of ultimate beneficial ownership data at the customer identification and due-diligence stage.   AR3719–36, 3766–80; Saab Decl. ¶¶ 16–17 & Apps. E & F.

### D.      FBME's Property in the United States

Although most of FBME's assets are overseas, FBME has property in North Carolina. On June 25, 2010, FBME lent $5.5 million to Johns Gamewell, LLC, a property management firm in North Carolina.   Johns Gamewell secured the loan by granting liens to FBME on roughly 600 acres of land in a 3,000-acre residential community under development in North Carolina, known as the "Coves at Round Mountain."   Per the loan terms, whenever one of the encumbered lots at the Coves is sold, FBME is entitled to a percentage of the sale in partial satisfaction of the loan.   Simultaneously, FBME is to execute a deed releasing its lien on the lot being sold.   AR3998 ¶ 37; Peters Decl. ¶¶ 24–33 & Apps. A–I.

For years, Johns Gamewell transferred to FBME proceeds owed from sales of the Coves lots.   After FinCEN published its July 2014 notice, however, Johns Gamewell was blocked from transferring U.S. dollars to FBME's account in Cyprus.   Johns Gamewell and FBME worked with local counsel to set up a trust account at CommunityOne Bank in North Carolina to hold the U.S. dollars in escrow for FBME until a workaround can be found.   At present, FBME retains liens on roughly 50 lots at the Coves, and in the North Carolina escrow account there is $291,435.97 that belongs to FBME.   AR3998 ¶ 38; Peters Decl. ¶¶ 34–37 & Apps. A, J–K.

## III.     PROCEDURAL HISTORY: FINCEN'S § 311 ACTION AGAINST FBME

### A.      FinCEN's First Rulemaking

In July 2014, FinCEN first published a notice asserting grounds for finding that FBME is an institution of primary money laundering concern.   79 Fed. Reg. 42639 (July 22, 2014), AR0075–77 ("Notice of Finding" or "NOF").   In this Notice, FinCEN accused FBME of having "facilitated a substantial volume of money laundering through the Bank for many years" and of having weak AML controls.   AR0075–76.   Simultaneously, FinCEN also published a notice proposing to adopt a rule imposing the fifth special measure against FBME.   79 Fed. Reg. 42486 (July 22, 2014), AR0079–84 ("Notice of Proposed Rulemaking" or "NPRM").

Throughout the following year, FBME submitted seven different comments to FinCEN that charted numerous steps FBME had taken to shore up its AML programs, demonstrated the inaccuracy of statements in the Notice of Finding, and noted the impropriety of imposing the fifth special measure on FBME.   AR0104–741, 0825–93, 0943–2653, 2948–52.   These comments showed that the specific examples in the Notice of Finding of alleged misconduct by FBME were outdated, inaccurate, and/or incomplete—at least to the extent that they were comprehensible.   AR0126–33.   Many allegations in the Notice were written in such vague terms that FBME did not know what it was being accused of.   Accordingly, FBME repeatedly

asked FinCEN to supply more details so that FBME could properly investigate—yet FinCEN repeatedly refused to say more.   AR0738–39.   For example, on January 26, 2015, FBME requested more information about seven allegations, including whether FBME had "accurately identif[ied] the customer" who FinCEN claimed was connected to the Scientific Studies and Research Center ("SSRC"), a U.S.-sanctioned Syrian entity; to the extent FBME had not identified the correct accountholder, FBME asked that "FinCEN provide additional information that could assist FBME in further efforts to identify this accountholder."   AR4367–69.   For six of the seven allegations—including the question about the Syrian entity—FinCEN stonewalled, claiming that "FinCEN is *unable* to release additional information in response to this question beyond the statements within the Notice of Finding."   AR2655–57 (emphasis added).

On July 29, 2015, FinCEN published the final rule imposing the fifth special measure against FBME.   80 Fed. Reg. 45057 (July 29, 2015) ("First Final Rule").   Notwithstanding FBME's detailed, substantiated refutations, FinCEN concluded that, aside from two minor corrections, "the statements made in the NOF remain true and accurate, and that FBME is of 'primary money laundering concern.'"   *Id.* at 45060.   FinCEN went on to impose the fifth special measure without considering intermediate alternatives.   *Id.* at 45061.

**B.     Court Proceedings: Lawsuit, Preliminary Injunction, and Remand**

On August 7, 2015, FBME filed this lawsuit (ECF 1) and simultaneously moved for a preliminary injunction (ECF 3), which this Court granted (ECF 32 & 33).   The Court reasoned that, although "FBME has not established a likelihood of success on the merits of its claim that FinCEN's ultimate finding is arbitrary and capricious under the APA," that "does not relieve the agency of its obligation to adhere to the APA's procedural requirements"; to the contrary, "FinCEN's reliance on nonpublic and classified evidence to impose a serious sanction against a

single institution required it to hew *even more closely* to the APA's demands than it might have in a garden-variety rulemaking." *FBME*, 125 F. Supp. 3d at 114 (emphasis added).

The Court went on to conclude that FinCEN had "provided insufficient notice of non-classified, non-protected information during the rulemaking proceeding, in violation of the APA's notice-and-comment requirement," and also that "FBME is likely to prevail . . . insofar as the Final Rule reflects FinCEN's failure to adequately consider at least one potentially significant, viable, and obvious alternative to the sanction it imposed." *Id.* at 118.   The Court did "not decide, however, whether FBME is likely to succeed on the merits of its due process claim . . . , because the record is currently unclear as to whether FBME has sufficient presence or property in the United States to establish an entitlement to due process at all." *Id.*

FinCEN then sought (ECF 38) and obtained (ECF 49) a voluntary remand so that it could reopen the rulemaking to fix errors identified by this Court.   In granting the remand, the Court assumed that FinCEN would conduct an entirely "'new evaluation of the totality of the evidence before it'" and that FinCEN, having learned its lesson, "now recognizes the need to provide 'plaintiffs notice and opportunity to comment on the unclassified, non-privileged evidence that was not available to them prior to the issuance of the rule' and to 'more explicit[ly] consider[] . . . alternative measures if it finds FBME to be of primary money laundering concern.'"   ECF 49 at 4–5 (quoting ECF 38 at 4–5; alterations in ECF 49).

## C.    FinCEN's Reopened Rulemaking

On November 27, 2015, FinCEN issued a notice stating that it sought "additional comment regarding the Section 311 rulemaking related to FBME."   80 Fed. Reg. 74064, 74065 (Nov. 27, 2015) ("2015 Notice").   This three-page notice neither asserted any new allegation against FBME nor identified any particular intervening development as being material to the rulemaking.   Instead, FinCEN generally inquired of commenters about "all aspects of this

11

rulemaking," including whether "[a]ny materials developments . . . have occurred with respect to FBME since the issuance of the NOF and NPRM on July 22, 2014."   *Id.* at 74066.

During this renewed comment period, FinCEN received twelve public comments.   81 Fed. Reg. at 18487.   FBME submitted an extensive comment, with exhibits, which is reproduced at AR3281–4398.   FBME raised six general points in its comment:   (1) FinCEN had ignored the procedural requirements of the APA and the Due Process Clause; (2) FinCEN had arbitrarily and capriciously relied on information from CBC; (3) FBME had rebutted the discernible allegations in the Notice of Finding; (4) FBME could, if given the opportunity, refute the secret allegations FinCEN unlawfully refused to disclose; (5) FinCEN had failed to explain why FBME is of "primary money laundering concern"; and (6) FinCEN had failed to explain why the fifth special measure is necessary and appropriate in light of the availability of effective yet less severe alternative measures.   AR3291–96.

As for the eleven other public comments (which are reproduced at AR3173–280), all but one support FBME and oppose the fifth special measure.[2]   These comments "generally raise the following issues: (1) FinCEN's purported use of unreliable, misleading, or inaccurate information to support its NOF and NPRM, (2) APA or Constitutional due process requirements, (3) concerns about CBC's impartiality with respect to FBME, and (4) concerns that FinCEN is unfairly focusing on FBME as opposed to U.S. persons or other financial institutions."   81 Fed. Reg. at 18487.   None of these comments identified any adverse "material development" that could be held against FBME and taken as a basis for the Second Final Rule.

---

[2]   The one adverse comment is short and insubstantial, asserting that "this 'bank' appears to be nothing but a front for evil.   In the wake of the terrorist attacks in France, please keep FBME out of the industry not only for now, but forever."   AR3175.

FinCEN also received one unpublished comment.   On February 1, 2016, after the reopened comment period had closed, FinCEN informed FBME that months earlier, during the preliminary-injunction proceedings in August 2015, it had obtained unsolicited affidavits (the "Affidavits") from certain investigators whom FBME and its counsel had previously retained to assist in responding to FinCEN's accusations.   ECF 52-1.   FinCEN made this disclosure only because it had received a comment (together with the Affidavits, the "Privileged Materials") from the investigators on January 18, 2016, during the reopened comment period.   ECF 51 at 9; ECF 52-1.   Even a cursory review of the Privileged Materials reveals that they contain core attorney-client communications and work product.   ECF 52-5 & 52-6.   They say as much on their face, purporting to recount conversations in which FBME's counsel conveyed legal advice to FBME's shareholders and senior personnel.   ECF 52-5 at 14–15; ECF 52-6.   What is more, the Privileged Materials state that the investigators wrote to FinCEN only after taking direction from Cypriot officials who appear to have been operating in a concerted, bad-faith effort to destroy FBME and to steer FinCEN's proceeding in service of that end.    ECF 52-6 at 2.

FinCEN concedes that it reviewed the Privileged Materials.   ECF 52-4.   Although FinCEN later claimed it would not "rely" on them, ECF 52-4 at 2, there is now pointed indication (as described in Argument § III.D, below) that the Privileged Materials did in fact influence FinCEN and serve as a source for the Second Final Rule.[3]

### D.    FinCEN's Second Final Rule

On March 31, 2016, FinCEN published the Second Final Rule in the Federal Register. 81 Fed. Reg. 18480.   Like the First Final Rule, the Second Final Rule imposes "a prohibition on

---

[3]    Because FinCEN appears to have relied on the Privileged Materials, FBME is today moving to add them to the administrative record (on a sealed basis, since they remain privileged) to ensure they are part of the official record for this Court to review.

U.S. financial institutions from opening or maintaining a correspondent account for, or on behalf of, FBME." *Id.* Absent this Court's preliminary injunction, *see* ECF 32 & ECF 49 at 7–8, the Second Final Rule would become effective on July 29, 2016, *see* 81 Fed. Reg. at 18480.

In the Second Final Rule, FinCEN purports to state its ongoing concerns with FBME, consider the comments received, and explain why the fifth special measure is appropriate. *Id.* at 18480–90. As detailed below, however, the Rule contains a bevy of new allegations and information that FBME had no chance to respond to, ignores key contrary arguments and evidence submitted by commenters, and fails to adequately consider alternative penalties.

If the Second Final Rule were to take effect, it would imperil FBME's survival. As this Court has found, "liquidation of FBME's remaining U.S. dollar correspondent accounts" threatens "the very existence of [FBME's] business." *FBME*, 125 F. Supp. 3d at 127 (citation omitted). Indeed, as soon as FinCEN issued the Second Final Rule, CBC redoubled its aggressive efforts to destroy FBME by, among other things, terminating at least 130 of FBME's roughly 160 employees. Saab Decl. ¶ 3 & App. A. Thus, just as FBME confronted another round of new allegations from FinCEN, it was denied the ability to gather responsive, exculpatory information it would otherwise be submitting. *Id.* ¶¶ 19–20.

