## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FBME BANK LTD.**; and | |
| **FBME LTD.**, | |
| Plaintiffs, | |
| v. | Case No. 1:15-cv-01270 |
| **JACOB LEW**, in his official capacity as Secretary of the Treasury; | |
| **U.S. DEPARTMENT OF THE TREASURY**; | |
| **JENNIFER SHASKY CALVERY**, in her official capacity as Director of the Financial Crimes Enforcement Network; and | |
| **FINANCIAL CRIMES ENFORCEMENT NETWORK**, | |
| Defendants. | |

### DECLARATION OF AYOUB-FARID SAAB

I, **Ayoub-Farid M. Saab**, declare as follows:

I.       **Background**

1.       I am one of two ultimate beneficial shareholders of FBME Bank Ltd. ("FBME" or the "Bank").  The other shareholder is my brother, Fadi M. Saab.  Unless otherwise indicated, the facts below are based on my personal knowledge obtained in my capacity as one of the ultimate beneficial owners of FBME.

2.       I previously submitted a sworn declaration in this case, dated August 7, 2015, and am submitting this declaration to supplement the record.

II.      **CBC's Response to FinCEN's Issuance of the Second Final Rule**

3.       Days after FinCEN issued the Second Final Rule, the Special Administrator of the Cyprus branch delivered termination letters to at least 130 FBME staff members, out of a total of approximately 160 at the Bank.  *See* Appendix A: Sample Employee Termination Letter.

4.       The Special Administrator attempted to terminate these employees without statutory notice and without other benefits to which those employees are entitled under Cypriot law.

5.       Indeed, the Special Administrator even attempted to terminate my brother Fadi Saab, executive director and 50% ultimate beneficial owner of the Bank, and me.  *See* Appendix B: Fadi Saab Termination Letter; Appendix C: Farid Saab Termination Letter.

III.     **AML Procedures and Improvements**

         A.      **Tanzania**

6.       When FBME first incorporated in Tanzania in 2003, FBME's Board of Directors decided to apply the strictest Anti-Money Laundering ("AML") regulations applicable to any branch to the *entire* FBME group.  Because the Cyprus AML regulations, which are based on the European Union AML requirements, are generally more strict than those of Tanzania, FBME

1

applied the Cypriot regulations to all of its branches including those in Tanzania.   Where Tanzania law is more strict, however, FBME applies the Tanzanian requirements.   For example, pursuant to the Tanzanian regulations, FBME employees collect the fingerprints of local Tanzanian customers (those who reside in Tanzania) upon first opening an account with FBME in Tanzania.

7.     FBME's Tanzanian operations have their own compliance manager and department which (1) reports to FBME's Tanzanian General Manager; and (2) submits reports to the Bank of Tanzania ("BOT").   The Tanzanian compliance manager also reports to the Group Head of Compliance on a quarterly basis.

8.     At least once a year, the Tanzanian compliance department holds all-staff trainings about AML and terrorist financing issues.

9.     Tanzanian branch managers and some officers receive additional training regarding AML and counter-terrorist financing measures from the BOT and the Tanzanian Financial Intelligence Unit ("FIU").

10.     All Tanzanian employees receive training on FBME's Compliance Manual of Policies and Procedures for Tanzania.   *See* Appendix D:   FBME's Manual of Policies and Procedures, Section O, Compliance.

11.     While the Tanzanian compliance department is responsible for on-boarding clients living in Tanzania, FBME's Cyprus branch screens international customers (individuals or companies that reside outside Tanzania) who wish to open an account with FBME in Tanzania.

12.     When FBME's Tanzanian branches identified any suspicious activity with its customers and accounts, the compliance manager reported it to the FIU and to FBME's Group Head of Compliance in Cyprus.

13.     Since FinCEN issued the Notice of Finding in July 2014, all transactions at FBME's Tanzanian branches have been conducted in the local Tanzanian currency.

**B.     AML Improvements**

14.     When FBME implemented improvements to its AML and compliance programs in satisfaction of the requirements of Cypriot AML laws, the Bank implemented these improvements in parallel at its Cyprus and Tanzanian branches, even though the applicable standards in Tanzania are less stringent than those of Cyprus.

15.     For example, FBME has implemented EY's 2014 recommendations bank-wide (*i.e.* at all of the Bank's branches in Cyprus and Tanzania) which include improvements to customer due diligence and transaction monitoring.

16.     In response to EY's 2014 recommendations, FBME has implemented a new UBO onboarding platform.  *See* Appendix E:  Screenshot of FBME's new UBO Onboarding Platform (using the name of an FBME employee in the IT Department for demonstrative purposes).

17.     As recommended by EY, in January 2015, FBME's Board of Directors participated electronically (and will continue to participate) in FBME's rigorous compliance trainings for the Bank's management.  *See* Appendix F: Training Registers.

18.     FBME cannot fully implement some of EY's recommendations simply because the Bank has been limited in its functionality as a result of FinCEN's notices and CBC's conduct.  For example, EY's recommendations regarding (i) compliance training for new hires; (ii) regular updates of the compliance training register; (iii) enhanced risk-rating methodology

3

for Approved Third Parties ("ATPs"); (iv) recording and tracking the resolution of alerts generated by FBME's transaction monitoring systems; and (v) upgrading the functionality of the Oracle Mantas software to further improve FBME's transaction monitoring systems cannot go live until and unless the Bank resumes its normal operations. For these recommendations, however, FBME has prepared detailed implementation plans for when the Bank resumes full operations ("Implementation Plan").

19.    Had FBME known that FinCEN needed more information about the Bank's improvements to its compliance program, FBME could readily have provided the agency with additional documentation and substantiation, including but not limited to (i) the attached screenshots of the new UBO onboarding platform; (ii) the attached Training Registers; (iii) copies of WorldCheck searches performed for corporate clients; and (iv) its Implementation Plan.

20.    Due to recent actions by the Special Administrator and CBC to shut down and liquidate FBME, key officers and most employees are unable to access the Bank's IT systems and obtain documentation relating to certain of FinCEN's new allegations against FBME including those relating to the Bank's AML improvements. Only a skeletal staff retains access. Any ability to communicate is limited and controlled by CBC.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed in Nicosia, Cyprus on April 28, 2016

Ayoub-Farid Saab

# APPENDIX A



**FBME BANK**

31 March 2016


Mr. Michael SAAB
Chief Executive Director
7357
Nicosia, Cyprus


**BY HAND**

**By email**: Michael.Saab@fbme.com


Dear Mr. SAAB,

In my capacity as Special Administrator of FBME BANK (Cyprus) Ltd (**"the Branch"**) under special administration, you are hereby given formal notice that your employment with the Branch is herewith terminated on grounds that the Branch has ceased carrying on its operations and shall not resume the same.

Termination of your employment with the Branch, as aforesaid, is effective as from the 1st of April 2016.


Yours truly,

**Chris Iacovides,**
**Special Administrator**

# APPENDIX B



**FBME BANK**

31 March 2016

Mr. Fadi SAAB
Chief Executive Director
7357
Nicosia, Cyprus

**BY HAND**

**By email**: Fadi.Saab@fbme.com

Dear Mr. SAAB,

In my capacity as Special Administrator of FBME BANK (Cyprus) Ltd (**"the Branch"**) under special administration, you are hereby given formal notice that your employment with the Branch is herewith terminated on grounds that the Branch has ceased carrying on its operations and shall not resume the same.

Termination of your employment with the Branch, as aforesaid, is effective as from the 1st of April 2016.

Yours truly,

**Chris Iacovides,**
**Special Administrator**

# APPENDIX C



**FBME BANK**

31 March 2016

Mr. Ayoub Farid SAAB
CHAIRMAN
7357
Nicosia, Cyprus

**BY HAND**

**By email**: Farid.Saab@fbme.com

Dear Mr. SAAB,

In my capacity as Special Administrator of FBME BANK (Cyprus) Ltd (**"the Branch"**) under special administration, you are hereby given formal notice that your employment with the Branch is herewith terminated on grounds that the Branch has ceased carrying on its operations and shall not resume the same.

Termination of your employment with the Branch, as aforesaid, is effective as from the 1st of April 2016.

Yours truly,

Chris Iacovides,
**Special Administrator**

FBME Bank Ltd, Nicosia Branch
90 Archbishop Makarios III Avenue, 1077 Nicosia, Cyprus  P.O. Box 25566, 1391 Nicosia, Cyprus
Tel: +357 22 888444  Fax: +357 22 888555  e-mail: nicosia@fbme.com  www.fbme.com
Registration No. AE1830

# APPENDIX D



# O:    COMPLIANCE

| A. COMPLIANCE MANAGEMENT | | |
|---|---|---|
| 1. | Introduction | **View** |
| 2. | Compliance Procedures | **View** |
| 3. | Regulatory Requirements | **View** |
| 4. | Legal Framework | **View** |
| 5. | Conflicts of Interest | **View** |
| **B. PREVENTION OF MONEY LAUNDERING AND TERRORIST FINANCING** | | |
| 1. | Introduction | **View** |
| 2. | Know Your Customer Procedures | **View** |
| 3. | Documents required and retained in compliance with the KYC Principle | **View** |
| 4. | Procedures for High Risk Customers | **View** |
| 5. | Compliance Procedures | **View** |
| 6. | Cards | **View** |
| 7. | Compliance with Court Orders | **View** |
| 8. | The Role of the Money Laundering Compliance Officer | **View** |
| 9. | Customer Acceptance Policy | **View** |



## A. COMPLIANCE MANAGEMENT

### 1. INTRODUCTION

1.1. The Board of Directors, having acknowledged the Bank's, henceforth the "Group", exposures to compliance risks, the need for the strict compliance with relevant laws and regulations, as well as having addressed the key issues regarding its fundamental attitude towards compliance risks and management, has approved a comprehensive Compliance Management Strategy and Policy.

1.2. This document (See B.11.12), prescribes the objectives and responsibilities of the Compliance Unit compliance governance and guiding principles which represent the core set of values driving the Compliance Management function of the Group irrespective of the nature or type of compliance risk managed.

1.3. The responsibility for the implementation of the management of the Compliance Risk Strategy and Policy resides with the Group's Executive and Senior Management through the compliance function headed currently by the Group Head of Compliance.

1.4. The responsibility for the strict compliance with relevant laws and regulations lies with the Compliance Unit for the application of suitable internal procedures the implementation of which achieve a timely and on-going compliance of the Group with the existing legal and regulatory framework thus protecting the Bank from any financial and reputational loss.

1.5. Compliance Management holds the role of an independent control function of the Group across all its operations and units.

### 2. COMPLIANCE PROCEDURES

For the purpose of securing the implementation of the Bank's Compliance Management Strategy and Policy the following procedures are implemented that intend to provide the Bank assurance, guidance and feedback on the level of ongoing compliance with appropriate rules and regulations.

2.1. The Compliance Risk Management Strategy is subject to update at least annually and the approval, generally or specifically, of the Board of Directors must be sought and obtained accordingly.

2.2. The Head of the Tanzania Compliance Unit is required to submit an annual report for assessment and approval by the Board of Directors through the Bank's Group Head of Compliance with regard to the Bank's level of compliance with its obligations laid down in the Law and the Directives of the Tanzania supervisory authorities.

2.3. The Group Head of Compliance takes all action as deemed appropriate to remedy any weaknesses / deficiencies identified in the annual report mentioned above.



2.4.    Internal Audit carries out, at least once a year, an audit review of the Compliance Unit's functions. The results are reported to the Board of Directors through the Board Audit Committee.

2.5.    The Group Compliance Management provides guidance, assistance and training particularly in complying with the regulatory framework relating to the prevention of the use of the financial system for purposes of money laundering and financing of terrorism.

2.6.    The Compliance Unit undertakes, oversees or commissions the analysis of new regulations and codes so as to assist the Bank in identifying the necessary changes to the systems, procedures, instructions and practices that will be necessary, as a result of these changes, to ensure that the requirements of the changes are implemented in a timely and effective manner.

2.7.    All business units are responsible to have appropriate internal controls in place and to comply with their operational functions by applying such internal control measures ensuring compliance with laid down policies and procedures.

2.8.    Compliance and operational function risks for each business unit have been identified and a quarterly detailed questionnaire must be completed by each business unit and submitted to the Head of Compliance no later that 5 days from quarter end confirming compliance with laid down policies and procedures, internal control measures applies as well as remedial action taken in case of procedural deviations found.

2.9. The Tanzania Compliance Unit is required and should carry out on a half-yearly basis, spot reviews for the purpose of testing, assessing and validating that compliance risks are effectively managed by each business unit.

2.10.   The Tanzania Head of Compliance must report to the Group Head of Compliance on a quarterly basis with regard to compliance with internal control procedures applied by each business unit.

## 3.   REGULATORY REQUIREMENTS

3.1.    In accordance with the existing regulatory directives/ requirements for the submission of returns/reports to Bank of Tanzania the following reporting schedule stipulates the subject matter of each required report relating to each department, the reporting period and delivery calendar.

| Form required | Description | Period |
|---|---|---|
| From Accounts | | |
| Form 16-1 | Balance Sheet | monthly |
| | Income Statement | |
| | Cash flow Statement | |
| | Maturity Analysis of Assets & Liabilities | monthly |
| | Classification of Loans, Advances & OD | monthly |
| | Sectoral Classification of Loans Bill Equity | |



|  |  |  |
|---|---|---|
|  | Investments & Financial Derivatives | monthly |
|  | Classification of Risk Assets | quarterly |
|  | Analysis of Allowance for Probable Losses, Provisions, Charge Offs & Recoveries | quarterly |
|  | Concentration Analysis | quarterly |
|  | Related Entity Analysis- Equity Investment | quarterly |
|  | Related Entity Analysis-Direct Credits to Related company, shareholders, Directors & senior officers | quarterly |
|  | Related Entity Analysis- Indirect Credits to Related Companies, Shareholders, directors & senior officers | quarterly |
|  | Bank premises, leasing rights, furniture & equipment | monthly |
|  | Sectoral classification of deposits, accrued interest on Deposits, borrowings, and subordinated debt | monthly |
|  | Structure of Deposits | quarterly |
|  | Top 100 borrowers | quarterly |
|  | Interest Bearing Assets & Liabilities (TZS & Forex) | monthly |
|  | Negotiated Interest Rates | monthly |
|  | Analysis of Capital Accounts | monthly |
|  | Geographical Distribution of Loans, Deposits, ATMs & Employees | annually |
|  | Assets denominated in Foreign Currencies | monthly |
|  | Liabilities denominated in foreign currencies | monthly |
|  | Foreign Short Term debt | monthly |
|  | Foreign Short Term Debt – Services | monthly |
|  | Capital Transfers-Declaration of Foreign Currency Receipts from Capital transfers | monthly |
|  | Capital Transfers- Declaration of Remittances | monthly |
|  | Classification of Micro Loans- Industry | monthly |
|  | Interest rates structure for micro loans | monthly |
|  | Computation of Risk Weighted Assets | monthly |
|  | Computation of Risk weighted Off Balance Sheet Exposure | monthly |
|  | Foreign Exchange Placements in Parent, Related & Correspondent Organizations | monthly |
| Form 16-2 | Income statement | monthly |
| Form 16-3 | Report on Required and Available Reserves against Total Deposits & Borrowing from the General Public | weekly |
| Form 16 – 3b | Report for minimum reserve requirements | fortnightly |
| Form 16-4b | Report on Foreign Exchange Purchases Sales & Balances | weekly |
| Form 16-6 | Computation of the required minimum and available Liquid Assets | weekly |
|  | Daily report for foreign exchange net open position | daily |

From HR

Engagement of Tanzanian staff and Vetting of Management   annually

3.2.   For control and monitoring purposes in order to ensure the timely and ongoing compliance with the regulatory framework, each department must send to the



Tanzania Compliance Unit a confirmation of action taken and date according to the subject of the reporting schedule no later than 3 days from the submission of the relative returns reports.

## 4. LEGAL FRAMEWORK

The Compliance register has been completed to include the main laws and regulations that the Bank is subject to. In this regard, for controlling purposes, the Heads of Departments must submit to Compliance an annual confirmation of adherence and compliance with the Legal Framework.

