**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FBME Bank Ltd.,<br><br>FBME Ltd.,<br><br>Plaintiffs,<br><br>v.<br><br>JACOB LEW<br>in his official capacity as Secretary of the Treasury,<br><br>U.S. DEPARTMENT OF THE TREASURY,<br><br>JENNIFER SHASKY CALVERY in her official capacity as Director of the Financial Crimes Enforcement Network,<br><br>FINANCIAL CRIMES ENFORCEMENT NETWORK,<br><br>Defendants. | Civil Action No. 1:15-CV-1270 CRC |

**OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ ..1

ARGUMENT ............................................................................................................ .2

I. The March 2016 Final Rule Was Substantively Reasonable. ............................................ .2

A. FinCEN reasonably considered and weighed the material in the administrative record, including evidence submitted by FBME. .................................................................. .2

1. Suspicious Activity Reports………………………………………………………… .4

2. The Central Bank of Cyprus……………………………………………………….5

3. Other evidence challenged by FBME……………………………………………...6

B. FinCEN appropriately applied the statutory factors of Section 311……………………7

C. FinCEN appropriately considered alternative measures............................................... 8

D. FBME's allegations of taint are baseless. ................................................................... 12

II. FBME is Not Entitled to Due Process. ..................................................................... 15

A. FBME lacks the presence necessary to establish an entitlement to due process rights…………………………………………………………………………………...16

B. *Vermont Yankee* precludes rather than supports plaintiffs' demand for extra-statutory procedural protections. .......................................................................................... 20

III. FinCEN Provided More than Adequate Process Under Either a Due Process or APA Standard……….. ................................................................................................ 23

A. FinCEN provided more notice of the classified evidence than is required by the Constitution or the APA. ........................................................................................ 23

B. FinCEN was not required to provide statutorily protected evidence to FBME......... 27

C. FinCEN made available for comment all of the unclassified, non-protected evidence it considered. ........................................................................................................ 30

1. FBME employees took various measures to obscure information in late 2014…32

2. FBME misidentified a customer connected to a sanctioned Syrian entity………33

3. FBME did not demonstrate AML improvements in Tanzania…………………..34

4. FBME did not provide meaningful documentation of its AML compliance improvements…………………………………………………………………….35

5. An alleged Hezbollah associate held accounts at FBME in 2015……………….36

6. FBME completed review of only 3% of its high-risk files as of June 2014……..36

D. FinCEN conducted the required inter-agency consultations.. ………………………37

E. FBME is not entitled to a hearing before a "neutral" decisionmaker. ...................... 41

CONCLUSION……………………………………………………………………………..45

# TABLE OF AUTHORITIES

Cases

*Abourezk v. Reagan*,
785 F.2d 1043 (D.C. Cir. 1986) ........ 27, 28
*Action for Children's Television v. FCC*,
564 F.2d 458 (D.C. Cir. 1977) ........ 14, 22
*Ad Hoc Metals Coalition v. Whitman*,
227 F. Supp. 2d 134 (D.D.C. 2002) ........ 40
*Air Transp. Ass'n v. America v. FAA*,
169 F.3d 1 (D.C. Cir. 1999) ........ 14, 31
*Al-Aqeel v. Paulson*,
568 F. Supp. 2d 64 (D.D.C. 2008) ........ 28
*Al-Haramain v. U.S. Dep't of Treasury*,
686 F.3d 965 (9th Cir. 2011) ........ 25
*Alaska Airlines, Inc. v. Civil Aeronautics Board*,
545 F.2d 194 (D.C. Cir. 1976) ........ 22
*Alaska Airlines, Inc. v. TSA*,
588 F.3d 1116 (D.C. Cir. 2009) ........ 4
*Armstrong v. Manzo*,
380 U.S. 545 (1965) ........ 23
*Bismullah v. Gates*,
501 F.3d 178 (D.C. Cir. 2007) ........ 26
*Campanale & Sons, Inc. v. Evans*,
311 F.3d 109 (9th Cir. 2002) ........ 41
*Chem. Waste Mgmt. v. EPA*,
873 F.2d 1477 (D.C. Cir. 1989) ........ 42
*CIA v. Sims*,
471 U.S. 159 (1985) ........ 26
*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971) ........ 3
*Concrete Pipe & Productions of California, Inc. v. Construction Laborers Pension Trust*,
508 U.S. 602 (1993) ........ 43
*Dep't of Navy v. Egan*,
484 U.S. 518 (1988) ........ 26
*Elec. Frontier Found v. U.S. Dep't of Justice*,
739 F.3d 1 (D.C. Cir. 2014) ........ 40
*FBME v. Lew*,
125 F. Supp. 3d 109 (D.D.C. 2015) ........ passim
*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........ 10, 17
*Friedman v. Sebelius*,
686 F.3d 813 (D.C. Cir. 2012) ........ 11
*Gen. Dynamics Corp. v. United States*,
563 U.S. 478 (2011) ........ 26

*Getty v. Federal Savings & Loan Insurance Corp.*,
805 F.2d 1050 (D.C. Cir. 1986) ..... 41

*Gilbert v. Homar*,
520 U.S. 924 (1997) ..... 23

*Gilmore v. Gonzales*,
435 F.3d 1125 (9th Cir 2006) ..... 28

*GSS Grp. Ltd v. Nat'l Port Auth.*,
774 F. Supp. 2d 134 (D.D.C. 2011), *aff'd* 680 F.3d 805 (D.C. Cir. 2012) ..... 18

*Heckler v. Chaney*,
470 U.S. 821 (1985) ..... 11

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
219 F. Supp. 2d 57 (D.D.C. 2002), *aff'd* 333 F.3d 156 (D.C. Cir. 2003) ..... 3, 25, 28

*Home Box Office v. FCC*,
567 F.2d 9 (D.C. Cir. 1977) ..... 14

*In re Guantanamo Bay Detainee Litig.*,
577 F. Supp. 2d 143 (D.D.C. 2008) ..... 26

*Islamic Am. Relief Agency v. Gonzales ("IARA")*,
477 F.3d 728 (D.C. Cir. 2007)..... 3, 6, 10

*J. McIntyre Mach., Ltd. v. Nicastro*,
564 U.S. 873 (2011) ..... 18

*Jifry v. FAA*,
370 F.3d 1174 (D.C. Cir. 2004) ..... 28, 30

*Kadi v. Geithner*,
42 F. Supp. 3d 1 (D.D.C. 2012) ..... 4, 24, 25

*KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*,
710 F. Supp. 2d 637 (N.D. Ohio 2010) ..... 26

*Latif v. Lynch*,
No. 2016 WL 1239925 (D. Or. Mar. 28, 2016) ..... 43

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
134 S. Ct. 1377 (2014) ..... 39

*Lorillard, Inc. v. FDA*,
56 F. Supp. 3d 37 (D.D.C. 2014) ..... 13

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ..... 39

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ..... 23, 42

*Meridian Int'l Logistics, Inc. v. United States*,
939 F.2d 740 (9th Cir. 1991) ..... 28

*Mobil Oil Corp. v. Federal Power Commission*,
438 F.2d 1238 (D.C. Cir. 1973) ..... 22

*Morrissey v. Brewer*,
408 U.S. 471 (1972) ..... 28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983) ..... 3, 6, 10

*Nat'l Ass'n of Broadcasters v. FCC*,
740 F.2d 1190 (D.C. Cir. 1984) ..... 42

*Nat'l Council of Resistance of Iran v. Dep't of State ("NCRI"),*
251 F.3d 192 (D.C. Cir. 2001) ........ 25, 43
*Nuclear Energy Inst., Inc. v. EPA,*
373 F.3d 1251 (D.C. Cir. 2004) ........ 38
*PATCO v. FLRA,*
672 F.2d 109 (D.C. Cir. 1982) ........ 14
*People's Mojahedin Org. of Iran v. Dep't of State ("PMOI"),*
182 F.3d 17 (D.C. Cir. 1999) ........ 15
*Ralls Corp. v. Comm. on Foreign Inv. in U.S,*
758 F.3d 296, 319 (D.C. Cir. 2014)........ 25, 30
*Riggs Nat'l Corp. & Subsidiaries v. Comm'r of Internal Revenue,*
295 F.3d 16 (D.C. Cir. 2002) ........ 41
*San Luis Obispo Mothers for Peace v. NRC,*
789 F.2d 26 (D.C. Cir. 1986) ........ 40
*Sangamon Valley Television Corp. v. United States,*
269 F.2d 221 (D.C. Cir. 1959) ........ 14
*Sierra Club v. Costle,*
657 F.2d 298 (D.C. Cir. 1981) ........ 21
*States Marine Lines, Inc. v. Federal Maritime Commission,*
376 F.2d 230 (D.C. Cir. 1967) ........ 29
*United States v. Chem. Found., Inc.,*
272 U.S. 1 (1926) ........ 41
*United States v. Florida East Coast Railway Co.,*
410 U.S. 224 (1973) ........ 42
*United States v. Sum of $70,990,605,*
128 F. Supp. 3d 350 (D.D.C. 2015) ........ 20
*Vermont Yankee Nuclear Power Corp. v. Nat. Resources Def. Council, Inc.,*
435 U.S. 519 (1978) ........ 20, 21
*Gomez v. Vernon,*
255 F.3d 1118 (9th Cir. 2001) ........ 13
*Westar Energy, Inc. v. FERC,*
473 F.3d 1239 (D.C. Cir. 2007) ........ 11
*Wisconsin Gas Co. v. FERC,*
770 F.2d 1144 (D.C. Cir. 1985) ........ 22
*Withrow v. Larkin,*
421 U.S. 35 ........ 43
*Zevallos v. Obama,*
10 F. Supp. 3d 111 (D.D.C. 2014), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015) ........ 4, 7

Statutes

18 U.S.C. app. 3 ........ 26
31 U.S.C. § 310 ........ 4
31 U.S.C. § 5311 ........ 27
31 U.S.C. § 5318 ........ 27
31 U.S.C. § 5318A ........ passim
5 U.S.C. § 553(c) ........ 42
5 U.S.C. § 556 ........ 14

5 U.S.C. § 557 ........ 14
5 U.S.C. § 706 ........ 13, 28
28 U.S.C. § 1927 ........ 13

Regulations

31 C.F.R. § 1020.320(e)(2) ........ 28
79 Fed. Reg. 42639 (July 22, 2014) ........ 32, 33
80 Fed. Reg. 45057 (July 29, 2015) ........ 35
80 Fed. Reg. 74064 (Nov. 27, 2015) ........ 31
81 Fed. Reg. 18480 (Mar. 31, 2016) ........ passim

Other Authorities

H.R. Rep. No. 108-381, *reprinted in* 2004 U.S.C.C.A.N. 2289 (Nov. 19, 2003) ........ 17
House Conf. Rep. No. 106-728 (106th Cong. 1999-2000) ........ 39
*Aliens and the Constitution*,
88 N.Y.U. L. Rev. 801 (2013) ........ 19
*Making Sense of Sovereignty: A Historical Understanding of Personal Jurisdiction from Pennoyer to Nicastro*,
110 Nw. U. L. Rev. 679 (2016) ........ 18
*Sovereignty, Not Due Process: Personal Jurisdiction Over Nonresident Alien Defendants*,
41 Wake Forest L. Rev. 1 (2006) ........ 18

**INTRODUCTION**

Prior to issuing the new Final Rule in this matter, FinCEN disclosed all of the unclassified, non-protected information that it relied upon or otherwise considered during the rulemaking. It received comments based upon that information and its prior rulemaking from FBME and others, considered these comments as well as other information available to the agency, weighed the relevant statutory factors, and considered alternative prophylactic measures. Ultimately, in light of the agency's ongoing concerns regarding FBME, FinCEN concluded that FBME continues to be a financial institution of primary money laundering concern and that a prohibition under the fifth special measure of Section 311 is the only viable measure to protect the U.S. financial system against the money laundering and terrorist financing threats posed by FBME.

