IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
FBME BANK LTD,
CA No: 1:15-cv-01270-CRC
Plaintiff,
Washington, D.C.
Friday, June 3, 2016
vs.
1:37 p.m.

JACOB J. LEW, et al.,

Defendants.
- - - - - - - - - - - - - - - - x

---

TRANSCRIPT OF MOTIONS HEARING
HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

For the Plaintiff: **DEREK L. SHAFFER, ESQ.**
**JONATHAN G. COOPER, ESQ.**
**LAUREN H. DICKIE, ESQ.**
**CAROLYN HART, ESQ.**
QUINN EMANUEL URQUHART & SULLIVAN, LLP
777 6th Street, NW
Suite 1100
Washington, DC 20001
(202) 538-8123

For the Defendant: **LYNN Y. LEE, ESQ.**
**AMY E. POWELL, ESQ.**
U.S. DEPARTMENT OF JUSTICE
Civil Division-Federal Programs Branch
P.O. Box 883
Washington, DC 20044
(202) 305-0531

Court Reporter: Lisa A. Moreira, RDR, CRR
Official Court Reporter
U.S. Courthouse, Room 6718
333 Constitution Avenue, NW
Washington, DC 20001
202-354-3187

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription

P R O C E E D I N G S

THE COURTROOM DEPUTY: Civil Case No. 15-1270, *FBME Bank LTD versus Jacob Lew, et al.*

Counsel, will you please come forward and identify yourselves for the record.

MR. SHAFFER: Good afternoon, Your Honor. For plaintiffs, Derek Shaffer here from Quinn Emanuel, joined by my colleagues, Jon G. Cooper, Lauren Dickie, Carolyn Hart.

MR. SPIVAKC: Good afternoon, Your Honor; Peter Spivack from Hogan Lovells with my colleague, Evans Rice.

THE COURT: How are you all? Good. Welcome back.

MS. LEE: Good afternoon, Your Honor; Lynn Lee for the government. And with me at counsel's table is Amy Powell, also from DOJ.

THE COURT: Ms. Lee. Ms. Powell. How are you all?

Okay. I know we're on cross-motions for summary judgment, but why don't we start with Mr. Shaffer. Are you going to take the laboring oar?

MR. SHAFFER: Thank you, Your Honor. I'm glad to.

THE COURT: Okay. I'm obviously familiar with the statutory background and procedural background so why don't we jump right in.

MR. SHAFFER: Absolutely, Your Honor.

THE COURT: Before we start, I think the first

issue I'd like to discuss is the prejudicial error rule in the APA. You know, no rule-making is perfect, obviously. What is the standard for deciding whether error is prejudicial and requires vacating an informal rule, and who bears the burden of showing that?

MR. SHAFFER: Thank you, Your Honor.

THE COURT: Okay.

MR. SHAFFER: Glad to begin there. Obviously Your Honor is versed in this issue, too. We've previously talked about *People's Mojahedin* in Footnote 6, so to the extent that the error we're talking about, Your Honor, is the failure to disclose, we believe there is no harmless error standard. It is, per se, prejudicial. I think that's what the case law says, and I believe that's what Your Honor ruled the last time around in granting the preliminary injunction. So that's one type of error that I think we have our answer to.

As to -- let us take a substantive error, Your Honor -- say, arbitrary and capricious explanation or lack thereof of the agency, I believe that is an incurable error. One that necessitates vacatur. And the reason for that, Your Honor, is it's the flip side base to give the deference an agency gets.

The agency has wide latitude, as long as it explains itself, to offer an intelligent rationale for its

decision. As long as you see that, Your Honor, as you said last time around, you won't be second-guessing the agency's ultimate judgment.

But by the same token, Your Honor, if you look for that reasoned, intelligent explanation as to the points that are apparent from the record, if the agency has not adequately explained itself, that is the cardinal sin under the APA. That is a sin that necessitates vacatur. And to put it this way, Your Honor, there's nothing equivalent to an alternative ground for affirmance where you look at what the agency has said and say, "Well, that doesn't really adequately justify the agency's decision to make this finding or to impose this sanction, but I, Judge Cooper, looking at the record, can find alternative rationales that the agency might have articulated."

That's not available to you in the APA context, which is why we believe, if there's a substantive defect here, it's necessarily a substantive defect that necessitates vacatur, and for that proposition, Your Honor, I'd commend to you the *Butte* case. I believe it is the *Butte County* case that we cite when it comes to arbitrary and capricious review under the APA.

Judge Randolph wrote it, and he explains why the dissenting view in that case, which was although the agency itself had not adequately, in the majority's view, explained

its rationale for decision, she looked at the decision that the agency had not properly considered and said, "Well, I don't really think that submission undercuts the agency's ultimate decision here," and Judge Randolph's answer to that was -- just to quote from the opinion at 613 F. 3d 190 -- "Our dissenting colleague provides her own analysis of the Beckham Report" -- that's what the challenger put in -- "and concludes that it does not undermine the evidence the tribe submitted. We are not so sure, but that is not the point. An agency's action must be upheld, if at all, on the basis articulated by the agency itself." The secretary mentioned none of the dissent's reasons for rejecting the Beckham Report so those reasons are really not available as the basis for the Court to uphold the agency's action.

And similarly, Your Honor --

THE COURT: Hold on one second. I mean, you have -- on the arbitrary and capricious issue, you said that the rule is flawed because it did not adequately respond to any number of comments that FBME made. Let's assume that I agree with you on some subset of those comments.

MR. SHAFFER: Okay.

THE COURT: Is it your position that you win and vacatur is required if I agree with you on any one; or must I look at the record as a whole and make a determination as to whether the agency would have reached the same decision

regardless of whether it fully commented on or responded to one of your comments?

MR. SHAFFER: Not to be disingenuous, Your Honor, but I'm going to take option number one.

THE COURT: Okay.

MR. SHAFFER: And I believe that that's correct.

THE COURT: And what's the authority for that?

MR. SHAFFER: The authority for that is the *District Hospital Partners* case that we repeatedly cite, 786 F. 3d 46 from the D.C. Circuit in 2015. The basic standard there is that to avoid arbitrary and caprice, the agency must examine the relevant data and articulate satisfactory explanation for its action, including a rationale connection between the facts found and the choice made. That's number one. Number two, not fail to consider an important aspect of the problem; and three, not offer an explanation for its decision that runs counter to the evidence before it.

Now, Your Honor, I'm not submitting to you that there's no such thing as a de minimis error.

THE COURT: The agency doesn't have to respond to every comment.

MR. SHAFFER: Absolutely correct, Your Honor. I'd have to persuade you that there was something important in this record that the agency didn't adequately explain itself on. Something that was truly material to its decision from

the perspective of an intelligent reviewer.

So I have to do that much, Your Honor. But if I do persuade you of that, and you look at that lack of explanation from the agency or, you know, counter record explanation from the agency and say, "Well, it still might be available to the agency to reach the same conclusion coming at things the right way," that still necessitates vacatur.

Of course all Your Honor would do at the end of this proceeding, even if I get everything I'm asking for, is you would remand. And in remanding, you're not foreclosing FinCen from going down the APA path correctly. You're simply saying unless and until it does that, it hasn't arrived at a valid rule.

THE COURT: Okay.

MR. SHAFFER: And that really is, I think, the proposition that emerges from the D.C. Circuit's teachings on this. I mentioned the accounting, and I do believe it's the flip side of the deference that the agency gets because, Your Honor, you'd have to make some presumption. If you were to look at the agency's explanation, and you find it from the agency, and say, "Well, that actually doesn't work. That doesn't grapple with an important aspect of the problem. That runs counter to the data. It's not a sound conclusion from what the agency was offering in support of

that"; if you decide that, Your Honor, everything else is left to the agency as to whether it would nonetheless reach the same outcome.

You're not second-guessing or arriving at a judgment of your own. You're simply looking at the agency's reasoning on its face, giving that a hard look.

There's also the *State Farm* case from the U.S. Supreme Court that if you're upholding the agency action, your only basis for doing that is based on the rationale, the explanation you have from the agency in the administrative record, particularly in the final rule.

THE COURT: Okay.

MR. SHAFFER: So that's my submission to Your Honor.

And while we're talking about the -- and of course there are separate arguments in play, as I know Your Honor knows, for consultation. We've cited multiple precedents, Your Honor. I'll just give you three that I think stand for the proposition there would not be a harmless error in this case.

One is the *California Wilderness Coalition* case from the Ninth Circuit. It's at 631 F. 3d 1072. It's a 2011 decision. And the failure to consult there, even though there was evidence in the record, some evidence in the record that there were some consultations, the agency --

THE COURT: The issue I want you to address on consultation is the standing issue that the government raised that I don't think you've had an opportunity to respond to since we didn't have reply briefs. You know, their argument is that the purpose of the consultation requirement is not to give notice or to protect the target, but rather to assess the overall governmental effect of the sanction, and the target doesn't have standing to challenge that.

Respond to that.

MR. SHAFFER: Thank you, Your Honor.

That's -- is it fair to say that's the zone of interest argument essentially? Their argument that we're outside the zone of interest of these provisions.

My first answer to that, Your Honor, is the zone of interest threshold is a low threshold. It is the rare case for a party that actually has Article III injury and is complaining of the action nonetheless doesn't fall within the zone of interest of a statute. And it's clear beyond doubt, Your Honor, from reading the government's cases and cases that articulate the zone of interest standard that if an entity is the target of a particular regulation or law and is adversely affected by it, it's essentially invariably within the zone of interest.

I think Your Honor answered this question when you

noted that we're outside the garden variety rule-making context; that we have an extraordinary rule here which says in its very title, as well as in its substance, this is a sanction in the Fifth Special Measure directed against FBME Bank. Everything in 311, Section 311, that governs and constrains the agency's imposition of that sanction singularly affects the entity that is targeted.

So just as we have standing under Section 311 to be citing the substantive analysis that the government must follow and the procedure that goes into that and all the requirements of the APA, you don't parse out separate provisions of the statute once we're within the zone of interest for it and then say, "Well, this particularly" -- "this particular violation of that very same statutory provision is out of play because as to those words Congress wasn't thinking about the target."

And I can cite multiple cases for that proposition, Your Honor; that you look at the zone of interest test in terms of the statute as a whole rather than individual provisions. One is *Clarke v. Securities Industry Association*. That's 479 US 388. Page 401 is the pinpoint. "In considering whether the zone of interest test provides or denies standing in these cases, we first observe that the comptroller's argument focuses too narrowly on 12 USC 36 and does not adequately place Section 36 in the overall context

of the National Bank Act. As data processing demonstrates, we are not limited to considering the statute under which respondents sued, but may consider any provision that helps us to understand Congress's overall purposes in the National Bank Act." So looking even beyond the statutory provision consistent with the generosity, I think, of the zone of interest test.

And then *Gross Rate Manufacturers Association vs. EPA*. That's 693 F. 3d 169-186. This is from the D.C. Circuit in 2012. "Importantly, in determining whether a petitioner falls within the zone of interest to be protected by a statute, we do not look at the specific provision said to have been violated in complete isolation, but rather in combination with other provisions to which it bears an integral relationship."

So, Your Honor, once we've all agreed -- as I think the government's agreed to this point -- that we are able to invoke the protections and provisions of 311, as we've been doing since the very inception of this case, the consultation requirements are part and parcel of those.

THE COURT: Okay. The rule says, or at least the first rule, I believe, says that the agency engaged in the required consultations. Were they required to consult again?

MR. SHAFFER: Absolutely yes, Your Honor. And

multiple reasons.

I just want to offer one last point, though, just on this zone of interest inquiry while we're talking about it, which is I would question the premise, Your Honor, that when it comes to consultations with the Attorney General, with the Secretary of State, even with the chairman of the Federal Reserve, their insight and their expertise is really central to what FBME's complaining about here; that there was trust placed in certain foreign regulators that was excessive relative to the reputation and standing and practice --

THE COURT: But counsel, isn't the inquiry designed to determine whether the national security will be affected or the international financial system will be affected? It's not to -- it's not to second-guess FinCen's determination regarding CBC, is it?

MR. SHAFFER: I don't speak for Congress, but Congress did say that this was about foreign policy sensitivities, law enforcement sensitivities, and national security. With all due respect for FinCen, I don't know that they're as well-positioned as the Attorney General's office to say what stock do we place in law enforcement information coming out of Cyprus. How do we weigh input from the Central Bank of Cyprus against that of the Bank of Tanzania, which is pointing a finger of blame at the Central

Bank of Cyprus and expressing concerns about it.

As to the Secretary of State and as to the chairman of the Federal Reserve, Your Honor, there is a comment in the record from one of FBME's depositors, Mr. Gusev. And I can get you the page in the administrative record, but he makes the point that I think the matter of the chairman of the Federal Reserve, that part of what's at issue in this case, part of what's problematic is the confidence that foreign investors place in the U.S. dollar, because if FinCen is able to take actions like this based on the processes and rationales in play, it is undermining the confidence of those who count on U.S. dollars; and not just the U.S. dollar itself obviously, the government, the rule of law that's behind it.

And this case, in and of itself, combined with others, as we've mentioned to Your Honor, is compromising that sort of reliance upon the U.S. dollar for U.S. -- for legitimate business people who are wondering what currency to transact in overseas, and those are questions that I think go to other officers as reflected in the statute.

THE COURT: When is the final rule scheduled to go into effect? July 31st?

MR. SHAFFER: Your Honor, I think that that is correct.

THE COURT: And if the agency did not consult

properly, why couldn't they do so before the final rule goes into effect to cure the deficiency? Why would that require vacatur of the rule?

MR. SHAFFER: Well, Your Honor, I would cite you to the Ninth Circuit case that I was just mentioning. In these cases the result has been vacatur because it's viewed to be a substantive defect.

