**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FBME BANK LTD., et al.,** | |
| Plaintiffs, | |
| v. | Case No. 15-cv-01270 (CRC) |
| **JACOB LEW, in his official capacity as Secretary of the Treasury, et al.,** | |
| Defendants. | |

## Table of Contents

I.     **Background** ........................................................................................................ 3

II.    **Applicable Legal Standards** ........................................................................... 6

III.   **Analysis** ............................................................................................................ 8

    A.   FinCEN's Compliance with Statutory Procedural Requirements ........................ 12

        *1.   Whether FinCEN Complied with its Obligations Under the APA* .................. 13

           a.   Informal Versus Formal Rulemaking ............................................................. 13

           b.   Notice-and-Comment Procedures .................................................................... 14

        *2.   Whether FinCEN Adequately Put FBME on Notice of the Basis for the Second Final Rule* .................................................................................................... 16

           a.   FinCEN's Nondisclosure of Suspicious Activity Reports (SARs) ................. 16

           b.   FinCEN's Failure to Produce a Privilege Log of Otherwise Privileged or Protected Information ..................................................................................... 18

           c.   FinCEN's Alleged Nondisclosure of New Accusations and Information ...... 19

        *3.   Whether FinCEN Met Its Obligation to Undertake Required Consultations* .. 27

  a. FinCEN's Contention That FMBE Is Precluded from Raising This Argument

   ......................................................................................................... 30

  b. The Sufficiency of the Administrative Record to Establish that FinCEN

   Undertook the Required Consultations........................................................... 32

B. FinCEN's Compliance with Constitutional Due Process Requirements.............. 34

 1. *Whether FBME is Entitled to Due Process*...................................................... 34

 2. *Whether the Rulemaking Complied with Due Process*.................................... 39

C. FinCEN's Compliance with APA § 706(2)(A)...................................................... 43

 1. *Whether FinCEN Impermissibly Failed to Respond to FBME's Concerns*

  *Regarding the Agency's Analysis of SARs*..................................................... 44

 2. *Whether FinCEN Failed to Respond to FBME's Concerns Regarding FBME's*

  *Cypriot Regulator* ........................................................................................... 49

 3. *Whether FINCEN Considered Other "Discredited" Allegations* ................... 52

 4. *Whether FinCEN Considered the Statutory Factors Listed in Section 311* .... 54

  a. Factors Related to Whether FBME Is of Primary Money-Laundering Concern

   ......................................................................................................... 54

  b. Factors Related to Which Special Measure to Impose ................................... 55

 5. *Whether FinCEN Considered Alternatives to a Prohibition Under the Fifth*

  *Special Measure*.............................................................................................. 57

 6. *Whether the Rulemaking was Tainted by FinCEN's Alleged Review of*

  *Privileged Materials* ....................................................................................... 60

D.      Remedy ............................................................................................................ 62

IV.   **Conclusion** .................................................................................................................. **65**

## MEMORANDUM OPINION

### I.      Background

On July 29, 2015, the U.S. Treasury Department's Financial Crimes Enforcement

Network ("FinCEN") promulgated a Final Rule under Section 311 of the USA PATRIOT Act of

2001, imposing a "special measure" against FBME Bank Ltd. ("FBME" or the "Bank"), a

Tanzanian-chartered commercial bank that operates mainly in Cyprus.  The measure—the fifth

and most serious authorized by the statute—prohibited domestic financial institutions from

opening or maintaining correspondent bank accounts on behalf of FBME.[1]  The Final Rule was

designed to prevent FBME from continuing to do business in the United States or in U.S. dollars.

Congress required that the agency impose this special measure only by regulation, following a

finding that a nondomestic financial institution is of "primary money laundering concern" and

thus a threat to national security and the U.S. financial system.  31 U.S.C. § 5318A(a)(2)(C).

Congress also empowered the agency to consider classified information in formulating a rule

under this section, and to provide that information "to the reviewing court ex parte and in

camera."  Id. § 5318A(f).  In other words, the imposition of this special measure involves a sort

of quasi-adjudicative rulemaking process in which the agency may rely on classified information

unavailable to the target of the rule or the public.

---

[1]  A correspondent account is "an account established to receive deposits from, make
payments on behalf of a foreign financial institution, or handle other financial transactions
related to such institution."  31 U.S.C. § 5318A(e)(1)(B).

Beginning in July 2014, after FinCEN issued a Notice of Finding ("NOF") that FBME was an institution of primary money-laundering concern and a Notice of Proposed Rulemaking to impose the fifth special measure, U.S. banks holding correspondent accounts on behalf of FBME began to terminate their relationships with the Bank, and other banks abroad held FBME's U.S.-dollar correspondent accounts in suspension pending imposition of the Final Rule. If the Final Rule had taken effect as scheduled in August 2015, U.S. banks would have been wholly prohibited from engaging in transactions with or for FBME.  The Bank thus moved for a preliminary injunction to block the Rule, contending that it would prompt remaining banks with which FBME maintained U.S.-dollar correspondent accounts to liquidate those accounts, effectively excommunicating FBME from the global financial system.

The Court granted the Bank's motion and preliminarily enjoined the Rule on August 27, 2015.  See FBME Bank Ltd. v. Lew ("FBME I"), 125 F. Supp. 3d 109, 129 (D.D.C. 2015). FinCEN then moved for a "voluntary remand," which the Court granted, in order to conduct a new rulemaking and correct the deficiencies the Court had identified in its earlier opinion.  See FBME Bank Ltd. v. Lew ("FBME II"), No. 15-cv-1270, 2015 WL 6854416 (D.D.C. Nov. 6, 2015).  On November 27, 2015, FinCEN published a notice to reopen the Final Rule for 60 days to solicit additional comments.  See 80 Fed. Reg. 18481 (Nov. 27, 2015) (to be codified at 31 C.F.R. pt. 1010).  The comment period closed on January 26, 2016.  See id. at 18482.  FinCEN issued the new Final Rule ("Second Final Rule") on March 25, 2016 and published it in the Federal Register on March 31, 2016.  The Second Final Rule again concludes that FBME is of primary money-laundering concern and imposes the fifth special measure of Section 311 of the USA PATRIOT Act.

As the Court detailed in its opinion granting FBME's preliminary-injunction motion,

FBME I, 125 F. Supp. 3d at 115–17, FinCEN's NOF concluded that FBME had facilitated

money laundering and maintained weak anti-money-laundering ("AML") controls for many

years.  The agency specifically found that FBME had maintained accounts for the head of an

international narcotics-trafficking and money-laundering network; an account for a front

company for a U.S.-sanctioned Syrian entity that has been designated as a proliferator of

weapons of mass destruction; and an account that the Department of Justice suspected of

containing some $7 million in proceeds from foreign corruption offenses perpetrated by the

President of Equatorial Guinea.  79 Fed. Reg. 42639–40.  FinCEN also found that FBME had

facilitated transactions involving a Hezbollah financier, a financial advisor to a major

transnational organized-crime figure, a transfer of over $100,000 to an FBME account involved

in a high-yield investment program fraud against a U.S. person, a transfer of over $100,000 to an

FBME account from a Michigan-based company that was the victim of a computer-fraud attack,

and transfers of over $600,000 generated from a wire fraud scheme.  Id.  In addition, FinCEN's

investigation uncovered almost $400 million in FBME wire transfers through the U.S. financial

system that the agency concluded "exhibited indicators of high-risk money laundering

typologies, including widespread shell company activity, short-term 'surge' wire activity,

structuring, and high-risk business customers," and "at least 4,500 suspicious wire transfers

through U.S. correspondent accounts that totaled at least $875 million between November 2006

and March 2013."  Id.  These findings continue to serve as at least part of the basis for the

Second Final Rule.

Following FinCEN's issuance of the Second Final Rule, the parties filed cross-motions

for summary judgment that became ripe on May 23, 2016, and the Court heard argument on

those motions on June 3, 2016.  In order to enable thorough judicial review, the court stayed

implementation of the Rule pursuant to 5 U.S.C. § 705, which "authorizes courts to stay agency

rules pending judicial review without any time limit on the duration of the stay." Mexichem

Specialty Resins, Inc. v. EPA, 787 F.3d 544, 562 (D.C. Cir. 2015) (Kavanaugh, J., dissenting).

For the reasons that follow, the Court declines to vacate the rule, but will remand the matter to

FinCEN so that it may adequately respond to certain comments made by FBME.  The Court will

continue to stay implementation of the rule until FinCEN complies with that directive.

## II.    Applicable Legal Standards

The Administrative Procedure Act ("APA") empowers a reviewing court to hold

unlawful and set aside an agency's actions, findings, or conclusions that are "(A) arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to

constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right; [or] (D) without observance of procedure

required by law."  5 U.S.C. § 706(2).  "An agency must 'examine the relevant data and articulate

a satisfactory explanation for its action including a rational connection between the facts found

and the choice made' to allow [a reviewing court] to evaluate the agency's decision-making

process." Nat'l Shooting Sports Found., Inc. v. Jones, 716 F.3d 200, 214 (D.C. Cir. 2013)

(quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

A court "may not uphold agency action based on speculation . . . or on the post hoc

rationalization of the agency's appellate counsel," and it does not "defer to an agency's

'conclusory or unsupported suppositions.'" Id. (quoting McDonnell Douglas Corp. v. U.S. Dep't

of the Air Force, 375 F.3d 1182, 1187 (D.C. Cir. 2004)).  A court "will, however, uphold a

decision of less than ideal clarity if the agency's path may reasonably be discerned." Id. (citing

State Farm, 463 U.S. at 43).  And review of agency action "in an area at the intersection of national security, foreign policy, and administrative law . . . is extremely deferential."  Islamic Am. Relief Agency v. Gonzales, 477 F.3d 728, 734 (D.C. Cir. 2007).

Judicial review of agency action is generally confined to the administrative record as designated by the agency.  See Hecht ex rel. James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1095 (D.C. Cir. 1996).  "The administrative record includes all materials compiled by the agency that were before [it] at the time the decision was made."  Id.  "[A]bsent clear evidence to the contrary, an agency is entitled to a strong presumption of regularity, [i.e.,] that it properly designated the administrative record."  Pac. Shores Subdivision v. U.S. Army Corps of Eng'rs, 448 F. Supp. 2d 1, 5 (D.D.C. 2006).  As a result, courts "do not allow parties to supplement the record 'unless they can demonstrate unusual circumstances justifying a departure from this general rule.'"  City of Dania Beach v. FAA, 628 F.3d 581, 590 (D.C. Cir. 2010) (quoting Tex. Rural Legal Aid v. Legal Servs. Corp., 940 F.2d 685, 698 (D.C. Cir. 1991)); see also Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior, 667 F. Supp. 2d 111, 115 (D.D.C.2009) ("[T]here are certain limited, and highly exceptional, circumstances when a court may review evidence beyond the administrative record.").  Departures from the general rule should be made "sparingly" and typically "only [in] those cases where extra-record evidence [is] necessary to make judicial review effective."  Cape Hatteras, 667 F. Supp. 2d at 115.

Finally, a court ruling on agency action pursuant to the APA's judicial-review provision is required to "take account" of "the rule of prejudicial error."  5 U.S.C. § 706.  Few rulemakings are perfect, and a court should not set aside an agency's action under the APA based on procedural irregularities that constitute harmless error.  Although the burden to show that an error was not harmless may fall on the agency if it "completely fail[s] to comply" with its notice-

and-comment obligations under 5 U.S.C. § 553, the burden is generally on the challenger to the rule to demonstrate that any given error was not harmless.  McLouth Steel Prods. Corp. v. Thomas, 838 F.2d 1317, 1323–24 (D.C. Cir. 1988).  At a minimum, the challenger bears the burden to demonstrate prejudice "where the agency merely failed to provide proper access to some *supplemental* study or studies"—or other data, information, or evidence—"that partially undergirded its rule." Id.  In particular, when an agency fails to disclose supporting documents or information, a plaintiff must "show that error was prejudicial" by "indicat[ing] with reasonable specificity what portions of the documents [or other supporting material] it objects to and how it might have responded if given the opportunity." Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin., 494 F.3d 188, 202 (D.C. Cir. 2007) (quoting Gerber v. Norton, 294 F.3d 173, 182 (D.C. Cir. 2002)) (internal quotation mark omitted).  Furthermore, a plaintiff "must 'show that on remand [it] can mount a credible challenge . . . and [was] thus prejudiced by the absence of an opportunity to do so before' the agency." Id. (alterations in original) (quoting Gerber, 294 F.3d at 184).

## III.    Analysis

The Administrative Procedure Act has governed federal-agency action in the United States for over seventy years.  The APA on its own does not authorize federal agencies to issue whatever rules they see fit; rather, the statute provides a framework for agencies to issue rules pursuant to some other source of statutory authority.  In recent history, federal agencies have promulgated between roughly 2,500 and 4,500 final rules each year, many of them implicating the APA's notice-and-comment procedures.  See Maeve P. Carey, Cong. Research Serv., R43056, Counting Regulations: An Overview of Rulemaking, Types of Federal Regulations, and Pages in the Federal Register (2015).  Under Section 311 of the USA PATRIOT Act, FinCEN

has authority to impose a variety of special measures against institutions that it finds to be of primary money-laundering concern, and it may impose the fifth special measure—at issue here—only by rulemaking.  To date, FinCEN has acted pursuant to its authority under Section 311 to issue just seven final rules since 2004.  See Section 311 – Special Measures, FinCEN, https://www.fincen.gov/statutes_regs/patriot/section311.html (last visited Aug. 3, 2016).  And as far as the Court is aware, this is the first judicial challenge to a Section 311 rulemaking.

