Federal Register / Vol. 81, No. 231 / Thursday, December 1, 2016 / Rules and Regulations 86577

■ 3. In § 201.20, add paragraphs (c)(5) through (7) to read as follows:

**§ 201.20 Fees.**

* * * * *

(c) * * *

(5) The Commission will not charge fees if it fails to comply with any time limit under the FOIA or these regulations, and if it has not timely notified the requester, in writing, that an unusual circumstance exists. If an unusual circumstance exists, and timely written notice is given to the requester, the Commission will have an additional 10 working days to respond to the request before fees are automatically waived under this paragraph.

(6) If the Commission determines that unusual circumstances apply and that more than 5,000 pages are necessary to respond to a request, it may charge fees if it has provided a timely written notice to the requester and discusses with the requester via mail, Email, or telephone how the requester could effectively limit the scope of the request (or make at least three good faith attempts to do so).

(7) If a court has determined that exceptional circumstances exist, a failure to comply with time limits imposed by these regulations or FOIA shall be excused for the length of time provided by court order.

* * * * *

By order of the Commission.

Issued: November 25, 2016.

**Katherine M. Hiner,**

*Acting Supervisory Attorney.*

[FR Doc. 2016–28819 Filed 11–30–16; 8:45 am]

**BILLING CODE 7020–02–P**

---

## DEPARTMENT OF THE TREASURY

### Financial Crimes Enforcement Network

### 31 CFR Part 1010

**RIN 1506–AB27**

### Supplemental Information Regarding the Final Rule Imposing the Fifth Special Measure Against FBME Bank, Ltd.

**AGENCY:** Financial Crimes Enforcement Network (''FinCEN'').

**ACTION:** Supplement to final rule.

**SUMMARY:** In its September 20, 2016 order, the U.S. District Court for the District of Columbia remanded to FinCEN the final rule imposing a prohibition on covered financial institutions from opening or maintaining correspondent accounts for, or on behalf of, FBME Bank, Ltd. In its memorandum opinion accompanying that order, the Court stated that the agency had not responded meaningfully to FBME's comments regarding the agency's treatment of aggregate Suspicious Activity Report (SAR) data. The Court found that those comments challenged FinCEN's interpretation of SAR data on at least four distinct grounds. In this supplement to the final rule, FinCEN provides further explanation addressing FBME's comments.

**DATES:** December 1, 2016.

**FOR FURTHER INFORMATION CONTACT:** The FinCEN Resource Center at (800) 767–2825 or *regcomments@fincen.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background

In its September 20, 2016 order, the U.S. District Court for the District of Columbia remanded to FinCEN the final rule imposing a prohibition on covered financial institutions from opening or maintaining correspondent accounts for, or on behalf of, FBME Bank, Ltd. (FBME). In its memorandum opinion accompanying that order, the Court stated that the agency had not responded meaningfully to FBME's comments regarding the agency's treatment of aggregate SAR data. In this supplement to the final rule, FinCEN notes that FBME's comments regarding FinCEN's use of SARs in the rulemaking process reflect a misunderstanding of SARs generally and how FinCEN analyzed and used SARs in this rulemaking.

As an initial matter, FBME overstates the centrality of the use of SARs in FinCEN's determination that FBME is of primary money laundering concern. As reflected in the agency's Notice of Finding (NOF), Final Rule, and Administrative Record, far from being the only evidence that informed FinCEN's determination that FBME is of primary money laundering concern, the agency's analysis of SARs simply affirmed FinCEN's concern surrounding FBME's involvement in money laundering that was informed by other information in the Administrative Record. For instance, as detailed in the NOF, this information included: (1) An FBME customer's receipt of a deposit of hundreds of thousands of dollars from a financier for Lebanese Hezbollah; (2) providing financial services to a financial advisor for a major transnational organized crime figure; (3) FBME's facilitation of funds transfers to an FBME account involved in fraud against a U.S. person, with the FBME customer operating the alleged fraud scheme later being indicted in the United States District Court for the Northern District of Ohio; and (4) FBME's facilitation of U.S. sanctions evasion through its extensive customer base of shell companies, including at least one FBME customer that was a front company for a U.S.-sanctioned Syrian entity, the Scientific Studies and Research Center, which used its FBME account to process transactions through the U.S. financial system.

Set forth below are summaries of FBME's four arguments in its comments surrounding FinCEN's interpretation of SARs and the agency's responses.

1. FBME argues that SARs are so over-inclusive—''sweeping in [so many] transactions that are perfectly legitimate''—that ''categorically'' viewing SARs as indicative of illicit transactions is ''invalid and improper.''

