**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FBME Bank Ltd. *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 15-CV-1270 CRC |
| | ) | |
| Jacob LEW, in his official capacity as Secretary of the Treasury, *et al.* | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# Table of Contents

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. FinCEN Adequately Responded to FBME's Comments Regarding FinCEN's Reliance on SARs. ........ 4

A. The Supplement reasonably explained why setting a comparative benchmark was not appropriate or necessary to its SARs analysis. ........ 4

B. The Supplement reasonably explained why the Cypriot financial crisis did not impact its SARs analysis. ........ 6

C. The Court has already rejected FBME's remaining arguments, which do not address the adequacy of FinCEN's response to FBME's comments. ........ 8

1. FBME's "proportionality" comment, which FinCEN adequately responded to, is not a proper vehicle for relitigating whether FinCEN properly considered the statutory factors of Section 311. ........ 9

2. FinCEN considered and adequately responded to FBME's comment regarding the overinclusiveness of SARs. ........ 10

3. The process issues in this case have already been resolved, and do not bear in any way on the adequacy of FinCEN's response to FBME's comments. ........ 12

II. If Upheld, the Rule Should be Allowed to Take Effect, Not Stayed Pending Appeal. . 13

CONCLUSION ........ 14

# **Table of Authorities**

## **Cases**

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971) ..... 4, 5

*FBME Bank Ltd. v. Lew*,
-- F. Supp. 3d ---, 2016 WL 5108018 (D.D.C. Sept. 20, 2016) ..... passim

*FBME Bank Ltd. v. Lew*,
125 F. Supp. 3d 109 (D.D.C. 2015) ..... 12

*Food Mktg. Inst. v. ICC*,
587 F.2d 1285 (D.C. Cir. 1978) ..... 3

*Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*,
185 F. Supp. 3d 233 (D.D.C. 2016) ..... 13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983) ..... 2, 4, 10

*NRDC v. SEC*,
606 F.2d 1031 (D.C. Cir. 1979) ..... 3

*Pub. Citizen, Inc. v. FAA*,
988 F.2d 186 (D.C. Cir. 1993) ..... 2, 10

*Reytblatt v. Nuclear Regulatory Comm'n*,
105 F3d 715 (D.C. Cir. 1997) ..... 2

*Thompson v. Clark*,
741 F.2d 401 (D.C. Cir. 1984) ..... 2

## **Other Authorities**

79 Fed. Reg. 42,639 (July 22, 2014) ..... 7, 8

81 Fed. Reg. 18,480 (Mar. 31, 2016) ..... 6, 8

81 Fed. Reg. 86,577 (Dec. 1, 2016) ..... passim

# INTRODUCTION

Only one issue in this case remains properly before the Court: whether the Financial Crimes Enforcement Network ("FinCEN") has adequately responded to "significant comments made by FBME regarding the adverse conclusions it drew from the SARs [Suspicious Activity Reports] data" in promulgating the Second Final Rule. *FBME Bank Ltd. v. Lew*, -- F. Supp. 3d ---, 2016 WL 5108018, *29 (D.D.C. Sept. 20, 2016) ("*FBME III*"). Although defendants believe that the Second Final Rule adequately addressed all of FBME's comments, there can be no doubt the December 1, 2016 supplement ("Supplement") to the March 31, 2016 Final Rule regarding FBME ("Second Final Rule") more than sufficiently responds to the comments highlighted by the Court by explaining the basis for FinCEN's "reliance on aggregate information derived from SARs," *id.* at *30, and in particular why FBME's comments on its SARs analysis did not alter the agency's conclusions. FinCEN's explanation addresses FBME's comments point by point, laying out its reasoning in a clearly discernible manner. As such, it easily satisfies the requirements of the Administrative Procedure Act.

