**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FBME BANK LTD.**, *et al.*,

Plaintiffs,

v.

**JACOB LEW**, in his official capacity as Secretary of the Treasury, *et al.*,

Defendants.

Case No. 15-cv-01270 (CRC)

# REPLY IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR A CONTINUED STAY PENDING APPEAL

## TABLE OF CONTENTS

ARGUMENT ..... 1

I. MORE EXACTING SCRUTINY IS APPROPRIATE AT THIS STAGE ..... 1

II. THE SUPPLEMENT FAILS TO RESPOND TO FBME'S COMMENTS REGARDING FINCEN'S RELIANCE ON SARS ..... 2

A. FinCEN Refuses to Provide a Comparative Benchmark or Rationally Articulate Its Failure to Do So ..... 2

B. FinCEN Disregarded the Impact of the Cypriot Financial Crisis on SARs ..... 4

C. FinCEN's SARs Analysis Reveals Further Need for Vacatur ..... 5

III. THE FINAL RULE SHOULD BE EITHER VACATED OR STAYED ..... 7

CONCLUSION ..... 8

## TABLE OF AUTHORITIES

**Page**

### Cases

*American Radio Relay League, Inc. v. FCC*,
524 F.3d 227 (D.C. Cir. 2008) .......... 3

*Armenian Assembly of America, Inc. v. Cafasjian*,
748 F.3d 265 (D.C. Cir. 2014) .......... 6

*Edwards v. California*,
314 U.S. 160 (1941) .......... 7

*FBME Bank Ltd. v. Lew*,
125 F. Supp. 3d 109 (D.D.C. 2015) .......... 8

*FBME Bank Ltd. v. Lew*,
142 F. Supp. 3d 70, 75 (D.D.C. 2015) .......... 4

*FBME Bank Ltd. v. Lew*,
--- F. Supp. 3d ---, 2016 WL 5108018 (D.D.C. Sept. 20, 2016) .......... passim

*Food Marketing Institute v. ICC*,
587 F.2d 1285 (D.C. Cir. 1978) .......... 1

*Judulang v. Holder*,
656 U.S. 42 (2011) .......... 1

*NRDC v. SEC*,
606 F.2d 1031 (D.C. Cir. 1979) .......... 1

*People's Mojahedin Org. of Iran v. U.S. Dep't of State*,
613 F.3d 220 (D.C. Cir. 2010) .......... 8

*Scriptgen Pharmaceuticals, Inc. v. 3-Dimensional Pharmaceuticals, Inc.*,
79 F. Supp. 2d 409 (D. Del. 1999) .......... 6

*Walter O. Boswell Memorial Hospital v. Heckler*,
749 F.2d 788 (D.C. Cir. 1984) .......... 3

### Statutes

5 U.S.C. § 706 .......... 7

**Other Authorities**

79 Fed. Reg. 42639 (July 22, 2014) .......... 5

81 Fed. Reg. 18480 (Mar. 31, 2016) .......... 5, 6

81 Fed. Reg. 86577 (Dec. 1, 2016) .......... 4, 5

Landon Thomas Jr., *Deutsche Bank Fined in Plan to Help Russians Launder $10 Billion*, N.Y. Times (Jan. 30, 2017), http://goo.gl/dBKTxy .......... 2

Andrew Rettman, *Leaked Report Damns Cyprus on Money Laundering*, *EUObserver* (May 20, 2013), https://euobserver.com/economic/120167 .......... 3

## ARGUMENT

The APA obligates FinCEN to justify its Final Rule without drifting into arbitrariness and caprice. FinCEN must, in other words, answer reasoned comments with reasoned explanation. "That is not a high bar, but it is an unwavering one." *Judulang v. Holder*, 656 U.S. 42, 45 (2011). Neither FinCEN's Supplement nor the Government's briefing contains reasoned, intelligent justification of the sort that might pass muster. To the contrary, FinCEN maintains that it could invoke aggregate SARs data as a "central" basis for condemning FBME, *FBME Bank Ltd. v. Lew* ("***FBME III***"), --- F. Supp. 3d ---, 2016 WL 5108018, at *22 (D.D.C. Sept. 20, 2016), without, *e.g.*, comparing that data against any benchmark or baseline, considering FBME's rate of incidence of SARs relative to its total volume of transactions, or accounting for the Cypriot financial crisis as an obvious confounding variable that triggered an artificial spike in SARs. Simply stated, this Final Rule (as supplemented) is incapable of withstanding hard-look judicial review as long practiced by this Court and the D.C. Circuit. The APA calls for vacatur.

