**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FBME BANK LTD.**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**JACOB LEW**, in his official capacity as Secretary of the Treasury, *et al.*,<br><br>Defendants. | Case No. 15-cv-01270 (CRC) |

**REPLY IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR RECONSIDERATION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

ARGUMENT .......... 1

I. THE GOVERNMENT'S PERSISTING INVOCATION OF CLASSIFIED STATUS NOW SERVES ONLY TO OBFUSCATE .......... 1

II. THE GOVERNMENT LACKS SATISFYING JUSTIFICATION FOR ITS HANDLING OF THE FEBRUARY REPORT .......... 4

A. FinCEN Obviously "Considered" The February Report .......... 4

B. FinCEN Should Not Have Treated The February Report As "Classified" .......... 5

III. REVELATIONS SURROUNDING THE FEBRUARY REPORT HAVE SERIOUS IMPLICATIONS AND WARRANT SERIOUS REMEDY .......... 10

A. Bad Faith And Impropriety Have Been Shown .......... 11

B. FBME's Merits Arguments Are Now Better Illuminated .......... 15

1. Procedural Deficiencies .......... 15

2. Substantive Arbitrariness and Caprice .......... 18

3. Due Process Deprivations .......... 20

CONCLUSION .......... 21

# TABLE OF AUTHORITIES

**Page**

## Cases

*FBME Bank Ltd. v. Lew*,
125 F. Supp. 3d 109 (D.D.C. 2015) ........................................15, 16

*FBME Bank Ltd. v. Lew*,
142 F. Supp. 3d 70 (D.D.C. 2015) ........................................16

*FBME Bank Ltd. v. Lew*,
--- F. Supp. 3d ---, 2016 WL 5108018 (D.D.C. Sept. 20, 2016) ................ 18, 19, 21

*Shands Jacksonville Medical Center v. Burwell*,
139 F. Supp. 3d 240 (D.D.C. 2015) ........................................18

*United States v. Trabelsi*,
2015 WL 5175882 (D.D.C. Sept. 3, 2015) ........................................8

## Statutes

5 U.S.C. § 706 ........................................7

## Other Authorities

75 Fed. Reg. 707 (Dec. 29, 2009) ........................................9, 10

81 Fed. Reg. 18480 (Mar. 31, 2016) ........................................5

Department of the Treasury, Office of Inspector General,
*General Management: Treasury Has Policies and Procedures to Safeguard Classified Information But They Are Not Effectively Implemented*,
Report OIG-13-055 (Sept. 27, 2013), https://goo.gl/g7V33R ........................................10

Executive Order 13526 ........................................9, 10

Federal Rule of Civil Procedure 60 ........................................1

Josh Gerstein, Politico, *Now-Classified Clinton Emails Sitting on Google Servers* (Sep. 14, 2015), http://www.politico.com/story/2015/09/hillary-clinton-gmail-google-classified-content-213458 ........................................8

## ARGUMENT

The Government's latest submission (ECF 98) amounts to a confession of error, minus the virtue of candid confession. While disputing the import of revelations reported by FBME, the Government does not deny any of the actual facts.[1] Nor does the Government offer satisfying explanation of how it could have made a series of representations so thoroughly at odds with the actual facts. Without belaboring questions of discretion and remedy that are familiar to this Court in connection with reconsideration requests,[2] FBME will focus this reply on emphasizing the extraordinary basis for this particular request: The Government's conduct of this case has gone seriously amiss, compromising the fundamental fairness of this proceeding and calling into question the Government's overall approach to employing "classified" designations and submissions, particularly as to materials received from foreign regulators as third parties, in the context of administrative challenges such as this.

## I. THE GOVERNMENT'S PERSISTING INVOCATION OF CLASSIFIED STATUS NOW SERVES ONLY TO OBFUSCATE

The Government is studiously agnostic about whether and how it handled the February Report from CBC, maintaining that "Defendants cannot confirm or deny the specific content of the *ex parte* classified and protected administrative record." ECF 98 at 1. While submitting "a classified declaration to identify for the Court whether any of this information described by

[1] In a footnote, the Government quibbles over Exhibit F to the Georgiou Declaration and questions whether he has "personal knowledge of this particular document." ECF 98 at 4 n.2. But the quibble seems out of place: The Government itself strained well beyond Mr. May's personal knowledge throughout prior declarations, including by having Mr. May vouch for deliberations by FinCEN's ultimate decision-maker. ECF 79 & 79-1. In any event, the Government does not deny that Exhibit F accurately reflects the February Report.

[2] It bears noting that the Government's opposition at times reads as though the Court has already entered a final judgment, at which point any reopening of proceedings would be limited by Federal Rule of Civil Procedure 60(b). Of course, these proceedings remain ongoing, and the bar that must be cleared for reconsideration is not so high.

Plaintiffs appears in the administrative record," the Government insists that it "cannot otherwise comment publicly on the specific substantive content of the classified or otherwise protected portions of the administrative record." *Id.* at 8–9; *see also id.* at 10 ("Defendants cannot comment on the content of the classified record . . . ."). Mindful of the sensitivities that surround classified material and treatment thereof, FBME simply notes that the Government's instant position is dubious as well as problematic in the present circumstances—even before reaching the larger questions, discussed *infra* at 5–10, of whether and how the February Report might *initially* have been designated as "classified."

