**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**FBME BANK LTD., <u>et al.</u>,**

        Plaintiffs,

        v.

**STEVEN MNUCHIN,[1] in his official capacity as Secretary of the Treasury, <u>et al.</u>,**

        Defendants.

Case No. 15-cv-01270 (CRC)

---

<u>**MEMORANDUM OPINION**</u>

Sometimes, the third time really is the charm.  The Financial Crime Enforcement Network ("FinCEN") first imposed the PATRIOT ACT's "fifth special measure" against Plaintiff FBME Bank Ltd. ("FBME" or the "Bank") via rulemaking in July 2015.  After this Court preliminarily enjoined the rule, FinCEN sought a voluntary remand to correct certain deficiencies identified by the Court, and for a second time promulgated a rule imposing the measure against the Bank.  Most of the prior inadequacies were addressed, but in September 2016, the Court returned the matter once again to the agency, noting that it had failed to respond to several significant comments FBME had submitted during the second rulemaking process.  On remand, FinCEN supplemented its rule with responses to those comments, and now renews its motion for summary judgment.  Finding that FinCEN has met its obligation to respond "in a reasoned manner" to FBME's comments, <u>Reytblatt v. Nuclear Regulatory Comm'n</u>, 105 F.3d 715, 722 (D.C. Cir. 1997), the Court will grant the agency's motion.

---

[1] By operation of Fed. R. Civ. P. 25(d), the current Secretary of the Treasury, as former Secretary Lew's successor, has been "automatically substituted as a party."

## I.  Background

A.  Previous Proceedings and Summary Judgment Opinion[2]

In July 2015, FinCEN, a component of the U.S. Department of the Treasury, promulgated a Final Rule imposing the "fifth special measure" against FBME under Section 311 of the USA PATRIOT Act of 2001.[3]  The Rule, aimed at blocking FBME from doing business in the United States or using U.S. dollars, prohibited domestic financial institutions from opening or maintaining correspondent bank accounts on behalf of FBME.  In August 2015, in light of apparent procedural deficiencies in the Rule's promulgation and the likelihood of irreparable harm to FBME, the Court granted the Bank's motion to preliminarily enjoin the Rule.  FBME Bank Ltd. v. Lew ("FBME I"), 125 F. Supp. 3d 109, 114 (D.D.C. 2015).  Soon thereafter, the Court permitted FinCEN to voluntarily remand the proceedings in order to conduct a new rulemaking and correct deficiencies.  FBME Bank Ltd. v. Lew ("FBME II"), 142 F. Supp. 3d 70, 72 (D.D.C. 2015).  After reopening the Rule to solicit comments, FinCEN published a new Rule ("Second Final Rule") in March 2016, reiterating its finding that FBME was an institution of primary money laundering concern and again imposing the fifth special measure.  81 Fed. Reg. 18480 (Mar. 31, 2016).

The parties subsequently filed cross-motions for summary judgment as to the Second Final Rule's compliance with the Administrative Procedure Act ("APA") and constitutional due process.  In September 2016, the Court granted in part and denied in part FinCEN's motion for

---

[2] The history of this litigation has been recounted more extensively elsewhere.  See FBME Bank Ltd. v. Lew ("FBME I"), 125 F. Supp. 3d 109 (D.D.C. 2015); FBME Bank Ltd. v. Lew ("FBME II"), 142 F. Supp. 3d 70 (D.D.C. 2015); FBME Bank Ltd. v. Lew ("FBME III"), No. 15-cv-1270, 2016 WL 5108018 (D.D.C. Sept. 20, 2016).  A brief synopsis is included here.

[3] Throughout this Opinion, the Court will collectively refer to Defendants as "FinCEN," and to Plaintiffs as "FBME."

summary judgment.  <u>FBME Bank Ltd. v. Lew</u> ("<u>FBME III</u>"), 2016 WL 5108018 (D.D.C. Sept. 20, 2016).  The Court found that FinCEN's rulemaking process had been lacking in some respects, but that those errors were ultimately harmless.  <u>Id.</u> at *5–*15.  The Court also rejected FBME's constitutional due process arguments, <u>id.</u> at *15–*20, and most of its arguments that the Second Final Rule was substantively arbitrary and capricious, <u>id.</u> at *20–*29.