## ARGUMENT

## I.    STANDARDS OF REVIEW

This lawsuit raises procedural and substantive challenges. The procedural claims are reviewed *de novo*. *See* 5 U.S.C. § 706(2)(B), (D); *Bruce Packing Co. v. NLRB*, 795 F.3d 18, 22 (D.C. Cir. 2015) (due-process claim reviewed *de novo*); *United States v. Brewer*, 766 F.3d 884, 887–88 (8th Cir. 2014) (APA procedural claim reviewed *de novo*); *United States v. Reynolds*, 710 F.3d 498, 506–07 (3d Cir. 2013) (same). Moreover, as noted above, "FinCEN's reliance on nonpublic and classified evidence to impose a serious sanction against a single institution

require[s] it to hew *even more closely* to the APA's demands than it might have in a garden-variety rulemaking." *FBME*, 125 F. Supp. 3d at 114 (emphasis added).

The substantive claims are reviewed under the arbitrary-and-capricious standard. *See* 5 U.S.C. § 706(2)(A). This review is "narrow" insomuch as "a court is not to substitute its judgment for that of the agency. . . . But courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Judulang v. Holder*, 132 S. Ct. 476, 483 (2011) (citation omitted). The D.C. Circuit adds that, "in an area at the intersection of national security, foreign policy, and administrative law," this review "is extremely deferential." *Islamic American Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007). Even in "national security" cases, however, "the judiciary must remain vigilantly prepared to fulfill its own responsibility to channel Executive action within constitutional bounds." *Zweibon v. Mitchell*, 516 F.2d 594, 604–05 (D.C. Cir. 1975) (en banc) (plurality opinion).

Furthermore, "a somewhat greater degree of scrutiny" is in order because FinCEN's Second Final Rule "comes to precisely the same conclusions as the order previously remanded by this court." *Food Marketing Institute v. ICC*, 587 F.2d 1285, 1290 (D.C. Cir. 1979). "[W]e must recognize the danger that an agency, having reached a particular result, may become so committed to that result as to resist engaging in any genuine reconsideration of the issues." *Id.* Thus, "close consideration of the [agency's] action is warranted" to ensure that "[t]he agency's action on remand [is] more than a barren exercise of supplying reasons to support a pre-ordained result." *Wint v. Yeutter*, 902 F.2d 76, 81 (D.C. Cir. 1990) (Judge R. B. Ginsburg; citation omitted); *accord Greyhound Corp. v. ICC*, 668 F.2d 1354, 1358 (D.C. Cir. 1981).

## II.   FINCEN'S SECOND RULEMAKING FAILED TO ABIDE BY STATUTORY AND CONSTITUTIONAL PROCEDURAL REQUIREMENTS

FinCEN's Second Final Rule is the product of unlawful and unconstitutional procedures. Section § 311, the APA, and the Due Process Clause impose procedural obligations on FinCEN (§ II.A, below) that it has shirked, particularly by relying on secret evidence (§ II.B, below), by failing to provide a neutral decisionmaker and an oral hearing (§ II.C, below), and by failing to undertake the consultations required by § 311 (§ II.D, below).

### A.   FinCEN Has Procedural Obligations to FBME

#### 1.   FBME is entitled to due process

In its preliminary-injunction opinion, the Court ruled that it need "not decide . . . whether FBME is likely to succeed on the merits of its due process claim . . . because the record is currently unclear as to whether FBME has sufficient presence or property in the United States to establish an entitlement to due process at all."   *FBME*, 125 F. Supp. 3d at 118.

FinCEN now seems to recognize it must accord FBME due process.   When FBME demanded due process on remand, FinCEN did not question FBME's entitlement and instead responded on the merits, maintaining that "the process that FinCEN has undertaken is consistent with the Constitution."   81 Fed. Reg. at 18485.   It is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action."   *Michigan v. EPA*, 135 S. Ct. 2699, 2710 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).   Because FinCEN responded only on the merits to FBME's due-process claim, this Court can uphold FinCEN's Second Final Rule only if concludes that FinCEN's procedures satisfied due process, as considered *de novo*.

In any event, for multiple reasons FinCEN was quite right not to deny FBME's entitlement to due process.   First and foremost, § 311 should be read as incorporating, not

jettisoning, due process.   Absent "the most explicit action by the Nation's lawmakers" indicating that due process is inapplicable, courts must construe statutes to "afford those affected by [agency] action the traditional safeguards of due process," even "where it is possible that the Constitution" does not require it.   *Greene v. McElroy*, 360 U.S. 474, 507–08 (1959).   There is every reason to follow that presumption here.   The legislative history of § 311 makes clear that due process is a requirement in § 311 proceedings.   When Congress amended § 311 in 2003 to authorize use of classified information, *see* 117 Stat. 2599, 2630 (adding 31 U.S.C. § 5318A(f)), the accompanying conference report stated that, when the government uses classified evidence, "the Conferees intend that a court will fashion procedures, necessary to assure a moving party due process of law . . . ."   H.R. Conf. Rep. 108-381, at 55 (2003).

Were the intent to provide due process not clear from the statute itself, the doctrine of constitutional avoidance would commend the same result.   It is a "cardinal principle" of statutory interpretation that a court will construe a statute "to avoid [constitutional] problems unless such construction is plainly contrary to the intent of Congress."   *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 575 (1988). By reading § 311 as incorporating due process, the Court will properly avoid the real and troubling constitutional questions otherwise posed.

Assuming this Court nonetheless confronts the constitutional question, FBME has the better of it.   Previously, this Court was uncertain whether FBME has sufficient "presence or property" in the United States to satisfy the inflexible rule laid down in *People's Mojahedin Organization of Iran v. U.S. Department of State* that "[a] foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise." 182 F.3d 17, 22 (D.C. Cir. 1997) ("*People's Mojahedin I*").   Yet that rule has been relaxed.

In *GSS Group Ltd. v. National Port Authority*, the D.C. Circuit read recent Supreme Court precedent as establishing that "foreign corporations *are* entitled to due process protection, despite the fact that they have no meaningful connection to the United States," at least when challenging a court's exercise of personal jurisdiction.   680 F.3d 805, 816–17 (D.C. Cir. 2012) (emphasis added; citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011)); *accord Daimler AG v. Bauman*, 134 S. Ct. 746 (2014) (reaffirming *Goodyear*).   While finding it unnecessary to adopt a bright-line rule as to when a foreign corporation may invoke due process, the D.C. Circuit in *GSS Group* suggested a couple of candidates, including that due process would attach whenever a government entity takes action in the United States that "inflicts damage" on the foreign corporation.   680 F.3d at 816.   In this case, of course, FinCEN's administrative action was promulgated in the United States and directly threatens FBME with crushing damage by permanently depriving FBME of its *U.S. dollar* correspondent accounts.   There is no room to question any of that.   Subsidiary questions about presence or property in the United States should not matter to the bottom line of the U.S. Constitution: FBME may invoke due process to challenge U.S. *agency* action denying it U.S. dollars no less than foreign corporations with no connection to the United States may, under *Goodyear*, *Daimler*, and *GSS Group*, invoke due process to challenge *judicial* action harming them.

Last and not least, FBME *does* have ample presence and property in the U.S. Specifically, FBME has liens on roughly 50 lots at the Coves at Round Mountain in North Carolina, and $291,435.97 in an escrow account in North Carolina belongs to FBME—although FinCEN's actions have effectively cut FBME off from these funds.   *See* Background § II.D, above.   Such property and presence in the U.S. more than suffice to trigger due process, even under the test laid down in *People's Mojahedin I*.   *See National Council of Resistance of Iran v.*

*U.S. Department of State*, 251 F.3d 192, 201 (D.C. Cir. 2001) (presence in an office building and interest in "small bank account" triggers due process); *United States v. Sum of $70,990,605*, 128 F. Supp. 3d 350, 363 (D.D.C. 2015) (money in a U.S. bank account entitles party to due process).

> **2.     The adjudicatory nature of FinCEN's rulemaking entitles FBME to more process than the APA requires**

Although FinCEN used the APA's informal rulemaking procedures (5 U.S.C § 553) to promulgate the Second Final Rule, this administrative action was adjudicatory in nature.   A rulemaking is "adjudicatory in nature" when "adjudicative, rather than legislative, facts are involved."   *Alaska Airlines, Inc. v. Civil Aeronautics Board*, 545 F.2d 194, 200 (D.C. Cir. 1976). ("Adjudicative facts are the facts about the parties and their activities, businesses, and properties," the "kind of facts that go to a jury in a jury case." *Id.* at 200 n.11 (citation omitted).)   The "determinative inquiry" is "whether the agency's action pertained to a class of individuals, indicating a rule-making function, or whether it focused on a particular individual, indicating an adjudicative function requiring a hearing."   *Id.* at 200 (citation omitted).

Here, there is no question that FinCEN's Second Final Rule focuses on FBME (rather than a class) and involves adjudicative facts about FBME's business (rather than legislative facts).   As this Court has noted, it is a "rarity" to have "a rulemaking that is so focused on one particular entity."   *FBME*, 125 F. Supp. 3d at 122.   The title of the Second Final Rule says it all:   "Imposition of Special Measure *Against FBME Bank Ltd*. . . . as a Financial Institution of Primary Money Laundering Concern."   81 Fed. Reg. at 18480 (emphasis added).

The Supreme Court has held that, "in a rulemaking proceeding when an agency is making a 'quasijudicial' determination by which a very small number of persons are 'exceptionally affected, in each case upon individual grounds,' in some circumstances additional procedures may be required in order to afford the aggrieved individuals due process."   *Vermont Yankee*

*Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 542 (1978) (citation omitted).   Such circumstances are present here.   Through the Second Final Rule, FinCEN has singled out FBME and taken action that will gravely damage it.   FBME is thus entitled not only to the APA's procedural protections for informal rulemakings but also to the procedures that due process requires for adjudicatory actions.   *See id.*; *Alaska Airlines*, 545 F.2d at 199–201; *see also Mathews v. Eldridge*, 424 U.S. 319, 333–35 (1976).

### B.      FinCEN Unlawfully Relied on Secret Evidence

The APA requires that a federal agency provide notice and an opportunity for meaningful comment on any regulation it proposes adopting.   5 U.S.C § 553; *American Medical Ass'n v. Reno*, 57 F.3d 1129, 1132 (D.C. Cir. 1995).   Due process likewise requires that a party facing deprivation of property from a governmental action receive "notice of the case against him and opportunity to meet it."   *Mathews*, 424 U.S. at 348 (citation omitted).

From these venerable principles, courts have deduced three essential rules that apply here:   First, when an agency takes an action that affects a particular party, it must disclose to that party *all* the unclassified factual material it relies on.   Second, the agency must disclose all of this material in time for the affected party to have a meaningful opportunity to comment. Third, if the agency relies on undisclosed classified evidence, it must take steps to mitigate the unfairness and enable the affected party to defend itself.   FinCEN here violated all three rules.

### 1.      FinCEN is withholding unclassified evidence

Both the statutes at issue here and the Constitution forbid agencies from acting against a party based on secret evidence, *unless* the evidence is *classified*.   Section 553 of the APA requires an agency to release to the public *all* "critical factual material," which means all unique information the agency considered.   *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236–40 (D.C. Cir. 2008); *Chamber of Commerce of the United States v. SEC*, 443 F.3d 890, 899–

908 (D.C. Cir. 2006).   Separately, § 311(f) of the USA PATRIOT Act explicitly authorizes FinCEN to use "classified information" and then to submit it "to the reviewing court ex parte and in camera."   31 U.S.C. § 5318A(f).   Thus, the combination of the APA and § 311(f) requires FinCEN to disclose *all* unclassified information on which it relies to impose the fifth special measure on FBME.   *See also FBME*, 125 F. Supp. 3d at 120–23 (holding that FinCEN likely violated the APA by failing to disclose unclassified material to FBME).