## 5. CONFLICTS OF INTEREST

### 5.1. General

Conflicts between personal interests and the interests of the Bank or even the appearance of such conflicts must be avoided. A staff member must not act on behalf of the Bank in any transaction involving persons or organisations with which the staff member, or a family member i.e. spouse or domestic partner, child, parent, grandparent, sibling or parent-in-law has any financial or residual interest.

Defined broadly, a conflict of interest includes any situation in which a staff member is engaged in two or more activities or relationships that, to some degree, are incompatible. Such situations might include activities, conduct or investments that could conflict with a staff member's duty to FBME, or that could adversely affect his/her judgment or job performance.

### 5.2. Work Conflicts and Outside Activities

If a staff member decides to pursue additional employment, engage in an independent business venture or perform services for another business organisation, he/she must disclose such activities to the Human Resources Department of the Bank and obtain its pre-approval. Such activities must not be pursued during Bank business hours or allow any outside business, civic or charitable activities to interfere with the staff member's job performance.

### 5.3. Outside Directorships of Associates

Although staff members are encouraged to take part in community and charitable activities, due to the time demands and potential conflicts of interest, the Bank must be advised before serving in a board of an organisation. Directorships that will involve significant time away from the Bank, or that might otherwise interfere with efficient performance of normal duties or pose a conflict of interest, require the written approval of the Bank.

A staff member is to abstain from, and not be physically present during, negotiations, preparations, recommendations or approvals of any extensions of credit or other business transactions between any company in the Bank and any outside organisation on whose board of directors he/she sits.



### 5.4. Corporate Opportunities

A staff member owes a duty to the Bank to advance its legitimate interests whenever the opportunity arises. He/she must not deprive the Bank of an opportunity, take for personal own advantage an opportunity that belongs to the Bank or help others do so if he/she is in a position to divert a bank opportunity for personal own benefit. Further, a staff member must not compete with the Bank or use bank property, information or position for improper personal gain.

### 5.5. Gifts

A staff member must not solicit, and except in accordance with the conditions set out below are discouraged from accepting, gifts from current or prospective customers or suppliers who are not family members. When a gift is proffered it must be clearly established whether the gift is being made personally to a staff member, or to the Bank or some part thereof. Gifts valued in excess of USD 200 may not normally be accepted by either a staff member or his/her family members other than on the strict understanding that the gift is being accepted on behalf of the Bank. It should be borne in mind that while gifts of this order may be addressed to individuals, it is for the Bank to determine whether the gift may be retained by the recipient or should be absorbed in the general assets of the Bank to be disbursed at its discretion e.g. through a Christmas raffle or other events for staff where the benefit may be more widely enjoyed. Gifts of money, in any amount, may not be accepted. Gifts valued at USD 200 or less may be accepted, if declining the gift would damage the relationship and the circumstances are appropriate when the conflict of interest factors enumerated above are taken into consideration, and gifts have not been accepted from the same source within the previous 12 months. Under no circumstance, however, may a staff member receive gifts or anything of value from current or prospective customers or suppliers of there is a corrupt intent. A staff member is also prohibited, on behalf of the Bank, from giving, offering or promising anything of value to an employee of another financial institution in connection with any business of that financial institution if there is a corrupt intent.

A staff member should dedicate the same careful consideration and thought for the appropriateness of gifts to customers and suppliers of the Bank, as he/she would apply to any gifts received.

### 5.6. Hospitality

A staff member must not normally accept hospitality or entertainment that is:

    Solicited
    Lavish or unusual
    Not normal or customary type of amenity
    An expense reimbursed by a customer or supplier that the Bank would not pay

When in doubt and where practicable, guidance should be sought from Human Resources and Administration.



In addition, a staff member should consider the following:

- Reciprocity. Is a staff member in a position where he/she could provide reciprocal hospitality at the Bank's expense? He/she should consider not only the nature of the hospitality being offered, but also the organisational stature of the person making the offer.
- Reasonableness. Is the nature of the hospitality being offered typical for the size and status of the customer or supplier relationship? The type of hospitality being offered should be customary and appropriate with regard to a staff member's job responsibilities.

A staff member is encouraged to discuss the appropriateness of any offer of hospitality, given the circumstances, with the Bank.

**5.7. Management of Conflicts of Interest**

The Human Resources Department has, through the Code of Ethics, the ability to effectively manage any conflicts of interest.

To ensure that a conflict of interest has occurred or not the Tanzania Human Resources Department, must carry out regular checks in this respect and to submit a Half-Yearly report to the Group Head of Compliance of their findings and action taken with effect from the half-year ending 31st December 2009.

The Group Head of Compliance Department must review each half-yearly report and determine (in liaison with the Group Head of Human Resources and Administration) whether any further action is necessary.



MANUAL OF POLICIES AND PROCEDURES

### B. PREVENTION OF MONEY LAUNDERING AND TERRORIST FINANCING

## 1. INTRODUCTION

1.1. The Bank of Tanzania monitors all financial institutions operating in the country in an effort to maintain high standards of financial integrity and in particular the avoidance of money laundering and terrorist financing activities, in accordance with the provisions of the Anti Money laundering Act 2006;

1.2. Compliance officers have been appointed and a compliance department created in Dar es Salaam for Tanzanian operations;

1.3. The compliance officers are the main contact point with the appropriate authorities, as well as being responsible for handling court orders and liaison with the police.

1.4. It is the responsibility of the Tanzania compliance department to safeguard against any involvement in money laundering and financing of terrorism through the careful monitoring of account opening procedures and subsequent account activity. The department conducts regular in-house seminars on this subject;

1.5. In order to satisfy the need to compile a satisfactory audit trail for suspected laundered money and to enable it to establish a financial profile of any suspected account, the Bank has implemented these procedures. Therefore, it is in a position to provide the information that the law seeks to establish concerning customer identification and details of transactions for use as evidence in any possible investigation into money laundering. Such information includes: -

- The beneficial owners of the account;
- The volume of funds flowing through the account;
- The origin of funds;
- The form in which the funds were placed or withdrawn
- Verification of identity and evidence of address of directors, ultimate beneficial owners and authorised signatories of corporate accounts;
- The identity of the person undertaking the transaction;
- The destination of the funds;
- The form of instructions and authority.

1.6. In compliance with Bank of Tanzania requirements our standard account opening documents and policies and procedures have been designed to obtain all required information to ensure strict implementation of the know your customer principle.

## 2. KNOW YOUR CUSTOMER PROCEDURES

### 2.1. Account Opening and Activation

2.1.1. It is obviously in the Bank's best interests to ensure that account relationships are established only with reputable bona fide clients, specifically in respect of the global concern within the finance industry



and the regulatory authorities regarding money laundering and terrorist financing activities;

2.1.2. The scrutiny of new account opening documentation serves a dual purpose; firstly, to ensure that adequate information has been obtained on a new client to fulfil the Bank's know your customer policy and so prevent the unwitting participation in money laundering and terrorist financing. Secondly, to guarantee, as far as is possible, that the documentation obtained by the Bank is also legally binding upon the customer in the event that the Bank has to seek legal recourse to recover an obligation;

2.1.3. Before an account relationship may be established, therefore, all documentation relating to the opening of an account (See E.1.) is examined by the branch manager in Tanzanian branches to make sure that it has been correctly executed and that all necessary documentation has been obtained to ensure that the account is legally established. It is then sent to Central Operations Department, Head Office, for review and approval to open the account. Only after the documentation is perfected, may the CIF be established in Flexcube by Central Operations and an account be activated by the branch (on receipt of funds);

2.1.4. Prohibition of anonymous and numbered accounts and accounts in fictitious names.

It is prohibited to open or maintain anonymous or numbered accounts or accounts in names other than those stated in official identification documents.

2.1.5. Transactions and products that favour anonymity.

The laid down internal control procedures must always apply for the prevention of the use of the Bank's products and services to counter any money laundering or terrorist financing transactions.

In the case of transactions via the internet, phone, fax or other electronic means where the customer is not present so as to verify the authenticity of his signature, the laid down internal control procedures should always be applied to ensure that the Bank deals with the true owner or the authorized signatory of the account.

2.1.6. Prohibition of correspondent relationships with "Shell Banks".

In compliance with the provisions of the relative law it is prohibited from entering into or continuing a correspondent banking relationship with a "shell bank".  It is also prohibited to engage in or continue correspondent banking relationship with a bank that is known to permit its accounts to be used by a "shell bank".



A "Shell bank" is defined by law as a credit institution or an institution engaged in equivalent activities, incorporated in a jurisdiction in which it has no physical presence in the form of a fully fledged office carrying on real banking business in its country of incorporation and which is not connected with a regulated financial group.

2.1.7.   Exercise of due diligence and updating of identification data of existing customers.

2.1.7.1.   Customer identification and due diligence measures are required to apply when there are doubts about the veracity or adequacy of previously obtained customer identification documents, data or information.

It is further required to apply customer identification and due diligence procedures not only to new customers but also at appropriate times to existing customers, depending on the level of risk of being involved in money laundering or terrorist financing activities.

2.1.7.2.   To ensure that customer identification records remain completely updated with all relevant identification elements and information, at least once a year, the validity and adequacy of the customer identification and information should be examined, especially those concerning high risk customers.

The outcome of the said review should be recorded in a separate note to be kept in the respective customer file.

2.1.7.3.   In addition to the above requirement for the update of the customer identification data or when it is observed that unreliable or inadequate data and information are being held, the adequacy of the data and information held with regard to the customer's identity and business/ economic profile should be checked, whenever one of the following events or incidents occurs:

(1)   An individual transaction takes place which appears to be unusual and/or significant compared to the normal pattern of transactions and the business / economic profile of the customer.

(2)   There is a material change in the customer's legal status and situation, such as:

(i).   Change of director(s) / secretary;
(ii).   Change of registered shareholder(s) and / or beneficial owner(s);
(iii).   Change of registered office;
(iv).   Change of trustee(s);
(v).   Change of corporate name and / or trading name(s) used; and



      (vi). Change of the principal trading partners and / or assumption of new major business activities.

    (3)    There is a material change in the way the account operates, such as:

- Change in the person(s) that are authorized to operate the account(s); and
- Application for the opening of new account(s) or the provision of new banking service(s) and / or product(s).

    2.1.7.4.  If a customer fails or refuses to submit, within a reasonable timeframe, the required data and identification information for the updating of his / her identity and business / economic profile and, as a consequence, the Bank is unable to comply with the customer identification requirements then the business relationship should be terminated and close all the accounts of the customer concerned. At the same time it should be examined whether it is warranted under the circumstances to submit a report of suspicious transactions / activities to the Bank of Tanzania.

## 2.2. Our procedures include: -

- Obtaining satisfactory evidence of identity of customers and of any persons who have power to operate an account at the time of establishing the account relationship and prior to the execution of any banking transactions;
- Whenever possible, interviewing the prospective customer personally;
- Record keeping in relation to customers' identity and their transactions. Such records and supporting evidence of verification of identity are maintained for at least ten years after the account is closed;
- Internal reporting to the Bank's Tanzania Compliance Officer, who has been appointed to receive and consider information that gives rise to knowledge or suspicion that a customer may be engaged in money laundering activities;
- Regular monitoring of account activity for the identification of any suspicious transactions;
- Training staff at least once a year and continuous on the job training of employees of various levels in account opening as well as in the recognition and handling of suspicious transactions, which might be associated with money laundering.

## 2.3. The strict implementation of above procedures is of primary importance as by doing so:

- We comply with the requirements of the relevant laws;
- We are able to provide our part of the audit trail to the authorities should one of our customers come under investigation, although no information is provided unless we are requested by Bank or Tanzania or served with a court order;
- Money launderers are hesitant to approach us to open an account;
- The image and prestige of the Bank is preserved and protected;



MANUAL OF POLICIES AND PROCEDURES

2.4. The Bank's Manual of Policies and Procedures is very detailed with clear instructions for completion of each one of the account opening forms and a checklist indicates the documents required for each type of account (see E.1). The manuals are accessible from all the computers of the Bank, and staff may easily refer to them in case of need.

3. **DOCUMENTS REQUIRED AND RETAINED IN COMPLIANCE WITH THE KNOW YOUR CUSTOMER PRINCIPLE**

3.1. Personal and Joint Accounts

3.1.1. Passport or National Identity Card

- Photocopy of prospective customers' passports or national identity cards which must be valid with a clear photo and of the pages containing all relevant information.  After it is satisfied that the original identification documents have been presented, copies thereof must be certified as true copies of the originals by the employee who verifies the customer's identity or the business introducer on whom the Bank relies for the performance of the customer identification and due diligence procedures.

- In lieu of a passport or identity card required for identification purposes of citizens or residents in Tanzania who may not have a passport or identity card either one or more of the following unexpired and valid documents must be obtained to verify the full name, date of birth and nationality

  - Driving Licence

  - Voter Registration Card

Any of the above official documents not bearing a clear and recent photo must be accompanied with the following as satisfactory evidence of customers' identity:

- A recent photograph

- Official letter or document issued by a government official or advocate adequately identifying a person.

- Tax Identification Number

A document issued by the Tanzania Revenue Authority is required to be obtained for verification of the Tax Identification Number, if such a number has been issued to the prospective customer.  The same requirement applies to a foreign national who is a citizen of another country and not a Tanzania resident.

- Where the potential customer is a student.



- The student's identity card.

- An introductory letter from the head or a representative of the head of the student's institution.

- Legal Incapacity

   Where a potential customer does not have the legal capacity to establish a business relationship or conclude a single transaction and needs the assistance of a third party it is required to:

   - Apply the customer identification procedures as in O.3.1.1 for said third party.

   - Establish the business relationship with that third party.

After it is satisfied that the aforesaid original documents under O.3.1.1. have been presented, copies thereof must be certified true copies of the originals by the Bank Officer who carries out the verification procedures of the customer's identity or a third person that the conditions and eligibility criteria prescribed in the law and Bank of Tanzania requirements.

3.1.2.   Occupation

- It must be specific as to the nature of prospective customer's profession.

3.1.3.   Address

- Home address in country of permanent residence must be stated in the application to open an account.

   Home address must be verified by producing evidence in the form of; -

   o   An original recent (up to 6 months), utility bill, local authority tax bill and/or a Bank statement; or
   o   Record of home visit by a Bank official; or
   o   Letter from a public authority or embassy or consular office; or
   o   Recent lease or rental agreement; or
   o   Any other document obtained from a credible independent source; or
   o   A certificate of residential address issued by the "Ten Cell Leader"/ Ward Secretary of the district where the potential customer resides.

3.1.4.   Copy of residence or work permit for foreigners living and/or working in Tanzania;

3.1.5.   References

- Two references are required, although one may be acceptable on a case-by-case basis from: -



MANUAL OF POLICIES AND PROCEDURES

- o   An employer;
- o   A bank;
- o   Professional intermediary (a lawyer or accountant);
- o   An established key business introducer;
- o   An existing reliable customer who is personally known to the management;
- o   An officer of FBME at the level of manager or above.

- An acceptable reference should clearly state that the individual(s) is/are honest and trustworthy and considered good to open an account. A reference from a bank should state that the account maintained with them is satisfactorily conducted.

## 3.2. Corporate Accounts

3.2.1.   Original or certified copies of the following documents:

- Memorandum and Articles of Association or other constitutional document;
- Certificate of incorporation;
- Certificate of directors, registered shareholders and secretary;
- Certificate of registered address of the company or other evidence thereof from the company's statutory documents;
- A copy of the latest auditor's report and accounts.

Statutory documents must be dated not more than 6 months prior to the date of the application to open the account;

If the documents are dated more than 6 months from the date of the application to open the account: -

- For Tanzanian companies, conduct a search from the Tanzanian Business Registration and Licensing Agency

- For companies incorporated in England and Wales conduct a search from Companies House (on-line search available);

- For companies incorporated in jurisdictions other than Tanzania and England and Wales, if the application is dated between 6 and 12 months from the incorporation date a letter of Confirmation of the Company's Good Standing signed by the directors, form 223A (see Z.02.9.223A for all branches) must be obtained;

  For companies incorporated in jurisdictions other than Tanzania and England and Wales, if the application is dated more than 12 months from the incorporation date a certificate of good standing or a certificate of incumbency issued by the appropriate company registration authority in



the country of incorporation is required. If this is not available and until it is provided to us, obtain form 223A;

The purpose is: -

- To ascertain that the applicant company is not nor is in the process of being dissolved or liquidated or struck off and that it continues to be registered as a normal operating company.