In their motion for summary judgment, Plaintiffs again raise various objections to the substance of the agency's determinations—including its assessment of the threat posed by FBME, weighing of the statutory factors of Section 311, consideration of less-burdensome alternatives, and alleged consideration of purportedly privileged material, submitted by an aggrieved former FBME consultant, that the agency did not actually consider. All of these arguments, however, fail on their merits. They also fail as a matter of law because it is not FBME's or the Court's job to second-guess FinCEN's judgment so long as that judgment had a reasonable basis, which it clearly did.

In addition to substantive objections, Plaintiffs spend a great deal of time attempting to concoct objections to the process underlying the agency's determinations. They object to the agency's statutorily authorized reliance on classified evidence, to the agency's satisfaction of statutory consultation requirements, and to the inclusiveness of the record. These objections,

however, fare no better than Plaintiffs' substantive attacks on the rule. As a wholly foreign bank with virtually no U.S. presence, FBME is not entitled to constitutional rights, and in any event, the process it received more than satisfied both due process and the Administrative Procedure Act.

Accordingly, the Court should grant summary judgment for the Government.

## ARGUMENT

### I. The March 2016 Final Rule Was Substantively Reasonable.

As discussed in greater detail in the Government's summary judgment motion, FinCEN had ample evidence to support its conclusion that (1) FBME remains an institution of primary money laundering concern, and (2) only a prohibition of U.S. correspondent accounts, pursuant to the fifth special measure, would adequately protect against the risk the bank poses to the U.S. financial system. Defs.' Summ. J. Mot. at 17-20, 24-37 (ECF No. 61). Although Plaintiffs attempt to cast doubt on the quality of FinCEN's sources or analysis, they fail to show that FinCEN's decision was arbitrary or capricious. To the contrary, the 2016 Final Rule on its face, and certainly in conjunction with the underlying administrative record, reflects the agency's careful and measured consideration of all the evidence before it, including extensive submissions by FBME itself.

#### A. FinCEN reasonably considered and weighed the material in the administrative record, including evidence submitted by FBME.

Plaintiffs do not (and cannot) dispute that the 2016 Final Rule is supported by a robust administrative record that includes over 65 pages of evidentiary analysis. Taken together, the evidence shows that FBME has a long history of facilitating money laundering, terrorist financing, and other criminal financial transactions, evading anti-money laundering ("AML") regulations, and failing to implement effective AML controls, and that these characteristics have

attracted a large customer base of shell companies who have performed a significant volume of obscured transactions through the U.S. financial system. Even after FinCEN's issuance of the July 2014 Notice of Finding, there is information available to FinCEN that supports FinCEN's assessment that the bank continued to evade regulatory oversight by potentially taking measures to obscure information. In addition, FBME provided banking services to an alleged Hezbollah associate and his company after the publication of the Notice of Finding. *See* Defs.' Summ. J. Mot. at 10-11, 18, 25-26; 81 Fed. Reg. 18480, 18482 (Mar. 31, 2016); AR00009-11 (redacted).

Plaintiffs' response to this array of evidence is to pick and choose discrete pieces and challenge FinCEN's analysis of each of those pieces by pointing to supposedly countervailing evidence FBME submitted during the comment period. This tactic is unavailing for two reasons. First, the Court's review does not rest on the agency's treatment of any one individual piece or even category of information but on the *totality* of the information before the agency. *See, e.g., Holy Land Found. for Relief & Dev. v. Ashcroft* ("*Holy Land*"), 219 F. Supp. 2d 57, 75 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) ("[T]he purpose of the Court's inquiry is not to determine whether each and every piece of the evidence in the record independently supports [the agency's] determination."). Second and more fundamentally, FBME disregards the significant deference due to FinCEN's section 311 determinations. Under the APA alone, it is black letter law that the Court's review of the agency's decision is limited and highly deferential, and the Court must not substitute its judgment for that of the agency. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). That deference is heightened in the context of decisions on foreign affairs and national security. *See Islamic Am. Relief Agency v. Gonzales* ("*IARA*"), 477 F.3d 728, 734 (D.C. Cir. 2007); *FBME v. Lew*, 125 F. Supp. 3d 109, 123 (D.D.C. 2015)

(citing *IARA*); *Zevallos v. Obama*, 10 F. Supp. 3d 111, 119 (D.D.C. 2014), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 10-11 (D.D.C. 2012). And Section 311 itself gives the Secretary—and by delegation FinCEN—broad discretion to determine that an institution is of primary money laundering concern in light of relevant factors and to select an appropriate prophylactic measure in light of that determination. *See generally* 31 U.S.C. § 5318A. Yet Plaintiffs would have the Court not only override FinCEN's assessments but, in fact, adopt *FBME's* assessments and weighing of the evidence as its own. Such an approach directly contravenes settled APA law and the statutory authority vested in FinCEN under Section 311.

1. <u>Suspicious Activity Reports</u>

FBME takes issue with FinCEN's analysis of Suspicious Activity Reports ("SARs"). Pls.' Summ. J. Mot. at 41-43 (ECF No. 62-1). FBME complains that the number of SARs triggered by the bank was only a small percentage of its total USD transactions and that FinCEN provided no point of comparison between this percentage and the corresponding percentages for other financial institutions. *Id.* What this argument amounts to is *FBME* dictating what metric FinCEN is required to use in weighing evidence it routinely analyzes as the agency tasked with administering the Bank Secrecy Act ("BSA"). *See* Defs.' Summ. J. Mot at 9-10; Declaration of Jennifer Shasky-Calvery ¶¶ 5-10 (ECF No. 20) ("Calvery Decl.") (describing FinCEN duties under the BSA); *see also* 31 U.S.C. § 310. Indeed, collecting and analyzing this kind of financial reporting is an essential component of the agency's core mission of combating money laundering and protecting the U.S. financial system from illicit use. *Id.* While the Court owes considerable deference to FinCEN's expertise, it owes none to FBME. *Cf. Alaska Airlines, Inc. v. TSA*, 588 F.3d 1116, 1120 (D.C. Cir. 2009) ("complex judgments about…data analysis that are within the

agency's technical expertise" merit an "extreme degree of deference") (citation omitted). In any event, as FinCEN explained in the Final Rule, SARs were only a part of the overall mosaic of evidence indicating that FBME continued to be of primary money laundering concern, "relevant…when viewed in the context of all the other information considered." 81 Fed. Reg. at 18486.[1]

2. The Central Bank of Cyprus

Similarly, it was entirely reasonable for FinCEN to rely on evidence provided by one of FBME's regulators, the Central Bank of Cyprus ("CBC"). As noted in the Final Rule and the Government's summary judgment motion, the CBC conducted a 2014 audit of FBME in which it documented recurring deficiencies in the bank's AML compliance that corroborated both FinCEN's own findings and those of auditing firms commissioned by FBME itself. Defs.' Summ. J. Mot. at 17-19, 28-29; 81 Fed. Reg. at 18482-84; AR0011-12, 3931-58.

FBME contends, as it did in its January 2016 comment, that the CBC has a history of unfair bias and persecution of FBME that renders its findings suspect. Pls.' Summ. J. Mot at 43-

[1] FBME's framing of the SARs issue only illustrates the problem:

> That SARs are "an important tool for financial investigations" does not mean they are, taken individually or in aggregate, proper tools for *convictions* of financial institutions like FBME. That they are "relevant…when viewed in the context of all the other information considered" does not mean they bear the purported quantification and heft attributed to them. And that "[m]ultiple SARs indicate that FBME facilitated transactions on behalf of shell companies" does not differentiate FBME from countless, and indeed, *all* international banks the world over.

Pls.' Summ. J. Mot. at 42-43 (quoting 81 Fed. Reg. at 18486). Setting aside the fact that a Section 311 special measure is neither a criminal "conviction" nor a sanction, but a prophylactic regulatory measure based on a determination that a foreign jurisdiction or institution is of primary money laundering concern, these criticisms make unwarranted inferences about the "quantification and heft" that FinCEN accorded the SARs. Moreover, they also presume that FBME is better qualified than FinCEN to determine what weight to give this evidence.

47. FinCEN took these allegations and supporting information into consideration, along with other comments critical of the CBC, as well as its own experience and more positive third-party reviews of the CBC. Defs.' Summ. J. Mot at 29; 81 Fed. Reg. at 18485, 18487-88; AR0046-48, 51-52. Ultimately, FinCEN decided that the CBC's findings were entitled to weight, to the extent that they were consistent with other evidence available to FinCEN showing that FBME had serious deficiencies in its AML controls. As the leading U.S. regulator in the area of foreign money laundering, FinCEN has particular expertise to judge the reliability of foreign regulators. The fact that it gave greater credence to a banking regulator than to the entity the regulator found to be non-compliant was in no way arbitrary or capricious—particularly where FinCEN had independent evidence of money laundering activity at that entity.[2] Neither the Court nor FBME should second-guess the agency where there was clearly a reasoned basis for its decision. *See Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43.

3. Other evidence challenged by FBME

FBME also takes issue with FinCEN's reliance on various other pieces of evidence cited in its decision, including (1) evidence that FBME advertised itself to potential customers as being willing to facilitate the evasion of AML regulations; (2) gambling websites that tout FBME as a provider of offshore banking services; (3) evidence of FBME's use as part of an embezzlement scheme involving an Italian political party; (4) third-party audits of FBME; and (5) fines levied by the CBC against FBME. Pls.' Summ. J. Mot. at 47-49. FinCEN maintains

[2] FBME accuses FinCEN of coordinating with the CBC to "take down" the bank, apparently based on the timing of the agencies' respective actions. Pls.' Summ. J. Mot. at 44 & n.8. FinCEN, however, has attested that it exercised its authority independently under Section 311. 81 Fed. Reg. at 18485. The fact that it relied on information from the CBC, or that the CBC for its part may have relied on information in FinCEN's Notice of Finding, is in no way unlawful. In any event, the agency's decisions regarding its relationships with foreign regulators lie squarely in the area of foreign affairs – where judicial deference is at its zenith. *IARA*, 477 F.3d at 734.

that this evidence, all of which is available in the administrative record (and some of which could not be disclosed publicly), speaks for itself. But to the extent that FBME contests FinCEN's *interpretation* of the evidence, this is not an appropriate basis to set aside FinCEN's decision. *See Zevallos*, 793 F.3d at 114 ("[W]hen we evaluate agency action, we do not ask whether record evidence could support the petitioner's view of the issue, but whether it supports the [agency's] ultimate decision.") (citation omitted). The only question properly before the Court is whether there was a rational connection between the sum total of the evidence and the agency's ultimate conclusion. The Court's own review of the evidence will confirm that FinCEN was reasonable in finding that FBME was an institution of primary money laundering concern.