If the rule that comes before Your Honor has not complied with the statute, then Your Honor's calculus is limited to Is that compliant with the governing statute? And the answer reached in this case, I think, should be the same as was reached by the Ninth Circuit in the case that I was just mentioning, the *CWC* case, *California Wilderness Coalition*, which we cite in our brief, and by this court, the D.C. District Court, in the *National Parks Conservation Association* case.

THE COURT: When the *Ralls* case was remanded -- and you rely quite a bit on that case -- the district court did not vacate the designation; is that right?

MR. SHAFFER: You're right, Your Honor. There was a designation in effect at that point or a determination that had been made as to the transaction in question, I believe. It had been prohibited.

As Your Honor noted last time around -- and thanks to your preliminary injunction -- this rule has never taken

effect. The status quo, as it stands, is there is no imposition of the Fifth Special Measure.

And I have to note, Your Honor, last time around the agency got a do-over. It got a do-over, and I had indicated that there would be certain prejudices visited on FBME Bank. If anything, you know, FBME Bank, as much as it was hanging by a thread previously, Your Honor, we are now facing liquidation proceedings in Cyprus. We're facing mounting questions from the Bank of Tanzania. And everyone is looking at FinCen's final rule and saying, "Well, it is essentially a fait accompli." Maybe there are Is remaining to be dotted or Ts remaining to be crossed, but as difficult as it's been for this bank to remain on life support, if the result from this courtroom is that the rule continues on subject to further proceedings on remand, I believe that FinCen will essentially prevail and accomplish its purpose through shear force of will, as has happened in case after case after case after case involving 311 determinations. We're the only challenger, Your Honor, that's been able to stand to court. To get one vacatur out of all of them is not too many. I would respectfully submit it's too few.

As to whether there was an obligation to consult, Your Honor, in connection with the remand, we understood the remand, I think the way that FinCen was framing it and the way Your Honor was characterizing it, as a do-over, and no

one could know, going into that remand, whether the result of it would be, as Your Honor put it, the same rule, a different rule, or no rule, which to us necessarily meant that the agency would be engaging in the three levels of deliberation. It wouldn't be remaining on a fixed course, and it would be taking meaningful and good faith account of the comments that came in and revisiting its premises.

And given all that, Your Honor, I just don't think there's any way to say that it was somehow relieved of its consultation obligation because it had, prior to July 2014, engaged in consultations. I would note even as to the pre-July 2014 consultations, we don't know -- FinCen has not said -- what officers were consulted, whether they were the ones specified by statutes or their designees to whom the authority had been specifically under regulation, as I understand it. Basically there would be a delegation. We don't know who they were.

THE COURT: Well, this issue sort of permeates a number of your points, which is the presumption of regularity that comes with agency rule-making, right? And if FinCen says, "We've engaged in the required consultations," unless you can show me evidence that, you know, for some reason they didn't consult with the AG, why shouldn't I extend them the presumption of regularity?

MR. SHAFFER: A few answers to that, Your Honor.

The first answer is I believe the requirement of the APA is show, don't tell. Show, don't tell. The agency will every time say, "We've complied with the law procedurally and substantively." It's the Court's obligation and it's the Court's role to take a look at the administrative record and look for the proof that should be in that.

And, again, the cases that I was just citing, Your Honor, all three of those cases -- or two of them actually; the case that was decided by the Ninth Circuit and the case that was decided by the D.D.C. In both of those cases, the agency not only claimed to have consulted, it pointed to specific record indications that it had gone some way to engage in consultations.

In the *CWC* case from the Ninth Circuit, it specifically said, "Look, we notified the affected states of what we were doing. We gave them the opportunity to comment." The Court said that's not consultation in any meaningful sense as the way Congress must have said and therefore said that's insufficient.

In the *National Parks Conservation Association* case, there, too -- I'm sorry, actually I'm confusing myself, Your Honor. It's the *Campanale* case from the First Circuit where the Court was reversing a summary judgment in favor of the agency where it actually found some evidence

that there had been consultations, but said it needed to take its own independent look at the record. And when it looked at the administrative record it did not find sufficient evidence of the consultations happening.

So that's my point number one, Your Honor.

THE COURT: Okay.

MR. SHAFFER: My second point is, with all due respect to the United States government, I'm sure you read their brief the same way I do, Your Honor. In the four-page section that's devoted to the consultation requirement under the heading "FinCen Engaged in the Required Consultations," the first three and a half pages of that do not say anything about FinCen having actually consulted with anyone as part of the remand.

That, to me, is quite conspicuous, Your Honor. The government isn't telling Your Honor that they've done anything subsequent to the remand in the way of consultations. All they do is they cite to our brief where we point out that the only indication, the only reference, even the agency's assertion of consultation is to the pre-July 2014 consultation. I take that as a concession by the government, and a pretty clean one, that they have not undertaken the requisite consultations.

In particular, Your Honor, they haven't done that with respect to deciding on the Fifth Special Measure, and

as Your Honor put a sharp point on the question for the remand, specifically whether there should be a prohibition, as FinCen said there should be, as opposed to the imposition of conditions pursuant to the Fifth Special Measure. That determination, Your Honor, requires its own separate set of consultations with the Attorney General, the Secretary of State, the chairman of the Federal Reserve. That's explicit in the statute.

And you may recall, Your Honor, you basically changed FinCen's premises for how it would evaluate that going into the remand. You indicated the agency had looked at this as though it's a prohibition or not. It essentially mistakenly believed that it couldn't do anything short of the prohibition. You pointed out that actually the agency has to decide between conditions versus prohibition, something that FinCen had never thought about previously.

So at the very least, Your Honor, it's clear as can be that that consultation needed to happen, and I think it is all but as clear as it can be -- you don't have the explicit concession by the government, but I think you've still got the pretty plain concession by the government that that consultation -- no such consultation happened in connection with the remand.

THE COURT: Okay. Move on to the notice issues or the due process issues, whichever you want to take up first.

MR. SHAFFER: Fair enough, Your Honor.

THE COURT: And Mr. Shaffer, I know you're zealous, but let's slow down just a little bit for the benefit of the court reporter.

MR. SHAFFER: Of course, Your Honor. I've told her she can take me into custody if I continue to --

THE COURT: She'll do it, too.

MR. SHAFFER: I don't doubt she will.

I do want to return to the arbitrary and capricious point at some point, Your Honor, so I will simply bracket that for the moment.

As to the notice point, Your Honor, I think we can decide this case and arrive at vacatur now using the same rationale, the same holding, that you laid down last time around in granting the preliminary injunction.

As Your Honor put it, the touchstone for whether the agency has complied with its procedural obligation, you said that, "The touchstone remains whether the agency disclosed enough to allow the parties to comment meaningfully and contest the basis on which an agency reached the result that it did." That's from your preliminary injunction memorandum at Page 15.

We respectfully submit that FinCen again violated that cardinal rule and again denied FBME fair opportunity to rejoin in its comments. In its remand notice, Your Honor,

which we pointed the Court to -- it's three pages -- it doesn't stand out for its substance. FinCen suggested that there was no intervening allegation that was on its mind as a material basis for sanction, and it certainly did not disclose any specifics. And that's in contrast, Your Honor, to what you had noted about the first set of notices, the July 2014 notices.

Although we think that there wasn't all the substance we would want there to be and all the bases spelled out for the whole laundry list of allegations that FinCen said were of concern, Your Honor did look at those and conclude FinCen really couldn't have done any better in order to summarize the conclusions it was deriving from its black box of secret evidence.

This time around, Your Honor, there was nothing like that. The agency didn't even say there's something that has occurred subsequent to the July 2014 notices that's of particular concern to us as a basis for 311 sanction or as suggesting that we need to impose the Fifth Special Measure and, even beyond that, a prohibition under the Fifth Special Measure. It was blank.

THE COURT: It talked about certain conduct in late 2014.

MR. SHAFFER: Your Honor, there was -- the agency -- I think Your Honor's referring to an allegation

about how, in 2015, there was an alleged Hezbollah associate, an alleged Hezbollah associate, who was banking -- who was -- a company that that individual managed was banking with the bank in Tanzania. That was released by FinCen pursuant to an unredaction of its initial memo in support of the First Final Rule, which was --

THE COURT: Okay.

MR. SHAFFER: -- essentially negated.

The notice didn't say that that was of any particular importance to FinCen. It certainly didn't suggest that FinCen would then wind up citing that allegation five different times as a central basis to what became the Second Final Rule.

The other allegation that Your Honor might be referring to is this bombshell allegation that as of late 2014 supposedly FBME employees were trying to obscure information in Cyprus. Your Honor, that allegation was dropped on us in the Second Final Rule. There was no previewing of that in the notice. There was no unredacting of anything that would clue us into that. And now, when FinCen explains how it arrived at that allegation, which is a central basis, Your Honor -- I'd say it's the number one basis for the sanction that FinCen has arrived at -- everything it's citing to is redacted. Everything it's citing to is in the black box. There was no public or FBME-

specific foreshadowing of that allegation.

So in our view, that repeated expressed reliance on new, altogether undisclosed allegations following a notice that disclosed nothing, that, Your Honor, is totally irreconcilable with what Your Honor laid down as the rules for the remand. And I'd cite the same *Association of Data Process* --

THE COURT: Now, the initial notice -- correct me if I'm wrong -- had a general statement about efforts to evade the Cypriot authorities, correct?

MR. SHAFFER: Your Honor, it did have that about general, I'd say, unease or tense relations between the Central Bank of Cyprus and --

THE COURT: I think it said that the bank took active steps to evade actions by the Central Bank of --

MR. SHAFFER: Your Honor, we did everything we could to respond to that allegation, and I believe we did so decisively. But here's what I want to emphasize, Your Honor --

THE COURT: Why didn't that put you on notice in the second rule-making, regardless of the specific time period, that basically obstruction was on the table?

MR. SHAFFER: Your Honor, we try to litigate hard, us at Quinn Emanuel and our friends at Hogan. To cover an invisible waterfront is tough enough.

THE COURT: I understand.

MR. SHAFFER: If someone doesn't tell me that there's a specific concern that subsequent -- that's going to become the most damning allegation against the bank because it's not just you were doing this previously, as FinCen emphasizes, this is even after we notified you of AML concerns. Even after we gave you grave caution, you still -- you still return to this sort of obstruction.

That is a uniquely damaging allegation, Your Honor, that we would have recognized as such, and if someone says, "Even though we're not going to tell you what our basis is, who this is coming from, we're not going to give you anything more than in late 2014 some FBME employees were engaged in a cover-up," Your Honor, we would have launched an internal investigation into that. We would have asked every question we could ask, just as we did through Ernst & Young to address the allegations the last time around. And we also, Your Honor, would have been looking at what was the Central Bank of Cyprus, which, as you know, we have our own concerns and misgivings about that are reflected in the record, that are joined by others, Your Honor, third parties who are not part of this litigation. We would have been looking at what was CBC doing or what were other regulators doing in Cyprus that might explain how they would mischaracterize things in this way and what motivations they

might bring to this.

We just didn't have that opportunity to make that record on this, as I said, bombshell allegation about supposed obstruction in late 2014.

And, Your Honor, I think this is an easy one for you -- not that there's a lot that's easy about this case -- in the sense that if you look at the notice, the remand notice, it is a complete blank. It doesn't suggest this allegation or any other allegation, intervening allegation subsequent to the initial notices that would be basis for imposing the Fifth Special Measure. And that, Your Honor, just doesn't set the table for notice and comment that's essential in any rule making, but essential in this extraordinary rule making whereas you've noted, Your Honor, we're outside the garden variety context. We've got a bank that's basically fighting for its life with very grave stakes, and those remain the stakes today.

Now, that's true, Your Honor, for what we think was just unclassified information, that you know was unclassified because FinCen says -- I'm pointing to the number one on the list, but there's allegation after allegation like this that FinCen spells out in clear, express terms in the Second Final Rule that weren't previewed by anything that we had or adequately previewed by anything that we had prior to it.

But I want to turn to another category, Your Honor, which is unclassified-but-protected information that FinCen is continuing to withhold. We'll talk about the SARs separately, Your Honor, so I want to bracket those, if I could.

But we've tried from before the remand, and we expressed concern before the remand that this very issue might continue to vex the administrative proceedings, and the issue is, Your Honor, outside the category of classified information, even outside the category of SARs that FinCen contends -- and I think Your Honor tends to agree -- are protected by the Bank Secrecy Act. Is there anything else that's in the black box that FinCen would argue although it's unclassified it's nonetheless protected? I still don't know the answer to that, Your Honor, but my suspicion is that there is some unspecified category of information that's in the black box. I can't see it. We've never seen it. We don't know why. They've only grown because in the government's last brief, in its summary judgment opposition, it refers to a category of information where they say it is statutorily protected.

In their first summary judgment brief, they referred to BSA-protected information, and when they now --

THE COURT: I thought we resolved this issue, and I thought the government made a representation that when

they say "unclassified information that's statutorily protected," they're referring to SARs only. Is that not the case?

MR. SHAFFER: Your Honor, I just don't have the confidence or the certitude I would like to have about that because, again, the terminology changed in the last brief from "BSA-protected" to "statutorily protected." And we also had indications from FinCen prior to the remand that there would be some unspecified remainders that were not SARs and potentially covered by the Bank Secrecy Act that we potentially wouldn't be seeing.

So I'm saying, if there is any such category, Your Honor, it only adds to our concerns.

And to briefly touch on --

THE COURT: But the basis for your suspicion is the nomenclature used by the government in their brief.

MR. SHAFFER: Correct, Your Honor. And also we have asked this question, I think, just to make sure we know. We don't have a privilege log. We don't have the specifics. We understand that. We're trying to understand, in terms of the arguments here, is there any category of unclassified-but-protected information that is not SARs?