FinCEN's authority under Section 311 is unique in at least two important respects.  First, the statute requires the agency to act through rulemaking when it imposes the fifth special measure.  True, these rules technically bind all U.S. financial institutions and prevent *them* from doing business with the entity in question, but there is no dispute that each of these rules targets *one* particular entity and involves heavy reliance on factual information specific to that entity. Rulemaking is more commonly used to "resolve certain issues of general applicability." Am. Hosp. Ass'n v. NLRB, 499 U.S. 606, 612 (1991).  It is unusual for a rulemaking to focus so acutely on a single suspected bad actor.  Second, and perhaps more important, Section 311 allows the agency to consider—and a court to review *ex parte*—*classified information* as part of the rulemaking.  As far as the Court is aware, no other statute expressly allows an agency to consider and use classified information in promulgating a rule pursuant to the APA's notice-and-comment procedures.  This statutory authorization obviously clashes with the goals of transparency and public participation that underlie the notice-and-comment process.  The authorization also creates some tension with a large body of case law requiring agencies to disclose for public comment at least the most critical factual information underlying a proposed rule.  In cases like these, the most critical information is very likely to be classified.  Taken to the

extreme, requiring the agency to share only the most critical information could license it to share almost nothing publicly, despite nominally proceeding through notice and comment.

To avoid that result here, the Court has sought guidance in first principles.  The purpose of requiring agencies to disclose certain information, evidence, or material during the notice-and-comment period is to allow the public to *meaningfully* comment on the proposed rule.  And the opportunity to offer meaningful comment would be severely limited by an inability to question or criticize the factual basis for the proposed rule.  The Court must thus confront the question of how an agency in FinCEN's position can afford the public a meaningful opportunity to comment on a rule that is based, in potentially crucial respects, on classified information.  Neither the D.C. Circuit nor any other court has had occasion to weigh in on this issue.  As a result, the Court— and the parties, for that matter—have been navigating without a detailed roadmap.

The Court has nonetheless attempted to formulate at least two standards for assessing whether FinCEN has disclosed enough information to put the public on notice of the basis for its proposed rule and allow for a meaningful opportunity to comment.  As previously noted in the Court's preliminary injunction ruling, one step the agency should take under these circumstances is to disclose any unclassified material that it relies on, even if this material is not as important to the agency's decision as the classified material (or material that is otherwise protected from disclosure by statute).  See FBME I, 125 F. Supp. 3d at 123 (explaining that "withholding from FBME and the public the unclassified record on which [the agency] relied and which provided part of the evidentiary basis for its rule" likely violates the APA's notice-and-comment provision).  This requirement tracks what the D.C. Circuit has held to be necessary for meaningful comment when the government employs classified evidence to restrict foreign entities from investing in the United States under the Defense Production Act, Ralls Corp. v.

10

<u>Committee on Foreign Investment in the United States</u>, 758 F.3d 296, 318 (D.C. Cir. 2014), or

designates an entity as a foreign terrorist organization pursuant to the Antiterrorism and Effective

Death Penalty Act ("AEDPA"), <u>People's Mojahedin Org. of Iran v. U.S. Dep't of State ("PMOI

III")</u>, 613 F.3d 220, 230 (D.C. Cir. 2010).

      In addition, FinCEN has distilled, generalized from, or declassified certain classified

information that it then held up publicly as part of the basis for the Second Final Rule.  Any

significant factual information or assertions that the agency publicly invokes as a basis for the

Rule, should be disclosed in time for the public to comment on those purported facts.  That some

of those facts may have been derived from classified information does not change the analysis.

If the agency wants to act—and justify its final rule publicly—on the basis of some key fact

(even if the fact is stated in more general terms than in its classified form), that fact must have

been disclosed in time for commenters to challenge its veracity and weight.

      With these standards in mind, the Court proceeds to assess FBME's challenge to

FinCEN's Second Final Rule.  It will first elaborate on FinCEN's procedural obligations under

the APA before finding that the agency failed to fully comply with two notice obligations in this

case.  The Court concludes, however, that FinCEN's errors were ultimately harmless.  The Court

will then discuss FinCEN's obligation to consult with other agencies as part of the Section 311

rulemaking process, determining that FinCEN did in fact undertake the required consultations.

The Court will next turn to the issue of constitutional due process.  It finds that FBME, as a

foreign bank with few connections to the U.S., has likely not met its burden to demonstrate an

entitlement to due process protections, and that, even assuming due process applies, the Bank

was not entitled to additional procedures beyond those afforded during the rulemaking.  The

Court will proceed to consider FBME's arbitrariness-and-capriciousness challenge to the Second

Final Rule.  Although the Court believes that FinCEN's reasoning in support of the Rule is largely sound, it concludes that FinCEN failed adequately to respond to certain significant comments made by FBME concerning the agency's reliance on data drawn from Suspicious Activity Reports ("SARs") submitted by other financial institutions concerning transactions with the Bank.  Finally, the Court will address the appropriate remedy.  Because FinCEN's errors with regard to its notice obligations were harmless, the Court does not remand the Rule with respect to those.  It will remand, however, for the agency to properly respond to certain comments by FBME.  Because it is quite possible that FinCEN will be able to substantiate its decision, and vacating the rule would cause needless disruption and impose a disproportionate hardship on the agency, the Court will remand without vacating the Rule and simply stay its implementation until proceedings on remand are complete.

A.  <u>FinCEN's Compliance with Statutory Procedural Requirements</u>

FBME contends that FinCEN failed to comply with a number of non-constitutional procedural obligations in formulating the Second Final Rule.  First, the Bank argues that FinCEN's rulemaking was "adjudicatory in nature" and that principles of administrative law thus required FinCEN to provide FBME with more process than would typically be called for in an informal rulemaking.  Second, FBME claims that FinCEN denied it the opportunity to meaningfully comment on its proposed rule by failing to disclose certain unclassified evidence and unveiling new accusations for the first time after the close of the comment period.  The Court will first explain FinCEN's obligations under the APA before discussing whether FinCEN complied with them here.

1.    *Whether FinCEN Complied with its Obligations Under the APA*

a.   Informal Versus Formal Rulemaking

As noted above, Section 311 of the PATRIOT Act provides that the fifth special measure

"may be imposed only by regulation."  31 U.S.C. § 5318A(a)(2)(C).  This language implicates

the informal rulemaking process, rather than the formal rulemaking process, which is triggered

only when "the statute requires that the rulemaking procedure take place 'on the record after

opportunity for an agency hearing.'"  United States v. Fla. E. Coast Ry. Co., 410 U.S. 224, 241

(1973) (quoting 5 U.S.C. § 553(c)).  When the statute does not so provide, "a court cannot

require that the [agency] adopt formal rulemaking proceedings."  Nat'l Ass'n of Broadcasters v.

FCC, 740 F.2d 1190, 1221 (D.C. Cir. 1984).  Whereas formal rulemaking typically implicates

some sort of hearing, informal rulemaking involves the much more common notice-and-

comment procedures specified in 5 U.S.C. § 553.

In FBME's view, this particular proceeding operates as a rulemaking in name only.  It is

actually adjudicatory in nature, FBME claims, "because adjudicative, rather than legislative,

facts are involved and the agency's action focused on a particular individual . . . rather than . . . a

class of individuals."  Pls.' Mem. Supp. Mot. Summ. J. ("Pls.' MSJ") 19 (citing Alaska Airlines,

Inc. v. Civil Aeronautics Bd., 545 F.2d 194, 200 (D.C. Cir. 1976)).  FinCEN, the argument goes,

must therefore provide procedural protections that more closely align with the formal rather than

the informal rulemaking framework.

This argument lacks a basis in statute or case law.  As the D.C. Circuit has explained, the

> Supreme Court's opinion in the landmark Vermont Yankee case precludes [a]
> [c]ourt from imposing procedural requirements on agency rulemakings beyond that
> required by statute. . . .  In its unanimous opinion, the Supreme Court
> unambiguously cautioned this court against imposing its own notions of proper
> procedures upon an administrative agency entrusted with substantive functions by
> Congress.  The Court declared that so long as an agency abided by the minimum

> procedural requirements laid down by statute, this court was not free to impose additional procedural rights if the agency did not choose to grant them.  Except in "extremely rare" circumstances, the Court stated, there is no justification for a reviewing court to overturn agency action because of the failure to employ procedures beyond those required by Congress.

Sierra Club v. Costle, 657 F.2d 298, 391–92 (D.C. Cir. 1981) (quoting Vermont Yankee, 435 U.S. 519 (1978)).  Under Vermont Yankee, then, at least where the Constitution is not implicated, this Court may not impose upon FinCEN requirements beyond those called for by the APA's informal rulemaking procedures and the relevant provisions of Section 311.  FBME is therefore not entitled "to more process than the APA requires," such as a hearing or other procedures that typically accompany formal rulemakings, simply because of the adjudicative aspects of the rulemaking.  Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' MSJ") 19.

### b.  Notice-and-Comment Procedures

Although the parties agree that FinCEN had to provide the public (and FBME) with notice of its proposed rule and an opportunity to comment on it, they disagree sharply on the contours of FinCEN's notice-and-comment obligations.  The Court's earlier discussion on this point, in the context of FinCEN's nondisclosure of certain unclassified materials in the first rulemaking, bears repeating:

> Given FinCEN's [admitted] reliance on . . . non-classified, non-protected documents, its failure to publicly disclose them during the notice-and-comment period appears to constitute a procedural error under the APA.  To fulfill its obligation to provide adequate notice, an agency must "make available to the public, in a form that allows for meaningful comment, the data the agency used to develop [its] proposed rule." Am. Med. Ass'n [v. Reno], 57 F.3d [1129,] 1133 [D.C. Cir. 1995] (quoting Chamber of Commerce v. SEC, 443 F.3d 890, 899 (D.C. Cir. 2006)).  Agencies are required to make these disclosures in order to "allow[] the parties to focus on the information relied on by the agency and to point out where that information is erroneous or where the agency may be drawing improper conclusions from it." Id. (quoting Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC, 737 F.2d 1095, 1121 (D.C.Cir.1984)).

Additionally, the D.C. Circuit has set a floor for disclosure, holding that, "in informal rulemaking, *at least* the most critical factual material that is used to support the agency's position on review must have been made public *in the proceeding* and exposed to refutation." Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys., 745 F.2d 677, 684 (D.C.Cir.1984) (emphases added). *The touchstone remains whether the agency has disclosed enough of the evidentiary basis and supporting documentation for its rule to allow parties to comment meaningfully and contest the basis on which an agency reached the result that it did.* See Am. Med. Ass'n, 57 F.3d at 1129. Especially in light of the fact that FBME was not and could not have been privy to the classified and statutorily protected material on which FinCEN relied, it was entitled at a minimum, it would seem, to view and comment on all of the non-classified, non-protected material on which FinCEN relied.

FBME I, 125 F. Supp. 3d at 121 (emphases added).

Importantly, the Court did not, nor did it purport to, require FinCEN to go beyond the APA's notice-and-comment requirements. The Court's point was simply that FinCEN was not relieved "of its obligation to adhere to the APA's procedural requirements" just because its ultimate decision did not appear to be arbitrary and capricious. Id. at 114. Even though the APA typically does not require agencies to disclose in informal rulemakings all non-classified, non-privileged material on which they rely, the Court found that agencies have an obligation to do so in those highly unusual rulemaking proceedings where the predominant source of information is classified; otherwise, there would be no way for parties to have a meaningful opportunity to comment.

Despite the Court's attempt to elucidate its holding in its earlier opinion, FinCEN claims that the Court has conflated APA and due process requirements. Not so. Given the need to evaluate whether FBME and the public had a meaningful opportunity to comment on FinCEN's proposed rule—as required by the APA—the Court simply sought guidance in due process jurisprudence from a similar context to determine what a meaningful opportunity for comment looks like when an agency bases its action on both classified and unclassified materials. In that

vein, the Court looked to cases like <u>People's Mojahedin Organization of Iran v. U.S. Department of State</u> ("<u>PMOI I</u>"), 182 F.3d 17 (D.C. Cir. 1999) and <u>National Council of Resistance of Iran v. Department of State</u> ("<u>NCOR</u>"), 251 F.3d 192 (D.C. Cir. 2001), which dealt with another kind of targeted designation, and determined that a meaningful opportunity to comment in such situations requires the commenter to be able to view and challenge the unclassified material upon which the agency relies in making its determination.  The Court continues to find that analysis relevant and reaffirms its earlier holding here as to FinCEN's notice obligations.  It now turns to whether FinCEN in fact complied with those obligations.

> 2.   *Whether FinCEN Adequately Put FBME on Notice of the Basis for the Second Final Rule*

> a.   <u>FinCEN's Nondisclosure of Suspicious Activity Reports ("SARs")</u>

In the course of its investigation of FBME, FinCEN reviewed numerous Suspicious Activity Reports ("SARs")[2] filed by other financial institutions concerning transactions involving the Bank.  FinCEN did not disclose the individual SARs to FBME, citing its obligation under the Bank Secrecy Act, Pub. L. No. 91-508, 84 Stat. 1114-2 (1970), to maintain the confidentiality of SARs, except in limited circumstances.  <u>FBME I</u>, 125 F. Supp. 3d at 120.  Instead, the agency summarized the aggregate information it derived from these reports in its NOF, noting that from "April 2013 through April 2014, FBME conducted at least $387 million in wire transfers through the U.S. financial system that exhibited indicators of high-risk money laundering typologies, including widespread shell company activity, short-term 'surge' wire activity, structuring, and

---

[2] As the Court noted in its opinion granting FBME's preliminary-injunction motion, SARs are reports by banks and other financial institutions disclosing transactions that the institution "knows, suspects, or has reason to suspect" involve possible illegal activity.  <u>See</u> <u>FBME I</u>, 125 F. Supp. 3d at 120 n.3 (quoting 31 C.F.R. § 1020.320(a)).

high-risk business customers."  79 Fed. Reg. 42640.  The Notice continued that "FBME was involved in at least 4,500 suspicious wire transfers through U.S. correspondent accounts that totaled at least $875 million between November 2006 and March 2013."  Id.