In its January 26, 2016 comments, FBME asserted that:

> To paint FBME as posing a significant threat to U.S. and other financial institutions, FinCEN relies on limited and misleading statistical data regarding ''suspicious wire transfers'' as well as biased reports from financial institutions seeking to offload responsibility for their own actions. During the hearing before Judge Cooper, FinCEN revealed that the statistical data relied upon in the NOF was based on SARs. But such reliance is categorically invalid and improper. To begin, we know of no instance, prior to this proceeding, in which FinCEN has equated any particular SARs data or rate as indicative of a problem under Section 311 [of the USA PATRIOT Act]. Nor is such use valid. To the contrary, it ignores the purpose of a SAR, which involves a designedly low threshold for the sake of erring on the side of over-inclusion—sweeping in transactions that are perfectly legitimate, simply to ensure there is scrutiny of them to ensure against any issue. It is spurious in this light to take a SAR or any number of them as evidencing the illegitimacy of any transaction or set thereof—not to mention as evidence that a particular bank is one of ''primary money laundering concern'' under Section 311.[1]

Contrary to FBME's assumptions, FinCEN analyzed the SARs as qualitative evidence of activity conducted by FBME that reflected one of FinCEN's primary concerns about FBME—specifically, a ''[s]ignificant [v]olume'' of ''[o]bscured [t]ransactions'' as indicated in part by the size and number of ''[w]ire transfers related to suspected shell company activities.'' NOF, 79 FR at 42640. While FinCEN recognizes that actual wrongdoing does not necessarily underlie the suspicious activity described in any particular SAR, many of the SARs relating to FBME described typical indicators of shell company activity. As FinCEN has explained, it is particularly concerned, among other things, by the lack of

[1] FBME's January 26, 2016 Comments, pp. 50–51.

transparency associated with transactions by FBME's shell company customers, and the high volume of U.S. dollar transactions conducted by these shell companies with no apparent business purpose. March 31, 2016 Final Rule, 81 FR at 18487. Therefore, when reviewing SARs associated with such activity, FinCEN appropriately concluded that they were indicative of potential money laundering. In addition to the SARs as well as other information available to FinCEN discussed in the NOF and Final Rule, the agency's concerns were supported by FBME's own acknowledgement in its January 26, 2016 comment that it transacted with shell companies.

Moreover, with respect to FBME's claim that SARs are over-inclusive, based on FinCEN's extensive experience with SAR filings and the other illicit conduct at FBME detailed in the NOF, Final Rule, and Administrative Record, FinCEN assesses it more likely that the SARs understate the size and frequency of shell company and other suspicious activity conducted by FBME. The SARs include only the information that financial institutions identified and reported to FinCEN; they do not necessarily reflect all suspicious transactions engaged in by FBME. FinCEN assesses that such is the case here given FinCEN's determination that FBME has sought to evade anti-money laundering (AML) regulations, has ignored the Central Bank of Cyprus' AML directives, and that following the issuance of the NOF, FBME employees took various measures to obscure information, all of which may have undermined the ability of U.S. financial institutions to detect and report all of FBME's suspicious activity.

2. FBME argues that while the absolute dollar amounts of transactions tagged as ''suspicious'' might appear high on the surface, they represented a small proportion of FBME's overall transactions.

FBME notes that while the NOF highlighted ''at least 4,500 suspicious wire transfers through U.S. correspondent accounts that totaled at least $875 million between November 2006 and March 2013,'' that figure represented, according to FBME, ''only 0.55% of the total amount of transfers and 0.81% of the [U.S. dollar] amount of transfers conducted by FBME during this period.''[2] In other words, FBME asserts without supporting evidence that the SARs reflect a small portion of the bank's total transactions. But the final rule never suggested otherwise; FinCEN may identify a bank as a financial institution of primary money laundering concern pursuant to Section 311 even if it has extensive legitimate activities.

FinCEN considered the volume of suspicious transactions in absolute terms—not whether such money laundering was a greater percentage of FBME's activities than that suggested in FBME's comments. FBME's comment incorrectly assumes that FinCEN's focus in the NOF was, or should have been, based upon a percentage of suspicious activity by FBME's customers. To the contrary, FinCEN made clear it was concerned by the substantial volume of all suspicious activity at the bank, including the suspicious activity reported in SARs and that described in other sources available to the agency and included in the Administrative Record. The overall amount of such activity informed FinCEN's evaluation of the ''extent to which'' FBME has been ''used to facilitate or promote money laundering''[3] and its conclusion that ''FBME facilitated a substantial volume of money laundering through the bank for many years.''[4] FinCEN finds the opportunity for money laundering of such a magnitude and through so many transactions to be ''substantial'' because, in absolute terms, it poses a significant threat to the U.S. and international financial systems, potentially allowing large amounts of funding to pass to terrorist or criminal activity. FinCEN does not find that the size of a bank that facilitates a substantial amount of money laundering is determinative of the threat posed by that activity. Adopting such an assumption would essentially permit significant volumes of money to pass through large banks. In any event, for the reasons described in the preceding section, FinCEN assesses that it is more likely that, if anything, the SARs understate the size and frequency of suspicious activity conducted by FBME.