Plaintiffs cannot and do not refute this fact. Instead, they attempt to misdirect the Court by misreading the Supplement, resurrecting arguments from their prior summary judgment motion that the Court has already rejected, and speculating that FinCEN did not identify a specific "benchmark" or produce a comparison of the SARs data for FBME with that of other banks because it feared such an analysis would exonerate FBME. Nothing could be further from the truth. The Supplement explains in detail why a benchmark is undesirable as a general policy matter and why a comparison was unnecessary to FinCEN's specific assessment that the volume of suspicious activity identified in FBME-related SARs was concerning. As the Court has recognized, FinCEN has "immense expertise in these areas," *FBME III*, 2016 WL 5108018 at

*30, and its judgment is entitled to substantial deference under the APA. It also bears emphasizing that the Court has upheld the vast majority of the Second Final Rule, of which the SARs analysis was only one part, and FBME has shown no grounds for revisiting any other part of the Court's ruling.

For these reasons, the Court should grant summary judgment for defendants.

**ARGUMENT**

As the Court is well aware, in reviewing an agency decision under the APA, it must not substitute its own judgment for that of the agency but should uphold the agency's decision "if the agency's path may reasonably be discerned," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983), and must accord an even higher level of deference to an agency decision that, as here, implicates issues of national security and foreign policy. *FBME III*, 2016 WL 5108018 at *3; *see also* Defs.' Summ. J. Mot. at 20-24 (ECF No. 61). With respect to comments submitted in response to a proposed rule, an agency is not required to address every comment but "must respond in a reasoned manner" to relevant and significant comments. *FBME III*, 2016 WL at *22 (quoting *Reytblatt v. Nuclear Regulatory Comm'n*, 105 F3d 715, 722 (D.C. Cir. 1997)). The agency's response "need only 'enable us to see what major issues of policy were ventilated and why the agency reacted to them as it did.'" *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993). Failure to respond adequately to a comment is arbitrary and capricious only if "it demonstrates that the agency's decision was not based on a consideration of the relevant factors." *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984).

FinCEN has more than met this standard. While the Court previously found that "FinCEN's reasoning in support of the Rule is largely sound," *FBME III*, 2016 WL 5108018 at

*5, it held that FinCEN had not adequately responded to four points raised in FBME's January 2016 comment that the Court identified as significant: (1) SARs are so overinclusive — in that they sweep in many legitimate transactions — that "categorically" viewing SARs as indicative of illicit transactions is "invalid and improper"; (2) while the absolute dollar amounts or numbers of suspicious transactions might appear high, they represented a small proportion of FBME's overall transactions; (3) FinCEN failed to consider alternative bases for the increase in SARs involving FBME between April 2013-April 2014, in particular the Cypriot financial crisis that overlapped with that time period; and (4) FinCEN failed to provide a point of comparison between FBME and other similarly situated banks or any baseline for SARs statistics it considers standard or acceptable for a bank like FBME. 2016 WL 5108018 at *20; *see also* Administrative Record ("A.R.") at AR3342-43. The Supplement fully addresses each of these four specific points and explains why FinCEN found that they did not warrant a change in its analysis of the SARs data or the conclusions it drew from that data. *See* Supplemental Information Regarding the Final Rule Imposing the Fifth Special Measure Against FBME Bank Ltd., 81 Fed. Reg. 86,577, 86,578 (Dec. 1, 2016). Contrary to plaintiffs' intimations, the Supplement was no "post-hoc rationalization" of a predetermined outcome, but rather a clarification of FinCEN's original reasoning and a further explanation of why revisiting FBME's comments in light of the Court's order did not alter that reasoning.[1]