### I. MORE EXACTING SCRUTINY IS APPROPRIATE AT THIS STAGE

In trying to deny the warrant for "more exacting scrutiny" under *NRDC v. SEC*, 606 F.2d 1031, 1049 n.23 (D.C. Cir. 1979) and *Food Marketing Institute v. ICC*, 587 F.2d 1285, 1289–90 (D.C. Cir. 1978), the Government offers no satisfying distinction and cites no contrary precedent. ECF 95 at 3 n.1. Although the Government at one point suggests that FinCEN actually considered whether FBME's points "warrant[ed] a change in its analysis of the SARs data or the conclusions it drew from that data," ECF 95 at 3, the suggestion is not a serious one on this record, and the Government itself seems to drop it quickly. *See, e.g.*, *id.* at 12 ("The Supplement was intended to clarify and explain its analysis, not to change the agency's position strategically or add any post hoc rationalizations."). To the extent that FinCEN has (once again) gone through a *pro forma* process en route to a foreordained outcome, this Court has all the more reason to be review FinCEN's final output with a measure of skepticism.

## II. THE SUPPLEMENT FAILS TO RESPOND TO FBME'S COMMENTS REGARDING FINCEN'S RELIANCE ON SARS

### A. FinCEN Refuses to Provide a Comparative Benchmark or Rationally Articulate Its Failure to Do So

Defying Reason & Precedent: The Government's persisting assertion that "the volume of suspicious activity identified in FBME-related SARs was concerning," ECF 95 at 1, remains as vacuous, impenetrable, and unreasoned as ever. The assertion undisputedly lacks grounding in any benchmark or baseline. As to FBME's absolute SARs numbers, they are well below those of leading international banks that never concerned FinCEN. *See, e.g.*, Landon Thomas Jr., *Deutsche Bank Fined in Plan to Help Russians Launder $10 Billion*, N.Y. Times (Jan. 30, 2017), http://goo.gl/dBKTxy. As to FBME's rate of SARs, FinCEN does not deny that "FBME might come out among the very *best* [banks in the world] if only FinCEN even-handedly applied the same SARs analysis to other banks, apples to apples, so as to enable fair comparison." ECF 62-1 at 43. As to this Court's question about how absolute SARs numbers can be assessed in a vacuum (*a la* toxic particulates regulated by EPA), SJ Hearing Tr. 78:4–11, ECF 77, the Government still has no answer. As to caselaw that holds it folly to use statistics without regard for any baseline, as FinCEN has, the Government has no answer and no case that might support FinCEN's approach. *See* ECF 89-1 at 5. Nor does the Government have any answer or counter-authority for FBME's cases that forbid FinCEN from purporting to analyze the "extent" of any illicit activity, per the statute, without considering that as a proportion. *See id*. at 8.

Silence Speaking Volumes for FBME: The Government accuses FBME of "magical thinking, long on speculation but short on supporting evidence," ECF 95 at 5, because FBME submits that FinCEN's abject failure to identify any benchmark or baseline adverse to FBME speaks in favor of FBME. *See also id*. at 6 ("FBME . . . is speculating on the likely results of a comparison that the Supplement says nothing about."). The accusation adds insult to injury. As the Government well knows, FBME has pressed at every turn to be clued into FinCEN's aggregate SARs analysis, only to be denied whatever "supporting evidence" exists. What we know is that FinCEN has "immense expertise" in precisely this area and spent more than two

months drawing upon it, specifically to address the issues flagged by this Court, including any "comparative benchmarks." *FBME III*, 2016 WL 5108018, at *21, 30. We also know that FinCEN has been eager to throw the kitchen sink at FBME, drawing far and wide upon inputs that are dubious at best. It is not at all plausible that FinCEN identified a benchmark or baseline adverse to FBME yet withheld it for the sake of *sparing* FBME.