First, the submissions now before the Court make plain that the February Report has been disclosed in Cyprus, per the order of a Cypriot court. ECF 92-2 ¶¶ 11, 15. The Government does not contend otherwise. To the contrary, the Government acknowledges the prospect that "disclosure of such information in Cypriot litigation would waive classification," while disavowing any position on that too. ECF 98 at 11. It is unclear why the Government would not—in the face of the grave concerns posed by the present record and FBME's compelling need to engage about what actually happened—at least inquire and report about the prospect of a discrete declassification. By all indications, however, the Government has made no such attempt.

The Government's justification for maintaining a freeze on classified status appears to be that it fears "potentially endless re-litigation, [after] this case has already involved a significant amount of litigation and briefing on a single rulemaking." ECF 98 at 11. That purported explanation is especially unsatisfying considering that the Government's own failures to this point have prompted, *e.g.*, (i) a second rulemaking that the Government sought and obtained pursuant to its own request for a voluntary remand, ECF 38; (ii) special leave for the

Government to file an after-the-fact, extra-record affidavit from Mr. May on the issue of inter-agency consultations, which then triggered briefing around that, ECF 79, ECF 80, ECF 81; (iii) the Government's pending reservation of rights for a third remand, which would be followed by still more briefing, ECF 94 at 6 n.3; and (iv) two recent requests by the Government for extension (obtained with FBME's consent) that resulted in the Government taking six weeks before first addressing its receipt, two years ago, of the February Report, ECF 93, ECF 97. Any newfound concern the Government may have about protracting the litigation is no good justification for not taking obvious, reasonable steps now simply to lift a classified designation that seems outdated, at best.

Second, the Government's notion that it can say nothing whatsoever about the classified record, including "what it does or does not include," ECF 98 at 9, is belied by its prior conduct. At an earlier stage of this case (when it was seeking voluntary remand and bidding for FBME's consent to the same) the Government expressly assured FBME in this litigation that "FinCEN does not have [PwC audits] in its possession." ECF 42, Ex. B at 1. Likewise, FinCEN in the administrative record (when it was trying to ward off critical comments by FBME) had no compunction about representing that "FinCEN has not received any such [PwC] reports." AR0052 (emphases added). Crediting the Government's instant position that material sent by CBC as foreign regulator would be entitled to classified status, those prior representations substantively conveyed that the PwC audits—which everyone understood would have come from CBC, as the record abundantly confirms, *see infra* at 10–11—were *not* in the black box of classified evidence. Only upon being called out for that representation has the Government decided that it can make no such representation. The change in position is anomalous and serves to keep FBME in the dark, quite gratuitously. Considering the pitfalls and unfairness

that arise from forcing FBME to litigate blind as compared to the Government, it is most unfortunate that the Government would be stretching classified treatment so far, so persistently.

## II. THE GOVERNMENT LACKS SATISFYING JUSTIFICATION FOR ITS HANDLING OF THE FEBRUARY REPORT

Despite its agnosticism about the status of the February Report, the Government offers a faint assurance. Citing the facts reported by FBME, the Government submits that those "would be consistent with conclusions that either: (1) FinCEN never ultimately considered [the February Report] as part of the rulemaking or submitted it to the decisionmaker; or (2) FinCEN did consider it but treated the communication as classified, considering the request of a foreign government." ECF 98 at 8. Notably, the Government stops short of offering firm assurance that those conclusions are in fact *correct*, just as it stops short of confirming FBME's factual account. Under the circumstances, FBME has every basis to stand by its factual account (which seems incontrovertible) as to how FinCEN secretly received the February Report yet made contrary representations. From there, it is easy enough to say why the "conclusions" FinCEN posits afford no comfort, and instead compound the concerns already raised.

### A. FinCEN Obviously "Considered" The February Report

We begin with the prospect that "FinCEN never ultimately considered [the February Report] as part of the rulemaking or submitted it to the decisionmaker." ECF 98 at 8. This one should be dismissed out of hand. Only by stripping the word "considered" of meaning might FinCEN claim *not* to have "considered" the February Report in connection with this rulemaking. Richard May received the February Report, corresponded with CBC specifically about it for more than a year (including at the outset of the litigation and at the conclusion of the second rulemaking), and sought CBC's permission to disclose it in this case, surely as part of the administrative record. ECF 92-1 at 14. And Richard May was acting as FinCEN's **Director**

**of the Office of Special Measures**, through whom the memorandum in support of the final rule was routed, as the memo says on its face. AR0001. Last, because FinCEN has made clear that it places stock in CBC and findings therefrom, 81 Fed. Reg. 18480, 18485 (Mar. 31, 2016), it is altogether implausible that it would have *ignored* the content of the February Report from CBC.