The Court did, however, "conclude[] that FinCEN [had] failed adequately to respond to certain significant comments made by FBME concerning the agency's reliance on data drawn from Suspicious Activity Reports ("SARs") submitted by other financial institutions concerning transactions with the Bank."  <u>Id.</u> at *5.[4]  In particular, FBME had raised the following concerns regarding SARs data, none of which FinCEN had adequately responded to: (1) that SARs included so much legitimate activity (along with illicit transactions) that they were unreliable; (2) that the number of suspicious transactions was actually quite low as a proportion of FBME's overall transactions; (3) that FinCEN had failed to consider alternative explanations for the increase in SARs involving FBME, including the Cypriot financial crisis; and (4) that FinCEN provided no benchmark or baseline for measuring abnormal or acceptable SARs rates.  <u>Id.</u> at *20.  The Court considered these comments "significant," because "resolving them in the Bank's favor would likely have 'require[d] a change in [FinCEN's] proposed rule.'"  <u>Id.</u> at 23 (quoting <u>City of Portland, Oregon v. EPA</u>, 507 F.3d 706, 715 (D.C. Cir. 2007)).  Accordingly, while the Court declined to vacate the Rule, it remanded the matter to FinCEN so that it could adequately respond to the relevant comments.  In the meantime, the Court continued to stay the implementation of the Rule.

---

[4] SARs are reports by banks and other financial institutions disclosing transactions that the institution knows or suspects to involve possible illegal activity.

B.  Remand, Supplement and Renewed Summary Judgment Motions

On remand, FinCEN authored a supplement to the Second Final Rule, which was published on December 1, 2016.  See Supplemental Information Regarding the Final Rule Imposing the Fifth Special Measure Against FBME Bank, Ltd., 81 Fed. Reg. 86577 (Dec. 1, 2016) ("Supplement").  In the Supplement, FinCEN acknowledged this Court's conclusion that "[it] had not responded meaningfully to FBME's comments regarding the agency's treatment of aggregate SAR data."  Id. at 86577.  The agency went on to identify the four significant comments enumerated above, and to offer substantive responses to each one.  Id. at 86577–79. First, the agency responded to FBME's concern that SARs were unreliable because they included too much legitimate activity by explaining that the data was primarily valuable to show the Bank's high volume of shell-company transactions (itself an indicator of money-laundering activity).  Id.  Second, regarding FBME's concern about FinCEN's focus on absolute versus proportional numbers of SARs transactions, the agency conceded that its focus was "the substantial volume of all suspicious activity at the bank," and explained that "extensive legitimate activities" alone could not save an institution from the imposition of special measures. Id. at 86578.  Third, even if SARs data had been inflated by the Cypriot financial crisis (as FBME posited), that effect would have accounted for only a small portion of the "hundreds of millions of dollars" of suspected shell company activities identified between 2006 and 2014.  Id. Fourth, FinCEN rejected FBME's call for a benchmark or some other means of comparing the Bank's SARs data to other banks:  The agency pointed out other facts that distinguished FBME, and worried that setting a benchmark might "simply set a target for banks or customers wishing to evade money laundering controls."  Id. at 86578–79.

In light of the Supplement, FinCEN renews its motion for summary judgment, arguing

that it has now complied with its obligation to respond adequately to all significant comments.

FBME disagrees:  It cross-moves for summary judgment, and contends that FinCEN's

supplemental responses indicate an "inability or refusal to engage in reasoned decision-making."

Pls.' Mem. Supp. Cross-Mot. Summ. J. ("Pls.' Cross-MSJ") 1.  In the alternative, FBME

requests that the Court stay the Second Final Rule pending appeal.

   C.   FBME's Motion for Reconsideration

   Meanwhile, as the parties completed summary judgment briefing, FBME moved the

Court to reconsider certain aspects of its September 2016 Opinion and Order, under Federal Rule

of Civil Procedure 54(b).  FBME alleges that FinCEN excluded from the administrative record a

report that the agency "secretly received and considered . . . in February 2015."  Pls.' Mem.

Supp. Mot. for Reconsideration ("Pls.' Mot. Reconsider") 1.  The Central Bank of Cyprus

("CBC") prepared this "February Report" to summarize the findings of an FBME audit it

conducted with PricewaterhouseCoopers ("PwC") in the summer of 2014.  FBME points to a

series of emails it recently uncovered, between the CBC and Richard May—then the Director of

FinCEN's Office of Special Measures—revealing that May received a confidential copy of the

February Report via email on February 13, 2015, and that between August 2015 and March

2016, May sought permission from the CBC to disclose the Report, either to U.S. courts or

generally.  See Pls.' Mot. Reconsider, Declaration of George Z. Georgiou ("Georgiou Decl.")

¶¶ 15–20.[5]

_____

   [5] The evidence was uncovered in the course of litigation involving FBME in Cyprus, and
is described in a declaration submitted by FBME's Cypriot lawyer, George Z. Georgiou.
Georgiou Decl. ¶¶ 1, 4.  He and four other FBME lawyers "examined four boxes provided by
CBC" and were "permitted . . . to take detailed and/or verbatim notes," but not "to photocopy,
photograph, or otherwise copy the documents."  Id. at ¶ 14.  Mr. Georgiou attests to the timing

In FBME's view, this evidence indicates that FinCEN "willfully circumvented obligations to compile the Administrative Record" and "cast[s] grave doubt" on the declarations of Richard May—who had, among other things, attested to the record's completeness.  Pls.' Mot. Reconsider 3.  FBME asks the Court to: (1) retract its prior determination that FinCEN had afforded FBME sufficient due process by adequately disclosing unclassified, unprotected material and giving the Bank an opportunity to respond, see FBME III, 2016 WL 5108018, at *18; (2) grant FBME's request for a privilege log to describe the basis for any withheld documents, which the Court had previously denied, see id., at *8; and (3) order the deposition of Richard May, which the Court had earlier declined to do, see id., at *15 n.5.  See Pls.' Mot. Reconsider 20–24.