Due process likewise forbids agencies from relying on secret unclassified evidence.   It is an "immutable" principle that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue."   *Greene*, 360 U.S. at 496; *accord, e.g.*, *Ohio Bell Telephone Co. v. Public Utilities Commission*, 301 U.S. 292, 300–06 (1937); *Ralpho v. Bell*, 569 F.2d 607, 628–29 (D.C. Cir. 1977).   There is one extraordinary exception for one extraordinary category of information: classified information that must remain secret for the sake of national security need not be disclosed; that isolated exception to the due-process imperative leaves the normal rule holding sway such that an agency relying on classified information must still release the *entire* unclassified record.   *Ralls*, 758 F.3d at 317–21; *People's Mojahedin Organization of Iran v. U.S. Department of State*, 613 F.3d 220, 227–30 (D.C. Cir. 2010) ("*People's Mojahedin II*"); *National Council of Resistance*, 251 F.3d at 208–09.   FinCEN has steadfastly refused to do so.

### i.   FinCEN failed to produce consultation materials

There is a glaring absence from the administrative record of *any* documentation of FinCEN undertaking the requisite consultations.   Section 311 mandates that the Secretary engage in three levels of consultations with various federal officers and agencies before utilizing the fifth special measure.   *See* Background § I, above (describing the separate consultations

required by 31 U.S.C. § 5318A(a)(4)(A), (b)(5), and (c)(1)).   Especially considering the heavy hammer and wide discretion FinCEN wields under § 311, the consultations that must inform and constrain its deliberations serve as vital safeguards.   Yet FinCEN has said *virtually nothing* about any such consultations occurring, much less about their substance.

If these consultations had occurred, there should surely be memos, emails, letters, meeting minutes, or other papers reflecting an exchange of views with the federal agencies and officers that FinCEN consulted.   *Cf. Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 116–21 (1st Cir. 2002) (ruling that an agency failed to place sufficient evidence in the record to demonstrate it had fulfilled a consultation requirement).   Nothing of the sort appears in this administrative record.   There is not even a second-hand description or summary of the various consultations that FinCEN was statutorily bound to solicit and consider.   Although there is no evidence of it beyond the agency's say-so, FinCEN does state blankly in the Rule that it undertook the "required consultations."   81 Fed. Reg. at 18488.   It follows that either FinCEN did conduct the consultations but *failed to disclose* to FBME the contents of those consultations, thereby violating the obligation to disclose all unclassified information relied on, or it *failed to consult* as required by § 311 (we discuss this latter possibility in § II.D, below).

### ii.   FinCEN is withholding suspicious activity reports ("SARs")

FinCEN is also continuing to rely on withheld SARs.   81 Fed. Reg. at 18486–87.   We acknowledge that this Court previously indicated that, at least under the APA, FinCEN might properly withhold these SARs because FinCEN provided a summary "sufficient to allow FBME to respond to FinCEN's accompanying concerns—namely, that FBME's wire transfers involved suspicious levels of shell company activity, short-term surge wire activity, structuring, and high-risk business customers."   *FBME*, 125 F. Supp. 3d at 120.   We respectfully disagree that the Court's prior analysis suffices now to resolve the ultimate merits, for at least three reasons.

First, FinCEN lacks authority to rely upon SARs *ex parte*.  It is "the firmly held main rule that a court may not dispose of the merits of a case on the basis of *ex parte, in camera* submissions."  *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986), *affirmed by an equally divided Court*, 484 U.S. 1 (1987).   The three exceptions, inapplicable here, are for (1) classified information; (2) statutes authorizing *ex parte* submissions; and (3) parties asserting privilege "*to prevent use* of the materials in the litigation."  *Id.* (emphasis added).   In other words, if an agency claims privilege over unclassified material, and no statute authorizes its *ex parte* submission, it "has an option:   it can hold back [the] material, and take the risk of not being able to prove its case, or it can produce the material and allow it to be the subject of direct and cross-examination."  *Wirtz v. Baldor Electric Co.*, 337 F.2d 518, 528 (D.C. Cir. 1963).

What an agency cannot do is wield privilege as both a sword and a shield— simultaneously relying on it while cloaking it in secrecy.   The Bank Secrecy Act authorizes FinCEN to *withhold* SARs, *see FBME*, 125 F. Supp. 3d at 120 & n.4, but it does not authorize FinCEN to *selectively disclose* SARs via *ex parte* submission to the Court.   *See* 31 U.S.C. § 5318(g).   Also cutting against FinCEN is § 311(f), which explicitly authorizes "ex parte" submission of "classified information" in a § 311 proceeding, 31 U.S.C. § 5318A(f), *without* authorizing *ex parte* submission of any privileged or protected unclassified evidence.   Had Congress wished to empower FinCEN to use unclassified SARs *ex parte*, it would have so specified.   Because it has not granted such statutory authorization, the "main rule" of *Abourezk* controls and forecloses FinCEN from using the SARs as it has.   785 F.2d at 1060–61.

Second, FinCEN's summary of the SARs is inadequate.   A SAR is a report that a *specific* "transaction" may be suspicious.   31 C.F.R. § 1020.320(a).   To the extent that FinCEN would hold *each* specific suspicious transaction against FBME, it is only fair that FBME receive

notice of *each* specific transaction flagged in *each* SAR so that it can investigate and respond with specifics.   A summary that does not identify particular transactions but instead confines itself to a high level of generality—as FinCEN's does by discussing what all of the SARs, as a whole, purportedly indicate numerically, *see* 81 Fed. Reg. at 18486—is insufficient.   It is *the details*—the "technical studies and data"—that "must be made available during the rulemaking in order to afford interested persons meaningful notice and an opportunity for comment." *American Radio*, 524 F.3d at 236–37.   FinCEN has failed to provide those details.

Third, FinCEN's conduct patently violates due process under settled precedent.   Nearly 50 years ago, the D.C. Circuit held that due process does not allow a party to be sanctioned based on secret third-party complaints, even when summaries are provided.   In *States Marine Lines, Inc. v. Federal Maritime Commission*, the Federal Maritime Commission had approved a system in which shippers set rules for themselves and self-policed by filing written complaints about each other for resolution by an accounting firm known as the "Neutral Body."   376 F.2d 230, 232–33 (D.C. Cir. 1967).   To encourage shippers' participation, written complaints were kept secret, as was any evidence that would expose a complainant; all the Neutral Body would supply was a summary of the "*substance* of the evidence in sufficient detail to enable the accused to rebut it."   *Id.* at 237–39.   The D.C. Circuit held that this system violated the principle that "an accused should not be subjected to punishment on the basis of secret evidence."   *Id.* at 239. Only by receiving "all the evidence *in its original form*"—not just in a summary—could the accused be assured that an adverse decision was not based on secret evidence.   *Id.* at 239–40 (emphasis added); *accord Forcade v. Knight*, 416 F. Supp. 1025, 1038–39 (D.D.C. 1976). *States Marine Lines* and *Forcade* control this case.   Just as the Neutral Body could not, consistent with due process, rely on third-party complaints that were summarized but not

disclosed in their original form, neither can FinCEN rely on SARs that have not been disclosed to FBME in their original form but at most only summarized.   Indeed, the due-process violation is even more egregious here because the summaries FinCEN provided do not even supply FBME with sufficient detail to identify and address specific transactions flagged by the SARs.

### iii.   FinCEN has not identified other documents it is withholding

A third fundamental defect is that FinCEN has repeatedly refused to identify (1) what unclassified materials it is relying on but withholding, and (2) the legal basis for such withholding.   Before the remand, FinCEN promised this Court that, if during the remand it "reaches a decision adverse to plaintiffs, and relies upon any classified or otherwise protected or privileged information in making such a decision, the Government would identify the above categories of such information publicly to the extent possible."   ECF 47 at 3.   FinCEN has failed to do so.   In the Second Final Rule, FinCEN states that it "did not disclose information that is classified or *otherwise protected from disclosure.*"   81 Fed. Reg. at 18485 (emphasis added).   Nowhere does FinCEN illuminate this category of undisclosed and unclassified information that is "otherwise protected from disclosure."   Its persisting veil of secrecy encompasses the SARs, but we still do not know what other materials may be hidden behind it.

If FinCEN is relying on but withholding *any other* unclassified information, the APA and due process require its disclosure.   *See Ralls*, 758 F.3d at 317–21; *American Radio*, 524 F.3d at 236–40.   If FinCEN nonetheless insists that it has a valid basis for withholding the material, then it must at a minimum provide a privilege log so that there is a complete record of the documents and privileges at issue and FBME can challenge specific withholdings.[4]   *See Ralls*

---

[4]   To be clear, FBME seeks a log only of materials FinCEN is withholding and may be *relying* on.   FBME does not seek a log of withheld materials that reflect only the internal

*Corp. v. Committee on Foreign Investment in the United States*, 2014 U.S. Dist. Lexis 177868, at *5 (D.D.C. Nov. 6, 2014) (ordering government to provide privilege log of any unclassified material the agency relied on but withheld on privilege grounds).

### 2. FinCEN withheld new accusations and information until after FBME could comment on them

Both the APA and due process require that an agency disclose the unclassified record *before* it renders its final decision, so that aggrieved parties have a meaningful opportunity to comment in time to influence the decision. *People's Mojahedin II*, 613 F.3d at 227–28; *Owner-Operator Independent Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Administration*, 494 F.3d 188, 199–203 (D.C. Cir. 2007). "An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary." *Connecticut Light & Power Co v. NRC*, 673 F.2d 525, 531 (D.C. Cir. 1982).

FinCEN is flouting this rule. The Second Final Rule contains important accusations and information never previously disclosed, including allegations that (i) FBME employees obscured information in late 2014; (ii) FBME identified the wrong customer connected to a sanctioned Syrian entity; (iii) FBME never demonstrated AML improvements in Tanzania; (iv) FBME failed to substantiate its compliance improvements; (v) an alleged Hezbollah associate held accounts at FBME as of early 2015; and (vi) FBME completed review of only three percent of its high-risk files as of June 2014. Such sandbagging is irreconcilable with due process, the APA, this Court's orders, and FinCEN's "core principle[]" that "Enforcement should never be a 'gotcha' or

---

deliberative process. *See Stand Up for California! v. U.S. Department of Interior*, 71 F. Supp. 3d 109, 122–24 (D.D.C. 2015) (deliberative-process materials need not be logged).

hide-the ball exercise."[5]   Stephanie Brooker, Assistant Director for Enforcement, FinCEN, Remarks at 2015 Bank Secrecy Act Conference 4 (June 18, 2015), https://goo.gl/gLbTtG.

### i.       New accusation: FBME hid information in late 2014

Three separate times FinCEN alleges in the Second Final Rule that, "in late 2014, FBME employees took various measures to obscure information."   81 Fed. Reg. at 18482, 18486, 18489.   This allegation was absent from FinCEN's initial set of notices, the First Final Rule, and its re-noticing on remand.   The only discernible source of this allegation is the Privileged Materials (described in Background § III.C, above), which FinCEN did not provide to FBME until February 1, 2016, after the comment period closed.   *See* ECF 52-1.   Although FinCEN has represented that it "has not considered" these Materials "as part of this rulemaking," 81 Fed. Reg. at 18487 n.16, FBME has found no other conceivable source after scouring the administrative record.   If FinCEN is relying on the Privileged Materials no fewer than *three* times in the Second Final Rule, then its rulemaking is tainted by both its failure to invite timely comment and its use of the Privileged Materials (*see* § III.D, below).   Alternatively, if FinCEN is referencing something else, then it has provided no clue as to what that something else is and no prior notice that would have enabled proper response.