- To ensure that there have been no changes in the structure or the ownership status of the company since its registration. In case that such changes, occur at any later stage identification requirements for new director(s) or shareholder(s) should be obtained. Furthermore if any suspicions arise emanating from such changes further enquiries should be made for updating the file and business profile of the company.

### 3.2.2. Directors

- A resolution for appointment of directors by incorporators or subscribers or beneficial shareholders always in accordance with the company's memorandum and articles of association;

Or

- An official list of directors issued by the appropriate government office.

### 3.2.3. Work Permit

Copy of work permit for foreign directors living and/or working in Tanzania;

### 3.2.4. Shareholders

3.2.4.1.    The identity, occupation/profession and residential address of the natural person(s) who ultimately owns or controls a legal entity, other than public companies listed on a recognised stock exchange, must be established irrespective of the layers of companies behind the company requesting the opening of an account;

In Tanzania ultimate beneficial owners are considered to be the persons with 5% or more of the company's share capital.

3.2.4.2.    Identification evidence must also be obtained for any natural person(s) who otherwise exercises control over the management and direction of a legal entity.

### 3.2.5. Registered Shares

- Requirements:



- o Names of shareholders (persons or companies);
- o Number of shares issued to each one of the shareholders. Preferably photocopies of share certificates to be obtained from jurisdictions other than Tanzania;
- o Statement of beneficial ownership by nominee shareholders (if applicable);
- o Copy of the declaration of trust executed by nominee shareholders indicating the names of the natural persons who are the true beneficial owners of the company (if applicable);
- o If the jurisdiction where company is incorporated allows the issue of bearer shares, a signed declaration that no bearer shares have been or will be issued.

### 3.2.6. References

As in <u>O.3.1.5</u> and also by the company's external auditors, if known to the Bank.

### 3.2.7. Business Address

- This should normally be in the country where the company maintains an office or manages and controls its business.

### 3.2.8. Identification Requirements

- As O.3.1.5 above under personal and joint accounts for:

  - o All directors;
  - o The natural persons being the real beneficial owners holding 5% or more of the company's share capital.
  - o Any person who has the ultimate control over a company's business or assets;
  - o All authorised signatories on the account;

- Nominee companies must provide certified copies of their statutory documents and fulfil the identification requirements for those directors or other individuals that may sign on their behalf.

### 3.2.9. Business Profile

The business profile has been incorporated in the Application to open an account for all types of accounts and includes the following information:

- The purpose for which the account is required.
- The anticipated annual account turnover and method of deposits.
- The specific nature and detailed description of the main business activities.
- The expected sources of incoming funds (countries and names of principal counter parties) to be credited in the account.



- Expected destination of outgoing payments (countries and names of principal counterparties).

Where deemed necessary for a better understanding of the activities, sources and uses of funds/assets of a company, a copy of its latest audited financial statements (whenever available), and/or a copy of its latest management accounts should be obtained.

## 3.3. Clubs, Societies and Associations Accounts

- Copy of the constitutional document;
- Copy of certificate of registration;
- Evidence of registered address;
- Identification requirements of current signatories.
- List of the members of the Board of Directors / Management Committee.

All document verification requirements apply as in corporate accounts.

## 3.4. Sole Proprietorship Accounts

- Copy of the certificate of business name;
- Evidence of the registered address;
- Photocopy of the passport details and / or national identity card of the proprietor and of any other authorised signatory.

All document verification requirements apply as in corporate accounts.

## 3.5. Partnership Accounts

- Copy of the partnership agreement;
- Original or certified copy of the certificate of registration of the partnership;
- Evidence of registered address;
- Photocopy of the passport and/or national identity card of each partner and of any other authorised signatory.

All document verification requirements apply as in corporate accounts.

## 3.6. Banks and Financial Institutions Accounts within the European Union

3.6.1.  Customer identification and due diligence procedures may not be applied in respect of the following business relationships:

- Credit or financial institutions situated in the European Economic Area.

- Credit or financial institutions that are situated in a country outside the European Economic Area where the credit or financial institution is subject to supervision with regard to its compliance with the said requirements



- Listed companies whose securities are admitted to trading on a regulated market in a country of the European Economic Area or a third country which is subject to disclosure requirements consistent with Community legislation;

- Domestic public authorities of countries of the European Economic Area.

3.6.2.  For the purpose of last bullet point of paragraph O.3.6.1, domestic public authorities of countries of the European Economic Area should fulfil the following criteria:

- Have been entrusted with public functions pursuant to the Treaty on European Union, the Treaties on the Communities or Community secondary legislation;

- Their identity is publicly available, transparent and certain;

- The activities, as well as their accounting practices, are transparent;

- They are accountable either to a Community institution or to the authorities of a Member State, or appropriate check and balance procedures exist, ensuring control of their activity.

3.6.3.  Irrespective of the above, it is required that, in any case, the following information is obtained:

- Formal letter of request signed by an authorised signatory to establish a correspondent relationship and to open an account for that purpose;
- Certified/legalised copies of the incorporation certificate,  memorandum and articles of association and/or charter and statutes;
- Certified/legalised copy of banking license issued by the recognised regulatory authority in the country of incorporation;
- List of current directors and shareholders;
- Specimens of authorised signatures;
- Latest financial statements or annual report;
- Test key and/or Swift authentication code;

3.7.  Investment Funds and Persons Engaged in the Provision of Financial and Investment Services

3.7.1.  Business relationships are established and maintained with persons involved in the provision of financial and investment services which are incorporated and/or operating in countries of the European Economic Area or a third country which according to a decision of the Advisory Authority for Combating Money Laundering Offences and Terrorist Financing it has been determined that applies requirements equivalent to those laid down in the European Union



Directive for the prevention of money laundering and terrorist financing and provided that :

- It is ascertained that the said persons possess the necessary license or authorization from a competent supervisory/regulatory authority to provide the said services, and

- Are subject to supervision for anti-money laundering and terrorist financing purposes.

3.7.2. In the case of business relationships established or maintained with persons who carry out the above activities and which are incorporated and / or operating in a third country other than those mentioned above, it is required to obtain, in addition to the above mentioned documentation and the information required for the identification and verification of natural and legal persons, including the ultimate beneficial owners, the following:

- A copy of the license or authorization granted to the said person from a competent supervisory / regulatory authority, whose authenticity should be verified either directly with the relevant supervisory / regulatory authority or other independent and reliable sources;

- Adequate documentation and sufficient information is obtained in order to fully understand the control structure and management of the business activities as well as the nature of the investment and financial services provided by the customer.

3.7.3.  In case of establishing a business relationship with a company which is a subsidiary of another company (parent company) that provides financial and investment services, it is required to apply the provisions of paragraphs O.3.7.1 and O.3.7.2 in relation to the parent companies, depending on the country of incorporation and operation of the parent company.

3.7.4. In the case of investment funds, it is required, apart from identifying beneficial owners, to obtain full information regarding their objectives and control structure, including documentation and information for the verification of the identity of investment managers, investment advisors, administrators and custodians.

3.8. Reliance on Third Parties for Customer Identification and Performance of Due Diligence

3.8.1. A third person is defined by law as a credit or financial institution or auditors or independent legal professional or trust and company service providers situated in the European Economic Area, and who:

- Are subject to mandatory professional registration, recognized by law and

- Are subject to supervision with regard to their compliance with the requirements of the European Union Directive.



A third person could also be any person as defined above operating in countries outside the European Economic Area which applies procedures and measurers for the prevention of money laundering and terrorist financing equivalent to those laid down in the European Union Directive.

3.8.2.   The Bank may rely on third parties as prescribed in paragraph O.3.8.1 above for the implementation of customer identification and due diligence procedures and it may accept the documentation pertaining to customers' identity duly certified as being true copies of the original by third parties subject to the following:

- Data and information is obtained verifying the mandatory professional registration of the third party in accordance with the competent law of its country of incorporation and/or operation.
- Data and information that the third party is subject to supervision by the appropriate competent authority of its country of incorporation and/or operation for the purposes of compliance with the measurers for the prevention of money laundering and terrorist financing.

3.8.3   Prior to accepting the customer identification data verified by the said third party the following additional measures / procedures should apply:

- The Bank's Tanzania Head of Branch Operations has ascertained and evaluated the systems and procedures applied by the third person for the prevention of money laundering and terrorist financing.

- As a result of the above mentioned assessment, the Bank is satisfied that the third person implements customer identification, due diligence and record keeping systems and procedures which should be in line with the requirements of the law and the directives issued by the supervisory authorities.

- A separate file must be maintained for every third person where the Bank stores the assessment report and other relevant information (identification details, records of meetings, evidence of professional registration etc)

- The Tanzania Head of Branch Operations' approval is required for the commencement of the cooperation with the third person and the acceptance of identification data verified by the third person at the establishment of a business relationship with customers.

3.8.4.   The Bank may rely on third parties only at the outset of establishing a business relationship for the purpose of ascertaining and verifying customers' identity.

According to the degree of risk any additional data and information for the purpose of updating the customer's business profile during the operation of the account or for the purpose of examining unusual transactions executed through the account, should be obtained from the natural persons (directors, beneficial owners) who control and manage the activities of the customer and have the



ultimate responsibility of decision making as regards management of funds and assets.

3.8.5.   The European Economic Area includes the member states of the European Union and three members of the European Free Trade Association (EFTA) i.e. Iceland, Liechtenstein and Norway.

## 4.   PROCEDURES FOR HIGH RISK CUSTOMERS

4.1.   Customer Identification and Due Diligence on a Risk Sensitive Basis.

4.1.1. The Bank has applied customer identification and due diligence procedures which enable it to determine the extent of such measures on a risk sensitive basis depending on the type of customer, business relationship, product or transaction.

4.1.2. The applied measures and procedures enable the Bank to focus its efforts in those areas where the risk of money laundering and terrorist financing appears to be higher and aim towards the achievement of the overall objective of preventing the abuse of the banking system for illegal activities.

4.1.3. The risk-based approach applied by the Bank involves the following discrete steps in order to be able to counter and manage the money laundering and terrorist financing risks:

- Identifying and assessing said risks emanating from the particular customers, products, services and geographical areas of operation.

- Managing and investigating the assessed risks by the application of appropriate and effective policies, procedures and controls.

- Continuous monitoring and improvements in the effective operation of policies, procedures and controls.

- Documenting in its Manual of Procedures reports and internal circulars, the policies, procedures and controls to ensure their uniform application across the Bank.

4.1.4. For the implementation of above measures risk assessment criteria are set resulting in the classification of customers into low and high risk categories and separate lists of high and low risk customers are maintained containing the customers' names, account numbers and date of commencement of business relationship.  Said lists are promptly updated with all new customers or existing customers that it has been determined, in the light of additional information received, to classify under the low or high risk categories.

4.1.5.   The Bank's risk assessment report is revisited at least annually for updating purposes even if there is no case for revision.



**4.2 High Risk Customers**

The following categories of customers are designated as high risk, apart from normal customer identification and due diligence measurers, enhanced due diligence should be performed as set out herein below.

4.2.1   Non Face to Face Customers

4.2.1.1 For a potential customer who is not physically present for identification and interview purposes and directly requests the opening of an account through mail, telephone, or the internet it is required to take one or more of the following additional measures:

4.2.1.2 The production of additional documentary evidence e.g., copy of the national identity card;

In this respect the on-line data of URU, a competent independent agency based in U.K., must always be used for the verification of the validity of the details of passports and residential address as an additional measure for identity verification purposes.

In addition World Check must also be always used as a further additional measure to identify that potential customers are not PEPs and are not listed in a watch list or sanctioned by any authority.

4.2.1.3 Practical measurers to verify or certify the documents supplied:

- The receipt of confirmatory certification by a credit institution or financial organisation that operates in a member state of the European Union or falls within the scope of application of the European Union Directive.

- The first payment in the context of the business relationship or one off transactions must be received through an account maintained in the customer's name with a credit institution operating in a country of the European Economic Area.

- Obtaining a reference letter from a third person (business introducer) as defined in paragraph O.3.8.1 and who is subject to mandatory professional registration and also subject to supervision with regard to compliance with the requirements of the European Union Directive.

- The customer supplies the Bank with the original customer identification documents e.g. passport, identity card, which are subsequently returned by registered and secured mail.

Note:    The copies of prospective customer's passport or national identity must be certified true copies of the original by the Bank Officer who carries out the verification procedures.



4.2.2.   Accounts in the Names of Companies with Bearer Shares

4.2.2.2 For accounts in the names of companies whose shares are in the form of bearer the following supplementary due diligence measures are required to be applied:

- A written declaration is obtained by which the identity of the beneficial owners is disclosed from:

    o A third party, as this is defined in paragraph 3.8, on whom the Bank relies for customer identification and performance of due diligence.

      Or

    o The Company's directors

- The relevant evidential records of the beneficial owners' identity are obtained duly certified as true copies of the original by said third party or the company's directors.

4.2.2.3 The account must be closely monitored throughout its operation.

4.2.2.4 At least once a year, a review must be carried out of the accounts' transactions and turnover and a note prepared summarising the results of the review and kept in the customer's file.

4.2.2.5 If the opening of the account has been recommended by a business introducer as defined in paragraph O.3.8 above, at least once a year, the business introducer who has introduced the customer must confirm that the capital base and the shareholding structure of the company or that of its holding company (if any) has not been altered by the issue of new bearer shares or the cancellation of existing ones.

   If the account has been opened directly by the company, then the confirmation should be provided by the company's directors.

4.2.3.   Accounts in the Name of Trusts.

4.2.3.1. As trusts do not form a separate legal entity, a business relationship should be established with the trustees who act on behalf of the trust. Consequently, the trustees together with the trust should be considered as the Bank's customers.

4.2.3.2. The legal substance of the trust, its name and date of establishment must be ascertained and the identity of the settlors, trustees and true beneficiaries must be verified.



4.2.3.3. The nature of activities and purpose of establishing the trust should be ascertained as well as the source and origin of funds requesting sight and obtaining copies of the relevant extracts from the trust deed; any other relevant information to be obtained from the trustees.

4.2.3.4. The identity of beneficial owners of legal entities, such as foundations and legal arrangements, such as trusts, are required to be verified as follows:

- When the future beneficiaries have already been determined, the natural person(s) who is the beneficiary of 5% or more of the property of a legal arrangement or entity.

- When the individuals that benefit from the legal arrangement or entity have yet to be determined, the class of persons in whose main interest the legal arrangement or entity is set up or operates.

- The natural person(s) who exercise control over 10% or more of the property of a legal arrangement or entity.

### 4.2.4. Client Accounts in the Name of Third Parties

4.2.4.1. "Client accounts" may be opened in the name of financial institutions from countries of the European Economic Area or a third country which it has been determined that it applies procedures and measures for preventing money laundering and terrorist financing equivalent to the requirements of the European Union Directive.

4.2.4.2. In the case that the opening of a "client account" is requested by a third person acting as auditor/accountant or independent legal professional or trust and company service provider or real estate agent situated in a country of the European Economic Area or a third country which has been determined that it applies procedures and measures for preventing money laundering and terrorist financing, an account may be opened provided that the following conditions are met:

o The third person is subject to mandatory professional registration in accordance with the relevant laws of the country of operation.

o The third person is subject to regulation and supervision by an appropriate competent authority in the country of operation for anti-money laundering and terrorist financing purposes.

o The MLCO has assessed the customer identification and due diligence procedures employed by the third person and has found them to be in line with the provisions of the relative Law and Directives issued by the regulatory authorities. A record of the assessment should be prepared and kept in a separate file maintained for each third person.



o   The identity of all beneficiaries of credit transactions in excess of TZS 50 million on whose behalf the third person is acting is verified in accordance with the customer identification procedures for natural or legal persons, as the case may be.

o   All relevant customer identification data and other documentation for the beneficiaries duly certified by the third person as true copy of the original is obtained upon opening the account or before the execution of any credit transaction, as the case may be.