**B. FinCEN appropriately applied the statutory factors of Section 311.**

Although FBME would have the Court believe otherwise, there is no rigid formula or requirement for how FinCEN must go about applying the statutory factors of Section 311. As noted in the Government's summary judgment motion, the statute directs the agency determining whether an institution is of primary money laundering concern to consider such information as the agency "*determines to be relevant*," including three "*potentially* relevant" factors: (1) the extent to which the institution is used to facilitate or promote money laundering; (2) the extent to which the institution is used for legitimate purposes; and (3) the extent to which one of the special measures is sufficient to fulfill the purpose of Section 311. 31 U.S.C. § 5318A(c)(2)(B) (emphasis added). Thus the very language of the statute defers to the agency's discretion in determining the relevant factors and weighing them appropriately. FinCEN nonetheless carefully analyzed each of the three factors, finding that (1) FBME was used for or facilitated money laundering and other illicit financial activity; (2) few of FBME's customers were Cypriot or Tanzanian citizens, and it had a significant number of shell entity and high-risk customers;

and (3) imposing a prohibition under the fifth special measure would guard against the proliferation of international money laundering and other criminal financial activity. 81 Fed. Reg. at 18481; AR0058-62.

In their summary judgment motion, Plaintiffs focus on the text of the July 2014 Notice of Finding and the March 2016 Final Rule in arguing that FinCEN failed to consider the extent to which FBME was used for legitimate business purposes in Tanzania. Pls.' Summ. J. Mot. at 50. However, as noted above, FinCEN did expressly consider this factor as set forth in the evidentiary memorandum supporting the 2016 Final Rule. *See* AR0059-60, 63-64 (considering the relative extent of legitimate business and associated risks, including in Tanzania). Plaintiffs' argument that FinCEN did not adequately consider the statutory factors is therefore without merit.[3]

**C. FinCEN appropriately considered alternative measures**.

The Court previously held that FinCEN's consideration and rejection of the other four special measures was implicit in its initial rule imposing the fifth special measure on FBME, but that the rule did not indicate that FinCEN had given any consideration to the possibility of "an alternative . . . *within* the fifth special measure—namely, the imposition of *conditions* on the opening or maintaining of correspondent accounts." 125 F. Supp. 3d at 124. The Court therefore found FBME likely to succeed on this point, *id.*, and FinCEN's commitment to

[3] FBME also attempts to bootstrap an argument that because FinCEN did not adequately consider the extent to which FBME was used in legitimate business activities, it also necessarily failed to give adequate consideration to one of the statutory factors for choosing which special measure to impose—specifically, the extent to which imposition of the fifth special measure "would have a significant adverse systemic impact…on legitimate business activities" involving FBME. 31 U.S.C. § 5318A(a)(4)(B)(iii). FinCEN did, however, adequately consider the extent to which FBME was used in legitimate business activities, as well as the extent to which imposing the fifth special measure would impact legitimate business activities involving FBME, and concluded that the fifth special measure was still warranted. *See* AR0060-61, 63-64.

considering such alternatives was one of the bases for its motion for remand. *See* Defs.' Remand Mot. at 4 (ECF No. 38).

Accordingly, the Final Rule gives careful consideration to the possibility of alternatives. 81 Fed. Reg. at 18489-90. But FinCEN notes that any such alternatives "inherently rely on FBME to provide accurate, credible, and reliable information to the party responsible for assuring compliance," *id.* at 18489, and explains that for a variety of reasons "FinCEN is not assured that FBME will implement appropriate and necessary safeguards to ensure that it provides accurate, credible, and reliable information to the entities tasked with ensuring compliance." *Id.* As a result, "FinCEN concludes that a prohibition under the fifth special measure is the only viable measure to protect the U.S. financial system against the money laundering and terrorist financing threats posed by FBME." *Id.*; *see also id.* at 18489-90 (considering alternatives proposed by FBME).

Plaintiffs do not deny that FinCEN considered alternatives, asserting only that they were not considered "adequately," Pls.' Summ. J. Mot. at 41, 51, or "properly," *id.* at 50. They attempt to support this claim with a hodgepodge of arguments, none of which alters the fact that FinCEN did in fact, consider alternatives. Moreover, none of the components of Plaintiffs' attack on the adequacy and propriety of FinCEN's consideration of alternatives holds up.

First, Plaintiffs argue that the factual "support" discussed by FinCEN in considering alternatives is "contrary to the record," *id.* at 51, even though FinCEN cites extensive record evidence supporting its conclusions, 81 Fed. Reg. at 18489-90. Plaintiffs ultimately resort to arguing that FinCEN should have weighed certain items in the evidentiary record differently. *See* Pls.' Summ. J. Mot. at 47 (arguing that Secretary should have read promotional materials as merely "highlight[ing] its international banking experience" and not indicating willingness to

facilitate evasion of AML regulations) (citing AR0130); *id.* at 48-49 (arguing that FinCEN should have focused on "positive compliance determinations" in various audit reports rather than on "issues and recommended improvements" identified therein), *id.* at 49-50 (arguing that FinCEN should have given less weight to CBC penalties because of, *inter alia*, "troubling circumstances" surrounding underlying audit). FBME's argument effectively asks the Court "to substitute its judgment for that of the agency," *FCC v. Fox Television Stations*, *Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43), and does so "'in an area at the intersection of national security, foreign policy, and administrative law,' [where] judicial review 'is extremely deferential.'" *FBME Bank*, 125 F. Supp. 3d at 123 (quoting *IARA*, 477 F.3d at 734 (D.C. Cir. 2007)).

Second, Plaintiffs complain that one factor considered by FinCEN—that "[i]n late 2014, FBME employees took various measures to obscure information," 81 Fed. Reg. at 18,489-90—"was first alleged in the Second Final Rule, so FBME could not refute it," Pls.' Summ. J. Mot. at 27, 52. The Government addresses below Plaintiffs' allegation that, in light of this and other findings in the Final Rule, Plaintiffs were denied a meaningful opportunity to comment. *See infra* Pt. III.C.1. But that erroneous allegation does not undermine the underlying fact.

Third, Plaintiffs argue that as a matter of law "an extensive history of AML deficiencies" by itself cannot serve as justification for imposing the *fifth* special measure because such a history is one of the considerations in determining that an institution is one of primary money laundering concern in the first instance under 31 U.S.C. § 5318A(c)(2)(B), which in turn can be the basis for imposing *any* of the special measures. Pls.' Summ. J. Mot. at 52. Plaintiffs cite no authority for this argument, and there is none. The fact that past AML deficiencies are relevant in the "primary money laundering concern" analysis indicates that such deficiencies are a *proper*

consideration in determining whether to impose the fifth special measure. And furthermore, to the extent Plaintiffs contend that there needs to be an "aggravating factor" justifying the imposition of the fifth special measure, *id.* at 52, there is one—namely, the agency's "conclu[sion] that a prohibition under the fifth special measure is the only viable measure to protect the U.S. financial system against the money laundering and terrorist financing threats posed by FBME." 81 Fed. Reg. at 18489-90.

Finally, Plaintiffs complain that "FBME compares favorably to" another financial institution against which FBME proposed to impose the fifth special measure, Multibanka, that FBME alleges FinCEN ultimately "let off much lighter." Pls.' Summ. J. Mot. at 52. Plaintiffs allege that this supposedly differential treatment violated a purported rule requiring FinCEN to "treat like cases alike." *Id*. at 53.[4] But FinCEN considered this argument in its rulemaking and responded that "[t]he matter of Multibanka is not analogous to the one here." 81 Fed. Reg. at 18490. It noted numerous differences in that case, among them the fact that as to Multibanka (but not FBME), FinCEN "found that Multibanka was working to ensure that its improved AML procedures were translated effectively into practice." *Id.* Plaintiffs' only response is to dispute

[4] Overturning FinCEN's determinations with regard to which threats warrant prophylactic measures would entail impermissible interference with the agency's decisionmaking about how to spend its limited resources. *Cf. Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("an agency's decision not to prosecute or enforce . . . is a decision generally committed to an agency's absolute discretion"). It is no wonder the only support Plaintiffs offer for their view to the contrary comes from a case involving a routine and ministerial decision by an agency, namely, the decision to grant an extension to the deadline to file a report, *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007). Plaintiffs also cite *Friedman v. Sebelius*, 686 F.3d 813, 827-28 (D.C. Cir. 2012), but that case found fault with the agency for failing to explain a departure from an established agency precedent, *id.* at 826, not for purportedly differential treatment of isolated cases. Plaintiffs did not argue in their comment to the agency, and do not argue here, that the imposition of the fifth special measure at issue in this case marks such a departure from precedent. And as discussed above, the agency did explain why the fifth special measure was warranted in light of the concerns presented by FBME.

the validity of that conclusion, but their disagreement does not change the fact that FinCEN had ample grounds to differentiate this case from that of Multibanka.[5]

**D. FBME's allegations of taint are baseless.**

As has been discussed extensively in other filings, Plaintiffs appear to be embroiled in a toxic dispute with their former consultants, who as a result of that dispute sent FBME an email with two attachments and then a comment that FinCEN claims are attorney-client privileged ("Disputed Materials"). Pls.' Summ. J. Mot. at 54-55; *see* Joint Notice at 7-9 ((ECF No. 51); Defs.' Opp. to Mot. to Supp. at 2-4 (ECF No. 67). Plaintiffs seem to hope that a good—or at least strident—offense is the best defense to whatever material might be in these Disputed Materials, and so make baseless arguments that the agency's handling of these materials was unethical and "tainted" the rulemaking. Pls.' Summ. J. Mot. at 54-55. Such a defense is unnecessary; the agency could not assess the credibility of the materials, did not include them in the administrative record, and did not consider them. *See* Defs.' Opp'n to Mot. to Supp. at 4; Decl. of Richard May ¶ 3 (ECF No. 67-1) ("May Decl."). But as an attack on the rulemaking itself, Plaintiffs "taint" argument fails.

First, Plaintiffs assert that FinCEN violated the rules of professional conduct through its "receipt, review, and concealment of the [Disputed] Materials," and that this purported ethics violation "tainted" the rulemaking. Pls.' Summ. J. Mot. at 54-55. The Government strongly

---

[5] Plaintiffs also point to the compliance history of other banks in their brief, Pls.' Summ. J. Mot. at 52 n.10 & 53. But Plaintiffs do not and cannot argue that these other banks are similarly situated to FBME, given that they, unlike FBME, were domestic banks subject to U.S. oversight and enforcement jurisdiction under the BSA. *See* AR0066.

denies any impropriety in its handling of the Disputed Materials.[6] However, Plaintiffs cannot through scurrilous allegations convert judicial review of agency action into an ethics inquiry into the conduct of agency employees. In any event, these allegations are irrelevant to the operative legal standard under which the Court's role is to hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).[7]

Plaintiffs claim that *Lorillard, Inc. v. FDA* provides that an agency's failure to "heed ethical considerations and remedy ethical violations 'amount[s] to fail[ure] to consider an important aspect of the problem' and renders agency action arbitrary and capricious." *See* Pls.' Summ. J. Mot. at 55 (quoting *Lorillard, Inc. v. FDA*, 56 F. Supp. 3d 37, 51 (D.D.C. 2014)). But in *Lorillard* the possibility of conflicts of interest on the advisory committee—which could affect the advice of that committee—was a relevant factor the agency should have considered in making its decision. Plaintiffs do not argue that the alleged possession of privileged information influenced the agency's decision or was otherwise a "relevant factor" in determining whether to impose the fifth special measure. Nor could they, as the Disputed Materials were neither included in the record nor considered by the agency. *See* Defs.' Opp'n to Supp. at 4.