There's the SARs information, Your Honor, which we'll talk about, perhaps, in a moment, and finally there's the black box of classified information, which, as we've

noted -- and I know Your Honor's thought about this argument previously -- we haven't had any accommodations that would enable us to better understand and engage whatever may be in that black box.

So that's one set of procedural concerns. I put them under the heading of "Lack of Notice/Withholding of Information."

The other concern we have that I characterize as a squarely procedural concern is due process, Your Honor. The absence of a hearing and a neutral decision-maker.

And I respectfully submit, Your Honor, that we can win on other grounds here. There was no consultation, we don't believe, when consultation was required. There was a clear withholding of information that we think is within the teeth of your prior holding. We think that the agency's substantive explanation doesn't make sense under the black letter law of arbitrary and capricious review.

If you don't agree with that, Your Honor -- and that's all statutory so I think that's where you're likely to go first. But if you don't agree with that, then we believe you should vacate this under the United States Constitution because the circumstances that you are looking at in this case combine into a perfect storm of due process deprivation, one that I don't believe the D.C. Circuit or this Court has yet confronted, although I think that the

governing precedence on this support the view.

Now, I first have to convince you --

THE COURT: If you're correct that your client has due process and is entitled to a hearing before a neutral arbiter, doesn't that mean that the statute itself is unconstitutional because it provides for informal notice and comment rule-making, which does not carry with it a right to a hearing before a neutral magistrate?

MR. SHAFFER: I wouldn't try to talk you out of that holding, Your Honor, but I don't think you need to so hold in order to give me the vacatur.

THE COURT: Why not?

MR. SHAFFER: The *Withrow* case from the Supreme Court that we cite and the *Concrete Pipe* case that follows it both stand for the proposition that there are specific circumstances in which the denial of a neutral decision-maker or a fair proceeding may violate due process. And what are the circumstances, Your Honor? Well, let me just quote, if I could, the *Withrow* case on this, because there they were looking at an instance where a doctor had gone before the same board that had decided to bring a proceeding against him and complained it is inherently unconstitutional for the same board that pursued the enforcement action to also decide it, and the Supreme Court said that is not a categorical violation of due process.

THE COURT: But that's an adjudicatory proceeding. This is a rule-making.

MR. SHAFFER: It's not a garden variety rule-making, as Your Honor has said. There's still the classic distinction, the *Londoner* versus *Bi-Metallic* distinction between when we have an adjudicatory proceeding and when we have a rule-making. There's still all the due process jurisprudence from the U.S. Supreme Court and the D.C. Circuit that says in certain sorts of circumstances where an individual or an entity faces a particularly consequential denial, that is one that implicates due process, Your Honor. I don't believe, for instance, the United States government could get around *Goldberg* by saying we're going to deny someone welfare benefits by doing that via a rule. That wouldn't take due process out of play in that sort of a fact pattern. There's something inherently adjudicatory about that.

I think we have that here. I'm not saying that the statute necessarily violates due process because what *Withrow* contemplates is essentially an as-applied due process challenge. Let me quote, if I could, from 421 U.S. 35. The pinpoint is 58. "If the initial view of the facts based on the evidence derived from nonadversarial processes as a practical or legal matter foreclosed fair and effective consideration at a subsequent adversary hearing leading to

ultimate decision, a substantial due process question would be raised."

It continues: "That the combination of investigative and adjudicative functions does not, without more, constitute a due process violation does not preclude a court from determining from the special facts and circumstances present in the case before it that the risk of unfairness is intolerably high."

And then in *Concrete Pipe*, Your Honor, the Supreme Court took what was, the government argues, a dictum. I would say it's limiting the scope of the holding. But in *Concrete Pipe* that clearly becomes a holding because there the Supreme Court's looking at the ERISA statute that contemplated that a trustee, who always wants to get more money into the fund rather than less, the trustee would make an initial determination, potentially at the expense of the employer. The employer could then challenge that, but the standard, Your Honor, spelled out by the statute was to show that it is an unreasonable determination by the trustee or that it was clearly erroneous. And Justice Rehnquist writes the opinion saying, "Look, if that statute meant what it literally says, we recognize, we assume, that there could be a bias on the part of the trustee. We recognize that."

So you have the *Withrow* problem where you're not getting a fair contest in the first instance, and if we said

it is that high of a hurdle for a challenger to overcome, that would -- they say in terms, that would violate due process. So the only way out is to use the rule of constitutional avoidance in the statutory construction to basically say it's just preponderance of the evidence. That's all it was in that case.

And --

THE COURT: How do you square all that with the terrorist designations cases --

MR. SHAFFER: Your Honor --

THE COURT: -- where, you know, it has been held not to violate due process to deny, target, an adversarial hearing?

MR. SHAFFER: I don't know of a precedent that so holds that, Your Honor. When it comes to --

THE COURT: Those procedures are not available.

MR. SHAFFER: They're not available, Your Honor. The question has not presented itself, and specifically I would quote Your Honor to the *People v. Mojahedin* [sic] case. I call it Roman numeral II. I think there have been many installments of the case. We do cite it in our brief, and it specifically talks about the use, potentially, of secret evidence.

And what it basically says, Your Honor, is that in all of the cases where the D.C. Circuit has looked at the

determinations that were made -- it's 613 F. 3d 220 -- the Court goes out of its way to note, however, that none of the AEDPA cases decide whether an administrative decision relying critically on classified material would comport with due process because in none of the classified record -- in none was the classified record essential to uphold an FTO designation. And that, Your Honor, is of a piece with the D.C. Circuit's decision in the *Chemical Waste Management* case, which the government cites to you but I would recommend that you read -- it's at 873 F. 2d 1477 -- because in that case, Your Honor, the D.C. Circuit took very seriously the notion of an as-applied *Withrow* challenge. It looked at a facial challenge to EPA's statute that -- or I think it was a regulation, Your Honor -- that permitted the EPA not to use a neutral demission-maker. And what the D.C. Circuit said is, "Well, that's not inherently unconstitutional. We can't say that the facial challenge succeeds."

But it did specifically leave room for an as-applied attack per *Withrow*, and it expressly supposes that the absence of formal safeguards could prove troublesome in a case that involves both high financial stakes to the operator and either substantive issues that would benefit greatly from development through trial-type procedures or a presiding officer with actual bias.

And the last one I'll give you, Your Honor, is the *Rafeedie v. INS* case. This is from the D.D.C. in 1992, 795 F. Supp. 13. And there specifically a judge of this court was looking at the unique and troubling circumstances surrounding a permanent resident alien who had been denied certain protections as part of an effort to have him deported, and it looked at what he was confronting in terms of secret evidence, the lack of recourse and fairness that had been afforded to him, and said, "We're not going to decide what exactly process he may be due, but we are holding that the treatment that he's received violates due process."

And so let me just say this, Your Honor, about the circumstances we have for our as-applied challenge. You have critical allegations that are disclosed only after the fact, as we've been discussing. You have repeated requests for feedback. You have questions. You have efforts to obtain guidance that are coming from FBME and are getting blanked by FinCen, and I point Your Honor to Ms. Peters's declaration for that proposition. It walks through it quite well.

You have reams, Your Honor, hundreds of pages of documentary submissions from FBME that the agency rejects only at the last saying essentially those are not worth the paper they're printed on. That's just documentation. We

can't tell that that translates to anything real.

You have secret evidence that's being critically relied upon here, Your Honor. It's treated as dispositive by the agency in its Second Final Rule. You have pivotal reliance that's being placed on a foreign regulator that we've identified as having a strong pecuniary interest, stated bias, and a lawless corrupt approach. Again, all that's corroborated by the record, including by third parties, and you have privileged materials from our side of this case, the lawyers in this case that were concededly received and reviewed by FinCen.

All of that, Your Honor, goes into this proceeding, and we come out of it without having had either a live hearing, where we could, in the language of the Supreme Court in *Goldberg*, in the language of the Supreme Court in *Mathews v. Eldridge*, and as this Court adopted -- I'm sorry, the D.C. Circuit referred to it in *Gray Panthers*. We didn't have the opportunity to mold our arguments based on what was important to the decision-maker. We've always been guessing what is it that FinCen has been looking at? What could we do to persuade it? And we find out each time only at the last.

We didn't have any neutral who was coming fresh to this case. We didn't have the chance to call our own witnesses and say and have people present under oath all the

AML improvements that had happened, have real-time video feeds demonstrating here's what's happening in Cyprus, here's what's happening in Tanzania. We didn't have the opportunity to confront our central accusers from the Central Bank of Cyprus.

And, Your Honor, if you --

THE COURT: And just so I'm clear, your position is that you would be entitled to all of those protections only if you were entitled to due process as a threshold matter.

MR. SHAFFER: Yes, Your Honor.

THE COURT: So address the threshold issue.

MR. SHAFFER: And I just want to emphasize, Your Honor, that's not an argument that every entity challenging a terrorist designation has.

THE COURT: Understood.

MR. SHAFFER: And they're also looking at exigencies and justifications from the government in denying procedures that I don't think obtain here. So there are distinctions even before I proceed onward.

As to whether or not FBME Bank is entitled to due process, I can make all sorts of interesting arguments to Your Honor -- and the government has some interesting arguments -- about how the Court might harmonize due process for the jurisprudence from the Supreme Court in the context

of personal jurisdiction with due process jurisprudence in the context of cases like this. It's pretty easy, this one, Your Honor, because you have, from the D.C. Circuit and the *NCRI* opinion written by Judge Sentelle, a clear statement that reads as follows -- this is 251 F. 3d 192 -- "A foreign organization that acquires or holds property in this country may invoke the protections of the Constitution when that property is placed in jeopardy by government intervention. That is not to say that the government cannot interfere with that and many other rights of foreign organizations present in the United States."

THE COURT: Okay.

MR. SHAFFER: "It is only to say that it does" -- "that when it does, it is subject to the due process clause," and that includes, according to the opinion, predeprivation notice.

THE COURT: Let me stop you there. What about the final rule prevents the bank from withdrawing money from its escrow account in North Carolina?

MR. SHAFFER: Your Honor, that's -- there are two aspects of the prohibition that was reflected in the Second Final Rule as in the prior one. One is the direct prohibition. No bank can essentially hold funds for or on behalf of FBME Bank. This is what we're talking about in terms of the fund is an escrow account held for or on behalf

of FBME. That's actually written into the face of the account itself. That's if the --

THE COURT: Who owns the account?

MR. SHAFFER: It's the Lawyers -- and I always mess up the acronym on this, Your Honor. The interest-bearing lawyers trust account. IOLTA? Which, under North Carolina law -- and this is how the Supreme Court looked at this question in the case that we cite on how you determine whether property --

THE COURT: And FBME is the beneficiary?

MR. SHAFFER: It is the client of the lawyer, which is to say it's its property.

THE COURT: So what would prevent FBME from directing the lawyers to liquidate that account the day after the rule takes effect and to transfer the funds -- write them a check or transfer the funds by wire to Cyprus?

MR. SHAFFER: The other side of this, Your Honor, is the indirect prohibition, which basically says that for any U.S. financial institution covered by the rule -- and it's by design and by definition a very broad rule -- they cannot send funds to any correspondent account that they have any reason to believe would be servicing FBME or permitting access to FBME.

So this domino effect, Your Honor, goes around the world. It's the same thing that we were discussing in the

context of the preliminary injunction; that basically the effect of the final rule, even as an interim measure, has been that FBME is cut off from all of its U.S. dollars all over the world because no bank wants to have the exposure to FinCen or to U.S. banks that would cut off that bank.

THE COURT: Give them cash.

MR. SHAFFER: But, Your Honor, what cash would it be? If it is foreseen or foreseeable that some bank somewhere in the chain would be paying monies to FBME Bank, they are in violation of FinCen's rule, at least from the perspective of the banks that actually implement this. That has been the practical effect. I think that is the designed effect of it. If you look at the language on this, Your Honor -- and I would point to another aspect of the record that demonstrates this.

When CBC sent FBME Bank the September 2015 letter that's been talked about and FBME Bank put in its response to this, you'll see in our brief that one of the points that FBME Bank made is that the Central Bank of Cyprus, through its special administrator, was trying to get funds that it could use to pay off debts of FBME Bank. You know how they did that, Your Honor? What they ultimately resorted to was setting up a dummy account at the Central Bank of Cyprus that designedly disclosed -- designedly disguised the actual identity. Those funds were then wired from a bank in

England. As soon as the bank in England got wind of the fact that this was, in fact, going to FBME in any shape, size, or form, it filed a suspicious activity report and demanded return of the money.

Now, because that was the Central Bank of Cyprus doing that, Your Honor, they were able to get away with it, Your Honor, and they were willing to try to get away with it. That's not something that is available to us. That's not something we would contemplate doing, and I think anyone in this chain, whether it's the lawyer, the lawyer's bank, or the downstream bank, they are instructed by this final rule that the money can't travel.

THE COURT: So your position is that any foreign bank that's the subject of a FinCen notice can obtain due process without any physical presence in the United States by depositing $100 in a checking account in a U.S. bank.

MR. SHAFFER: $100 might be too small. I do note that the *NCRA* [sic] case refers to a small bank account. It doesn't tell us how much is in there. If it's de minimis, Your Honor, it's de minimis. I don't think you have to wrestle hard with that one because if it's $290,000 plus, I think any U.S. citizen or anyone else would recognize that's an amount of money that's not de minimis. That's an amount of money that the due process clause cares about.

And, Your Honor, I emphasize, it's not like FBME

Bank was doing this in anticipation of a 311 sanction. Perhaps if there was some gamesmanship afoot, it might be different. Your Honor, this is organically what it is.