FBME seeks to challenge FinCEN's use of SARs in formulating the Second Final Rule without fully disclosing them to FBME.  Unsatisfied with FinCEN's summary of information the SARs contained, FBME contends that, "[t]o the extent that FinCEN would hold *each* specific suspicious transaction against FBME, it is only fair that FBME receive notice of *each* specific transaction flagged in *each* SAR so that it can investigate and respond with specifics."  Pls.' MSJ 23–24.  FBME explains that "[a] summary that does not identify particular transactions but instead confines itself to a high level of generality—as FinCEN's does by discussing what all of the SARs, as a whole, purportedly indicate numerically—is insufficient."  Id. at 24 (citation omitted).  The Court addressed this concern in its previous opinion, concluding that FBME could not claim inadequate notice of FinCEN's consideration of SARs, or the material they contained, because the NOF adequately summarized that information.  See FBME I, 125 F. Supp. 3d at 120.  Moreover, FinCEN points not to specific transactions that support its determination that FBME is of primary money-laundering concern, but rather to the aggregate information derived from SARs—such as that "FBME was involved in at least 4,500 suspicious wire transfers through U.S. correspondent accounts that totaled at least $875 million between November 2006 and March 2013."  Id. (quoting NOF, 79 Fed. Reg. 42640).  Thus, FBME had notice of what FinCEN was considering with respect to SARs—aggregate information available not in specific activity reports, but rather summary data that FinCEN disclosed in the NOF.

It is also worth noting that FinCEN's observations about shell corporations, high-risk customers, and "suspicious" wire transfers are significant primarily in the context of the agency's

more general concern regarding deficiencies in the Bank's AML controls, particularly its faulty

customer due diligence procedures.  The agency made FBME aware of this concern, engaged in

a "thorough, point-by-point review of the deficiencies," and came away unpersuaded by FBME's

responses. 81 Fed. Reg. 18483.   FBME therefore had ample opportunity to satisfy, or at least

defuse, FinCEN's concerns about the aggregate SARs data by demonstrating that the Bank

maintained adequate AML controls, yet it failed to do so.  Access to the individual SARs would

not have helped its case in that regard.

> b.  FinCEN's Failure to Produce a Privilege Log of Otherwise
>     Privileged or Protected Information

FBME also complains that FinCEN has withheld from the administrative record other

materials related to its rulemaking, besides the classified evidence and the SARs.  FinCEN must,

according to FBME, "provide a privilege log so that there is a complete record of the documents

and privileges at issue and FBME can challenge specific withholdings."  Pls.' MSJ 25.  As

FinCEN notes, however, the most FBME can muster in support of this proposition is an order

issued on remand in a case involving the Committee on Foreign Investment in the United States

("CFIUS").  See Ralls Corp. v. Comm. on Foreign Inv. in U.S., 1:12-cv-01513 (D.D.C. filed

Sep. 12, 2012).  CFIUS reviews and potentially investigates foreign investments in the U.S. that

implicate national security.  If CFIUS finds that a foreign investment should be prohibited, it

sends a report to the President, who then has the authority to void the investment.

Unsurprisingly, such a report often contains both classified and unclassified information.  See

Ralls Corp v. Comm. on Foreign Inv. in U.S., 758 F.3d 296, 302–03 (D.C. Cir. 2014).  In Ralls

Corp., "the district court *sua sponte* set a schedule for disclosure of . . . unclassified material

from the record and directed the Government to provide Plaintiffs with a privilege log of any

unclassified material withheld on the basis of the Executive privilege."  Defs.' Opp'n Pls.' Mot.

Summ. J. ("Defs.' Opp'n") 30 n.19 (citing Order, <u>Ralls Corp. v. Comm. on Foreign Inv.</u>, No. 12-1513 (D.D.C. Nov. 6, 2014), ECF No. 65).

That unique case notwithstanding, it is far from the norm to require agencies to produce privilege logs when they exclude material from an administrative record.  In fact, the general rule is that when "documents are not part of the administrative record"—having been omitted on privilege grounds—"an agency that withholds these privileged documents is not required to produce a privilege log to describe the documents that have been withheld."  <u>Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Human Servs.</u>, 631 F. Supp. 2d 23, 27 (D.D.C. 2009); <u>see also</u> <u>Stand Up for California! v. U.S. Dep't of Interior</u>, 71 F. Supp. 3d 109, 122 (D.D.C. 2014) ("In this Circuit, requests for privilege logs of documents that may have been withheld from an administrative record on grounds of privilege or deliberative process are routinely denied.").  Even though FBME "claim[s] to seek a privilege log so that [it] can participate in the process of determining what documents are and are not part of the administrative record," the idea "that a plaintiff and the Court should be permitted to participate in an agency's record compilation as a matter of course [through review of a privilege log] contravenes 'the standard presumption that the agency properly designated the Administrative Record.'"  <u>Chain Drug Stores</u>, 631 F. Supp. 2d at 27–28 (quoting <u>Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior</u>, 143 F. Supp. 2d 7, 12 (D.D.C. 2001)).  The Court will therefore not compel FinCEN to produce a privilege log here.

c.  <u>FinCEN's Alleged Nondisclosure of New Accusations and Information</u>

FBME further complains that FinCEN never disclosed to FBME a host of new, unclassified accusations and information until it issued its Second Final Rule in March 2016. These purported "allegations" included the following: that (i) FBME employees obscured or

concealed information from regulators in late 2014; (ii) FBME identified the wrong customer

connected to a sanctioned Syrian entity; (iii) FBME failed to demonstrate AML improvements in

its Tanzanian headquarters; (iv) FBME failed to substantiate its purported AML compliance

improvements; (v) an alleged Hezbollah associate held accounts at FBME as of early 2015; and

(vi) FBME completed review of only three percent of its high-risk files as of June 2014.  The

Court will discuss each issue in turn.

i.     Obscuring of Information by FBME Employees

The Second Final Rule states that "in late 2014," after FinCEN made its initial finding

that FBME was of primary money-laundering concern, "FBME employees took various

measures to obscure information."  81 Fed. Reg. at 18482, 18486, 18489; see also id. at 18482

(finding that "this behavior may have been part of an effort to reduce scrutiny over FBME's

operations following the issuance of the NOF and increased regulatory scrutiny").   As FinCEN

acknowledges, "this precise statement did not previously appear in the July 2015 Final Rule,"

Defs.' Opp'n 32, or in the Notice of Proposed Rulemaking.  Yet the allegation partly underlies

FinCEN's conclusion in the Second Final Rule that it simply cannot trust FBME to comply with

certain conditions or to provide it with accurate information.  See 81 Fed. Reg. at 18490

("Given this past behavior, FinCEN cannot reasonably rely on a proposed resolution that

depends on FBME's candid provision of complete, credible, and accurate information.").  And

FinCEN cited FBME's alleged untrustworthiness and deceptiveness as its justification for why

the most extreme version of the fifth special measure, in particular, was appropriate.  It is

somewhat problematic, then, that FBME never had the opportunity to comment on this

purported fact, especially considering that FBME was not and could not be privy to any classified or privileged material in the record that may support it.

FinCEN counters that FBME was at least on notice of FinCEN's general concerns about FBME's apparent propensity for evading AML oversight, citing to FinCEN's prior statement in the July 2014 NOF that "FBME took active steps to evade oversight by the Cypriot regulatory authorities."  79 Fed. Reg. 42639–40 (July 22, 2014).   True as this may be, it is nonetheless concerning that FinCEN did not disclose to FBME or the public this additional piece of evidence until the comment period had closed and Second Final Rule had been issued.  If FBME employees in fact tried to conceal information from regulators following FinCEN's 2014 NOF, it would imply that FBME attempted to stymie FinCEN in this very rulemaking and would be unwilling to work in good faith with U.S. regulators in the future.

The only reason FinCEN offers for why this information was not disclosed during the comment period is that it "was cleared [for public disclosure] relatively late or recently . . . prior to the rule."  Hr'g Tr. at 70:16-17.  The Court appreciates that FinCEN sought to have declassified what general information it could and that the declassification process takes time. But if FinCEN was able to make this information available only when issuing the Rule, as part of the public justification for its action, the agency should have extended or reopened the comment period, and if necessary, moved the Court to enlarge the time allotted to issue the Second Final Rule.  FinCEN took none of those steps here.

The bottom line is this:  At the preliminary-injunction stage, the Court found that "FinCEN's authority to impose conditions [as part of the fifth special measure] was an obvious potential alternative to a full prohibition on opening or maintaining correspondent accounts on behalf of FBME."  FBME I, 125 F. Supp. 3d at 125.  FinCEN, in its new Rule, proposed to take

the same action as before, basing its decision to impose the more-severe version of the fifth special measure on its distrust of FBME's willingness to candidly provide complete, credible, and accurate information.  FinCEN justified its distrust of FBME in part on the alleged fact that FBME employees acted to conceal information even after FinCEN issued its NOF—a piece of information that was ultimately deemed unclassified, although the supporting information was not.  FBME and the public were never made aware of this unclassified allegation against FBME and had no meaningful opportunity to contest it during the comment period.  Thus, this piece of the factual foundation of FinCEN's Second Final Rule escaped public scrutiny during the rulemaking process.

Nevertheless, when an agency fails to disclose supporting documents or information, a plaintiff must "show that [the] error was prejudicial" by "indicat[ing] with reasonable specificity . . . how it might have responded if given the opportunity."  Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin., 494 F.3d 188, 202 (D.C. Cir. 2007) (quoting Gerber, 294 F.3d at 182).  Furthermore, a plaintiff "must 'show that on remand [it] can mount a credible challenge . . . and [was] thus prejudiced by the absence of an opportunity to do so before' the agency."  Id. (quoting Gerber, 294 F.3d at 184) (alterations in original).  FBME has done neither here.  The closest FBME has come to indicating how it would have responded to this evidence is to explain that it would have conducted an internal investigation in an attempt to decipher what incident or incidents FinCEN may have been referencing and then try to rebut FinCEN's interpretation.  It has not, as far as the Court is aware, undertaken any such investigation or suggested what its response might be.  The Court also finds it exceedingly unlikely that FBME could mount a credible challenge on this point.  Having reviewed the entire record, including the classified and unclassified portions, the Court is persuaded that FinCEN has strong enough

support for its factual assertion in this regard that any comment from FBME would not make a difference. Finally, FinCEN had a more-than-sufficient basis, apart from this new allegation of fact, to conclude that it could not "reasonably rely on a proposed resolution that depends on FBME's candid provision of complete, credible, and accurate information." 81 Fed. Reg. 18490. Specifically, FinCEN discusses "FBME['s] previous[] disregard[] [for] the instructions of its AML regulator" and its pattern of "engag[ing] in opaque and suspicious money transfers" as reasons why it could not trust FBME. Id. at 18489–90. The fact that FBME employees may have acted to obscure information from regulators in late 2014 is simply "extra icing on a cake already frosted." Yates v. United States, 135 S. Ct. 1074, 1093 (2015) (Kagan, J., dissenting). The Court thus concludes that FinCEN's error in this regard was harmless.

ii.   FBME's Failure to Identify a Customer

FinCEN claimed in its NOF that an unidentified FBME customer was connected to the Scientific Studies and Research Center ("SSRC"), a U.S.-sanctioned organization. See 79 Fed. Reg. 42640. FBME investigated this allegation, provided FinCEN information about the customer it believed FinCEN was referencing, and, during the comment period, asked FinCEN whether the Bank had correctly identified the individual in question. FinCEN responded that it was "unable to release additional information in response to this question beyond the statements within the Notice of Finding." A.R. 2656. Yet when FinCEN issued the Second Final Rule, it evidently *was* able to release additional information—i.e., that FBME had not correctly identified that individual. See 81 Fed. Reg. at 18486 ("[T]he sanctioned entity referenced in FinCEN's Notice of Finding was not the individual identified by FBME."). FBME's frustration here is understandable, given that it could not investigate further because FinCEN refused to confirm or deny FBME's identification until *after* the comment period had closed. But this

simple statement in the Second Final Rule—that FBME did not correctly identify a particular customer—hardly counts as an accusation or as a new part of the evidentiary basis for the Rule to which FBME must be permitted to respond.  Rather than a new, substantive fact on which FinCEN based its decision, it merely constitutes FinCEN's response to a question posed to it by FBME: whether FBME had correctly identified the problematic individual referenced in the NOF.  Because FinCEN was under no legal obligation to engage in an active dialogue with FBME on this point, its failure to answer FBME's inquiry at an earlier stage of the process was not erroneous.

### iii.   FBME's Lack of AML Improvements in Tanzania

FBME also claims to have been blindsided by FinCEN's assertion in the Second Final Rule that FBME did "not demonstrate[] any AML improvements with respect to its headquarters in Tanzania."  81 Fed. Reg. 18490.  As FinCEN points out, however, it would be unreasonable to think that the public and FBME were not on notice that the AML controls at the Bank's *headquarters* would be relevant to FinCEN's determination of which special measure to impose.  FBME knew that FinCEN had criticized its AML controls as weak, see, e.g., NOF, 79 Fed. Reg. 42640, meaning that FBME cannot claim unfair surprise when FinCEN faults it in the Second Final Rule for this very problem.  To the extent that FBME's weak AML controls served as a basis for FinCEN's action, FBME had notice and could meaningfully comment on that issue.