3. FBME criticizes FinCEN for ''fail[ing] to consider alternative bases for the increase in SARs involving FBME * * * between April 2013 and April 2014,'' particularly the ''Cypriot financial crisis and attendant controls.''

FinCEN recognizes that suspicious activity and reports of such activity could be influenced by a number of factors, including financial developments within a country or internationally, but FinCEN views this scenario as inapplicable in this case. SARs typically deal with suspicious activity by individuals and entities conducting transactions, not systemic issues involving debt defaults and liquidity challenges by financial institutions. FinCEN did not rely on any suggestion that the number of SAR filings involving FBME increased during the Cypriot financial crisis as compared to past periods in the analysis. In addition, FinCEN finds no reason to assume that any renewed focus on Cypriot financial controls would decrease rather than increase the credibility of SAR filings as to FBME, let alone decrease the credibility of those filings to such an extent as to undermine its finding of a substantial volume of shell company activity at FBME. Finally, the NOF highlighted suspected shell company activities accounting for hundreds of millions of dollars between 2006–2014;[5] such activity was not limited to the period of the Cypriot financial crisis.

4. FBME faults FinCEN for failing to provide either a ''point of comparison between FBME and other * * * banks that [the agency] considers similarly situated but less deserving of suspicion given their SAR statistics,'' or ''any baseline for the SARs statistics it considers standard or acceptable for an international bank like FBME.''

Again, FBME misunderstands the role that SARs played in FinCEN's analysis, incorrectly assuming that the analysis necessarily depended on a relative comparison to other banks. FBME appears to assume that SAR filings, or the absolute number and size of suspicious transactions described in such filings, are not in themselves relevant, but instead that only *relative* SAR rates among banks can be an indication of significant suspicious activity. FinCEN finds this assumption unwarranted. FinCEN found that the SAR filings discussed in the NOF informative of significant shell company activity at FBME to be ''substantial'' because, in absolute terms, it poses a significant threat to the U.S. and international financial system, potentially allowing large amounts of funding to pass to terrorist or criminal activity. This conclusion did not depend on comparison with other banks.

In addition, as noted in the NOF and Final Rule, FinCEN concluded that FBME has sought to evade AML regulations, has ignored the Central Bank of Cyprus' AML directives, and that following the issuance of the NOF, FBME employees took various measures to obscure information. These facts distinguish FBME from other Cypriot banks and may have undermined the ability of U.S. financial institutions to detect all of FBME's suspicious activity,

[2] FBME's January 26, 2016 Comments, p. 52.

[3] 31 U.S.C. 5318A(c)(2)(B)(i).

[4] 79 FR 42639 (July 22, 2014).

[5] 79 FR 42639 at 42640 (July 22, 2014).

underscoring the high likelihood that SARs involving FBME are actually under-inclusive. Given FinCEN's concern regarding FBME's willingness to evade AML regulations that may have inhibited the identification of suspicious activity by U.S. financial institutions, a comparison of SARs filed on FBME compared to other Cypriot financial institutions would not necessarily portray the relevant risk posed by FBME.

More broadly, FinCEN notes that setting a benchmark as FBME suggests could simply set a target for banks or customers wishing to evade money laundering controls. Instead, the agency reviews relevant information and determines whether all of that information, taken together, justifies action under Section 311. FinCEN is daily immersed in the global flow of financial intelligence, including SARs, and is tasked as a policy matter with identifying concerns within that intelligence stream. As discussed above, FinCEN assesses that the volume of shell company activity reflected in the Administrative Record, including SARs filed on FBME, is substantial.

Dated: November 23, 2016.