[1] Plaintiffs cite *Food Mktg. Inst. v. ICC*, 587 F.2d 1285, 1289-90 (D.C. Cir. 1978), and *NRDC v. SEC*, 606 F.2d 1031, 1049 n.23 (D.C. Cir. 1979), for the proposition that "where the agency has arrived at an identical result after remand from a reviewing court for further explanation of reasons," the presumption of agency regularity is "rebutted" and "'[m]ore exacting scrutiny is in order.'" Mem. in Supp. of Plfs.' Cross-Mot. for Summ. J. at 2 (ECF No. 89-1) ("FBME Opp'n"). Only *NRDC* refers to a "rebuttal," and only in dicta, while *Food Marketing*, cited by *NRDC* for this proposition, held "a greater degree of scrutiny" to be appropriate where "the agency order under review…reaffirmed a decision that itself departed drastically from" an earlier, on-point agency order. *Food Mktg.*, 587 F.2d at 1290. No such circumstance is present here. And even if greater scrutiny were to be applied, there is nothing in the case law to suggest that the agency must do more than meet the APA standard for responding to agency comments, which FinCEN plainly did here. *See supra*; *see also Food Mktg.*, 587 F.2d at 1290 (noting

## I. <u>FinCEN Adequately Responded to FBME's Comments Regarding FinCEN's Reliance on SARs.</u>

### A. The Supplement reasonably explained why setting a comparative benchmark was not appropriate or necessary to its SARs analysis.

Plaintiffs direct most of their fire at the fact that FinCEN did not identify a "baseline or 'comparative benchmarks'" regarding "how many SARs are allowed for an international bank like FBME" in the Supplement. FBME Opp'n at 3. However, plaintiffs presume that FinCEN was *required* to provide such a benchmark in order to respond adequately to FBME's concerns and that in the absence of such a benchmark, the Court may infer that "any fair comparison of the relevant SARs data exculpates, rather than inculpates, FBME." *Id.* at 4. Plaintiffs are incorrect on both counts.

First, the Court did not order FinCEN to lay down a benchmark or point of comparison; rather, it held that the Second Final Rule neither provided any comparative benchmarks nor "attempt[ed] to explain why such benchmarks may be unnecessary, or infeasible to provide, or how else the agency may have applied its expertise and regulatory experience in the absence of specific benchmarks." *FBME III*, 2016 WL 5108018 at *21. In its Supplement, FinCEN did precisely the latter: that is, it responded to FBME's comment by explaining why it did not use or need a benchmark to determine that the volume of SARs related to FBME was high enough to be of substantial concern. *See* 81 Fed. Reg. at 86,578. To the extent that plaintiffs challenge the reasoning set forth in the Supplement, they are once again attempting to convince the Court to substitute their own judgment for that of the agency. This is contrary to the basic principles of administrative law. *See State Farm*, 463 U.S. at 43; *Citizens to Preserve Overton Park v. Volpe*,

"where, as here, the remand merely requires the agency further to elaborate its reasoning, there is no requirement that the agency arrive at a different substantive result upon reconsideration").

401 U.S. 402, 416 (1971); *see also* Defs.' Opp'n to Pls.' Mot. for Summ. J. at 3-4 (ECF No. 73) ("Defs.' Summ. J. Opp'n").[2]

Even more misguided is FBME's assumption that because the Supplement did not include a comparison of FBME's SARs rates with that of other banks, FinCEN has tacitly admitted that such a comparison could only prove that FBME compares favorably with other banks. FBME Opp'n at 5-6. This leap of logic verges on magical thinking, long on speculation but short on supporting evidence. Plaintiffs have offered no basis for their conclusory assertion that "the volume of SARs for FBME is substantially lower than for comparable banks." *Id.* at 5. Although they cite unspecified "*affirmative indications*" in the record, *id.* (emphasis in original), the only "indications" they point to is their assessment that the SARs filed by FBME constitute a relatively low percentage of its transactions—which reveals nothing about how the volume of FBME-related SARs compares to that of other banks.