*Ignoring On-Point Contrary Evidence*: The Government is quite wrong when it claims that FBME pointed only to its "assessment that the SARs filed by FBME constitute a relatively low percentage of its transactions—which reveals nothing about how the volume of FBME-related SARs compares to that of other banks." ECF 95 at 5. In fact, FBME in its relevant comments to FinCEN specifically cited an article published by the EU Observer in May 2013, which reported that "[a]lmost 60 percent of one Cypriot bank's clients are 'high risk' in terms of money laundering" and that a leaked report from Deloitte (commissioned by the EU) examined and faulted "the six Cypriot banks which hold €2 billion or more in deposits." Andrew Rettman, *Leaked Report Damns Cyprus on Money Laundering*, *EUObserver* (May 20, 2013), https://euobserver.com/economic/120167 (cited at AR3342 & n.131). FinCEN has altogether ignored that. It studiously fails to deny that FBME is less, not more, deserving of sanction than any of its fellow banks based in Cyprus. By all indications, therefore, FinCEN is attempting to do what no agency is permitted to do—ignoring and withholding "information adverse to it." *Walter O. Boswell Memorial Hospital v. Heckler*, 749 F.2d 788, 793 (D.C. Cir. 1984); *see American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 239 (D.C. Cir. 2008).

*Hiding the Ball & Reclaiming the Void*: Alternatively, FinCEN suggests it may have kept itself willfully blind. According to the Government, "FinCEN is ready to take appropriate steps at the Court's direction" if it now ought to be undertaking "a comparison in response to FBME's comment." ECF 95 at 6 n.3. That begs the question of *what else* FinCEN could have been doing with the *more than two months* it spent on the latest remand. The most charitable interpretation of FinCEN's peculiar approach remains that it insists on hiding the ball—*i.e.*, withholding any benchmark, baseline, or other stated metric susceptible to external scrutiny—as

a matter of principle and pride. Indeed, FinCEN's Supplement signals precisely such an anti-APA bent, 81 Fed. Reg. 86577, 86579 (Dec. 1, 2016), as we have noted. ECF 89-1 at 6–7.

Notably, the Government does not deny the *feasibility* of consulting a benchmark or baseline—to the contrary, it reserves rights for FinCEN to get to that later. ECF 95 at 6 n.3. Nor does the Government deny that any concern about "tipping off" banks on how to comply "would be no less applicable to *any* threshold that *any* regulator might articulate and thus warn regulated entities against crossing," and unavoidable unless a regulator "proceed[s] with perfect, inscrutable irrationality and unpredictability in how it handles one regulated entity versus another." ECF 89-1 at 7. Nor does the Government deny that the concern "is altogether unfounded," including because banks never know their SARs rates, must focus on day-to-day anti-money-laundering compliance, and would not have bright-line protection in any event. *Id*.

Instead, without engaging key substance, the Government retreats to a footnote. ECF 95 at 5 n.2. There, the Government sums up what is really eating FinCEN: "designating a precise or even a ballpark 'permissible' number . . . *would unduly constrain the agency's discretion*." *Id.* (emphasis added). That may be the most telling confession yet. Having relied on black boxes of secret evidence to wipe out one foreign bank after another without ever answering to judicial review, FinCEN has come to dread any perceived intrusion upon its hitherto unchecked discretion; thus, FinCEN cannot bear to reason through whether SARs numbers are good, bad, or so-so from one case to the next. This Court may have "begun to fill th[e] void" with its decisions in this case, *FBME Bank Ltd. v. Lew*, 142 F. Supp. 3d 70, 75 (D.D.C. 2015), but FinCEN remains nostalgic and pining for the void. Suffice it to note that the agency cannot withhold critical reasoning for the sake of retaining absolute, unreviewable discretion. The Government's instant stance affords further confirmation that arbitrariness and caprice remain at work and in need of correction.