Conspicuously absent this time around is the attestation Mr. May earlier offered—however unsatisfyingly, *see* ECF 72; ECF 76—in connection with other objectionable material, to the effect that FinCEN specially "excluded [the submission] from consideration" such that it was "never seen by the ultimate decisionmaker for the March 30, 2016 Rule related to FBME." *Compare* ECF 67-1 at 1–2. If FinCEN were nonetheless excused from including the February Report in the administrative record merely because, as Mr. May says in his latest declaration (further discussed *infra* at 11–15), the agency purports to have "included in the administrative record everything that it considered for purposes of this rulemaking," ECF 98-1 at 1, then nothing substantive would remain of the requirement that it include all documents potentially considered. The agency could always establish, conclusively and by definition, that it did "not consider" a particular document merely by noting that it omitted the document from the administrative record it certified. Here, there can be no fair doubt that FinCEN *did* receive and consider the February Report, nor could there be any excuse for omitting it from the administrative record.

**B. FinCEN Should Not Have Treated The February Report As "Classified"**

That brings us to the second conclusion FinCEN posits—namely, that "FinCEN did consider [the February Report] but treated the communication as classified, considering the request of a foreign government." ECF 98 at 8. Assuming that is in fact what happened (and this Court should know definitively), the Government's approach to classified information in this

case raises further problems. To be sure, FBME has previously expressed concern about FinCEN's black box, and about how the Government was exploiting it to FBME's prejudice, without regard for fundamental fairness or available means of mitigation (such as a log). ECF 40 at 15–22; ECF 62-1 at 25–26. But the Government offered reassurances to assuage those concerns. In particular, the Government dismissed as "unfounded" the concerns FBME raised specifically about the specter that FinCEN was receiving and relying upon secret submissions from CBC in connection with voluntary remand. ECF 45 at 11–12.

It is important to recall the specific concerns that FBME had raised and that the Government was calling "unfounded" back in October 2015 (eight months after FinCEN, we now know, received the February Report). As FBME put it when opposing voluntary remand,

> With respect to information and documentation *received and relied upon from third parties*, FinCEN has refused to confirm what role ***information provided by the CBC had played previously and stands to play going forward***. Specifically, *FBME asked about purported reports from the CBC, which reports CBC had inexplicably withheld from FBME*. There are indications that *certain CBC audit reports prepared in summer of 2014 by PricewaterhouseCoopers, with the knowledge and cooperation of FBME—even though they were then withheld from FBME—in fact influenced FinCEN's previous rulemaking*. After just recently representing that it "does not have [the PWC reports] in its possession and therefore does not plan to rely on them," FinCEN would *not* represent that it never possessed, reviewed, or relied upon such reports. Shaffer Decl., Ex. B. *Nor is FinCEN illuminating the nature of the third-party information—**including summaries, compilations, or second-hand accounts**—that it **may be continuing to rely upon as derived from CBC**.*

ECF 40 at 5–6 (some emphases added). In case that was not clear enough, FBME later noted:

> FBME has every reason to believe that ***FinCEN plans to make its case against FBME by relying in substantial part upon CBC as its proxy***. As the Court is well aware, *the CBC has been coordinating with FinCEN throughout these proceedings* . . . . And one day after FinCEN, in the face of pointed inquiries from FBME, represented that it "does not have [the PWC reports] in its possession and therefore does not plan to rely on them," yet refused to say that FinCEN never had the reports, *CBC* happened to disclose to FBME *the purported content of those reports, thereby affording FBME its first opportunity to respond*.
> …

> This presents a situation in which FinCEN and CBC may *both* be joining forces to destroy FBME without *either* regulator being held to substantive account.

*Id.* at 19–20 (some emphases added); *see also id.* at 16 ("What we understand at this point is that FinCEN is intent upon withholding unclassified documents as privileged; that this category encompasses anything and everything FinCEN received from a third party; that no log or other summary will be provided to identify specific information or even categories being withheld; and that no purported basis will be specified for any such withholding.").

Admittedly, FBME was not so cynical as to suspect that FinCEN might go so far as to treat *all* such submissions from CBC as being, by definition, *classified* so long as CBC desired to keep FBME blind. To state the obvious, however, such a sweeping, automated, obliging approach by the Government to classified designations by no means *mitigates* the substantive concerns FBME so clearly raised, and it certainly did not leave FBME's stated concerns "unfounded." To the contrary, such a categorical approach to classifying and thus secreting all submissions from CBC—to the point that the Government now maintains a veil over the basic question whether it has even received anything from CBC—elevates FBME's procedural and substantive concerns in this case to their zenith. Worse, it strongly suggests that "classified" designations are subject to unbounded, unprincipled abuse that imperils the integrity of civil administrative challenges even as they progress through the federal courts. This deeper concern is elaborated *infra* at 15–20, but FBME's instant point is simply that the Government by no means should have submitted to this Court that FBME's stated concerns were "unfounded" while FinCEN was in fact secretly considering the February Report from CBC—and, indeed, planning to do so throughout the voluntary remand and then upon return to this Court, unless and until CBC might be (uncharacteristically) gracious enough to authorize release for FBME's benefit.