FinCEN responds that none of the evidence FBME has presented establishes that "the February Report was considered by the agency and improperly excluded from the record." Defs.' Mem. Opp'n Pls.' Mot. Reconsider ("Defs.' Opp'n") 7–8.  The facts FBME has put forth, the agency points out, do not foreclose the conclusions either that (1) FinCEN never "considered [the February Report] as part of the rulemaking or submitted it to the decisionmaker," or that (2) "FinCEN did consider it but treated the communication as classified, considering the request of a foreign government."  Id. at 8.  Regarding the latter possibility, although FinCEN cannot "comment publicly on the specific substantive content of the classified or otherwise protected portions of the administrative record," including whether or not that classified portion of the

_____

and content of the relevant email messages, and also attaches as an exhibit to his declaration what he describes as "to the best of my knowledge and belief a very similar, if not identical copy" of the February Report, obtained from FBME's shareholders.  Id. at ¶ 15.  As FinCEN points out, see Defs.' Mem. Opp'n Pls.' Mot. Reconsider ("Defs.' Opp'n") 4 n.2, there are obvious authentication issues with the exhibit, but those are unnecessary to resolve for the purposes of FBME's motion.

record includes the February Report, the agency submitted separately, *ex parte* and *in camera*, "a classified declaration to identify for the Court whether any of [the] information described by [FBME] appears in the administrative record." Id. at 9.  The Court has reviewed that classified lodging in resolving FBME's motion.

## II.  Legal Standards

A.  Summary Judgment Motions

When an agency action is challenged under the APA, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the [relevant] APA standard of review." Coe v. McHugh, 968 F. Supp. 2d 237, 240 (D.D.C. 2013); see also Sec. Indus. & Fin. Markets Ass'n v. United States Commodity Futures Trading Comm'n, 67 F. Supp. 3d 373, 399 (D.D.C. 2014) ("[T]he general standard for summary judgment set forth in Rule 56 of the Federal Rules of Civil Procedure does not apply to a review of agency actions.").  As relevant here, the APA directs a reviewing court to "hold unlawful and set aside [any] agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

"The requirement that agency action not be arbitrary or capricious includes a requirement that the agency . . . respond to 'relevant' and 'significant' public comments." City of Portland, Oregon v. EPA, 507 F.3d 706, 713 (D.C. Cir. 2007) (quoting Pub. Citizen, Inc. v. FAA, 988 F.2d 186, 197 (D.C. Cir. 1993)).  There is no requirement, however, that an agency respond to significant comments in a manner that satisfies the commenter.  Instead, to respond adequately, the agency must only address significant comments "in a reasoned manner," Reytblatt v. Nuclear Regulatory Comm'n, 105 F.3d 715, 722 (D.C. Cir. 1997), that allows a court "to see what major

issues of policy were ventilated . . . and why the agency reacted to them as it did," Pub. Citizen, Inc. v. FAA, 988 F.2d 186, 197 (D.C. Cir. 1993).  In other words, the agency's responses must show that its "decision was . . . based on a consideration of the relevant factors."  Thompson v. Clark, 741 F.2d 401, 409 (D.C. Cir. 1984).[6]

   B.  Motion for Reconsideration

   Federal Rule of Civil Procedure 54(b) provides that an interlocutory order "may be revised at any time before the entry of a [final] judgment."  Although the Rule does not specify a standard of review, motions for reconsideration of interlocutory orders should be granted only "as justice requires."  United States ex rel. Landis v. Tailwind Sports Corp., 160 F. Supp. 3d 253, 267 (D.D.C. 2016) (quoting United States v. Slough, 61 F. Supp. 3d 103, 107 (D.D.C. 2014)).  More specifically, a court may reconsider an interlocutory order "when the movant demonstrates: (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order."  BEG Investments, LLC v. Alberti, 85 F. Supp. 3d 54, 58 (D.D.C. 2015) (quoting Stewart v. Panetta, 826 F. Supp. 2d 176, 177 (D.D.C.