### ii.      New information: FBME misidentified a problematic customer

We also learn from the Second Final Rule that FBME misidentified the customer connected to SSRC, the U.S.-sanctioned Syrian entity.   81 Fed. Reg. at 18486 ("[T]he sanctioned entity referenced in FinCEN's NOF was not the individual identified by FBME."). FBME had instructed Ernst & Young to investigate this allegation.   Yet when FBME repeatedly

---

[5]    For FinCEN simultaneously to raise new technical "gotchas" and claim them as basis for its most extreme sanction was also arbitrary and capricious as a substantive matter.   As should be clear from the discussion *infra*, the record suggests no genuine basis for FinCEN now to be concerned about such things as FBME's AML documentation or operations in Tanzania.

asked in January 2015 (and since) whether Ernst & Young had pinpointed the correct customer (AR4409–10; Peters Decl. ¶¶ 13, 16–17), FinCEN refused to say, claiming that "FinCEN is *unable* to release additional information in response to this question beyond the statements within the Notice of Finding" (AR2656; emphasis added).   *See* Background § III.A, above.

FinCEN somehow became "able" when it published the Second Final Rule to release the previously withheld "additional information" that FBME had misidentified the customer at issue. Needless to say, there is no satisfying reason (setting aside tactical reasons) why FinCEN could not have come clean sooner.   The instant revelation came too late, after the comment period was closed and the sanction locked in, so FBME could not further investigate or respond.

### iii.      New accusation: FBME did not show improvement in Tanzania

FinCEN also newly alleges that FBME did "not demonstrate any AML improvements with respect to its headquarters in Tanzania," 81 Fed. Reg. at 18490, and that the "continuation of illicit activity" in Tanzania is of concern to FinCEN, *id.* at 18488.   At no time prior did FinCEN suggest that FBME should provide further demonstration of AML protocols and compliance in Tanzania, or, indeed, that FinCEN had specific concerns about Tanzania.   Had FinCEN wondered what FBME was doing in Tanzania, it should have asked, which it never did, or agreed to meet, which it repeatedly refused to do (apart from a single meeting in early 2015, at which FinCEN signaled no concern about Tanzania).   Peters Decl. ¶¶ 9–12; AR3284–85.

By all indications from FinCEN, it was not even looking to Tanzania.   The Notice of Finding scarcely mentioned the country except to note that FBME is headquartered there. AR0075.   Tellingly, a heading purporting to discuss "The Extent to Which FBME Is Used for Legitimate Business Purposes in Cyprus *and Tanzania*" was followed by a paragraph that focused *exclusively* on Cyprus without *once* mentioning Tanzania.   AR0076 (emphasis added).

Following remand, FinCEN did nothing to refocus or expand its geographic scope:   the 2015 Notice again omitted any meaningful mention of Tanzania, and certainly posed no question and suggested no concern about what was happening there, as opposed to Cyprus.   80 Fed. Reg. at 74064.   And when FBME, in its January 2016 comment, proposed a meeting to see if FinCEN had any other questions or concerns FBME might address, FinCEN did not engage. AR3284–85.   FinCEN thus sat back and waited until the Second Final Rule to fault FBME, for the first time, for supposedly omitting to pay adequate attention to Tanzania.

FinCEN's failure to provide notice of any concern about Tanzania violates this Court's remand order and the rule that an agency must provide a meaningful opportunity to comment on adverse evidence.   *See* ECF 49 at 4–5; *People's Mojahedin II*, 613 F.3d at 227–28; *Owner-Operator*, 494 F.3d at 199–203.   Furthermore, because FinCEN's Notice of Finding did not reasonably suggest that FBME's AML protocols in Tanzania were a basis for sanctioning FBME, the Second Final Rule is unlawful because it is not a "logical outgrowth" of the proposed rule. *See Allina Health Services v. Sebelius*, 746 F.3d 1102, 1107–09 (D.C. Cir. 2012).

### iv.    New information: FBME did not supply documentation

FinCEN also newly announces that FBME has not provided "meaningful information or documentation" to support the battery of AML improvements that FBME has been laboring to document throughout this proceeding.   81 Fed. Reg. at 18483; *accord id.* at 18484, 18486.

Concerns about FBME's substantiation of its compliance strides are as new and out of the blue as those surrounding Tanzania.   FinCEN never before suggested that it required more "meaningful information" about FBME's AML and compliance improvements.   If FinCEN somehow needed more documentation, then FinCEN should have signaled that some time prior to issuing the Second Final Rule—but it did not.   Or FinCEN could have picked up the phone

or sent a letter or email posing a relevant question—but it did not.   Or FinCEN could have agreed to meet following remand, as FBME suggested—but it did not.

This particular surprise is all the more perverse considering the lengths FBME has gone to in supplying copious documentation.   In November 2014, FBME provided details about specific actions it had taken to enhance its AML and sanctions compliance program.   AR0737–41.   Counsel for FBME then attended an in-person meeting at FinCEN's offices to demonstrate the sufficiency of FBME's AML compliance program, including improvements.   AR0913–42. Following the meeting, FBME specifically inquired "if there are any other steps or measures that FinCEN requests or would consider advisable."   AR4410.   FinCEN made no response. FBME's counsel went still further in requesting feedback on its AML and sanctions compliance improvements, but FinCEN withheld any suggestions.   Peters Decl. ¶¶ 2, 9–12, 23.   To the contrary, FinCEN indicated to FBME that, if anything, FBME's documentation was overwhelming.   *Id.* ¶ 17.   Only in the Second Final Rule did FinCEN suddenly discover and announce an absence of "meaningful information" in the piles of documentation that FBME had been supplying to FinCEN (and soliciting FinCEN's reactions to) throughout the preceding year.

### v.       New accusation: Hezbollah associate banked at FBME in 2015

FinCEN alleges five times in its Second Final Rule that, "[a]s of early 2015, an alleged Hezbollah associate and the Tanzanian company he managed owned accounts at FBME."   81 Fed. Reg. at 18482; *see also id.* at 18483, 18484, 18488, and 18489.   That allegation appeared *zero* times, however, in FinCEN's preceding notices.   It appears traceable only to a single, fragmented sentence in FinCEN's July 14, 2015, Memorandum Supporting Final Rule, which was redacted by FinCEN until December 2015, at which time FinCEN re-released the Memorandum with some redactions removed as part of the remand proceedings.   Here is how the sentence reads as provided to FBME (redaction lengths are approximate):



Finally ███████████████████████████████████████████ as of ████ 2015, ████ alleged Hezbollah ████████████████ and the Tanzanian company ████████████ owned accounts at FBME. ██████

AR4490.   This cryptic statement in FinCEN's new version of the July 2015 Memorandum (as furnished in December 2015) did not make clear that it was referencing an alleged Hezbollah connection different from the one referenced in FinCEN's initial notice.   Nor did it specify that the alleged Hezbollah associate *managed or owned* the Tanzanian company with accounts at FBME, which was new information that could have guided a renewed, targeted forensic audit.

Most importantly, FinCEN said nothing whatsoever about this allegation in its 2015 Notice, nor suggested it would matter to its remand deliberations—much less be central to them, as the Second Final Rule now indicates it was.   As for FinCEN's prior notices, the 2014 Notice of Finding contained what we now know to be a *different* allegation that an FBME customer received hundreds of thousands of dollars from a financier for Hezbollah, which allegation FinCEN then reiterated in its First Final Rule.   80 Fed. Reg. at 45058.

FBME was greatly concerned about the previous Hezbollah allegation and made recurring requests that FinCEN provide details to enable FBME to investigate.   *See* AR4409. FinCEN ultimately responded that it "is unable to release additional information in response to this question beyond the statements within the Notice of Finding."   AR2656.   FinCEN then represented to this Court that it could not reveal any more information "without disclosing classified or [Bank Secrecy Act]-protected information."   ECF 23-1 at 31.

FinCEN seems to have shed its compunction about disclosing further specifics about a Hezbollah connection just in time to call FBME into public calumny in the Second Final Rule. FinCEN somehow gave prominent attention to an alleged Hezbollah connection in its Second Final Rule, despite altogether omitting it from its 2015 Notice, and offered new specifics, despite previously stonewalling in response to FBME's repeated requests for such information.

### vi.    New accusation: FBME did not review enough high-risk files

FinCEN also stated that it "remains troubled by the fact that as of June 2014, FBME had completed its review of only three percent of its high-risk customer files."   81 Fed. Reg. at 18483.   FinCEN said nothing to this effect at any time prior.   As best FBME can tell, FinCEN lifted the statistic from CBC's September 2015 letter purporting to report on the PricewaterhouseCoopers ("PWC") audit of FBME that was conducted June through September 2014.   *See* AR4460–62.   The record reveals that this *supposed* PWC audit does *not* come from PWC; PWC *disavowed* any involvement in or knowledge of this report, which CBC fraudulently attributed to PWC's name.   AR3320, 3990.   We discuss below, in § III.A.2, CBC's misconduct and this fabricated "PWC" audit.   For present purposes, it suffices to note that although FBME's *annual* review of high-risk files had just *begun* (and therefore was not finished) in June 2014, it "was carried out during the second half of the year."   AR3973.   For FinCEN to find or suggest otherwise in the Second Final Rule is simply contrary to the record.

### vii.    FBME would have rebutted these new accusations and responded to this new information if it had the chance

If previously alerted to the new allegations and information that FinCEN unveiled in the Second Final Rule, FBME would have provided a meaningful response that would matter to a fair decision-maker.   In other words, FinCEN's failure to reveal this new information in a timely fashion cannot be considered harmless.   *See People's Mojahedin II*, 613 F.3d at 228–29 & n.6; *Owner-Operator*, 494 F.3d 188, 202–03.   A few examples are emblematic:

*Tanzania*:   Contrary to FinCEN's allegation that FBME did "not demonstrate any AML improvements with respect to its headquarters in Tanzania," 81 Fed. Reg. at 18490, FBME has AML compliance procedures in Tanzania and has applied all AML improvements to both its Cypriot and its Tanzanian branches.   Indeed, this should be clear enough from the record.   *See*

AR0107 (FBME has "devoted substantial resources to developing and enhancing its [AML] and sanctions compliance program . . . to adhere to applicable European, Cypriot, and *Tanzanian* standards." (emphasis added)); AR0113; AR0916.   As soon as FBME first incorporated in Tanzania in 2003, FBME applied Cyprus's AML requirements, which are more stringent than Tanzanian requirements, to the Tanzanian offices.   Saab Decl. ¶ 6.   Onboarding for local Tanzanian customers is done face-to-face, with fingerprinting, per Tanzanian law.   *Id.* International Tanzanian customers are screened through FBME's Cyprus branch, per Cypriot regulations.   *Id.* ¶ 11.   And since FinCEN's Notice of Finding in July 2014, all transactions at FBME's Tanzanian branches have been conducted in the local Tanzanian currency, which minimizes the risk of international money laundering.   *Id.* ¶ 13.