### 4.2.5.   Politically Exposed Persons (PEPs)

4.2.5.1 In compliance with the requirements of the relative Law in respect of transactions or business relationship with PEPs, it is required to apply the following:

- Determine whether a prospective customer is a PEP using "World Check" and URU which are the online engines used in carrying out the appropriate risk-based procedures applied as part of the Bank's KYC and Customer Acceptance Policies and Procedures prior to opening an account and/or establishing a business relationship.

- Senior Management approval should be obtained for opening an account and/or establishing a business relationship with a PEP. Senior Management approval is also required for continuing the operation of the business relationship and/or account if subsequently it is ascertained that the person(s) are or have become PEPs.

- Adequate measures must be taken to establish the source of wealth and source of funds that are involved in the business relationship or transaction.

- Prior to establishing a business relationship with a PEP it is required to obtain adequate documentation to assess the PEP's business reputation (e.g. references from third parties)

- Enhanced ongoing monitoring of the business relationship must be conducted and more attention must be paid when said persons originate from a country which is widely known to face problems of bribery, corruption and financial irregularity and whose anti-money laundering statutes and regulations are not equivalent with international standards.  It is required to be particularly cautious and most vigilant where customers are involved in businesses which appear to be most vulnerable to corruption such as trading in oil, arms, cigarettes and alcoholic drinks.



- The account should be subject to annual review by Compliance in order to determine whether to allow the account to continue operating.

A note should be prepared summarising the results of the review which should be considered and approved by the management of Compliance and filed in customer's file.

4.2.5.2 PEPs are defined by Law to be natural persons who are or have been entrusted with prominent public functions and immediate family members, or persons known to be close associates of such persons.

4.2.5.3 PEPs include the following natural persons:

- Natural persons who have, or had in the last twelve months, a prominent public function in a foreign country:

o Heads of State, Heads of Government, Ministers and Deputy or Assistant Ministers.

o Members of Parliaments.

o Members of supreme courts, of constitutional courts or of other high-level judicial bodies whose decisions are not subject to further appeal, except in exceptional circumstances.

  - Members of courts of auditors or of the boards of Central Banks.

  - Ambassadors, chargés d'affaires and high-ranking officers in the armed forces.

  - Members of the administrative, management or supervisory bodies of state owned enterprises.

None of the categories set out above shall be understood as covering middle ranking or more junior officials.

- Immediate family members of PEPs include the following persons:

  o The spouse;
  o Any partner considered by national law as equivalent to the spouse;
  o The children and their spouses or partners;
  o The parents

- Persons known to be "close associates" of a politically exposed person include the following:



- Any natural person who is known to have joint beneficial ownership of legal entities or legal arrangements, or any other close business relations with a person referred to in subparagraph (i) above.

- Any natural person who has sole beneficial ownership of a legal entity (company) or legal arrangement (trust) which is known to have been set up for the benefit de facto of the person referred to in subparagraph (i) above.

4.2.5.4 A person is not considered to be a PEP where such a person has ceased to be entrusted with a prominent public function within the meaning of paragraph O.4.2.5.3. for a period of at least one year.

All documents obtained must be certified as true copies of the originals.

4.2.6.    Correspondent Accounts of Banks

4.2.6.1.The application of the following enhanced due diligence measurers are required for cross-frontier correspondent banking relationships with credit institutions from third countries:

- Gathering adequate information for the credit institution-customer so as to fully understand the nature of its business and assess, using publicly available information, its reputation and the quality of its supervision.

- Assessing its systems and procedures in place for the prevention of money laundering and terrorist financing.

- Obtaining the approval of the Management before entering into new correspondent bank account relationship.

- Document the respective responsibilities of the Bank and of the credit institution customer.

- With regard to payable through accounts, it must be ensured that the credit institution customer has checked the identity and performed on going due diligence on the customers who have direct access to the correspondent bank accounts and that it is able to provide customer due diligence data upon request of the bank concerned.

4.2.6.2.In addition to the above measures, it should be ensured that the following conditions are met:

- o  The correspondent bank is either connected to a regulated financial group or maintains a physical presence in the form of a fully-fledged office carrying on real banking business in its country of incorporation i.e. the respondent bank is not a "shell bank". The physical existence



of a bank and its regulated status should be checked by one of the following means:

- o Checking with the home country Central Bank or relevant supervisory body, or

- o Obtaining from the correspondent bank evidence of its group structure as well as licence or authorization to conduct banking and financial business.

o The correspondent bank employs adequate procedures to prevent money laundering and terrorist financing. In this regard, information on the correspondent bank's customer acceptance policy and identification procedures as well as anti-money laundering and terrorist financing measures in general should be obtained and evaluated by the MLCO. The MLCO must ensure that the correspondent bank does not provide any services nor allows the use of its correspondent bank accounts by shell banks. Also, it must be ascertained whether the respondent bank has been subject to a special investigation for the purpose of preventing money laundering or terrorist financing by the competent supervisory authority of its country of origin or operation and as to whether any administrative sanctions have been imposed by the supervisory / regulatory authority of its country of origin and/or operation for inadequate preventive measures.

o Sufficient information must be collected to establish fully the nature of the respondent's business activities, ownership structure, management and places of operations and it is required to verify the identity of its beneficial owner(s). In addition, publicly available information must be used to assess its reputation and the quality of its supervision. Additional information for the respondent bank can be obtained from The Bankers' Almanac, Thompsons' Directories or other international services providing professional information as well as correspondent banks operating in the country of registration of the bank.

o The correspondent bank account must be operated by duly approved officials of the bank in the name of which the account is maintained. Customers of the bank or any other third parties should not be allowed to have direct or indirect access and make transactions through the account on behalf of the bank holding the account.

4.2.7. Electronic Gambling/gaming through the Internet

4.2.7.1.Accounts may be opened in the names of persons who are involved in above activities provided that:

- ▪ Customer identification procedures are fully applied.



- Copy of the licence that has been granted to the subject person by the competent supervisory/regulatory authority of a country of the European Economic Area or a third country which applies sufficient measurers for the licencing and supervision of such businesses; the authenticity of the licence must be verified either directly with the supervisory /regulatory authority or from other independent and reliable sources.

- Adequate information is obtained so as to understand customers' control structure and to ensure that the said customers apply adequate and appropriate systems and procedures for customer identification and due diligence for the prevention of money laundering and terrorist financing.

4.2.7.2. In the case that a customer is a person who offers services (e.g. payment providers, software houses, card acquirers) to the persons mentioned in paragraph O.4.2.7.1, it is then required to obtain, apart from the information required for customer identification of natural or legal persons, as the case may be, the following:

- Adequate information so as to be satisfied that the services are offered only to licenced persons.

- Information necessary to understand completely the ownership structure and the group in which the customer belongs as well as any information that is deemed necessary to establish the customer's business profile.

- The signed agreement must be obtained between the customer and the company duly licenced by the competent authority of a country prescribed in paragraph 4.2.7.1 above to be engaged in electronic gambling/gaming activities.

- The decision for opening this type of account is subject to the approval of the Management.

- The account must be closely monitored and subject to regular review with a view to deciding whether or not to permit the continuance of its operation.

4.2.8. Customers from countries which do not adequately apply FATF's recommendations.

4.2.8.1. The Financial Action Task Force's (FATF) 40+9 recommendations constitute today's primary international standards for the prevention and detection of money laundering.

For the implementation of above Recommendations and all FATF's other related initiatives, it is required to apply the following:



- Exercise additional monitoring procedures and pay special attention to business relationships and transactions with persons, including companies and financial institutions, from countries which do not apply or they apply inadequately the aforesaid Recommendations.

- Whenever the above transactions have no apparent economic or visible lawful purpose, their background and purpose should be examined and the findings established in writing.  If the Bank cannot satisfy itself as to the legitimacy of the transaction, then a suspicious transaction report should be filed through the MLCO.

## 5.   COMPLIANCE PROCEDURES

### 5.1 General

For the prevention of money laundering and terrorist financing, the Bank is required to include the name, the account number and address of the remitter on transfer of funds in excess of TZS 2 million;

The address may be substituted with the date and place of birth of the remitter and his customer identification number or national identity number.

Where the remitter is not an account holder, the account number must be substituted by a unique identifier which allows the transaction to be traced back to the remitter.

("unique identifier" is a combination of letters, numbers or symbols determined by the ordering financial institution, in accordance with the protocols of the payment and settlement system or messaging system used to effect the transfer of funds).

### 5.2.   Inward Transfer of Funds

5.2.1   Transfer of funds must include full information on the remitter.

5.2.2   In cases that information on the remitter is missing or incomplete, complete information must be required from the ordering institution which should be provided within three working days of receiving that request.

5.2.3   Failure by the ordering institution to provide complete information, the transfer must be rejected.

5.2.4   Where an ordering institution regularly fails to supply the required information on the remitter, the matter must be reported to the Compliance Department for further steps to be taken as follows:-

   o   Initially the issuing of warnings and setting of deadlines, before either rejecting any future transfer of funds from that payment service provider.

Or



> o Deciding whether or not to restrict or terminate the business relationship with that payment service provider.
>
> o Reporting that fact to the authorities responsible for combating money laundering or terrorist financing.

### 5.2.5   Record Keeping

Records of any information received on the remitter must be kept for five years.

## 5.3   Outward Transfer of Funds

All outgoing transfers of funds must include full information on the remitter i.e. the name, account number and address of the remitter and the Bank is required to obtain a copy of the related invoice or agreement.

## 5.4   On-going Monitoring of Accounts and Transactions

### 5.4.1   General

5.4.1.1   The business profile has been incorporated in the Account Opening Application and it aims towards obtaining sufficient information on a customer's business activities and expected pattern of activities and as a means of identifying transactions which fall outside the regular pattern of an account's activity;

Such information includes:

- The purpose for which the account is required;

- Nature of the customer's business including detailed description of the main and secondary business activities;

- Anticipated annual level of account turnover, expected source and origin of the funds to be credited in the account and expected destination of outgoing payments;

- The customer's sources of wealth or income, size and nature of business/professional activities.

5.4.1.2   On-going monitoring must and is carried out on a daily basis and the information contained in the business profile provides the means of identifying transactions which fall outside the regular pattern of an account's activity;



5.4.1.3    A suspicious transaction will often be one, which is inconsistent with a customer's known legitimate business or personal activities or with the normal business for that type of account.

5.4.1.4    The laid down high risk approach factors, as stipulated in the High Risk Approach Policy (see Appendix Z.06.2.677), is always observed and applied for all transactions prior to processing. If a transaction falls under a red alert category further investigation must be carried out by the department concerned to establish the legitimacy of funds, the purpose of transaction and the connection between the parties. If satisfactory replies are not obtained, the case must be reported to the Compliance Officer for further appropriate action.

5.4.1.5    Any transaction, which by its nature may be associated with money laundering, must be examined in detail to ascertain the economic or commercial purpose of the transaction and whether the customer has conducted an unusual or a suspicious activity. The checks and investigations may include: -

o   Checking if the size and nature of incoming funds transfers are unusual or inconsistent with the beneficiary's financial condition and nature of operations;

o   Same day transfers - funds in/funds out transactions.

o   No profit margins on underlying transactions;

o   No real connection to underlying business;

o   Unidentified beneficiary/remitter;

o   Source and destination of funds.

## 5.4.2   Inward Transfers

5.4.2.1    An inward payment report covering all transactions in excess of TZS 15 million for Tanzanian branches or the equivalent in any other currency must be extracted daily from the computer system of the Bank. The structure the above report includes the following information: -

- Transaction reference number
- Account number
- Account description
- Ordering customer's name and address
- Ordering institution and address
- Payment details
- Standard industry code (SIC) description
- Value date



- Amount

5.4.2.2    Every transaction in the report must be checked to ascertain whether, based on the laid down high risk approach factors set by the Bank, a transaction falls under a red alert category or not. If classified as a red alert further investigation must be carried out. Any transaction in excess of TZS 75 million for Tanzania branches or the equivalent in any other currency must be reported to the Tanzania Compliance Department for approval.

5.4.2.3    The extent of investigation that must be carried out should include, as a minimum, the following: -

- The commercial purpose of the transaction
- The connection / relationship between originator and beneficiary
- Detailed explanation regarding the goods, services etc associated with the payment
- Sources and legitimacy of funds

### 5.4.3   Outward Payments

5.4.3.1    For Tanzania Branches, an outward payment report covering all transactions in excess of TZS 15 million or the equivalent in any other currency must be extracted daily in a similar format and structure as the inward payment report mentioned above.

5.4.3.2    The same monitoring procedures as inward payments above must be followed and where a transaction is classified as a red alert, further investigation must be carried out as aforementioned;

### 5.4.4   Cash Transactions

5.4.4.1    Special attention and emphasis must be given on monitoring all cash transactions in excess of TZS 100 million or the equivalent in other currency, supported with documentary evidence, in order to establish the source of funds for deposit as well as the reason or purpose for cash withdrawals;

5.4.4.2    Such information must be recorded for audit trail purposes and in case of a red alert according to the laid down high-risk approach of the bank, further investigation must be carried out.

## 5.5   AML Monitoring Systems

### 5.5.1   Mantas

5.5.1.1    The Bank has introduced and implemented Mantas, an automated / electronic transaction monitoring system that uses sophisticated



pattern recognition techniques to identify potentially problematic activity and transaction behaviours by generating alerts. Alerts can be generated from a pattern matching specific source events, a sequence of events, trends, conditions, or context. An alert is a signal which requires immediate investigation and action taken by the AML Unit.

5.5.1.2    The following six scenarios related to money laundering and terrorist financing have been incorporated in the system for the purpose of detecting potentially problematic activity and transactions:

(i)    Funds Transfers Between Customers and External Entities

o   This scenario identifies patterns of potentially suspicious activity between internal accounts/customers and external entities, such as high levels of activity that indicates the existence of exclusive accounts between accounts/customers and external entities;

o   In determining if an exclusive relationship exists between the accounts/customers and external entities, three types of activity must be examined:

➢   Mutual activity between the account/customer and the external entity;

➢   Total outgoing activity from the originating account/customer (or the external entity when account/customer is the beneficiary);

➢   Total incoming activity to the receiving account/customer (or the external entity, if the account/customer is the originator).

(ii)    Focal High Risk Entity

o   This scenario monitors transactions and account activities of the Bank's customers classified as high risk. The AML Unit maintains an internal watch list of high-risk customers based on the following factors:

**Geography Risk**

| | |
|---|---|
| Afghanistan | Eritrea |
| Algeria | Ethiopia |
| Burma/Myanmar | Guinea-Bissau |
| Cuba | Iran |
| People's Republic of Korea (DPRK) | Iraq |



MANUAL OF POLICIES AND PROCEDURES

| | |
|---|---|
| Ivory Coast | Sudan |
| Liberia | Syria |
| Libya | Turkish Occupied Area of Cyprus |
| Central African Republic | Tunisia |
| Belarus | Zimbabwe |
| Turkey | Indonesia |
| Republic of Congo | Pakistan |
| Republic of Guinea | Ecuador |
| Egypt | Yemen |
| Somalia | Ukraine |

Customer Risk

➢ Customers applying for an account through the internet
➢ Bearer Share accounts
➢ Trust accounts/Foundations/Charities/Associations/Clubs & Societies
➢ Client accounts
➢ Accounts for PEPs
➢ Correspondent accounts for banks outside EU
➢ Private Banking customer accounts
➢ Complex legal ownership structures

Product / Service Risk

➢ Alcohol / tobacco
➢ Mobile phones
➢ Adult content / website development / website administration
➢ Financial / Investment Services / Trading of shares on behalf of clients
➢ E-commerce, E-marketing, E-payments
➢ Carbon, natural gas, mining
➢ Video activities and film productions
➢ Precious stones and metals (diamonds, emerald, sapphire, gold etc)
➢ Oil trading
➢ Gambling, betting, Gaming
➢ Military Arms
➢ Pharmaceutical Products

(iii)     High Risk Counterparty

o This scenario generated alerts on accounts or transactions that may be related to high risk counterparties. Enhanced scrutiny is required to be applied on transactions involving geographies, entities (including other financial institutions) and individuals that are considered as high risk. For this purpose an external watch list (World Check) has been incorporated in the system purported to identify any transactions that may be associated with internationally



recognised criminals, blacklisted individuals, Politically Exposed Individuals (PEP's) and organised crime groups;

o   World Check is a global database providing highly structured risk intelligence in meeting all regulatory compliance requirements in relation to the high risk entities and individuals.