Second, Plaintiffs argue that "agencies whose rulemakings have been exposed to taint fall under an obligation to conduct evidentiary hearings and make findings in order to determine

---

[6] Among other points obscured by Plaintiffs in their version of the facts is the fact that a review of the email attachments by a DOJ filter attorney determined that they were not privileged. *See* ECF No. 51, Joint Notice, Exs. A & D.

[7] The primary authority on which plaintiffs rely—via a *cf* cite—*Gomez v. Vernon*, 255 F.3d 1118, 1134 (9th Cir. 2001)—is not remotely on point. There, prisoners' motions for sanctions against government counsel under 28 U.S.C. § 1927 were granted after a three-day hearing revealed that "counsel had implicitly authorized and encouraged prison employees to secretly search for, inspect, examine, read, copy and then deliver ... confidential attorney-client correspondence or documents over a nine-month period." *Id.* at 1125.

whether a new rulemaking is necessary." Pls.' Summ. J. Mot. at 55. But they cite only cases in which courts, having held that an agency had failed to disclose improper *ex parte* communications during a proceeding in which such communications were prohibited, ordered the agency to investigate whether decisionmakers were improperly influenced by those communications as a remedy. *See PATCO v. FLRA*, 672 F.2d 109, 112 (D.C. Cir. 1982) (affidavit of Assistant Attorney General indicated "improper endeavor to influence the vote of one of the members of the FLRA"; court ordered hearing "to disclose whether any improper influence tainted FLRA's decisionmaking processes"); *Home Box Office v. FCC*, 567 F.2d 9, 53 (D.C. Cir. 1977) (evidence of "undue industry influence" on decisionmakers from improper *ex parte* communications); *Sangamon Valley Television Corp. v. United States*, 269 F.2d 221, 224 (D.C. Cir. 1959) (filing of Department of Justice complaining of improper *ex parte* communications). No such violation occurred here.[8]

Instead, and in stark contrast to the *ex parte* communication violations in *Home Box Office* and the other cases plaintiffs cite, in this case the violation that Plaintiffs allege is to a duty in certain cases to inform counsel of a disclosure of privileged material. Pls' Opp. at 55. To be sure that is a serious (and false) allegation, but whether the agency mishandled privileged

---

[8] Prohibitions on *ex parte* communications ordinarily apply only to formal rulemakings and hearings, not to informal rulemakings. *See* 5 U.S.C. § 557(d)(1) (setting forth limitations on *ex parte* communications applicable to formal proceedings subject to the hearing requirements of 5 U.S.C. § 556 & 557). Although *Home Box Office*, 567 F.2d at 51, can be read to suggest that due process forbids such communications during informal rulemaking as well, the D.C. Circuit has repeatedly rejected such a reading. *See Action for Children's Television v. FCC*, 564 F.2d 458, 474 (D.C. Cir. 1977); *see also Air Transport Ass'n v. America v. FAA*, 169 F.3d 1, 7 n.5 (D.C. Cir. 1999). The D.C. Circuit has made clear that *ex parte* communications during informal rulemaking potentially run afoul of due process only where such "rulemaking proceedings involve 'competing claims to a valuable privilege,'" as this is the "point where the potential for unfair advantage outweighs the practical burdens." *Action for Children's Television*, 564 F.2d at 477. Plaintiffs cannot argue that the *ex parte* prohibition applied in this case, as there was no one "competing" with FBME in the rulemaking.

material or not has no relevance to the validity of an administrative determination in which that material was not considered.

By citing no actual authority for their contentions that their taint allegations warrant a new rulemaking, Plaintiffs are asking the Court to adopt a new administrative law doctrine that would severely hamper agency decision-making while simultaneously making it harder for agency decision-makers to obtain the input of the interested public. It would force agencies to take pains to insulate their staff from any outside correspondence to guard against the mere possibility that—whether intentionally or otherwise—someone might submit, and an agency employee might see, information alleged later to be privileged, thereby "tainting" the employee out of the rulemaking altogether, or voiding the rule. Plaintiffs might well be happy with such a result. But the Court should not adopt a theory that would lead to agency paralysis and inaction, particularly in the context of Section 311's mandate to protect against the threat of money laundering and terrorist financing.

## II. FBME is Not Entitled to Due Process.

The Court need not decide whether FBME is entitled to due process, because the process provided by FinCEN satisfied both statutory and constitutional due process requirements. *See infra* Part III. That said, Plaintiffs' due process claim is based on infirm grounds from the start because FBME is *not* entitled to constitutional due process. Specifically, as a wholly foreign financial institution, FBME lacks sufficient presence in the U.S. to claim a constitutional right to due process. *See* Defs.' Summ. J. Mot. at 45-48; *People's Mojahedin Org. of Iran v. Dep't of State ("PMOI")*, 182 F.3d 17, 22 (D.C. Cir. 1999) ("A foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise."). In addition, Plaintiffs do not cite authority to establish that the ability to maintain a

correspondent account at a U.S. financial institution is a property interest sufficient for due process protections. Any claim on this basis therefore lacks merit.

**A. FBME lacks the presence necessary to establish an entitlement to due process rights.**

FBME largely conflates its APA and constitutional arguments, in hopes of evading the constitutional presence requirement and elevating the standards applicable to a rulemaking that affects a foreign bank. First, FBME argues that the agency assumed it had constitutional rights during the administrative proceedings, and that the agency has therefore somehow waived its ability to argue otherwise. Pls.' Summ. J. Mot. at 16. Plaintiffs misread both the Final Rule and the law. The Final Rule stated generally that FinCEN's process is "consistent with the Constitution and the . . . APA," 81 Fed. Reg. 18485, which in no way concedes FBME's entitlement to constitutional rights and makes no findings as to its connections with the United States. The doctrine that "a court may uphold agency action only on the grounds that the agency invoked," Pls.' Summ. J. Mot. at 16, therefore in no way guarantees Plaintiffs due process rights or guarantees Plaintiffs a constitutional cause of action in court.

Second, Plaintiffs argue that Section 311 "incorporates" due process even if the Constitution does not require it. *Id*. at 16-17. Plaintiffs point to no statutory language in Section 311 or the APA that even arguably purports to provide full due process protections when the Constitution does not require it. Instead, Plaintiffs cite ambiguous and out-of-context language from the legislative history, namely in a Conference Report noting that "[i]n administering a proceeding in which classified information is submitted to a court under this provision, the Conferees intend that a court will fashion procedures, necessary to assure a moving party due process of law, that resemble those already required in similar situations in which the government, or another party, seeks to base a claim or defense on classified information." *See*

H.R. Rep. No. 108-381 at 55, *reprinted in* 2004 U.S.C.C.A.N. 2289, 2302 (Nov. 19, 2003). This language does not provide that foreign banks will be accorded due process rights during administrative proceedings. It merely affirms the legislative intent that any such rights, if they exist, could be appropriately protected during subsequent judicial proceedings, just as they are in terrorism designation proceedings similar to those discussed in *PMOI*. Plaintiffs' position that the statute was intended to protect any existing constitutional rights begs the question. If a plaintiff does not have constitutional rights, the statute is not intended to protect them.

Third, Plaintiffs argue that the doctrine of constitutional avoidance requires the Court to read due process requirements into the APA. Pls.' Summ. J. Mot. at 17. "The so-called canon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts." *Fox Television Stations, Inc.*, 556 U.S. at 516. The Supreme Court has noted that there is "no precedent for applying it to limit the scope of authorized executive action." *Id*. The canon only applies when a plaintiff makes a serious constitutional challenge and the narrowing construction is not at odds with the evident scope of the statute and congressional intent. *Id.* Plaintiffs here have identified no ambiguous statutory language and no serious constitutional doubts.

Fourth, Plaintiffs misconstrue the standard for establishing a constitutional presence. *See* Pls.' Summ. J. Mot. at 17-18. Plaintiffs argue that the rule in *PMOI* has been "relaxed" by subsequent D.C. Circuit opinions that address a very different legal question – whether foreign corporations can be haled into court and forced to defend themselves once they are "present" through counsel. The D.C. Circuit did not "relax" the standard, or even address it. The Court of Appeals has not resolved the apparent doctrinal tension between the personal jurisdiction cases (in which courts refuse to exercise personal jurisdiction over foreign defendants on due process

grounds) and the constitutional presence cases (which do not allow foreign plaintiffs to assert due process rights at all). *See GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 816 (D.C. Cir. 2012) (declining to resolve conflict).[9] But the D.C. Circuit noted that the cases can be reconciled, explaining that a corporation which is "forced to defend itself" and become present in U.S. courts may be entitled to due process only for that limited purpose. *Id*.

A more straightforward way of reconciling the two doctrines appears in recent Supreme Court jurisprudence on personal jurisdiction, which focuses on structural concerns rather than individual rights. Although personal jurisdiction case law originated with the due process clause, "jurisdiction is in the first instance a question of authority rather than fairness," and "whether a judicial judgment is lawful depends on whether the sovereign has authority to render it." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 883-84 (2011) (plurality).[10] Because personal jurisdiction is primarily a limitation on *sovereignty* that can be asserted by individuals, foreign persons who lack presence may be able to assert it to avoid an improper extension of that authority, but may not be able use the due process clause to challenge other actions of the United States.[11] Here, the Court need not resolve apparent tension in precedent in different areas of the

---

[9] The district court noted in *dicta* that "[i]t is not clear why foreign defendants . . . should be able to avoid the jurisdiction of United States courts by invoking the Due Process Clause when it is established in other contexts that nonresident aliens without connections to the United States typically do not have rights under the United States Constitution." *GSS Grp. Ltd. v. Nat'l Port Auth.*, 774 F. Supp. 2d 134, 139 (D.D.C. 2011), *aff'd*, 680 F.3d 805 (D.C. Cir. 2012).

[10] *See* Kyle Voils, *Making Sense of Sovereignty: A Historical Understanding of Personal Jurisdiction from Pennoyer to Nicastro*, 110 Nw. U. L. Rev. 679, 682 (2016) ("the history of the Supreme Court's personal jurisdiction doctrine has always focused on sovereign authority.").

[11] There are other potential ways to resolve or reconcile the tension between the two lines of cases. As noted by the D.C. Circuit, at least one commentator proposed no longer treating personal jurisdiction over alien defendants as constitutional at all, *see, e.g.*, Austen L. Parrish, *Sovereignty, Not Due Process: Personal Jurisdiction Over Nonresident Alien Defendants*, 41 Wake Forest L. Rev. 1, 28–33 (2006), but the Supreme Court has not moved in that direction.

law, but can rely on the directly analogous precedent that foreign plaintiffs without a sufficient presence in the United States lack constitutional rights. *See* Defs.' Summ J. Mot. at 45-47.

Plaintiffs' reading of the case law would extend due process requirements to any Executive action that may cause financial injury (even assuming loss of correspondent relationships constitute a financial injury) to a wholly foreign person, regardless of where they are located or any connections with the United States. The President and the components of the Executive Branch take many diplomatic, military and administrative actions that may arguably impair the liberty or property interests of aliens abroad. Plaintiffs' proposed dramatic expansion of judicial oversight of Executive action would have problematic implications for foreign policy and national security decisions.