There are liens, too, that FBME Bank holds on this property. Those are going to be rendered worthless because FBME Bank will never be able to collect on the liens, which are only meant to pay off proceeds in U.S. dollars.

And I would note, Your Honor, the government, last time around and this time around, has not said, "Oh, here's a mechanism through which you can take your dollars and, consistent with our law and our rules and the way banks do business, you can get this money to FBME." All they've said is, well, essentially, we're not trying to do that or that may be -- or they're saying that we haven't adequately established with certitude that that is what's going to happen. I believe that the affidavits that we put in, the language of the final rule, the practical realities that we've been looking at for more than a year now all confirm that what I'm saying is true, and the government doesn't have anything to contradict it.

I'll also note that the language of *NCRI* is not when property is going to be destroyed or when property is going to be confiscated. The language of it that I was reading is when that property is placed in jeopardy by government intervention. And I don't think there's any

doubt, Your Honor, that's what we have because FBME has not been able to move forward with its transactions from this account even though the lawyer, according to the declaration, has tried to get them out, even though they've wanted to proceed on these liens the way the initial transaction contemplated. Everything has been stymied.

And the last one that I'll cite on this proposition, Your Honor, that due process attaches, is Judge Moss's decision in *U.S. v. Sum of* -- I'll round it up to $78 million [sic], 128 F. Supp. 3d 350. And Judge Moss wrote, "The government cites no case holding that a foreign national with funds on deposit in a U.S. bank is not entitled to due process before the government may seize those funds. Because the property at issue here was money located in U.S. bank accounts, the Court concludes that AIB is entitled to due process protections in this action."

I acknowledge, Your Honor, if you don't buy the fact that there's something happening to the North Carolina property and money, you might distinguish that case, but I don't know what there is in the record that distinguishes our circumstances from those of the case that was before Judge Moss because that money is basically gone from FBME if the final rule does take effect. So we think that due process does attach, Your Honor.

And then we're in the middle of the due process

storm that I was talking about, and I think the fact that it is as clearly open to consider an as-applied due process challenge, and we have the extraordinary combination of facts that we do here on top of those that would normally attend a 311 proceeding, that, I think, Your Honor, means that due process requires more than FBME Bank has obtained. And if the decision were otherwise, Your Honor, it would be, I humbly submit, a very damaging blow to due process and due process jurisprudence for everyone because it would mean the government has set up this procedure for any U.S. entity or any U.S. citizen, and they would have nothing to complain about unless the statute gave them some additional protection.

The cases I was just referring to from the D.C. Circuit, and I'd also mentioned the *Gray Panthers* case, those are ones, Your Honor -- and also, as I was mentioning, the *Concrete Pipe* case, the statute did not specify that there was some additional protection required. The Court simply said the statute doesn't foreclose that additional protection.

We think due process requires it. We're going to require that there be something more, a live hearing, a neutral decision-maker, or something even that's left to the government's discretion, but it has to be better than what was afforded here.

And I would note, Your Honor, there's nothing that prevents FinCen from convening a hearing. They can do that. That is at their discretion. Any U.S. governmental agency has that option, and so it's not like 311 forecloses that. It's just that it doesn't say explicitly that a hearing needs to be held in these circumstances.

THE COURT: Address the SARs issue briefly, and then move to the motion to supplement the record.

MR. SHAFFER: I'm sorry, as to the question of the disclosure or --

THE COURT: Not so much the disclosure. I think -- I'm sure you disagree with me, but the Court has ruled on that. More so FinCen's response to your comment regarding the inadequacy of the SARs as a basis for the rule.

MR. SHAFFER: And I'm just going to take one two-minute stab at visiting the other and then get to the substance.

THE COURT: No problem.

MR. SHAFFER: And it's this, Your Honor. Last time around you were explicit that due process was not something that you were confronting, so your decision last time was purely based on the statutes, and now, for the reasons we've just discussed, I would submit that due process is in play. Once due process is in play, I think

that the *States Marine Lines* case, which is an old one from the D.C. Circuit, but it is still good law at 376 F. 2d 230, squarely says -- squarely holds it violates due process to withhold secret evidence that is being relied upon that comes from third parties. Yes, there may be reasons to protect secrecy of third parties and keep them anonymous, but that's not good enough reason to deny a respondent an opportunity to see that evidence and defend itself with the benefit of that evidence.

And that was also --

THE COURT: While we're on this point, address the issue that, look it, the government was not relying on individual SARs. They were relying on the aggregate information that they extracted from the however many there are, and that they disclosed, in the description of the so-called topologies, that they laid out in the rule the implications that they drew from the SARs. And so, in other words, you knew, the bank knew, that there were concerns with shell companies, there were concerns with high-volume churn accounts, and you were given an opportunity to respond not to any individual SAR, which wasn't the basis for their conclusions, but to these general conclusions that they drew from them.

MR. SHAFFER: I understand where Your Honor's going. The last case is *Abourezk*, the D.C. Circuit case

from 1986 that points out just how extraordinary departure it is to allow the agency to rely upon evidence submitted ex parte in camera when a statute doesn't specifically provide for that, and we respectfully submit the Bank Secrecy Act does not.

But to take Your Honor's premise, your premise last time around, and I think it's the one you suggested this time around, it's look, we will have the opportunity to meet FinCen's evidence by commenting on aggregate data; that FinCen's case is an aggregate data case, and we can respond to it as such, and that's good enough to make our case and force the agency to answer it.

And if that premise is correct, Your Honor, then I win substantively under the arbitrary and capricious standard of the Administrative Procedures Act because I respectfully submit you will not see a worse analysis of data, a more underexplained analysis of data, than what you have in the FinCen here.

THE COURT: Because they codify or benchmark the conclusions that they make.

MR. SHAFFER: So the points we made were these, Your Honor. All we know is what the aggregate numbers were for a period of years, 2006 to 2013, and then 2013 and 2014. Your Honor, that doesn't tell you anything because, of course, with any bank you're not going to have a perfect

SARs rate. Presumably if FinCen saw that there were zero SARs reports over a period of years, that might look a little bit fishy. Any bank is going to have imperfections, and SARS are, of course, designed not just to detect illicit transactions, but to have some prophylaxis built into them. So just looking at a SARs number, unless you know the total aggregate transactions that that's a percentage of, doesn't tell you anything.

FinCen never said, "Here's what the percentage is." We did. We said, "Here's the total number of bank transactions in all currencies. Here are the ones in U.S. dollars."

We pointed out to the agency that their use of the aggregated SARs analysis was unprecedented, was sui generis. This is not a use that we can ever see FinCen or anyone else having made or a court ever having accepted, as Your Honor said. We said there's no baseline. What would you, FinCen, expect the baseline percentage rate to be for a healthy bank that's not a primary money laundering concern? What is the point of comparison? Never mind whether it's a baseline or a standard or an average or a target. What are you seeing from some other bank that you can measure FBME against?

We pointed to known confounding variables, Your Honor, that would explain why there was an increase in the SARs percentage for the year 2013-2014 specifically. We

noted that, number one, there was a financial crisis in Cyprus, as elsewhere, but in Cyprus that resulted in capital controls that basically put daily and weekly limits on what foreign investors could withdraw, and so predictably people in Cyprus were withdrawing up to those limits on a daily or weekly basis, and that, to other banks, could look like structuring activity even though it had nothing to do with AML. It was just the reality of what banks were doing coming out of Cyprus.

We also pointed out that FinCen had lowered, by design and on the form, the SARs threshold for the number of transactions that would fall within it. So you would expect all banks around the world to have seen an uptick in the incident of SARs.

And we also noted to them that Cyprus, for whatever reason, whether it's disconnects in terms of regulations or the nature of transactions or how other banks view activity coming out of Cyprus, we cited in Footnote I think it's 131 of our comment to a news report that talked about a Deloitte & Touche report that said there are high SARs rates for all international banks in Cyprus. And I would submit that FBME is one of the best banks in Cyprus, if you actually look apples to apples at FBME as compared to others.

All of that was in the record, Your Honor. All of

that went in to FinCen. I take no liberty, Your Honor, in saying that none of it, none of that, was answered by FinCen in the Second Final Rule or even in the briefing before Your Honor. And it, of course, has to be coming up from the agency. It couldn't come from the government's lawyers, but even the government's lawyers don't answer any of that at all. All they say is, "We're FinCen. We know SARs. We understand SARs. So you can trust us to make good use of it, and it's part of other things that we were looking at."

Well, Your Honor, if FinCen is so well-versed in SARs -- and I don't doubt that it is -- surely they know what is the baseline SARs rate. What is the average during this period of time around the world? Was there an uptick for other banks around the world in 2013 and 2014? Are there higher incidents of SARs reports coming out of Cyprus?

They have all that information at their fingertips, Your Honor, so why haven't they offered that any place in the administrative record? Either they know it and they're not saying because they fear that transparency, they fear that accountability, or they are keeping themselves willfully blind because they don't like the answers that they're going to get. But either way, Your Honor, the public and other onlookers and FBME Bank and this Court deserve to have answers to that very important question coming from the agency, and unless there are those answers,

we submit that one of the arbitrary and capricious standards laid down by *District Hospital* -- this is the D.C. Circuit 786 F. 3d, Page 56 and 57 -- has not been met.

The agency needed to examine the relevant data and articulate the satisfactory explanation for its action, including a rational connection between the facts found and the choice made. And they didn't explain, Your Honor, even as they use this SARs aggregate analysis as incriminating FBME Bank to explain why isn't it exculpatory. When you look at this in a context, not just in a vacuum, does FBME Bank look like a great bank, a good bank, a so-so bank, a poor bank, or a terrible bank and a bank of primary money laundering concern? That explanation is not there in the record. There aren't even the kernels of it.

The only other thing that FinCen said is, "Well, we're overstating the reliance they placed on the SARs." Your Honor, you will see throughout the Second Final Rule FinCen refers to the volume of transactions that are of concern. That's the SARs analysis. That's the only thing they have that's not just an anecdotal account.

Each time they refer to the volume, they're referring to the SARs, but I'll point you specifically to FinCen's analysis of the third statutory factor, a critical statutory factor that we say they didn't properly handle in any event -- and I rely upon my briefing for that -- but

when they talk about the number of legitimate transactions that stand to be stamped out by imposition of the Fifth Special Measure -- this is on 81 Federal Register 18488 and '89 -- that all comes down in substance to the aggregated SARs analysis. And FinCen specifically refers to hundreds of millions of dollars in transactions from 2006 to 2014, and specifically to the $387 million figure for that year 2013 and 2014.

So that's how they're saying that they've satisfied the statutory factor, is with that aggregated SARs data without answering any of the criticism that goes right to the heart of it, Your Honor. That, to me, is arbitrary and capricious agency action, and I think Your Honor could so hold under the black letter law of the APA. And I'd submit, given the procedural deprivations, at the very least the concerns that are at issue here, that should put more pressure on the agency. At least now we've taken our best shot at this aggregated SARs analysis. That's all we're going to get.

FinCen should at least have to explain itself. Explain why its analysis is sound. Explain why it finds something that truly is incriminating in that data. And you're just not going to find that, I submit, in the administrative record.

THE COURT: Okay. Move to the disputed materials

and the motion to supplement.

MR. SHAFFER: Could I talk about the CBC, Your Honor? That's the only other point on arbitrary and capricious review that I'd like to press upon Your Honor.

THE COURT: Briefly.

MR. SHAFFER: Okay. Your Honor, we think that when it comes to the CBC, FinCen failed to consider an important aspect of the problem. It's relying centrally upon input from CBC that's explicit throughout the Second Final Rule. It's especially explicit when it comes to allegations of evasion and noncompliance in Cyprus, and that is a recurring theme of the Second Final Rule.

And we think that given that we demonstrated obvious overwhelming, well-documented, pecuniary interest that CBC has, both in liquidating FBME Bank, following FinCen's final rule, using that as its cover, if you will, that's their argument in arbitration, that they don't bear responsibility. It's FinCen's final rule that it would threaten to end FBME Bank. They are going to seize hundreds of millions of dollars by virtue of that, and correspondingly in the arbitration, where FBME shareholders are seeking upwards of a billion dollars from Cyprus, the central defense of CBC is, "We didn't do it. FinCen's done it. Look at FinCen's final rule." So CBC has every financial interest in trying to advance FinCen's imposition

of the Fifth Special Measure, and that is reflected in our submission and not answered by FinCen.

We've quoted CBC as a valid discrimination against FBME as non-Cypriot-owned. We've cited third parties who echo us in pointing to ulterior motives and animus that CBC would have against FBME. I'd point there to Mr. Demetriades, the former governor of the CBC who talks about the toxic politics in Cyprus and why there are political motivations for CBC to be going after FBME Bank without any basis in terms of AML issue. That's at the administrative record, 3198 and '200. We've quoted an email that's in the administrative record at 4442 from Tanzania's statutory manager, Mr. Mafuru, who explicitly calls CBC out for trying to go after FBME in order to advance Cyprus's financial interest, recover money for itself at the expense of depositors. We've noted CBC's September 2015 letter to FBME that's based on this joint audit that it commissioned PricewaterhouseCoopers to undertake. PwC has disavowed that. And of course we have former investigators who have told FinCen in terms that they were directed by the CBC or by authorities in Cyprus before they submitted the attorney-client privileged materials that we were talking about to FinCen, and that happened just days after FBME had brought the suit.

So I would ask that FinCen at least provide an

explanation for its decision that -- and explain why its decision does not run counter to the evidence before it, all this evidence that I've talked about that undermines the credibility and integrity of CBC. And when FinCen says, as it does in the Federal Register, 81 Federal Register 18482, that CBC independently identified many of the same concerns that FinCen did, Your Honor, there's nothing independent about what CBC has been doing, and I think that the administrative record is completely one-sided about that.