### iv.   FBME's Failure to Substantiate Compliance Improvements

In the Second Final Rule, FinCEN stated—apparently for the first time—that FBME had not provided "meaningful information or documentation" to support its claimed AML improvements.  81 Fed. Reg. at 18483.  But all FinCEN appears to be saying here is that FBME did not sufficiently support its own claim that it promptly and consistently adopted auditors'

suggestions to establish an AML compliance program exceeding applicable legal requirements. This simply represents FinCEN's assessment that FBME's comments and submissions were inadequate; it hardly qualifies as a new accusation, piece of information, or part of the evidentiary basis underlying the Second Final Rule.

v.   FBME's Maintenance of an Alleged Hezbollah Associate's Account

FBME complains that five times in the Second Final Rule, FinCEN states that "[a]s of early 2015, an alleged Hezbollah associate and the Tanzanian company he managed owned accounts at FBME." 81 Fed. Reg. at 18482; see also id. at 18483–84, 18488–89. Yet when FinCEN notified FBME of this factual allegation, before the comment period closed, its disclosure looked like this: "Finally [redacted] as of [redacted] 2015 [redacted] alleged Hezbollah [redacted] and the Tanzanian company [redacted] owned accounts at FBME." Pls.' MSJ 31 (citing A.R. 4490). According to FBME, this statement

> did not make clear that it was referencing an alleged Hezbollah connection *different* from the one referenced in FinCEN's initial notice. Nor did it specify that the alleged Hezbollah associate managed or owned the Tanzanian company with accounts at FBME, which was new information that could have guided a renewed, targeted forensic audit. Most importantly, FinCEN said nothing whatsoever about this allegation in its 2015 Notice, nor suggested it would matter to its remand deliberations—much less be central to them, as the Second Final Rule now indicates it was. As for FinCEN's prior notices, the 2014 Notice of Finding contained what we now know to be a different allegation that an FBME customer received hundreds of thousands of dollars from a financier for Hezbollah, which allegation FinCEN then reiterated in its First Final Rule.

Id. (emphasis added). FBME's argument, then, is that FinCEN did an insufficient job of putting it (and the public) on notice that FBME allegedly maintained accounts for *multiple* Hezbollah associates and it therefore could not meaningfully comment on this finding as a factual basis supporting FinCEN's Rule.

25

The Court shares FBME's confusion as to why FinCEN could make this fact public in its entirety when it issued the Second Final Rule, but could release only a heavily-redacted form during the notice-and-comment period. FinCEN's tendency to make available in its Second Final Rule declassified information that it disclosed only in limited form in its NOF or Notice of Proposed Rulemaking is hardly a best practice, because it carries with it the taint of unfair surprise. Moreover, FinCEN benefits from its ability to publicly justify its Rule on the basis of the unredacted information, while hampering (albeit perhaps inadvertently) public comment through the advance disclosure of heavily-redacted information. While the redacted version of this material may well have provided FBME with sufficient notice that FinCEN was basing its action, in part, on FBME's potential association with multiple Hezbollah financiers, this particular allegation appears somewhat important in its own regard: As FBME observes, it appears five times in the Second Final Rule.

As with the assertion that FinCEN employees acted to obscure information in late 2014, however, FBME has again failed to demonstrate prejudicial error. It has not explained how it would rebut this particular allegation of fact or what comment it would make to the agency about it. Moreover, this new fact—while certainly serious in isolation—must be considered in the context of the body of material on which the agency relied and that was properly disclosed. Although the agency should have allowed for comment on the unredacted material if it wished to hold up that material as justification for its Second Final Rule, this information adds little in the context of the other evidence against FBME. In other words, FinCEN has adequately justified its concern over FBME's ties to Hezbollah (and to illicit international actors in general), even in the absence of this fact. A persuasive criticism of this particular assertion by FBME would almost

certainly not have changed the agency's ultimate determination.  As a result, the Court finds any error in this regard to have been harmless.

vi.    <u>FBME's Inadequate Review of High-Risk Files</u>

Finally, FBME takes issue with FinCEN's remark in the Second Final Rule that the agency "remain[ed] troubled by the fact that as of June 2014, FBME had completed its review of only three percent of its high-risk customer files."  81 Fed. Reg. 18483.  FBME acknowledges, though, that this statistic comes from a September 2015 letter sent to FBME from its Cypriot regulator of which FBME was obviously aware.  FBME cannot claim, then, to have lacked notice of this piece of potential evidence against it.  FinCEN has committed no error here.

*3.    Whether FinCEN Met Its Obligation to Undertake Required Consultations*

FinCEN must clear an additional procedural hurdle before it may impose any special measure contemplated by Section 311:  It must consult with several specified executive-branch agencies.  First, before making a finding that an institution is of primary money-laundering concern, FinCEN is directed to "consult with the Secretary of State and the Attorney General." 31 U.S.C. § 5318A(c)(1).  Then, if FinCEN finds an institution to be of primary money-laundering concern, it is required "[i]n selecting which special measure or measures to take" to

> consult with the Chairman of the Board of Governors of the Federal Reserve System, any other appropriate Federal banking agency (as defined in section 3 of the Federal Deposit Insurance Act)[,] the Secretary of State, the Securities and Exchange Commission, the Commodity Futures Trading Commission, the National Credit Union Administration Board, and in the sole discretion of the Secretary, such other agencies and interested parties as the Secretary may find to be appropriate.

27

Id. § 5318A(a)(4)(A).  Finally, if FinCEN elects to impose the fifth special measure, it must

again consult with "the Secretary of State, the Attorney General, and the Chairman of the Board

of Governors of the Federal Reserve System."[3]  Id. § 5318A(b)(5).

FBME contends that the administrative record lacks sufficient support for the Court to

conclude that FinCEN undertook the required consultations.  The Bank relies primarily on

Campanale & Sons, Inc. v. Evans, 311 F.3d 109 (1st Cir. 2002), where the First Circuit found

"insufficient evidence in the record to show that the Secretary [of Commerce] complied with

Congress' explicit procedural requirement to consult with the appropriate [regional fishery-

management] councils before implementing regulations governing fishing in" a particular

offshore zone.  Id. at 121.  Campandale & Sons indeed lends support for the idea that when a

statute requires an agency to engage in consultation in concert with its rulemaking, it must

provide independent evidence in the record that it engaged in those consultations.  FinCEN, by

contrast, argues that a lone statement that an agency undertook the "required consultations"

should suffice.  81 Fed. Reg. 18488.  The Court finds the agency's obligation to lie somewhere

in between.

When a statute specifically requires an agency to consult with an outside entity during the

course of a rulemaking, the administrative record should contain some evidence that such a

_____

[3] FBME essentially argues that these provisions must be read literally—that FinCEN
must consult with the specific individuals serving as the Secretary of State, Attorney General,
and Chairman of the Board of Governors.  The Court declines to adopt such a rigid reading.
FBME's interpretation would preclude FinCEN from consulting with designated representatives
of those federal officials, despite the general rule that "[w]hen a statute delegates authority to a
federal officer or agency, subdelegation to a subordinate federal officer or agency is
presumptively permissible absent affirmative evidence of a contrary congressional intent."  U.S.
Telecom Ass'n v. FCC, 359 F.3d 554, 565 (D.C. Cir. 2004).  There is no indication of contrary
congressional intent here.

consultation took place.  But the evidence needed will vary depending on the context, especially the extent to which the consultations implicate the agency's deliberative-process privilege.  The required consultations in Campanale & Sons evidently did not involve predecisional interagency deliberations.  See 311 F.3d at 116–17 (describing the relevant consultation requirement as obligating the agency to consult with "appropriate Councils," id. at 116 (emphasis omitted), such as the New England Fishery Management Council and the Mid-Atlantic Fishery Management Council, id. at 117).  One would thus expect evidence of consultations to be included in the administrative record in that circumstance.  There is little doubt, however, that the interagency deliberative-process privilege would protect the results of the consultations that FinCEN must undertake pursuant to Section 311, disclosure of which "would undermine the confidentiality of that process, potentially implicating sensitive agency perspectives on matters of diplomacy, law enforcement, national security, and finance."  Defs.' Suppl. Reply Mem. On Consultations 10.  Any such records would qualify as predecisional, deliberative materials that do not belong in an administrative record.[4]  See Elec. Frontier Found. v. U.S. Dep't of Justice, 739 F.3d 1, 7 (D.C. Cir. 2014); San Luis Obispo Mothers for Peace v. NRC, 789 F.2d 26, 45 (D.C. Cir. 1986).  A court therefore should not expect to see work product from those interagency consultations in the record.

At the same time, a court reviewing a Section 311 rulemaking should be able to conclude from the record before it that FinCEN met its obligations to consult the right agencies at the right

_____

[4]  And, as FinCEN observes, "[b]ecause the consultations are not properly part of the record, Plaintiffs cannot object to their inability to comment on them."  Defs.' Opp'n 40.

stage of the rulemaking process.  A plain statement to the effect that FinCEN has engaged in the "required consultations" will not do.  A more detailed explanation is required.

        a.  <u>FinCEN's Contention That FMBE Is Precluded from Raising This Argument</u>

Before the Court reaches the merits of FBME's argument that FinCEN failed to demonstrate compliance with the consultation requirements, it must first address two arguments that FinCEN advances for why FBME should not be allowed to argue the issue at all.  First, FinCEN notes that FBME never raised the issue before the agency during the administrative process.  Defs.' Opp'n 38 (citing <u>Nuclear Energy Inst., Inc. v. EPA</u>, 373 F.3d 1251, 1297 (D.C. Cir. 2004) ("[I]ssues not raised before an agency are waived and will not be considered by a court on review.")).  This argument makes little sense.  The problem FBME identifies is with the materials and documentation that the agency included in the record submitted to the Court, which is obviously not something FBME could have commented on earlier.  Moreover, FBME would have had no way of knowing during the administrative process that FinCEN potentially failed to undertake the required consultations; indeed, FinCEN could have undertaken those consultations the day before promulgating its rule and after the comment period had closed.  The Court thus rejects FinCEN's first argument.

Second, FinCEN contends that any interest FBME has falls outside the zone of interests protected or regulated by the interagency-consultation provisions in Section 311.  FinCEN points to <u>Lujan v. National Wildlife Federation</u>, in which the Supreme Court explained that

    to be "adversely affected or aggrieved . . . within the meaning" of a statute, the plaintiff must establish that the injury he complains of (*his* aggrievement, or the

adverse effect *upon him*) falls within the "zone of interests" sought to be protected by the statutory provision whose violation forms the legal basis for his complaint.

497 U.S. 871, 883 (1990).  The Court illustrated the point with a hypothetical:

> the failure of an agency to comply with a statutory provision requiring "on the record" hearings would assuredly have an adverse effect upon the company that has the contract to record and transcribe the agency's proceedings; but since the provision was obviously enacted to protect the interests of the parties to the proceedings and not those of the reporters, that company would not be "adversely affected within the meaning" of the statute.

Id.  In FinCEN's view, the consultation provisions self-evidently are not intended to protect the interests of FBME or other banks against whom special measures are imposed.  This position finds support in a congressional conference-committee report discussing a prior version of the consultation requirements.  The report explains: "Among other things, this consultation is designed to ensure that the [Treasury] Secretary possesses information on the effect that any particular special measure may have on the domestic and international banking system" and to allow the Secretary to "better understand the impact of any particular special measure on those entities" that would have to take steps to comply with whatever special measure is imposed.  See H.R. Rep. No. 106-728, at 22 (2000) (Conf. Rep.).

The purpose of Section 311's consultation requirements in isolation is not the determinative point, however.  "To demonstrate prudential standing, [a plaintiff] 'must show that the interest it seeks to protect is *arguably* within the zone of interests to be protected or regulated by *the statute . . . in question*' or by any provision 'integral[ly] relat[ed]' to it."  Grocery Mfrs. Ass'n v. EPA, 693 F.3d 169, 179 (D.C. Cir. 2012) (emphases added) (quoting Nat'l Petrochem. Refiners Ass'n v. EPA, 287 F.3d 1130, 1147 (D.C. Cir. 2002) (per curiam)); see also Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 400 n.16 (1987) ("The principal cases in which the 'zone of interest' test has been applied are those involving claims under the APA, and the test is most

usefully understood as a gloss on the meaning of [the APA's judicial-review provision.]"). FinCEN's line-by-line approach is therefore too narrow. Indeed, FinCEN does not dispute that FBME can challenge the Second Final Rule by alleging violations of a number of other requirements imposed by Section 311 that might render the rule unlawfully promulgated. Nor does it contest that FBME's interest is arguably within the zone of interests to be protected by Section 311 as a whole or by its integral rulemaking provision. Because FBME may bring suit to invalidate the rule as promulgated in violation of Section 311, it may raise the issue of FinCEN's alleged failure to comply with the interagency-consultation requirement.

b.   The Sufficiency of the Administrative Record to Establish that FinCEN Undertook the Required Consultations

In the Second Final Rule, the Court would have expected FinCEN to have indicated which agencies it consulted and at what stage of the rulemaking process it did so. Even taking the agency at its word, how else could the Court determine whether FinCEN spoke to the appropriate agencies at the appropriate time?

As FBME points out, the Second Final Rule left the impression that FinCEN consulted only before promulgating the First Final Rule and that it engaged in no new consultations following remand, see 81 FR 18488 ("*Following the required consultations* and the consideration of all relevant factors discussed in the Notice of Finding, FinCEN proposed the imposition of a prohibition under the fifth special measure in an *NPRM published on July 22, 2014*." (emphases added)). This timing would be at odds with FinCEN's previous representation to the Court that its "decision would be a new evaluation of the totality of the evidence before it," which could "possibly change the outcome of the [earlier] rulemaking." FBME II, 2015 WL 6854416, at *2 (citing Defs.' Mot. Remand 5). After all, FinCEN could not have legitimately

undertaken a new evaluation of the totality of the evidence and decided anew which special

measure to impose without engaging in a new round of consultations.

That is not the situation with which we are faced, however.  Although FinCEN neglected

to include this information in the preamble to its Second Final Rule, it has now submitted an

affidavit from the agency's Acting Deputy Associate Director, Richard May, explaining

FinCEN's understanding of Section 311's consultation requirements and describing FinCEN's

actions with respect to them.  Mr. May attests that

> FinCEN consulted with representatives of the Chairman of the Board of Governors
> of the Federal Reserve System, the Secretary of State, the Attorney General, the
> Securities and Exchange Commission, the Office of the Comptroller of the
> Currency, the Commodity Futures Trading Commission, the Federal Deposit
> Insurance Company, and the National Credit Union Administration Board, to
> include sharing drafts and information for the purpose of obtaining inter-agency
> views and recommendations on the selection of special measures (if any) to be
> imposed on FBME, the imposition of a prohibition of correspondent accounts or
> payable through accounts by any domestic financial institution or domestic
> financial agency for or on behalf of FBME, and the finding that FBME is of primary
> money laundering concern. These consultations occurred before issuing the July
> 2014 Notice of Finding and Notice of Proposed Rulemaking, before issuing the
> July 2015 Final Rule, and again before issuing the March 2016 Final Rule.