**Jamal El-Hindi,**

*Deputy Director, Financial Crimes Enforcement Network.*

[FR Doc. 2016–28752 Filed 11–30–16; 8:45 am]

**BILLING CODE 4810–02–P**

## DEPARTMENT OF HOMELAND SECURITY

### Coast Guard

### 33 CFR Part 117

**[Docket No. USCG–2016–1015]**

### Drawbridge Operation Regulation; New Jersey Intracoastal Waterway (NJICW), Point Pleasant Canal, Point Pleasant, NJ

**AGENCY:** Coast Guard, DHS.

**ACTION:** Notice of deviation from drawbridge regulation.

**SUMMARY:** The Coast Guard has issued a temporary deviation from the operating schedule that governs the S.R. 88/Veterans Memorial Bridge across the NJICW (Point Pleasant Canal), mile 3.0, at Point Pleasant, NJ. The deviation is necessary to facilitate and complete urgent bridge maintenance. This deviation allows the bridge to remain in the closed-to-navigation position.

**DATES:** The deviation is effective 9 p.m. on Wednesday, December 7, 2016 to 6 a.m. on Thursday, December 8, 2016.

**ADDRESSES:** The docket for this deviation, [USCG–2016–1015] is available at *http://www.regulations.gov.* Type the docket number in the ''SEARCH'' box and click ''SEARCH''. Click on Open Docket Folder on the line associated with this deviation.

**FOR FURTHER INFORMATION CONTACT:** If you have questions on this temporary deviation, call or email Mr. Michael Thorogood, Bridge Administration Branch Fifth District, Coast Guard, telephone 757–398–6557, email *Michael.R.Thorogood@uscg.mil.*

**SUPPLMENTARY INFORMATION:** The New Jersey Department of Transportation, who owns the S.R. 88/Veterans Memorial Bridge, has requested a temporary deviation from the current operating schedule is set out in 33 CFR 117.5, to facilitate replacement of a defective coupling and floating shaft of the bridge.

Under this temporary deviation, the bridge will be in the closed-to-navigation position at 9 p.m. December 7, 2016 to 6 a.m. December 8, 2016. The bridge is a vertical lift bridge and has a vertical clearance in the closed-to-navigation position of 31 feet above mean high water.

The Point Pleasant Canal is used by a variety of vessels including, recreational vessels and tug and barge traffic. The Coast Guard has carefully considered the nature and volume of vessel traffic on the waterway in publishing this temporary deviation.

Vessels able to pass through the bridge in the closed-to-navigation position may do so at any time. The bridge will not be able to open for emergencies and there is no immediate alternative route for vessels to pass in the closed position. The Coast Guard will also inform the users of the waterway through our Local and Broadcast Notices to Mariners of the change in operating schedule for the bridge so that vessel operators can arrange their transits to minimize any impact caused by the temporary deviation.

In accordance with 33 CFR 117.35(e), the drawbridge must return to its regular operating schedule immediately at the end of the effective period of this temporary deviation. This deviation from the operating regulations is authorized under 33 CFR 117.35.

Dated: November 28, 2016.

**Hal R. Pitts,**

*Bridge Program Manager, Fifth Coast Guard District.*

[FR Doc. 2016–28852 Filed 11–30–16; 8:45 am]

**BILLING CODE 9110–04–P**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 180

**[EPA–HQ–OPP–2014–0919; FRL–9952–88]**

### Muscodor albus Strain SA–13 and the Volatiles Produced on Rehydration; Exemption From the Requirement of a Tolerance

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This regulation establishes an exemption from the requirement of a tolerance for residues of *Muscodor albus* strain SA–13 and the volatiles produced on rehydration in and on all food commodities when used in accordance with label directions and good agricultural practices. Marrone Bio Innovations, Inc. submitted a petition to EPA under the Federal Food, Drug, and Cosmetic Act (FFDCA), requesting an exemption from the requirement of a tolerance. This regulation eliminates the need to establish a maximum permissible level for residues of *Muscodor albus* strain SA–13 and the volatiles produced on rehydration under FFDCA.

**DATES:** This regulation is effective December 1, 2016. Objections and requests for hearings must be received on or before January 30, 2017, and must be filed in accordance with the instructions provided in 40 CFR part 178 (see also Unit I.C. of the **SUPPLEMENTARY INFORMATION**).

**ADDRESSES:** The docket for this action, identified by docket identification (ID) number EPA–HQ–OPP–2014–0919, is available at *http://www.regulations.gov* or at the Office of Pesticide Programs Regulatory Public Docket (OPP Docket) in the Environmental Protection Agency Docket Center (EPA/DC), West William Jefferson Clinton Bldg., Rm. 3334, 1301 Constitution Ave. NW., Washington, DC 20460–0001. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the OPP Docket is (703) 305–5805. Please review the visitor instructions and additional information about the docket available at *http://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:** Robert McNally, Biopesticides and Pollution Prevention Division (7511P), Office of Pesticide Programs, Environmental Protection Agency, 1200 Pennsylvania Ave. NW., Washington, DC 20460–0001; main telephone