Plaintiffs also latch onto a phrase in the Supplement — that "a comparison of SARs filed on FBME compared to other Cypriot financial institutions would not necessarily portray the relevant risk posed by FBME" — as "virtually conced[ing] that FBME's SARs rate is comparatively low," *id.* at 6, while dismissing as "speculation" the larger context of that statement, namely, FinCEN's concern that "FBME's willingness to evade AML regulations…may have inhibited the identification of suspicious activity by U.S. financial institutions." *See id.*; 81 Fed. Reg. at 86,579. But FinCEN had good reason to judge that FBME's pattern of evading oversight and detection of suspicious transactions, which is well

[2] Nor is there anything inappropriate about FinCEN's broader concern that as a matter of policy, "setting a benchmark as FBME suggests could simply set a target for banks or customers wishing to evade money laundering controls." 81 Fed. Reg. at 86,579. Although FBME reflexively casts this concern as "hiding the ball," *see* FBME Opp'n at 6-7, it was reasonable for FinCEN to adjudge that designating a precise or even a ballpark "permissible" number, let alone making it public, would unduly constrain the agency's discretion. And while FBME suggests measures that it contends would mitigate FinCEN's concerns, it is not for FBME to instruct FinCEN on how best to implement Section 311.

documented in the administrative record, might diminish the usefulness of any SARs comparison with other banks that did *not* demonstrate such behavior. In no way is this assessment a concession that FBME's SARs rate was lower than other banks', and it is FBME, not FinCEN, that is speculating on the likely results of a comparison that the Supplement says nothing about.

Moreover, FBME implicitly — and erroneously — assumes that the results of such a comparison would be so significant that they could "make or break" FinCEN's SARs analysis vis à vis FBME, and, by extension, its assessment of whether FBME is of primary money laundering concern. Not so: as explained in the Supplement, FinCEN considered both the volume of SARs related to FBME and the particular characteristics of many of those SARs to be of serious concern, irrespective of how other banks might compare. *See* 81 Fed. Reg. at 86,577-78. More generally, the SARs were only part of the overall administrative record FinCEN considered, which included extensive independent evidence that FBME was substantially involved in money laundering and illegal financial activity. *See* Second Final Rule, 81 Fed. Reg. 18,480, 18,486 (Mar. 31, 2016) (SARs were "relevant…when viewed in the context of all the other information considered").[3]

**B. The Supplement reasonably explained why the Cypriot financial crisis did not impact its SARs analysis.**

Like their complaints regarding the absence of a benchmark, plaintiffs' attack on FinCEN's consideration of the Cypriot financial crisis relies almost entirely on groundless conjecture. FBME asserts that the Supplement does not say whether there was an "overarching spike in SARs reports coming out of Cyprus" during the 2013-2014 financial crisis because

[3] If FinCEN erred in assuming that the Court was not mandating a comparison in response to FBME's comment, FinCEN is ready to take appropriate steps at the Court's direction, which would render vacatur premature. Vacatur would be inappropriate in any event, given that FinCEN's SARs analysis was only a part of the overall record showing FBME to be of primary money laundering concern, and that the Court has already upheld the Second Final Rule in all other respects.

FinCEN "presumably" knows FBME's comment is "right on target." FBME Opp'n at 10. FBME presumes wrongly. The overall level of SARs for Cyprus during this period was simply not germane to FinCEN's assessment of whether the level of FBME-related SARs was so substantial as to trigger concerns about money laundering. As the Supplement explains, "SARs typically deal with suspicious activity by individuals and entities conducting transactions, not systemic issues involving debt defaults and liquidity challenges by financial institutions" such as those implicated in the Cypriot crisis. 81 Fed. Reg. at 86,578. Moreover, even if a financial crisis did trigger additional suspicious activity, FinCEN found no reason, either in the SARs or in its experience, to believe that the reported activity was somehow less or not suspicious. *See id.* ("FinCEN finds no reason to assume that any renewed focus on Cypriot financial controls would decrease rather than increase the credibility of SAR filings as to FBME").