### B. FinCEN Disregarded the Impact of the Cypriot Financial Crisis on SARs

<u>*Ignoring a Key, Obvious Variable*</u>: The Government reiterates that FinCEN did not consider the effect of the Cypriot financial crisis while seizing on data derived from it: "[E]ven

if a financial crisis did trigger additional suspicious activity, FinCEN found no reason . . . to believe that the reported activity was somehow less or not suspicious." ECF 95 at 7. The word "reason" is out of place there. As FBME noted (AR3342 & n.131) and this Court emphasized, *FBME III*, 2016 WL 5108108 at *21, there are obvious indications that the attendant financial controls instituted in Cyprus prompted legitimate withdrawal patterns by individuals that nonetheless looked like structuring and triggered SARs for banks. If the incidence of SARs likewise spiked for *every* bank in Cyprus during this *same* period from 2013–14, then that is all the more reason to attribute those SARs to the financial crisis rather than to bad acts or anti-money laundering deficiencies. Yet FinCEN, at best, has not bothered to look.

*Abandoning Stated Reliance on 2013–14 Data*: The Government is left scrambling to discount the importance the $387 million SARs figure from 2013–14, which it now says is "consistent with the large volume of such activity in the years proceeding 2013-2014." ECF 95 at 8. In fact, the reported total for the *seven* years from 2006-13 was $875 million, just a little more than *twice* what the total was for 2013–14 *alone*. 79 Fed. Reg. 42639, 42640 (July 22, 2014). The spike's magnitude and recency are surely why FinCEN gave the 2013–14 year such prominence in the Final Rule. 81 Fed. Reg. 18480, 18480–01, 18489 (Mar. 31, 2016). FinCEN cannot now run from its stated reliance on 2013–14, merely because that has been exposed as indefensible when placed under bright lights. ECF 89-1 at 11.

### C. FinCEN's SARs Analysis Reveals Further Need for Vacatur

While characterizing FBME as "recycling old arguments," ECF 95 at 8, the Government does little to deny that FinCEN's Supplement has revealed fatal problems with FinCEN's analysis.

*Failure to Consider Proportionality*: This Court found that FinCEN did not "directly address any of [FBME's] points" regarding SARs, including that the SARs "represented a small *proportion* of FBME's overall transactions." *FBME III*, 2016 WL 5108018 at *20–22. FinCEN continues to take no account of proportionality, 81 Fed. Reg. at 86578, and the Government emphasizes as much: "[T]he absolute volume of suspicious transactions identified

in FBME-related SARs contributed to FinCEN's concerns, *regardless of what percentage of FBME's overall transactions they composed*." ECF 95 at 9 (emphasis added). That leaves FinCEN at odds with the statutory language requiring it to analyze "the extent to which" FBME was used for illegitimate activity and cases construing materially identical language. *See Armenian Assembly of America, Inc. v. Cafasjian*, 748 F.3d 265, 278 (D.C. Cir. 2014); *Scriptgen Pharmaceuticals, Inc. v. 3-Dimensional Pharmaceuticals, Inc.*, 79 F. Supp. 2d 409, 421 (D. Del. 1999); *see also* ECF 89-1 at 8 (citing same). The Government has no answer whatsoever to this on-point authority.

*Failure to Consider Legitimate Activity*: Nor does the Government offer a meaningful response to FBME's observation that this Court's stated premise as to how FinCEN accounted for the next statutory factor—the extent of FBME's *legitimate* activity—has proved false. All the Government says is that "the extent to which the bank was used to facilitate illicit vs. legitimate activity is a larger issue that is obviously not limited to the volume, absolute or relative, of suspicious transactions." ECF 95 at 9. But that is a dodge: FinCEN has now announced that it cared nothing about proportionality and dealt only in absolutes when assessing the volume of problematic transactions. By so doing, it has pulled the rug out from under itself and this Court's prior decision, for FinCEN has never claimed and this Court has never found that FinCEN undertook any *separate* inquiry into the extent of FBME's *legitimate* activity.

*Overinclusiveness of SARs*: Although the Supplement purported to analyze SARs content only as to "shell company activities," 81 Fed. Reg. at 18489, the Government treats that as covering "particular characteristics" that render the SARs suspicious. ECF 95 at 11. Still, there is no explanation as to why or how FinCEN might deem "shell company activity"—something commonplace across all banks—inherently problematic for SARs. And there

certainly is no justification for why FinCEN lumped *additional* SARs categories—including structuring—into the same undifferentiated, overinclusive tally without any further analysis.[1]

Qualitative Analysis of SARs: The Government now says that FinCEN's determinations were "always premised on FinCEN's analysis of the qualitative characteristics of the SARs . . . *as well as* their overall volume" and that "FinCEN *did* examine and find that many of the SARs had the 'particular characteristics' that are associated with money laundering." ECF 95 at 11–12. The Government does not deny, however, that this Court assumed *the opposite* in stating that FinCEN based its determinations only "on the aggregate data drawn from the SARs" and *not* "on particular instances of activity reported in particular, withheld SARs." *FBME III*, 2016 WL 5108018 at *19. Because it is now apparent that FinCEN was in fact placing key reliance upon the qualitative characteristics of individual SARs while withholding them from FBME, this Court's express rationale for approving withholding of individual SARs no longer holds.