Moreover, the notion that the February Report might ever deserve classified treatment from a national-security perspective strains credulity. Communications between the U.S. officials and foreign government officials are not "ordinarily privileged," let alone classified. *United States v. Trabelsi*, 2015 WL 5175882, at *3 (D.D.C. Sept. 3, 2015). Indeed, even when foreign officials send communications to U.S. officials "with the expectation of confidentiality," that is not enough to establish that a document is privileged: "Expectations of confidentiality, even those shared by a foreign sovereign, and 'anticipation of the nondisclosure of . . . candid communications,' are not enough to establish a legally recognizable privilege." *Id*. Thus, in *Trabelsi*, this Court rejected the Government's argument that communications between U.S. and Belgian officials were inherently privileged or were protected by the attorney-client or deliberative-process privileges. *Id*. at *3–7. (The Court did hold that the "work product privilege" may protect some of the communications from disclosure—although that could be decided only after the Government prepared a privilege log and submitted the materials to the Court for in camera review. *Id*. at *5.) The law is thus clear that communications between FinCEN and Cypriot officials—even confidential communications—would not ordinarily be privileged or classified. Were emails with foreign government officials presumptively classified, daily operations of diplomats and others who routinely interact with foreign governments would grind to a halt.[3]

Furthermore, the fact that Richard May asked the CBC for permission to disclose the February Report to the public on two separate occasions—first on August 8, 2015, and then

[3] *See* Josh Gerstein, Politico, *Now-Classified Clinton Emails Sitting on Google Servers* (Sept. 14, 2015), http://www.politico.com/story/2015/09/hillary-clinton-gmail-google-classified-content-213458 (quoting a former State Department official: "The daily operations of State and, I would add, the White House, would not be possible if everyone put everything on the classified email system that involved foreign government information.").

again on March 11, 2016—suggests that the Report was not classified at those times. If it were classified, then Richard May presumably would not have asked; because foreign officials cannot authorize U.S. officials to disclose classified information, *see* Executive Order 13526 §§ 3.1–3.7, 4.1(a), 75 Fed. Reg. 707, 720–21 (Dec. 29, 2009), CBC's permission to disclose the Report should not have controlled.

It should also be noted that treating the February Report as confidential does not square with FinCEN's handling of *other* third-party materials it received from individuals purporting to act at the instruction of the Cypriot government. ECF 51; ECF 52, Ex. F. For all of the problems FBME perceives with how FinCEN sat on certain secret, improper, *ex parte* submissions over a period of months before first flagging them for FBME, the Government did not ultimately subject those to a "classified" designation, such that FBME and its counsel could never know anything of them. By all indications, however, that was a close shave: had FinCEN deemed those to be submissions by the Cypriot government that commissioned them, or had the Cypriot government (CBC or MOKAS) directly routed them to FinCEN, Cypriot instruction to conceal them would have sufficed to ensure "classified" treatment by FinCEN. That prospect does not sit well.

Nor did a mere audit report conveyed by CBC implicate national security. Again, the audit had been conducted with PwC in full view of FBME and with FBME's full engagement and cooperation; the report was due to be disclosed as a matter of course and was the subject of active discussion between FBME and CBC; and the ensuing September Report both covered similar subject matter and confirmed that the relevant findings should be grist for consumption and response by FBME, especially because alleged AML problems supposedly required urgent correction by FBME. AR3315, 3319—20; AR3958. The routine nature of this audit and its

treatment in Cyprus, including now by a Cypriot court that has ordered their disclosure, confirms that the February Report never should have been classified. Only by giving CBC *carte blanche* to condemn FBME while operating under an unreviewable, impenetrable cloak of secrecy might our Government have arrived at a "classified" designation. Such an approach distends classified treatment beyond propriety, particularly in the context of litigation that puts FinCEN's collusion with CBC centrally at issue, as this one unmistakably does. ECF 70 at 28–35.

Finally, all known communications pertaining to the Report—namely, those on February 13, 2015; August 6, 2015; March 3, 2016; and March 11, 2016—were transmitted on unclassified email systems, absent any classification markings. Yet there are rules against transmitting classified information without such safeguards. *See* Executive Order 13526 § 4.1(f), (g); 75 Fed. Reg. at 720–21; Department of the Treasury, Office of Inspector General, *General Management: Treasury Has Policies and Procedures to Safeguard Classified Information But They Are Not Effectively Implemented*, Report OIG-13-055, at 4 (Sept. 27, 2013), https://goo.gl/g7V33R (finding that Treasury Department personnel often improperly mark classified emails in violation of Treasury Department rules). It follows that either the February Report was unclassified, or else that Richard May may have violated the rules governing transmission of classified material.

## III. REVELATIONS SURROUNDING THE FEBRUARY REPORT HAVE SERIOUS IMPLICATIONS AND WARRANT SERIOUS REMEDY

Beyond offering faint, unsatisfying assurances that all is well in this case, the Government tries to deny the seriousness of the instant affliction. The affliction is grave, however, and it calls for judicial cure.