_____

   [6] FBME argues that a higher level of scrutiny necessarily applies in reviewing an agency action that reaches the same result following remand.  See Pls.' Cross-MSJ 2–3.  But the cases it cites for support are distinguishable.  In Food Marketing Institute v. ICC, 587 F.2d 1285 (D.C. Cir. 1978), the court had remanded a decision after identifying a material error in the agency's reasoning, in particular an "inference [that] was not supported by the evidence."  Id. at 1288.  Plus, the agency's decision following remand "reaffirmed a decision that itself departed drastically from" prior agency policy.  Id. at 1290.  Those circumstances signified irregularity, and understandably heightened the court's skepticism of the agency's post-remand actions.  Here, by contrast, the Court remanded not for the correction of an analytical error but for the augmentation of FinCEN's reasoning, and in remanding without vacatur, the Court was "convinced" of a "substantial probability that FinCEN could respond adequately to FBME's comments" and thereby justify implementation of the Rule.  FBME III, 2016 WL 5108018, at *30.  It is not suspicious that FinCEN has now claimed to have done just that.  Accordingly, Food Marketing Institute and Natural Resources Defense Council, Inc. v. SEC, 606 F.2d 1031 (D.C. Cir. 1979)—which cites the former case in passing and in a broad-brush footnote, id. at 1049 n.23—are inapposite.

2011)).  "The burden is on the moving party to show that reconsideration is appropriate and that harm or injustice would result if reconsideration were denied."  U.S. ex rel. Westrick v. Second Chance Body Armor, Inc., 893 F. Supp. 2d 258, 268 (D.D.C. 2012).

**III.  Analysis**

A.  Summary Judgment Motions

As discussed above, FinCEN has renewed its motion for summary judgment, arguing that the Supplement—which identifies and responds to each of the comments outlined in the Court's September Opinion—brings the Rule squarely within the APA's requirements.  Unsurprisingly, FBME does not agree:  The Bank argues that FinCEN, even accounting for the Supplement, has failed to respond adequately to *any* of its comments regarding the agency's use of SARs data. The Court will therefore consider the adequacy of each of FinCEN's responses, asking whether the agency reasonably discussed the "major issues of policy that were ventilated" and "why the agency reacted to them as it did."  Pub. Citizen, 988 F.2d at 197.

*1.  SARs' Inclusion of Too Much Legitimate Activity*

FinCEN responded to FBME's concern that SARs were "overinclusive"—capturing too much legitimate activity to reliably indicate illicit activity—in two main ways.  The agency noted, first, that the SARs data was primarily valuable as "qualitative evidence" of suspicious activity, in that "many of the SARs relating to FBME describe typical indicators of shell company activity"—including such activity "with no apparent business purpose."  Supplement at 86577–78.  Second, FinCEN challenged the premise of the concern:  It asserted that SARs "more likely . . . understate the size and frequency of shell company and other suspicious activity conducted by FBME," particularly in light of evidence that FBME had evaded anti-money laundering ("AML") regulations.  Id. at 86578.

In response to FinCEN's claim that it used SARs primarily as "qualitative" indicators of shell company activity, FBME argues that *this* practice was overinclusive, too, since "shell-company activity is not inherently indicative of money laundering." Defs.' Cross-MSJ 12. But FinCEN did not just count shell-company transactions: The agency notes in its Supplement that it was "particularly concerned . . . by the lack of transparency associated with" shell company transactions, and by many of the shell companies' lack of "apparent business purpose." Supplement at 86577–78; see also Second Final Rule, at 18487 (noting the agency's consideration of, *inter alia*, "the lack of transparency with respect to beneficial ownership or legitimate business purposes of many of FBME's shell company customers" and "the high volume of U.S. dollar transactions conducted by these shell companies with no apparent business purpose"). In other words, the problem was not just the high number of shell companies, but their apparent nature, purpose, and use.

FBME also faults FinCEN for "relying on untold numbers of SARs that have nothing to do with shell-company activity." Defs.' Cross-MSJ 12. FinCEN not only downplayed its reliance on such quantitative data, however, it also also explained that those overall numbers— which reflect not only shell-company transactions but "other suspicious activity," Supplement, at 86578—likely understate suspicious activity due to FBME's weak AML controls. The Bank does not seriously challenge that contention, except by calling it "speculation." Defs.' Reply Supp. Cross-Mot. Summ. J. ("Defs.' Reply") 7 n.1. But FinCEN's findings that FBME had evaded AML controls *were* based on investigative evidence. See Second Final Rule at 18482–83. Accordingly, its statement that SARs data likely understates illicit activity due to weak AML controls is not speculative, but a logical inference based on a factual finding. The Court

therefore concludes that FinCEN adequately responded to FBME's concern about SARs'
overinclusiveness.