*AML Documentation*:   FinCEN's new allegation that it lacks "meaningful information and documentation" about FBME's AML improvements is likewise at odds with the record. FBME provided FinCEN with detailed descriptions of the improvements it has made pursuant to external auditors' recommendations, then made further demonstration at the one in-person meeting FinCEN entertained.   AR0738–41, 3720–36, 3767–80; Peters Decl. ¶¶ 9–12. Although FBME would have been only too glad to make further demonstration on remand at a meeting (which it requested, AR3284–85) or at a live hearing (which it demanded, AR3285, 3301), FinCEN granted neither.   Had FBME known that FinCEN wanted *still more*, FBME would have provided whatever additional documentation and substantiation FinCEN desired, including, but not limited to, (i) documentation that it has implemented compliance improvements *bank-wide* (*i.e.*, in Cyprus *and* Tanzania); (ii) screenshots of its new ultimate-beneficial-owner onboarding platform to prove it "satisfies EY's recommendation" (*contra* 81 Fed. Reg. at 18486); (iii) training registers proving that FBME's board of directors have

completed recent, rigorous compliance trainings[6]; (iv) copies of Worldcheck searches performed for corporate clients; and (v) its plan for implementing additional improvements once FBME resumes normal operations.   Saab Decl. ¶¶ 15–19 & Apps. E & F.

*2015 Hezbollah*:   It does not square with the administrative record for FinCEN to fault FBME based on the allegation that, "[a]s of early 2015, an *alleged* Hezbollah associate and the Tanzanian company he managed owned accounts at FBME."   81 Fed. Reg. at 18482 (emphasis added).   The 2014 EY Audit reviewed all of FBME's accounts—including those in Tanzania— and failed to identify *any* FBME connection to Hezbollah.   AR2960.   Although the EY Audit shows the absence of a Hezbollah account at FBME, FinCEN completely ignored that evidence, instead resting its finding on an unsubstantiated report that an "*alleged* Hezbollah associate"— not even a *confirmed* associate—had an account at FBME.   Relying on mere rumor, when it is counter to the evidence on the record, is arbitrary and capricious.   *District Hospital Partners, L.P. v. Burwell*, 786 F.3d 46, 56–57, 59 (D.C. Cir. 2015).   Furthermore, as of early 2015, the Bank of Tanzania had a statutory manager at FBME's headquarters, 81 Fed. Reg. at 18488, and CBC likewise seized control of the FBME's Cyprus branch and appointed a Special Administrator.   There is no indication that those regulators have found any Hezbollah connection during their time overseeing FBME, and it is no fairer to fault FBME for any imperfection in detection than it is to fault them.   Moreover, if FinCEN truly believed there is a real (not just alleged) Hezbollah connection, it would presumably have alerted its sister regulators to correct the problem.

---

[6]   Although FinCEN suggests in passing a concern that "FinCEN has no reason to believe that FBME's leadership has changed" or "that management has modified its practices," 81 Fed. Reg. at 18484, that observation is beside the point:   FBME's fundamental point remains that FinCEN has not identified any systemic or other deficiency that implicates FBME's management.   AR3323–24.

### 3.      FinCEN failed to mitigate its use of classified evidence

Due process requires an agency designating an entity based on classified information to enable a meaningful defense.  *Al Haramain Islamic Foundation, Inc. v. U.S. Department of Treasury*, 686 F.3d 965, 982–84 (9th Cir. 2012).   "Courts have found that their duty to protect individual rights extends to requiring disclosure of classified information to give a party an ability to respond to allegations made against it."   *KindHearts for Charitable Humanitarian Development, Inc. v. Geithner*, 710 F. Supp. 2d 637, 659 (N.D. Ohio 2010) (collecting cases).

To be clear, FBME seeks only such limited access to classified information as affords a meaningful opportunity for FBME to defend itself without compromising national security. Congress intends that, when the government uses classified information in a § 311 proceeding, the court "will fashion procedures, necessary to assure a moving party due process of law, that resemble those already required in similar situations in which the government . . . seeks to base a claim or defense on classified information."   H.R. Conf. Rep. 108-381, at 55 (2003).   Such procedures naturally include:   (1) declassifying materials that need not be classified; (2) presenting an adequate unclassified summary of classified materials; and (3) granting attorneys'-eyes-only access to classified materials to FBME's counsel with requisite security clearances.[7]

Which mitigation measures to use is left for "case-by-case" determination.   *Al Haramain*, 686 F.3d at 984.   Access to classified materials is unnecessary when the agency has

---

[7]       *See, e.g.*, 8 U.S.C. § 1534(e)(3) (unclassified summaries & security-cleared counsel); *Bismullah v. Gates*, 501 F.3d 178, 187 (D.C. Cir. 2007) (security-cleared counsel); *Van Bourg v. Nitze*, 388 F.2d 557, 564 (D.C. Cir. 1967) (declassification and unclassified summaries); *Al Haramain*, 686 F.3d at 982–84 (unclassified summaries & security-cleared counsel); *Kiareldeen v. Ashcroft*, 273 F.3d 542, 548 (3d Cir. 2001) (unclassified summaries); *Latif v. Lynch*, 2016 WL 1239925, at *18–19 (D. Or. Mar. 28, 2016) (unclassified summaries & security-cleared counsel); *United States v. Bagcho*, --- F. Supp. 3d ----, 2015 WL 9216604, at *3 (D.D.C. Dec. 17, 2015) (unclassified summaries); *KindHearts*, 710 F. Supp. 2d at 660 (declassification, unclassified summaries & security-cleared counsel).

35

not "relied critically" on the classified materials.   *People's Mojahedin II*, 613 F.3d at 230–31.

When an agency has relied critically on classified materials, however, mitigation measures

become essential, "because no matter what evidence [the designated entity] adduced to rebut the

disclosed bases for the [agency action], the government could point to the other, unknown bases

in refusing to [alter the agency action]."   *KindHearts*, 710 F. Supp. 2d at 660 n.17.

Here, FinCEN has conceded that the Second Final Rule is "based on . . . classified . . .

materials," 81 Fed. Reg. at 18482 n.6, without "disclos[ing] information that is classified," *id.* at

18485, or taking any steps to enable access.    That alone violates § 311 and due process.

## C.    FinCEN Failed To Provide a Neutral Decisionmaker and Oral Hearing

Due process also requires a neutral adjudicator in administrative proceedings.   *Withrow

v. Larkin*, 421 U.S. 35, 46–47 (1975).   Government officials are presumed fair, so it can

comport with due process for the same official in an agency to both initiate enforcement and

sanction, *as long as the party has the opportunity to contest in an adversarial process all of the

evidence the official considered*.   *Id.*   When, however, "the initial view of the facts based on

the evidence derived from *nonadversarial processes* [that] . . . foreclosed fair and effective

consideration at a subsequent adversary hearing leading to ultimate decision, *a substantial due

process question would be raised*."   *Id.* at 58 (emphasis added).   In that circumstance, due

process requires "providing for a neutral adjudicator to conduct a *de novo* review of all factual

and legal issues."   *Concrete Pipe & Productions of California, Inc. v. Construction Laborers

Pension Trust*, 508 U.S. 602, 618 (1993) (citations and quotation marks omitted).

A neutral adjudicator who can consider the record *de novo* is sorely needed.   As

explained, FinCEN relied heavily on secret evidence (both classified and unclassified) that

FBME had no chance to contest.   FinCEN's process has been anything but calculated to apprise

FBME of where FinCEN was coming from and afford FBME the opportunity to contest in an

adversarial process the evidence FinCEN considered.   Because FinCEN arrived at an "initial view of the facts based on the evidence derived from nonadversarial processes," and because FinCEN continues to rely on secret evidence, there cannot be "fair and effective consideration" of the evidence at "a subsequent adversary hearing"—indeed, there would not be *any* adversary hearing at all with respect to this secret evidence to the extent that this Court now defers to FinCEN's one-sided, self-reinforcing evaluation of it.   Thus, under *Withrow* and *Concrete Pipe*, FinCEN violated due process by having the same officials serve as prosecutor, judge, and executioner, rather than appointing a neutral arbiter to evaluate all the evidence afresh without the tint of the prosecutor's glasses.   *See also Propert v. District of Columbia*, 948 F.2d 1327, 1333–34 (D.C. Cir. 1991) ("affected individual must have a meaningful opportunity to present his case before a neutral decisionmaker" rather than before the "same [enforcement] officer").

Due process further requires that FinCEN provide FBME an oral hearing before imposing the fifth special measure.   When an agency takes an *adjudicatory* action (*see* Argument § II.A.2, above), courts usually consider oral hearings necessary.   *E.g.*, *Gray Panthers v. Schweiker*, 652 F.2d 146, 159–73 (D.C. Cir. 1980) (collecting cases).   As the Supreme Court has pointed out, "written submissions do not afford the flexibility of oral presentations; they do not permit the recipient to mold his argument to the issues the decision maker appears to regard as important." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970).   The problem is especially pronounced in this case, for FinCEN has been extraordinary begrudging in refusing to credit reams of documentation submitted by FBME and maintaining those somehow miss the mark when it comes to, *e.g.*, actual operationalization of AML improvements and implementation in Tanzania. If FinCEN has questions on such points, then FBME could of course address them at a live

hearing, including with sworn testimony.   But FinCEN's process as it stands has doomed FBME by suggesting only after the fact what FBME should have been addressing and how.

Whether written submissions suffice depends upon case-specific application of the considerations set forth in *Mathews v. Eldridge*, which held an oral hearing unnecessary before a state suspended disability benefits.   Written submissions sufficed there because (1) the disability recipient knew "with particularly the information relevant to the entitlement decision"; (2) the information could be "communicate[d] more effectively through written documents"; and (3) the recipient's representative had "full access to *all* information relied upon."   424 U.S. at 345–46 (emphasis added).   The recipient could thus "'mold' his argument to respond to the precise issues which the decisionmaker regards as crucial."   *Id.* at 346.

The circumstances in this case are diametrically opposed to those in *Mathews*.   First, FBME does not know what information the FinCEN decisionmakers deem relevant.   Section 311 mandates that FinCEN "consider" *any* "information [it] determines to be relevant," 31 U.S.C. § 5318A(c)(2), and FinCEN has made a mystery of what it deems relevant, despite FBME's repeated inquiries (AR0113, 0143, 0926–27, 4422, 4416, 4418; Peters Decl. ¶ 2). Again, FinCEN has just now sprung on FBME what amount to "gotcha" questions and concerns that FBME could have been addressing as soon as FinCEN voiced them at an oral hearing. Second, critical to the Second Final Rule is FinCEN's conclusion that FBME is untrustworthy: "FinCEN does not believe FBME" will, if ordered to do so, "provide accurate, credible, and reliable information."   81 Fed. Reg. at 18489.   Determinations of a party's "credibility" are "peculiarly suitable" to oral hearings.   *Gray Panthers*, 652 F.2d at 169–70; *accord, e.g.*, *Califano v. Yamasaki*, 442 U.S. 682, 696 (1979).   Last, but not least, FBME obviously did not have access to "all information" relied on by FinCEN.   *See* Argument § II.B, above.

A final feature of this case heightens the imperative for FBME to receive an oral hearing before a neutral decisionmaker.   It clearly violates due process for a decisionmaker to hold a pecuniary bias in a case he or she is deciding.   *See Withrow*, 421 U.S. at 47; *see also Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009).   Here, FBME has identified *precisely* such a *pecuniary* bias (indeed, an *overriding* one) on the part of *CBC*, yet FinCEN is relying heavily on CBC as FinCEN's proxy without so much as addressing the bias identified by FBME. Surely CBC and FinCEN should not be permitted to "mail in" FBME's virtual death sentence via written submission and rubber stamp as they are, without FBME at least being able to put CBC's veracity and motives to the test at a live hearing.   In these circumstances, due process requires FinCEN to provide an oral hearing.   *See Gray Panthers*, 652 F.2d at 159–73.