(iv)   Rapid Movement of Funds

o   Above scenario detects both new accounts/customers and old accounts/customers that move transactions of all types in and out of an account or accounts within a specified period. The scenario can take into account the amount or velocity of funds through the account relative to the account balance or net worth;

o   The aim of this scenario is to identify those suspected money launderers who typically move funds between accounts to help integrate the funds and give the appearance of legitimacy. One possible indication of money laundering activity is the rapid movement of funds into and out of an account.

(v)   Large Depreciation of Account Value

o   This scenario identifies accounts that experience significant value depreciation within a specified period of time. A large and sudden debit or series of debits from an account causing a significant depreciation in the account's net worth could signal account takeover or other type of fraudulent activity.

(vi)   Large Reportable Transactions

o   This scenario detects deposits of any type (across products and asset types), made at account opening or within a certain period after account opening, that exceed a specified threshold. The scenario also detects deposits or withdrawals of any type (across products and asset types) in existing accounts that exceed a certain threshold. It also detects transactions involving a single account or multiple accounts that are linked to the customer or group of customers.

5.5.1.3   All alerts generated by Mantas are thoroughly analysed and investigated by the AML investigators. An investigation form in this regard has been prepared (Appendix Z.06.2.676) summarising the outcome of the investigation of each alert.



5.5.1.4  During the process of the investigation when a transaction or activity does not conform within the customer's stated business activities and proves to be inconsistent or raises suspicions for money laundering / terrorist financing or the customer fails / refuses to submit, within a reasonable timeframe all required information / documents to justify the legitimacy and commercial nature of the alerted transaction, then in accordance with the provisions of the law, a suspicious transaction report is submitted to FIU Tanzania through the Bank's MLCO.

## 5.6   Hotscan

5.6.1  Hotscan is an automated real time solution which scans all Swift Incoming/Outgoing transaction, against lists of sanctioned parties. It also has the functionality to scan all Incoming/Outgoing transactions against internal watch lists and set of rules that have been introduced by the Bank on which proper action is required to be taken prior of processing a transaction. Needless to say, the aim of Hotscan is to offer to the Bank the ability of reducing any potential regulatory and reputational risks that may be associated with a transaction and simultaneously, comply with the local and international requirements.

5.6.2  The Anti-Money Laundering (AML) Unit of the Bank is responsible for the daily application of Hotscan.

All alerts are scrutinised, investigated by the AML Unit applying the Bank's AML Policy and Procedures and appropriate due diligence measures, and is responsible to approve or not the processing of red alert transactions.

5.6.2.1  Inward Payments

- All swift incoming payments, prior of being uploaded in Flexcube for processing, are filtered and scanned by Hotscan against the sanction lists, the Bank's internal watch lists, which include High Risk Jurisdictions, Activities, Accounts and other set of rules introduced by the Bank as follows:

(i)      Sanction Lists

- In cases when a sanction alert is generated then an internal investigation is carried out and, if deemed necessary, the Bank's verification and identification procedures are carried out concerning the matching names that caused the creation of the alert;

- Sanction lists include:

  o  Office of Foreign Assets Control
  o  Bank of England
  o  European Union



Above official lists include all specially designated individuals, entities and blocked persons as being identified by the above authorities in relation to terrorism, international narcotics traffickers, engagement in activities related to the proliferation of weapons of mass destruction and other threats to national security.

(ii)     Internal watch lists include:

- High Risk Jurisdictions

  In compliance with the requirements of local regulators and other regulatory bodies all payments originated by or transferred to any of the jurisdictions (see Mantas – Focal High Risk entities scenario) representing globally the highest money laundering and terrorist financing risks are alerted by Hotscan requiring the necessary investigation.

- High Risk Accounts

  All customer accounts classified by the Bank as High Risk require the approval of the AML Unit for Processing

- High Risk Activities

  All payment details are scanned against the high risk activities (see Mantas – Focal High Risk entities scenario) generating alerts in case of a matching business / activity name.

(iii)    Other Set of Rules

- Large Reportable Payments

  All incoming payments equal to or exceeding the amount of USD 10,000 or the equivalent in other currencies are reviewed by the Compliance Officer to ensure that all due diligence requirements are duly satisfied in accordance with the Bank's anti-money laundering policy.

  Operations Department is required to manually submit to the Compliance Officer prior of processing, all payments related to accounts marked with a blocking/warning market, i.e. no debit, no credit, frozen, dormancy status.

5.6.2.2    Outward Payments

- All outward payments are scanned by Hotscan against the lists and the set of rules as described in the inward payments above. The



same investigation and due diligence procedures apply as the inward payments.

**6    CARDS**

**6.1** The Bank's anti-money laundering procedures include procedures with regard to the provision of card services as follows:

- Card applicants undergo thorough client identification and due diligence checks;
- Limits are set and approved in accordance with applicants' nature of business and scale of activities;
- Anonymous activities are prohibited;
- Cards are cancelled and deactivated as soon as it is detected that the Bank's procedures are not followed or a suspicion that money laundering activity and/or terrorist activity is carried out;

**7    COMPLIANCE WITH COURT ORDERS**

7.1. Disclosure of Information

Disclosure of any information with regard to the Bank's customers should only be given on production of a court order by the local authorities;

Delivery of a court order must be made to the Compliance Officer or, in his absence, to the officer of the compliance department dealing with the monitoring of account activity and AML issues;

In the event that the court order does not specify the provision of specific transactions but is of a general nature to provide all transactions appearing in the customer's statement of account, a meeting with the relative authority should be arranged in order to avoid a fishing expedition that may be attempted.  If the investigator insists on having photocopies of all transactions, the Compliance Officer should provide guidance and further instructions;

**7.2. Documents Required for Disclosure**

On receipt of the court order and provided an agreement is reached with the authorities with regard to specific transactions required to be provided to them, photocopies of the following documents must be collated for delivery:

Bank standard forms;

- Account opening application (Form 201)
- Power of attorney (if applicable)
- Statement of beneficial ownership (if applicable - Form 223

Statutory documents;



MANUAL OF POLICIES AND PROCEDURES

- Certificate of incorporation
- Certificate of registered office address
- List of directors
- List of shareholders
- Statutory documents as above of corporate nominees

Interim bank statements;

- For the period stipulated in the court order or as otherwise agreed with investigator.

ID documents for directors, signatories & ultimate beneficial owners;

- Passport copies
- Permanent home address
- Evidence of address

### 7.3.  Final Action

A statement is prepared by the investigator which is read, accepted and signed by the Compliance Officer or, in his absence, by the person designated to act on his behalf;

The documents to be delivered must be numbered and initialled and it may be required to have those certified true copies.  This process is done in the presence of the investigator and in the manner indicated by him;

Photocopies of all documents to be delivered including the signed statement must be obtained and filed by alphabetical order.  A record must be made in front of the file.

## 8.   THE ROLE OF THE MONEY LAUNDERING COMPLIANCE OFFICER

### 8.1.  Appointment of a Money Laundering Compliance Officer ("MLCO")

It is a requirement of the Law in Tanzania that persons carrying on financial and other business to apply the following internal reporting procedures which have been approved by the Board of Directors:

- Appointing a person known as the MLCO to whom a report is to be made about any information or other matter which comes to the attention of any member of staff and which, in his/her opinion, proves or creates suspicions that another person is engaged in money laundering or terrorist financing.

- Requiring that any such report be considered in the light of all other relevant information by the MLCO, for the purpose of determining



whether or not the information or other matter contained in the report proves this fact or creates such suspicion.

- Allowing the MLCO to have access to other information, records and details which may be of assistance to him/her and which is available to the person responsible for maintaining the said internal reporting procedures; and

- Securing that the information or other matter contained in the report is transmitted to the appropriate authorities in Tanzania where the person who has considered the report under the above procedures ascertains or has reasonable suspicions that another person is engaged in a money laundering offence or terrorist financing or the transaction might be related to such activities.

Furthermore, the Law explicitly provides that the obligation to report to the appropriate authorities includes also the attempt to execute such suspicious transactions.

The person appointed to the post of MLCO should belong to the Management of the Bank so as to command the necessary authority.  Where it is deemed necessary due to the volume and/or the geographic spread of the Bank's operations, the Bank may appoint Assistant MLCOs by division district or otherwise for the purpose of assisting the MLCO and passing internal suspicion reports to the Chief MLCO.  In the light of the aforesaid, the Bank should communicate to the Bank of Tanzania on a continuous basis, the name and position of the person whom they appoint, from time to time, to act as MLCO;

## 8.2.  Duties of the Money Laundering Compliance Officer

As a minimum, the duties of a MLCO should include the following:

The MLCO has the primary responsibility, together with the Bank's Senior Management, for establishing appropriate measures, systems and procedures for the due implementation of the Law and the Directive of Bank of Tanzania as well as for adherence to all other circulars/recommendations which are issued by the above supervisory authority from time to time, for the prevention of the use of the banking system for money laundering and terrorist financing.  In this regard, the MLCO has the primary responsibility for the preparation of the Bank's risk management and procedures manual for the prevention of money laundering and terrorist financing.

The MLCO monitors and assesses whether the policy, procedures and controls that have been introduced for the prevention of money laundering and terrorist financing are correctly and effectively applied.  In this regard, the MLCO should apply appropriate monitoring mechanisms (e.g. on-site visits to units/branches) which will provide him/her with all necessary information for assessing the level of compliance of the units/ branches of the Bank with the



procedures and controls which are in force.  In the event that the MLCO identifies shortcomings and/or weaknesses in the application of the requisite procedures and controls, he/she should give appropriate guidance for the assumption of corrective measures.

The MLCO prepares the Customer Acceptance Policy which is submitted through the Senior Management of the Bank to the Board of Directors for consideration and approval.

The MLCO receives information from the Bank's employees which is considered by the latter to be knowledge or suspicion of money laundering or terrorist financing activities or might be related with such activities.  A specimen of such an internal report (hereinafter to be referred to as "Internal Money Laundering Suspicion Report") is attached. All such reports should be registered and kept on a separate file.

The MLCO validates and considers the information received by reference to any other relevant information and discusses the circumstances of the case with the reporting employee concerned and, where appropriate, with the employee's superior(s).  The evaluation of the information reported to the MLCO should be made on a separate form which should be registered and retained on file. (Money Laundering Compliance Officer's Internal Evaluation Report).

If following the evaluation, the MLCO decides to notify the appropriate authorities then he/she should complete a written report and submit it the soonest possible. A specimen of such a report is attached.  All such reports should be registered and kept on a separate file.

In Compliance with section 17 of the Tanzania Act a report must be submitted     to the Tanzania FIU as soon as possible but not later than 24 hours after the MLCO has become aware of a suspicious transaction.

After the submission of the MLCO's report to the appropriate authorities the transactions of the customer(s) involved are monitored by the MLCO.

If following the evaluation, the MLCO decides not to notify the appropriate authorities then he/she should fully explain the reasons for such a decision on the Money Laundering Compliance Officer's Internal Evaluation Report which should be registered and retained on file.

The MLCO maintains a registry with statistical information (e.g. district and branch/unit maintaining the customer(s) account(s), date of submission of the internal report, date of assessment, date of reporting in relation to the Internal Money Laundering Suspicious Reports and the MLCO's reports to the appropriate authorities.

The MLCO acts as a first point of contact with the appropriate authorities upon commencement of and during an investigation as a result of filing a report.



The MLCO responds to requests from the appropriate authorities and provides all the supplementary information requested and fully co-operates with said authorities.

The MLCO ensures that all branches and subsidiaries of the Bank in non-EU countries have taken all necessary measures for achieving full compliance with the provisions of the Law and the Directive issued by the supervisory authorities in relation to customer identification, due diligence and record keeping procedures.

The MLCO is responsible for the evaluation, on an annual basis, of all risks arising from existing and new customers, new products and services and updating and amending systems and procedures applied by the bank for the effective management of aforesaid risks.  In this regard the participation of the MLCO, in an advisory capacity, is required with regard to the development of new products and services and possible changes in the Bank's business profile (i.e. penetration of new markets with the opening of branches/subsidiaries in new countries/regions, in matters that call for an operational decision, as well as for the assessment of operational risks, so that necessary control and risk Management mechanisms which will ensure compatibility with the existing rules are established and pursued.

The MLCO is generally responsible for the timely and correct submission to the supervisory authorities of the prudential reports referred to their Guidance Notes and Directives and providing the necessary explanations to the employees responsible for the preparation of the aforesaid returns.  The MLCO responds on a timely manner to any queries or clarifications requested by the supervisory authorities in relation to information contained in the aforesaid returns.

The MLCO is responsible for examining and deciding on the applications for accepting large cash deposits submitted in writing by the responsible officials of the branches/units of the Bank where the related customers' accounts are maintained.  Copies of the applications submitted together with his/her decision must be kept by the MLCO on a separate file as well as the file of the customer concerned.

The MLCO monitors on a monthly basis the volume of deposits in foreign currency notes for which he has given his written approval for the acceptance of such deposits.

The MLCO responds to all requests and queries from the supervisory authorities and provides all requested information and co-operates fully with them.

The MLCO and the assistant MLCOs acquire the requisite knowledge and skills for the implementation of appropriate internal procedures for recognising,



preventing and reporting transactions/activities suspected to be associated with money laundering or terrorist financing.

The MLCO provides advice and guidance to other employees of the Bank on the correct implementation of procedures and controls against money laundering and terrorist financing.

The MLCO determines which of the Bank's units/branches staff and employees need further training and education for the purpose of money laundering and terrorist financing prevention and organizes appropriate training sessions/seminars. In this regard, the MLCO prepares and applies, in co-operation with other departments of the Bank, an annual staff training program.

The MLCO maintains full records of the seminars and other training offered to the Bank's employees and assesses the adequacy of the education/training provided.

The MLCO assesses the systems and procedures applied by a third person on whom the bank relies for customer identification and due diligence purposes or who applies for the opening of "client accounts".

The MLCO assesses the adequacy of the policy measures and procedures against money laundering and terrorist financing applied by non-EU banks which apply for the opening of correspondent accounts.

The MLCO ensures that the Bank prepares and maintains lists of customers classified as low and high risk (as these are determined by the Law, and the Bank itself) which should contain the names of customers, their account number(s), the branch/unit maintaining the account(s) and the date of the commencement of business relationship. Moreover, the MLCO ensures the updating of the said lists with new or existing customers which the Bank has decided, in the light of additional information obtained, to classify as high or low risk customers.

The MLCO informs, through regular periodic reports, the Senior Management of the Bank regarding the management of risks associated with money laundering and terrorist financing.

The MLCO obtains and utilizes, for the purpose of applying the provisions supervisory authorities concerning "Customers from countries which do not adequately apply FATF's recommendations the country assessment reports on money laundering issued by the Financial Action Task Force, regional international bodies which have been established and operate on FATF principles (e.g. Money Val Committee of the Council of Europe) the International Monetary Fund and the World Bank.

8.3. Annual Report of the Money Laundering Compliance Officer



The MLCO has also the additional duty of preparing an Annual Report which is a significant tool for assessing the Bank's level of compliance with its obligations laid down in the Law and the Directives of the supervisory authorities for the prevention of money laundering and terrorist financing.

The MLCO's Annual Report should be prepared within two months from the end of each calendar year (i.e. by the end of February, the latest) and should be submitted for consideration to the Board of Directors through the Bank's Senior Management.

The Board of Directors assesses and approves the Annual Report. The Senior Management of the Bank will then take all action as deemed appropriate under the circumstances to remedy any weaknesses and/or deficiencies identified in the Annual Report.