Although Plaintiffs attempt to demonstrate their connections to the United States, these connections fall far short of establishing the presence necessary for constitutional rights. Pls.' Summ. J. Mot. at 18-19. FBME alleges that it has liens on development properties in North Carolina and over $200,000 in an escrow account. *Id.* According to Plaintiffs' submissions, at some point, their business associate "became unable to transfer the U.S. Dollar proceeds to FBME as it had previously" and "set up an escrow account to hold the U.S. Dollar proceeds for FBME until the parties could find a way to transfer the funds to FBME in Cyprus." Decl. of M. Elizabeth Peters ("Peters Decl.") (ECF No. 62-3) ¶¶ 34-35. In other words, FBME has one bank account in North Carolina, which is a pittance in light of FBME's overall assets, and which is not affected by the Final Rule. The hearsay declaration provides no reason to believe that FBME is "unable" to access its account, and only suggests that the funds could not be transferred to

---

More recently, another article highlighted the consistency of the underlying impact of the two doctrines: the closer an alien is to the United States, the more she will be treated like a U.S. person. *See* Hon. Karen Nelson Moore, *Aliens and the Constitution*, 88 N.Y.U. L. Rev. 801, 847-48 (2013).

FBME using the same means as previously transferred. *Id*. According to Plaintiffs' submissions, the funds are not currently held in a correspondent account at all, but in an attorney's trust account. By its terms, the Final Rule does not prohibit access to this account, and Plaintiffs' declaration provides no reason to believe otherwise.

Some courts have held that the existence of a U.S. bank account engenders due process rights with respect to that account – *i.e.*, the Government could not forfeit the account without due process. *See United States v. Sum of $70,990,605*, 128 F. Supp. 3d 350, 363 (D.D.C. 2015). But FBME continues to obtain and have access to its funds in the North Carolina account, and can withdraw them at any time, notwithstanding its conclusory assertion that "FinCEN's actions have effectively cut FBME of from these funds." Pls. Summ. J. Mot. at 18. After the Final Rule becomes effective, FBME will continue to have access to its funds, and the Final Rule will not prevent FBME from withdrawing those funds. FBME will also continue to be able to transfer its funds using any means other than a correspondent account or could use those funds to pay for goods and services in the United States.

In short, Plaintiffs' single U.S.-based bank account does not demonstrate a presence or substantial connections to the United States. Because Plaintiffs are not entitled to constitutional rights, Defendants are entitled to summary judgment on Plaintiffs' due process claim.

### B. *Vermont Yankee* precludes rather than supports plaintiffs' demand for extra-statutory procedural protections.

It is hornbook law that in *Vermont Yankee Nuclear Power Corp. v. Nat. Resources Def. Council, Inc.*, 435 U.S. 519, 556 (1978), the Supreme Court put an end to the D.C. Circuit's then-growing practice of requiring agencies to afford more or different procedural protections than Congress itself had required. As the D.C. Circuit explained three years after the *Vermont Yankee* decision:

> In its unanimous opinion, the Supreme Court unambiguously cautioned this court against imposing its own notions of proper procedures upon an administrative agency entrusted with substantive functions by Congress. The Court declared that so long as an agency abided by the minimum procedural requirements laid down by statute, this court was not free to impose additional procedural rights if the agency did not choose to grant them. Except in "extremely rare" circumstances, the Court stated, there is no justification for a reviewing court to overturn agency action because of the failure to employ procedures beyond those required by Congress.

*Sierra Club v. Costle*, 657 F.2d 298, 391-92 (D.C. Cir. 1981) (citing *Vermont Yankee*).

Nonetheless, Plaintiffs argue that *Vermont Yankee* supports their position that they are entitled to additional procedural protections beyond those provided by the APA and section 311. *See* Pls.' Summ. J. Mot. at 20. They focus on a line in the opinion noting that "[i]n prior opinions we have intimated that even in a rulemaking proceeding . . . [under] some circumstances additional procedures may be required *in order to afford the affected individuals due process*." *Vermont Yankee*, 435 U.S. at 542 (emphasis added). But they replace "in prior opinions we have intimated that" with "[t]he Supreme Court has held that" and suggest that *Vermont Yankee* creates a special category of "adjudicatory" rulemakings that are subject to heightened procedural requirements. Not so. *Vermont Yankee* cautioned against the creation of such categories, while recognizing that "prior opinions" had "intimated" that in some circumstances the procedures required by statute might themselves fall short of constitutional due process requirements. *Id.*[12] Thus, properly understood, the line referenced by Plaintiffs simply directs the inquiry back to Plaintiffs' due process arguments, which fail for the reasons

[12] A still surviving example of such a circumstance is the rule—now in doubt in light of *Vermont Yankee*—that while the APA does not forbid *ex parte* communications in informal rulemaking, in certain cases involving "competing claims to a valuable privilege" due process itself circumscribes such communications. *See supra* Pt. I.D.

described *supra*, Part II.A (plaintiffs are not entitled to due process), and *infra*, part III (FinCEN provided more than adequate process under either a due process or APA standard).[13]

Plaintiffs appear to argue that because FBME purports to feel the effects of the Final Rule acutely (even if the rule actually regulates the conduct of U.S. financial institutions), Pls.' Summ. J. Mot. at 20, and because (in plaintiffs' view) the Final Rule implicated FBME's credibility, *id.* at 39, FBME is entitled to procedural protections above and beyond those provided by the APA and section 311. This argument is strikingly similar to one endorsed in a pre-*Vermont Yankee* case, *Mobil Oil Corp. v. Federal Power Commission*, 438 F.2d 1238, 1252-54 (D.C. Cir. 1973), in which the D.C. Circuit "recognized that informal rulemaking under § 553 [of the APA] might require certain adversary procedures akin to adjudications or formal rulemakings when circumstances … make them appropriate." *Action for Children's Television*, 564 F.2d at 470 n.10 (describing *Mobil Oil*). The problem for Plaintiffs is that *Mobil Oil* "is no longer good law" after *Vermont Yankee*, which "rejected . . . with great force and clarity" the proposition that "procedural requirements deemed inherent in the very concept of fair hearing could be fashioned by the Court even though no such requirements had been specified by Congress." *Wisconsin Gas Co. v. FERC*, 770 F.2d 1144, 1167 (D.C. Cir. 1985) (internal quotations omitted); *see id.* ("[N]othing 'permitted the court to review and overturn the rulemaking proceeding on the basis of the procedural devices employed (or not employed) by the Commission so long as the Commission employed at least the statutory *minima*.'") (quoting *Vermont Yankee*).

---

[13] Plaintiffs also cite *Alaska Airlines, Inc. v. Civil Aeronautics Board*, 545 F.2d 194, 200 (D.C. Cir. 1976), which found insufficient for constitutional due process purposes an informal adjudication that suspended a particular airline's license. But that pre-*Vermont Yankee* opinion did not involve an agency action statutorily-mandated to be "imposed only by regulation," 31 U.S.C. § 5318A(a)(2)(C), or hold that the APA's notice and comment rulemaking procedures would have been inadequate to satisfy the constitutional minima.

## III. FinCEN Provided More than Adequate Process Under Either a Due Process or APA Standard.

Regardless of whether the Court reviews Plaintiffs' procedural claims within the APA or due process framework, there can be no doubt that FBME received adequate process. FinCEN provided FBME more than sufficient notice and opportunity to be heard by disclosing all of the unclassified, non-protected evidence it considered; publishing a robust summary of the classified and statutorily protected evidence in the July 2014 Notice of Finding and the enjoined July 2015 Final Rule; engaging in ongoing dialogue with Plaintiffs; and considering all of their extensive submissions during both comment periods. Plaintiffs are not entitled to any more process as a matter of law.

### A. FinCEN Provided More Notice of the Classified Evidence Than is Required by the Constitution or the APA.

Plaintiffs continue to argue that the rulemaking failed to make sufficiently public information that is classified or protected by the Bank Secrecy Act. This Court already found in the preliminary injunction proceedings that Plaintiffs were unlikely to succeed on similar arguments. The same arguments should be rejected now.

"[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (citation omitted). Instead, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.* (citation omitted). The fundamental requirement of due process is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

Courts in this Circuit have repeatedly re-affirmed that the Government is not required to disclose classified information used in administrative records in national security proceedings, as this Court noted in finding Plaintiffs unlikely to succeed on the merits. *See FBME*, 125 F. Supp. 3d at 118-19 (collecting cases). Congress specifically approved the use of *ex parte* information in this particular context. 31 U.S.C. § 5318A(f). Plaintiffs nevertheless demand that the Government fashion special "mitigation" measures that have only been applied for limited purposes in certain criminal cases and certain kinds of immigration proceedings, and that are neither required nor appropriate here.[14]

Plaintiffs have already been provided with summaries of relevant information to the extent possible consistent with national security interests. The Court was previously "satisfied that the Notices adequately summarized the conclusions FinCEN drew from the classified evidence and that providing further unclassified summaries would be difficult, if not impossible, without revealing the underlying classified information." *FBME*, 125 F. Supp. 3d at 119 n.2. On remand, FinCEN undertook yet another review to determine whether additional information could be disclosed, which is more than required by the case law in this Circuit. In addition to the (1) Notice of Finding, (2) the unclassified record for the 2015 Final Rule, and (3) two Notices of Proposed Rulemaking, Plaintiffs engaged in extensive back and forth with FinCEN over the course of two rulemakings, including an in-person meeting, and made extensive submissions in connection with both rulemakings. FBME has no plausible argument that it failed to understand the allegations against it. *Cf. Kadi*, 42 F. Supp. 3d at 29 ("even if [Kadi] did not receive the full unclassified administrative record . . . , he did receive an opportunity, in substance, to rebut the

[14] This appears to be a purely constitutional argument, rather than a statutory or APA one. Congress specifically provided for *ex parte* use of classified information in this context and cannot reasonably be read to have required more.

evidence found in the unclassified administrative record through his own submissions . . . , as well as the opportunity to respond robustly to OFAC's follow-up questions addressing previous statements Kadi had made and identifying specific facts and areas of concern relevant to the designation decision.").

FBME is not entitled to further efforts at declassification or summary, and it is certainly not entitled to access classified evidence. The same cases previously relied upon by this Court have rejected identical arguments for measures like summaries and cleared counsel. *See, e.g.*, *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 319 (D.C. Cir. 2014) ("due process does not require disclosure of classified information supporting official action."); *Holy Land Found.*, 333 F.3d at 164 (emphasizing "the primacy of the Executive in controlling and exercising responsibility over access to classified information"); *Nat'l Council of Resistance of Iran v. Dep't of State* ("*NCRI*"), 251 F.3d 192, 208-09 (D.C. Cir. 2001) (classified information "is within the privilege and prerogative of the executive, and we do not intend to compel a breach in the security which that branch is charged to protect"); *Kadi*, 42 F. Supp. 3d at 28-29 & n.16 (noting that there is no automatic right to access classified evidence).