CBC pounced to liquidate the bank as soon as FinCen issued the First Final Rule. It's the one that directed FBME's former investigators before they went to FinCen submitting the materials they did. It's CBC that waited over a year to produce findings supposedly coming out of the PwC audit. And CBC did that when, Your Honor? They did that right after FinCen decided to pursue a remand and the day after FinCen told us they weren't possessing any such report. They wouldn't provide it. And it's renewed its attempts to liquidate FBME in the aftermath of FinCen's remand notice.

We think, Your Honor, that this, too, is arbitrary and capricious for FinCen not to have grappled with these aspects of the record that should foreclose -- if they don't foreclose it from placing such extensive reliance on CBC, at least FinCen should have to explain why it is placing such

stock in what CBC is saying in this very same case where it has the pecuniary interest, where it has the animus, where it is by no means a disinterested party whose good faith could be counted upon.

If there's a presumption of regularity when it comes to foreign regulators, Your Honor, and I'm not denying that there is, it should be rebuttable presumption, and FBME, in this record, did enough to rebut it and to force FinCen to answer with something other than what FinCen offered. All it offered, Your Honor, was a 2011 MONEYVAL report that I think is, I think by any fair reading, unflattering to CBC, expresses explicit concern about Cypriot supervisory authorities, and it's from 2011. It's been superseded many times over. It has nothing to do with this case or CBC's conduct toward FBME.

And of course, FinCen did rely upon regulators around the world, Your Honor, as our authorities do, but not every country follows the same principles of the APA and the rule of law that the United States does. There may be corruption. There may be discrimination. There may be bad faith and misconduct running amuck abroad. And before our regulators piggyback atop foreign regulators in what they're supposedly finding and determining, they should still have to, under the APA, explain themselves. Explain why it is that under circumstances that would, I think, discredit CBC,

they place the stock that they do in it.

And if you don't buy all of that, Your Honor, I just submit that's all the more reason why we should have had a live hearing to get to the bottom of these sorts of concerns and why FinCen, at the very least, should have been consulting, as I said earlier, with the Attorney General, the State Department, perhaps, as per the statute, the chairman of the Federal Reserve to say, "What do other sister officers within the United States government make of these sorts of concerns specifically directed against Cyprus relative to Tanzania and, you know, relative to law enforcement and so forth?"

THE COURT: Okay.

MR. SHAFFER: And I think FinCen could have done any number of other things. They could have checked with PricewaterhouseCoopers. They could have checked with CBC, followed up with them; checked with Tanzania; posed questions to FBME; explained themselves about the SARs baseline; consulted; as I said, agreed to a remand meeting that we requested, or held a hearing. What they could not do, Your Honor, what they could not do is what they did, simply take CBC's word as basis to indict FBME in the most damning terms and say nothing short of a prohibition under the Fifth Special Measure would suffice.

THE COURT: Okay.

MR. SHAFFER: Thank you, Your Honor. You've been very indulgent on that point. You had another point you wanted me to turn to.

THE COURT: The motion to supplement the record regarding the disputed materials.

MR. SHAFFER: Yes.

THE COURT: Why don't you go first.

MR. SHAFFER: Your Honor, I would say this about it. I don't think that there are factual disputes surrounding -- or at this point I think you have enough to decide what to do under the governing precedent of the D.C. Circuit in the following sense. The materials in question are ones that FinCen received. They received them at two different intervals.

The first time they received it was in August of 2015 as we were litigating this case, Your Honor. And having received the materials, they've reviewed the materials. They reviewed them specifically with an eye towards this rule-making and, in fact, were, as I understand it, disseminating them around FinCen to some degree. I haven't been able to find out specifics beyond what I just said, but they were certainly receiving and reviewing without telling us and doing this in the context of this rule-making.

The second set arrived in January of this year,

and FinCen sat on that set of materials for two weeks. It was styled a comment. FinCen said it was treating it as a comment. They wrote to us asking us if we saw any confidential business information that would -- that should be redacted out before it was published as part of the administrative record. They came to this Court asking if they had any basis to exclude it from the administrative record because otherwise they saw it as part and parcel of what they needed to be considering from the rule-making.

Now, when we expressed the grave concerns we did, which was really the moment we learned from FinCen that it had received these materials and had been sitting on them, we came to a negotiated outcome essentially where the agency agreed that it would not be relying upon the materials in connection with this rule-making, nor would it be publishing them. And that, of course, was critical to us, Your Honor, because we have our obligations to our client and our own ethical responsibilities, of course, and we wanted to do everything necessary in order to preserve the privileges at issue.

But I don't think there's any doubting, Your Honor, that you can take judicial cognizance of the fact that FinCen received and reviewed these materials, took months before they first alerted us to the fact that they'd been received. They then, as I said, were proposing to use

them as part of their administrative record --

THE COURT: Just so I'm clear, your argument as to why FinCen considered these materials in reaching the final rule is based on, A, the timing of their receipt and, B, that your position is that there is no other way that certain materials could have or certain conclusions could have wound up in the Second Final Rule but for the consideration of this material?

MR. SHAFFER: To be fair, Your Honor, I can't quite say the second because, of course, I don't know what's in the black box.

THE COURT: Okay.

MR. SHAFFER: And so there may be things in the black box that support certain things that FinCen said in the Second Final Rule, so I can't say that just the way Your Honor did. Let me try and say it a different way.

I can't know whether these materials somehow influenced FinCen en route to that conclusion, whether because they corroborated something that was in the black box, whether because something that was in the black box had traveled from the same former investigators who were violating attorney-client privilege, or whether because decision-makers at FinCen who were contributing to the Second Final Rule, to the memo, to the premises, took a certain view of FBME based upon what they'd seen in the

materials. I can't unring the bell, especially without knowing what happened within the agency.

THE COURT: Fine. So what I'm inclined to do is to grant your motion to supplement the record to the extent that you're asking the Court to consider extrajudicial or extra-record material that is necessary to avoid frustration of judicial review of the rule.

MR. SHAFFER: That's a perfectly fair outcome, Your Honor. I was going to suggest --

THE COURT: I think we've sort of stumbled over the nomenclature a little bit because if you're adding something to the record, then it's an implicit finding that the agency considered it, but in order to determine whether the agency may have considered it, I need to consider that information.

MR. SHAFFER: Just two points on that, Your Honor. I think the standard is "might have influenced the agency's decision," and we think it does fall under that heading because it might have influenced the agency's decision, but I -- and I don't want to get tripped up in nomenclature either, Your Honor. I think whether it's judicial notice or -- just as Your Honor described it or part of the administrative record, what matters to us is that Your Honor be able to take cognizance of it so that you can adjudicate the concerns that exist at this point in time about what may

have -- the possible taint on FinCen's Second Final Rule.

And my last point on that --

THE COURT: Now, the materials have been submitted in connection with your request for the Court to resolve the initial dispute, which I refrained from doing. Can I simply adopt the material as part of the summary judgment record here, or do you need to or do I need to have you refile it? Is it the same material?

MR. SHAFFER: It's the same material, I believe, Your Honor. I'm going to confer with my colleagues, if I could.

THE COURT: Okay.

MR. SHAFFER: But my tentative answer to Your Honor is that that would get you to the correct place from our perspective.

THE COURT: Okay.

MR. SHAFFER: I think that that is substantively the right outcome, and I think that the nomenclature should not matter. I think that we do agree with the government that these were materials that should not have been relied upon. The question is whether there was any taint to them, and as to that I would simply cite Your Honor to the D.C. Circuit cases that we've cited: the *Professional Air Traffic Controllers* case, the *Home Box Office* case, the *Sangamon Valley Television Corporation* case where concerns

about whether there was improper influence on an agency's proceedings necessitated that there at least be an evidentiary hearing.

In the *Sangamon* case there was a vacatur that preceded it. In the *Professional Air Traffic Controllers* case, the D.C. Circuit essentially pressed pause and said, "We're going to send it back to the evidentiary hearing before we do anything else." And then there's the *Home Box Office* case, Your Honor.

And I think without that evidentiary hearing, I think it is exceptionally difficult -- I honestly don't know how we would ever get to the bottom of whether there was an impermissible taint and whether the attorney-client privileged materials colored improperly decisions and impressions of FinCen.

THE COURT: Okay. I understand.

Ms. Powell. Ms. Lee.

MS. LEE: I wanted to let you know Ms. Powell will be --

THE COURT: Come on up.

MS. LEE: Your Honor, I just wanted to let you know that Ms. Powell will be handling the issues to do with what we've been calling the disputed materials, the motion to supplement and the taint issue.

THE COURT: That's fine.

MS. LEE: I'll be handling --

THE COURT: However you want to divide it.

MS. LEE: So I'll be -- I don't know if you wanted to address that first or just go into the main meat.

THE COURT: You're in the driver's seat.

MS. LEE: Okay. Well, I will go ahead and start.

I wanted to start by just emphasizing a couple of points which I'm sure the Court is already well aware. One is that FinCen has completely complied with the Court's remand order. The order --

THE COURT: Did you consult again?

MS. LEE: Yes, we did, and --

THE COURT: Did it consult again?

MS. LEE: Yes.

THE COURT: And where is that reflected in the second rule?

MS. LEE: So it's actually in the second rule. It uses somewhat of the similar phrasing. It's at 81 Fed. Reg. 18488, Section 6, "Imposition of Special Measure," and it says, "Following the required consultations and the consideration of all relevant" --

THE COURT: I'm sorry, give me that page number again.

MS. LEE: This is 81 Fed. Reg. at 18488.

THE COURT: And I'm sorry, there's a lot of text

on this.

MS. LEE: Yes. No, it's at Section 6. I realize this might -- this might actually be a referral to the earlier consultations, but I do -- I can say and I'd also like to add that --

THE COURT: Wait, wait, wait, wait.

MS. LEE: Sorry.

THE COURT: Is it in the Second Final Rule?

MS. LEE: It is in -- so consultations are mentioned in the Second Final Rule.

THE COURT: Where are they mentioned?

MS. LEE: So at -- if you look at 81 Fed. Reg. at 18488.

THE COURT: I'm with you.

MS. LEE: Under Section 6, "Imposition of Special Measure."

THE COURT: Yes.

MS. LEE: The first paragraph. It says, "Following the required" -- about halfway down it says "Following the required consultations..."

Looking at that I'm saying that it might be a little ambiguous whether that's a referral to the first time it was asked versus the second time, but --

THE COURT: I would agree with you.

MS. LEE: But I do want to confirm that FinCen did

undertake the required consultations. We -- to the extent Your Honor wants confirmation of that, we're happy to submit a declaration to that effect.

As to, you know, the other points that were brought up, I mean, we'd first like to reiterate the arguments made in our brief that this issue isn't even really properly before the Court. It was never raised at any point during the administrative process by plaintiff, and as Your Honor --

THE COURT: How could they raise it before the Second Final Rule was issued?

MS. LEE: Well, I think -- it was noticed in the original --

THE COURT: And they raised it because the Second Final Rule didn't say we reconsulted, and, therefore, they were not on notice that it was an issue before then. Right?

MS. LEE: But I would say the first time there was also -- I think a lot of their issue is it seems to be there was no documentation of the consultation.

THE COURT: That's a separate issue. I'm not going to make them -- I'm not going to make you give them the documentation, but if --

MS. LEE: Well, as I said, we're happy to submit a -- I mean, I think, again, because of the deliberative -- well, first let me back up.

And the other problem is that they're not in the zone of interest, as you were discussing with opposing counsel, which I think you've gone through and highlighted the problems with that; that it really clearly doesn't -- these were not -- that part of the statute does not contemplate the bank's interest. It's like other interests to do with the U.S. banking community and other --

THE COURT: Well, this issue has not been joined in the brief because, as I said -- or in the briefing because there was no reply brief, but Mr. Shaffer cited a number of cases where at least, according to him, the test is whether the rule-making as a whole affects the interest, not simply that particular provision. Is that not the case?

MS. LEE: Well, again, Your Honor, since we didn't have the benefit of the reply, I'd probably have to go back and look at these cases. But it seems perverse to have an entity that really, again, is not within the known zone of interest --

THE COURT: Because had the consultation taken place --

MS. LEE: Yes.

THE COURT: -- and the Secretary of State said, you know, "Hold on, this would affect the national security," the rule doesn't go into effect, and FinCen's interests are not affected. Why isn't that within the zone

of injury if the outcome of the consultation, if it's positive, could affect the bank's interests?

I mean, I haven't read the cases either, but just as a logical proposition, that makes sense to me. Right?

MS. LEE: I can also table that and maybe, if Your Honor wants --

THE COURT: We'll look at the cases, and if we need more briefing, we'll request it. Okay?

MS. LEE: Again, I think proceeding to the main point, yes, the consultations were done again, and we can verify that in a declaration. Again, we wouldn't be able to provide a lot of these document -- we wouldn't be able to provide any of the documentation or a lot of the specific details because they are deliberative, but I'm sure we could confirm that they were done.

And, again, just given the presumption of regularity that the agency is accorded, I think that Your Honor would have to accept that they were done.

THE COURT: Well, if you'd like to submit a declaration, you should do that.

MS. LEE: Okay.

THE COURT: And I'm sure that the plaintiffs will have an opportunity to tell me why that's not sufficient under APA notice and comment procedures, and we'll take it up. But you're certainly free to submit any declaration

that you see fit.

MS. LEE: Certainly, Your Honor.

THE COURT: Okay.

MS. LEE: So as I said, we did comply with the Court's -- and the Court's order was geared towards making available all of the unclassified and nonprotected information, and despite plaintiffs' -- which I'll get to. Despite plaintiffs' attempts to cast doubt on this, there really is no doubt that we did that.