Second Decl. Richard May ¶ 4.  This affidavit provides information about whom FinCEN

consulted (representatives of agencies listed in Section 311), when FinCEN consulted (at all

stages of the rulemaking process, including following remand), and how and for what purpose

FinCEN consulted (by sharing drafts and information to obtain the views and recommendations

of the relevant agencies).  Beyond that, any views and recommendations shared with FinCEN by

these agencies would be protected by the interagency deliberative-process privilege.  What

FinCEN has provided in its affidavit is therefore all the record need show in order to demonstrate to a reviewing court that FinCEN has met its consultation obligations.[5]

B.   FinCEN's Compliance with Constitutional Due Process Requirements

The Court turns next to FBME's argument that FinCEN denied the Bank due process in promulgating the Second Final Rule.  It first considers whether FBME, as a foreign entity, enjoys a right to constitutional due process at all, and concludes that it likely does not.  Even assuming the Bank has due process rights, however, the Court further finds that it is not entitled to any additional procedural protections other than those it was provided during the rulemaking process as delineated by Section 301. [6]

1.    Whether FBME is Entitled to Due Process

As noted, FBME is chartered in Tanzania, operates mainly in Cyprus, and has no branches or other physical presence in the United States.  Under Supreme Court precedent, "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."  United States v. Verdugo-Urquidez, 494 U.S. 259, 271 (1990).  "A foreign entity without property or presence in this

_____

[5] Because the Court finds that the information provided in the May affidavit is sufficient to meet FinCEN's obligation to document the required interagency consultations, it will deny FBME's motion to depose or cross-examine Mr. May, or in the alternative, to strike the affidavit.

[6] The parties also spar over a third question: whether the interest implicated by the Second Final Rule—FBME's ability to maintain correspondent accounts at U.S. banks—is a property right protected by the Due Process Clause.  FBME maintains the rule will divest it of identifiable "U.S. Dollars."  See Pl.'s Opp'n 11–12.  The Government, by contrast, casts FBME's interest as merely a lost business opportunity.  See Def.'s Opp'n 19–20.  Because neither party has briefed this issue comprehensively and because the Court has determined that the rulemaking complied with due process in either event, the Court need not resolve this issue.

country has no constitutional rights[,]"  People's Mojahedin Organization of Iran v. U.S. Dept. of State ("PMOI"), 182 F.3d 17, 23 (D.C. Cir. 1999), at least as far as deprivation of property is concerned.  The government argues that FBME was not entitled to due process in the rulemaking because it lacks the property and presence necessary to establish "substantial connections" to the United States.  See Defs.' MSJ 45-48.

FBME responds, first, that under the Chenery doctrine, FinCEN effectively waived this argument at the rulemaking stage by "not question[ing] FBME's entitlement and instead respond[ing] on the merits" of the Bank's complaint that it was denied due process.  Pls.' MSJ 16; see also Michigan v. EPA, 135 S. Ct. 2699, 2710 (2015) ("[A] court may uphold agency action only the grounds that the agency invoked when it took the action.") (citing SEC v. Chenery Corp., 318 U.S. 80, 87 (1943)).  Yet all the Second File Rule says on this score is that "the process that FinCEN has undertaken is consistent with the Constitution and the . . . APA." 81 Fed. Reg. at 18485.  That statement merely expresses the agency's view that FBME received all the process it was due, viewed either under the APA or the Due Process Clause; it does not concede that FBME is in fact entitled to due process based on its connections to the United States.  FinCEN therefore did not waive its right to challenge the Bank's claim to due process here.

FBME also contends that the D.C. Circuit has relaxed the rule in PMOI requiring foreign corporations seeking to invoke due process protections to have substantial connections to the United States.  It points to GSS Group Ltd. v. National Port Authority, where the D.C. Circuit made the rather broad observation that "the Supreme Court has reaffirmed as recently as last year that foreign corporations are entitled to due process protection, despite the fact they have no meaningful connection to the United States."  680 F.3d 805, 817 (D.C. Cir. 2012) (citing

Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 923 (2011)).  The cases the Circuit referenced in GSS Group, however, dealt with the rule that "United States courts may not exercise personal jurisdiction over a foreign corporation unless the corporation has 'minimum contacts' with the relevant forum."  Goodyear, 564 U.S. at 923.  They do not stand for the proposition that the federal government must afford a foreign entity due process protections whenever it takes an action that has the effect of depriving the foreign entity of property, regardless of its connection to the United States.  As FinCEN points out, FBME's interpretation would lead to absurd results, "extend[ing] due process requirements to any Executive action that may cause financial injury . . . to a wholly foreign person, regardless of where they are located or any connections with the United States."  Defs.' Opp'n 19.  Clearly, that is not what the Circuit had in mind.[7]

Finally, while FBME concedes that it has no physical locations in the U.S., it contends that it does in fact have sufficient property here to satisfy the Verdugo-Urquidez "substantial connections" requirement.   The Bank has submitted a competent affidavit establishing that in 2010, it loaned $5.5 million to a North Carolina property-management firm.  Decl. of M. Elizabeth  Peters ¶ 25.  The loan is secured by liens on lots in a residential community that is currently under development near Hickory, North Carolina.  FMBE currently holds liens on

---

[7] A number of courts and commentators have noted the apparent tension between allowing foreign defendants with no U.S. connection to assert due process in order to contest personal jurisdiction, and requiring foreign entities to show substantial U.S. connections before invoking the Due Process Clause to challenge deprivations of property.  See J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 73, 883-84 (2011); Kyle Voils, Making Sense of Sovereignty: A Historical Understanding of Personal Jurisdiction from Pennoyer to Nicastro, 110 N.w. U. L. Rev. 679, 682 (2016); Austin L. Parrish, Sovereignty, Not Due Process: Personal Jurisdiction Over Nonresident Alien Defendants, 41 Wake Forest L. Rev. 1, 28-33 (2006).  The Court need not attempt to reconcile that tension here.

about 50 remaining lots.  As each encumbered lot is sold, FBME releases the associated lien and

becomes entitled to a percentage of the sale price in partial satisfaction of the loan.  Prior to the

June 2014 publication of the notice of the initial Final Rule, these payments were made directly

to FBME in Cyprus.  Due to the impending sanctions caused by the rule, however, the sales

proceeds are now being deposited and held in escrow in a trust account of FBME's North

Carolina local counsel.  The escrow account contained approximately $290,000 when FBME

filed its summary judgment motion in April 2016.  Id.

The caselaw is surprisingly sparse on what quantum of U.S. contacts are sufficient to

establish general purpose due process under Verdugo-Urquidez.  FBME relies primarily on

National Council of Resistance of Iran v. Department of State, where the D.C. Circuit extended

due protections in a terrorist-designation proceeding to a foreign entity with *both* a physical

office and a small bank account in the U.S.  251 F.3d 192 (D.C. Cir. 2001).  The parties have

cited no case, and the Court is aware of none, where all-purpose due process has been extended

to a foreign entity with only a U.S. bank account and no physical presence.  In the Court's view,

moreover, finding due process protections under these circumstances would be inconsistent with

Verdugo-Urquidez's requirement that the foreign entity "come within the territory" of the United

States, which suggests at least some degree of physical presence.  See 494 U.S. at 1058.  As a

result, the Court concludes that FBME has likely not met its burden to establish an entitlement to

due process as a general matter.

That being said, FBME might still be able to stake a claim to due process protections *in*

*this particular proceeding* if it could show that the Second Final Rule will deprive it of property

or funds held in the United States.  FBME's U.S. property includes the North Carolina property

liens and bank account discussed above.  See Decl. of M. Elizabeth Peters ¶ 24-37.  In a recent

civil-forfeiture case in this district, Judge Moss observed that the government was unable to cite "[any] case holding that a foreign national with funds on deposit in a U.S. bank is not entitled to due process before the government may seize those funds." United States v. Sum of $70,990,605, 128 F. Supp. 3d 350, 363 (D.D.C. 2015). He thus held that "[b]ecause the property at issue . . . was money located in U.S. bank accounts," the foreign bank with an interest in those accounts "is entitled to due process protections in [an] action" to seize that property. Id. Application of this principle—which strikes the Court as a sound one—would guarantee FBME due process protections in this particular rulemaking if the Second Final Rule deprived it of the North Carolina property liens or the escrowed proceeds of the lot sales.

As for the property liens, there is nothing to suggest that they will be affected at all by the rule. The disposition of the escrowed funds is less clear. FMBE asserts that "FinCEN's actions have effectively cut FBME off from these funds[.]" SJM at 18. FinCEN, however, insists otherwise:

> After the Final Rule becomes effective, FBME will continue to have access to its funds [in the escrow account], and the Final Rule will not prevent FBME from withdrawing those funds. FBME will also continue to be able to transfer its funds using any means other than a correspondent account or could use those funds to pay for goods and services in the United States.

Defs.' Opp'n 20. FBME concedes that it bears the burden of demonstrating its entitlement to due process, see Hr'g Tr. At 101:10-12. Yet other than bare assertions, it has made no showing to overcome FinCEN's representation that the Second Final Rule will leave undisturbed the funds held in the North Carolina escrow account. That is hardly surprising. After all, FinCEN is not seeking to seize or freeze FBME's U.S. bank accounts. The Bank will continue to be able to spend, access, and transfer those funds provided it does not use a U.S. bank correspondence account to do so. So while there may well be certain limitations on what types of transfers the

Bank's local counsel may make without using a correspondence account—and FBME has failed to explain precisely what those may be—the rule does not appear to extinguish FBME's ownership or ability to obtain the funds.  As a result, the Rule's effect on FBME's North Carolina interests does not entitle the Bank to due process protection in this proceeding.

2.   <em>Whether the Rulemaking Complied with Due Process</em>

Regardless of whether FBME's connections to the United States are sufficient to establish a general right to due process, the Court agrees with FinCEN that the procedures it afforded the Bank (with the exceptions noted in this opinion) complied with both the APA and constitutional due process.  Claims of denials of due process are evaluated under the familiar framework set out in <u>Matthews v. Eldridge</u>, 424 U.S. 319, 335 (1976).  <u>Matthews</u> requires the Court to balance three factors: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burden that the additional or substitute procedural requirement would entail."  Id.

FBME's "private interest" in maintaining correspondent accounts (whether or not the ability to do so is a constitutionally-protected property interest) is undeniably substantial:  the inability to conduct U.S. dollar transactions would present a potentially existential threat to any international bank.  But so too is the United States' interest in preventing international criminal and terrorist organizations from using unscrupulous (or merely inattentive) banks to launder funds though the international financial system.  As the Court has noted, "[e]liminating [terrorist and transnational criminal] financing, and extricating it from the U.S. financial system, are of paramount importance to the Government and the public."  <u>FMBE I</u>,  125 F. Supp. 3d at 128.

39

Give the weighty interests on both sides of the scale, application of the <u>Matthews</u> test in this case boils down to its second factor: the risk of an erroneous deprivation through the procedures used and the probable value of additional procedures.  In making this assessment, the Court is mindful that "due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances."  <u>Gilbert v. Homar</u>, 520 U.S. 924, 930 (1997).  Rather, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands."  <u>Id.</u>  The touchstone, always, is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  <u>Mathews</u>, 424 U.S. at 333 (quoting <u>Armstrong v. Manzo</u>, 380 U.S. 545, 552 (1965)).

In ruling on FBME's preliminary injunction motion, the Court determined that FinCEN had violated the APAs' notice requirements by failing to disclose all of the unclassified and non-statutorily-protected materials on which it relied in promulgating the initial rule.  That failure violated any due process rights the Bank may have as well.  <u>See</u> <u>Ralls Corp</u>, 758 F.3d at 296; <u>PMOI III</u>, 613 F.3d at 230; <u>NCOR</u>, 251 F.3d at 209.  Yet FinCEN corrected that deficiency on remand by providing FBME with the relevant materials and giving it an opportunity to respond to them.  Otherwise, the procedural protections afforded by FinCEN in the rulemaking satisfied due process.  FinCEN's published notices specified the findings against the Bank and summarized the supporting evidence, including, to the extent possible, the classified evidence that the agency relied upon.  FinCEN also summarized the conclusions it drew from the Suspicious Activity Reports that other banks had filed concerning FBME.  In addition, FinCEN engaged the Bank in an extensive dialogue, including face-to-face meetings, and considered its

voluminous written submissions during both comment periods.[8]  Finally, as required by Section

311, the classified information withheld from FBME was provided to the Court for *ex parte*

review.

These procedures are at least as fulsome as those the D.C. Circuit has determined are

necessary to satisfy due process in analogous national security proceedings involving State

Department designations of foreign terrorist organizations under AEDPA.   Specifically, in

PMOI, the Circuit required the State Department to provide potential designees with (1) advance

notice of the impending designation, (2) the unclassified information upon which the proposed

designation is based; (3) an opportunity to present, at least in written form, evidence to rebut the

administrative record or otherwise contest the proposition that it is a terrorist organization; and

(4) assurance that the Secretary of State had evaluated the material and sources she relied upon in

her decision to designate an entity as a foreign terrorist organization.  613 F.3d at 227, 228, 231.

There is no dispute that FBME was afforded all of these things.

FBME nevertheless contends that it was entitled to more process than what is required in

FTO designation proceedings, given the "stark[ ] and categorical[ ]" differences between

imposing the fifth special measure under Section 311 and designating an entity as a foreign

terrorist organization.  See Pls.' Opp'n Defs.' Mot. Summ. J. ("Pls.' Opp'n") 13.  The threat that

such a bank poses to the United States, FBME argues, is far less "grave and imminent" than that

posed by a foreign terrorist organization.  Id. at 14.  The Court disagrees as a categorical matter.