In any event, as FinCEN notes, whether the SARs rates were higher than normal during the crisis would not change its broader assessment that for the overall period of 2006-2014, the SARs filed as to FBME were indicative of a substantial degree of shell company activity. FBME attempts to deflect this point by asserting that "it remains problematic that the total volume of SARs for the period 2006-2014 was inflated by the crisis," FBME Opp'n at 11. However, even assuming *arguendo* that the volume for 2013-2014 was higher than normal because of the crisis, it obviously would not have affected FinCEN's prior observation that the volume of suspicious activity from 2006-2013 was also substantial and that "[t]he FBME customers involved in these wire transfers exhibited shell company attributes, and other financial institutions involved in the transfers reported that they were unable to verify the identifies of FBME's customers." Notice of Finding, 79 Fed. Reg. 42,639, 42,640 (July 22, 2014).

While plaintiffs make much of the Supplement's statement that "FinCEN did not rely on any suggestion that the number of SAR filings involving FBME increased during the Cypriot financial crisis as compared to past periods in the analysis," *id.*, pointing to the Second Final Rule's observation that "FBME conducted at least $387 million in wire transfers…that had indicators of high-risk money laundering typologies, including shell company activity" during the 2013-2014 period, 81 Fed. Reg. at 18,489, they completely miss FinCEN's point. The Second Final Rule cited the $387 million as merely the most recent *example* of the "wire transfers related to suspected shell company activity [that] accounted for hundreds of millions of dollars of FBME's financial activity between 2006 and 2014," which was consistent with the large volume of such activity observed in the years preceding 2013-2014. *Id.*; *see also* Notice of Finding, 79 Fed. Reg. at 42,640 ("For example, FBME was involved in at least 4,500 suspicious wire transfers through U.S. correspondent accounts that totaled at least $875 million between November 2006 and March 2013."). FinCEN's treatment of the Cypriot crisis period has remained consistent throughout this rulemaking, and it has provided an entirely reasonable explanation for why the crisis did not impact its SARs analysis.

### C. The Court has already rejected FBME's remaining arguments, which do not address the adequacy of FinCEN's response to FBME's comments.

The rest of plaintiffs' criticisms have an oddly familiar ring, although this is the first time they are addressing the Supplement. That is because they are largely recycling old arguments made in their prior briefs—arguments that the Court already rejected in its prior rulings. Shoehorning these arguments into a discussion of whether the Supplement adequately responded to FBME's comments regarding FinCEN's SARs analysis does not make them any more compelling than they were in their original context. In fact, they are even less persuasive here, and should be disregarded.

1. FBME's "proportionality" comment, which FinCEN adequately responded to, is not a proper vehicle for relitigating whether FinCEN properly considered the statutory factors of Section 311.

In response to FBME's comment that the dollar amounts of reported suspicious transactions represented a small proportion of its overall transactions, FinCEN explained that it "considered the volume of suspicious transactions in absolute terms—not whether such money laundering was a greater percentage of FBME's activities than that suggested in FBME's comments." 81 Fed. Reg. at 86,578. FBME distorts this statement by asserting that FinCEN meant "it need not consider [the suspicious transactions] in relation to the total volume of FBME's legitimate activities" (which is not what FinCEN said), and from there argues (yet again) that FinCEN violated Section 311 by not properly considering "the extent to which" FBME was used to facilitate money laundering as opposed to the extent to which it was "used for legitimate business purposes." FBME Opp'n at 8-9. This is a non sequitur. The Supplement says that the absolute volume of suspicious transactions identified in FBME-related SARs contributed to FinCEN's concerns, regardless of what percentage of FBME's overall transactions they composed. 81 Fed. Reg. at 86,578. Whether FinCEN properly assessed the extent to which the bank was used to facilitate illicit vs. legitimate activity is a larger issue that is obviously not limited to the volume, absolute or relative, of suspicious transactions.