## III. THE FINAL RULE SHOULD BE EITHER VACATED OR STAYED

Vacatur is anything but "premature." ECF 95 at 6 n.3. Since July 2014 (two-and-a-half-years ago), FBME has been ravaged by actions that lacked basis in law. FinCEN withheld unclassified, nonprotected information, only then to obtain a voluntary remand. After committing and being ordered to provide all unclassified, nonprotected information for comment, FinCEN again violated its notice obligation in multiple respects, but those were excused as harmless. After omitting reasoned justification for its reliance on aggregate SARs data, FinCEN was afforded yet another stab, this time to provide unilateral explanation on remand. There should be no more do-overs at the expense of FBME.

Congress provided for this Court to "hold unlawful and set aside agency action" found to be arbitrary and capricious. 5 U.S.C. § 706. In a different context, Justice Jackson once

[1] The Government echoes FinCEN's newfound speculation "that the SARs were more likely underinclusive than overinclusive." ECF 95 at 11. Such speculation does not substitute for reasoned analysis of the data actually reported, however, and by no means justifies skewing that data so as to distort the case against FBME and to bury aspects helpful to FBME.

warned against the prospect that certain rights might be reduced to "a promise to the ear to be broken to the hope, a teasing illusion like a munificent bequest in a pauper's will." *Edwards v. California*, 314 U.S. 160, 186 (1941) (Jackson, J., concurring) (striking down law that infringed constitutional right to travel). The APA's principle and promise remain unchanged and vital today: In our present times, this Court should be no less willing to "set aside" action by an executive agency that has overstepped or wandered astray.

Alternatively, this Court should continue its stay pending appeal. Although FBME would not oppose "further briefing" on this issue, ECF 95 at 14 n.4, the basis for stay seems obvious and FBME is reluctant to belabor the same merits points already addressed.[2] For present purposes it may suffice to note that, if the Court upholds the rule, it will be doing so despite having found procedural notice defects (which it nonetheless excused as harmless)[3] as well as substantive arbitrariness and caprice that the Supplement does little (if anything) to cure. Especially given the acknowledged paucity of precedent in this area (*FBME III*, 2016 WL 5108018 at *4), the D.C. Circuit should have its say before the Final Rule takes effect and FinCEN does its worst to FBME. To facilitate that, FBME would gladly embrace whatever expedition the Government might desire on appeal.

## CONCLUSION

For the foregoing reasons, FBME respectfully requests that the Court vacate FinCEN's Rule or else, alternatively, stay the Rule pending appeal.

---

[2] Although the Government asserts that "many circumstances have changed" since "an earlier stage of the case" so as to impact irreparable injury, *id*. at 13, it neither identifies any such changed circumstances nor acknowledges the Court's repeated, persisting maintenance of the stay.

[3] *But see FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 123 (D.D.C. 2015) (citing *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 613 F.3d 220, 229 n.6 (D.C. Cir. 2010) to reject prospect that failure of notice might be harmless in this context).

Dated: February 6, 2017

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN LLP

*/s/ Derek L. Shaffer*

Derek L. Shaffer (D.C. Bar No. 478775)
William A. Burck (D.C. Bar No. 979677)
Lauren H. Dickie (IL Bar No. 6286037)
Jonathan G. Cooper (D.C. Bar No. 999764)
777 Sixth Street NW, 11th Floor
Washington, DC 20001
(202) 538-8000

HOGAN LOVELLS US LLP

*/s/ Peter S. Spivack*

Peter S. Spivack (D.C. Bar No. 453731)
J. Evans Rice III (D.C. Bar No. 481768)
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5600

*Attorneys for Plaintiffs*
*FBME Bank Ltd. and FBME Ltd.*