### A. Bad Faith And Impropriety Have Been Shown

The Government insists that there is no showing here of “bad faith” or “improper behavior.” ECF 98 at 7 (citing cases). It is difficult to imagine what stronger showing could realistically be made without benefit of discovery—discovery of the very sort that FBME has sought and continues to seek, including via the relief now requested. Tellingly, the Government does not even purport to defend its submission to this Court that FBME’s concerns about FinCEN secretly receiving and relying upon submissions from CBC were “unfounded.” ECF 45 at 11–12; *see* ECF 92-1 at 7, 16 (repeatedly noting that the Government’s submission was at odds with the actual facts). To reiterate, FBME was expressly warning this Court of the prospect that FinCEN would categorically withhold “third-party information—including summaries, compilations, or second-hand accounts— . . . as derived from CBC,” including any specifically coming out of the PwC audit. ECF 40 at 5–6. The Government somehow called that “unfounded” while knowing it to be substantively on target, presumably calculating that FBME would never be able to uncover the instant evidentiary foundation. Only thanks to an improbable turn of events in Cyprus can FBME now prove that it was right all along and that the Government’s denials were false. It has become all too apparent that the Government made representations that were either false by their terms or sure to mislead, as evident from facts known only to the Government, in circumstances where FBME was never expected to learn better. *See* ECF 92-1 at 15–19. Although it is rare to identify proof of governmental bad faith and impropriety, such proof abounds here. The “presumption of regularity” on which the Government relies, ECF 98 at 8, seems thoroughly out of place in these extraordinary circumstances.

Nor does Mr. May’s latest declaration restore things to good order. Instead, it only raises louder and louder alarms. Far from acknowledging any mistake or oversight, or offering

any apology, Mr. May now attests under oath that he was "aware that litigation counsel informed FBME that 'FinCEN does not have [the Pricewaterhouse Cooper audits] in its possession and therefore does not plan to rely on them.'" ECF 98-1 ¶ 5. He adds that he "understood FBME's counsel's inquiry regarding the Pricewaterhouse Cooper audits to refer to reports authored by PwC and not the Central Bank of Cyprus." *Id.* Mr. May does not explain how he could have understood FBME's inquiry to be so limited, or why he neither sought any clarification nor suggested any caveat. In particular, he does not attempt to square his understanding with the explicit concerns FBME had been contemporaneously expressing about any "summaries, compilations, or second-hand accounts . . . that [FinCEN might then] be continuing to rely upon as derived from CBC," especially as arising out of the PwC audit. ECF 40 at 6; *see id.* at 20 (expressly invoking the September Report as reflecting that "CBC happened to disclose to FBME the purported content of those [PwC] reports, thereby affording FBME its first opportunity to respond"); *see also* ECF 42 ¶ 6 ("[C]ounsel for FBME inquired about certain information and material FBME believes ***FinCEN had received from the Central Bank of Cyprus***, including certain reports ***purportedly*** produced by PricewaterhouseCoopers.").[4]

Nor does Mr. May (or the Government, for that matter) attempt to explain how he could have been comfortable conveying a final memorandum in support of the final rule that stated, without equivocation, "[r]egarding the comment's allegations regarding PwC reports related to

[4] It is disingenuous for the Government to characterize FBME as contending "the Government should have intuited that their request for the 'PwC' audit was in fact a request for the CBC audit reports." ECF 98 at 12. As FBME has emphasized and the record reflects, FBME was being as explicit and clear as it possibly could be—even while kept in the dark—that it wanted whatever FinCEN might have received from CBC coming out of the audit conducted with PwC. The February Report was *precisely* such a report, *precisely* from CBC to FinCEN, *precisely* arising from PwC's audit. Even so, the Government and Mr. May made no effort to clarify, caveat, or to seek guidance from the Court. Instead, they offered flat denials that were sure to be misleading, at best, to anyone not versed in the black box known only to FinCEN.

FBME, FinCEN has ***not*** received ***any such*** reports." AR0052 (emphases added); *see* ECF 92-1 at 8–9, 16–17 (repeatedly calling out this statement in the memorandum as false and calculated to deceive). In its administrative comments, too, FBME had made exquisitely clear that a document from CBC such as the February Report fell at the center of FBME's concerns: "[T]he shroud of secrecy and mysterious circumstances surrounding the ***phantom*** PWC report suggest that ***the Cypriot regulators likely misrepresented information to FinCEN about FBME***—or else (much the same) ***disguised their own biased, self-serving findings regarding FBME as those of PWC*** in order to advance their goal of scapegoating FBME to distract from the systemic problems within the domestic Cypriot banking sector and seizing the Bank and its assets." AR3320. It is nothing short of stunning that Mr. May would, in full view of FBME's comment alongside the February Report (about which he was actively corresponding with CBC at precisely that point in time), sign off on a statement in FinCEN's final memorandum—public, unredacted, and very much part of this proceeding—that could only be taken as *denying* the very same charge by FBME that Mr. May *knew* to be substantively on target.

To the extent that Mr. May, like the Government, was comfortable treating "PwC Report" as a term of art subject to his own peculiar, unstated definition (without regard for FBME's natural understanding or the context surrounding it), that should eviscerate his credibility here and now. As everyone recognizes, the black box by its very nature leaves FBME blind to details that might otherwise enable insight and precision. That informational disparity is not one that Mr. May and FinCEN should have been comfortable exploiting—or that the Government should be exploiting now. Notably, FBME is no better equipped now to understand or to test the peculiar, unstated definitions that may lie behind the spare, conclusory, opaque terms in which Mr. May has couched all three of his affidavits. The current record

therefore affords compelling warrant for at least permitting FBME fair opportunity to probe and test Mr. May's affidavits and to clarify what he actually means by them before they are finally credited by this Court. Indeed, as noted earlier, *supra* at 8–10, if the February Report was classified, then Mr. May may have violated Treasury Department rules by communicating about it through unclassified email systems as he did. That hardly enhances confidence in anything he may swear to under oath.