### 2.   Use of Absolute Rather than Proportional SARs Data

In response to FBME's concern about FinCEN's focus on the absolute rather than
proportional volume of its suspicious activity, the agency conceded that—at least when it came
to SARs numbers—its focus *was* on absolute data.  In the Supplement, FinCEN explains that the
absolute volume of suspicious activity is a more valuable metric because it indicates whether a
bank "poses a significant threat to the U.S. and international financial systems" by "allowing
large amounts of funding to pass to terrorist or criminal activity."  Supplement at 86578.  On the
other hand, a focus on proportional SARs data "would essentially permit significant volumes of
money to pass through large banks."  Id.  Thus, FinCEN "may identify a bank as a financial
institution of primary money laundering concern . . . even if [the institution] has extensive
legitimate activities."  Id.

FBME counters that FinCEN's reliance on absolute numbers is an approach at odds with
the statutory factors the agency is bound to consider when deeming an institution one of primary
money-laundering concern.  See 31 U.S.C. § 5318A(c)(2)(B)(i) (requiring a consideration of "the
extent to which [a] financial institution[] . . . [is] used to facilitate or promote money
laundering"); id. at § 5318A(c)(2)(B)(ii) (requiring a consideration of "the extent to which [an]
institution[] . . . [is] used for legitimate business").  More specifically, FBME contends that the
phrase "extent to which" necessarily requires a proportional analysis.  Pls.' Cross-MSJ 8.  And it
asserts that FinCEN's conceded focus on absolute numbers of suspicious transactions means it
did *not* consider the extent of FBME's legitimate business.

These arguments fail for several reasons.  First, they are beyond the scope of the Court's review on this motion, which is limited to considering whether FinCEN adequately responded to FBME's comments regarding SARs data—not evaluating whether the agency properly applied the statutory factors.  The Court has twice before considered and rejected such arguments.  See FBME I, 125 F. Supp. 3d at 125; FBME III, 2016 WL 5108018, at *24–*26.  Second, there is no reason to construe the word "extent" to require proportional data, as FBME would prefer.  FinCEN's understanding of that term—that the "overall amount" of activity can also indicate the "extent" of such activity, Supplement at 86578—is reasonable.  Third, even if consideration of some proportional data were an analytical requirement, it would apply to FinCEN's consideration of the *statutory factors*, not SARs data.  And in evaluating that broader, former category, FinCEN considered a variety of information, including some proportional data.  For instance, in considering the "extent" of FBME's "legitimate business," 31 U.S.C. § 5318A(c)(2)(B)(ii), FinCEN noted that between 12 and 27 percent of FBME's customers were high-risk, including a high volume of shell company customers and politically exposed persons ("PEPs").  See FBME III, 2016 WL 5108018, at *25.[7]

For all of these reasons, FBME's arguments are unavailing, and the Court finds that FBME has adequately responded to FinCEN's concerns about the use of absolute versus proportional SARs data.

### 3.   Cypriot Financial Crisis as an Alternative Explanation for High SARs Rates

FinCEN offered several responses to FBME's concerns that the Cypriot financial crisis had artificially inflated the Bank's SARs numbers, and some of those responses were more lucid

---

[7] FBME correctly surmises that, in its prior Opinion, the Court considered FinCEN to have "correspondingly analyzed" the extent of the Bank's legitimate activity by considering the proportion of its *il*legitimate activity.  Pls.' Cross-MSJ 9.

than others.  It is unclear, for instance, whether FinCEN's statement that it "finds no reason to assume that any renewed focus on Cypriot financial controls would decrease rather than increase the credibility of SAR filings as to FBME" has *any* substantive content.  Id.  And FinCEN's vague remark that "SARs typically deal with suspicious activity by individuals and entities conducting transactions, not systemic issues involving debt defaults and liquidity challenges by financial institutions" misses the point.  FBME's whole concern was that "systemic issues" related to the crisis (*e.g.*, regulatory controls that limited withdrawal rates) may have *affected* rates of apparently "suspicious activity by individuals and entities" (*e.g.*, legitimate withdrawals that looked like structuring), thereby artificially inflating SARs numbers.  See A.R. 3342–43.  FBME fairly criticizes the above responses.

However, FinCEN's main point in response is straightforward.  The agency explained that its conclusions did not materially "rely" on any increase in "the number of SAR filings involving FBME . . . during the Cypriot financial crisis as compared to past periods in the analysis."  Id.  That follows because the agency considered "shell company activities accounting for hundreds of millions of dollars between 2006 [and] 2014," a stretch of time "not limited to the period of the Cypriot financial crisis."  Id.  In support, FinCEN cites its analysis in the 2014 Notice of Finding ("NOF"), 79 Fed. Reg. 42639, where in a section devoted to summarizing evidence of the Bank's weak AML controls and obscured transactions, the agency cited figures spanning the 2006–2014 period.  The agency noted: (1) that "[w]ire transfers related to suspected shell company activities accounted for hundreds of millions of dollars of FBME's financial activity between 2006 and 2014"; (2) that "FBME was involved in at least 4,500 suspicious wire transfers through U.S. correspondent accounts that totaled at least $875 million between November 2006 and March 2013"; (3) and that "[f]rom July 2007 to February 2013, at least 71

entities used FBME's Cyprus address to conduct transactions through the U.S. financial system," an unusual practice aimed at obscuring the customer's address and suggesting illicit activities. Id. at 42640.