> **D.**     **FinCEN Failed To Conduct the Required Consultations**

FinCEN also failed to show that it conducted the consultations required by § 311.   *See* 31 U.S.C. § 5318A(a)(4)(A), (b)(5), (c)(1).   FinCEN does now *say* that it undertook the "required consultations," 81 Fed. Reg. at 18488, but the administrative record does not back that up.   *See* Argument § II.B.1.i, above.   FinCEN's say-so is not enough.   An agency does not satisfy a statutory requirement just by saying it satisfied it; it must show its work.   *See Getty v. Federal Savings & Loan Insurance Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986) ("Stating that a factor was considered . . . is not a substitute for considering it."); *Campanale*, 311 F.3d at 121 ("We rule that there is insufficient evidence in the record to show that the Secretary complied with Congress' explicit procedural requirement to consult with [other entities].").

Even assuming FinCEN did engage in consultations, there is no evidence that FinCEN consulted the right people, at the right time.   Although FinCEN in its initial Notice referred to "representatives" it consulted from specified agencies, AR0080, Section 311 mandates consultation specifically with the "Secretary of State," the "Attorney General," and the

"Chairman" of the Federal Reserve.   § 5318A(a)(4)(A), (b)(5), (c)(1).   Without a record of *who* was consulted, FinCEN cannot prove it consulted the officers required by § 311.

Nor is there evidence that FinCEN consulted at the right time.   FinCEN stated in the Rule that "[f]ollowing the required consultations," it published the Notice of Proposed Rulemaking "on July 22, 2014."   81 Fed. Reg. at 18488.   Thus, any consultations happened *before* July 22, 2014, and well *before* FinCEN undertook on remand what was to be "a new evaluation of the totality of the evidence," ECF 36 at 3, including "a more extensive consideration" of which special measure to impose," ECF 38 at 4.   Section 311 demands that FinCEN consult other officials and agencies when it is "selecting" which special measure to impose, § 5318A(a)(4)(A), yet FinCEN failed to do that during the remand.

FinCEN's failure to establish that it has fulfilled § 311's explicit consultation requirements renders the Second Final Rule unlawful.   *See Karuk Tribe of California v. U.S. Forest Service*, 681 F.3d 1006 (9th Cir. 2012) (en banc) (striking down agency action because agency failed to satisfy statutory consultation requirements); *California Wilderness Coalition v. U.S. Department of Energy*, 631 F.3d 1072, 1085–96 (9th Cir. 2012) (same); *National Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 14–22 (D.D.C. 2014) (same).   Given the profile of this case, there is good reason to fear that FinCEN hurdled past the requisite consultations because it anticipated less-than-favorable reactions.   Indeed, agencies have previously disagreed with FinCEN over § 311 sanctions.   *See A Fearful Number*, THE ECONOMIST ("[o]ther American government departments objected" to FinCEN's § 311 action against Banco Delta Asia).

## III.     FINCEN'S SECOND FINAL RULE IS ARBITRARY AND CAPRICIOUS

Procedural deficiencies aside, the substance of the Second Final Rule is arbitrary and capricious.   FinCEN unreasonably ignored key comments (§ III.A, below), failed to apply statutory factors appropriately (§ III.B, below), and imposed an excessive penalty without

adequately considering lesser alternatives (§ III.C, below).   Finally, FinCEN's rulemaking is tainted by its receipt, review, and concealment of the Privileged Materials (§ III.D, below).

### A.     FinCEN Unreasonably Ignored Contrary Evidence

An agency action is arbitrary and capricious if, *e.g.*, it (1) fails to "examine *the relevant data* and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," (2) fails "to consider an important aspect of the problem," or (3) offers "an explanation for its decision that runs counter to the evidence before it."   *District Hospital*, 786 F.3d at 56–57 (citation omitted).   The Court need not second-guess any judgments by FinCEN in order to rule that the Second Final Rule lacks reasoned explanation as to how FinCEN purports to account for obvious, critical points raised in the record before it.

### 1.     FinCEN failed to consider critical flaws in the use of SARs

The Second Final Rule remains based on what FBME showed to be cherry-picked SARs data, taken without regard for context or baseline points of comparison.   81 Fed. Reg. at 18486, 18488–89.   FinCEN's unwavering, unexplained reliance on this data does not bear scrutiny.

Denied access to the individual SARs (as discussed above in Argument § II.B.1.ii), FBME responded as best it could by noting a variety of flaws inherent in FinCEN's use of aggregated data from the SARs.   FBME critiqued FinCEN's SARs analytics at length in its public comment, and we respectfully urge this Court to read for itself the relevant pages.   *See* AR3340–3344.   Among the key points are the following:

- AR3341:   FinCEN "takes no account of the fact that . . . only *1.7%* of the total amount of transfers and *2.3%* of the amount of USD transfers [between April 2013 and April 2014] triggered a SAR—which hardly fits the profile of a bank *primarily* engaged in facilitating money laundering or other illicit activity";

- AR3341–42:   "FinCEN fails to consider alternative bases for the increase in SARs involving FBME (and presumably numerous other banks in Cyprus) between April 2013 and April 2014, such as the most obvious and likely contributor—the Cypriot financial crisis and attendant controls";

- AR3342:   "[L]ess *than 1%* of the total USD transactions conducted by FBME over this six-year period triggered a SAR [and the] USD 875 million in suspicious transfers cited in the NOF constitutes *only* 0.55% of the total amount of transfers and 0.81% of the USD amount of transfers conducted by FBME during this period";

- AR3342:   "In other words, the overwhelming majority of FBME transactions between November 2006 and March 2013 did not exhibit anything suspicious that might warrant even a SAR, much less a Section 311 sanction";

- AR3342:   "FinCEN offers no point of comparison between FBME and other U.S. or Cypriot banks that it considers similarly situated but less deserving of suspicion given their SAR statistics.   Neither does FinCEN suggest any baseline for the SARs statistics it considers standard or acceptable for an international bank like FBME, say, from April 2013 to April 2014"; and

- AR3341:   "[W]e know of no instance, prior to this proceeding, in which FinCEN has equated any particular SARs data or rate as indicative of a problem under Section 311.   Nor is such use valid. To the contrary, it ignores the purpose of a SAR, which involves a designedly low threshold for the sake of erring on the side of over-inclusion—sweeping in transactions that are perfectly legitimate, simply to ensure there is scrutiny of them to ensure against any issue."

Here is FinCEN's response to FBME's multi-faceted substantive critique, in its entirety:

> FinCEN disagrees and notes that SARs, which are filed by financial institutions regarding transactions revealing a possible violation of law, are an invaluable source of information and an important tool for financial investigations.   In this case, FinCEN believes that the SARs related to FBME are relevant to the finding that FBME is of primary money laundering concern when viewed in the context of all the other information considered.   Multiple SARs indicate that FBME facilitated transactions on behalf of shell companies which, as stated earlier, can be an indicator of money laundering and other suspicious activity.

81 Fed. Reg. at 18486.   None of FinCEN's three sentences comes close to reflecting the reasoned decisionmaking the APA demands.   That SARs are "an important tool for financial investigations" does not mean they are, taken individually or in aggregate, proper tools for *convictions* of financial institutions like FBME.   That they are "relevant . . . when viewed in the context of all the other information considered" does not mean they bear the purported quantification and heft attributed to them.   And that "[m]ultiple SARs indicate that FBME

facilitated transactions on behalf of shell companies" does not differentiate FBME from countless, and, indeed, *all* international banks the world over.   AR3344–45.

Simply put, FinCEN has ignored that its use of SARs in this case is (AR3340–44):

- unprecedented and *sui generis*;

- divorced from and contrary to the very purpose and design of SARs;

- blind to the mass of legitimate FBME transactions, relative to which those triggering SARs are but a small percentage;

- unadorned by any baseline or point of comparison;

- liable to condemn a wide swathe of international banks, and certainly all international banks in Cyprus;

- capturing routine phenomena that have nothing to do with AML deficiencies; and

- in particular confounded by the 2013 financial crisis in Cyprus, which triggered recurring withdrawals (to the extent of Cypriot caps) that could predictably be mistaken for suspicious structuring activity.

For FinCEN to rely on SARs data without addressing these critical points affords stark illustration of outcome-oriented arbitrariness and caprice.   Indeed, FinCEN's Second Final Rule somehow still invokes SARs data to brand FBME one of the *worst* offending banks in the world without denying that FBME might come out among the very *best* if only FinCEN even-handedly applied the same SARs analysis to other banks, apples to apples, so as to enable fair comparison.

### 2.   FinCEN relied on information sourced from CBC, despite its awareness of CBC's unreliability

As FBME demonstrated at length in its Comment, CBC's decades of hostility and prejudice against FBME render any information obtained from CBC altogether unusable—or, at the very least, highly suspect.   AR3302–22.   Yet FinCEN took no account whatsoever in relying upon CBC time after time in the Second Final Rule for the proposition that FBME is a bad-faith scofflaw that cannot be trusted.   81 Fed. Reg. at 18482, 18488–89.   FinCEN has thus

embraced a corrupt regulator that systematically violated Cypriot and international law in order to destroy a bank and seize its assets for its own self-serving purposes.   That approach is part and parcel of FinCEN's longstanding (if unsavory) collaboration with CBC.[8]   It is inimical, however, to the obligation of a U.S. agency to avoid arbitrariness and caprice.   If nothing else, FinCEN was obliged to take account of these grave concerns before crediting CBC.

It bears emphasizing that FBME's critique of CBC is well substantiated by the record, even though it is virtually unaddressed by FinCEN.   In chronicling CBC's history of discriminating against FBME as a successful, non-Cypriot-owned bank, FBME invoked extensive documentation and incontestable facts.   AR3302–22, 3432–69, 3472–90, 3737–65, 3820–24, 3829–92, 4170–81.   FinCEN addressed none of those in the Second Final Rule.

What is more, independent third parties, who have no particular axe to grind in this case, thoroughly validated FBME's stated concerns.   In a comment to FinCEN, a former Governor of CBC expressed his surprise that FBME would suddenly be engendering AML concerns and observed that politics best explain CBC's campaign against FBME at this point.   He wrote that "[d]uring [his] tenure, there was considerable evidence in the public domain that certain politicians were uncomfortable with FBME's presence in Cyprus," and that, in regards to "the rationale of the CBC's actions in relation to FBME," "the diminished independence of the central bank and the toxic politics alluded to above may well have contaminated the decision making process at the CBC, pushing it away from strict banking considerations and into the realm of party and interest group politics."   AR3198–200.   FinCEN ignored the former Governor's

---

[8]     Over the course of 390 pages of comments and exhibits, FBME noted the extensive indicia of FinCEN and CBC choreographing a shared strategy to take down FBME, without either being held to account.   AR3302–22, 3432–69, 3472–590, 3737–65, 3820–24, 3828–992, 4169–81.   FinCEN has offered no contradiction on that score.

comment.   Similarly, FBME submitted a letter from Tanzania's statutory manager that called out CBC's unscrupulousness and illegality and quoted CBC's special administrator as confessing his goal of seizing FBME assets for Cyprus to claim as its own.   AR4442.   FinCEN ignored that letter too.   PWC, after being engaged by CBC to audit FBME in 2014, disavowed any involvement or even knowledge of the resulting audit report that CBC nonetheless somehow attributed to PWC.   AR3320, 3990.   Once again, FinCEN said nothing about this while relying on CBC's self-concocted account of the 2014 audit.   81 Fed. Reg. at 18482.