The MLCO's Annual Report should deal with money laundering and terrorist financing preventive issues pertaining to the year under review and, as a minimum should cover the following:

o   Information on changes in the Law and the Bank of Tanzania Directives which took place during the year and measures taken and/or procedures introduced for securing compliance with the above changes.

o   Information on the inspections and reviews performed by the MLCO and the Bank's Internal Audit Unit and the material deficiencies and weaknesses identified in the Bank's anti-money laundering and terrorist financing policies, procedures and controls. In this regard, the report should outline the seriousness of the issue, its risk implications and the recommendations made as well as the action taken for rectifying the situation.

o   The number of internal money laundering suspicious reports submitted by Bank employees to the MLCO, broken down by district, address and branch and possible comments/observations thereon.

o   The number of suspicious reports submitted by the MLCO to the appropriate authorities with information on the main reasons for suspicion and highlights of any particular trends.

o   Information on circulars and other communication with staff on money laundering and terrorist financing preventive issues.

o   Information on the policy, procedures and controls applied by the Bank in relation to high risk customers as well as the number and countries of origin of high risk customers with whom the Bank has a business relationship such as companies with bearer shares, trusts, client accounts, politically exposed persons, correspondent accounts for non-EU banks and persons engaged in electronic gambling/gaming through the internet.



o Information on the systems and procedures applied by the Bank for the on-going monitoring of accounts and transactions.

o Information on the training courses/seminars attended by the MLCO, Assistant MLCOs and any other educational material received.

o Information on training provided to staff during the year, including:

    o The courses/seminars organized
    o Their duration
    o The number of employees attending
    o Names and qualifications of the instructor(s) and
    o Specifying whether the courses/seminars were developed in-house or by an external organization/consultant/

o Information on the next year's training program.

o Results of the assessment of the adequacy and effectiveness of staff training.

o Information on the structure and staffing of the MLCO's section as well as recommendations for any additional staff and technical resources which may be needed for reinforcing the measures and procedures against money laundering and terrorist financing.

## 9. CUSTOMER ACCEPTANCE POLICY

### 9.1. Introduction

The Customer Acceptance Policy has been prepared after a detailed assessment of the risks faced by the Bank taking into consideration the types of its customers, their background, type and nature of their business activities, their countries of origin or operation, anticipated level and nature of business transactions as well as the expected source and origin of funds, in strict compliance and in line with the provisions of the Law and the requirements of directives of the supervisory/regulatory authorities.

It describes the basic principles and criteria for the establishment and continuity of customers' relationships, the types of customers who do not meet the said criteria and are not, therefore, acceptable for entering into a business relationship and prescribes the categories of customers that should be designated as being of high risk.

It also describes the enhanced due diligence measures that are required to be applied on high risk customers.

This policy as well as all other policies, procedures and measures adopted for the prevention of money laundering and terrorist financing are obligatory for implementation and compliance by the Management and all members of staff of the Bank without deviation.



9.2.  Unacceptable Business Relationships

The following categories of natural and legal entities are not acceptable for entering into a business relationship.

In case of an existing business relationship this should be terminated in accordance with the Bank's internal procedures.  The continuation of such an account relationship requires the approval of the Group Head of Compliance as well as of a member of Senior Management.

o  Persons who have been convicted for money laundering and terrorist financing activities and a period of at least 5 years has not elapsed in the engagement of documented legitimate business activities.

For legal entities the period of 5 years may be reduced subject to Compliance's approval and provided that it is documented that a said legal entity has reviewed its policy and has improved significantly its systems, procedures and measures against money laundering.

o  Persons who are included in the sanctions lists of the United Nations, the European Union, Bank of Tanzania, OFAC or any other sanction or black list issued by any other authority.

o  Persons or entities acting as third parties and who do not disclose the real ultimate beneficial owners.

o  Persons on whom there is reliable information that another bank declined to offer its services.

o  Persons with inadequate identification.

o  Persons or entities engaged in the provision of financial and investment services that are not licenced or authorized from a competent supervisory / regulatory authority to provide such services and are not subject to supervision for anti-money laundering and terrorist financing purposes.

o  Unregulated/unlicenced entities engaged in electronic gambling.

o  Unregulated/unlicenced entities engaged in gaming through the Internet.

o  Unregulated/unlicensed casinos.

o  Unregulated/unlicenced persons or entities engaged in betting activities.

o  Anonymous and numbered accounts and accounts in fictitious names.

o  Correspondent bank accounts with "Shell Banks".



o   A Correspondent bank account that is known to permit its accounts to be used by a "Shell Bank".

For the following categories a business relationship is considered on a case-by-case basis by the Head of Compliance and the approval of the Group Head of Compliance.

o   Persons on whom there is information from serious and reliable sources (like World-Check system) that they are alleged of being involved in money laundering or terrorist financing or any other illegal activities.

o   Persons known to have been convicted of or included in reports issued by regulatory authorities confirming said persons' involvement in illegal activities or their connection with persons engaged in illegal activities.

o   Persons directly connected / associated with persons who have been convicted or accused or are suspected of being involved in money laundering of terrorist financing activities.

### 9.3.  High Risk Customers

The following categories of persons and legal entities are designated as high risk and are subject to enhanced due diligence measures and close monitoring throughout their account operation as prescribed in the Banks Manual of Procedures for each category:

o   Non-Face to Face customers.

o   Bearer share companies

o   Trust Accounts

o   Client Accounts

o   Politically exposed persons (PEP)

o   Correspondent accounts with banks outside the European Union

o   Electronic gambling/gaming through the internet.

o   Customers from countries which do not adequately apply FATF's Recommendations.

o   Persons that have been convicted for money laundering and terrorist financing in the past but not classified under "Unacceptable Business Relationships" (see 8.2.1. (i)).



- o Persons for whom there is information from serious sources (such as World-Check system) that they are directly or indirectly involved in or are faced with judicial cases.

- o Companies registered in Non Co-operative Countries and Territories (NCCTs).

- o Persons or legal entities from countries in which sanction or restrictions have been imposed by United Nations, OFAC, European Union or other organizations.

- o Legal entities with complicated structures aiming towards the hiding of the real ultimate beneficial owners.

- o Persons or entities engaged in the trading of arms, oil, alcoholic drinks, tobacco / cigarettes.

- o Persons or entities the main business activities of which are carried out through Internet.

- o Entities without a physical presence in their country of registration or operation.

  - o Persons or entities engaged in cash intensive business activities such as night clubs, restaurants etc which are vulnerable to potential money laundering

9.4.  Enhanced Due Diligence Measures

The categories of customers designated as High Risk (see paragraph 9.3) are subject to enhanced due diligence measures prior to establishing a relationship and on a risk sensitive basis their account activity is also subject to continuous and close monitoring;

Detailed enhanced due diligence measures that are applied for each category are prescribed in the Bank's Manual of Procedures.

Such measures are as follows:

- o The verification of identity of shareholders, ultimate beneficial owners, directors and signatories.

- o For transactions over a variable threshold limit, which is set by the Compliance Department, are referred to Compliance for approval prior to processing, whereas documentary evidence may be required to be provided for any amount depending on the perceived risk of money laundering for the purpose of verifying the purpose of underlying transactions, the consistency of the business activities, the relationship of the parties involved and the sources of funds in accordance with the Business Profile of the customer.

- o The application of additional measures to verify the authenticity of documents provided to open an account.



o   The business profile is incorporated in the "Application to open an Account" form which is applicable for all customers, however, this is reviewed at regular intervals or when unusual transactions are identified or when there are changes in the account behaviour.

High risk accounts are recorded within the parameters of the automated Anti-Money Laundering Solution System of the Bank and any unusual activity creates a red alert for further investigation by Compliance department;

9.5. High Risk Countries

The following countries have been identified as:

o   Not applying adequate measures against money laundering and/or terrorist financing activities.

o   Sanctions or restrictions have been imposed on said countries or freezing of asset orders of persons from said countries by United Nations, OFAC, European Union or other authorities.

o   Non-Cooperative countries and territories.

Extreme caution is exercised and any incoming or outgoing funds from/to the following countries, approval is sought from Compliance prior to processing of any transactions;

| | |
|---|---|
| Afghanistan | Turkey |
| Algeria | Republic of Congo |
| Burma/Myanmar | Republic of Guinea |
| Cuba | Egypt |
| People's Republic of Korea (DPRK) | Somalia |
| Eritrea | Sudan |
| Ethiopia | Syria |
| Guinea-Bissau | Turkish Occupied Area of Cyprus |
| Iran | Tunisia |
| Iraq | Zimbabwe |
| Ivory Coast | Indonesia |
| Liberia | Pakistan |
| Libya | Ecuador |
| Central African Republic | Yemen |
| Belarus | Ukraine |

# APPENDIX E

# Screenshots of FBME's New UBO Database

**(Operational as of January 2015)**











# APPENDIX F

 Compliance

FBME BANK LTD INTRANET > Compliance > AML CTF Quiz

# AML CTF Quiz

| Respond to this Survey | Actions ▼   Settings ▼ | 1 - 100 ▶   View: | **All Responses** |
|---|---|---|---|
| View Response | Created By | Modified | Completed |
| View Response #1 | Sandra Nebritova | 1/15/2015 3:05 PM | Yes |
| View Response #2 | Mihail Stoica | 1/15/2015 3:09 PM | Yes |
| View Response #3 | Sylvia Atanasova | 1/15/2015 3:11 PM | Yes |
| View Response #4 | Amanda Pain | 1/15/2015 3:27 PM | Yes |
| View Response #5 | Ana Isabella Georgakoudes | 1/15/2015 3:32 PM | Yes |
| View Response #6 | Michel Saab | 1/15/2015 3:41 PM | Yes |
| View Response #7 | Karen Israelian | 1/15/2015 3:50 PM | Yes |
| View Response #8 | Natalia Profir | 1/15/2015 4:21 PM | Yes |
| View Response #9 | Olga Chirina | 1/15/2015 4:21 PM | Yes |
| View Response #10 | Kalliopi Palmas | 1/15/2015 4:24 PM | Yes |
| View Response #11 | Maria Kakoullis | 1/16/2015 9:26 AM | Yes |
| View Response #12 | Rado Krastev | 1/16/2015 9:31 AM | Yes |
| View Response #13 | Mireille Khoury Kouppis | 1/16/2015 9:44 AM | Yes |
| View Response #14 | Maria Piskitzis | 1/16/2015 9:51 AM | Yes |
| View Response #15 | Peter Markov | 1/16/2015 9:56 AM | Yes |
| View Response #16 | Lynn Riley | 1/16/2015 10:08 AM | Yes |
| View Response #17 | Pauline Wales | 1/16/2015 12:13 PM | Yes |
| View Response #18 | Raushan Shubekova | 1/16/2015 12:18 PM | Yes |
| View Response #19 | Daria Isichenko | 1/16/2015 12:27 PM | Yes |
| View Response #20 | Marilena Lefa | 1/16/2015 12:38 PM | Yes |
| View Response #21 | Paul Allery | 1/16/2015 1:05 PM | Yes |
| View Response #22 | Sousanna Santafianou | 1/16/2015 1:11 PM | Yes |
| View Response #23 | Erini Constantinides | 1/16/2015 1:23 PM | Yes |
| View Response #24 | Loizidou M. Lisa | 1/16/2015 1:28 PM | Yes |
| View Response #25 | AL Aker Mohammed | 1/16/2015 1:40 PM | Yes |
| View Response #26 | Tracy Grist | 1/16/2015 1:55 PM | Yes |
| View Response #27 | Elena Bukovska | 1/16/2015 2:13 PM | Yes |
| View Response #28 | Konyushenkova Margarita | 1/16/2015 2:17 PM | Yes |
| View Response #29 | Androulla.Papademetri | 1/16/2015 2:43 PM | Yes |
| View Response #30 | Olga Polyntseva | 1/16/2015 2:51 PM | Yes |
| View Response #31 | Chrystalleni Aristidou | 1/16/2015 3:00 PM | Yes |
| View Response #32 | Mary Stylianou | 1/16/2015 3:19 PM | Yes |
| View Response #33 | Meropi Plati | 1/16/2015 3:25 PM | Yes |

| | | | |
|---|---|---|---|
| View Response #75 | Eleanora Charitou | 1/21/2015 1:52 PM | Yes |
| View Response #76 | Lia Eftychiou | 1/21/2015 2:03 PM | Yes |
| View Response #77 | Olivia Malaxos | 1/21/2015 2:16 PM | Yes |
| View Response #78 | Pambos Kyriacou | 1/21/2015 2:18 PM | Yes |
| View Response #79 | Annie Kaplanian | 1/21/2015 2:43 PM | Yes |
| View Response #80 | Kassiani Nicolaou | 1/21/2015 3:03 PM | Yes |
| View Response #81 | Modestos Papas | 1/21/2015 3:06 PM | Yes |
| View Response #82 | Helen Eliassidou | 1/21/2015 3:32 PM | Yes |
| View Response #83 | Anita Hadjigeorghiou | 1/22/2015 8:53 AM | Yes |
| View Response #84 | Irene Vladimirou | 1/22/2015 9:31 AM | Yes |
| View Response #85 | Elli Polycarpou | 1/22/2015 9:43 AM | Yes |
| View Response #86 | Donna Wilton | 1/22/2015 12:01 PM | Yes |
| View Response #87 | Anthony Charalambous | 1/22/2015 1:52 PM | Yes |
| View Response #88 | Claudia Viscu | 1/22/2015 3:00 PM | Yes |
| View Response #89 | Theodore Georgiou | 1/22/2015 3:08 PM | Yes |
| View Response #90 | Vladimir Kondakov | 1/23/2015 9:06 AM | Yes |
| View Response #91 | Pascal Hagge | 1/23/2015 10:36 AM | Yes |
| View Response #92 | Katinka Aitchison | 1/23/2015 12:00 PM | Yes |
| View Response #93 | Sophia Fanti | 1/23/2015 12:44 PM | Yes |
| View Response #94 | Gabriella Paphitis | 1/23/2015 1:09 PM | Yes |
| View Response #95 | Maria Constantinou | 1/23/2015 1:52 PM | Yes |
| View Response #96 | Polina Christodoulou | 1/23/2015 5:20 PM | Yes |
| View Response #97 | Flora Georgiou | 1/26/2015 9:53 AM | Yes |
| View Response #98 | Louisa Thrasivoulou | 1/26/2015 10:38 AM | Yes |
| View Response #99 | Nikolay Lamparov | 1/26/2015 11:11 AM | Yes |
| View Response #100 | Koulla Kika | 1/26/2015 11:17 AM | Yes |