Plaintiffs' list of out-of-Circuit cases involving unclassified summaries or security cleared counsel does not change the analysis. *See* Pls.' Summ. J. Mot. at 35 n.7. For example, in *Al-Haramain*, a terrorism designation case pursuant to the International Emergency Economic Powers Act in which a U.S. charitable office was shut down, the Ninth Circuit disagreed with the D.C. Circuit and found that the Government had to at least consider the availability of security-cleared counsel and unclassified summaries, but also found that any error was harmless. *Al-Haramain v. U.S. Dep't of Treasur*y, 686 F.3d 965 (9th Cir. 2011). Aside from the fact that it is not binding, the case is distinguishable on many grounds: the plaintiff was a domestic entity, the

deprivation of liberty and property was more substantial; it was an adjudication, not a rule-making; and the plaintiff did not have pre-deprivation access to the extensive unclassified information laid out in a notice of finding and two notices of proposed rule-making.[15]

Plaintiffs' citations of Guantanamo Bay detainee cases or criminal cases are even more inapposite. The Government agreed to the information-sharing regime in the Guantanamo habeas cases precisely because of the unique context they presented: quasi-criminal proceedings arising from potentially indefinite detention. *See In re Guantanamo Bay Detainee Litig.*, 577 F. Supp. 2d 143, 154 (D.D.C. 2008) (¶ 48(b): "Nothing herein requires the government to disclose classified information."); *see also Bismullah v. Gates*, 501 F.3d 178, 198 (D.C. Cir. 2007) ("Without authorization from the Government, neither Petitioner nor Petitioner's counsel may have access to any classified information involved in this case."). And criminal cases are governed by the Classified Information Procedures Act, which has no applicability to civil cases. *See* 18 U.S.C. app. 3. Rather, here Congress and the Executive Branch have both concluded that classified information can and should be used *ex parte* in this proceeding.[16]

---

[15] Likewise, in *KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 710 F. Supp. 2d 637 (N.D. Ohio 2010), the court did not require disclosure of classified information or new summaries, and only "propose[d]" counsel access as one of multiple options, subject to further briefing. *Id*. at 660. The case settled, and private counsel was never given access to classified information.

[16] In no event would Plaintiffs or their counsel be entitled to receive classified information. Decisions about who may access or use classified information and under what circumstances are committed to the Executive Branch and not subject to judicial review. *Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988); *see also CIA v. Sims*, 471 U.S. 159, 180 (1985) ("[I]t is the responsibility of the [Executive], not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether [to disclose sensitive information]."); *Gen. Dynamics Corp. v. United States*, 563 U.S. 478, 482 (2011) (noting that disclosure of sensitive information to a limited number of lawyers led to "unauthorized disclosure of military secrets").

### B. FinCEN was not required to provide statutorily protected evidence to FBME.

Plaintiffs also argue that this Court erred in holding that FinCEN could properly rely on Bank Secrecy Act-protected information, namely, the SARs. As described in the Government's Motion for Summary Judgment, Congress specifically provided for the secrecy of this information, which is crucial to the effective implementation of Section 311. Defs.' Summ. J. Mot. at 41-43. The Court previously held that FinCEN did not err in withholding the SARs under the Bank Secrecy Act and that in any event there was an adequate summary to which Plaintiffs could respond. *FBME*, 125 F. Supp. 3d at 120.

Plaintiffs argue first that the *ex parte* use of SARs is inappropriate, relying on *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986). Pls.' Summ. J. Mot. at 23. In *Abourezk*, a divided panel of the D.C. Circuit cautioned the district court in dicta against relying so heavily on *ex parte* submissions in the future. 785 F.2d at 1060-61. The Court expressed reluctance to "dispose of the merits of a case on the basis of *ex parte, in camera* submissions," except in limited circumstances, including where Congress has authorized such review by statute. *Id*. at 1061. As briefed in Defendants' opposition to the preliminary injunction and herein, Congress has authorized the use of this information. Information contained in SARs is protected by the BSA, and is collected for the purpose of aiding criminal, tax, or regulatory investigations or proceedings or intelligence and counterintelligence activities, in order to protect against international terrorism. *See* Calvery Decl. ¶ 5; 31 U.S.C. §§ 5311, 5318(g). Section 311 is codified within the BSA and implicates exactly the sort of proceeding contemplated by the BSA. Disclosure is generally prohibited by the statute and regulations, and there are no applicable exceptions for administrative proceedings or civil litigation. 31 U.S.C. § 5318(g)(2)(A)(ii) ("no current or former officer or employee of or contractor for the Federal Government . . . may

disclose to any person involved in the transaction that the transaction has been reported, other than as necessary to fulfill the official duties of such officer or employee."); 31 C.F.R. § 1020.320(e)(2). At the same time, the Court has authority under the APA to review such information when it is properly included. *See* 5 U.S.C. § 706 ("the court shall review the whole record or those parts of it cited by a party"); *cf. Jifry*, 370 F.3d at 1182 (discussing the court's inherent authority to review classified information used in a record).

*Ex parte* review effectively balances the interests at issue by preventing disclosure of highly sensitive information while ensuring that an Article III judge reviews the information considered by the decisionmaker. This is entirely consistent with the due process analysis in *Holy Land* and *Jifry*, and protects the interests of affected institutions. While use of *ex parte* information is certainly not the norm in every case, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Here, where FinCEN's Notice of Finding contains references to and analysis of the SARs to facilitate comment, there was no violation of due process.[17]

Second, Plaintiffs argue that the summary is inadequate because they do not have the details of every suspicious transaction. Pls.' Summ. J. Mot. at 23-24. But meaningful notice does not entitle them to the very details that Congress and the agency need to keep secret in order to gather financial information in this area. Disclosing such information "has the potential to alert illicit actors that their transactions are subject to reporting, and to aid them in evading BSA

---

[17] Moreover, courts in certain settings have relied on inherent authority to review classified or sensitive information *ex parte*. *See Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004) (reviewing ex parte the classified portion of an administrative record in connection with a petition for review); *Al-Aqeel v. Paulson*, 568 F. Supp. 2d 64, 72 (D.D.C. 2008) (upholding ex parte use of law enforcement information in an administrative record); *see also Meridian Int'l Logistics, Inc. v. United States*, 939 F.2d 740, 745 (9th Cir. 1991); *Gilmore v. Gonzales*, 435 F.3d 1125, 1131 (9th Cir 2006). Here, of course, express statutory authority to submit information ex parte falls within the *Abourezk* framework. *See al-Aqeel*, 568 F. Supp. 2d at 72.

requirements and other methods to deter their activities." Calvery Decl. ¶ 9. And as this Court previously held, the "summary information was sufficient to allow FBME to respond to FinCEN's accompanying concerns – namely, that FBME's wire transfers involved suspicious levels of shell company activity, short-term surge wire activity, structuring and high risk business customers." 125 F. Supp. 3d at 120.

Third, Plaintiffs argue that the use of undisclosed information from third parties is always prohibited, relying primarily on *States Marine Lines, Inc. v. Federal Maritime Commission*, 376 F.2d 230 (D.C. Cir. 1967). Pls' Summ. J. Mot. at 24. In that case, the Court found that a "Neutral Body" had permitted excessive secrecy when it did not disclose evidence to the target of the investigation. *States Marine Lines*, 376 F.2d at 238. But the "Neutral Body" was not a Government entity and apparently had not claimed any common law or statutory privilege, simply a general interest in secrecy.[18] The operations of FinCEN present a very different situation. An Executive Branch agency charged by Congress with collecting and analyzing sensitive information has determined, consistent with statutory obligations, that the information should remain secret, has summarized it for Plaintiffs (and the public) to the extent possible, and has presented the undisclosed information to the Court *ex parte* so that the Court can review its decision.

[18] Moreover, the Court actually affirmed the ability of the Neutral Body to withhold the identity of a complainant. 376 F.2d at 238 ("[W]e are not aware of any principle of fairness that demands disclosing a complainant's identity no matter what the cost."). And the Court's and the Government's suggested resolution involved a compromise that would make evidence available while protecting identity of complainants to the extent possible. Even under that analysis, the approach adopted by FinCEN would be appropriate. Plaintiffs were provided with the overall analysis of the transactions but not the individualized information that would permit them to know who submitted reports.

Finally, Plaintiffs argue that there may be other, as yet undescribed information that the Government has not provided and demands a "privilege log" for the undisclosed administrative record. Pls.' Summ. J. Mot. at 25-26. All of the information in the record has either been provided to Plaintiffs or is classified or statutorily protected and has been submitted to the Court *ex parte*. And although Plaintiffs do not have a "privilege log," a concept inconsistent with APA proceedings, they do have the redacted index of all the materials submitted to the Court, while the Court has access to full and unredacted index with the classified and protected administrative record. *Cf. Jifry*, 370 F.3d at 1182 (rejecting similar request for *Vaughn* index). Plaintiffs cite no similar case in which a court has required such a log.[19] The information redacted from the index attached to the certification tends to reveal the classified or statutorily-protected information that is properly withheld. And to the extent possible on the public record, Defendants have provided an explanation as to what those materials are and why they were protected. To the extent the Court has any specific questions about the nature of the *ex parte*, *in camera* record, the Government will endeavor to provide answers *ex parte* and *in camera*.

**C. FinCEN made available for comment all of the unclassified, non-protected evidence it considered.**

As discussed in its summary judgment motion, the Government does not concede that it committed any procedural error in the first rulemaking period or that it was required to disclose the actual unclassified, non-protected evidence it considered. Defs.' Summ. J. Mot. at 43-44.

---

[19] Plaintiffs cite one order from the district court on remand in *Ralls* in which the district court *sua sponte* set a schedule for disclosure of the unclassified material from the record and directed the Government to provide Plaintiffs with a privilege log of any unclassified material withheld on the basis of the Executive privilege. *See* Order, *Ralls Corp. v. Comm. on Foreign Inv.*, No. 12-1513 (D.D.C. Nov. 6, 2014), ECF No. 65. That non-precedential order, entered without the benefit of briefing or argument, provides no arguable basis for ordering production of a "privilege log" here, where the unclassified material is protected by statute and has been adequately summarized on the public record. *See* 125 F. Supp. 3d at 120.

However, FinCEN did make this evidence available for comment during the remand. *Id.* at 44; 80 Fed. Reg. 74064 (Nov. 27, 2015). And FBME fully availed itself of the opportunity, as evidenced in the lengthy comment it submitted on the last day of the reopened comment period and the "supplement" it added three days later. AR0012-15, 50-58, 3281-4398.

FBME nonetheless contends that FinCEN "withheld new accusations and information until after FBME could comment on them." Pls.' Summ. J. Mot. at 26. This charge is groundless. Plaintiffs' list of items allegedly "withheld" by FinCEN is based on either misunderstanding or misrepresentation of the evidence made available to them during the remand. Moreover, Plaintiffs appear to be retroactively trying to expand what the Court ordered the Government to provide—access to the unclassified, non-protected evidence FinCEN relied upon—to include a requirement that FinCEN's analysis of that evidence in the 2016 Final Rule precisely match its analysis of the evidence in the prior, enjoined final rule. The Court most certainly did not order this, nor would there have been any basis in law or logic to do so. The underlying reasoning for the Court's holding that FBME was entitled to the unclassified, non-protected evidence in the record turned on affording the commenters an opportunity to challenge the "veracity, credibility, or relevance" of that evidence. *See FBME*, 125 F. Supp. 3d at 121. The agency's ability to change the weight it gives any particular evidence in the record, or its interpretation of that evidence, is limited only by the requirement that the agency's ultimate decision not "so depart[] from [the] proposed rule as to constitute more surprise than notice." *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999). Indeed, adopting FBME's contrary view—that every "accusation" in the final rule must have been itemized previously—would either forbid the agency from taking the meaningful look at the evidence that is

envisioned by the notice-and-comment process or would result in a potentially never-ending cycle of notice and comment rulemaking.

In any event, taken item by item, none of the items identified by Plaintiffs constitutes "new" unclassified, non-protected information.