We also --

THE COURT: Well, when you say "protected," you're just talking about --

MS. LEE: So on that point.

THE COURT: You're just talking about the SARs; is that right?

MS. LEE: At that point we're talking about Bank-Secrecy-Act-protected information, the SARs.

THE COURT: Okay.

MS. LEE: There is no other category of protected information. We were using that term because I believe that's the term the Court used in its preliminary injunction opinion and possibly also the remand order. But as to that, yes.

So there really is nothing except the unclassified nonprotected info that has been made publicly available, and

then the classified information, and then, well, the Bank-Secrecy-Act-protected information, which as to those two categories, I don't believe that -- it doesn't sound like the Court believes that we should be disclosing those two other categories. So I think this all -- at least on the procedural side, this comes down to whether or not we disclosed everything we should have on the unclassified materials.

And as we said in our brief, our opposition brief, we believe that plaintiffs, in some ways, are moving the goal post or changing the scope of what it is that they were entitled to in terms of notice. I don't think there's anything in the case law that suggests that FinCen was obligated to make available what it was thinking was important or what conclusions it would draw from the unclassified evidence or, you know, what aspect of it would be most problematic. All it was required to do was provide what it was considering, and it did that.

And also, even if you take each of their itemized objections to things that they called surprises, none of them, I think, were really surprises on their own terms. The two examples that --

THE COURT: Why don't we talk about the one that Mr. Shaffer emphasized, which is this allegation that in late 2014 there were efforts to obscure information from

investigators.

MS. LEE: Yes, Your Honor. So for that --

THE COURT: Was that disclosed to them in some way, shape, or form? Or what's the government's position with respect to that issue?

MS. LEE: Well, as you know, the specific fact underlying that sentence was classified, so that couldn't have been disclosed.

Now, as to the larger --

THE COURT: But the sentence could have been disclosed, right?

MS. LEE: I mean, I think --

THE COURT: Because you did disclose it in the rule.

MS. LEE: We did eventually. The sentence I think was cleared relatively late or recently or prior to the rule. I don't know the exact timing, but the fact is that plaintiffs were on notice that, you know, the general area of concern that -- sorry -- that FinCen had about FBME's pattern of evading regulators and trying to evade oversight was very much made apparent both in the notice of -- well, in the notice of finding and, of course, in the enjoined final rule. So I think it's somewhat disingenuous to say that this took them completely by surprise, and for that reason, I don't -- I don't think that constitutes any

failure of notice or -- either under the due process or the APA standard. And I can get, in a minute, to why we don't -- we've continued to believe that due process -- that plaintiffs are not entitled to due process.

But I guess the other thing that was brought up was the Hezbollah associate, but they themselves admit that they had notice of that so I don't really see how that also is any sort of failure to provide unclassified information or to comply with the Court's order.

So moving on.

THE COURT: Talk about the due process issues. A, the threshold question as to whether the bank is entitled to due process and, B, that the procedures accorded them did not satisfy due process.

MS. LEE: So for the first part, we're backing in at whether or not they have established sufficient constitutional presence, and we continue to submit that they have not.

THE COURT: Answer the question that I asked Mr. Shaffer, which is, if the rule goes into effect tomorrow, what would become of an escrow account in North Carolina as to which the bank is the beneficiary? Could those funds be withdrawn consistent with the final rule or converted into something of value and given to the holders?

MS. LEE: My understanding is yes, Your Honor.

THE COURT: And what's that based on? I'm having a -- you know, I need a banking primer to answer that.

MS. LEE: I admit I am not an expert either, Your Honor, but I do -- first of all, there's no dispute that the funds are currently not in a correspondence account. They're in an escrow account. And there doesn't seem to be anything that prevents the plaintiffs from withdrawing the funds.

THE COURT: What's the difference between a correspondent account and an escrow account held by a U.S. FDIC-insured bank?

MS. LEE: Well, to that I don't know the exact answer, but I can certainly find out from the agency. But I will say that I've been -- I understand that there's nothing that would prevent them from at least withdrawing the funds in cash, or I think spending them within the United States even after the rule goes into effect.

I think everything else is a bit hypothetical since the rule hasn't actually gone into effect yet, but the burden --

THE COURT: But would you agree, under the Judge Sentelle decision and the Judge Moss decision that Mr. Shaffer referred to, that if I find that the bank's assets are in jeopardy, that the bank has assets in jeopardy here that are not simply de minimis, that that would be

sufficient to establish due process?

MS. LEE: I don't agree with that. And can you remind me which case that was?

THE COURT: This is the *In Re: $70,990,000* --

MR. SHAFFER: And *NCRI*, I believe.

THE COURT: -- and the *NCRI* decision by Judge --

MS. LEE: So I think in *NCRI*, there wasn't just a bank account. There was also a physical presence in a building so it was --

THE COURT: In the National Press Club.

MS. LEE: Yes. So that combination, I think, was considered to be enough.

As for the other case, I believe that was a case where the funds actually were going to be seized, which is really not the case here. No one is going to touch this account. And I'd like to reiterate, the plaintiffs have the burden of showing that they wouldn't be able to access this account or to get the funds from it, and I'd submit, if you look at their declarations, they really haven't. They basically said in their declaration from their lawyer that they were not -- they found they were unable to transfer the funds in the way that they were used to, whatever that means, and so they put it in this escrow account, but they certainly have not made a showing that they couldn't get these funds, for instance, in cash from the account once the

rule goes into effect.

So we submit they have not met that burden, and so they really haven't established a presence that would qualify for due process.

As to whether extra procedures are required, we would submit, even with due process standards, we would submit absolutely not. As Your Honor pointed out, this is not an adjudication. This is a rule-making. And we admit that it's a slightly unusual rule-making in the sense that it is more or less focused on one entity, but the fact is that Congress, in Section 311, mandated that the Fifth Special Measure be imposed by regulation, and it could have, if it had wanted to, required a hearing or more formal procedures, but it didn't.

THE COURT: Is it FinCen's position or is it your position that the classified material was critical to FinCen's designation, or would it or could it have relied simply on the public material and the SARs?

MS. LEE: Sorry. So would it --

THE COURT: Was the classified material critical to FinCen's decision?

MS. LEE: I think it was a significant portion. Now, if you're asking whether the decision would still stand without the classified information, I would have to re-evaluate the totality there. You know, I think there's

still evidence in there that is not classified, and, again, maybe I didn't get this quite clear, but if this includes the SARs, then I think that also makes a stronger case.

THE COURT: Okay.

MS. LEE: But if -- in any case, we don't believe that the presence of classified information changes or the reliance on classified information changes the -- what is actually required by due process. In terms of whether they were required to have a neutral -- what's called a neutral arbiter and/or a live hearing, as Your Honor noted, in many of the cases that are most similar to this one involving targeted financial sanctions or terrorist designations -- and I would like to note that there are cases that explicitly reject the idea that you would need a hearing of any kind. I think *Holy Land* is one of them, and possibly *Kadi*. I think that's in our briefs. So that in itself is indicative of the fact that such extra proceedings are not required.

The other thing is the other cases --

THE COURT: But as Mr. Shaffer says, there were at least indications in those cases that the decision did not critically rely on --

MS. LEE: Well, I would submit -- I don't agree with that characterization.

THE COURT: Okay.

MS. LEE: Again, I'm not -- I think "critical" is not the most precise term, but I would submit that -- and, again, I didn't -- I don't know those -- I don't know what was in the record in those cases, but that the information was probably at least as important there, the classified information, as it is here, if not more so, and yet no hearing was required.

Also, in terms of the other cases, the nonsanctions cases that plaintiffs cite, they rely more on the risk of bias. And for all the rhetoric that they show in their briefs and also at argument, they haven't shown this risk. This intolerably high risk of bias I think is the standard that was set forth in *Withrow*. They haven't shown that this decision, FinCen's decision, is really any different from any other kind of decision that involves this kind of targeted financial measure. In fact, if anything, you know, they can't deny the fact that more process, as the Court has noted, has been presented here than in those other cases.

They did get notice and comment. They had two comment periods, and even if we're talking just about the second one, they had -- they were able to submit an extensive submission. We'd submit that, like, even if they took issue with the specific way in which those comments were addressed, they were addressed, and really nothing more

should be required under the APA -- well, under due process, and certainly under the APA.

And *Vermont Yankee*, that case has been routinely held by the D.C. Circuit to stand for the proposition that you really shouldn't be importing extra procedures on top of the APA unless, again, some sort of extraordinary circumstances are shown, which, again, I don't think the plaintiffs have shown here. This has been done according to the book, if you will, the notice and comment rule-making procedures, and there really hasn't been any demonstrated irregularity setting aside this issue of the allegedly privileged materials, which we would submit were handled entirely appropriately.

So with that, we believe that even if you do read a due process right into this action, FinCen would have met that standard.

THE COURT: Okay. Address FinCen's discussion of the SARs, the aggregate data from the SARs, and tell me why the Court can draw a conclusion one way or the other about the -- you know, how good or bad or indifferent the data are from that aggregate data.

MS. LEE: Well, respectfully, Your Honor, I think that's the wrong question to be asking the Court. It's pretty much textbook APA law that the Court isn't supposed to be evaluating each evidence on a piece-by-piece basis,

and it's also not supposed to be imposing its own judgment for the agencies, and this is pretty much exactly what the --

THE COURT: But what is the agency's judgment? I mean, if the EPA says, "We find that someone dumped, you know, 300 million gallons of a toxic material," and that's the basis of a rule-making in an adverse finding, how is the Court to know whether that's a high amount? A low amount? How can I assess FinCen's exercise of its discretion if it's just a raw number with no benchmark? That's what I'm struggling with.

MS. LEE: Again, I still think that -- I don't believe that the APA requires the agency to set down a benchmark. Remember that SARs are, again, only part of the evidence that the -- I'm sorry, that FinCen was looking at in the context of the other information. They --

THE COURT: But it says there was $387 million in suspicious wire transfers in one year, and that's the basis of the finding. How am I to assess that? Is that a lot? Is that a little?

I mean, I understand FinCen has the expertise. They know better than the Court or the plaintiffs. But without explaining and putting that number in context, how can I assess whether that's a reasonable exercise of the agency's discretion?

MS. LEE: I think -- if you look at that number in the context of the rule, I think the implication is that it is an unusually high number.

Now, I don't read -- again, I don't read the APA or really due process --

THE COURT: So you're saying that I should just trust the agency because it has the expertise?

MS. LEE: I mean, at a deeper level I think the agency does have the expertise here and is --

THE COURT: I don't doubt that, but, you know, what's my job then?

MS. LEE: Well, the Court's role in this is to -- and I think Your Honor had asked about this earlier in the context of error. The Court is really supposed to look at the totality -- well, to confirm that the agency's decision was based on a, you know, reasonable reading of the overall totality of the evidence.

Again, it's not the Court's job to really confirm -- and this is also in the sanctions cases as well, as well as the regular APA cases, but to confirm whether each piece of evidence was analyzed correctly, but whether the overall decision and whether -- whether the overall decision laid out what's I think it's called a reasonably -- or a discernible path to its conclusion and whether it was based on substantial facts.

THE COURT: So your position is that the agency advised the bank that it was concerned about a high volume of suspicious wires, the use of shell companies, the, you know, churning of accounts, and that that was sufficient to put it on notice of the general issues that were the basis of the money laundering concern?

MS. LEE: Yes, Your Honor.

THE COURT: And that the agency did not have to go farther and substantiate that $387 million in one year of suspicious wire transfers was high, low, or average.

MS. LEE: Yes, Your Honor. I don't believe that was what was required here.

THE COURT: Okay.

MS. LEE: Yes.

For the rest of the substantive issues, again, just stepping back, almost all the plaintiffs' complaints repeat this pattern of trying to take a very granular approach to how FinCen analyzed this or that piece of evidence and whether or not that was correct. And, again, we would submit that is not what either -- well, that is certainly not what the Court is supposed to do in reviewing the decision.

Now, specifically on the CBC, that actually falls in the same category in that, well, first of all, this is squarely the area in which FinCen should be accorded the

highest level of deference because it has to do with its relationship with foreign regulators, and, again, it's the expert here in what is valuable information to be gotten from foreign regulators and how credible it is. I think the only issue there is whether or not it considered FBME's submissions regarding the CBC, and it did. You know, it considered other comments that drew attention to concerns about the CBC as well, but it adjudged in its own -- it laid out its own assessment that the CBC was reliable, at least reliable enough to rely on their evidence.

I don't want to get into too much detail, but the MONEYVAL report, if the Court wants to look at it, actually does come out overall positively in favor of the CBC. But that's not even what the Court should be asking because, again, this is -- the Court shouldn't be substituting its own judgment for what the agency determined to be a reliable source.

THE COURT: Well, certainly the MONEYVAL comment indicates that the agency considered CBC's reliability and credibility generally.

MS. LEE: Indeed.

THE COURT: Is there anything in the rule that suggests that it considered the specific sources of bias or allegations of bias as to FBME?

MS. LEE: If you mean does the rule draw

attention -- I mean, does the rule focus on, you know, each specific allegation that FBME had about the CBC, no. And, again, I would submit that that's not --

THE COURT: Your position is that it didn't have to?

MS. LEE: Yes, Your Honor.

THE COURT: Okay. Because FinCen is charged with working with its sister regulators around the world, and it should be given leeway to accept or reject recommendations made by them based on all the circumstances given its expertise.

MS. LEE: Yes, Your Honor, and the same thing applies to the CBC evidence as well as the others. It's one of many pieces that FinCen is relying on, and it also was relied on to the extent that it was consistent with some of the other audit reports that were submitted, including, I might add, the report submitted by FBME, which although FBME presents them as showing how strong their controls were, it also identified --

THE COURT: These are the KPMG and Ernst & Young reports?