Curtailing a foreign bank's use of the U.S. financial system to facilitate transactions for multiple

terrorist and criminal organizations could be just as important–if not more so in some situations–

_____

[8] FinCEN even accepted comments filed by the Bank after the first comment period
ended.  See Defs.' MSJ 3.

as freezing the assets of a single terrorist organization. FinCEN's decision to impose the most severe special measure only highlights the seriousness of the government's interest here.

Nor has FBME shown that the particular circumstances of this proceeding demanded additional due process measures. The Bank contends, for example, that it was entitled to an oral hearing before imposition of the fifth special measure. To be sure, there may be situations in which written submissions are an "inadequate substitute for oral presentation[,]" such as when the subject of a proceeding "lack[s] the 'educational attainment necessary to write effectively' and [cannot] afford professional assistance." Mathews, 424 U.S. at 345 (quoting Goldberg v. Kelly, 397 U.S. 254, 269 (1970)). But this is not one of them. Quite the contrary: FBME has been able to fully and effectively present its objections on numerous occasions through highly-qualified counsel.

FMBE also contends that, given the quasi-adjudicative nature of the rulemaking, due process entitled it to a "neutral" decisionmaker independent of the FinCEN staff who developed the agencies' findings. Yet the Supreme Court has instructed that, absent "special facts and circumstances[,]" "the combination of investigative and adjudicative functions [in one agency] does not, on its own, constitute a due process violation[.]" Withrow v. Larkin, 421 U.S. 35, 58 (1975). For the reasons noted above, no such extraordinary circumstances are present here that would warrant departing from the customary notice-and-comment procedures that Congress required FinCEN to follow in imposing the fifth special measure.

Finally, FBME asserts that FinCEN's summary of the SARs is inadequate on due process grounds. FBME argues that "an accused should not be subjected to punishment on the basis of secret evidence." Pls.' MSJ 24 (quoting States Marine Lines Inc. v. Fed. Maritime Comm'n, 376 F.2d 230, 239 (D.C. Cir. 1967)). As discussed previously, however, FinCEN has not based its

designation of FBME as being of primary money-laundering concern, or its imposition of the

fifth special measure, on particular instances of activity reported in particular, withheld SARs.

Rather, it has based those decisions on the aggregate data drawn from the SARs, which was

made public in the NOF.  In other words, in order to be able to defend itself, FBME did not need

"sufficient detail to identify and address specific transactions flagged by the SARs," id. at 25,

because FinCEN did not rely on any specific transaction.  FBME needed only to be able to

challenge the aggregate information derived from the SARs—that a large volume of transactions

"exhibited indicators of high-risk money laundering typologies," such as "widespread shell

company activity, short-term 'surge' wire activity, structuring, and high-risk business

customers."  NOF, 79 Fed. Reg. 42640.  As the Court will discuss in the next section, FinCEN

did not adequately respond to FBME's comments regarding the concessions it drew from the

aggregate SARs data.  But because the NOF pointed clearly to this information and FinCEN's

use of it, FBME was adequately on notice.[9]

C.   FinCEN's Compliance with APA § 706(2)(A)

FBME next challenges the Second Final Rule as arbitrary and capricious in violation of

the APA.  See 5 U.S.C. § 706(2)(A).  The Bank rests the challenge on the following grounds: (1)

---

[9]  The above discussion also makes clear why neither FinCEN's, nor this Court's, reliance on information derived from SARs has violated the "firmly held . . . rule" set out by the D.C. Circuit in Abourezk v. Reagan, 785 F.2d 1043, 1061 (D.C. Cir. 1986), "that a court may not dispose of the merits of a case on the basis of ex parte, in camera submissions."  FinCEN did not rely on individual SARs—but rather on aggregate data drawn from them—to formulate the Second Final Rule, and the agency made these data public and available to FBME in the NOF. For the same reason, it is unnecessary for the Court weigh in on FinCEN's argument that the Bank Secrecy Act's authorization of SARs collection, see 31 U.S.C. §§ 5311, 5318(g), is sufficient to bring the ex parte review of those materials within the specified-by-statute exception to Abourezk's main rule.  See Defs.' Opp'n Pls.' Mot. Summ. J. ("Defs.' Opp'n") 27 (citing Abourezk, 785 F.2d at 1061).

that the agency failed to respond to various significant comments challenging its analysis of aggregate SARs data; (2) that it failed to adequately address FBME's concerns regarding bias on the part of the Central Bank of Cyprus ("CBC"), one of FinCEN's information sources; (3) that the agency relied on a host of "discredited" allegations; (4) that it failed properly to apply the factors set forth in Section 311 for determining which special measure to impose; (5) that it imposed an excessive penalty without adequately considering lesser alternatives; and (6) that it impermissibly based its Rule on privileged materials submitted during the comment period.

The Court concludes that FinCEN did fail to respond meaningfully to FBME's comments regarding the agency's treatment of aggregate SARs data, and further, that those comments were significant enough to require a response. The Court otherwise rejects FBME's arbitrariness-and-capriciousness challenge.

*1. Whether FinCEN Impermissibly Failed to Respond to FBME's Concerns Regarding the Agency's Analysis of SARs*

As discussed above, the Court sees little merit in FBME's contention that it was entitled to notice of individual SARs, since the aggregate information FinCEN materially relied upon was made available for review. FBME makes a stronger point, however, in arguing that FinCEN failed to respond adequately to FBME's comments regarding the agency's *analysis* of aggregate SARs data, and the adverse *conclusions* it drew as a result of that analysis. Pls.' MSJ 41–43. Those comments challenged FinCEN's interpretation of SARs data on at least four distinct grounds.

First, FBME contended that SARs are so overinclusive—"sweeping in [so many] transactions that are perfectly legitimate"—that "categorically" viewing SARs as indicative of illicit transactions is "invalid and improper." A.R. 3341. Second, the Bank argued that, while the *absolute* dollar amounts or numbers of transactions tagged as "suspicious" might appear high

on the surface, they represented a small *proportion* of FBME's overall transactions. For example, while the NOF highlighted "at least 4,500 suspicious wire transfers through U.S. correspondent accounts that totaled at least $875 million between November 2006 and March 2013," 79 Fed. Reg. 42640, that figure represented, according to FBME, "only 0.55% of the total amount of transfers and 0.81% of the [U.S. dollar] amount of transfers conducted by FBME during this period." A.R. 3342. Third, FBME criticized the agency for "fail[ing] to consider alternative bases for the increase in SARs involving FBME . . . between April 2013 and April 2014," particularly the "Cypriot financial crisis and attendant controls." A.R. 3341–42.[10] Finally, the Bank faulted FinCEN for failing to provide either a "point of comparison between FBME and other . . . banks that [the agency] considers similarly situated but less deserving of suspicion given their SAR statistics," or "any baseline for the SARs statistics it considers standard or acceptable for an international bank like FBME." A.R. 3342.

The Second Final Rule does not directly address any of these points. Indeed, this is the full extent of FinCEN's response to the above concerns:

> FinCEN disagrees [with FBME's various criticisms of SARs] and notes that SARs, which are filed by financial institutions regarding transactions revealing a possible violation of law, are an invaluable source of information and an important tool for financial investigations. In this case, FinCEN believes that the SARs related to FBME are relevant to the finding that FBME is of primary money laundering concern when viewed in the context of all the other information considered. Multiple SARs indicate that FBME facilitated transactions on behalf of shell companies which, as stated earlier, can be an indicator of money laundering and other suspicious activities.

---

[10] FBME further explained that "reports provide every indication that Cypriot banks have been associated with especially high SARs rates," which may be "a function of the tight capital controls that were imposed to address the Cypriot financial crisis in 2013—capital controls that limited withdrawal rates for depositors and resulted in routine, legitimate withdrawal patterns (with depositors withdrawing daily the maximum amount permitted to them by Cypriot controls) that might . . . be mistaken abroad as reflecting 'structuring' otherwise associated with money laundering." A.R. 3342–43.

81 Fed. Reg. 18486.

The first two sentences are hollow generalities.  The third sentence, considered generously in the context of the Second Final Rule and the administrative record more broadly, may be read as being responsive to FBME's overinclusiveness concern, i.e., that SARs "sweep[] in [too many] transactions that are perfectly legitimate."  A.R. 3341.  The Court understands FinCEN to be saying, in essence, that it has examined not only aggregate SARs data, but the particular characteristics of the SARs generated and the entities involved in those transactions.  That is, perhaps the examination of the *content* of SARs transactions, in addition to simply their overall *number*, yielded more specific insights regarding the unusually suspicious nature of FBME-facilitated transactions.  Later in the Rule, for instance, FinCEN notes that a "large number of FBME customers . . . are either shell companies or . . . conduct transactions with shell companies," and that many of FBME's customers are located in "high-risk money laundering jurisdictions" and "use the bank's physical address in lieu of their own," another high-risk indicator.  81 Fed. Reg. 18487.  See also A.R. 58–61 (Evidentiary Memo in Support of Second Final Rule) (estimating that roughly 27 percent of FBME's customers are high-risk, including "shell companies located in off-shore financial centers" and "politically exposed persons" ("PEPs")).

All of this requires the Court to engage in extensive reading in between the lines,[11] however, and in any event, none of it is responsive to FBME's remaining comments regarding

---

[11] FinCEN's briefing offers the Court little aid in this respect.  The agency broadly asserts that "collecting and analyzing" the information provided by SARs "is an essential component of the agency's core mission of combating money laundering and protecting the U.S. financial system from illicit use," and that "[w]hile the Court owes considerable deference to FinCEN's

flaws in the agency's SARs analysis.  For instance, FinCEN provides no comparative

benchmarks referencing other banks to support its assertions that FBME has a "large number" of

shell company customers or that the Bank has facilitated a "high volume" of U.S. dollar

transactions by such shell companies.  81 Fed. Reg. 18487.  Nor does the agency attempt to

explain why such benchmarks may be unnecessary, or infeasible to provide, or how else the

agency may have applied its expertise and regulatory experience in the absence of specific

benchmarks.  FinCEN also appears to have ignored FBME's suggestion that the Cypriot

financial crisis and related regulations alternatively explained the rise in suspicious transactions

facilitated by the Bank beginning in 2013.

It being clear that FinCEN did not meaningfully respond to FBME's comments regarding

the agency's analysis of SARs data, the Court must evaluate whether those comments were

sufficiently "significant" to warrant a response.  City of Portland, Oregon v. E.P.A., 507 F.3d

706, 714–15 (D.C. Cir. 2007); Reytblatt v. Nuclear Regulatory Comm'n, 105 F.3d 715, 722

(D.C. Cir. 1997) (An agency "need not address every comment, but it must respond in a reasoned

manner to those that raise significant problems.").  Significant comments "raise points relevant

to the agency's decision and . . . if adopted, would require a change in an agency's proposed

rule.'"  City of Portland, 507 F.3d at 715 (quoting Home Box Office, Inc. v. FCC, 567 F.2d 9, 35

n.58 (D.C.Cir.1977)).  Framed differently, failing to respond to a comment rises to the level of

arbitrariness if "it demonstrates that the agency's decision was not based on a consideration of

the relevant factors."  Thompson v. Clark, 741 F.2d 401, 409 (D.C. Cir. 1984).

_____

expertise, it owes none to FBME."  Defs.' Opp'n 4–5.  These are essentially assertions that, due
to FinCEN's expertise, the Court should trust that the agency properly interpreted SARs data.

Here, FinCEN's analysis of SARs data appears central to its assessment of "the *extent* to which" FBME had been "used to facilitate or promote money laundering," one of three statutory factors the agency must consider before deeming a foreign financial institution one of "primary money-laundering concern."  31 U.S.C. §§ 5318A(a)(1), 5318A(c)(2)(B).  The agency's broad conclusion in response to that factor—that "FBME [had] facilitated a substantial volume of money laundering through the Bank for many years"—rested in large part on specific examples of illicit transactions facilitated by FBME, but it was equally dependent upon aggregate metrics, derived from SARs, suggesting systemic patterns of illegitimate activity.  See 79 Fed. Reg. 42639–40.  In support of the finding that "[t]he volume of suspicious wire activity" facilitated through FBME "remain[ed] significant," FinCEN noted that "[i]n just the year from April 2013 through April 2014, FBME conducted at least $387 million in wire transfers through the U.S. financial system that exhibited indicators of high-risk money laundering typologies, including widespread shell company activity, short-term 'surge' wire activity, structuring, and high-risk business customers."  Id. at 42640.  Similarly, as mentioned above, FinCEN identified "4,500 suspicious wire transfers [involving FBME customers with shell company attributes] through U.S. correspondent accounts that totaled at least $875 million between November 2006 and March 2013."  Id.  These summary statistics formed important cornerstones in FinCEN's analysis.

It is clear, though, that if FBME's critiques regarding the analysis of SARs data were considered, deemed valid, and incorporated into FinCEN's analysis, those cornerstones might well be weakened.  For example, if the spike in "structuring" transactions were indeed attributable to the Cypriot financial crisis and subsequent regulations, that fact would make the $387 million in wire transfers "exhibit[ing] indicators of high-risk money laundering typologies"

much less probative of money-laundering activity.[12]  Similarly, if it turned out that the proportion

of FBME-facilitated transactions generating SARs was actually far lower than that of similarly

situated banks, this would undermine FinCEN's conclusion that the "volume" of money

laundering transactions facilitated by the Bank was "significant" or "substantial," making it of

"primary" money-laundering concern.  And all of FBME's comments regarding FinCEN's SARs

analysis may have affected FinCEN's overall assessment of "the *extent* to which" the Bank had

been "used to facilitate or promote money laundering."  31 U.S.C. § 5318A(c)(2)(B) (emphasis

added).