FBME is really just reprising its argument, which failed at both the preliminary injunction and summary judgment stages, that FinCEN did not adequately consider the statutory factors of Section 311. The third time is not the charm, however, and the argument is particularly inapposite here. FBME misleadingly conflates its proportion of suspicious transactions with the extent to which the bank was used to facilitate illicit activity, which is a much broader inquiry. *See FBME III*, 2016 WL 5108018 at *22 (noting that "agency's broad

conclusion in response to that factor—that FBME [had] facilitated a substantial volume of money laundering through the Bank for many years—rested in large part on specific examples of illicit transactions facilitated by FBME" as well as "aggregate metrics, derived from SARs"); *see also* 81 Fed. Reg. at 86,578 ("FinCEN made clear it was concerned by the substantial volume of all suspicious activity at the bank, including the suspicious activity reported in the SARs *and that described in other sources* . . . The overall amount of such activity informed FinCEN's evaluation of the 'extent to which' FBME has been 'used to facilitate or promote money laundering[.]'") (emphasis added). And the Court has already found that FinCEN "engaged in a substantial evaluation of" the extent of FBME's *legitimate* activity but that it did not outweigh the agency's concerns about the level of suspicious activity and the difficulty of verifying the identities and business purposes of many of FBME's customers. *See FBME III*, 2016 WL 5108018 at *25.

All the Court needs to decide now is whether FinCEN has adequately responded to FBME's comment regarding its relative proportion of SARs. The Court should find that FinCEN did so, given that the Supplement explains exactly why FBME's evidence on this point did not change the agency's assessment of the overall significance of the SARs. Nothing more is required, and FinCEN's expertise in this area should be accorded deference. *See Pub. Citizen, Inc.*, 988 F.2d at 197; *State Farm,* 463 U.S. at 43.

2. <u>FinCEN considered and adequately responded to FBME's comment regarding the overinclusiveness of SARs.</u>

In response to FBME's comment that SARs were overinclusive, FinCEN explained in the Supplement that it "analyzed the SARs as qualitative evidence of activity conducted by FBME that reflected one of FinCEN's primary concerns about FBME — specifically, a '[s]ignificant [v]olume' of '[o]bscured [t]ransactions'" — and that "[w]hile FinCEN recognizes that actual

wrongdoing does not necessarily underlie the suspicious activity described in any particular SAR, many of the SARs relating to FBME described typical indicators of shell company activity," such as lack of transparency and lack of apparent business purpose, that are often indicative of potential money laundering. 81 Fed. Reg. at 86,577. The Supplement further noted that based on its extensive experience with SARs and the evidence of other specific illicit conduct at FBME, including efforts to evade AML regulation and obscure information, FinCEN assessed that the SARs were more likely underinclusive than overinclusive as to the extent of shell company and other suspicious activity conducted by FBME. *Id.* at 86,578. This is a cogent and reasonable explanation for FinCEN's reliance on SARs despite their potential overinclusiveness, and as such constitutes a more than adequate response.

Perhaps realizing this, FBME reverts once again to a straw-man argument it has made frequently before—that shell company activity is "not inherently indicative of money laundering, so it is irrational and overinclusive for FinCEN to lump all such transactions together without examining whether 'particular characteristics' render them suspicious." FBME Opp'n at 12. But FBME ignores the fact that the Supplement addresses precisely that point, as did the Second Rule, and makes clear that FinCEN *did* examine and find that many of the SARs had the "particular characteristics" that are associated with money laundering. Plaintiffs also appear to argue that because shell company activity is only "one" of FinCEN's primary concerns about FBME, the agency has failed to explain why it was proper to rely on SARs as evidence of other concerns identified in the Rule, such as structuring. *Id.* However, the Supplement addresses both "shell company and *other suspicious activity* conducted by FBME" in assessing that such activity is likely actually understated rather than overstated by the SARs. 81 Fed. Reg. at 86,578 (emphasis added). And in any event, given that FBME's comment raised the overinclusiveness

of SARs as a broad and general problem, it was reasonable for FinCEN to respond by focusing on the most prominent reasons why and under what circumstances they were still indicative of potential money laundering. Even for "significant" comments, an agency need only "respond in a reasoned manner." *FBME III*, 2016 WL 5108018 at *22.