Mr. May's current circumstances render the Government's reliance upon him all the more suspect. We now learn that Mr. May has been recused from all Section 311 rulemakings dating back to November. This is attributed to the fact that he has "been in employment negotiations with a financial institution" throughout the intervening three months. ECF 98-1 ¶ 6. We further understand that he "has been out of the office on extended family leave" during some portion of those three months. ECF 97 at 2. These unusual circumstances render all the more suspect the Government's singular reliance on Mr. May and his three conclusory affidavits to sustain critical, controversial aspects of its case. Examination of him is amply warranted, as are requirements of a privilege log and renewed confirmation that the Government has provided an accurate and complete administrative record. Indeed, crediting the Government's characterization of FBME's concerns as arising from "some misunderstanding between counsel," ECF 98 at 13, there can be no denying that such a regrettable misunderstanding could have been avoided if only the Government had offered the barest nod towards transparency—specifically by logging basic information about inputs from CBC. At this point and on this record, there is every good reason for the Government now to compile and produce a privilege log that at least covers whatever materials it may have received from CBC and other third parties.

### B. FBME's Merits Arguments Are Now Better Illuminated

The Government criticizes FBME for "not even attempt[ing] to show that the 'new information' would change the outcome of summary judgment or the rulemaking." ECF 98 at 14.[5] FBME is entitled to summary judgment, however, if FinCEN has withheld materials on which it relied and to which FBME should have been granted access, either in whole or in limited forms via a privilege log. *See FBME Bank Ltd. v. Lew* (**"*FBME I*"**), 125 F. Supp. 3d 109, 121 (D.D.C. 2015); *see also* ECF 62-1 at 25–26, 35–36; ECF 70 at 21–23. To the extent that the Government would demand further merits showing, it is only appropriate for FBME briefly to note that its instant concerns have even larger import. They stand to make a profound difference to the merits arguments this Court earlier rejected with respect to (1) procedural deficiencies; (2) substantive arbitrariness and caprice; and (3) due process deprivations.

#### 1. Procedural Deficiencies

First, as to procedural deficiencies, the very fact that FinCEN had received the February Report demonstrates the fundamental deficiency of its Notice. The February Report was the critical outgrowth of the summer 2014 audit of FBME that CBC had conducted with PwC—the purportedly best, most recent, most on-point evidence of FBME's AML compliance. Yet, in

[5] The Government also faults FBME for the fact that, in the Government's words, FBME "sat on the 'newly discovered evidence' for six weeks before even bringing it to the Government's attention." ECF 98 at 15. That is grossly unfair. The instant revelations were turned up by Cypriot counsel through litigation in Cyprus. From there, none of FBME's counsel was primed to conclude they had uncovered evidence that clear, consistent representations made by the U.S. Government in this case were in fact false. Indeed, the instant revelations were very nearly lost on all concerned, who were not quick to fathom that the Government could have made a series of representations contrary to what it actually knew. FBME's counsel then spent time attempting to obtain paper copies of the emails in question, both through the Cypriot Court and through requests to the U.S. Government, to no avail. Especially considering that the Government itself took six weeks to respond to the revelations—despite being advised in the premises from the outset—it should not be faulting FBME for taking like time to make sense of them.

noticing the voluntary remand, FinCEN said *nothing whatsoever* about *any* intervening developments or evidence subsequent to its initial notices that might bear upon its Section 311 determination. *Nothing whatsoever*. Even giving FinCEN every benefit of the doubt about its basis for classifying the February Report, it still had no basis for withholding notice from FBME and other commenters of the basic fact that intervening developments were under active consideration. Indeed, FinCEN and Mr. May were obviously contemplating disclosure of the February Report following the close of notice and comment, as reflected in Mr. May's March 2016 request that CBC consent to disclosure. ECF 92 at 13; ECF 92-1 ¶ 19. It follows that FinCEN would have been glad to surprise FBME with a critical input on the back end without having said anything to preview it on the front end of notice and comment, which is antithetical to what the APA and this Court's orders required. *FBME I*, 125 F. Supp. 3d at 122; *FBME Bank Ltd. v. Lew* (“***FBME II***”), 142 F. Supp. 3d 70, 76 (D.D.C. 2015).[6]

Nor should such a fundamental notice deprivation be deemed harmless. Although FBME did what it could to protect itself by submitting the September Report and FBME's response thereto, that was no substitute for having the actual February Report that FinCEN had

---

[6] Only by withholding notice could FinCEN proclaim to the world that one of the adverse findings set forth in the Second Final Rule came from “an exhibit to *FBME's own comment*, namely a letter to FBME from the CBC summarizing the result of its 2014 audit.” ECF 73 at 36. Similarly, the Government argued here that, “[g]iven that FBME also submitted a detailed response to the [September Report] . . . it can hardly claim that the 3% statistic was new evidence to which they were unable to respond.” *Id.* at 37. But the notion that FinCEN had visited the issue and deliberated over it only at FBME's urging has been exposed as *fictive* to anyone familiar with the actual facts—we now know that FinCEN had been crediting CBC's unilateral submission for many months without envisioning any prospect of refutation by FBME. Although the Government now paints as virtuous FinCEN's discussion of the September Report, saying it serves “the goal of making the public discussion as robust as reasonably possible given the national security considerations at stake,” ECF 98 at 15 n.7, it was no virtue for FinCEN to *affirmatively deceive* FBME and the public as to whether it had already processed and credited a precursor report of the very same findings it purported to confront afresh.