In the same discussion, FinCEN did cite one piece of information that would have been particularly affected by the Cypriot financial crisis:  "In just the year from April 2013 through April 2014," the agency noted, "FBME conducted at least $387 million in wire transfers through the U.S. financial system that exhibited indicators of high-risk money laundering typologies." Id.  FBME makes much of this statement, emphasizing that it was "the only such one-year band spotlighted by FinCEN, and any reader would understand it to be especially telling."  Defs.' Cross-SMJ 11.  The Bank also notes that the $387 million amount is "almost half" of the total volume of suspicious wire transfers detected during the 2006–2013 period, "which indicates how impactful the Cypriot crisis was."  Id.

All in all, the Court agrees with FBME that the $387 million figure cited by FinCEN in the NOF was a significant detail—but it was a detail, nonetheless.  In light of the Supplement, it is now clear that FinCEN's conclusions did not turn on the 2013–14 period of concern to FBME. Rather, FinCEN's various determinations about FBME's weak AML controls and murky transactions were based on the agency's analysis of an eight-year period that began well before the Cypriot crisis.  Most of the data predates the period FBME complains is inflated.  See NOF at 42640 ("FBME was involved in at least 4,500 suspicious wire transfers through U.S. correspondent accounts that totaled at least $875 million between November 2006 and March 2013").  Perhaps more to the point, total SARs numbers, as FinCEN has since made clear, were not even central to its analysis.  Rather, the agency focused on the *nature* of the SARs—the shell company transactions, the lack of transparency, and other signals of money laundering.  See

Supplement at 86577 (explaining that SARs were used as "qualitative evidence" of FBME's activity). More important still was affirmative evidence that FBME had facilitated transnational, criminal transactions. Id. (explaining that "the agency's analysis of SARs simply affirmed FinCEN's concern surrounding FBME's involvement in money laundering"). FBME has made no argument that the Cypriot financial crisis tainted any of *that* information.

In short, the agency has adequately explained that, even assuming inflated SARs figures at the end of the 2006–14 period, its conclusion would not have changed—and therefore, was "based on a consideration of the relevant factors." Thompson, 741 F.2d at 409.

### 4. *No SARs Benchmark or Point of Comparison*

FinCEN responded to FBME's concern about the lack of a SARs benchmark or point of comparison in two main ways. First, it reiterated some of its points regarding the agency's focus on absolute SARs data, and on the potential that SARs rates actually underestimate FBME's illicit activity because of the Bank's weak AML controls. Supplement at 86578–79. Second, FinCEN noted its concern that "setting a benchmark as FBME suggests could simply set a target for banks or customers wishing to evade money laundering controls." Id. at 86579.

FBME critiques these responses, first, by recycling prior arguments about the importance of comparative data. See Pls.' Cross-MSJ 3–4 (arguing that "a number can be large or substantial only in relation to another number" and citing FBME's briefing in support of its first cross-motion for summary judgment). These assertions that FinCEN *must* compare FBME's SARs data to other banks, or to a benchmark, turn on policy judgments that neither FBME nor this Court is authorized to render. See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("[A] court is not to substitute its judgment for that of the agency."). That is why the Court did not *require* FinCEN to draw comparisons or identify

typical SARs rates on remand.  Instead, the Court faulted the agency for neither providing

comparative benchmarks, *nor* "attempt[ing] to explain why such benchmarks may be

unnecessary, or infeasible to provide, or how else the agency may have applied its expertise and

regulatory experience in the absence of specific benchmarks." FBME III, 2016 WL 5108018, at

*21.  FinCEN's response does the latter:  It explains why benchmarks are both "unnecessary"

and "infeasible to provide."

FBME again encroaches on the province of the agency by doubting FinCEN's judgment

that a benchmark could operate as "a target for banks or customers wishing to evade money

laundering controls."  Supplement at 86579.  In FBME's view, that "reasoning is perverse,"

since "announcing a baseline [would have] the effect of reducing suspicious transactions below

that level."  Pls.' Cross-MSJ 7.  But FinCEN's point is that it could have the opposite effect as

well; it is plausible that banks would relax their AML controls with the knowledge that they were

well under a benchmark SARs rate (thereby increasing their SARs rate).  In any event, the merits

of FBME's own views regarding the relative costs and benefits of publishing a benchmark are

not of concern here.  By explaining why in its judgment a public SARs benchmark is not

necessary or desirable, FinCEN has discharged its duty to communicate "what major issues of

policy were ventilated . . . and why the agency reacted to them as it did." Pub. Citizen, 988 F.2d

at 197.[8]

For the above reasons, in light of the Supplement, the Court finds that FinCEN has now

adequately responded to FBME's significant comments in promulgating the Second Final Rule.