We respectfully submit that anyone reviewing the administrative record will find reason to fault, or at least question, the role that CBC has played in this case.   To note just a few key facts that should now be undisputed:

- CBC is on record as discriminating against FBME on the express ground that FBME's owners are not from Cyprus.   AR3508.

- After inexplicably withholding for over a year any report from PWC's 2014 audit of FBME, CBC tried to pass its own report off as that of PWC, only for PWC to disavow authoring or reviewing the report.   AR3319–20, 3922, 3390–92.[9]

- CBC has repeatedly stated its intent to claim hundreds of millions of dollars in FBME's assets as those of the Cypriot government.   *See, e.g.*, AR3315–17, 3820–27.

- CBC has still more pecuniary interest in FinCEN issuing its Second Final Rule. FBME's shareholders have commenced an arbitration against CBC seeking hundreds of millions of dollars for the damage it caused.   Central to CBC's defense is the

---

[9]   Especially problematic is FinCEN's effort to piggy-back atop the "PWC" audit findings that CBC finally sent FBME in September 2015.   81 Fed. Reg. at 18484; AR4445–72. FBME prominently alerted FinCEN that CBC had apparently doctored the report in order to fault FBME, without getting sign off from the PWC auditors CBC had commissioned and paid to audit FBME.   AR3320, 3989–90.   As further reflected in FBME's comments, CBC's adverse findings (i) contradicted the positive, contemporaneous reports of the actual PWC auditors on site, as confirmed by CBC's officers, that no material deficiencies had been found; (ii) came after CBC had withheld the audit report for over a year, contrary to its established practice and despite FBME's repeated requests; (iii) put FBME on a seven-day clock to respond, right as FBME was facing the press of other exigencies; and (iv) reached back to years and issues that had been addressed through other audits and mooted by acknowledged upgrades to FBME's AML policies and procedures.   AR3315, 3319–21.

argument that it is FinCEN's imposition of the fifth special measure that has caused FBME's damages.    AR3320–22, 3999–4001 ¶¶ 46–53.

- CBC has been trying to liquidate FBME without permitting adversarial contestation, including by proceeding *ex parte* three days before Christmas.    AR3317–18.

- CBC solicited and paid for breaches of attorney-client privilege by disgruntled investigators who had been retained by FBME and its counsel and privy to their confidences.    ECF 51 & 52.

FinCEN did not address *any* of these facts in its Second Final Rule.    Nor has FinCEN addressed or accounted for a litany of other facts that are of the same piece and utterly impugn CBC, particularly insomuch as CBC now has an undeniable and overwhelming pecuniary interest in propelling FinCEN towards re-imposing the fifth special measure.    *See* AR3302–22.

The only thing FinCEN says to justify its continued reliance on CBC is that "CBC has received positive reviews"; for that, FinCEN points to a single 2011 report from the Committee of Experts on the Evaluation of Anti-Money Laundering and the Financing of Terrorism ("MONEYVAL").    81 Fed. Reg. at 18485, 18487–88.    But MONEYVAL's 2011 report (now out of date and superseded) has nothing to say about CBC's conduct *specifically towards FBME,* much less its conduct *in this case*, which is what engenders grave concern.    In any event, far from praising Cyprus, this 2011 MONEYVAL report concludes that "[t]he human, financial and technical resources allocated to competent authorities regarding AML/CFT matters are not satisfactory on the whole, and *the situation is particularly worrisome as regards supervisory authorities*."    MONEYVAL, *Report of the Fourth Assessment Visit—Anti-Money Laundering and the Combating of the Financing of Terrorism: CYPRUS* ¶ 35 (Sept. 27, 2011), https://goo.gl/UHO9U6 (emphasis added).    That FinCEN cites that report as *endorsing* CBC speaks volumes about how far FinCEN must stretch to find something "good" to say.

Thus, FinCEN's only defense of CBC—that it received "positive reviews" from MONEYVAL—is at odds with what FinCEN cites.    If anything, MONEYVAL's report further

bolsters the concerns raised by FBME:   To the extent there have been larger worries about

"supervisory authorities" in Cyprus, is all too predictable that an incompetent, unscrupulous,

politicized regulator like CBC, when caught on shaky footing, would be—and has been—eager

to offer up FBME as a non-Cypriot scapegoat whose valuable assets can become a Cypriot prize.

If FinCEN does not think that is what is happening here, then the least it should do is explain

why.   In any event, FinCEN's continued reliance on CBC is arbitrary and capricious given that

it is (1) based on "positive reviews" that do not exist in the administrative record and (2) contrary

to reams of on-point, unanswered evidence in the record establishing that CBC is in fact

unreliable, unscrupulous, engaged in flagrant misconduct, and thoroughly biased against FBME.

### 3.     FinCEN continues to rely on discredited allegations

FinCEN continues to rely on discredited allegations without acknowledging on-point

refutation.   The sum of FinCEN's obstinacy is greater than any part:   FinCEN's rationale is

unreasoned precisely because it is indifferent to contrary evidence and insusceptible to refutation.

Without confronting (much less correcting) any particular factual mistake, FinCEN simply

repeats it or treats it as irrelevant to the ever-shifting, indistinct blob FinCEN offers as its case.

*Advertisements*: According to the Second Final Rule, FBME "advertised the bank to

potential customers as being willing to facilitate the evasion of AML regulations."   81 Fed. Reg.

at 18482.   FBME thoroughly rebutted this claim in its September 2014 Public Comment, which

demonstrated that FBME "has never advertised its willingness to" facilitate the evasion of AML

regulations.   AR0130.   "FBME's promotional materials do not advertise the Bank's ease of use

or evasion of regulations"; instead, FBME's marketing highlights its international banking

experience.   *Id.*   For FinCEN to conclude otherwise is contrary to the evidence and unjustified.

*Gambling Websites*: FinCEN also cites third-party, online gambling websites as evidence

of FBME's wrongdoing.   AR0029.   But FBME showed FinCEN how it constantly sought "the

removal of any false, maligning statements about the Bank that the third parties publish on the Internet." AR0131. In its comment to FinCEN, FBME detailed the numerous letters it has sent to third parties who post such inaccurate information (AR0131–32) and the court proceedings it has brought against some (AR0132). To the extent FinCEN is nonetheless faulting FBME for not being able to exert perfect control over one or another third-party Internet site, that is arbitrary and capricious in the extreme.

*Italy*: FinCEN has no better basis to persist in alleging, as it does in its Second Final Rule, that FBME was complicit in illicit financial transactions involving an Italian political party. FBME authoritatively debunked any suggestion that it facilitated the alleged embezzlement and bribery scheme, showing that, to the contrary, its AML protocols worked exactly as they should have. *See* AR3339–40. But FinCEN gives no credit to FBME's refutation, instead relying on "articles" that reference "multiple checks going back and forth between Italy and FBME in Tanzania." AR0056. The "articles" FinCEN cites to are, in fact, *one* Kenyan article (posted on two separate websites), which reported that Italian authorities were "*investigating*" a transfer to Tanzania and a transfer to Cyprus. AR2877, 2879 (emphasis added). Thus, FinCEN skips past FBME's concrete refutation to land on an *unsubstantiated* "reference" to an *investigation* in a *single* article reposted online more than *four years* ago, without anything more (such as follow up with Italian investigators), as basis to condemn FBME for egregious AML lapses.

*External Audits*: While endorsing CBC's invention of a supposed "PWC" audit report that PWC disavowed, FinCEN still gives FBME no credit—and, indeed, turns against FBME— positive compliance determinations made by EY and KPMG. 81 Fed. Reg. at 18483. There is no denying that FBME showed transparency, good faith, and commitment to compliance by bringing in preeminent third-party auditors who could review its compliance and recommend

improvements.   AR3330–35.   Nor is there any denying that those auditors found FBME consistently cooperative and fundamentally compliant with applicable laws.   AR0754–55, 3064–66.   That the auditors found issues and recommended improvements is consistent with FBME's continuing commitment to compliance—as further demonstrated by FBME's implementation of their recommendations.   AR3333–35, 3719–36, 3766–80.   In nonetheless cherry-picking supposed "deficiencies" EY identified, such as FBME's failure to "modify[] [its] periodic customer due diligence process to align with industry practices," 81 Fed. Reg. at 18484, FinCEN ignores EY's *explicit* acknowledgment that such a modification was "*not required*" by applicable law.   AR3786 (emphasis added).   More fundamentally, FinCEN treats as damning the sort of back and forth between a state-of-the-art auditor and an attentive bank that is healthy and deserving of encouragement.

*CBC Fines:* Finally, FinCEN cites specifically to two fines CBC levied against FBME. FBME demonstrated the baselessness, inapplicability, and unfairness of these fines in its comment (AR3308, 3310–14, 3319–20, 3352–56), and FinCEN offered no contradiction even as it relied on them in the Rule (81 Fed. Reg. at 18482, 18484, 18486).   FinCEN particularly emphasizes CBC's December 2015 fine of €1.2 million, which was based on the extremely suspicious (to say the least) "PWC" audit discussed above.   AR3751–55.   Although FBME detailed the troubling circumstances surrounding this audit in its comment, AR3319–20, not the least of which is that the *auditors themselves disavowed any involvement in CBC's findings*, FinCEN ignored all of that while leaning heavily on CBC's account.   81 Fed. Reg. at 18480–94.   FinCEN's continual reliance on these fines as basis for a § 311 sanction without addressing, much less disputing, any aspect of what was actually behind them, reflects an egregious failure "to consider an important aspect of the problem."   *District Hospital*, 786 F.3d at 56–57.

**B.      FinCEN Failed To Apply § 311's Statutory Factors Appropriately**

FinCEN did not properly consider the two governing sets of statutory factors—one in deciding to designate an entity as "of primary money laundering concern," and the other in selecting a special measure.   31 U.S.C. § 5318A(a)(4)(B), (c)(2)(B); *see* Background § I, above.

With respect to the "primary money laundering concern" factors, FinCEN wholly failed to consider "the extent to which" FBME is "used for legitimate business purposes in [Tanzania]." 31 U.S.C. § 5318A(c)(2)(B)(ii).   This failing is particularly conspicuous given that FinCEN has suddenly raised *against* FBME its AML efforts in *Tanzania*.   *See* Argument §§ II.B.2.iii & II.B.2.vii, above.   Despite this new accusation, nowhere in the Second Final Rule does FinCEN consider the extent of FBME's legitimate business in Tanzania.   *See* AR0076 (omitting any substantive mention of Tanzania).   FinCEN's analysis is marginally better with respect to FBME's legitimate business in Cyprus, but still inadequate:   The Notice of Finding calls it "difficult to assess" FBME's legitimate activity in Cyprus, but then never *attempts* to assess—or even estimate—the "extent" of that activity.   AR0076.   FinCEN has thus unlawfully abdicated its statutory obligation to weigh FBME's legitimate business in Cyprus and Tanzania.   *Public Citizen v. Federal Motor Carrier Safety Administration*, 374 F.3d 1209, 1216–17 (D.C. Cir. 2004); *FEC v. Rose*, 806 F.2d 1081, 1088 (D.C. Cir. 1986).