1 - 100  ▶



**Compliance**

FBME BANK LTD INTRANET > Compliance > AML CTF Quiz

# AML CTF Quiz

| Respond to this Survey | Actions ▾   Settings ▾ | ◀ 101 - 177   View: | **All Responses** |
|---|---|---|---|
| View Response | Created By | Modified | Completed |
| View Response #101 | Lilit Petrosyan | 1/26/2015 11:47 AM | Yes |
| View Response #102 | Rita Toth | 1/26/2015 12:39 PM | Yes |
| View Response #103 | Charalambos Zervos | 1/26/2015 3:23 PM | Yes |
| View Response #104 | George Karvounis | 1/26/2015 3:23 PM | Yes |
| View Response #105 | Koulla Theodoridou | 1/26/2015 3:36 PM | Yes |
| View Response #106 | Nina Papalazarou | 1/26/2015 3:48 PM | Yes |
| View Response #107 | Chrisi Kanaris | 1/26/2015 4:50 PM | Yes |
| View Response #108 | Lisa Matheou | 1/27/2015 9:16 AM | Yes |
| View Response #109 | Dobri Kasabov | 1/27/2015 9:52 AM | Yes |
| View Response #110 | Theodoros Markou | 1/27/2015 10:11 AM | Yes |
| View Response #111 | Frosoulla Tsolakis | 1/27/2015 10:38 AM | Yes |
| View Response #112 | Andreas Poyiadjis | 1/27/2015 10:38 AM | Yes |
| View Response #113 | Stalo Soteriou | 1/27/2015 10:43 AM | Yes |
| View Response #114 | Milan Csaplovics | 1/27/2015 2:12 PM | Yes |
| View Response #115 | Terry Wright | 1/28/2015 9:01 AM | Yes |
| View Response #116 | Milian Kostadinov | 1/28/2015 9:02 AM | Yes |
| View Response #117 | Ewa Kuczynska | 1/28/2015 9:59 AM | Yes |
| View Response #118 | Costas Kyriakides | 1/28/2015 11:12 AM | Yes |
| View Response #119 | Aimee Titoyan | 1/28/2015 11:18 AM | Yes |
| View Response #120 | Anna Georgiou | 1/28/2015 12:26 PM | Yes |
| View Response #121 | Charles Charalambous | 1/28/2015 2:32 PM | Yes |
| View Response #122 | Viera Mylonas | 1/29/2015 9:12 AM | Yes |
| View Response #123 | Maria Tsiatini | 1/29/2015 9:13 AM | Yes |
| View Response #124 | Laura Simeonidou | 1/29/2015 9:54 AM | Yes |
| View Response #125 | Andreas Pieris | 1/29/2015 11:02 AM | Yes |
| View Response #126 | Terry Panayiotou | 1/29/2015 11:44 AM | Yes |
| View Response #127 | Chris Boreham | 1/29/2015 12:03 PM | Yes |
| View Response #128 | Chriso Habib | 1/29/2015 12:53 PM | Yes |
| View Response #129 | Antonia Petri | 1/29/2015 2:08 PM | Yes |
| View Response #130 | Olga Pati | 1/29/2015 3:44 PM | Yes |
| View Response #131 | Kirill Korneychuk | 1/29/2015 5:44 PM | Yes |
| View Response #132 | Sandra Marcou | 1/30/2015 8:43 AM | Yes |
| View Response #133 | Stella Orphanou | 1/30/2015 9:20 AM | Yes |

| View Response #134 | Kyriakos Mavros | 1/30/2015 9:24 AM | Yes |
| View Response #135 | Alex Chilingirian | 1/30/2015 10:08 AM | Yes |
| View Response #136 | Kyriakos Pavlou | 1/30/2015 10:10 AM | Yes |
| View Response #137 | Marianna Nicolaou | 1/30/2015 10:22 AM | Yes |
| View Response #138 | Georgia Klatsia | 1/30/2015 10:34 AM | Yes |
| View Response #139 | Rada Lukic | 1/30/2015 10:44 AM | Yes |
| View Response #140 | Olga Alexandrou | 1/30/2015 10:58 AM | Yes |
| View Response #141 | Alexandrina Ivanova | 1/30/2015 11:45 AM | Yes |
| View Response #142 | Marina Gregoriadou | 1/30/2015 1:10 PM | Yes |
| View Response #143 | Fax Operations(elena theocharous) | 1/30/2015 1:42 PM | Yes |
| View Response #144 | Agathi Zinga | 1/30/2015 2:14 PM | Yes |
| View Response #145 | Georgia Pitta | 1/30/2015 3:24 PM | Yes |
| View Response #146 | Diana Konstantinide | 1/30/2015 3:55 PM | Yes |
| View Response #147 | Christodoulos Christodoulou | 1/30/2015 4:02 PM | Yes |
| View Response #148 | Krasi Nikolova | 1/30/2015 4:43 PM | Yes |
| View Response #149 | Jayne Costas | 2/2/2015 10:23 AM | Yes |
| View Response #150 | Natasha Kornienko | 2/2/2015 11:29 AM | Yes |
| View Response #151 | Anna Chiripi | 2/2/2015 12:02 PM | Yes |
| View Response #152 | Koulia Petridou | 2/2/2015 12:19 PM | Yes |
| View Response #153 | Guegam Ovakimian | 2/2/2015 1:40 PM | Yes |
| View Response #154 | Fani Hadjikyriakou | 2/2/2015 1:45 PM | Yes |
| View Response #155 | David Dawoud | 2/2/2015 3:12 PM | Yes |
| View Response #156 | Abraham Thomas Malayatoor | 2/2/2015 6:12 PM | Yes |
| View Response #157 | Litsa Demetriou | 2/3/2015 11:18 AM | Yes |
| View Response #158 | Sasha Alexander Lazic | 2/3/2015 1:15 PM | Yes |
| View Response #159 | Demetris Triantafyllou | 2/4/2015 12:45 PM | Yes |
| View Response #160 | Christos Alexandrou | 2/5/2015 11:45 AM | Yes |
| View Response #161 | Natalie Abushakra | 2/5/2015 11:47 AM | Yes |
| View Response #162 | Tatiana Smirnova | 2/5/2015 12:15 PM | Yes |
| View Response #163 | Margaret Georgiou | 2/5/2015 12:55 PM | Yes |
| View Response #164 | Elpida Nicolaou-Farrell | 2/5/2015 1:48 PM | Yes |
| View Response #165 | Elena Theocharous | 2/5/2015 4:00 PM | Yes |
| View Response #166 | David Reid | 2/5/2015 7:23 PM | Yes |
| View Response #167 | Maria Stavrou | 2/6/2015 10:09 AM | Yes |
| View Response #168 | Benny Najarian | 2/6/2015 10:21 AM | Yes |
| View Response #169 | Dimitris Tatsiopoulos | 2/6/2015 10:49 AM | Yes |
| View Response #170 | Christos Dionysiou | 2/6/2015 4:45 PM | Yes |
| View Response #171 | Athina Antonopoulou | 2/9/2015 10:19 AM | Yes |
| View Response #172 | Sophia Kyprianou | 2/9/2015 11:09 AM | Yes |
| View Response #173 | Julie Kallonas | 2/10/2015 1:31 PM | Yes |
| View Response #174 | Rebecca Savva | 2/12/2015 11:03 AM | Yes |

| | | | |
|---|---|---|---|
| View Response #175 | Cody Breckenreid | 2/12/2015 2:00 PM | Yes |
| View Response #176 | Harry Xenophontos | 2/13/2015 11:31 AM | Yes |
| View Response #177 | Costi Bifani | 2/16/2015 2:34 PM | Yes |

◀  101 - 177

**In-house Training & Development Matrix**

| Last Name | First Name | Department |
|---|---|---|
| PIERIS | Andreas | Business Development |
| PAPAPETROU | Christos | Business Development |
| KUZNETSOVA | Ewa | Business Development |
| KORNETENKO | Natasha | Business Development |
| KLEITOU | Georgia | Business Development |
| GREGORIADOU | Marina | Business Development |
| CHRISTOFOROU | George | Business Development |
| CHARALAMBOUS | George | Business Development |
| BOGDEVA | Chris | Business Development |
| BOGDAN | Lucia | Business Development |
| ATCHISON | Katerina | Business Development |
| PAN | Donna | Administration |
| WILTON | Bryan | Administration |
| SHOPKIN | David | Administration |
| RED | Kassem | Administration |
| NICOLAOU | Michael | Administration |
| MICHAEL | Chris | Administration |
| KANIKIS | Maria | Administration |
| HRISTOV | Despina | Administration |
| LIAPPE | Panagiota | Administration |
| EFTYCHIOU | Lia | Administration |
| CHRYSOSTOMOU | Kyriacos | Administration |
| BODNIOV | Maryam | Accounts |
| ALLERY | Paul | Accounts |
| ZINGA | Agathi | Accounts |
| ZERVOS | Charalambos | Accounts |
| THEODOROU | Georgia | Accounts |
| PETRIDOU | Koula | Accounts |
| ORFANIDOU | Stella | Accounts |
| PITTA | Kyriacos | Accounts |
| MAKROS | Anna | Accounts |
| MARIOU | Eli | Accounts |
| GEORGIOU | Gregory | Accounts |
| CHRISTODOULOU | Chrisostomos | Accounts |
| ANASTASIOU | Marios | Accounts |

Training / Development courses (rows):

- Passport Issued
- Training Folder Provided
- AML & Compliance Training Test 2011
- AML & Compliance Training Test 2012
- AML/CFT - Customer Facing Depts. 12.07.14
- AML CTF Quiz 2013
- Body Language & Listening Skills 02.07.10
- Body Language & Listening Skills 12.11.10
- Body Language & Listening Skills 11.03.11
- Body Language & Listening Skills 18.04.11
- Body Language & Listening Skills 03.06.11
- Change Management 11.05.12
- Change Management 07.09.12
- Change Management 07.12.12
- Change Management 30.05.14
- Communication Skills 27.05.10
- Communication Skills 25.10.10
- Communication Skills 10.05.11
- Communication Skills 23.09.11
- Emotional Intelligence 26.10.12
- Emotional Intelligence 25.10.13
- Introduction to Banking 18.11.11
- Introduction to Banking 16.12.11
- Introduction to Banking 10.02.12
- Introduction to Banking 02.04.12
- Introduction to Banking 27.04.12
- Introduction to Banking 21.09.12
- Induction 07.06.10
- Induction 21.09.10
- Induction 10.12.10
- Induction 08.04.11
- Induction 05.08.11
- Induction 21.10.11
- Induction 17.09.12
- Induction 18.02.13
- Induction 14.03.14
- Organisation Behaviour G1 G1 14.02.13
- Managing Conflict at Work 22.06.12
- Managing Conflict at Work 6.11.12
- Managing Conflict at Work 26.04.13
- Managing Conflict at Work 05.07.13
- Motivation in the Workplace 01.03.13
- Motivation in the Workplace 04.07.14
- Management Skills 23.11.12
- Negotiation Skills 02.11.12
- Negotiation Skills 31.05.13
- Negotiation Skills 19.07.13
- Negotiation Skills 21.03.14
- Negotiation Skills 16.05.14
- Negotiation Skills 23.06.2014
- Performance Appraisals 14.09.12
- Performance Appraisals 15.10.12
- Performance Appraisals 13.11.12
- Performance Appraisals 07.12.12
- Problem Solving & Decision Making 20.02.12
- Problem Solving & Decision Making 25.05.12
- Problem Solving & Decision Making 15.06.12
- Problem Solving & Decision Making 23.05.14
- Team Work & Co-Operation 15.04.10
- Team Work & Co-Operation 21.05.10
- Team Work & Co-Operation 17.09.10
- Team Work & Co-Operation 30.06.11
- Team Work & Co-Operation 09.09.11
- Team Work & Co-Operation 07.10.11
- Time Management Skills 21.06.10
- Time Management Skills 12.07.10
- Time Management Skills 06.09.10
- Time Management Skills 13.12.10
- Time Management Skills 23.05.11
- Time Management Skills 13.02.12
- Time Management Skills 26.05.14
- Time Management Skills 27.06.2014
- Written Communication 11.06.13
- Written Communication 11.04.14
- Business Etiquette May 2010

Last Name (columns, left to right): GRIST, GIANNAKITSOB, DUMITRACHE, DEMETRIOU, CHIPPS, Despina, BRECKENRIDGE, ARMENDEZA, VOTRICVIC, RETIEF, POLYCARPOU, PATI, KYRIAKIDES, GEORGIOU, CHRISTODOULOU, ANXIANO, KORNIENTCIUK, ZAGELOW, WHITELY, SHANKOVA, STYLIANOU, PETRIDIGYAN, PALMAS, NICOLADU, NEDERBOVA, MELIAN, KOUFPIS, KONSTANTINIDI, KHACHATRYAN, COX-LETTEUL, FANTIS, ANTONOPOULOU, KALLONAS, SAAB, TITOTYAN, HIGG, WALES, RILEY

First Name: Tracy, Gianna, Adina, Despina, Heidn, Despina, Cody, Anna, Alexandra, Jan, Krista, Eli, Olga, Costas, Diana, Flora, Louisa, Evelina, Kirill, Kyra, Stephanie, David, Marcela, Mary, Lia, Kirstin, Sena, Doris, Mirielle, Diane, List, Sophia, Lucia, Adrina, Elpida, Julie, Michel, Pascal, Ameis, Plurmia, Lorraine

Department: Customer Service FO, Customer Service MA, Customer Service MA, Customer Service MA, Customer Service MA, Marketing, Credit, Credit, Credit, Credit, Credit, Credit, Credit, Credit, Corporate Business, Compliance, Compliance, Compliance, Compliance, Compliance AP, Compliance DD, Compliance DD, Compliance DD, Compliance DD, Compliance DD, Compliance AP, Compliance DD, Compliance DD, Chairman's Office, Chairman's Office, CEO's Office, CEO's Office, CEO's Office, Business Development, Business Development

Training rows (top to bottom):

- Passport Issued
- Training Folder Provided
- AML & Compliance Training Test 2011
- AML & Compliance Training Test 2013
- AML/CFT - Customer Facing Depts. 12.07.14
- AML CTF Quiz 2015
- Body Language & Listening Skills 02.07.10
- Body Language & Listening Skills 12.11.10
- Body Language & Listening Skills 11.03.11
- Body Language & Listening Skills 18.04.11
- Body Language & Listening Skills 03.06.11
- Change Management 11.05.12
- Change Management 07.09.12
- Change Management 07.12.12
- Change Management 30.05.14
- Communication Skills 27.05.10
- Communication Skills 25.10.10
- Communication Skills 10.05.11
- Communication Skills 23.09.11
- Emotional Intelligence 26.10.12
- Emotional Intelligence 25.10.13
- Introduction to Banking 18.11.11
- Introduction to Banking 16.12.11
- Introduction to Banking 10.02.12
- Introduction to Banking 02.04.12
- Introduction to Banking 27.04.12
- Introduction to Banking 21.09.12
- Induction 07.06.10
- Induction 21.09.10
- Induction 10.12.10
- Induction 08.04.11
- Induction 05.08.11
- Induction 21.10.11
- Induction 17.09.12
- Induction 18.02.13
- Induction 14.03.14
- Organisation Behaviour G1 S1 14.02.13
- Managing Conflict at Work 22.06.12
- Managing Conflict at Work 9.11.12
- Managing Conflict at Work 26.04.13
- Managing Conflict at Work 65.07.13
- Motivation in the Workplace 01.03.13
- Motivation in the Workplace 04.07.14
- Management Skills 23.11.12
- Negotiation Skills 02.11.12
- Negotiation Skills 31.05.13
- Negotiation Skills 19.07.13
- Negotiation Skills 21.03.14
- Negotiation Skills 16.05.14
- Negotiation Skills 23.06.2014
- Performance Appraisals 14.09.12
- Performance Appraisals 15.16.12
- Performance Appraisals 13.11.12
- Performance Appraisals 07.12.12
- Problem Solving & Decision Making 20.02.12
- Problem Solving & Decision Making 25.05.12
- Problem Solving & Decision Making 15.06.12
- Problem Solving & Decision Making 23.05.14
- Team Work & Co-Operation 15.04.10
- Team Work & Co-Operation 21.05.10
- Team Work & Co-Operation 17.09.10
- Team Work & Co-Operation 30.06.11
- Team Work & Co-Operation 09.09.11
- Team Work & Co-Operation 07.10.11
- Time Management Skills 21.06.10
- Time Management Skills 12.07.10
- Time Management Skills 06.09.10
- Time Management Skills 13.12.10
- Time Management Skills 23.05.11
- Time Management Skills 13.02.12
- Time Management Skills 26.05.14
- Time Management Skills 27.06.2014
- Written Communication 11.06.13
- Written Communication 11.04.14
- Business Etiquette May 2010

Employee roster (columns), listed as Last Name — First Name — Department:

| Last Name | First Name | Department |
|---|---|---|
| SALADACUNES | Maria | HR |
| MAVROMMATI | Anna-Maria | HR |
| MATHEOU | Lisa | HR |
| COSTAS | Jayne | HR |
| BIFANI | Costi | HR |
| AXIOTES | Marinos | HR |
| ZITTI | Rada | Customer Service NA |
| WYLLIE | Scott | Customer Service |
| VLADIMIROU | Irene | Customer Service NA |
| TZOULIOU | Anna | Customer Service FD |
| TSIATINI | Maria | Customer Service FD |
| SAVVIDES | Constantinos | Customer Service CRM |
| SAKALLIS | Maria | Customer Service NA |
| SADOVA | Olga | Customer Service FD |
| POLYMEROU | Natalia | Customer Service NA |
| PAPATHEODOULOU | Andzela | Customer Service CF |
| PAPADEMETRI | Terry | Customer Service CRM |
| NIKOLOVA | Kirsi | Customer Service FD |
| NICEPHYTOU | Victoria | Customer Service CRM |
| NEMKOV | David | Customer Service FD |
| MYLONAS | Elena | Customer Service FD |
| MOUGHRABIE | | Customer Service CRM |
| MILLIS | Julian | Customer Service NA |
| LORIC | Rada | Customer Service FD |
| LAMPADIARIS | Nikolay | Customer Service NA |
| KOSTADINOV | Jovanna | Customer Service FD |
| KORENKOVA | Milan | Customer Service FD |
| KAZLOUSKAYA | Olga | Customer Service NA |
| KAITER | Karen | Customer Service NA |
| KALLISTA | Christina | Customer Service NA |
| IVANOVA | Alexandrina | Customer Service NA |
| HADJIGEORGIOU | Anna | Customer Service NA |