1. <u>FBME employees took various measures to obscure information in late 2014.</u>

In explaining FinCEN's grounds for continued concern regarding FBME, the March 2016 Final Rule notes that "in late 2014, FBME employees took various measures to obscure information." 81 Fed. Reg. at 18482, 18486, 18489. FBME correctly observes that this precise statement did not previously appear in the July 2015 Final Rule, only to jump to the incorrect conclusion that the statement must have been derived from allegedly privileged materials that FinCEN has specifically stated – and certified – it did not consider at all. *See generally* Defs.' Opp'n. to to Supp.; *see also* May Decl. In fact, the statement in question is one example of FinCEN providing as much information as it could from the *ex parte* portions of the record.[20] Moreover, even before this statement, FBME was on notice of FinCEN's concerns about FBME's apparent propensity for evading AML oversight. For example, the July 2014 Notice of Finding noted that "FBME took active steps to evade oversight by the Cypriot regulatory authorities" and that FinCEN had reason to believe that "FBME advertises the bank to its potential customer base as willing to facilitate the evasion of AML regulations." 79 Fed. Reg. 42639-42640 (July 22, 2014). There is no basis for FBME to maintain that it lacked notice of FinCEN's concern that the bank was actively evading regulatory scrutiny.

---

[20] This statement derives from evidence in the non-public record. *See, e.g.*, AR0010, AR0067 (nonpublic portion of evidentiary memorandum); Ex. 6 to March 25, 2016 Evidentiary Memorandum (nonpublic). To the extent the Court desires additional explanation of the non-public record, the Government could provide such explanation *ex parte* and *in camera*.

2. FBME misidentified a customer connected to a sanctioned Syrian entity.

With respect to FBME's complaint that FinCEN withheld information that FBME had "misidentified" a customer with connections to a U.S.-sanctioned Syrian entity, even after FBME had made inquiries about whether it had correctly identified that customer, Plaintiffs are conflating two separate customers that were identified at different times by FBME. In its July 2014 Notice of Finding ("NOF"), FinCEN noted that one of FBME's customers was a front company for the Scientific Studies and Research Center ("SSRC"), a U.S.-sanctioned Syrian entity. 79 Fed. Reg. at 42640. Subsequently, in early 2015, FBME asked FinCEN to confirm whether one of its customers was the SSRC-connected customer referenced in the NOF. AR4409-10. Because the identity of the customer referred to in the NOF was restricted, FinCEN replied that it could not provide any further information. AR2656.

Separately, FBME had submitted, in December 2014, an Ernst & Young ("EY") Transaction Report that identified as a former FBME customer a wholly different individual who had been sanctioned for providing support to the Syrian government. AR2960. FinCEN had not previously been aware of this individual's relationship with FBME. Later, on remand, FBME apparently inferred that this individual was the SSRC-connected customer referred to in the NOF, and complained in its January 2016 comment that FinCEN's reliance on this individual's relationship with FBME was "unjust" since his account had been suspended in 2008. AR3340. Responding to this portion of FBME's comment, FinCEN noted in the March 2016 Final Rule that this former customer was not, in fact, the sanctioned SSRC-connected entity referred to in the NOF. 81 Fed. Reg. at 18486. In other words, FinCEN did not make any information available in the 2016 Rule that it had denied in response to FBME's prior inquiry, since the prior inquiry was in relation to a completely different FBME customer.

3. <u>FBME did not demonstrate AML improvements in Tanzania.</u>

Plaintiffs complain that the March 2016 Final Rule was the first time FinCEN showed concern about lack of AML improvements at FBME's Tanzania branch, asserting that "[b]y all indications]…FinCEN [ ] was not even looking to Tanzania." Pls.' Summ. J. Mot. at 28. As a preliminary matter, Plaintiffs' focus on the two sentences in the final rule discussing FBME's efforts in Tanzania exemplifies what is wrong with their unsupported theory that an agency may not change the way it discusses aspects of an evidentiary record after considering comments. Here, *FBME's own comment* arguing that it is analogous to Multibanka put at issue FBME's lack of compliance efforts in Tanzania. *See* 81 Fed. Reg. 18,490 ("FBME [] compares this matter to . . . Multibanka . . . Multibanka is not analogous . . . [i]n contrast [to Multibanka], FBME has not demonstrated any AML improvements with respect to its headquarters"). Of course the agency could not predict specifically what aspects of the unclassified evidentiary record would be made relevant, and how they would be made relevant, by FBME's own comment on the proposed rule.

In any event, however, in this case FinCEN's focus on FBME's compliance efforts in Tanzania was not "new" at all. FinCEN's July 2014 NOF defined FBME as including *all* domestic and international branches, offices, and subsidiaries operating in Tanzania, Cyprus, or any other jurisdiction, and—as Plaintiffs themselves acknowledge—identified the bank's headquarters as residing in Tanzania. 79 Fed. Reg. at 42639. Nor was the NOF's discussion of money laundering activity and poor AML controls limited exclusively to Cyprus. *See id.* at 42639-40. Plaintiffs offer no reason why a proposed rulemaking that identifies an entire bank as being of primary money laundering concern should be presumed to exempt the bank's *headquarters*. Moreover, FinCEN has, since the issuance of the first, July 2015 Rule, made Plaintiffs aware of its concerns regarding specific illicit activity at FBME's Tanzania branch,

such as evidence that an alleged Hezbollah associate continued to bank there as of early 2015 and that the bank was used in an embezzlement scheme involving an Italian political party. AR2876-79, 4490. In short, FBME has no grounds to complain that lacked notice that FinCEN was looking for (and did not find) evidence of improved AML compliance at its Tanzania headquarters as well as its Cyprus branch.

4. FBME did not provide meaningful documentation of its AML compliance improvements.

Plaintiffs further complain that FinCEN did not give any previous indication that it was interested in FBME's improvements in its AML compliance, and that in any event FBME provided more than enough documentation of such improvements. Pls.' Summ. J. Mot. at 29-30. Again, Plaintiffs have offered no legal authority for the proposition that FinCEN was obligated to tell FBME in advance what aspects of its submissions (or omissions) would become significant to the agency during its consideration of comments. And the fact that FinCEN found FBME's documentation wanting, even if it came as a surprise to FBME (which it should not have), is not new "evidence" that was previously withheld.

But even taking Plaintiffs' argument on its own terms, Plaintiffs are simply wrong to argue that they were not on notice that FinCEN was interested in whether FBME could document improvements in its AML compliance. The first Final Rule discussed at length Plaintiffs' AML compliance efforts in general and their purported efforts to improve their AML compliance in particular. 80 Fed. Reg. 45057, 45058-45059 (July 29, 2015). Indeed, the rule noted Plaintiffs' argument that they had made improvements in their compliance program, *id.* at 45048-45059, and specifically addressed that claim in concluding that it nonetheless remained concerned. *See id.* at 45059. So Plaintiffs cannot plausibly plead ignorance that not only their *claims* about their AML compliance but also the *evidence* they offered in support of those claims

would be relevant to FinCEN's decision. Indeed, Plaintiffs themselves allege that they offered FinCEN "copious documentation" of their efforts to improve AML compliance, which undermines their "surprise" argument. Pls.' Summ. J. Mot. at 30.

5. An alleged Hezbollah associate held accounts at FBME in 2015.

FBME also asserts that FinCEN withheld the fact that "[a]s of early 2015, an alleged Hezbollah associate and the Tanzanian company he managed owned accounts at FBME." Pls.' Summ. J. Mot. at 30 (citing 81 Fed. Reg. at 18482, 18483, 18484, 18488, 18489). Again, Plaintiffs' argument that they were denied an opportunity to comment on this point is refuted by their own admission. Plaintiffs acknowledge that they were aware of this fact based on the version of the evidentiary memorandum supporting the July 2015 Final Rule that was published on regulations.gov in connection with the remand. *See id.* at 30-31 (citing AR4490). Because the underlying information was restricted, FinCEN was not previously able to share details; however, in an effort to release as much information as possible for purposes of the remand, FinCEN obtained authorization to remove some of the redactions and make this fact publicly available for comment.

6. FBME completed review of only 3% of its high-risk files as of June 2014.

Finally, Plaintiffs take issue with FinCEN's statement in the March 2016 Final Rule that it "remains troubled by the fact that as of June 2014, FBME had completed its review of only three percent of its high-risk customer files," asserting that "FinCEN said nothing to this effect at any time prior." Pls.' Summ. J. Mot. at 32 (citing 81 Fed. Reg. at 18483). Again, however, Plaintiffs' next sentence undercuts any pretense of surprise on FBME's part: as they acknowledge, this statistic was in an exhibit to *FBME's own comment*, namely a letter to FBME from the CBC summarizing the results of its 2014 audit. *Id.* (citing AR4460-62). Given that

FBME also submitted a detailed response to the CBC report as an addendum to its January 2016 comment, *see* AR3959-88, it can hardly claim that the 3% statistic was new evidence to which they were unable to respond.

Notably, FBME contends that it *would* have rebutted all of this purportedly new information "if it had [had] the chance," and goes on to explain how it would have done so. P;s.' Summ. J. Mot. at 32-34. These hypothetical rebuttals, however, are irrelevant to the issue at hand—namely, whether FBME received the unclassified, non-protected evidence considered by FinCEN and had an opportunity to respond to it. The record confirms that it did, and nothing in its recital shows otherwise. To the extent that Plaintiffs believe their ongoing efforts have now mitigated the threat the agency determined that they pose, or soon will, they are free to inform FinCEN of the reasons they believe that to be the case. "As in other cases, FinCEN will continue to assess developments with respect to FBME, its regulators, and the jurisdictions in which it operates in determining whether it remains of primary money laundering concern." 81 Fed. Reg. 18,490.

**D. FinCEN conducted the required inter-agency consultations.**

Section 311 includes three inter-agency consultation requirements. It requires the Secretary of the Treasury (and, by delegation, FinCEN) to consult with the Attorney General and Secretary of State in determining that a financial institution if of primary money laundering concern, 31 U.S.C. § 5318A(c); to consult with various national security and banking agencies in deciding which special measures to impose in light of such a determination, *id.* § 5318A(a)(4)(A); and to consult with the Secretary of State, Attorney General, and Chairman of the Board of Governors of the Federal Reserve in imposing the fifth special measure, *id.* § 5318A(b)(5).

Plaintiffs argue that FinCEN failed to undertake the required consultations and/or failed to include the consultations in the record. Pls.' Summ. J. Mot. at 20-22, 40. As a preliminary matter, Plaintiffs are foreclosed altogether from raising the inter-agency consultation requirements now because (1) they did not raise the issue before the agency during the administrative process, and (2) they lack standing to complain of alleged violations of the inter-agency consultation requirements, which were not intended to further the interests of foreign financial institutions. First, Plaintiffs' invocation of the interagency consultation requirements violates the "hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review." *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004). Plaintiffs did not refer to the consultation requirements in their January 2016 comment, let alone complain that they should have been permitted to comment on the content of FinCEN's inter-agency consultations. Indeed, by Plaintiffs' own account, their "extensive comment, with exhibits . . . raised six general points," Pls.' Summ. J. Mot. at 12, none of which had anything to do with the inter-agency consultation requirements. By raising their (unfounded) concerns about the consultations requirements for the first time in their summary judgment papers, Plaintiffs denied FinCEN the opportunity to avoid unnecessary litigation on this issue by further discussing the consultations in the rule. The doctrine of administrative waiver is designed to prevent precisely such tactical abuse of the administrative process and waste of judicial resources.

Second, even if they had raised their concerns before the agency, Plaintiffs would still be categorically barred from relying on the interagency consultation provisions in this litigation because they do not have statutory standing to do so. Under the "zone of interests" test, in order to establish an enforceable right to challenge purported non-compliance with a statutory

provision, "the plaintiff must establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) (citation omitted). Although this test has been called "prudential standing," that phrase is a "misnomer;" rather, "[w]hether a plaintiff comes within the zone of interests is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014). It is apparent on the face of the inter-agency consultation provisions that they are intended to inform FinCEN's consideration of the consequences of the special measures on various United States interests—the interests of the financial sector (the banking agencies) or national security (the Secretary of State) or law enforcement (the Attorney General)—and not the interests of foreign banks.[21] Thus, under the zone of interests test, Plaintiffs cannot allege a violation of the inter-agency consultation provisions of Section 311.