MS. LEE: Ernst & Young, yes. But the reports also identified significant weaknesses and deficiencies that, again, were consistent with both what FinCen found and also what the CBC found, and, you know, if this -- this,

again, should not come down to whether FinCen interpreted these reports correctly or it should have focused on other things. It's more overall did it have a reasonable basis to come to the conclusion it did, and we submit that all of the evidence in the record and the rule shows that it did.

THE COURT: On the disputed documents -- I guess Ms. Powell is going to address that.

MS. LEE: Yes, I just -- just as sort of -- well, will I get a chance to talk again, or is this it?

THE COURT: This is your last shot, so go ahead.

MS. LEE: Okay. I wanted --

THE COURT: That's why I schedule these things on Friday afternoons.

MS. LEE: Yes, Your Honor, and it's not my desire to keep anyone any later than we need to be, but I just wanted to reemphasize that, again, notwithstanding plaintiffs' rhetoric about death sentences and imaginary conspiracies of the CBC, the Fifth Special Measure, like all of the special measures under Section 311, is a prophylactic measure. It's not punitive. It's really intended only to protect the U.S. financial system against the threat posed by money laundering and terrorist financing.

And it's not imposed lightly or capriciously. It's only imposed after great deliberation and a lot of work. FinCen isn't doing this, you know, for fun or just

because it doesn't like FBME. And it is continually assessing the developments that relate to FBME and keeping an open mind, which is what it did on this final rule.

It's the reason it undertook the remand. It considered a lot of new information, but it concluded that because it showed -- because the information showed that there was still a pattern of FBME continuing to evade oversight even after it became aware of concerns, and the fact that there wasn't a lot of -- there was no concrete documentation of reforms made that FinCen could rely on, that it would have to impose the Fifth Special -- sorry, the prohibition on U.S. correspondent accounts.

And I think, again, if Your Honor looks at the whole of the rule and the underlying evidentiary memo, you can see that it was a reasoned conclusion well supported by the facts, and that's all that's required under the relevant standard under the APA to uphold the decision.

Now, I think FBME, realizing this, is trying to, instead, find lots of procedural defects that don't actually exist, and I just wanted to, again, emphasize that all of the unclassified nonprotected information was disclosed, and there isn't any other category of information, aside from what we've already known to be either classified or BSA-protected, so there really isn't anything more that should be required on the process side either.

And it kind of underscores the truth that we -- plaintiffs have taken the position that there's almost nothing -- there is almost no process that would be enough for them, I think, if the outcome were not in their favor, but that outcome should be respected because it was based on a carefully reasoned and well-supported analysis of the information, and it came after an unprecedented amount of process and considerable input from FBME.

I believe that's all for me.

THE COURT: Okay. Thank you.

MS. LEE: Thanks.

THE COURT: Ms. Powell.

MS. POWELL: Yes. I'll be brief, I promise.

THE COURT: Yes, I don't have too much on this. I guess the one question I do have is: Does FinCen explain the delay in notifying the bank that it had received these documents because of this taint review that it undertook by sending the documents to the justice department, or is there some other explanation for the delay?

MS. POWELL: In part, there are two tranches of documents that is useful to break them out. I think the first tranche --

THE COURT: This is before the comment?

MS. POWELL: -- was received by email after the first rule-making, before the second rule-making, while

FinCen and the government were in the midst of the PI proceedings. It was quickly reviewed, determined it was not relevant to any ongoing proceedings, and set aside.

It was picked back up again during the remand to determine whether it had any bearing on the rule-making. FinCen determined it could not relate -- determine the credibility of those materials. They weren't inclined to rely on it, but in light of the fact that an attorney is mentioned in it, it was sent for the taint review.

When FinCen then received comment from the same individuals, it was determined that needed to be provided to FBME to determine whether it could be put on the public record or considered. It was done along with the previously received materials at that time.

THE COURT: Okay. Let me stop you. What was the basis for the taint review conclusion that the documents were not privileged?

MS. POWELL: So I have not reviewed any -- I have not reviewed the August 2015 materials at all so I'm not familiar with their substance. I have talked to the filter attorney who reviewed them who said there was no communications from counsel on their face. They did not appear to be privileged.

Upon receiving further communications from plaintiffs' counsel on this matter, we determined that it

was not possible to tell from the record currently before us whether or not there was work product -- i.e., whether this was material that was directed by an attorney in anticipation of litigation -- and it was set aside. Not least because the agency had no interest in it.

THE COURT: Okay.

MS. POWELL: I have -- well, first I wanted to quickly respond to the Court's suggestion that they go ahead and be added to the record so that the Court could determine the issue.

THE COURT: Well, I didn't decide that they should be added to the administrative record, but that I would consider extra-record materials. So they won't be a part of the administrative record.

MS. POWELL: Understood, Your Honor.

THE COURT: They will be part of the record of the summary judgment proceeding here.

MS. POWELL: Understood. The government does not object to the Court taking notice of them in some way.

THE COURT: Okay.

MS. POWELL: We do object to the plaintiffs' motion that they be supplemented to the administrative record because that is a finding that the agency considered them, which it explicitly decided not to and in part at the plaintiffs' request.

THE COURT: I agree with you.

MS. POWELL: Yes.

THE COURT: Unless and until I find that the agency, in fact, considered them and then they can be added to the record, I think we're on the same page.

MS. POWELL: Understood. So with respect to the two motions to supplement, I have three very quick points, I think.

First, I think they can both be disposed of with reference to the certification of the administrative record by Richard May, which is entitled to a presumption of regularity and, if necessary, the supplemental certification that explains that they were received, but then not considered, not transmitted to the decision-maker, not used to track down leads and formed no part of the agency's analysis or decision-making. I think those alone are sufficient to deny both motions.

Second, I think it bears repeating that plaintiffs demanded all along that this material be excluded and they have now demanded that it be included as a basis for attacking the record. I don't think the privilege or the ethics rules are intended for such technical employment.

THE COURT: Counsel, I think we're past that.

MS. POWELL: Okay, understood.

THE COURT: We're not adding them to the record.

We're considering them outside of the record for the purposes of this motion.

MS. POWELL: Understood.

THE COURT: Okay.

MS. POWELL: Well, that is what I have on those motions other than what is in our briefing.

I also wanted to talk briefly about the taint issues --

THE COURT: Sure.

MS. POWELL: -- that are raised in the summary judgment motion.

The government's position is certainly that, because they were not considered and are not part of the record, there is no taint.

THE COURT: Okay.

MS. POWELL: They were effectively walled off from any decision-making.

Second, even --

THE COURT: And the issues as to which the plaintiffs suggest that they may be connected you think are supported by information in the classified record.

MS. POWELL: In the classified and nonpublic record -- that is correct -- but in no way relates to the disputed materials. And, in fact, the precise location of that can be discerned from the classified version of the

evidentiary memorandum.

Even -- second, even if FinCen had considered the materials in some way, plaintiffs don't actually cite a case suggesting that the agency is forbidden to consider material submitted in response to a request for comment, and we're aware of none. The only question would be whether plaintiffs had the ability to comment on those materials then, which they did.

All of their taint cases are related only to improper ex parte communications, informal rule-makings and adjudications, or in cases that the D.C. Circuit has limited to decisions which are about competing private claims to a valuable right, like the *Home Box Office* case, none of which are at issue here. FBME was not competing in this rule-making with the investigators or with anyone else who had improper access to FinCen.

There's simply no impropriety even properly alleged here in any factual form or evidentiary dispute.

Does the Court have any further questions?

THE COURT: No, that's all. Thank you very much.

Okay. Mr. Shaffer, one more bite at the apple.

MR. SHAFFER: Thank you. It will be quick, Your Honor. I have one point to make about the privileged materials at the outset, if I may.

THE COURT: Yes.

MR. SHAFFER: Ms. Powell makes the point that the D.C. Circuit has confined the taint cases that we're citing to instances where there are competing claims to a valuable privilege. That's the formulation she used coming out of those cases. I don't think the principle of those cases is so confined, Your Honor, but to the extent that there is that specific limiting principle, I believe we fall squarely within it. The former investigators in question were pressing claims for monetary recovery against FBME, and how did they get those claims satisfied? As the record reflects, we've demonstrated, with the affidavit from the special administrator in Cyprus, 100,000 euros were paid out of FBME's funds while the special administrator had control to the former investigators. According to the special administrator, that was in the settlement of claims in a lawsuit brought by those former investigators. But those claims remain pending, Your Honor. As best we can tell, the only thing that was obtained was the information that was submitted to FinCen in exchange for those funds being paid over.

And I won't return again and belabor the point, but we think CBC is very much competing against FBME in this proceeding, and not for hundreds of thousands of dollars or millions, but for hundreds of millions of dollars multiple different ways, through the assets of the claims and by

resisting claims in arbitration. So I think this falls squarely within the fact pattern that concerned the D.C. Circuit in those cases.

THE COURT: Let's be clear, Counsel. CBC would be a receiver, but they wouldn't profit from ownership of the bank. They're the regulator, correct?

MR. SHAFFER: Your Honor, I don't want to go too far afield here, but I do believe the administrative record reflects -- and, again, you have the Bank of Tanzania saying to Cyprus, "You are trying to take funds from FBME Bank that should be used, if anything, to pay off depositors, and you're claiming them for Cyprus, including to insulate Cyprus against liability that it may have to the shareholders through an arbitration." And I will simply tell Your Honor, because you're asking the question, if left to its own devices, Cyprus will pay depositors off from FBME's assets in pennies on the dollar. That's the current deal they're proposing. And the remainder of those funds will stay in Cyprus, Your Honor. There may have to be some accommodation struck with Tanzania, but that's where CBC is going in this case.

And, again, I will rest on our arguments in our briefs and on the administrative record for that, but I want to turn to the classic APA points, and then turn to due process, if I could, Your Honor, briefly.

Rhetoric aside, I would submit to Your Honor that FinCen, through 311 cases, is wielding extraordinary administrative discretion. They emphasize that up and down in very sensitive areas, and we note there have been twenty-three 311 cases. Your Honor, there's been one judicial challenge that has made its way to any sort of adjudication.

As you know, Judge Boasberg had his case that was before him mooted involving the Bank of the Andora, so there's one case, Your Honor, and when you issued the preliminary injunction opinion, you referred to starting to fill a void that was there. And I would submit, given all the principles behind the Administrative Procedures Act, U.S. agencies -- we can all stipulate -- they work hard. They're out to do the right thing, Your Honor. They are doing difficult jobs. No question about that.

But the Administrative Procedures Act, the procedural requirements of it, the substantive requirements, they sit atop that to ensure that agencies are going to have a discipline. They're going to have an understanding of what comes with judicial review. They're going to have the transparency, the accountability, all those things. And FinCen, I respectfully submit, is an agency that in practice, in operation, has been proceeding without that.

And I do think that our case reflects that. Last time around there was unclassified, unprotected information

that Your Honor had to order turned over. We don't think that the defects have been cured, and I don't think it should be a shock if they haven't been cured.

And on the substantive side of it, Your Honor, on the substantive side of it, the government has accused us of looking at this backwards. We want a certain outcome, and if it's not basically a rescission of the 311 sanction, then we're always going to be pressing our arguments under the Administrative Procedures Act. But, Your Honor, my arguments are irrespective of outcome, and that's how this court looks at its judicial review under the APA.

I submit it's the government that wants to say to you, "Never mind the specific substantive criticisms that are reflected in the record and how the agency reasoned its way through them. Don't worry about those individual ones. If you can just look at the soup and say maybe the agency could have come to the same decision, that's good enough to uphold the rule." And it's simply not, Your Honor, and I stand on the precedence that I was citing earlier, but I'd submit that under Ms. Lee's framework, I'd have to establish that there should be no remand to the agency because it can't possibly, under any set of reasoning, reach the decision it did on this record. That's not -- that's a tougher case for me to make, Your Honor, than the case I'm here to make, which is that Your Honor should vacate the

rule with the explanation that it comes to you with and send this proceeding back to the agency.

There was a discussion of waiver on the consultation point, Your Honor. The notion that we'd waived --

THE COURT: You don't have to.

MR. SHAFFER: I don't have to address that, okay. Thank you.

The other point was the zone of interest. Ms. Lee returned to it briefly, and I just wanted to say this, Your Honor. You made the point it's really not logical to say that we're outside the zone of interest given our stakes in this, and I would simply add to it this, Your Honor: If we can't invoke the consultation requirement as a target of the 311 proceeding, no one ever will, Your Honor. If we're not within the zone of interest, there's no challenger who -- the Secretary of State -- with all due respect, the Secretary of State is not going to come here bringing a challenge. They probably couldn't pursue it if the Secretary wanted to. Same with the Attorney General. Same with the chairman of the Federal Reserve. We're the ones who get to invoke that requirement.

THE COURT: I will give you an opportunity to respond to any declaration that they submit, but just on the fly, can they cure the deficiency simply by providing a

declaration affirming that they consulted and with whom?

MR. SHAFFER: No, Your Honor. It's a show-don't-tell requirement, and the show-don't-tell of the APA has to be in the administrative record.

Again, they have blessings under the APA: the deference that comes with that, the fact that the Court's not second-guessing their judgment. But the responsibility that comes with that is they have to explain themselves and show this Court, through the administrative record, that they've complied with their statutory obligations.

To that I'd add the agency has a very strict construction of the statute, Your Honor. You've heard it from Ms. Lee. If they've done what the statute -- what 311 says that they can do --

THE COURT: I'm not saying that they could consult after the fact, but simply indicate to the Court that they did consult at the proper times.

MR. SHAFFER: And my --

THE COURT: That wouldn't fix the problem?