    For these reasons, the Court concludes that FBME's comments regarding FinCEN's

analysis of SARs data were "significant," since resolving them in the Bank's favor would likely

have "require[d] a change in [FinCEN's] proposed rule."  City of Portland, 507 F.3d at 715.  In

failing to respond to these material comments, FinCEN's decision was therefore arbitrary and

capricious, being "not based on a consideration of the relevant factors."  Thompson, 741 F.2d at

409.

>    2.    *Whether FinCEN Failed to Respond to FBME's Concerns Regarding*
>          *FBME's Cypriot Regulator*

    FBME also challenges FinCEN's reliance on supposedly unreliable information from

FBME's Cypriot regulator, the CBC.  The Bank complains that the regulator has demonstrated

---

[12] The failure to respond to FBME's concern regarding the effect of the Cypriot financial
crisis is even more troubling because there was little in the Rule to support FBME's claim
regarding high levels of structuring.  Although information available elsewhere in the Rule, and
the record, provides corroboration for claims regarding FBME's "widespread shell company
activity" and "high-risk customer" base—two of the four key "money laundering typologies"
FinCEN gleaned from available SARs data—FinCEN provided little to no support for its
conclusion that "short-term 'surge' wire activity" or "structuring" were present at suspiciously
high levels.  79 Fed. Reg. 42640.

"decades of hostility and prejudice against [the Bank], render[ing] any information obtained from the CBC altogether unusable—or, at the very least, highly suspect," and that FinCEN erred by failing to adequately address this concern in the Second Final Rule.  Pls.' MSJ 43.  FBME specifically contends that the CBC

> (1) repeatedly frustrate[ed] FBME's efforts to incorporate in Cyprus or outright refus[ed] to allow FBME to do so; (2) prohibit[ed] FBME from participating in local investment opportunities and blocking the Bank's efforts to challenge an illegal monopoly involving a CBC-regulated financial-services company; and (3) impos[ed] arbitrary and unreasonable regulatory requirements and fines on FBME but not other banks.

A.R. 3304.  The Bank further avers that the CBC's special administrator has been quoted as "confessing his goal of seizing FBME assets for Cyprus to claim as his own," that PricewaterhouseCoopers later disavowed an audit report that the CBC relied on and attributed to it, and that the CBC has pecuniary interests in the issuance of the Second Final Rule.  See Pls.' MSJ 45.

As an initial matter, FinCEN should be given substantial deference in assessing what weight to give information provided to it by its sister financial regulators.  In any event, the Second Final Rule responds to FBME's criticisms of the CBC by explaining that in "review[ing] a significant amount of information, including information related to fines that the CBC imposed on FBME and CBC examinations of FBME's Cypriot branch," FinCEN "ma[de] an independent assessment of [the information's] credibility and relevance."  81 Fed. Reg. 18485.  The agency explains further in its briefing that the CBC's audit was useful in "*corroborat[ing]*" both FinCEN's own findings and those of auditing firms commissioned by FBME itself."  Defs.' Opp'n 5 (emphasis added).  The Court has no difficulty accepting these assertions, particularly given the numerous corroborative sources identified in the Rule itself for much of the relevant information CBC provided.  For example, after summarizing the critical

AML deficiencies revealed by three separate FBME audits conducted by Ernst & Young and

KPMG between 2011 and 2014, the Rule notes that many of the very same deficiencies—

surrounding "customer identification, due diligence, and automated monitoring"—were revealed

by the CBC as the basis for its enforcement measures.  Id. at 18483–84.  That is, the CBC data

here reinforced, rather than founded, FinCEN's conclusion regarding FBME's continuing AML

deficiencies.  In other instances, it is clear that any relevant dispute lies not with the information

revealed to FinCEN by the CBC, but rather with FinCEN's own, independent assessment of that

information's import.  See, e.g., 81 Fed. Reg. 1848 (indicating general agreement, including by

FBME, that the Bank accepted false identifying information from customers, but a dispute

between the Bank and FinCEN—"agree[ing] with the CBC"—regarding whether that deficiency

"impede[d] the application of enhanced due diligence measures").

Finally, in addition to noting its independent corroboration of the information the agency

received from the CBC, FinCEN summarizes various "positive reviews" the CBC has received.

81 Fed. Reg. 18485.  Those reviews cite the regulator's adequate monitoring of the Cypriot

financial system for money-laundering and terrorist-financing issues from the Committee of

Experts on the Evaluation of Anti-Money Laundering and the Financing of Terrorism

(MONEYVAL), an intergovernmental organization established to set standards and promote

effective implementation of measures for combating money laundering and terrorist financing.

See id. (citing MONEYVAL, Report of the Fourth Assessment Visit—Executive Summary:

Anti-Money Laundering and the Combating of the Financing of Terrorism: CYPRUS (Sept. 27, 2011), https://www.coe.int/t/dghl/monitoring/moneyval/Countries/Cyprus_en.asp).

Taken together, FinCEN's independent corroboration of the information it received from the CBC and its overall evaluation of the CBC's institutional credibility adequately respond to FBME's concerns.

### 3. *Whether FINCEN Considered Other "Discredited" Allegations*

FBME next contends that FinCEN arbitrarily and capriciously "continues to rely on discredited allegations without acknowledging on-point refutation," simply treating such refutation "as irrelevant to the ever-shifting, indistinct blob FinCEN offers as its case."  Pls.' MSJ 47.  FBME points to the Second Final Rule's assertion that the Bank has advertised its willingness to facilitate evasions of AML regulations; FinCEN's consideration of third-party gambling websites; its consideration of FBME's alleged facilitation of embezzlement and bribery related to an Italian political party; and its failure to credit FBME with Ernst & Young's and KPMG's positive compliance determinations.  See id. at 47–49 (citing 81 Fed. Reg. 18482). FinCEN responds that this evidence speaks for itself and that a challenge to the agency's interpretation "is not an appropriate basis to set aside" the decision.  Defs.' Opp'n 7.

FinCEN responds to some, but not all, of these challenges.  With respect to the Ernst & Young and KPMG audits, the Second Final Rule opines that those audits actually "show a pattern of recurring AML deficiencies at the bank" and that "FBME has not provided meaningful information to support" its assertions that it "continued to make improvements."  81 Fed. Reg. 18483.  The Rule then details those deficiencies—"failures to maintain adequate customer identification files and other customer due diligence weaknesses, failure to ensure that third parties the bank relied on to establish new customer relationships employed appropriate AML

controls . . . , and issues with sanctions-related screening." Id.  FinCEN explains that FBME's objections on this ground do not reflect the full picture illustrated by the audits.

With respect to FinCEN's consideration of online articles, the Second Final Rule states that "FinCEN relies on a variety of information sources to support its rulemaking, including . . . press articles that may be found on the Internet;" that "FinCEN assesses the credibility and weight to be given to Internet sources on a case-by-case basis;" and that it has made corrections when it has become aware of inaccuracies in those articles.  81 Fed. Reg. 18487.  The corrections it cites appear earlier in the Rule.  One is that the CBC fined FBME in 2010 rather than 2008 as previously stated; the other is that the source of an article referring to another CBC fine was a different article that relied on an anonymous CBC source.  See id. at 18484.

Given the significant evidence in support of the Rule contained the full record, and in comparison with the information derived from SARs, FBME's concerns about advertisements and internet articles that FinCEN did not explicitly address are sufficiently insignificant that FinCEN was not required to address them in more detail.  Where an "agency's response to public comments . . . 'enable[s] [a court] to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did,'" Pub. Citizen, 988 F.2d at 197 (omission in original) (quoting Automotive Parts, 407 F.2d at 335), the agency "ha[s] no obligation to respond" to comments that "would not require a change in an agency's proposed rule," City of Portland, 507 F.3d at 714 (quoting Home Box Office, 567 F.2d at 35 n.58) (internal quotation mark omitted). Even accepting FBME's critique of these materials, there is no indication that these advertisements or articles played a meaningful role in the rulemaking such that FBME's critique, if true, would have changed the outcome of the Second Final Rule.

    *4.    Whether FinCEN Considered the Statutory Factors Listed in Section 311*

        a.  Factors Related to Whether FBME Is of Primary Money-
             Laundering Concern

FBME also challenges the Second Final Rule as arbitrary and capricious on the ground

that FinCEN failed to properly consider certain factors that Section 311 requires the agency to

take into account before imposing the fifth special measure.  There are two such sets of factors.

First, before "making a finding that reasonable grounds exist for concluding" that a foreign

financial institution is of primary money-laundering concern, 31 U.S.C. § 5318A(a)(1), the

Secretary must consider any information that he or she deems relevant, in addition to the

following factors:

> (i)      the extent to which such financial institutions . . . are used to facilitate or
> promote money laundering . . . , including any money laundering activity
> by organized criminal groups, international terrorists, or entities involved in
> the proliferation of weapons of mass destruction or missiles;

> (ii)     the extent to which such institutions . . . are used for legitimate business
> . . . ; and

> (iii)    the extent to which such action is sufficient to ensure . . . that the purposes
> of this subchapter continue to be fulfilled, and to guard against international
> money laundering and other financial crimes.

Id. § 5318A(c)(2)(B).

FBME contends that FinCEN failed to adequately consider the second of these factors—

"the extent to which" FBME is "used for legitimate business purposes" in its jurisdiction.  See

Pls.' MSJ 50 (citing 31 U.S.C. § 5318A(c)(2)(B)(ii)).  The record belies this contention.  In an

evidentiary memo written in support of the Second Final Rule and included in the administrative

record, FinCEN engaged in a substantial evaluation of this factor, finding that "FBME banks at a

minimum 1,200 high-risk customers, or roughly 12 percent of its clientele" and likely as many as

2,700 such customers, or 27 percent overall; that "FBME has a low volume of customers who are

citizens of Tanzania or Cyprus," making it "more difficult to track the identities and the business

purposes of" many of the Bank's customers; and that FBME has a "high volume of shell

company customers and transactions with shell companies," as well as "a significant volume of

high-risk customers known as politically exposed persons ("PEPs")."  A.R. 59–60.  Those

findings parallel FinCEN's (significantly briefer) treatment of the issue in its NOF, where the

agency explains that while "[l]egitimate activity at FBME's Cyprus branch is difficult to assess

because of the limited amount of information that is available regarding Cypriot branches of

foreign banks," it is nevertheless apparent that "FBME functions largely as an offshore bank

catering to a significant number of shell entities that are nominally located in Cyprus and other

high-risk jurisdictions."  79 Fed. Reg. 42640.  In sum, as at the preliminary injunction stage, the

Court remains "satisfied that the agency's reasoning" regarding the extent to which FBME

engages in legitimate business "is grounded in the record, taken as a whole."  FBME I, 125 F.

Supp. 3d at 125.

### b.  Factors Related to Which Special Measure to Impose

Once the Secretary determines that a particular foreign financial institution is of primary

money-laundering concern, he or she may take any of five "special measures" imposing

obligations on U.S. financial institutions.  Id. § 5318A(b).  The first four special measures

require domestic banks to engage in different types of recordkeeping and reporting activity

regarding the subject foreign bank.  See id. § 5318A(b)(1)-(4).  As noted previously, the most

severe measure—known colloquially as the "fifth special measure"—prohibits domestic banks

from maintaining correspondent accounts with the target foreign bank.  See id. § 5318A(b)(5).

In selecting which special measure to take, the Secretary must consider a second set of factors:

> (i)    whether similar action has been or is being taken by other nations or
>        multilateral groups;

(ii)    whether the imposition of any particular special measure would create a significant competitive disadvantage, including any undue cost or burden associated with compliance, for financial institutions organized or licensed in the United States;

(iii)    the extent to which the action or the timing of the action would have a significant adverse systemic impact on the international payment, clearance, and settlement system, or on legitimate business activities involving the particular jurisdiction, institution, class of transactions, or type of account; and

(iv)    the effect of the action on United States national security and foreign policy.

31 U.S.C. § 5318A(a)(4)(B).

FBME contends that FinCEN failed to consider the third of these factors—"'the extent to which' imposition of the fifth special measure 'would have a significant adverse systemic impact . . . on legitimate business activities involving [FBME].'"  Pls.' MSJ 50 (alteration and omission in original) (quoting 31 U.S.C. § 5318A(a)(4)(B)(iii)).  Yet the Second Final Rule does consider this factor.  See 81 Fed. Reg. 18488.  It reasons that "FBME is not a major participant in the international payment system and is not relied upon by the international banking community for clearance or settlement services," and thus the fifth special measure "will not have an adverse impact" on those systems.  Id.  It then acknowledges that "this action could affect FBME's legitimate business activities in the jurisdictions in which it operates," but ultimately concludes that "the need to protect U.S. financial institutions from the money laundering and terrorist financing risks presented by FBME outweighs any of those potential effects."  Id.  In addition, the Rule notes that "a not insignificant amount of FMBE's business activities are illegitimate" and lists examples from the aggregate SARs information.  Id. at 18488–89.

In short, the Rule reasons that, while there may be some effect on FBME's legitimate business activities, that effect will be limited both by the extent to which much of FBME's

business activity is illegitimate and the extent to which its legitimate activities are largely

confined to the jurisdiction in which it operates, rather than permeating the international system.

Accordingly, consistent with its preliminary view, the Court concludes that FinCEN properly

considered the statutory factors.  See FBME I, 125 F. Supp. 3d at 125 (concluding that the First

Final Rule "explicitly list[ed] and addresse[d]" the factors relevant to selecting a special

measure).

> 5.   *Whether FinCEN Considered Alternatives to a Prohibition Under the*
>      *Fifth Special Measure*

FBME also contends that FinCEN still has not shown that it adequately considered

alternatives to a full prohibition under the fifth special measure.  "While an agency must consider

and explain its rejection of 'reasonably obvious alternative[s],' it need not consider every

alternative proposed nor respond to every comment made."  Nat'l Shooting Sports Found. v.

Jones, 716 F.3d 200, 215 (D.C. Cir. 2013) (citation omitted) (quoting Natural Res. Def. Council,

Inc. v. SEC, 606 F.2d 1031, 1053 (D.C. Cir. 1979)).  "Rather, an agency [need] consider only

'significant and viable' and 'obvious' alternatives."  Id. (quoting City of Brookings Mun. Tel.