3. <u>The process issues in this case have already been resolved, and do not bear in any way on the adequacy of FinCEN's response to FBME's comments.</u>

FBME also, unsurprisingly, attempts to use what it perceives as flaws in the Supplement as an excuse to reopen issues of process that the Court has already resolved. *See* FBME Opp'n at 13-14. Nothing in the Supplement or in FBME's opposition warrants such a reopening. Notwithstanding plaintiffs' claim that "FinCEN has shifted to justifying the Rule based on the qualitative content of specific SARs while evading intelligent scrutiny of its aggregate count" and "leaving FBME blind to qualitative details," *id.* at 13, FinCEN has not shifted at all, nor are plaintiffs entitled to access any more information about the SARs than they were before. The Rule was always premised on FinCEN's analysis of the qualitative characteristics of the SARs (e.g., indicators of shell company activity) *as well as* their overall volume. The Supplement was intended to clarify and explain its analysis, not to change the agency's position strategically or add any post-hoc rationalizations. To the extent that plaintiffs argue that they are entitled to more information about the "qualitative details" of the SARs FinCEN relied upon, this argument is meritless. Any information that could have been made public has already been summarized in the Notice of Finding and subsequent rulemaking documents, as this Court has already held twice previously. *FBME III*, 2016 WL 5108018 at *8; *FBME Bank Ltd. v. Lew* 125 F. Supp. 3d 109, 120 (D.D.C. 2015). Plaintiffs have provided no grounds for revisiting this issue.

## II. If Upheld, the Rule Should be Allowed to Take Effect, Not Stayed Pending Appeal.

If the Court grants summary judgment for the government, it should lift the current stay on the Second Final Rule and allow it to enter into effect. Although FBME has signaled that it intends to appeal a ruling in the government's favor, it has not made the required showing to justify a stay pending appeal. As plaintiffs acknowledge, the standard for granting such a stay in this Circuit is governed by a four-factor test: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 185 F. Supp. 3d 233, 249-50 (D.D.C. 2016) (citations omitted).

Assuming that the government prevails on the merits, none of these four factors weighs in favor of a stay. First and foremost, "serious legal question[s]" are not enough to show a likelihood of success on the merits, as the Court has recognized, *see id.* at 250; a win by the government in this Court would obviously tilt this factor against a stay. Second, FBME has not even tried to show that it would suffer an irreparable injury; the fact that the Court found irreparable injury at an earlier stage of the case does *not* establish that the bank would suffer irreparable injury now, many months later, when many circumstances have changed. Third, issuance of a stay would obviously greatly injure the government's interest in having the rule take immediate effect and ensuring that a serious threat is permanently and finally denied access to the U.S. financial system. Fourth and finally, there is clearly a strong public interest in protecting the U.S. financial system from money laundering and other illicit financial activity, which weighs heavily in favor of the rule going into effect—both to protect against the threat

posed by this particular bank and to deter other banks from engaging similarly illicit conduct. This is not a close case: if the Court upholds the rule, the Court should allow it to take effect without further delay.[4]

**CONCLUSION**

For the foregoing reasons, the Court should (1) grant summary judgment for defendants; (2) deny plaintiffs' cross-motion for summary judgment; and (3) deny plaintiffs' request for a stay pending appeal.

Dated: January 31, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

JOSEPH H. HUNT
Director

DIANE KELLEHER
Assistant Branch Director

LYNN Y. LEE (CA Bar No. 235531)
AMY E. POWELL
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 305-0531
Fax: (202) 616-8470
Email: lynn.lee@usdoj.gov

*Attorneys for Defendants*

[4] If the Court grants summary judgment for defendants and is inclined to entertain plaintiffs' request for a stay, the government respectfully requests that the parties be permitted to submit further briefing on this issue.