received months earlier.[7] For one thing, acknowledgement by FinCEN of the February Report should have been attended by FinCEN's own observations therefrom—and FBME could then have targeted its comments at *those key FinCEN observations*, per proper notice and comment. For another thing, the hitherto-unknown February Report uniquely illuminates just how unfairly CBC has treated FBME: it alone demonstrates that CBC, *e.g.*, withheld from FBME (but not FinCEN) for some seven months, or 30 weeks, the same allegations that CBC then first dumped on FBME in September, only to give FBME a mere week to respond. That provides proof positive of CBC's bad faith, its lack of seriousness about the same AML issues that FBME allegedly needed to address posthaste, and the undue prejudice FBME faced in trying to respond within the artificially tight deadline set by CBC. Yet FBME had no opportunity to make those points because it knew nothing of the February Report when submitting its comments to FinCEN.

Further still, no such notice deprivation can be viewed in isolation. Assuming *arguendo* that harmless error applies in this context (and FBME respectfully submits that this Court was

[7] Far from affording a second "bite at this particular apple," ECF 98 at 13, revelation of the February Report has afforded FBME its first chance to understand the import the two reports have relative to one another and to argue accordingly to the Court. Although the Government also attributes to FBME a theory that "a report authored by PwC . . . , unlike a report authored by CBC, might be exculpatory," *id*., it somehow overlooks the theory that comes clear from FBME's actual comment: that FinCEN was secretly colluding with CBC and doing its bidding in a shared, surreptitious campaign to destroy FBME. *See supra* at 10; AR3318 ("[W]e have strong indications that FinCEN and CBC have been working closely together behind the scenes" rather than "at arms length"); *id*. ("[T]o the extent FinCEN may be relying on a corrupt, lawless regulator that has proved willing to violate Cypriot and international law in order to destroy a bank and seize its assets for its own self-serving purposes, that will render FinCEN's resulting action arbitrary and capricious, to say the least," and aggravate "related procedural deficiencies—particularly the reliance on a 'black box' of evidence and the absence of any neutral decisionmaker or hearing."); AR3319 ("One particularly troubling indication of the coordination between CBC and FinCEN surrounds the 2014 examination conducted by PWC on FBME."). The February Report affords definitive proof that FinCEN was in fact sitting on secret, smoking-gun proof of its coordination with CBC while denying the existence of same.

earlier correct that it does not, *FBME I*, 125 F. Supp.3d at 123), that analysis should be sensitive to the way various deprivations build upon one another. By withholding one key input, after another, after another, FinCEN denied FBME the opportunity to submit a profoundly different, better informed set of comments that could have made a difference. *FBME Bank Ltd. v. Lew* (**"*FBME III*"**), --- F. Supp. 3d ----, 2016 WL 5108018, at *18 (D.D.C. Sept. 20, 2016) (holding that any violation of due process notice requirements was corrected by "providing FBME with the relevant materials and giving it an opportunity to respond to them"); *Shands Jacksonville Medical Center v. Burwell*, 139 F. Supp. 3d 240, 265 (D.D.C. 2015) (rejecting harmless-error defense when agency withheld important information from commenters); *see also* ECF 92-1 at 6–7 (comparing the substantive differences between the February Report and the September Report).

Finally, it should be said that concerted, calculated, consecutive deprivations of notice at some point give the lie to any notion that the agency is conscientiously engaged in notice and comment, striving to solicit well informed submissions that might matter to its deliberations. Complete withholding of the February Report alongside the other procedural deprivations this Court found could only reflect that FinCEN was at best going through the motions—and falling well short even at that. To the extent that this withholding combines with the others to show that FinCEN was intent on achieving a foreordained result and insulating against contrary comments that might stand in its way, the procedural defects here have been anything but harmless.

**2. Substantive Arbitrariness and Caprice**

The way that FinCEN handled critical input from CBC—digesting it for months, maintaining it as classified on CBC's say-so, and denying that it had received any such submission in the face of pointed inquiries and comments from FBME—may be the most

powerful proof yet that FinCEN's reliance on CBC has been excessive, unsound and improper. Here, FBME respectfully incorporates by reference its prior submissions about FinCEN's arbitrary and capricious failure to acknowledge and account for the bias, prejudice and pecuniary motive CBC has brought to this case—thereby ensuring that FinCEN would reach a foreordained outcome, that FBME would be crushed, and that CBC would claim spoils for itself without facing any liability. ECF 62-1 at 43–47; ECF 70 at 28–35.