---

[8] FBME's third line of argument on the benchmark issue is premised on the notion that FinCEN "virtually concede[d] that FBME's SARs rate is comparatively low." Pls.' Cross-MSJ 6.  The agency made no such concession.  Instead, it merely pointed out that FBME's weak AML controls undermined the validity of any attempts to engage in an apples-to-apples comparison of SARs data.  See Supplement at 86578–79.

B. <u>FBME's Motion for Reconsideration</u>

As discussed above, FBME has separately moved the Court to reconsider three aspects of its previous summary judgment Opinion: (1) its determination that FinCEN had adequately disclosed unclassified, unprotected material, <u>see</u> <u>FBME III</u>, 2016 WL 5108018, at *18; (2) its denial of FBME's request for a privilege log, <u>see</u> <u>id.</u>, at *8; and (3) its decision *not* to order the deposition of Richard May, the FinCEN official who certified the administrative record, <u>see</u> <u>id.</u>, at *15 n.5.  <u>See</u> Pls.' Mot. Reconsider 20–24.  All three conclusions were, at bottom, determinations that FinCEN had satisfactorily compiled the administrative record.

"[A]bsent clear evidence to the contrary, an agency is entitled to a strong presumption of regularity, [i.e.,] that it properly designated the administrative record." <u>Comm. of 100 on the Fed. City v. Foxx</u>, 140 F. Supp. 3d 54, 59 (D.D.C. 2015) (quoting <u>Pac. Shores Subdivision v. U.S. Army Corps of Eng'rs</u>, 448 F. Supp. 2d 1, 5 (D.D.C. 2006)) (second alteration in original). That presumption sets a high bar for an APA plaintiff seeking to go beyond the administrative record—as FBME sought to do before and does here again.  In particular, in an APA case, whether seeking to supplement the record, obtain a privilege log, or engage in extra-record discovery, a plaintiff must generally make "a strong showing of bad faith or improper behavior" on the part of the agency.  <u>Theodore Roosevelt Conservation P'ship v. Salazar</u>, 616 F.3d 497, 514 (D.C. Cir. 2010); <u>see also</u> <u>Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.</u>, 663 F.3d 476, 487 (D.C. Cir. 2011) (extra-record discovery appropriate only where "a party makes a significant showing . . . that it will find material in the agency's possession indicative of bad faith or an incomplete record"); <u>Stand Up for California! v. United States Dep't of Interior</u>, 71 F. Supp. 3d 109, 123 (D.D.C. 2014) ("[T]o obtain a log of privileged and deliberative materials

excluded from the administrative record, plaintiffs must overcome, with clear evidence, the presumption of regularity in the agency proceedings by showing bad faith or other exceptional circumstances.").

FBME's motion to reconsider cites no evidence demonstrating either "bad faith" or "improper behavior" on the part of the agency.  As FBME notes in its briefing, see Pls.' Mot. Reconsider 2, 10–11, 17, the agency has repeatedly assured the Court that the administrative record includes all materials considered in promulgating the Second Final Rule, and that the documents in the *ex parte* portion of the record are either classified or protected by the Bank Secrecy Act.  Most recently, in response to FBME's motion, FinCEN has submitted yet another declaration from Richard May, who reaffirms that the record certified in April 2016 included "everything [the agency] considered for purposes of [the] rulemaking."  Defs.' Opp'n, Declaration of Richard May ("May Decl.") ¶ 2.  May further attests that all classified documents in the record were reviewed for possible declassification, and that documents ultimately "deemed classified were included in the classified and statutorily protected portions of the record lodged with the court."  Id. at ¶ 3.[9]

Neither the so-called February Report nor the series of emails between FinCEN and the CBC regarding the potential public release of that document contradicts those statements—let alone suggests that they are were the product of bad faith.  Rather, as FinCEN notes in its briefing, the facts that FinCEN possessed the February Report in 2015 and later sought permission to publicly disclose it are "consistent with conclusions that either: (1) FinCEN never

---

[9] Although FinCEN may not comment publicly on the substantive content of the *ex parte* administrative record, May has submitted "an *ex parte* declaration to describe whether or not any of the information referenced in the Georgiou Declaration appears in the classified portions of the administrative record."  May Decl. at ¶ 4.  The Court has reviewed that declaration.

ultimately considered it as part of the rulemaking or submitted it to the decisionmaker; or (2)

FinCEN did consider it but treated the communication as classified, considering the request of a

foreign government." Defs.' Opp'n 8.

While the Court agrees with FBME that the first possibility is unlikely, see Pls.' Reply

Supp. Mot. Reconsider 4–5, the second is not. Executive Order 13,526 governs the classification

of national security information, and provides that an original classifying authority may classify

"foreign government information" (§ 1.4(b)) when "the unauthorized disclosure of the

information reasonably could be expected to result in damage to the national security" (§ 1.1(a)).