In the same vein, FinCEN did not adequately apply the factors for imposing the fifth special measure because it failed to consider "the extent to which" imposition of the fifth special measure "would have a significant adverse systemic impact . . . on legitimate business activities involving [FBME]."   31 U.S.C. § 5318A(a)(4)(B)(iii).   Because FinCEN failed to assess the extent of FBME's legitimate business activity (under § 5318A(c)(2)(B)(ii)), it could not assess the extent to which the fifth special measure will impact that activity (under § 5318A(a)(4)(B)(iii)).   That FinCEN overlooked the costs of the fifth special measure means it

had no sound way of balancing those costs against the perceived benefits, as the statute requires. When Congress mandates that an agency consider a rule's costs, as it has here, it is arbitrary and capricious not to consider them.   *Michigan v. EPA*, 135 S. Ct. 2699 (striking down agency rule for failing to consider the rule's costs); *MetLife, Inc. v. Financial Stability Oversight Council*, --- F. Supp. 3d ----, 2016 WL 1391569, at *14–17 (D.D.C. Mar. 30, 2016) (same).

## C.   FinCEN Imposed an Excessive Penalty Without Adequately Considering Alternatives

In the Second Final Rule, FinCEN has returned to the same draconian sanction.   This time it purports to consider alternative sanctions, *see* 81 Fed. Reg. at 18489–90, but its consideration is unreasoned.   As an initial matter, FinCEN failed during the remand to conduct the consultations that § 311 requires when FinCEN is "selecting which special measure or measures to take" (31 U.S.C. § 5318A(a)(4)(A)) and when it chooses to deploy the fifth special measure (§ 5318A(b)(5)).   *See* Argument § II.D, above.   Because consultation is essential, because alternative sanctions were central to remand, and because FinCEN has offered no explanation of how consultations informed its sanction on remand, it has no leg to stand on.

According to FinCEN (*sans* consultation), any alternative measures against FBME would not suffice for the fundamental reason that FinCEN does not believe that FBME would "provide accurate, credible, and reliable information to the party responsible for assuring compliance." 81 Fed. Reg. at 18489.   But that statement is utterly bereft of support.   FinCEN points to FBME's supposed "extensive history of AML deficiencies," its alleged "advertising . . . to potential customers as being willing to facilitate the evasion of AML regulations," and the supposed fact that "[i]n late 2014, FBME took various measures to obscure information."   *Id.* As explained above, each of these points is either contrary to the record (FBME has an extensive history of AML *improvements* and never engaged in the alleged advertising, *see* Argument

51

§§ II.B.2.vii & III.A.3, above), or was first alleged in the Second Final Rule, so FBME could not refute it (as with the supposed obscuring of information, *see* Argument § II.B.2.i, above).

Moreover, even if FBME did have an "extensive history of AML deficiencies" (which it does not), that could not itself lead to imposition of the fifth special measure.   An extensive history of AML deficiencies is what triggers *some* special measure in the first place; it cannot simultaneously serve as justification for imposing the *fifth* special measure.   Rather, there must be some aggravating factor, beyond a history of AML deficiencies, to warrant imposition of the fifth special measure—or else FinCEN could automatically justify the fifth special measure in every § 311 proceeding.

Equally important, FBME compares favorably to other financial institutions that FinCEN let off much lighter.[10]   In particular, FinCEN withdrew its proposed imposition of the fifth special measure against Multibanka upon learning it had "instituted measures to guard against money laundering abuses," including retaining an auditing firm, reviewing accountholders, and overhauling its information technology system.   71 Fed. Reg. 39606, 39608 (July 13, 2006).  FinCEN responds that § 311 outcomes are determined on a "case-by-case basis," 81 Fed. Reg. at 18490, but that does not entitle FinCEN to favor one bank over another in comparable

---

[10]     In June 2015, FinCEN fined West Virginia-based Bank of Mingo because (1) the bank failed to implement an adequate AML program; (2) an employee lied to federal agents; and (3) the bank allowed a corporate customer to conduct over $9 million of structured transactions from 2008–2012.  *In the Matter of Bank of Mingo*, No. 2015-08 (2015), https://goo.gl/Ejx6ld. In February 2016, FinCEN fined a Florida bank $4 million for AML deficiencies including failing to timely file at least 120 SARs reports involving nearly $553 million, much of which involved a $1.2 billion Ponzi scheme.  *In the Matter of Gibraltar Private Bank and Trust Co.*, No. 2016-01 (2015), https://goo.gl/P4f51D.   And FinCEN let off Hong Kong-based Tinian Dynasty Hotel and Casino with a fine after finding that it developed *no* AML program, appointed *no* staff to monitor compliance, *never* independently tested its compliance systems, and obtained *no* training for AML compliance.  *In the Matter of Hong Kong Entertainment (Overseas) Investments, Inc.*, No. 2015-07, at 2–3 (2015), https://goo.gl/W9fWI5.   The casino also had systematic, pervasive failures in reporting suspicious transactions.   *Id.* at 6–7.

circumstances.   "A fundamental norm of administrative procedure requires an agency to treat like cases alike."   *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007).   Here, FinCEN's only rationale for treating FBME differently from Multibanka is that (i) "FBME has not demonstrated any AML improvements . . . in Tanzania," and (ii) FBME Cyprus allegedly ignored instructions from CBC and "actively evaded AML regulations."   81 Fed. Reg. at 18490. But we have already explained that both of these assertions are themselves unsupported by the record.   *See* Argument §§ II.B.2.vii, III.A.3.   Accordingly, FinCEN has "no basis in fact or in logic" for treating FBME and Multibanka so differently.   *Westar Energy*, 473 F.3d at 1243; *accord, e.g.*, *Friedman v. Sebelius*, 686 F.3d 813, 827–28 (D.C. Cir. 2012).

Similarly incongruous is the fact that FinCEN was content to see HSBC get off with a mere fine for willful violations, including obviously inadequate AML controls and severely understaffed and ineffectual AML compliance units, that facilitated the laundering of at least $881 million in drug proceeds through the U.S. financial system.   Despite recognizing the *heightened* risk of money laundering in Mexico, HSBC chose to apply its *lowest* level of diligence and thus failed to monitor appropriately more than *$670 billion* in wire transfers from Mexico.   *See In the Matter of HSBC Bank USA N.A.*, No. 2012-02 (2012), https://goo.gl/tX1Fl0; Deferred Prosecution Agreement, *United States v. HSBC Bank USA N.A.*, 12-cr-763 (Dec. 11, 2012), ECF 3-3.   Even now, HSBC's appointed monitor "remains unable to certify that the bank's compliance program is reasonably designed and implemented to detect and prevent violations of AML and sanctions laws" or "that HSBC has implemented and adhered to all of the remedial measures" as agreed.   Letter at 3, *United States v. HSBC Bank USA, N.A.*,

No. 12-cr-763 (E.D.N.Y. Apr. 1, 2016), ECF 77.   One can well wonder why FinCEN's decisionmakers have been so forgiving, by comparison, in the case of HSBC.[11]

### D.      FinCEN's Review of Privileged Materials Tainted the Rulemaking

Compounding all of the above concerns is the fact that FinCEN secretly received and reviewed obviously privileged materials—the "Privileged Materials," as defined in Background § III.C, above—from malcontent former agents of FBME who had been retained by FBME's legal counsel, worked closely with them, and became privy to their confidences.   *See* ECF 51. According to these investigators' own account, in the spring of 2015, they became paid agents of CBC and the Cypriot government.   ECF 52-6.   Leaving aside what this episode confirms about CBC's willingness to resort to impropriety to destroy FBME, FinCEN's protracted embrace of those tactics is still more disquieting.

In August 2015, while FBME's request for a preliminary injunction remained pending before this Court, FinCEN was sitting on hundreds of pages of information in which the investigators purport to describe the findings of their investigation and put a sinister gloss on communications between FBME and its undersigned legal counsel.   *See* ECF 51; ECF 52-5. Even amidst active litigation before this Court, FinCEN did nothing whatsoever to notify FBME's counsel about these obviously prejudicial and self-evidently privileged materials. FinCEN then continued to conceal the information in obtaining a voluntary remand, reopening the rulemaking, and collecting comments.   As with so much of its case, FinCEN waited until February 1, 2016—*after* the comment period closed and FBME had no chance to respond— before first notifying FBME's counsel about the Privileged Materials.   ECF 52-1.

---

[11]      Defendant Jennifer Shasky Calvery, the Director of FinCEN, recently announced she will resign from FinCEN, apparently to go work for HSBC.   *See* Brett Wolf, *U.S. Treasury anti-laundering head to join HSBC: sources*, REUTERS (Apr. 26, 2016), http://goo.gl/dghI20.

FinCEN's receipt, review, and concealment of the Privileged Materials for six months violated not only the APA and due process, but also the rules of professional conduct.   The D.C. Bar has advised that D.C. Rules of Professional Conduct 1.15(b) and 8.4(c) require counsel who receive privileged documents that *may* have been stolen or taken without authorization from an opposing party to (1) not review or use the documents and (2) return the documents or make inquiry of opposing counsel before determining what action to take.   D.C. Bar Ethics Opinion 318: Disclosure of Privileged Material by Third Party (Dec. 2002), https://goo.gl/l7k9lT. Simply put, FinCEN's review and concealment of the Privileged Materials left a taint on FinCEN's rulemaking.   *Cf. Gomez v. Vernon*, 255 F.3d 1118, 1134 (9th Cir. 2001)).

An agency's failure to heed ethical considerations and remedy ethical violations "amount[s] to fail[ure] to consider an important aspect of the problem" and renders agency action arbitrary and capricious.   *Lorillard, Inc. v. U.S. FDA*, 56 F. Supp. 3d 37, 51 (D.D.C. 2014) (citation and quotation marks omitted), *vacated on other grounds*, 810 F.3d 827 (D.C. Cir. 2016).   Moreover, agencies whose rulemakings have been exposed to taint fall under an obligation to conduct evidentiary hearings and make findings in order to determine whether a new rulemaking is necessary.   *E.g.*, *Professional Air Traffic Controllers Organization v. FLRA*, 672 F.2d 109, 113 & n.7 (D.C. Cir. 1982); *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 58–59 (D.C. Cir. 1977); *Sangamon Valley Television Corp. v. United States*, 269 F.2d 221, 225 (D.C. Cir. 1959).   Accordingly, this Court should either vacate the Second Final Rule as tainted or, at a minimum, order FinCEN to conduct an evidentiary hearing to address the taint.

## CONCLUSION

For the foregoing reasons, Plaintiffs FBME Bank Ltd. and FBME Ltd. respectfully request that the Court grant judgment in their favor and vacate FinCEN's Second Final Rule.

Dated:   April 29, 2016                     Respectfully submitted,

                                            QUINN EMANUEL URQUHART &
                                            SULLIVAN LLP


                                            */s/ Derek L. Shaffer*
                                            Derek L. Shaffer (D.C. Bar No. 478775)
                                            William A. Burck (D.C. Bar No. 979677)
                                            Lauren H. Dickie (IL Bar No. 6286037)
                                            Jonathan G. Cooper (D.C. Bar No. 999764)
                                            777 Sixth Street NW, 11th Floor
                                            Washington, DC 20001
                                            (202) 538-8000


                                            HOGAN LOVELLS US LLP


                                            */s/ Peter S. Spivack*
                                            Peter S. Spivack (D.C. Bar No. 453731)
                                            J. Evans Rice III (D.C. Bar No. 481768)
                                            555 Thirteenth Street NW
                                            Washington, DC 20004
                                            (202) 637-5600


                                            *Attorneys for Plaintiffs*
                                            *FBME Bank Ltd. and FBME Ltd.*