Training record rows (matrix of completion against the employees above):

- Passport Issued
- Training Folder Provided
- AML & Compliance Training Test 2011
- AML & Compliance Training Test 2013
- AML/CFT - Customer Facing Depts. 12.07.14
- AML CTF Quiz 2015
- Body Language & Listening Skills 02.07.10
- Body Language & Listening Skills 12.11.10
- Body Language & Listening Skills 11.03.11
- Body Language & Listening Skills 18.04.11
- Body Language & Listening Skills 03.06.11
- Change Management 11.05.12
- Change Management 07.09.12
- Change Management 07.12.12
- Change Management 30.05.14
- Communication Skills 27.05.10
- Communication Skills 25.10.10
- Communication Skills 10.05.11
- Communication Skills 23.09.11
- Emotional Intelligence 26.10.12
- Emotional Intelligence 25.10.13
- Introduction to Banking 18.11.11
- Introduction to Banking 16.12.11
- Introduction to Banking 10.02.12
- Introduction to Banking 02.04.12
- Introduction to Banking 27.04.12
- Introduction to Banking 21.09.12
- Induction 07.06.10
- Induction 21.09.10
- Induction 10.12.10
- Induction 08.04.11
- Induction 05.08.11
- Induction 21.10.11
- Induction 17.09.12
- Induction 18.02.13
- Induction 14.03.14
- Organisation Behaviour G1 S1 14.02.13
- Managing Conflict at Work 22.06.12
- Managing Conflict at Work 9.11.12
- Managing Conflict at Work 26.04.13
- Managing Conflict at Work 05.07.13
- Motivation in the Workplace 01.03.13
- Motivation in the Workplace 04.07.14
- Management Skills 23.11.12
- Negotiation Skills 02.11.12
- Negotiation Skills 31.05.13
- Negotiation Skills 19.07.13
- Negotiation Skills 21.03.14
- Negotiation Skills 16.05.14
- Negotiation Skills 23.06.2014
- Performance Appraisals 14.09.12
- Performance Appraisals 15.10.12
- Performance Appraisals 13.11.12
- Performance Appraisals 07.12.12
- Problem Solving & Decision Making 20.02.12
- Problem Solving & Decision Making 25.05.12
- Problem Solving & Decision Making 15.06.12
- Problem Solving & Decision Making 23.05.14
- Team Work & Co-Operation 15.04.10
- Team Work & Co-Operation 21.05.10
- Team Work & Co-Operation 17.09.10
- Team Work & Co-Operation 30.06.11
- Team Work & Co-Operation 09.09.11
- Team Work & Co-Operation 07.10.11
- Time Management Skills 21.06.10
- Time Management Skills 12.07.10
- Time Management Skills 06.09.10
- Time Management Skills 13.12.10
- Time Management Skills 23.05.11
- Time Management Skills 13.02.12
- Time Management Skills 26.05.14
- Time Management Skills 27.06.2014
- Written Communication 11.06.13
- Written Communication 11.04.14
- Business Etiquette May 2010

| Last Name | First Name | Department |
|---|---|---|
| RATCOVIC | Sanja | Limassol |
| OVAKIMIAN | Guegam | Limassol |
| LAZIC | Aleksandar | Limassol |
| KYRIAKOU | Charles | Limassol |
| SIMEONIDOU | Laura | Legal |
| MONIOT | Celine | Legal |
| HABIB | Chriso | Legal |
| GARDENER | Daniel | Legal |
| CHRISTODOULOU | Polina | Legal |
| ARGYRIDOU | Karolina | Legal |
| AULD | Ted | Legall |
| WRIGHT | Terry | IT & Comms |
| TSOLAKIS | Frosoulla | IT & Comms FC |
| TRIANTAFYLLOU | Demetris | IT & Comms FC |
| TATSIOPOULOS | Dimitris | IT & Comms FC |
| STYLIANOU | Terry | IT & Comms ST |
| STAVROU | Maria | IT & Comms FC |
| SOTERIOU | Stalo | IT & Comms FC |
| QUADROS | Ryan | IT & Comms |
| POYIADJIS | Andreas | IT & Comms |
| NAJARIAN | Benny | IT & Comms FC |
| MARKOU | Theodoros | IT & Comms ST |
| MALAYATOOR | Abraham-Thomas | IT & Comms |
| LYMBOURIS | Costas | IT & Comms ST |
| GEORGIOU | Margaret | IT & Comms |
| GEORGIOU | Achilleas | IT & Comms ST |
| DIONYSIOU | Christos | IT & Comms FC |
| DEMOSTHENOUS | Katerina | IT & Comms FC |
| BEJJANI | Bibo | IT & Comms ST |
| ARATTU | Jim George | IT & Comms |
| ALEXANDROU | Christos | IT & Comms |
| ABU-SHAKRA | Natalie | IT & Comms |
| YIANNIKOURIS | Constantinos | Investment Desk |
| PETRI | Ioannis | Investment Desk |
| KAKNIS | George | Investment Desk |
| MAROUN | Elena | Internal Audit |
| LEFA | Marilena | Internal Audit |
| CONSTANTINIDES | Erini | Internal Audit |
| ARISTIDOU | Chrystalleni | Internal Audit |

Passport Issued
Training Folder Provided
AML & Compliance Training Test 2011
AML & Compliance Training Test 2012
AML/CFT - Customer Facing Depts. 12.07.14
AML CTF Quiz 2015
Body Language & Listening Skills 02.07.10
Body Language & Listening Skills 12.11.10
Body Language & Listening Skills 11.03.11
Body Language & Listening Skills 18.04.11
Body Language & Listening Skills 03.06.11
Change Management 11.05.12
Change Management 07.09.12
Change Management 07.12.12
Change Management 30.05.14
Communication Skills 27.05.10
Communication Skills 25.10.10
Communication Skills 10.05.11
Communication Skills 23.09.11
Emotional Intelligence 26.10.12
Emotional Intelligence 25.10.13
Introduction to Banking 18.11.11
Introduction to Banking 16.12.11
Introdcution to Banking 10.02.12
Introduction to Banking 02.04.12
Introduction to Banking 27.04.12
Introduction to Banking 21.09.12
Induction 07.06.10
Induction 21.09.10
Induction 10.12.10
Induction 08.04.11
Induction 05.08.11
Induction 21.10.11
Induction 17.09.12
Induction 18.02.13
Induction 14.03.14
Organisation Behaviour G1 S1 14.02.13
Managing Conflict at Work 22.06.12
Managing Conflict at Work 9.11.12
Managing Conflict at Work 26.04.13
Managing Conflict at Work 05.07.13
Motivation in the Workplace 01.03.13
Motivation in the Workplace 04.07.14
Management Skills 23.11.12
Negotiation Skills 02.11.12
Negotiation Skills 31.05.13
Negotiation Skills 19.07.13
Negotiation Skills 21.03.14
Negotiation Skills 16.05.14
Negotiation Skills 23.06.2014
Performance Appraisals 14.09.12
Performance Appraisals 15.10.12
Performance Appraisals 13.11.12
Performance Appraisals 07.12.12
Problem Solving & Decision Making 20.02.12
Problem Solving & Decision Making 25.05.12
Problem Solving & Decision Making 15.06.12
Problem Solving & Decision Making 23.05.14
Team Work & Co-Operation 15.04.10
Team Work & Co-Operation 21.05.10
Team Work & Co-Operation 17.09.10
Team Work & Co-Operation 30.06.11
Team Work & Co-Operation 09.09.11
Team Work & Co-Operation 07.10.11
Time Management Skills 21.06.10
Time Management Skills 12.07.10
Time Management Skills 06.09.10
Time Management Skills 13.12.10
Time Management Skills 23.05.11
Time Management Skills 13.02.12
Time Management Skills 26.05.14
Time Management Skills 27.06.2014
Written Communication 11.06.13
Written Communication 11.04.14
Business Etiquette May 2010

**Last Name** (columns, left to right): PSIHTZIS, PETRI, PIDGIN, PAPAS, MICHALOPOULOS, MINKOU, VALLAKIS, Olivia, KYPRIANOU, KASIADY, KAPLANIN, KAKOULLIS, HADJIANNOU, GEORGIOU, GEORGIANNOUDES, FIELD, ELIASSIDOU, CSAPLOVICS, BUKOVSKA, BALEA, ANTONIOU, ALEXANDROU, ALI AKERI, AGATHOCLEOUS, YOURGA, GULYAEVA, ATHANASOVA

**First Name**: Maria, Androu, Leonid, Hilda, Nina, Christos, Sandra, Olivia, Sophia, Anna, Dolon, Maria, Anna Isabel, Theo, Andreas, Helen, Mean, Eleanora, Elena, Claudia, Thomas, Olga, Mohammed, Helen, Helen, Elina, Sofia

**Department**: Operations (most), Operations.CDM, Marketing

Course / training rows:

| Row label |
|---|
| Passport Issued |
| Training Folder Provided |
| AML & Compliance Training Test 2011 |
| AML & Compliance Training Test 2012 |
| AML/CFT - Customer Facing Depts. 12.07.14 |
| AML CTF Quiz 2015 |
| Body Language & Listening Skills 02.07.10 |
| Body Language & Listening Skills 12.11.10 |
| Body Language & Listening Skills 11.03.11 |
| Body Language & Listening Skills 10.04.11 |
| Body Language & Listening Skills 03.06.11 |
| Change Management 11.05.12 |
| Change Management 07.09.12 |
| Change Management 07.12.12 |
| Change Management 30.05.14 |
| Communication Skills 27.05.10 |
| Communication Skills 25.10.10 |
| Communication Skills 10.05.11 |
| Communication Skills 23.09.11 |
| Emotional Intelligence 26.10.12 |
| Emotional Intelligence 25.10.13 |
| Introduction to Banking 18.11.11 |
| Introduction to Banking 16.12.11 |
| Introduction to Banking 10.02.12 |
| Introduction to Banking 02.04.12 |
| Introduction to Banking 27.04.12 |
| Introduction to Banking 21.09.12 |
| Induction 07.06.10 |
| Induction 21.09.10 |
| Induction 10.12.10 |
| Induction 08.04.11 |
| Induction 05.08.11 |
| Induction 21.10.11 |
| Induction 17.09.12 |
| Induction 18.02.13 |
| Induction 14.03.14 |
| Organisation Behaviour G1 S1 14.02.13 |
| Managing Conflict at Work 22.06.12 |
| Managing Conflict at Work 5.11.12 |
| Managing Conflict at Work 26.04.13 |
| Managing Conflict at Work 65.07.13 |
| Motivation in the Workplace 01.03.13 |
| Motivation in the Workplace 04.07.14 |
| Management Skills 23.11.12 |
| Negotiation Skills 02.11.12 |
| Negotiation Skills 31.05.13 |
| Negotiation Skills 19.07.13 |
| Negotiation Skills 21.03.14 |
| Negotiation Skills 16.05.14 |
| Negotiation Skills 23.06.2014 |
| Performance Appraisals 14.09.12 |
| Performance Appraisals 15.10.12 |
| Performance Appraisals 13.11.12 |
| Performance Appraisals 07.12.12 |
| Problem Solving & Decision Making 20.02.12 |
| Problem Solving & Decision Making 25.05.12 |
| Problem Solving & Decision Making 15.06.12 |
| Problem Solving & Decision Making 23.05.14 |
| Team Work & Co-Operation 15.04.10 |
| Team Work & Co-Operation 21.05.10 |
| Team Work & Co-Operation 17.09.10 |
| Team Work & Co-Operation 30.06.11 |
| Team Work & Co-Operation 09.09.11 |
| Team Work & Co-Operation 07.10.11 |
| Time Management Skills 21.06.10 |
| Time Management Skills 12.07.10 |
| Time Management Skills 06.09.10 |
| Time Management Skills 13.12.10 |
| Time Management Skills 13.02.12 |
| Time Management Skills 13.02.12 |
| Time Management Skills 26.05.14 |
| Time Management Skills 27.06.2014 |
| Written Communication 11.06.13 |
| Written Communication 11.04.14 |
| Business Etiquette May 2010 |

Column headers (Last Name / First Name / Department):

| Last Name | First Name | Department |
|---|---|---|
| SAVVA | Rebecca | Treasury |
| PAVLOU | Kyriacos | Treasury |
| HINIS | George | Treasury |
| CHEUNGRIAN | Alex | Treasury |
| CHARALAMBOUS | Anthony | Treasury |
| MARKOU | Pavlo | Trade Finance |
| KRASTEV | Radu | Trade Finance |
| HADJANTONAOU | Mikail | Trade Finance |
| STOICA | George | Risk |
| SPYRIDES | Andreas | Risk |
| KANYOUNIS | George | Risk |
| JOHNSTON | Ian | Relationship Manager |
| BARBELONI | Marco | Recovery |
| CONSTANTINOU | Maria | Recovery |
| PAPPETIS | Litsa | Public Relations |
| TOULOUMI | Gabriela | Operations |
| THEOCHAROUS | Nicoletta | Operations |
| TOTH | Rita | Operations |
| SANTAPANOU | Elena | Operations |
| SALAMON | Soulla | Operations |
| RILEY | Lynn | Operations |
| PLATY | Margo | Operations |

Training course rows (right-hand labels):

- Passport Issued
- Training Folder Provided
- AML & Compliance Training Test 2011
- AML & Compliance Training Test 2013
- AML/CFT - Customer Facing Depts. 12.07.14
- AML CTF Quiz 2015
- Body Language & Listening Skills 02.07.10
- Body Language & Listening Skills 12.11.10
- Body Language & Listening Skills 11.03.11
- Body Language & Listening Skills 18.04.11
- Body Language & Listening Skills 03.06.11
- Change Management 11.05.12
- Change Management 07.09.12
- Change Management 07.12.12
- Change Management 30.05.14
- Communication Skills 27.05.10
- Communication Skills 25.10.10
- Communication Skills 10.05.11
- Communication Skills 23.09.11
- Emotional Intelligence 26.10.12
- Emotional Intelligence 25.10.13
- Introduction to Banking 18.11.11
- Introduction to Banking 16.12.11
- Introduction to Banking 10.02.12
- Introduction to Banking 02.04.12
- Introduction to Banking 27.04.12
- Introduction to Banking 21.09.12
- Induction 07.06.10
- Induction 21.09.10
- Induction 10.12.10
- Induction 08.04.11
- Induction 05.08.11
- Induction 21.10.11
- Induction 17.09.12
- Induction 18.02.13
- Induction 14.03.14
- Organisation Behaviour G1 S1 14.02.13
- Managing Conflict at Work 22.06.12
- Managing Conflict at Work 9.11.12
- Managing Conflict at Work 26.04.13
- Managing Conflict at Work 05.07.13
- Motivation in the Workplace 01.03.13
- Motivation in the Workplace 04.07.14
- Management Skills 23.11.12
- Negotiation Skills 02.11.12
- Negotiation Skills 31.05.13
- Negotiation Skills 19.07.13
- Negotiation Skills 21.03.14
- Negotiation Skills 16.05.14
- Negotiation Skills 23.06.2014
- Performance Appraisals 14.09.12
- Performance Appraisals 15.10.12
- Performance Appraisals 13.11.12
- Performance Appraisals 07.12.12
- Problem Solving & Decision Making 20.02.12
- Problem Solving & Decision Making 25.05.12
- Problem Solving & Decision Making 15.06.12
- Problem Solving & Decision Making 23.05.14
- Team Work & Co-Operation 15.04.10
- Team Work & Co-Operation 21.05.10
- Team Work & Co-Operation 17.09.10
- Team Work & Co-Operation 30.06.11
- Team Work & Co-Operation 09.09.11
- Team Work & Co-Operation 07.10.11
- Time Management Skills 21.06.10
- Time Management Skills 12.07.10
- Time Management Skills 06.09.10
- Time Management Skills 13.12.10
- Time Management Skills 23.05.11
- Time Management Skills 13.02.12
- Time Management Skills 26.05.14
- Time Management Skills 27.06.2014
- Written Communication 11.06.13
- Written Communication 11.04.14
- Business Etiquette May 2010