Plaintiffs' arguments also fail on their merits. First, Plaintiffs are seeking access to deliberative material – the views and recommendations expressed by consulting agencies during the course of the rulemaking. But pre-decisional, deliberative materials should not be included

---

[21] That intent is also apparent in the legislative history. A House Conference Report discussing a prior version of the provisions explained their purpose, *viz.*,

> To ensure that the Secretary is apprised of pertinent diplomatic, law enforcement, commercial, and trade implications of determinations made pursuant to this section, subsection (c)(1) requires the Secretary to consult with the Secretary of State, the Attorney General, the Secretary of Commerce and the United States Trade Representative.

House Conf. Rep. No. 106-728 (106th Cong. 1999-2000); *see also id.* ("Among other things, this consultation is designed to ensure that the Secretary possesses information on the effect that any particular special measure may have on the domestic and international banking system.").

in an administrative record, *San Luis Obispo Mothers for Peace v. NRC*, 789 F.2d 26, 44-45 (D.C. Cir. 1986) (*en banc*) (refusing to supplement administrative record to consider transcripts of deliberative proceedings), because "[j]udicial review of agency action should be based on an agency's stated justifications, not the predecisional process that led up to the final, articulated decision." *Ad Hoc Metals Coalition v. Whitman*, 227 F. Supp. 2d 134, 143 (D.D.C. 2002). The documents and descriptions Plaintiffs demand fall squarely within the deliberative process privilege—Plaintiffs seek inter-agency "[r]ecommendations[] and deliberations comprising part of a process by which governmental decisions and policies are formulated," *Elec. Frontier Found v. U.S. Dep't of Justice*, 739 F.3d 1, 7 (D.C. Cir. 2014) (describing deliberative process privilege)—and so were properly not included in the administrative record.

Because the consultations are not properly part of the record, Plaintiffs cannot object to their inability to comment on them. Plaintiffs suggest that they were denied a meaningful opportunity to comment on the rule because the notice of proposed rulemaking did not describe the consultations. Pls.' Summ. J. Mot. at 20-21. But FinCEN did not offer any unexplained consultations as an independent basis for its decision or purport to rely upon any point of fact learned through those consultations that is not otherwise supported in the record. *Cf. FBME*, 125 F. Supp. 3d at 121, 123 (basing finding of probable "meaningful opportunity to comment" violation on failure to make publicly available material the agency "acknowledged[] that it relied upon"). Rather, like any inter-or intra-agency deliberations, the consultations *were* subject to comment through the ultimate agency decision and evidentiary record that they informed. To the extent that the consultations may have informed FinCEN's judgment, that judgment was explained in the notice of proposed rulemaking and Plaintiffs had an opportunity to comment upon it.

In any event, FinCEN did in fact undertake the required consultations. Plaintiffs argue that the agency failed to engage in the required consultations altogether. Pls.' Summ. J. Mot. at 21-22, 39-40 ("FinCEN Failed to Conduct the Required Consultations"). But as Plaintiffs note, "FinCEN does [] *say* that it undertook the 'required consultations.'" *Id.* at 39 (quoting 81 Fed. Reg. at 18,488) (emphasis in original). Plaintiffs are merely speculating that FinCEN might have gone about the required consultations the wrong way, wondering whether the agency consulted with the right employees and "at the right time." *Id.* at 39-40. All this speculation is contrary to the presumption of regularity owed to the agency's performance of its duties, as is Plaintiffs' implicit argument that the agency bears the burden of demonstrating compliance with the consultation requirements. *See Riggs Nat'l Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 295 F.3d 16, 21 (D.C. Cir. 2002) ("The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties") (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)).[22]

**E. FBME is not entitled to a hearing before a "neutral" decisionmaker.**

Plaintiffs continue to argue, as they did in the preliminary injunction proceedings and in their January 2016 comment, that the Government violated due process by not providing FBME

---

[22] Plaintiffs argue the opposite, namely, that FinCEN is required to affirmatively establish its satisfaction of the interagency consultation requirements. In other words, Plaintiffs argue that the Court should presume FinCEN failed to abide by the inter-agency consultation requirements absent evidence to the contrary. But the cases Plaintiffs cite for this presumption of *ir*regularity are inapposite. In *Getty v. Federal Savings & Loan Insurance Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986), the D.C. Circuit held that the agency's statement that it had considered a factor that the statute required was so conclusory as to prevent the Court from reviewing its decision. The decision did not address the inquiry applicable to a claim that an agency failed to comply with a procedural requirement. As for *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109 (9th Cir. 2002), in that case the record revealed the full extent of communications between the agency and certain quasi-governmental fishing councils; the Ninth Circuit simply held that the communications revealed by the record did not satisfy the statutory "consultation" requirement.

an oral hearing before a "neutral" decisionmaker, by which Plaintiffs apparently mean a decisionmaker other than FinCEN. Pls.' Summ. J. Mot at 36-39. Even assuming *arguendo* that FinCEN is not "neutral" and that Plaintiffs have due process rights, FBME would not be entitled to such a hearing before a third party. To begin with, despite FBME's insistence that FinCEN's decision involves some considerations specific to FBME that Plaintiffs label "adjudicatory," Congress has mandated in Section 311 that FinCEN may impose the fifth special measure only through *rulemaking*. And equally clear is what Section 311 omits: any requirement of a trial-type hearing, as would be mandatory for formal rulemaking—that is, "[w]hen rules *are required by statute* to be made on the record after opportunity for an agency hearing."[23] 5 U.S.C. § 553(c) (emphasis added). Congress could easily have included such a requirement for imposition of the fifth special measure, but chose not to do so.

Thus, what Plaintiffs are asking is for the Court to read a formal rulemaking requirement into Section 311 that Congress did not put there. But courts have made absolutely clear that formal rulemaking requirements apply only where the statute provides for rulemaking "on the record." *United States v. Florida East Coast Railway Co.*, 410 U.S. 224, 234 (1973). Where a statute does not so provide, "a court cannot require the [agency] adopt formal rulemaking proceedings." *See National Ass'n of Broadcasters v. FCC*, 740 F.2d 1190, 1221 (D.C. Cir. 1984) (citing *Florida East Coast Railway*).

This leaves Plaintiffs to argue that the statutorily-proscribed procedure itself violates the Constitution. Plaintiffs are wrong. The nature and degree of procedural protections required in any case depends on the demands of the particular situation. *Mathews*, 424 U.S. at 334. Here,

---

[23] Where there is doubt (there is none here), courts defer to an agency's determination of whether its enabling statute requires formal procedures to resolve an issue. *Chem. Waste Mgmt. v. EPA*, 873 F.2d 1477, 1484 (D.C. Cir. 1989).

Plaintiffs have been afforded more process—more notice, and more of an opportunity to be heard—than is usually provided in Executive branch actions designating persons as threats to national security, which are the types of action most closely analogous to the agency action challenged here. *See FBME*, 125 F. Supp. 3d at 122 (collecting cases and noting "it is almost certainly true that FBME received substantially more process than any organization that is designated an FTO [Foreign Terrorist Organization]"). And Plaintiffs do not point to a single case involving a targeted financial designation where the court held a formal oral hearing is required prior to the designation. *See, e.g., NCRI*, 251 F.3d at 209 (holding that a trial-type hearing was not necessary for FTO designation and that hearing requirement could be satisfied in written form); *Holy Land Found.*, 333 F.3d at 164 (rejecting plaintiffs' demand for trial-like procedures); *cf. Latif v. Lynch*, No. 2016 WL 1239925, *16 (D. Or. Mar. 28, 2016) (finding "live, adversarial hearings are particularly inappropriate" in the context of No Fly List determinations because they involve classified and confidential material).

In arguing that the statutorily-provided procedure is constitutionally insufficient, Plaintiffs acknowledge that for due process purposes, a separation of investigative and adjudicative functions is normally not required in administrative actions. Pls.' Summ. J. Mot. at 36 (citing *Withrow v. Larkin*, 421 U.S. 35. 46-47 (1975)). Nonetheless, they fixate on the *possibility* of certain exceptional situations in which something about the investigative, fact-gathering phase of an agency action may "foreclose fair and effective consideration" at the "adjudicatory" stage, and thus raise a due process problem. *Id.*[24] Plaintiffs appear to argue that

[24] Plaintiffs also cite *Concrete Pipe & Productions of California, Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602, 618 (1993), for the proposition that under those circumstances, due process requires a neutral adjudicator. *See* Pls. Summ. J. Mot. at 36. *Concrete Pipe*, however, did not involve action by a government agency, but rather a trustees of a pension plan, and ultimately found no improper bias despite the trustees' fiduciary duties to the beneficiaries (who

imposition of the fifth special measure presents such a situation, based on the fact that a Section 311 decision can rely upon non-public evidence it cannot share with interested parties. *Id.* at 37-38. This argument, however, is a non sequitur. Reliance on classified and statutorily protected information, which FinCEN was prohibited *by law* from disclosing to FBME, does not make FinCEN an inherently biased or unfair decisionmaker. As discussed above, the Government regularly relies on such information in imposing similar targeted civil measures against known or suspected terrorists and other threats to national security, and no court has ever found that this practice somehow triggers the need for a neutral third-party adjudicator.[25]

Plaintiffs also argue that because (according to them) the CBC was biased against FBME, and because FinCEN relied on information from the CBC, bias somehow transferred over from the latter to FinCEN and compromised the agency's impartiality as an adjudicator—or, to borrow FBME's phrasing, rendered its decision no more than a "rubber stamp" on "FBME's virtual death sentence." *Id.*. at 39. This argument, too, has no merit. As discussed above, information provided by the CBC was only a part of a broad range of evidence considered by FinCEN in making its final decision, and that decision was made pursuant to the agency's independent statutory authority, not the secret behest of the CBC. Plaintiffs' conspiracy theories notwithstanding, it is beyond dispute that FinCEN's enabling statute did not provide for a hearing for Section 311 actions; that FinCEN took its Section 311 action pursuant to a full notice and comment rulemaking; that FinCEN received and considered a wide range of information, including extensive submissions from FBME; and that FinCEN made publicly available all the

---

were opposed to the employer challenging the decision). Here, there are no plausible allegations of competing obligations, and the agency is entitled to a presumption of regularity.

[25] To the extent that FBME is attempting to reprise its argument that due process entitles it to access and respond to this information, that argument fails for reasons discussed earlier. *See supra* Pt. III.A, B.

unclassified, non-protected information it was considering. Under these circumstances, Plaintiffs cannot show that a hearing before an arbiter other than FinCEN was required.

## CONCLUSION

For the reasons set forth above, the Court should grant summary judgment in favor of the Government and deny Plaintiffs' summary judgment motion.

Dated: May 23, 2016

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

CHANNING D. PHILLIPS
United States Attorney

JOSEPH H. HUNT
Director

DIANE KELLEHER
Assistant Branch Director

*/s/ Lynn Y. Lee*
LYNN Y. LEE (CA Bar No. 235531)
AMY E. POWELL
MATTHEW J. LAWRENCE
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 305-0531
Fax: (202) 616-8470
Email: lynn.lee@usdoj.gov

*Attorneys for Defendants*