MR. SHAFFER: No, Your Honor, because the APA cases really are confined to the administrative record. That's why the administrative record is such an important touchstone. That's why we've had our differences in skirmishing over what's in the administrative record. But they can't satisfy their obligation there after the fact any

more than they can offer their substantive explanation that would satisfy Your Honor.

And, again, I think the cases that I've cited to you are consistent with that, Your Honor, and we would add to that the cases that say that agencies can't submit post hoc declarations in order to cure things that are missing in the administrative record.

And, Your Honor, I just want to point to one aspect of the Second Final Rule in the Federal Register that you and Ms. Lee were discussing. Ms. Lee said it was ambiguous, the portion of it that she was reading to Your Honor -- 81 Federal Register 18488 -- and I have to say, Your Honor, I don't see any ambiguity in what she was pointing you to. Let me just read it. "Following the required consultations and the consideration of all relevant factors discussed in the NOF" -- notice of finding -- "FinCen proposed the imposition of a prohibition under the Fifth Special Measure in an NPRM published on July 22, 2014." It's referring to one set of consultations, and they preceded that July 22, 2014, issuance.

So I think it's as clear as can be in there, but, again, I don't want to prejudice whatever they may want to submit after this. I just think that that excerpt supports us rather than them.

The other thing on the consultation point that

Ms. Lee said is they can't provide details because they're deliberative. Obviously, Your Honor, if there were deliberative materials that show consultations, I'm not saying that would suffice if they weren't shared with us during notice and comment, but there's nothing that prevented them from producing them to Your Honor, even if they could say that they were withholding them from us.

Ms. Lee said that there's no issue for the Court as to the classified information in this record. I just wanted to emphasize, Your Honor, the last time around, as I understood Your Honor's disposition of the classified evidence that was altogether withheld from us, you assured yourself that the notice had summarized the specific inclusion in the form of the allegations in the notice. FinCen had disclosed, to the best of its ability, the conclusions it derived from the classified evidence, and I would contrast what you'll see in the remand notice in that regard as to the intervening allegations that became so critical to the Second Final Rule.

Ms. Lee also said that none of these were really surprises to us or should have been surprises, and I just have to tell you in earnest, Your Honor, they were huge surprises to us. They were huge surprises, and that we -- I think with the benefit of hindsight, as I look back, I don't know how we would have guessed where they were going.

And I want to emphasize just a couple, Your Honor.

THE COURT: Okay. We've talked about the late 2014.

MR. SHAFFER: I'm not going back there, Your Honor.

THE COURT: Okay.

MR. SHAFFER: So the allegation -- well, the conclusion by FinCen that all of our documentation as to the AML improvements, I understood from all -- from the rule last time around and from our litigation here, from what FinCen was saying in the remand notice, that they might question whether those AML improvements sufficed, whether they were too little too late. But FinCen said something different in the final rule, which is, they weren't even convinced that we made any AML improvements. They couldn't determine from mere documentation that we had AML improvements in place, and that, Your Honor, does come as a shock because we submitted hundreds of pages of documentation on that point.

We'd asked, "Is there anything else we can do? Will you meet with us?" Nothing. All we get is the conclusion in the Second Final Rule that everything that we did and was available to us through the process we had. That didn't suffice.

Same thing as to their point that they haven't

been assured that we made these improvements in Tanzania. Again, we think that was clear enough from the record that we put in. It said that these were across-the-board AML improvements, and we were complying with Tanzanian law in making them. But I don't know what we could have done, Your Honor, other than had a question from FinCen about could we establish or confirm or clarify what we were doing in Tanzania. We would have done that.

THE COURT: The bank is headquartered in Tanzania. How could it be a surprise that FinCen was considering your AML program in your headquarter's organization?

MR. SHAFFER: Well, Your Honor, all the allegations were about things that were happening in Cyprus. All of them were about that, and we pointed to legitimate activities in Tanzania. FinCen never even took account of those in its rule.

We had specific allegations, all of which were about Cyprus. There was one allegation that we talked about, Your Honor, which was unredacted from the First Final Rule memorandum that referred to the alleged Hezbollah connection in Tanzania. We didn't understand that because it wasn't stated with the substance that came out in the Second Final Rule that this was a new and different Hezbollah connection that had been first alleged in the First Final Rule, and nor did we understand that it was a

Tanzanian entity that was managed by this alleged Hezbollah affiliate.

So you just won't find in the Second Final Rule -- I'm sorry, in the notices preceding the Second Final Rule or anywhere else the specific concrete allegations that then become pivotal to the Second Final Rule.

And I want to turn now, if I could, Your Honor, to the due process threshold questions, and I think that we have to be --

THE COURT: It's your burden, correct?

MR. SHAFFER: It is our burden, Your Honor, to show that due process attaches.

THE COURT: Okay.

MR. SHAFFER: And I would offer --

THE COURT: And sitting here now, if I can't figure out whether you can withdraw these funds or not, how is it that you've satisfied your burden?

MR. SHAFFER: Well, Your Honor, I'm hoping that your premise is simply hypothetical, but I think that we have, through our declarations, shown the concrete reality that we can't move the money. The lawyer can't move the money. The bank can't move the money. We have liens on property, Your Honor, the value of which is -- as sales are made in U.S. dollars, those funds are to be sent to FBME Bank, and nothing's been able to happen on that. So they've

been going --

THE COURT: A lien is a piece of paper, right? Couldn't you --

MR. SHAFFER: Yes.

THE COURT: Can't you transfer the lien?

MR. SHAFFER: I don't know how we would do it, Your Honor, in a way that's monetizable, which is, of course, ultimately what the bank wants to get from its investment, is money back to the bank. And when, even from the escrow account, funds have been attempted to be transmitted, the declaration says that those have not been able to go.

And, Your Honor, this is what happens to banks that are subject to 311 designations. Certainly it's what's happened to FBME. You'll also find in the declarations, last time around and this time around, vendors won't do business with FBME because they read the 311 rule as basically requiring prophylaxis. Nobody wants to touch a bank that's not meant to be touched by any U.S. entity or any U.S. account or anything going through a correspondent account. That's how the money travels.

As to withdrawals, Your Honor, could it just come out in cash? You can't take out more than $10,000 in cash without running afoul of FinCen. That would be illegal. And we acknowledge, under Fifth Amendment jurisprudence,

when it comes to takings, for instance -- and we cite one such case -- there are regulatory takings, Your Honor. There are things that the government answers for short of "I'm taking your house" or "I'm seizing your property." There are things that the government can do to harm or jeopardize established interests, and I don't understand, Your Honor, how this case could fall outside of them.

I would make to Your Honor the more ambitious argument, the argument based on the *GSS Group* case that says, "Look, if you're a foreign entity that's being made to answer to a U.S. agency, you should have due process rights there, just as if you were answering to a U.S. court, and you can make your arguments about personal jurisdiction."

I think that's right. I think that we ought to be affording others around the world --

THE COURT: That's a more aggressive argument.

MR. SHAFFER: It's a more aggressive argument.

So I retreat to the formal argument that says do I have the property here, and I point to more than $290,000 worth that's been cut off, effectively, as a result of the prelude to implementation of the Second Final Rule, and I quote the literal terms of the rule that explain exactly how we're going to be cut off in terms of legal effect. And so I hope, Your Honor, that that's enough to establish the due process interest, because I think otherwise it would be very

difficult to envision how any bank under the Fifth Special Measure rubric could even invoke the claim to due process.

And there was a reference to the *NCRI* case and the fact that there was also the office in the press club, Your Honor. That's what gave them a liberty interest here. The excerpt that I was speaking to was about the property interest, and the property was grounded in the small bank account that existed in that case, and I read, I believe, the relevant reason there.

There was also the point that Ms. Lee didn't agree with my characterization that the other terrorism cases that have been cited didn't involve critical reliance on classified evidence. She quarrels with my characterization. Your Honor, my characterization comes straight out of the D.C. Circuit's decision in *People's* --

THE COURT: And what does "critical" mean? It means essential? It means that but for the classified information the decision would not have been made?

MR. SHAFFER: I believe that the D.C. Circuit was saying that they wouldn't -- that they could have upheld the rule even without resort to the classified evidence or the determination, and there, Your Honor, I would submit it really is, in a terrorism context, an up or down designation. Are you a terrorist entity, or are you not?

Here there is a more nuanced statutory in

corollary with 311. We are not squarely under the terrorism rubric. We've submitted to Your Honor we're well removed from those exigencies and the timing that surrounds those cases, but I would say, Your Honor, as FinCen analyzes its statutory factors, when it relies upon classified evidence for why it's imposing the Fifth Special Measure and why they've determined that there has to be a prohibition rather than a condition, that specific determination is explicitly and exclusively grounded in the classified evidence. And so it's clear -- I think it should be clear that that aspect of the reasoning does rest critically on the classified evidence, and of course that's of critical importance to the rule and to the bank.

Also on due process, Your Honor, before I move on from there -- this is the last point -- Ms. Lee made the point that we can't say that there was bias here at FinCen and within the meaning of the Supreme Court's decision in the *Withrow* case, and, Your Honor, I don't have to show that -- I think we have concerns about bias. Certainly the bias interjected by the CBC. But the problem, the core due process problem that *Withrow* was pointing to is when there's an absence of opportunity for meaningful adversarial contestation in the first round of decision-making, and then you go up, and when you have your adversarial hearing as we do here, you're not getting a fresh look. Someone is coming

at it with deference. It's kind of poisoned by what was determined below.

We do have that problem, Your Honor, because as to the black box, and certainly as to critical aspects of the black box, there was no adversarial contestation because we not only didn't know what was in there, we didn't know that -- any particular use that FinCen was making of it or what conclusion it was deriving from it. So I think we have that problem in a big way.

And then the other cases that we're citing explain, you know, what you can do about that problem in terms of additional procedures, and you don't have to decide -- I emphasize -- whether we get a live hearing and a neutral decision-maker or any of that. It would suffice for you to decide that there's a due process violation here, and leave it to the agency in how to do better next time around.

Last point is on the Ernst & Young and KPMG reports that Ms. Lee says align with the CBC. And, Your Honor, I don't think that those reports align with the CBC by any stretch of the imagination, but they certainly don't in one critical respect. The bottom line that FinCen lands on in saying why it needs to impose a prohibition upon FBME Bank, no monitor, no conditions, no separate framework to make sure this bank is doing right and not posing any concerns, there's really one core explanation for that, and

it's that FBME can't be trusted. It's going to cover up information. It's not going to operate in good faith.

And the basis for that, Your Honor, I believe comes from the CBC. It certainly comes from the black box, and I believe it comes from Cyprus, Your Honor, and you cannot read the Ernst & Young and KPMG reports -- and they're in the record, the exchange about them -- and believe that this was a bank that was not cooperating with them, not transparent with them, not out to implement their recommendations in good faith. They are fundamentally different in this critical respect in their view of the bank, and that's why FinCen relies upon what's coming out of Cyprus and the regulators in Cyprus, and as to that, the one independent --

THE COURT: But, you know, I've read accountants' reports, and they're hedged, and they don't -- you know, there's a disclaimer on the front of every one that says, you know, we're only relying on the information that the clients give us. And you can't make any determination as to whether the principles were cooperative or not, can you?

MR. SHAFFER: Well, Your Honor, you have more experience with accounting reports than I do.

THE COURT: Not necessarily.

MR. SHAFFER: I believe it's true. But I would say this: One thing I know about an accounting report is if

you bring in an outside, disinterested, professional auditor, like, let's say, PricewaterhouseCoopers, okay, and let's say they're commissioned by the Central Bank of Cyprus to perform an audit, you would expect the findings coming out of that are going to be somehow -- you're going to loop that accounting firm back in so you make sure you have the benefit of their insights, their impressions, their contemporaneous observations.

THE COURT: I think you can rely on the findings, but I don't think you can make any conclusions about the reliability of the reporters of the information given to the accountants one way or the other, can you?

MR. SHAFFER: But my submission is it's telling that CBC felt it couldn't go back through PricewaterhouseCoopers before it arrived at its supposed 2015 findings as to what it had found in the summer of 2014 after taking all that time and taking it by itself.

Thank you, Your Honor. I know you've been very patient on a Friday afternoon.

THE COURT: Thank you very much.

Okay. So we will take this under advisement. If you can provide a notice of a declaration -- Ms. Lee.

MS. LEE: Can I just -- Your Honor, can I just make one very small, short point?

THE COURT: Sure.

MS. LEE: It's just about on the due process point. I think plaintiffs' counsel had indicated that they wouldn't be able to withdraw more than $10,000 in cash from the account at a time. My understanding is that's not true. They would have to report such transactions, but I don't think there's anything preventing them from actually withdrawing that amount.

THE COURT: Understood.

If we could get a notice of a declaration within seven days, and I'll give the plaintiffs seven days to respond to it.

MR. SHAFFER: One more thing very quickly, Your Honor. Housekeeping. I'd indicated to Your Honor that I thought the procedure Your Honor was suggesting would suffice in order for the privileged materials to be considered by the Court. All I would ask Your Honor is if we can meet and confer with the government to make sure that we have the proper materials that are before the Court.

THE COURT: Very well. So we will hold off on entering an order on your motion until we've heard back from you based on your meet-and-confer, okay?

MR. SHAFFER: Thank you, Your Honor.

THE COURT: Okay. Thank you very much. Thank you for your patience, ladies and gentlemen. I know those seats are not as comfortable as they could be, but have a good

weekend.

(Whereupon the hearing was concluded at 3:49 p.m.)

**CERTIFICATE OF OFFICIAL COURT REPORTER**

I, LISA A. MOREIRA, RDR, CRR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 6th day of June, 2016.

/s/Lisa A. Moreira, RDR, CRR
Official Court Reporter
United States Courthouse
Room 6718
333 Constitution Avenue, NW
Washington, DC 20001