Co. v. FCC, 822 F.2d 1153, 1169 (D.C. Cir. 1987)).

In its previous opinion, the Court concluded that the agency's consideration of special

measures one through four was inherent in its explanation for imposing special measure five—

that the "recordkeeping and informational requirements" that would be imposed under the first

four special measures "do not involve steps to eliminate or curtail . . . access to the U.S. financial

system" and thus would not guard against the risks perceived by the agency.  FBME I, 125 F.

Supp. 3d at 124.  The Court nonetheless concluded that FBME was likely to succeed on the

merits of its claim regarding FinCEN's consideration of alternatives because FinCEN had not

addressed an alternative "*within* the fifth special measure—namely, the imposition of *conditions* on the opening or maintaining of correspondent accounts." Id.

The Second Final Rule considers, and rejects, the alternative of conditions over a full prohibition with respect to U.S. correspondent accounts. See 81 Fed. Reg. 18489.  FinCEN explains that, while there could be any number of conditions imposed, and while the "parties responsible for assuring compliance . . . could include FinCEN and/or U.S. financial institutions," "any condition, and any of the first four special measures, inherently rely on FBME to provide accurate, credible, and reliable information to the party responsible for assuring compliance," and "FinCEN has a reasonable basis to doubt" that FBME would provide such information.  Id.  The Rule cites "FBME's extensive history of AML deficiencies, including ignoring its own AML regulator's directives, and its active efforts to evade AML regulations." Id.  As examples, it lists

- FBME's "advertising the bank to potential customers as being willing to facilitate the evasion of AML regulations;"

- CBC's conclusion that "FBME's Cyprus branch failed to remedy AML weaknesses identified in previous CBC exams, despite the CBC's instructions to do so;" and

- FBME's "continu[ing] to take measures to evade regulatory oversight even after FinCEN highlighted its concerns in the NOF."

Id.

FBME objects to these characterizations, insisting that the record refutes FinCEN's analysis.  See Pls.' MSJ 51–52.  But FinCEN's obligation with respect to this alternative was only to consider and "explain its rejection of" it.  Nat'l Shooting Sports Found., 716 F.3d at 215. The agency has clearly done so by reasoning that conditions would require FBME to report

accurately its compliance efforts to regulators, and by citing an ongoing pattern of FBME's reporting deficiencies and evasive actions.

The Second Final Rule also considers additional alternatives suggested by FBME.  See 81 Fed. Reg. 18489.  FinCEN first considers and rejects FBME's suggestion that an "independent monitor" be established "to oversee and report on FBME's operations," and also to make "periodic reports to FinCEN regarding FBME's operations, plac[e] appropriate conditions on the use of correspondent accounts, and consult[] with FinCEN . . . to adopt . . . policies to supplement FBME's existing compliance program."  Id. at 18490.  The Rule reasons that this suggestion would also require honest reporting on the part of FBME and that, based on FBME's history of evasion, FinCEN does not believe that the Bank would provide a monitor with accurate and reliable information.  See id.

The Rule then rejects the suggestion that FinCEN impose a monetary fine, because such a measure would not address the risks underlying the agency's action—that the U.S. financial system will continue to be compromised by transactions flowing through FBME unless the Bank is cut off from the U.S. banking system.  See id.  The Rule then rejects the possibility that a combination of such alternatives would suffice on the ground that FBME does not seem capable of overcoming the "fundamental deficiency" in its ability to provide accurate and credible information.  Id.

Finally, FinCEN considers and rejects FBME's argument that the agency should treat FBME as it did a Latvia-based bank against which FinCEN withdrew a proposed imposition of the fifth special measure due to remedial measures taken by the bank.  The Rule explains that the Latvian bank differs from FBME in that it had "significantly revised its AML policies and procedures," whereas "FBME has not demonstrated any AML improvements with respect to its

headquarters in Tanzania" and has given FinCEN no reason to believe it would effectively implement such policies in Cyprus.  Id.

Because an agency need not "consider every alternative proposed," and need only "explain its rejection of" alternatives, Nat'l Shooting Sports Found., 716 F.3d at 215, FinCEN has met its burden under the APA by addressing several of the alternatives suggested by FBME and by providing its reasoning as to why those alternatives, in its judgment, either would not come to fruition or would not address the agency's concerns regarding FBME.  It is not up to the Court to second-guess that judgment.

> **6.**     *Whether the Rulemaking was Tainted by FinCEN's Alleged Review of Privileged Materials*

Finally, FBME contends that the integrity of the rulemaking has been compromised by the fact that FinCEN received and reviewed unflattering assessments of the Bank submitted by forensic investigators who FBME had previously retained to assist in its defense against FinCEN's findings.  Pls.' MSJ 54.

The circumstances involved two forensic investigators who sent unsolicited affidavits to FinCEN in August 2015 (after FinCEN had issued the First Final Rule) and subsequently submitted comments containing similar information during the notice-and-comment period connected to the Second Final Rule.  FinCEN had planned on including the comments as part of the administrative record for the second rulemaking, while allowing FBME to suggest redactions of confidential business information, but the agency refrained from doing so after FBME strenuously objected to the comments' inclusion on privilege grounds and demanded their destruction.  See Defs.' Opp'n Pls.' Mot. Suppl. Admin. Record 9.

FBME claims that these materials were "obviously prejudicial and self-evidently privileged," id., although a Department of Justice attorney who independently reviewed the

materials concluded that they were subject to neither the attorney-client nor attorney-work-product privileges, Defs.' Opp'n 13 n.6.  Even assuming that these materials were privileged, however, the Court lacks a basis for finding that the agency relied on them or that their receipt or review tainted the rulemaking proceedings in any meaningful way.[13]

The crux of FBME's concern is that the allegedly privileged materials, in its view, "provided the *only* discernible source of th[e] allegation" that "in late 2014, FBME employees took various measures to obscure information."  Pls.' MSJ 27 (emphasis added).  "If FinCEN is relying on the Privileged Materials no fewer than three times in the Second Final Rule, then its rulemaking is tainted by both its failure to invite timely comment and its use of the Privileged Materials."  Id.

Having reviewed the entire record, including the non-public portions, it is clear to the Court that the allegedly privileged materials are not the only (or the most credible) source of this

-----

[13]   The D.C. Circuit has held that "[i]t may sometimes be appropriate to resort to extra-record information to enable judicial review to become effective."  Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989).  Courts may need to look beyond the record in certain cases in order to determine whether the agency considered the right factors in its decision or whether judicial review would otherwise be frustrated in some important respect.  See City of Dania Beach v. FAA, 628 F.3d 581, 590 (D.C. Cir. 2010).  In other words, "[c]onsideration of extra-record information is appropriate when simply reviewing the administrative record is not enough to resolve the case."  Pac. Shores Subdiv., Cal. Water Dist. v. U.S. Army Corps of Engineers, 448 F. Supp. 2d 1, 6 (D.D.C. 2006).

The Court finds this to be the unusual situation where extra-record review is necessary for effective judicial review.  Specifically, FBME contends that the Second Final Rule references, and is based on, information derived from the materials in dispute here.  FBME further argues that it was improper for FinCEN to use this information in devising its rule and seeks to have the rule vacated, partly on this basis.  The Court would struggle in determining whether these documents and any information derived from them found their way into the Second Final Rule without having that material in front of it.  That is, the merits of FBME's claim pertaining to the disputed materials would be extremely difficult to resolve without the ability look to those materials.  The Court will therefore consider these disputed materials, which have been filed with the Court under seal, even though they do not make up part of the administrative record as certified by the agency.

information.  Moreover, the Court takes the agency at its word that it disregarded the substance

of the comment and related affidavit because it could not determine the credibility of the

commenter.  The agency's representation that it did not use any facts from the allegedly

privileged materials in promulgating the Second Final Rule—bolstered by the Court's finding

that there is other support in the record for the claim that FBME employees took steps to obscure

information from regulators in late 2014—suffices to negate any allegation of "taint."  In sum,

FinCEN's conduct concerning these disputed materials certainly does not merit vacating the

Second Final Rule, as FBME requests.  See Pls.' MSJ 55.

     D. Remedy

Although neither party fully discusses it in its briefing, the issue of remedy is crucial.

The Court has identified two defects in the notice and opportunity for comment FinCEN afforded

FBME but has found those errors to be harmless.  More problematic is FinCEN's failure to

adequately respond to significant comments made by FBME regarding the adverse conclusions it

drew from the SARs data.  Yet the Bank is not automatically entitled to have the Second Final

Rule vacated simply because the agency failed to provide a sufficient response.  The most

appropriate remedy under these facts is to remand to the agency without vacating the rule, yet

stay implementation of the rule so as to avoid potentially irreparable harm to FBME.[14]

---

[14]  The Court would have taken the same approach had it found FinCEN's notice-and-comment errors not to be harmless, because "when equity demands, an unlawfully promulgated regulation can be left in place while the agency provides the proper procedural remedy." Fertilizer Inst. v. EPA, 935 F.2d 1303, 1312 (D.C. Cir. 1991).  This is true even with failures in notice-and-comment procedures.  See Am. Med. Ass'n v. Reno, 57 F.3d 1129, 1135 (D.C. Cir. 1995) (recognizing "the obvious hardship that vacating the rule would impose on the agency" and declining to vacate a rule despite inadequate notice and opportunity for comment); Fertilizer Inst., 935 F.2d at 1313 ("We also hold that the EPA provided inadequate notice and comment regarding the creation of administrative exemptions [in its final rule] . . . . We exercise our equitable discretion, however, and allow those exemptions to remain in place until adequate

There are two main guideposts for a court to exercise its equitable discretion in this situation.  "A court may remand without vacatur where 'there is at least a serious possibility that the [agency] will be able to substantiate its decision given an opportunity to do so, and when vacating would be disruptive.'"  Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv., 288 F. Supp. 2d 7, 12 (D.D.C. 2003) (quoting Radio-Television News Dirs. Ass'n v. FCC, 184 F.3d 872, 888 (D.C. Cir. 1999)); see also Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150, 151 (D.C. Cir. 1993) ("The decision to vacate depends on 'the seriousness of the . . . deficiencies (and thus the extent of doubt whether the agency [decided] correctly) and the disruptive consequences of an interim change that may itself be changed.'" (quoting Int'l Union, UMW v. FMSHA, 920 F.2d 960, 967 (D.C. Cir. 1990))).  As the D.C. Circuit has explained, "[t]here is a fine line between agency reasoning that is 'so crippled as to be unlawful' and action that is potentially lawful but insufficiently or inappropriately explained."  Radio-Television, 184 F.3d at 872 (quoting Checkosky v. SEC, 23 F.3d 452, 464 (D.C. Cir. 1994)).  "In the former circumstance, the court's practice is to vacate the agency's [action], while in the latter the court frequently remands for further explanation . . . ."  Id.; see also Allied-Signal, Inc., 988 F.2d at 150 ("An inadequately supported rule . . . need not necessarily be vacated.").

The Court is convinced that there is a substantial probability that FinCEN could respond adequately to FBME's comments that call into question whether FinCEN could fairly rely on aggregate SARs data for the conclusions it drew about FBME and its relative standing as a bad actor in comparison with other foreign financial institutions.  The agency has immense expertise

---

notice and comment is completed."); W. Oil & Gas Ass'n v. EPA, 633 F.2d 803, 812–13 (9th Cir. 1980) (remanding but leaving in place designations imposed by rulemaking so as not to thwart statutory objectives and to avoid "the possibility of undesirable consequences which we cannot now predict that might result from invalidation of the designations").

in these areas, including familiarity with the practices and behaviors of financial institutions like

FBME.  Although simply invoking expertise will not suffice to answer FBME's specific and

facially-credible concerns and criticisms, the Court believes there is a fair likelihood that the

agency will be able to make use of its expertise to justify its reliance on data and information

traced to SARs.  This case thus easily satisfies the first factor counseling in favor of remand

without vacatur.

　　　In addition, the national-security interests underlying this rulemaking and the agency's

good-faith efforts to date make the Court especially hesitant to vacate the rule, thereby causing

undue "disrupti[on]," Hawaii Longline, 288 F. Supp. 2d at 12 (quoting Radio-Television News,

184 F.3d at 888), based on the errors identified above.  As the Court has already explained,

FinCEN's exercise of its Section 311 powers is critical to drying up the flow of financial support

for terrorist and international criminal organizations.  Indeed, Congress's explicit authorization

to consider classified evidence in this rulemaking—an authorization that, to the Court's

knowledge, appears in no other statutory rulemaking provision—highlights the national-security

stakes in Section 311 proceedings and shows that this type of rulemaking differs from all others.

As a result, the Court is all the more reluctant to vacate this particular rule—forcing FinCEN to

go all the way back to the drawing board and delaying the rule by many months—based on

errors the agency could perhaps fix relatively easily and quickly.

　　　This is not a free pass for FinCEN, however.  The Court will order that implementation of

the Second Final Rule remain stayed until FinCEN adequately responds (if it can) to FBME's

concerns and justifies its reliance on aggregate information derived from SARs.[15]  The ball is now again in FinCEN's court.

## IV.   Conclusion

For the foregoing reasons, the Court will grant in part and deny in part both FBME's and FinCEN's motions for summary judgment.  It will remand this matter to the agency for proceedings consistent with this opinion, decline to vacate the Second Final Rule, and order that the Rule remain stayed until the agency furnishes adequate responses to FBME's significant comments.  An order accompanies this memorandum opinion.

*Christopher R. Cooper*

CHRISTOPHER R. COOPER
United States District Judge

Date: September 20, 2016

---

[15]  This remedy is functionally similar to an order remanding *with* vacatur but staying the mandate while the agency has an opportunity to comply with the Court's directives.  For an example of that remedy, see Hawaii Longline Ass'n, 288 F. Supp. 2d at 12.