This Court, to be sure, was unmoved by those concerns, believing that "FinCEN should be given substantial deference in assessing what weight to give information provided to it by its sister financial regulators." *FBME III*, 2016 WL 5108018, at *23. The Court's apparent premise, however, is that FinCEN has been making disinterested judgments about the credibility of its sister regulator. FinCEN's handling of the February Report and back-and-forth with CBC over it belies any such premise. It provides strong indication that FinCEN went well beyond disinterested weighing, as FBME has warned, in actively colluding to destroy a foreign bank, without meaningful regard for niceties of notice and comment, reasoned consideration of contrary evidence, and demands of U.S. law and judicial review. Here, FinCEN went so far as to cover up a submission CBC made to it, from an audit that FBME knew of, cooperated in, and was due to see reported as a matter of course; the effect of FinCEN's withholding was to keep FBME blind to CBC's allegations and to shield CBC against ever having to answer for them. Then, when confronting the September Report and response as submitted by FBME, FinCEN neither acknowledged that it had been entertaining CBC's one-sided submission throughout preceding months nor made any allowance for the short fuse CBC had put FBME on to respond.

If FinCEN's approach to the February Report stands, then it will be able to piggy-back on foreign regulators without ever answering to meaningful substantive review of the underlying

rationale and evidence. Notably, the foreign regulators will not be answering to the APA—and, depending on the country, will not be answering to anything approaching judicial review and the rule of law as they operate here. Their inputs to FinCEN will likely never see the light of day, as they will, according to the Government's instant position, be subject to classified treatment so long as the foreign regulator so desires. And FinCEN will have the benefit of deference—likely dispositive—if and when it decides to rest its decision on submissions from its sister financial regulator. Thus, if FinCEN decides to boost its relationship with a foreign regulator by doing the foreign regulator's bidding in going after a politically or financially opportune target bank, for reasons well removed from AML deficiencies, and the foreign regulator tenders an adverse report to FinCEN (presumably "classified") in furtherance of that agreed end, a reviewing court will have little to nothing to say about that. Alternatively, FinCEN may farm out any dirty work to a sister regulator that cares little to nothing about legal constraints or truth. FinCEN might coax a foreign regulator (say, via emails or phone calls, none of which will become part of an administrative record) to concoct FinCEN's desired case against a target bank (possibly a convenient, easy scapegoat through which a message can be sent abroad). That too will be insulated against substantive review—the foreign regulator's ensuing report will become classified, secret, weighted as FinCEN sees fit, and fodder for deference.

These are not idle hypotheticals; they emerge naturally from the record of this case. The Government's procedural and substantive positions have closed a perfect loop between the U.S. and Cyprus, one that is designedly insulated against judicial review on either end. This Court should revisit its prior substantive determinations for the sake of intruding upon that loop.

**3. Due Process Deprivations**

Finally, due process concerns now loom larger than ever. Although this Court in its prior opinion indicated that due process may not attach to FBME, the tagline the Government

will take away for use in other cases is this: "the Court agrees with FinCEN that the procedures it afforded the Bank (with the exceptions noted in this opinion) complied with . . .constitutional due process." *FBME III*, 2016 WL 5108018, at *18. FBME respectfully submits that the same conclusion no longer holds. Worse than playing the role of judge, jury and executioner, FinCEN has played those roles while secretly conferring *ex parte* with a foreign regulator that is confessedly bent on liquidating FBME and has been using the instant proceedings to get its government off the hook for hundreds of millions of dollars that may otherwise be owed to FBME's shareholders in an arbitration. ECF 62-1 at 45–46; AR3315–18, 3820–27. Along the way, FinCEN has not only categorically and absolutely withheld the most rudimentary information about any inputs from CBC—any log, factual acknowledgement, or room for review by counsel cleared for that purpose—but has *affirmatively misled* FBME and its counsel relative to the actual facts. And none of FinCEN's evidence has ever been put before a neutral decisionmaker for independent evaluation; when the case reached this Court, deference was high.

Procedural concerns have always loomed large but they now tower over this case and cast a dark, heavy shadow. A persisting ruling that the Government's approach to this case satisfies due process may set a dangerous precedent, opening the door wide open to abuse by the Executive Branch and its agencies while leaving U.S. individuals and entities bereft of meaningful due-process entitlements they could otherwise invoke.

## CONCLUSION

For all of these reasons and in each of these respects, FBME respectfully urges that this Court reconsider its prior summary-judgment order and compel FinCEN to (1) disclose all unclassified materials it substantively considered (other than SARs); (2) prepare a privilege log of all unclassified materials it considered but withheld; and (3) make Richard May available for examination, either at deposition or at live hearing.

Dated: March 1, 2017

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN LLP

*/s/ Derek L. Shaffer*
Derek L. Shaffer (D.C. Bar No. 478775)
William A. Burck (D.C. Bar No. 979677)
Lauren H. Dickie (IL Bar No. 6286037)
Jonathan G. Cooper (D.C. Bar No. 999764)
777 Sixth Street NW, 11th Floor
Washington, DC 20001
(202) 538-8000

HOGAN LOVELLS US LLP

*/s/ Peter S. Spivack*
Peter S. Spivack (D.C. Bar No. 453731)
J. Evans Rice III (D.C. Bar No. 481768)
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-5600

*Attorneys for Plaintiffs*
*FBME Bank Ltd. and FBME Ltd.*