75 Fed. Reg. 707 (Dec. 9, 2009). "Foreign government information" includes "information

provided to the United States Government by a foreign government . . . or any element thereof,

with the expectation that the information, the source of the information, or both, are to be held in

confidence" (§ 6.1(s)). See also Unrow Human Rights Impact Litig. Clinic v. U.S. Dep't of

State, 134 F. Supp. 3d 263, 273 (D.D.C. 2015) (classification of "foreign government

information" valid under Executive Order 13,526). In other words, assuming the truth of

FBME's allegations, the February Report—provided by an "element" of a foreign government

"with the expectation" of confidentiality—would satisfy the criteria for classifiable "foreign

government information." FBME argues that the February Report does not implicate national

security, but the Bank fails to acknowledge that, under Executive Order 13,526, the

"unauthorized disclosure of foreign government information" is "*presumed* to cause damage to

the national security" (§ 1.1(d)) (emphasis added). In any event, FBME's views regarding

potential national security implications (and its other policy concerns regarding the classification

of foreign-government correspondence, see Pls.' Reply Supp. Mot. Reconsider 8), are entitled to

no weight. FinCEN's evaluations of national security risk, by contrast, fall within a "uniquely

executive purview" and receive considerable deference.  Larson v. Dep't of State, 565 F.3d 857,

865 (D.C. Cir. 2009) (quoting Ctr. for Nat. Sec. Studies v. DOJ, 331 F.3d 918, 926 (D.C. Cir.

2003)).

FBME also attempts to infer bad faith on FinCEN's part in a September 17, 2015

statement, sent via email from the agency's litigation counsel to FBME, that "to the best of our

knowledge FinCEN does not have" the "Pricewaterhouse Cooper audits you asked us about."

A.R. 3922.  FBME argues that the February Report is clearly a "Pricewaterhouse Cooper

audit[]," and that—since FinCEN was in possession of the February Report in September 2015—

the statement was a deliberate attempt at concealment and obfuscation.  See Pls.' Mot.

Reconsider 15–16.  In his declaration, Mr. May notes that he recalls the exchange, and explains

that he "understood FBME counsel's inquiry regarding 'the Pricewaterhouse Cooper audits' to

refer to reports authored by PwC and not the [CBC]."  May Decl. ¶ 5.  The Court finds that

explanation quite plausible, particularly since, as FinCEN notes, the February Report "is plainly

a CBC audit, not a PwC audit," mentioning PwC "exactly twice as having participated in the

onsite examination."  Defs.' Opp'n 12.  Under the circumstances, the incident was most likely a

simple misunderstanding between counsel.

In short, because none of the evidence FBME has adduced now or previously suggests

either "bad faith or improper behavior" on FinCEN's part, Theodore Roosevelt Conservation,

616 F.3d at 514, the Court again sees no reason to grant FBME extra-record discovery or

otherwise look beyond the administrative record that FinCEN has certified.  FBME has therefore

failed to show "that reconsideration is appropriate," much less "that harm or injustice would result if reconsideration were denied." Second Chance Body Armor, 893 F. Supp. 2d at 268.[10]

### IV. Conclusion

For the foregoing reasons, the Court will grant FinCEN's renewed motion for summary judgment and deny FBME's motion for reconsideration. Furthermore, the Court will lift the stay currently blocking the Second Final Rule's implementation. Four factors apply when resolving a motion to stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela, 185 F. Supp. 3d 233, 249–50 (D.D.C. 2016). In light of the Court's merits analysis, FinCEN's interest in having the Rule take effect, and the public's interest in protecting the U.S. financial system from illicit activity such as money laundering, only the second factor could possibly weigh in favor of FBME at this stage. And the Bank has not demonstrated how implementation of the Rule would cause it irreparable harm under present circumstances. Accordingly, lifting the stay pending appeal is proper.

---

[10] In its opposition, FinCEN invokes "the rule of harmless error," arguing that FBME's motion should fail because it has "not even attempted to show that the [February Report] would change the outcome of summary judgment or the rulemaking." Defs.' Opp'n 14. FBME's motion, however, was limited to seeking reconsideration of the Court's Opinion in three discrete respects. See Pls.' Mot. Reconsider 20–24. The motion is, in essence, one to supplement the record or engage in extra-record discovery, and the Court sees no reason to apply harmless error analysis in that context. Accordingly, the Court need not address whether the February Report, standing alone, has an effect on the Court's broader merits determinations—a subject the parties discussed at the tail end of their respective briefing. See Defs.' Opp'n 14–15; Pls.' Reply Supp. Mot. Reconsider 15–21.

An appropriate Order accompanies this Memorandum Opinion.


CHRISTOPHER R. COOPER
United States District Judge


Date: April 14, 2017